IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL ANTHONY LYNCH, )
)
Plaintiff, )
)
v. )   Civil Action No. 06-365
)
COINMASTER USA, INC., a Delaware )
corporation, and PAUL A. COX, )
)
Defendants. )

## ANSWER OF DEFENDANT
## COINMASTER USA, INC. TO COMPLAINT

1.      Admitted and denied.  Sentences 1-3, 5 and 7 of this paragraph are admitted.  The fourth sentence is denied.  The sixth sentence is denied inasmuch as answering Defendant Coinmaster USA, Inc. ("Coinmaster") lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, therefore, they are denied.

### The Parties

2.      Coinmaster lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, therefore, they are denied.

3.      Admitted.

4.      The allegations in this paragraph are directed to a defendant other than Coinmaster and, therefore, they are neither admitted nor denied.

**Background**

5.      Coinmaster lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and, therefore, they are denied.

6.      The allegations in this paragraph are directed to a defendant other than Coinmaster and, therefore, they are neither admitted nor denied.

7.      Admitted only that Lynch approached Paul A. Cox ("Cox") and requested that he become involved in the Coinmaster activities in the United States, to which Cox agreed, in exchange for a 10% interest in Coinmaster. Cox then became the sole director of Coinmaster. The remaining allegations are denied.

8.      Admitted.

9.      Admitted.

10.     Admitted only that the minutes of the November 8, 2002 Annual Meeting reflect three-year elections. However, those elections were contrary to the by-laws of Coinmaster and, therefore, were invalid.

11.     Denied. Only proposals, not actual service agreements, were reviewed by the Board at the referenced meeting.

12.     Denied.

13.     Denied inasmuch as the referenced service agreement ("Contract") speaks for itself. By way of further answer, the Contract specifically provides only for the payment of expenses.

14.     Denied inasmuch as the referenced Contract speaks for itself.

15.     Denied inasmuch as the referenced Contract speaks for itself.

16.     Admitted.

900200.00001/40163121v.1

17.    Admitted only that CG went into receivership on or about March 1, 2003 and, on information and belief, Lynch resigned from CG and all its subsidiaries and affiliates. After reasonable investigation, Coinmaster lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, therefore, they are denied.

18.    Denied.

19.    Denied. By way of further answer, Mr. Lynch resigned from CG and from all subsidiaries and affiliates of CG, including Coinmaster, on February 28, 2003, a fact Lynch hid from Coinmaster. Further, on this same date Lynch terminated a Service Agreement he had entered into with Coinmaster Gaming, PLC on November 6, 2001, which termination brought to an end Lynch's involvement with CG and all its subsidiaries. See Service Agreement between Coinmaster Gaming, PLC and Tony Lynch, dated November 6, 2001, attached as Exhibit 1.

20.    Denied. By way of further answer, Lynch had repeatedly consented to and had knowledge of, numerous applications filed by Coinmaster with various tribal gaming agencies in California, which applications reflected Lynch's notarized signature which was secured from Lynch by various means necessitated by his unavailability to sign these applications. Lynch was fully aware of these undertakings and consented to them.

21.    Denied. See response to Paragraph 20, supra.

22.    Denied.

23.    Denied.

24.    Denied. By way of further answer, Lynch terminated himself by his resignation on February 28, 2003.

25.    Denied.

26.    Denied.

3

27.    Denied.

## Count I

## (Breach of Contract)

28.    Coinmaster incorporates by reference its responses to Paragraphs 1-27, supra.

29.    Denied.

30.    Denied.

31.    Denied.

## Count II

## (Deceptive Trade Practices)

32.    Coinmaster incorporates by reference its responses to Paragraphs 1-31, supra.

33-36. The allegations in these paragraphs are directed to a defendant other than Coinmaster and, therefore, they are neither admitted nor denied. To the extent they are deemed to relate to Coinmaster, they are denied in their entirety.

## Count III

## (Intentional Interference with Prospective Business Relations)

37.    Coinmaster incorporates by reference its responses to Paragraphs 1-36, supra.

38-40. The allegations in these paragraphs are directed to a defendant other than Coinmaster and, therefore, they are neither admitted nor denied. To the extent they are deemed to relate to Coinmaster, they are denied in their entirety.

## Count IV

## (Fraud)

41.    Coinmaster incorporates by reference its responses to Paragraphs 1-40, supra.

42-45. The allegations in these paragraphs are directed to a defendant other than Coinmaster and, therefore, they are neither admitted nor denied.  To the extent they are deemed to relate to Coinmaster, they are denied in their entirety.

WHEREFORE, Defendant Coinmaster demands judgment in its favor and against Plaintiff on all Plaintiff's claims, together with an award of fees and costs in favor of Coinmaster, and such other relief as the Court may deem just and warranted.


## AFFIRMATIVE DEFENSES

46.    Under the November 6, 2001 Service Agreement between Coinmaster Gaming, PLC and Tony Lynch, Lynch waived his right to seek any claim against Coinmaster under Paragraph 18.2.

47.    Lynch's claims against Coinmaster, if he had any, are barred by the running of the statute of limitations, inasmuch as Lynch resigned all of his positions at CG and Coinmaster on February 28, 2003.

48.    Lynch's claims under the alleged Contract between Lynch and Coinmaster are barred inasmuch as the November 15, 2002 Letter Agreement with Coinmaster, attached as Exhibit A to the Complaint, was void at its inception by the terms of the Service Agreement between Coinmaster Gaming, PLC and Lynch, attached as Exhibit 1.

49.    Plaintiff fails to state a claim on which relief may be granted.

50.    Plaintiff's claims are barred by the doctrines of waiver and estoppel.

5

## COUNTERCLAIM OF COINMASTER AGAINST LYNCH

51.    Coinmaster incorporates by reference the identification of the parties contained in the Complaint.

52.    High View, Inc. was a Delaware corporation organized on or about June 11, 2003, in which Lynch and Paul A. Cox were each 50% shareholders.

53.    The purpose for founding High View, Inc. was to develop a new gaming machine which would be used by Coinmaster to compete for gaming business, particularly in California.

54.    Coinmaster contributed substantial sums of money to High View, Inc. to aid in the development of this new gaming machine.

55.    On information and belief, development proceeded as expected, and a new machine was developed by High View, Inc. which was ready for introduction into the gaming market in the United States and elsewhere in the world.

56.    On information and belief, Lynch absconded with all of the assets necessary for the development and marketing of this machine, depriving High View, Inc. and its owners and beneficiaries of the use of those assets.

57.    Lynch has not paid High View, Inc. for those assets, nor has it entered into any agreement with Cox or Coinmaster for their interests in High View, Inc. or in the assets of the new gaming machine.

## COUNT I

## (Conversion)

58.    Coinmaster incorporates by reference the allegations contained in Paragraphs 51-57, supra.

6

59.    Lynch has converted the assets of High View, Inc., to the detriment of Cox and Coinmaster, by taking those assets for his own use without permission or payment to High View, Cox or Coinmaster.

60.    The conversion of these assets has damaged Coinmaster, inasmuch as the new gaming machine was developed exclusively for the use of Coinmaster and was partially paid for by Coinmaster.

WHEREFORE, Coinmaster asks for judgment in its favor and against Lynch for damages stemming from this conversion, and such other relief as the Court may deem appropriate, together with fees and costs.

BLANK ROME LLP

By: _____
Thomas P. Preston, Esquire
I.D. No. 2548
1201 Market Street, Suite 1500
Wilmington, DE 19801
(302) 425-6400

Counsel for Defendant Coinmaster, USA, Inc.

Dated:  June 28, 2006

7

## CERTIFICATE OF SERVICE

I, Thomas P. Preston, hereby certify that on the 28th day of June, 2006, a copy of the

**ANSWER OF DEFENDANT COINMASTER USA, INC. TO COMPLAINT** was served on

the following counsel of record:

### BY ELECTRONIC SERVICE

James S. Green, Esquire
Kevin A. Guerke, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899

Erin K. Brignola, Esquire
Cooper Levenson April Niedelman &
  Niedelman & Wagenheim, P.A.
30 Fox Hunt Drive
Bear, DE 19701

### BY FIRST-CLASS MAIL

Kevin J. Thornton, Esquire
Cooper Levenson, Attorneys at Law
1125 Atlantic Avenue
Atlantic City, NJ 08401

*/s/ Thomas P. Preston*

———————————————————
     Thomas P. Preston
     I.D. No. 2548

**EXHIBIT 1**

<u>DATED   6 November 2001</u>

(1)   COINMASTER GAMING PLC

- and -

(2)  TONY LYNCH

---

### SERVICE AGREEMENT

---

**FINERS STEPHENS INNOCENT**
179 Great Portland Street
London W1N 6LS

Tel: 020 7323 4000
Fax: 020 7580 7069
DX: 42739 (Oxford Circus North)
Ref:C148/531726.1

<u>SERVICE AGREEMENT</u> dated     6 November 2001

<u>PARTIES</u>:

(1)     <u>COINMASTER GAMING PLC</u> a company registered in England under Number 2253400 whose registered office is at 321 Penarth Road, Cardiff CF11 8TT <u>(the "Company")</u>.

(2)     <u>TONY LYNCH</u> of Tree Tops, Bridge Road, Old St Mellons, Cardiff CF3 6UY <u>(the "Executive")</u>.

<u>IT IS AGREED</u> as follows:-

## 1.     DEFINITIONS AND INTERPRETATION

In this Agreement (which expression shall be deemed to include the Schedule and Appendices hereto):-

1.1     unless the context otherwise requires:

the "Act" means the Employment Rights Act 1996;

"Associated Company" means a company which is from time to time a subsidiary or a holding company of the Company or any other subsidiary of a holding company of the Company;

the "Auditors" means the auditors of the Company from time to time;

the "Board" means directors of the Company present at a meeting of them or of a committee of them duly convened constituted and held;

the "Commencement Date" means the date of commencement of the Executive's employment hereunder as specified in the Schedule;

"exploitation" means, in relation to any Products, the manufacture, production, assembly, sale, leasing, hiring, licensing, servicing, writing, design or development thereof;

"intellectual property rights" means patents, trade marks, service marks, registered designs, applications for any of the foregoing, copyright, design rights, know-how, confidential information, trade and business names and any other similar protected rights in any country (whether alone or jointly with any other person) while in the service of the Company (whether before or after the date of this Agreement and whether at the Company's premises or elsewhere) and which in any way affects or relates to or is capable of being used or adapted for use in connection with the business of the Company;

"Invention" means any invention, discovery, process, formula, idea, solution, improvement, computer program, semiconductor product topography, plan, specification, drawing, design, model, prototype or device of whatever nature and whether patentable or not which is made, written or discovered by the Executive (whether alone or jointly with any other person) while in the service of the

Company (whether before or after the date of this Agreement and whether at the Company's premises or elsewhere) and which in any way affects or relates to or is capable of being used or adapted for use in connection with the business of the Company;

"Patentable Invention" means an Invention which is patentable under the Patents Act 1977;

"Registrable Rights" means patents, registered designs, trade marks, service marks or similar commercial monopoly rights created by registration (whether in the United Kingdom or elsewhere in the world)

"Salary" the salary payable pursuant to Clause 6.1, as reviewed from time to time;

1.2     references to any statutes or statutory provisions include those statutes or statutory provisions as amended, extended, consolidated, re-enacted or replaced from time to time and any orders, regulations, instruments or other subordinate legislation made thereunder;

1.3     save as herein otherwise expressly defined, words or phrases defined in Part XXVI of the Companies Act 1985 bear the same respective meanings;

1.4     unless otherwise specified, words importing the singular include the plural, words importing any gender include every gender and words importing persons include bodies corporate and unincorporate; and (in each case) vice versa;

1.5     references to clauses and other provisions are references to clauses and other provisions of this Agreement;

1.6     the clause headings shall not affect interpretation.

2.     **APPOINTMENT**

2.1     The Company hereby agrees to employ the Executive and the Executive agrees to serve the Company as Chief Executive Officer in such other position of no less responsibility as the Board may require.

2.2     The Executive warrants to the Company that by virtue of entering into this Agreement he will not be in breach of any express or implied terms of any contract with or of any other obligation to any third party binding upon him.

3.     **TERM**

3.1     Subject to earlier termination as hereinafter provided, the Executive's employment pursuant to this Agreement shall commence on the Commencement Date for a fixed period of one year and shall continue thereafter unless and until his employment hereunder shall be terminated by either party giving to the other not less than twelve months' notice in writing to that effect to expire on the last day of the said fixed period or at any time thereafter.

3.2     The Executive's period of continuous employment with the Company shall be deemed to have begun on the date specified in the Schedule.

3.3     The Company shall be under no obligation to vest in or assign to the Executive any powers or duties or to provide any work for the Executive during any period of notice as referred to in clause 3.1 or at any other time, and the Company reserves the right (at its option):-

3.3.1    to pay the Executive in lieu of the whole or any part of such period of notice; and/or

3.3.2    to suspend the Executive from the performance of his duties under this Agreement with full salary and other benefits to which he may be entitled under this Agreement during the whole or any part of such period of notice (the exact period to be fixed at the discretion of the Company) and during that period to exclude him from any premises of the Company; and/or

3.3.3    to require the Executive to resign from any directorship, trusteeship or other office he may hold with the Company or with any pension scheme, employee share scheme or other trust established by the Company and upon being so required the Executive shall be deemed simultaneously to have submitted his resignation and he shall have no claim or right of action against the Company for compensation, damages or otherwise in respect of such resignation, but this provision shall not otherwise prejudice any of his rights in respect of the termination of this Agreement or of his employment.

## 4.    POWERS AND DUTIES

During the continuance of his employment hereunder the Executive shall:

4.1    devote the normal business hours of the Company (as specified in the Schedule) and such other time as is required by the Company to carrying out his duties hereunder and shall not without the prior consent of the Company engage in any activity likely to require him to be absent from work during the normal business hours of the Company or to affect his ability properly to perform his duties hereunder;

4.2    exercise such powers and perform such duties in relation to the business of the Company which are compatible with his job title and as may from time to time be vested in or assigned to him by the Board;

4.3    comply with all reasonable directions from time to time given to him by the Board and with all rules and regulations from time to time laid down by the Company concerning its employees which are consistent with this Agreement;

4.4    carry out his duties in a proper and efficient manner and use his best endeavours to promote and maintain the interests and reputation of the Company; and

4.5    at all times promptly give to the Board (in writing if so requested) all such information and explanations as the Board may require in connection with his employment hereunder or with the business of the Company.

## 5.    PLACE OF WORK

The Executive's place or area of work shall be as specified in the Schedule, but subject thereto the Company shall not without the prior written consent of the Executive require him regularly to work at any place which would necessitate his changing his place of residence.

## 6.    SALARY AND EXPENSES

6.1    As remuneration for his services during his employment hereunder the Company shall pay to the Executive a Salary at the rate of £130,000 per annum, payable by

equal monthly instalments in arrears on the last day of every month to a bank account designated by the Executive.

6.2 As further remuneration for his services, the Executive shall also be entitled to the commission payments (if any) specified in Appendix A.

6.3 Such Salary shall be reviewed in the manner specified in the Schedule.

6.4 All remuneration payable to the Executive under this Agreement shall be deemed to accrue from day to day.

6.5 Notwithstanding anything to the contrary contained in the articles of association of the Company the Executive shall not be entitled to any remuneration or expenses as a director or employee of the Company in addition to those specified in this Agreement.

6.6 In the event of any variation in the remuneration payable to the Executive hereunder being made by agreement between the parties hereto (and whether or not such agreement shall be evidenced by a written endorsement hereto), such variation shall not constitute a new agreement but (subject to any express written agreement to the contrary) the employment of the Executive hereunder shall continue subject in all respects to the terms and conditions of this Agreement with such variation as aforesaid.

6.7 The Company shall be entitled to deduct from any remuneration payable to the Executive any moneys which may at any time be owed by the Executive to the Company.

6.8 The Company shall pay or reimburse to the Executive (subject to production of such vouchers and/or other evidence as it may require) all proper and reasonable expenses wholly, exclusively and necessarily incurred by him in connection within his duties hereunder.

6.9 The Company shall reimburse the Executive for the cost (including VAT) of telephone calls made on his domestic telephone in the performance of his duties hereunder plus the rental charge thereof.

## 7.    MOTOR CAR

7.1 To assist him in the performance of his duties hereunder the Company shall during the continuance of his employment hereunder provide to the Executive a motor vehicle allowance as specified in the Schedule which shall provide solely for the purchase of a vehicle suitable to a person of his status and pay all running expenses of the vehicle properly incurred by the Executive in connection with his duties hereunder and shall bear the cost of insuring, testing, taxing, repairing and maintaining the same, except where damage is incurred as a result of the Executive's negligent use of the vehicle (which damage shall be paid for by the Executive).

7.2 The Executive shall take good care of the vehicle and procure that the provisions and conditions of any policy of insurance relating thereto are observed, shall be subject to any rules, regulations or restrictions imposed on the Company or agreed with the Inland Revenue in relation to any private use of such vehicle, and shall not take or permit to be taken such vehicle out of the United Kingdom without the prior consent in writing of the Company.

7.3     Subject as provided in clause 7.2, the Company shall permit the Executive to use such vehicle for private use.

7.4     The Executive shall ensure at all times that when the vehicle is driven on the road it is in the state and condition required by law and that if so required a current test certificate is in force in respect of it.  The Executive shall also (so far as the law permits) at all times be the holder of a current driving licence entitling him to drive motor cars in the United Kingdom and shall produce it to the Company on request.

7.5     At all times the vehicle shall remain the property of the Company

7.6     Upon the giving of notice of termination of his employment (howsoever arising) hereunder the Executive shall forthwith produce the vehicle and its registration documents and keys to the Company.

8.     **CONFIDENTIALITY**

8.1     The Executive shall not (except as authorised or required by his employment hereunder) during the continuance of his employment hereunder or after the termination thereof disclose to any person whatsoever any information relating to the organisation, business or finances of the Company or any of its customers, agents or suppliers or any of its trade secrets or details of any its dealings, transactions or affairs or any information in respect of which the Company is bound by an obligation of confidence to a third party of which (in each case) he is or may become possessed during his employment hereunder and shall keep with inviolable secrecy all matters entrusted to him and shall not use, nor attempt to use, nor permit others to use, any such information in any manner which may injure or cause loss whether directly or indirectly to the Company.

8.2     Any notes or memoranda made by the Executive during the subsistence of this Agreement or at any time thereafter relating to any matter within the scope of the business of the Company or concerning any of its dealings, transactions or affairs shall be the property of the Company, and the Executive will not either during the subsistence of this Agreement or at any time thereafter use or permit to be used any such notes or memoranda otherwise than for the benefit of the Company and on request at any time during the subsistence of this Agreement or thereafter shall forthwith return such notes and memoranda to the Company.

8.3     The Executive's obligations under clauses 8.1 and 8.2 shall be in addition to and not in substitution for any obligations imposed upon him by law in relation to abuse of confidential information.

8.4     The Executive's obligations shall cease to apply to information which shall come into the public domain other than by a breach of this clause 8 or which for any other reason, other than through the Executive's fault, shall have ceased to be confidential.

9.     **HOLIDAYS AND HOLIDAY PAY**

The Executive shall be entitled (in addition to statutory and bank holidays) to the number of working days' holiday in each holiday year (as defined in the Schedule) specified in the Schedule calculated from the Commencement Date (and which must include one period of not less than 14 consecutive days) to be taken at such time or times as may be convenient to the Company.  To the extent that any holiday entitlement is not taken in any holiday year the same shall lapse.

10.   **PENSION**

The Company shall make a contribution of 7.5% of the annual gross salary (excluding any bonus payments or other additional payments) of the Executive from time to time to such personal pension scheme(s) as the Executive may from time to time specify, such contribution to be paid monthly at the same time as Salary subject to deduction for tax and national contributions at source as necessary.

11.    **NOTIFICATION OF SICKNESS AND MEDICAL EXAMINATIONS**

11.1    In the event of illness, injury or accident preventing the Executive from performing his duties hereunder, he shall notify the Company by way of self-certificate in a form prescribed by the Company of the nature of such illness, injury or accident during the first 7 days thereof and thereafter the Executive shall provide the Company with a doctor's certificate in respect thereof at such intervals as the Company shall prescribe and shall inform the Company of details of any entitlement to statutory sick pay, or any other sickness or injury benefit payable to him by any government department or authority.

11.2    The Company may at its expense require that the Executive submit to such medical examinations and tests with doctors appointed by the Company as the Company may require from time to time.

12.    **INCAPACITY**

12.1    If the Executive shall at any time be incapacitated by illness, injury or accident from performing his duties under this Agreement and shall supply the Company with satisfactory evidence of such incapacity (as more particularly described in clause 11), he shall be entitled to his full salary and commission (if any) for the next consecutive period of 13 weeks of such incapacity in any one period of fifty-two weeks and to half his salary and commission (if any) for the next consecutive period of 13 weeks of such incapacity, in each case less an amount equal to any statutory sick pay or sickness or injury benefit payable to him by the Company or by any governmental department or authority and thereafter entitlement to salary shall be at the discretion of the Company.

12.2    The Executive shall give all assistance reasonably required by the Company to enable it to reclaim any statutory sick pay entitlement paid to the Executive, in default of which the Company shall be entitled to recover from the Executive or to deduct from any subsequent remuneration payable to the Executive any amount which the Company has been unable to reclaim in consequence.

12.3    This clause shall not in any way affect the right of the Company to terminate this Agreement in the event of the Executive being prevented from performing his duties for the periods provided in clause 16.2.

13.    **PROPERTY RIGHTS**

13.1    The whole interest of the Executive in any Invention and in all intellectual property rights relating thereto or obtained or capable of being obtained in respect thereof shall be the absolute property of the Company.   The Executive shall promptly communicate to the Company full particulars of all Inventions and shall keep the same absolutely confidential and shall not disclose the same to any other person without the prior written consent of the Company.  The Executive undertakes that if and whenever required by the Company, he will apply or join with the Company in applying for any Registrable Right for any such Invention and will do all things and execute all documents for vesting such Registrable Right and the full right, title and

interest to and in the same, in the Company as sole beneficial owner, or in such other person as the Board may specify.

13.2    The Executive hereby waives any moral rights (as provided by Chapter IV Copyright Designs and Patents Act 1998 or any similar provisions of law in any jurisdiction) in all intellectual property rights created by the Executive in pursuance of clause 12.1 above.

## 14.    RESTRICTIONS DURING EMPLOYMENT

Without prejudice to the provisions of clause 4.1, save for in relation to the business of T & R Operations Limited and except with the prior written consent of the Board, the Executive shall not during his employment hereunder whether directly or indirectly or whether solely or jointly with or as agent, director, partner, manager, employee, consultant, shareholder or independent contractor of or in any other person engage in, carry on or be interested in any other business;  Provided that nothing in this clause shall preclude the Executive from being the holder or beneficial owner of any securities in any other company which are listed or dealt in on any recognised stock exchange by way of bona fide investment only and where the Executive (together with his spouse, children, parents and parents' issue) neither holds nor is beneficially interested in more than a total of 5 per cent of any single class of the securities in that company.

## 15.    POST TERMINATION OBLIGATIONS

15.1    The Executive shall not, whether directly or indirectly, or whether solely or jointly with or as agent, director, officer, partner, promoter, manager, employee, consultant, shareholder, participator or independent contractor of or in any other person do any of the following things without the prior written consent of the Company:-

15.1.1    during the period of six months after termination of his employment, carry on or be engaged or concerned within England, Wales, Scotland, Northern Ireland, the Republic of Ireland or any other part of the world where the Company does business to a material extent in any trade or business competing with any trade or business of the Company as carried on at the date of such termination or at any time during the previous two years with which the Executive shall have been at any time personally concerned to a material extent while employed by the Company; Provided that this restriction shall not apply where the Executive's interest in such other trade or business is solely as an employee or a consultant and where his work or duties shall relate to services of a kind or nature with which the Executive shall not have been concerned to a material extent during the period of two years prior to the termination of his employment;

15.1.2    during the period of one year after the termination of his employment, solicit or endeavour to entice away from or discourage from dealing with the Company any person who was at the date of such termination or at any time during the period of two years or such shorter period before termination during which the employee was employed immediately preceding such termination a customer or client of the Company or had agreed to become such whether or not such person would commit a breach of contract by reason of transferring business and with whom the Executive shall have had personal contact during his employment;

15.1.3    during the period of one year after the termination of his employment, supply or provide any products or services to any person who was at

any time during the period of two years immediately preceding such termination a customer or client of the Company to whom the Company had during that period supplied or provided products or services of the same or a similar nature in the ordinary course of its business or who was at the date of such termination in the process of negotiating for the supply of any products or services of the same or a similar nature from the Company and (in either case) with whom the Executive shall have had personal contact during his employment;

15.1.4     at any time after the termination of his employment, cause or seek to cause to be terminated or adversely affected or otherwise interfere with any agreement or arrangement of any kind to which the Company is at the date of termination a party or from which the Company benefits;

15.1.5     during the period of one year after the termination of his employment, solicit or endeavour to entice away from or discourage from dealing with the Company any person who was at the date of such termination or at any time during the period of two years immediately preceding such termination a manufacturer for or supplier, distributor, agent or independent contractor of or to the Company or had agreed to become such whether or not such person would commit a breach of contract by reason of transferring business or leaving service provided that this restriction shall only apply to manufacturers, suppliers, distributors, agents and independent contractors with whom the Executive shall have had personal contact while employed by the Company;

15.1.6     during the period of six months after the termination of his employment, solicit or endeavour to entice away from or discourage from being employed by the Company any employee whose rate of gross contractual salary falls within the range of gross contractual salaries paid to the top 25 per cent. highest paid employees of the Company and with whom the Executive shall have had personal contact while he was employed by the Company and whether or not such employee would commit any breach of contract by reason of leaving service;

15.1.7     during the period of six months after the termination of his employment, employ or engage or attempt to employ or engage, or negotiate or arrange the employment or engagement by any other person of any individual who was at the date of termination, or was at any time within the period of three months immediately prior to that date, an employee of the Company whose rate of gross contractual salary falls or, at the date he left service, fell within the range of gross contractual salaries paid to the top 25 per cent. highest paid employees of the Company and with whom the Executive shall have had personal contact while he was employed by the Company and where such employment or engagement would require such individual to exercise skills or knowledge of the same or a similar nature to those acquired or used by that individual while employed by the Company and whether or not such individual would commit any breach of contract by reason of leaving service;

15.1.8     at any time after the termination of his employment, in any way make use of any corporate, business, product or service name which is identical or similar to, or likely to be confused with, the corporate name or any business, product or service name used by the Company or which might suggest a connection with the Company;

15.1.9    at any time after the termination of his employment, in any way hold himself out as employed by, representing, or acting for, the Company;

15.1.10    during the period of one year after the termination of his employment, accept employment or engagement in any capacity with any person who is at the date of such termination or was at any time during the period of two years immediately preceding such termination, a customer or client of the Company and with whom the Executive shall have had personal contact during his employment and where the Executive's duties or work shall relate to a material extent to services of a kind or nature the same as or similar to any services supplied by the Executive to that client or customer on behalf of the Company at any time during the said period of two years.

15.2    Each of clauses 15.1.1 to 15.1.10 shall be treated as a separate obligation and shall be severally enforceable as such.

15.3    Without prejudice to the operation of clause 17, the expression the "Company" where used in clauses 15.1.1 to 15.1.10 includes (where the context admits) each of the Associated Companies to the intent and effect that each of such sub-clauses shall apply (as a separate covenant in each case) in relation to each Associated Company as they apply in relation to the Company.

15.4    Nothing in this clause shall preclude the Executive from being the holder or beneficial owner of any securities in any other company which are listed or dealt in on any recognised stock exchange by way of bona fide investment only and where the Executive (together with his spouse, their parents and their parents' lineal descendants and any person or entity whom the Employee controls) neither holds nor is beneficially interested in more than a total of 5 per cent of any single class of the securities in that company.

15.5    The parties consider the restrictions in clause 15.1 to be reasonable, but if a court of competent jurisdiction finds any of them to be unenforceable the parties agree to accept any modification as to the area, extent or duration of the restriction concerned which the court sees fit to impose or, if it does not see fit, which is reasonably necessary to render the restriction enforceable.

16.    **TERMINATION**

16.1    Notwithstanding any other provision of this Agreement, the Company (without prejudice to its other rights and remedies) may terminate this Agreement forthwith by written notice to the Executive if he shall:

16.1.1    commit any serious or persistent breach of any of his obligations under this Agreement or shall neglect or fail (otherwise than by reason of accident or ill health) or refuse to carry out the duties required of him hereunder or to comply with any lawful orders or directions given to him by the Board consistent with the terms of this Agreement;

16.1.2    be guilty of any fraud, dishonesty, serious breach of duty or serious misconduct or any other conduct calculated or likely to affect prejudicially the interests or reputation of the Company;

16.1.3    be convicted of any criminal offence (other than an offence under the Road Traffic Acts not involving his disqualification from driving);

16.1.4    become bankrupt or make any arrangement or composition with his creditors;

16.1.5    shall be or become prohibited by law from being a director, or shall be removed from the office of director of the Company or (if under the articles of association from time to time of the Company he shall be obliged to retire by rotation or otherwise) shall, having retired, not be immediately re-elected; or

16.1.6    be or become of unsound mind or be or become a patient for any purpose of any enactment relating to mental health

Provided that no notice under clause 16.1.3 shall be given by the Company to the Executive by reason only of the Executive's disqualification from driving if the Executive can make suitable alternative arrangements at his own expense.

16.2    The Company shall be entitled by 3 months' notice in writing to terminate this Agreement if by reason of illness, accident or for any other cause the Executive shall at any time become or be unable properly to perform in whole or in part his duties hereunder either:

16.2.1    for an unbroken period of 13 consecutive weeks (but so that periods of less than 5 consecutive working days actually worked shall for these purposes be deemed not to break the continuity of such incapacity); or

16.2.2    for a period or periods aggregating 90 days (whether working days or not) in any period of 26 consecutive weeks (and notwithstanding in either case that during the period of any such notice any such incapacity may cease in whole or in part)

but any such notice of termination may only be given by the Company within 3 months after such unbroken period of 13 consecutive weeks or such period or periods aggregating 90 days.

## 17.    ASSOCIATED COMPANIES

17.1    It is hereby declared that the expression the "Company", when used in this Agreement, shall mean and include, where the context admits, the Company as defined in the heading to this Agreement and all Associated Companies (if any), and the Executive may be required to exercise and perform his powers and duties hereunder in relation to any Associated Company.

17.2    In carrying out his duties hereunder, the Executive shall at all times be governed by the terms of this Agreement, and it is hereby expressly agreed that no contract of employment arises by virtue of this Agreement between the Executive and any Associated Company.

## 18.    GENERAL

18.1    The Executive (if a director of the Company) shall not be entitled during the continuance of this Agreement to resign his directorship or disqualify himself from holding office as a director.  On the termination of this Agreement, howsoever occasioned, the Executive shall be deemed simultaneously to have submitted his resignation as:-

18.1.1    if then an officer of the Company, as such officer; and

18.1.2    if then a trustee, as trustee of any pension scheme, employee share scheme or other trust established by the Company

and he shall have no claim or right of action against the Company for compensation, damages or otherwise in respect of such resignation, but this provision shall not otherwise prejudice any of his rights in respect of the termination of this Agreement or of his employment.

18.2    If this Agreement be terminated in accordance with its terms the Executive shall have no claim or right of action against the Company for compensation, damages or otherwise in respect of such termination or the termination of his employment.

18.3    If the employment of the Executive hereunder be terminated before the expiration of this Agreement by reason of the liquidation of the Company for the purpose of amalgamation or reconstruction, or as part of any arrangement for the amalgamation of the Company's undertaking not involving liquidation, and if he be offered employment with the amalgamated or reconstructed company for a period of not less than the unexpired period of this Agreement and on terms no less favourable to him than the terms in effect under this Agreement, he shall have no claim against the Company in respect of such termination.

18.4    If the Executive shall have refused or failed to agree to accept employment offered to him on terms no less favourable to him than the terms in effect under this Agreement either by a person which has acquired or agreed to acquire the whole or substantially the whole of the undertaking and assets of the Company or which shall own or have agreed to acquire the whole or not less than ninety per cent of the equity share capital of the Company or by another person controlled by such first person or the company if any to which the Executive shall then be seconded hereunder, the Executive shall have no claim against the Company by reason of the termination of this Agreement by the Company within one month after such refusal or failure to agree.

18.5    The lawful expiration or termination of this Agreement shall not prejudice any claim which either party may have against the other in respect of any antecedent breach or contravention of or non-compliance with any provision hereof nor shall it prejudice the coming into force or the continuance in force of any provision hereof which is expressly or by implication intended to come into or continue in force on or after such expiration or termination.

18.6    On the expiration or termination of this Agreement howsoever caused the Executive shall at his own expense forthwith return to the Company at its principal place of business (free of any condition, restriction, lien or other encumbrance) all the items mentioned in clauses 7.5 and 8.2 and all other property of the Company, being in each case in the Executive's possession or under his control and the Company may repossess such items and for this purpose the Executive hereby grants to the Company and its employees and agents an irrevocable right and licence to enter upon any premises occupied by the Executive with or without vehicles and to remove such items, and all costs incurred by the Company is repossessing such items shall be borne by the Executive.

18.7    All notices which are required to be given hereunder shall be in writing and shall in the case of the Company be sent to its registered office from time to time and in the case of the Executive be sent to his address set out in this Agreement or to such other address in England as he may designate by notice given in accordance with the provision to this clause. Any such notice may be delivered personally or by first class prepaid letter, telex or facsimile transmission and shall be deemed to have been served if by delivery when delivered if by first class post 48 hours after

posting and if by telex or facsimile transmission when despatched. Any notice to be given to the Company shall be addressed for the attention of the person specified in the Schedule and marked "strictly private and confidential".

18.8     This Agreement is entered into in substitution for all rights and liabilities of the Company and the Executive expressed or implied in all former agreements or arrangements, whether written, oral or implied, between the Company and the Executive relating to the employment of the Executive, and the waiver of all such rights and release of all such liabilities is evidenced by the signature hereof. This Agreement sets forth the entire understanding of the parties subject as herein expressly contained and the parties warrant to each other that they are not entering into this Agreement in reliance on any representation not expressly set out herein. Any sums paid to or on behalf of the Executive in relation to his employment in respect of any period since the Commencement Date shall be deemed to have been received by the Executive on account of the remuneration payable to him hereunder.

18.9     The Executive shall not, in the event of the termination of his employment hereunder for whatever reason, have any claim on the Company arising out of the lapse, by virtue of such termination, of any option then held by him to subscribe for shares from and in the Company.

18.10     The Executive shall at all times observe the London Stock Exchange's "Model Code for Securities Transactions by Directors" (or such other Code adopted by the Company in lieu thereof) relating to share dealings in each case from time to time current, of which he is deemed hereunder to have notice.

18.11     This Agreement shall be governed by and construed in accordance with the laws of England and the parties submit to the non-exclusive jurisdiction of the English Courts.

18.12     Notwithstanding that the whole or any part of any provision of this Agreement (including, without limitation, clauses 15.1.1 to 15.1.10 hereof) may prove to be illegal or unenforceable the other provisions of this Agreement and the remainder of the provision in question shall continue in full force and effect.

19.     **STATUTORY NOTICES**

19.1     This Agreement constitutes written particulars of the Executive's terms of employment with the Company for the purposes of the Act and any legislation amending, replacing or re-enacting the same, and this Agreement replaces all previous notices under the Act and any other such legislation.

19.2     The provisions of item 18 of the Schedule are a note required to be given to every employee pursuant to Section 3 of the Act.

20.     **VARIATIONS IN TERMS**

The Company reserves the right to vary the terms of the Executive's employment with it. Minor changes may be made following notice to the Executive. Major changes will only be made with the Executive's agreement.

EXECUTED as a deed in two originals the day and year first before written.

## THE SCHEDULE

1.      Name: Tony Lynch

2.      <u>Residential Address</u>:

Tree Tops
Bridge Road
Old St Mellons
Cardiff
CF3 6UY

3.      <u>Commencement Date</u>:

6 November 2001

4.      <u>Position and Job Title (clause 2.1)</u>:

Chief Executive Officer

5.      <u>Fixed period (clause 3.1)</u>:

One year

6.      <u>Notice period (clause 3.1)</u>:

12 months

7.      <u>Date continuous employment began (clause 3.2)</u>:

6 November 2001

8.      <u>Periods of employment with prior persons which count as part of the Executive's period of continuous employment (clause 3.2)</u>:

None

9.      <u>Working time (clause 4.1)</u>:

Normal office hours 9 a.m. to 5.30 p.m. Monday to Friday (inclusive), provided that the Executive shall be obliged where the Company considers it necessary to work beyond those hours and at weekends and bank holidays without extra remuneration

10.     <u>Place/area of work (clause 5.1)</u>:

The Company's premises at 321 Penarth Road, Cardiff CF11 8TT

FSI-1482952-1

8 November 2001

11.     Salary and method of payment (clause 6.1):

        £130,000 per annum, payable by equal monthly instalments in arrears on the last
        day of every month to a bank account designated by the Executive

12.     Salary Review (clause 6.3):

        The Executive's salary shall be reviewed annually with effect from 1st March in each
        year (the first such review to be with effect from 1st March 2003 or such other date
        as the Board may notify the Executive) but without commitment to increase

13.     Motor Vehicle (clause 7.1):

        An allowance of £50,000 to be paid annually or as shall be in conformity with the
        Company's car policy from time.

14.     Holiday year (clause 9.1):

        1st January to 31st December

15.     Holiday entitlement (clause 9.1):

        25 working days

16.     Benefit schemes:

        Company Health Care Scheme (for the benefit of the Executive, his wife and
        children under the age of 21 or remaining in full-time education and not exceeding
        24 years of age)

17.     Addressee for notices to the Company (clause 19.7):

        The Chairman

18.     Disciplinary procedure (clause 20.2):

        There are no fixed disciplinary rules applicable to the Executive. In the event of the
        Executive being dissatisfied with any disciplinary action taken against him, or if he
        has any grievance relating to his employment, he should refer such disciplinary
        decision or grievance to the Board and the reference will be dealt with by discussion
        and decision of a Board Meeting.

APPENDIX A

*(Commission linked to profits)*

1.      As further remuneration for his services the Company shall pay to the Executive a Bonus (the "Bonus") at the rate specified below in the event of the Company achieving certain target net profit figures (the "Basic Figure") in each accounting reference period of the Company.

1.1     The Bonus to be paid to the Executive for the year ending 28 February 2002 is as follows:

    1.1.1    a sum equal to 10% of the Executives annual salary where the Basic Figure exceeds £1.1 million;

    1.1.2    a sum equal to 20% of the Executives annual salary where the Basic Figure exceeds £1.3 million;

    1.1.3    a sum equal to 30% of the Executives annual salary where the Basic Figure exceeds £1.5 million;

    1.1.4    a sum equal to 40% of the Executives annual salary where the Basic Figure exceeds £1.7 million;

    1.1.5    a sum equal to 50% of the Executives annual salary where the Basic Figure exceeds £1.9 million.

2.      The Bonus and Basic Figure shall be reviewed annually with effect from 1st March in each year (the first such review to be with effect from 1st March 2002 or such other date as the Board may notify the Executive) by the remuneration committee.

3.      In this Appendix "remuneration committee" means a committee comprising of the Chief Executive Officer, the Managing Director and two Non-Executive Directors of the Company and which shall be chaired by one of those Non-Executive Directors.

4.      In this Appendix "net profits" means the profits shown by the audited consolidated profit and loss account of the Company for the relevant accounting reference period of the Company as certified by the Auditors with the following adjustments (unless already taken into account in such profit and loss account):

4.1     after deducting all expenses and outgoings of working and management properly incurred, directors' remuneration (including salaries and fees and Bonuses or commission to be paid), depreciation as charged, interest on borrowed monies, and any revenue expenses charged directly against reserves

4.2     before deducting any taxation on profits (including corporation tax and any similar, additional or substituted tax) or on chargeable gains;

4.3     without taking into account profits and losses of a capital nature arising on a disposal of fixed assets, investments, plant or any other property;

4.4     after deducting such proportion of the profits or adding back such proportion of the losses (as the case may be) of any subsidiaries and associated companies which shall not be owned by the Company or by any subsidiary on the last day of such accounting reference period; and

4.5    after making any further adjustments which the Auditors may consider fair and reasonable or as may be agreed.

5.     Notwithstanding the foregoing, the Executive's commission for any accounting reference period shall not exceed an amount equal to 50 per cent of the Executive's basic annual rate of Salary in effect on the last day of such accounting reference period (the "Ceiling Figure").

6.     If any accounting reference period of the Company is a period longer or shorter than a year the Basic Figure and the Ceiling Figure shall be increased or reduced proportionately on a time basis calculated in days.

7.     Commission payable hereunder for each accounting reference period shall be paid within 90 days after the audited accounts for that period shall have been approved by the directors of the Company.

8.     The Executive shall be entitled to receive true copies of the audited balance sheets and accounts of the Company in respect of each accounting reference period during which he shall have been employed hereunder, whether or not he then be a director or member of the Company.

9.     A Bonus will only be paid to the Executive if he has acted in the service of the Company for the full relevant accounting reference period.

10.    Any dispute or difference which may arise between the Company and the Executive in connection with this Appendix shall be referred to the Auditors who shall act as experts and not as arbitrators and whose determination shall be final, conclusive and binding save for manifest error.

FSI-1482952-1                                                      1 November 2001

- 16 -

EXECUTED as a deed by                    )          Director:
COINMASTER GAMING PLC                     )
and signed by two duly                    )
authorised officers on its behalf:-       )          Director/Secretary:


EXECUTED and DELIVERED                    )
a deed by THE EXECUTIVE in                )
the presence of:-                         )

Signature of Witness:

Name of Witness:    DAN WILLMOTT

Address of Witness:    48 Bishopsgate
                       London  EC2N4AJ.

Occupation of Witness:    Investment Banker