IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DANIEL ANTHONY LYNCH,      ) | |
|                        ) | |
|         Plaintiff,     ) | |
|                        ) | |
|         v.             ) | Civil Action No. 06-365 |
|                        ) | |
| COINMASTER USA, INC., a Delaware    ) | |
| corporation, and PAUL A. COX,     ) | |
|                        ) | |
|         Defendants.    ) | |

## DEFENDANTS' MOTION FOR PERMISSION
## TO FILE MOTION FOR SUMMARY JUDGMENT

Defendants Coinmaster USA, Inc. and Paul A. Cox move this Court for permission to file their Motion For Summary Judgment and supporting Brief, a copy of which is attached as Exhibit 1.

1.       This Court entered a Rule 16 Scheduling Order on March 19, 2007. In that Order, at Paragraph 6, the Court provided that case dispositive motions were to be filed on or before November 9, 2007, absent leave of the Court to file at a different time.

2.       The parties encountered difficulties completing the depositions of the principal Plaintiff and Defendant witnesses, in part because of the unexpected illness of the attorney representing Paul Cox. Ultimately, those depositions were completed on November 26 and 27, 2007, after the deadline for dispositive motions contained in the Court's Rule 16 Scheduling Order.

3.      The parties agreed among themselves, by e-mail dated October 16, 2007, that they would extend certain discovery deadlines, and that at least between the parties, it was agreed that dispositive motions could be filed as late as January 5, 2008.

4.      Consequently, this Motion for Leave to File the Motion for Summary Judgment is unopposed, although the Motion For Summary Judgment will be opposed.

5.      Defendants apologize for the lateness of this filing, given that the final pretrial conference in this matter is scheduled for February 7, 2008, but respectfully suggest that the deposition of the Plaintiff established conclusively that there is no legal or factual basis for any of the claims in this matter and, therefore, the Motion For Summary Judgment is likely to save this Court enormous time and effort by avoiding a jury trial.

WHEREFORE, Defendants request that this Court permit the late filing of the attached Motion For Summary Judgment and supporting Brief.


Respectfully submitted,

BLANK ROME LLP

Thomas P. Preston (I.D. No. 2548)
1201 Market Street, Suite 800
Wilmington, DE 19801
(302) 425-6400
Attorneys for Defendant Coinmaster USA, Inc.

Dated:   December 21, 2007

2

## CERTIFICATE OF SERVICE

I, Thomas P. Preston, hereby certify that on the 21st day of December, 2007, a copy of

**DEFENDANTS' MOTION FOR PERMISSION TO FILE MOTION FOR SUMMARY**

**JUDGMENT** was served on the following counsel of record:

### BY ELECTRONIC SERVICE

James S. Green, Esquire
Kevin A. Guerke, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899

Erin K. Brignola, Esquire
Cooper Levenson April Niedelman &
  Niedelman & Wagenheim, P.A.
30 Fox Hunt Drive
Bear, DE 19701

### BY FEDERAL EXPRESS

Steven D. Scherzer, Esquire
Cooper Levenson, Attorneys at Law
1125 Atlantic Avenue
Atlantic City, NJ 08401

_____
Thomas P. Preston
I.D. No. 2548

125762.00601/40172732v.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL ANTHONY LYNCH,    )
    )
    Plaintiff,    )
    )
    v.    )    Civil Action No. 06-365
    )
COINMASTER USA, INC., a Delaware    )
corporation, and PAUL A. COX,    )
    )
    Defendants.    )

## ORDER

AND NOW, this ___ day of _____, 2007, having considered Defendants' Motion to File its Motion For Summary Judgment:

    (1)    Defendants' Motion is hereby granted; and

    (2)    Defendants' Motion For Summary Judgment and Opening Brief in Support of its Motion For Summary Judgment is entered.

AND IT IS SO ORDERED.

_____
J.

# EXHIBIT 1

# DEFENDANTS' PROPOSED
# MOTION FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DANIEL ANTHONY LYNCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-365 |
| | ) | |
| COINMASTER USA, INC., a Delaware | ) | |
| corporation, and PAUL A. COX, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Coinmaster USA, Inc. ("CMUSA") and Paul A. Cox ("Cox") jointly move for summary judgment on all Plaintiff's claims. The bases for this Motion, which are more fully set forth in the accompanying Opening Brief, are that:

(1) the breach of contract claim against CMUSA fails because the contract, which is unambiguous on its face, provides for the reimbursement of expenses, and Plaintiff admits he never submitted any expenses to CMUSA for reimbursement; further, the contract was void *ab initio* because it violated a previous contract binding on Plaintiff;

(2) the fraud claim against Defendant Cox fails because no false representations were made, Plaintiff was personally involved in reviewing the proposals made to acquire the acquisition of the stock of CMUSA, and it was Plaintiff's own actions which resulted in his being denied participation in CMUSA; and

(3) the Deceptive Trade Practices Act and intentional interference with prospective business relations claims against Cox both fail because the alleged "forgery" committed by Cox was done with the full knowledge and cooperation of Plaintiff, and Plaintiff admits he suffered no harm as a result thereof.

WHEREFORE, Defendants ask for judgment in their favor and against Plaintiff on all of his claims, and an award of fees and costs incurred in the defense of this action.

Respectfully submitted,

BLANK ROME LLP

By: _____

Thomas P. Preston (I.D. No. 2548)
1201 Market Street, Suite 800
Wilmington, DE 19801
(302) 425-6400

Attorneys for Defendant Coinmaster
USA, Inc. and Paul A. Cox

Dated:   December ____, 2007

2

# EXHIBIT 1

# PROPOSED ORDER FOR
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DANIEL ANTHONY LYNCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-365 |
| | ) | |
| COINMASTER USA, INC., a Delaware | ) | |
| corporation, and PAUL A. COX, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

AND NOW, this ___ day of _____, 2007, having considered Defendants' Motion

For Summary Judgment, Defendants' Motion is hereby granted, and judgment is entered in favor

of Defendants on all claims.

AND IT IS SO ORDERED.

_____
J.

**EXHIBIT 1**

**PROPOSED**

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DANIEL ANTHONY LYNCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-365 |
| | ) | |
| COINMASTER USA, INC., a Delaware | ) | |
| corporation, and PAUL A. COX, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF
IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Thomas P. Preston, Esquire
I.D. No. 2548
BLANK ROME LLP
1201 Market Street
Suite 800
Wilmington, DE 19801
(302) 425-6478

Attorneys for Defendants
Coinmaster USA, Inc. and
Paul A. Cox

Dated:   December 21, 2007

125762.00601/40172706v.1

# TABLE OF CONTENTS

I.    NATURE AND STAGE OF PROCEEDINGS.................................................1

II.   SUMMARY OF ARGUMENTS .........................................................3

III.  STATEMENT OF FACTS................................................................5

    A. Background of Dispute...........................................................5

    B. The Breach of Contract Claim ................................................5

    C. Lynch's Knowledge Of The Transaction For The Assets Of CMUSA Defeats His Fraud Claim ................................................7

    D. The Claims Based On Forgery Are Likewise Defeated By Lynch's Own Deposition Testimony ......................................10

IV.   ARGUMENT .............................................................................12

    A. Breach Of Contract Claim Against Coinmaster USA, Inc. ..........12

    B. Given Lynch's Testimony, There Was No Fraud In The CMUSA Asset Transaction. ................................................14

    C. The Claims Based On The Alleged "Forgery" Fail Based On What Lynch Admits He Knew. ...............................................15

V.    CONCLUSION ...........................................................................18

125762.00601/40172706v.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Tarasi v. Pittsburgh National Bank*,
    555 F.2d 1152 (3d Cir. 1977)...............................................................................4, 6, 9, 16

## STATE CASES

*Abrams v. Sachnoff & Weaver, Ltd.*,
    922 A.2d 414 (Del. 2007) ...............................................................................17

*Abry Partners V, L.P. v. F&W Acquis. LLC*,
    891 A.2d 1032 (Del. Ch. 2006)...............................................................................14

*Burns v. Ferro*,
    1991 WL. 53834 (Del. Super. Ct.) ...............................................................................17

*Elliott Associates, L.P. v. Abatex Corp.*,
    715 A.2d 843 (Del. 1998) ...............................................................................12

*Hajoca Corp. v. Security Trust Co.*,
    25 A.2d 378 (Del. Super. 1942) ...............................................................................3, 12

*Kaiser Aluminum Corp. v. Matheson*,
    681 A.2d 392 (Del. 1996) ...............................................................................12

*Sonitrol Holding Co. v. Marceau Investissements*,
    607 A.2d 1177 (Del. 1992) ...............................................................................12

*Wal-Mart Stores, Inc. v. AIG Life Insurance Co.*,
    901 A.2d 106 (Del. 2006) ...............................................................................3, 14

## OTHER AUTHORITIES

6 *Del. C.* § 2531, *et seq* ...............................................................................15

I.    **NATURE AND STAGE OF PROCEEDINGS**

The Complaint in this matter was filed in the Superior Court of the State of Delaware on April 4, 2006, and was timely removed by Defendant Paul A. Cox ("Cox") on May 31, 2006. *See* D.I. No. 1. After efforts to remand the case to the Superior Court were unsuccessful, Defendants filed their answers in late June, 2006. *See* D.I. No. 10. Those Answers were subsequently amended (*see* D.I. No. 29) and discovery commenced.

This case involves the falling out of two friends and business partners who had worked together in the casino gaming industry for some years. Plaintiff had taken a United Kingdom company, Coinmaster Gaming PLC ("PLC") public, and had committed PLC and its subsidiaries, including Coinmaster USA, Inc. ("CMUSA"), to servicing a substantial borrowing from the Bank of Scotland ("BoS"). Unfortunately, CMUSA ended up being the surviving entity after PLC and its UK subsidiaries went into receivership following default on that loan.

Plaintiff Lynch and Cox developed a plan for buying the assets of CMUSA from the Receiver. Cox negotiated with the Receiver over many months, finally concluding a transaction at the end of the June, 2004, which resulted in the shares of CMUSA being transferred to the management of CMUSA, Paul Cox and Brad Hutcheon. Mr. Lynch was forbidden by BoS from participating in this transaction because of the bad blood which had developed between them over the defaulted loan.

Unfortunately, after the transaction for CMUSA closed in June of 2004, Mr. Lynch decided that he had somehow been hoodwinked out of his anticipated interest in CMUSA. That conclusion ultimately lead to the filing of this lawsuit, in which Mr. Lynch claims that CMUSA breached an agreement for employment expense reimbursement, signed with Mr. Lynch in the Fall of 2002, and also claims that Paul Cox had engaged in fraud in keeping Mr. Lynch out of the CMUSA transaction. In addition, Mr. Lynch asserts that Mr. Cox had engaged in forgery in the

course of filing an application for CMUSA to sell products to an Indian casino in California, which application required the signature of Mr. Lynch.

Discovery was to have been completed in this matter in the Fall of 2007, although no specific date for discovery completion was established by the Rule 16 Scheduling Order (*see* D.I. No. 35). As a result of an unfortunate illness on the part of counsel for Defendant Cox, the depositions of Messrs. Cox and Lynch were not completed until the end of November, 2007. However, completion of those depositions represents, for the most part, completion of discovery.

Unfortunately, the Court's Rule 16 Scheduling Order set a filing deadline of November 9, 2007 for dispositive motions. Defendants have moved the Court for an extension of that dispositive deadline, inasmuch as the now completed depositions establish beyond dispute that there is no basis for this case proceeding, and that summary judgment on all claims is appropriate.

This is the Defendants' Opening Brief in Support of Their Motion For Summary Judgment.

125762.00601/40172706v.1

## II.    SUMMARY OF ARGUMENTS

1.      The breach of contract claim asserted against CMUSA must fail based upon the language of the contract at issue, the November 15, 2002 letter agreement for expense reimbursement.  Plaintiff concedes that the letter calls for payment to Plaintiff of his expenses incurred on behalf of CMUSA, that this language is unambiguous, that he understood it at the time he signed the Agreement, and that he has not submitted any expenses to CMUSA which have not been reimbursed.  Thus, under well-established rules of contract interpretation, this unambiguous contract must be interpreted against Mr. Lynch's claim.  *Hajoca Corp. v. Security Trust Co.*, 25 A.2d 378 (Del. Super. 1942).

2.      Lynch also concedes that at the time he entered into the expense reimbursement agreement with CMUSA, he was already party to an agreement with PLC which specifically prohibited any other agreement with any subsidiary of PLC.  *Id.*

3.      The fraud claim against Paul Cox fails because Mr. Lynch's own testimony defeats the elements of fraud in connection with the negotiation of the buyout of the assets of CMUSA.  Mr. Lynch admits that he was fully informed of the terms of the negotiation, and that he understood that the Receiver would not permit Mr. Lynch to be part of the buyout of CMUSA because of the hostility between the Bank of Scotland and Mr. Lynch.  Furthermore, and most critically, Mr. Lynch admits that his refusal to sign a settlement agreement as part of the overall transaction involving the assets of CMUSA was the critical impediment to his being involved in the CMUSA acquisition.  Under these circumstances the elements of fraud are not satisfied. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 115 (Del. 2006).

4.      Finally, the claims of violation of the Deceptive Trade Practices Act and the tort of intentional interference with prospective business relations based upon an alleged "forgery" fail based on Mr. Lynch's admissions.  He testified, and the documents demonstrate, that

3

application by CMUSA to Indian gaming authorities in California was a practice well known and participated in by Plaintiff Lynch. With respect to the particular application on which Mr. Lynch bases his claim of forgery, he specifically admitted that he was aware that the application was being prepared, he knew that it was going to be signed in his absence, and he was aware of the notary notarizing his signature. Under these circumstances, either no forgery occurred at all, or Mr. Lynch was *in pari delicto* with the forgery and, therefore, cannot be heard to make a claim based on it. *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152, 1156-7 (3d Cir. 1977).

125762.00601/40172706v.1

### III.    STATEMENT OF FACTS

#### A.    Background of Dispute

In 2001, Plaintiff D. A. Lynch ("Lynch") formed a public company in the United Kingdom, Coinmaster Gaming, PLC ("PLC"), from an existing, privately-held company, Coinmaster Gaming, Ltd.  Mr. Lynch was a 51% owner of the public company.  Deposition of D.A. Lynch taken on November 26, 2007 ("Lynch Deposition," Exhibit A) at 16-17.

At about the same time, a subsidiary of the public company was formed in the United States, Coinmaster USA, Inc. ("CMUSA").    The British public company borrowed approximately 3 million pounds sterling from the Bank of Scotland shortly after going public, and committed all of its subsidiaries, pursuant to the loan documents, to the repayment of that obligation.  Lynch Deposition at 19, 40, 55.

Unfortunately, PLC rapidly defaulted on the loans from Bank of Scotland, and fell into receivership.  As a result of the receivership, the assets of PLC were liquidated, including its interest in CMUSA.  It is the attempt to acquire the CMUSA assets, by CMUSA's management team, that has led to the current dispute.

#### B.    The Breach of Contract Claim

According to Plaintiff Lynch, he had a contract with CMUSA which provided for the reimbursement of certain expenses.  This contract, dated November 15, 2002 (attached as Exhibit B), states as follows:

> We propose that the terms of the Agreement between yourself and Coinmaster USA, Inc., for the provision of your services, as chairman of Coinmaster USA, Inc. on an expenses only basis, be amended to the following with effect from December 1, 2002. This will now take account of the extensive traveling required for you to perform your duties.  Please retain all receipts for travel, in case we are ever audited.

5

The contract provides for a monthly stipend for the reimbursement of expenses and includes a bonus of 5% of the company's net profits, and a provision for a one-time payout if the contract is terminated. Nowhere does the contract provide for the payment of employment compensation.

Lynch confirmed that the only contract on which his claim is based is the November 15, 2002 letter. Lynch Deposition at 65. He testified went on to confirm that he had read these terms at the time he entered into the Agreement, and that he understood them before he signed the Agreement. *Id*. Mr. Lynch specifically confirmed that he was aware of the "expenses only" language, and that he had never, in fact, submitted any documentation for expense reimbursement. Lynch deposition at 65-66.

Lastly, Mr. Lynch testified that he was aware of at least one other contract between CMUSA and one of its employees in which the language was very different. That different language was contained in an agreement between Mr. Paul Cox and Mr. Cox's personal corporation, Tri-County Entertainment, Inc. and CMUSA, also dated November 15, 2002 and signed by Mr. Lynch (*see* Exhibit C).

The Cox contract specifically provided that Cox was to be paid on a "fee basis," and there was no mention of expense reimbursement. Mr. Lynch agreed that he was aware of this agreement and understood that the wording was, as he stated, "completely" different. Lynch Deposition at 68.

Mr. Lynch also testified that he had entered into a November 6, 2001 contract with Coinmaster Gaming PLC, which provided for the employment of Mr. Lynch as CEO of PLC. *See* Exhibit D. This contract provided in Paragraph 6.5 that Mr. Lynch was not entitled to any remuneration or expense beyond that which was provided for the PLC employment contract.

6

The PLC contract also specifically stated that the reference in Paragraph 6.5 to "the Company" included all associated companies, *i.e.*, CMUSA. *See* Paragraph 17.1 of Exhibit D. Mr. Lynch admitted that he was aware of the terms of Paragraph 6.5 (Lynch deposition at 30) and that this prohibitive language was in effect at the time he entered into the November 2, 2002 agreement with CMUSA (Lynch Deposition at 33). Mr. Lynch attempted to argue that there was some other agreement which abrogated the meaning of Paragraph 6.5 (Lynch Deposition at 30-31), but subsequently conceded that there was no other such agreement (Lynch Deposition at 36), a position his counsel has subsequently confirmed.

### C.    Lynch's Knowledge Of The Transaction For The Assets Of CMUSA Defeats His Fraud Claim

Mr. Lynch contends in his Complaint that he was defrauded out of his rightful ownership interest in CMUSA. Specifically, Mr. Lynch contends that Paul Cox made "false representation to the Receiver [causing him] to sell [the stock owned by PLC] in Coinmaster to Cox." Complaint at ¶ 42.

Mr. Lynch's deposition testimony is a full and sufficient rebuttal to this claim. First, it is uncontroverted that Mr. Lynch was fully aware that the Bank of Scotland, and its Receiver, adamantly refused to deal with Lynch as a result, apparently, of their collective conclusion that Lynch had misrepresented and mishandled the loan from the Bank of Scotland to PLC. On September 3, 2003, Cox sent an e-mail to Lynch (attached as Exhibit E), in which Cox informed Lynch "... of the Bank and Receiver's apparent fixation with making sure that you do not have a continuing presence with Coinmaster USA, Inc." Mr. Lynch testified that he was aware of the Bank and the Receiver's position, and that as a result, a settlement of any claims by Lynch was a necessary part of any transaction involving CMUSA. Lynch Deposition at 139-140.

This position is confirmed by statements by the Receiver on behalf of the Bank of Scotland. On November 10, 2003, Ian Best, the Receiver, sent an e-mail to Paul Cox, which Mr. Lynch admits to having seen (Lynch Deposition at 152), in which Best states:

> Further to our recent discussions, I am writing to outline my thoughts/proposals for the way forward.
>
> Preconditions:
>
> We need to achieve a satisfactory settlement of Tony Lynch's contract.

Mr. Lynch further testified (Lynch deposition at 197) that he understood that it was a necessary pre-condition that he be separated from CMUSA, and that the Bank was insisting that he have no involvement with CMUSA. Finally, Lynch confirmed this himself in an e-mail exchange with Ian Best, in which Mr. Best wrote, on August 26, 2004 (Exhibit F):

> You need to understand that the Banks are inevitably disappointed at the overall position they find themselves in following the receivership of the UK Companies. As a result, they would not be supportive of you being involved in either the UK or the US companies going forward.
>
> Any proposals that do not have your involvement as a key feature would, of course, still be considered, and I would be happy for you to send them to me.

Second, Mr. Lynch was kept informed of the details of the negotiations as they unfolded. For example, on September 23, 2003, Mr. Cox sent Mr. Lynch a copy of an e-mail from Cox to Ian Best of a proposal for Cox and Brad Hutcheon to acquire the assets of CMUSA. *See* Exhibit G). Lynch responded to Cox, stating that this was "an excellent email to the Receiver." Lynch acknowledged in his deposition that Cox had sent this to him, and that Lynch understood this to be a proposal to the Receiver for management's buyout of CMUSA. Lynch Deposition at 144, 147-148. As Lynch testified, this buyout required Lynch's departure from CMUSA.

The sharing of information continued. In an e-mail exchange in mid-November, 2003, Cox again informed Lynch of proposals he had made to the Receiver. Exhibit H. Lynch testified that he was in agreement with the terms Mr. Cox proposed, including the removal of Lynch from CMUSA. Lynch Deposition at 155. Furthermore, Lynch agreed to a "term sheet" (Exhibit I) which outlined the proposed settlement between Lynch and the various Coinmaster entities, all of which was a pre-condition to any buyout of CMUSA. Lynch testified that he agreed to the terms reflected in this term sheet. Lynch Deposition at 160. This exchange of proposals continued, with Cox informing Lynch at each step of the way, and Lynch agreeing to what Cox was proposing. *See, e.g.*, Lynch Deposition at 168.

Finally, on March 29, 2004, Cox sent Lynch an e-mail (Exhibit J) to which versions of the "terms of separation" for Lynch and a proposed side letter, allowing Lynch to rejoin CMUSA once the Bank had been paid off, were attached. Lynch admitted receiving these, admitted that Cox was attempting to respond to his concerns, and admitted that he accepted and agreed to the terms reflected in these documents. Lynch Deposition at 173-175. Indeed, Lynch wrote back separate e-mails to Mr. Cox in which he stated his agreement to the terms contained in these agreements. *Id.*

Finally, the settlement agreement was put in the form of a formal agreement. Exhibit K. Mr. Lynch conceded at this deposition that this was the embodiment of the term sheet to which he had previously agreed, but that he now had changed his mind. Lynch Deposition at 199-202. Lynch further testified that it was his decision to walk away from this agreement, that he recognized that by doing this he abrogated the side letter agreement which would have permitted him to acquire a one-third interest in CMUSA once the Bank of Scotland had been paid off, and

9

that he understood that this settlement agreement was an essential pre-condition to any transaction involving CMUSA in which he had any hope to participate.

In short, Mr. Lynch testified at his deposition that it was his decision, and his decision alone, to walk away from his involvement in CMUSA. He pointed to nothing to support his contention that somehow Paul Cox had engineered the prevention of Lynch's involvement in CMUSA.

### D.    The Claims Based On Forgery Are Likewise Defeated By Lynch's Own Deposition Testimony

Finally, Mr. Lynch revealed at his deposition that he was fully aware of the efforts to submit an application to the Santa Ynez Tribal Gaming Agency (Chumach), that he agreed to this submission, that he was aware that his signature was to be notarized, although he would not be present in the United States at the time that notarization was to take place, and that he suffered no injury as a result of this application. That testimony is sufficient to defeat his claim, both because of the lack of any harm, and because Mr. Lynch's own involvement establishes his *in pari delicto* status.

On May 2, 2003, Cox sent Lynch an e-mail (Exhibit L), in which he informs Lynch that the Chumach application was upcoming. He specifically states the following:

> With your approval, we will "electronically" attach your signature to each package, and I'll get Kellie to notarize them.

Lynch testified that he had seen this e-mail (Lynch Deposition at 103-105), and that he did not disagree with this procedure, although he now contends he thought that this procedure would be "breaking the law."

10

Just a few days later, on May 6, 2003, Paul Cox faxed a letter to Lynch with licensing applications for various casinos and asking for them to be signed for future notarization by Kellie. *See* Exhibit M. Lynch testified that he received this, and that he was aware that the Chumach application was also going to be filed. Tellingly, Lynch testifies that while he believed it was improper to undertake the filing of the applications as Cox proposed, he never did anything to stop this conduct, notwithstanding his position as chairman of the board of CMUSA. *See* Lynch Deposition at 119-120.

Mr. Lynch also testified that he did not know who had signed his name to this document (Lynch Deposition at 221-222), and that he might have initialed each of the pages of the application (Exhibit N). Most importantly, Lynch conceded that there was nothing in the application, other than his signature, which was inaccurate, that he was fully aware that these applications had to be made in order to secure the necessary licenses, that he would have signed this application, and that he has suffered no financial damages as a result of this application being filed. Lynch Deposition at 222-226.

IV.    **ARGUMENT**

A.    **Breach Of Contract Claim Against Coinmaster USA, Inc.**

This claim involves two separate elements:

1.    The interpretation of the plain language of the Agreement between CMUSA and Lynch; and

2.    The effect of the equally plain language of the Agreement between PLC and Lynch.

Under the first, Lynch is not entitled to the damages he claims, and under the second, he is not entitled to anything because the contract with CMUSA was void at the time it was executed.

Contracts under Delaware law are to be construed "as they are made by the parties," and courts should "give to the language that is clear, simple and unambiguous the force and effect which the language clearly demands." *Hajoca Corp. v. Security Trust Co.*, 25 A.2d 378, 383 (Del. Super. 1942); *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996) ("If a contract is not ambiguous, the court must give effect to the clear language of the contract.").

Further, the contract should be construed so that each word is given meaning, and no words are rendered meaningless or surplusage. *See Elliott Associates, L.P. v. Abatex Corp.*, 715 A.2d 843, 854 (Del. 1998); *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992).

Applying these principles to the CMUSA contract produces a clear result. The contract states that it is "for the provision of your services, as Chairman of Coinmaster USA, Inc. on an expenses-only basis ...." There is no basis upon which Mr. Lynch may argue that he is entitled to

12

the amounts referenced in this contract inasmuch as he has not, and cannot, argue that any expense reimbursement has been denied.

Further, the entire CMUSA contract fails because it was prohibited by the terms of Lynch's previous Service Agreement entered into with Coinmaster Gaming, PLC. That PLC contract, pursuant to Paragraph 6.5, specifically forbids Lynch from receiving "any remuneration or expenses as a director or employee of the Company in addition to those specified in this Agreement." Paragraph 6.5 of Exhibit D. The term "the Company" is specifically defined in Paragraph 17.1 of this Agreement as:

> The "Company" when used in this Agreement shall mean and include, where the context admits, the Company as defined in the heading to this Agreement and all associated companies.

"Associated Company" in turn is defined, under Paragraph 1.1 of this Agreement as "a company which is from time to time a subsidiary or a holding company of the Company or any other subsidiary of a holding company of the Company."

As further support for the position that the PLC agreement forbad Lynch from entering into the contract with CMUSA, Paragraph 14 of the Agreement with PLC forbids Lynch from engaging in or having an interest in any other business.

Lynch readily conceded that he was fully aware of all of the limitations contained in the Service Agreement with PLC, that that November 6, 2001 contract was in effect at the time Lynch purported to enter into the November 15, 2002 Agreement with CMUSA, and that Lynch was aware that the PLC Agreement rendered the CMUSA contract void. Indeed, Lynch admitted in his deposition that he himself had notified Paul Cox that his PLC contract might well void the CMUSA contract. Lynch Deposition at 81.

For Lynch now to contend that CMUSA has somehow breached his November 15, 2002 letter by not paying him the monthly expenses, or whatever else might have been provided in the CMUSA contract, is the height of audacity. Lynch has conceded that he did not seek reimbursement of any expenses from CMUSA, so he unquestionably is not entitled to the $144,000 he seeks in "outstanding monthly pay." *See* Paragraph 25 of the Complaint. As to the $600,000 in termination fee and 5% of CMUSA's accrued profits, Lynch is not entitled to those (or the expense reimbursement) because the contract was void when it was signed. The plain language of the two agreements coupled with Lynch's testimony dictate this result. CMUSA is entitled to judgment in its favor on the breach of contract claim.

**B.    Given Lynch's Testimony, There Was No Fraud In The CMUSA Asset Transaction.**

Mr. Lynch contends that he was defrauded by Paul Cox's false representations to the Receiver with respect to his negotiation to acquire the stock of CMUSA. Complaint, ¶¶ 42, 43. To establish fraud, Mr. Lynch must establish that Cox intentionally misrepresented something to him, that Lynch justifiably relied upon the misrepresentation, and that as a result, Lynch was damaged. *Wal-Mart Stores, Inc.*, *supra*, 901 A.2d at 115; *Abry Partners V, L.P. v. F&W Acquis. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). Lynch's claim fails on all points.

Lynch has not, and cannot, point to any misrepresentation or misstatement by Paul Cox in connection with the transaction with the Receiver involving the acquisition of CMUSA. Indeed, as the deposition testimony and documents demonstrate, Mr. Lynch was kept fully informed at each step of the negotiations. Mr. Lynch was fully aware that the Bank of Scotland and the Receiver insisted that he not be involved in any CMUSA transaction. He was fully aware that any claim Lynch had against CMUSA or PLC had to be resolved as part of that transaction. He

14

was fully aware that the transaction proposed by Cox, with Lynch's blessing, involved Cox and Brad Hutcheon purchasing CMUSA, in exchange for paying off the Bank debt and acquiring CMUSA's stock.

Given this knowledge, and given Lynch's admitted refusal to enter into the settlement which was a condition precedent to him ultimately being involved in the CMUSA acquisition, Lynch's fraud claim fails completely. Lynch knew of the terms; Lynch was aware of the Settlement Agreement between him and CMUSA and PLC; Lynch knew that if he failed to enter into that Settlement Agreement, he would take himself out of the transaction with CMUSA. In short, by Lynch's own testimony, he gave up any right to participate in the acquisition of CMUSA.

There is no fraud anywhere in this transaction. Lynch took actions knowing of the consequences, and he cannot now lay blame at the feet of Paul Cox. Paul Cox is entitled to judgment in his favor on the fraud claims.

## C.    The Claims Based On The Alleged "Forgery" Fail Based On What Lynch Admits He Knew.

Mr. Lynch also asserts claims against Paul Cox based on the Uniform Deceptive Trade Practices Act, 6 *Del. C.* § 2531, *et seq.*, and based upon intentional interference with prospective business relations. The thrust of Mr. Lynch's claims is that the filing of the application for a business license from the Chumach Gaming Agency, in which Mr. Lynch's name was allegedly improperly affixed to the application, constituted a "forgery" by which Lynch was damaged.

These claims fail because Lynch himself was a willing participant in the activity which allegedly constituted "forgery." As Lynch testified in his deposition, he was fully aware that Paul Cox was filing an application with the Chumach gaming authorities. He knew his

15

information and signature were required on that application. Indeed, Lynch had participated in a number of similar applications with other gaming authorities.

Lynch also admits that he knew that Mr. Cox intended to have his signature notarized, although Lynch was not, and did not intend to be, in the United States at the time that signature was to be notarized.

Notwithstanding this knowledge, Mr. Lynch did absolutely nothing to prevent what he now contends was an illegal act. Having been fully informed by Paul Cox of his intention to file this application with Lynch's notarized signature, Lynch did absolutely nothing to prevent any of these acts from going forward.

Lynch's testimony also establishes that he has no idea who signed the application, and that, in fact, Lynch may have initialed each page of the application. Thus, his claim against Cox, even if there was a "forgery," as Lynch now contends, is utterly unfounded. Lynch has no proof that Cox had any responsibility for the alleged "forgery."

Most importantly, however, is that Lynch was an active participant and enabler of the conduct of which he now complains. The doctrine of *in pari delicto* prevents him from recovering for this alleged wrongful conduct.

> *In pari delicto*, which literally means "of equal fault" is one of the common law doctrines fashioned to assure that transgressors will not be allowed to profit from their own wrongdoing.

*Tarasi v. Pittsburgh Nat'l. Bank*, 555 F.2d 1152, 1156 (3rd Cir. 1977). This case goes on to state "in those cases where it can fairly be said that the plaintiffs' fault is substantially equal to that of the defendant the recovery [is] precluded." *Id.* at 1157.

16

*Abrams v. Sachnoff & Weaver, Ltd.*, 922 A.2d 414 (Del. 2007) holds similarly. There the court quotes approvingly from *Burns v. Ferro*, 1991 WL 53834, at *2 (Del. Super. Ct.): "it is well settled law that a court will not aid a contractual claim founded on a violation of the law ... where parties to a contract are *in pari delicto*, a court will 'leave them where it finds them,' and will refuse to enforce the contract." *Abrams*, *supra*, at footnote 38.

The bottom line of this claim is that Mr. Lynch was fully aware of precisely what Paul Cox proposed to do, enabled the action, and has suffered no damage as a result. Lynch's claim for damages based upon this act is unjustified and unsupported.

17

V.    **CONCLUSION**

There is no basis for allowing this case to go to trial. Mr. Lynch's testimony is fatal to his claims in all respects. Cox and CMUSA are entitled to judgment.

Respectfully submitted,

**BLANK ROME LLP**

By: _____
Thomas P. Preston (I.D. No. 2548)
1201 Market Street, Suite 800
Wilmington, DE 19801
(302) 425-6400

Attorneys for Defendant Coinmaster
USA, Inc. and Paul A. Cox

Dated:    December 21, 2007

18

# EXHIBIT A



**WILCOX & FETZER LTD.**

In the Matter Of:

# Lynch

v.

# Coinmaster USA, Inc.

C.A. # 06-365 JJF

---

Transcript of:

Daniel Anthony Lynch

November 26, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Lynch v. Coinmaster USA, Inc.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANIEL ANTHONY LYNCH,                    )
                                         )
              Plaintiff,                 )
                                         )    Civil Action
         vs.                             )    No. 06-365 JJF
                                         )
COINMASTER USA, INC.,                    )
a Delaware corporation,                  )
                                         )
              Defendant/Counterclaim     )
              Plaintiff                  )
                                         )
PAUL A. COX,                             )
                                         )
              Defendant/Counterclaim     )
              Plaintiff and Third-       )
              Party Plaintiff            )

         vs.

AUTO GAMING, INC.,

              Third-Party Defendant


         Deposition of DANIEL ANTHONY LYNCH taken
pursuant to notice at the law offices of Blank Rome, LLP,
Chase Manhattan Centre, 1201 Market Street, Suite 800,
Wilmington, Delaware, beginning at 9:12 a.m., on Monday,
November 26, 2007, before Allen S. Blank, Registered Merit
Reporter and Notary Public.


WILCOX & FETZER

1330 King Street - Wilmington, Delaware 19801

(302) 655-0477

www.wilfet.com

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

2

1   APPEARANCES:
2        KEVIN A. GUERKE, ESQUIRE
         SEITZ, VAN OGTROP & GREEN, P.A.
3        222 Delaware Avenue, Suite 1500
         Wilmington, DE 19899
4
              For - Plaintiff and Third-Party
5             Defendant
6   THOMAS P. PRESTON, ESQUIRE
         BLANK ROME, LLP
7        Chase Manhattan Centre
         1201 Market Street, Suite 800
8        Wilmington, DE 19801
9             For - Defendant/Counterclaim Plaintiff
10  STEVEN D. SCHERZER, ESQUIRE
         Cooper, Levenson, April,
11       Niedelman & Wagenheim, P.A.
         1125 Atlantic Avenue
12       Atlantic City, NJ 08401
13            For - Defendant/Counterclaim Plaintiff
              and Third-Party Plaintiff
14
    ALSO PRESENT:
15
         PAUL A. COX
16
17            * * * * * *
18            DANIEL ANTHONY LYNCH
19       the deponent herein, having first been
20       duly sworn on oath, was examined and
21       testified as follows:
22            EXAMINATION
23  BY MR. SCHERZER:
24       Q   Tom Preston just left the office to make copies of

3

1   various documents.  He will be taking most of the
2   deposition, Mr. Lynch.  But let me introduce myself and give
3   you certain instructions.
4        My name is Steve Scherzer.  I'm from the Cooper
5   Levenson law firm.  You and I never had the pleasure of
6   meeting before.  I represent Mr. Cox on an individual basis.
7   Mr. Preston, of course, represents Coinmaster USA.
8        You're here today for something called a
9   deposition.  Have you ever had your deposition taken before?
10       A   No.
11       Q   Let me give you some instructions; and, once those
12  instructions are finished, Mr. Preston then will begin.
13       A deposition is a process, as you can see,
14  where we have the stenographer, the gentleman sitting to
15  your right, who is taking down everything that you're
16  saying.
17       The questions that we ask you and the answers
18  that we give can be used at the time of the trial.  I don't
19  say that to impress you.  I'm saying that to impress upon
20  you the fact that these are important proceedings.  So that
21  we ask you not to guess at an answer.  If you don't know the
22  answer and that's a truthful answer, that's perfectly okay
23  for you to say I don't know.
24       If you want to go back and revisit an area,

4

1   something came up and something is on your mind and you're
2   not comfortable with an answer that you gave us, please let
3   us know and we will go back and we'll revisit.
4        A   Okay.
5        Q   Try not to say um-hmm or uh-huh.  In the normal
6   discourse, we would know exactly what you mean by that.  But
7   when we have a stenographer, the stenographer will have a
8   hard time understanding what that means.  So if Mr. Preston
9   or I would say to you, does um-hmm mean yes, please don't be
10  offended.
11       If you need to take a break to go to the
12  bathroom.  This is not an endurance contest.  Please let us
13  know.
14       If there is a question or a word that we use
15  that you don't understand or I know you come from the UK.
16  There may be some verbiage that we don't understand that you
17  use or you don't understand that we use, please let us know.
18  Because we don't want to make a mistake.
19       A   Will do.
20       Q   We don't want to have miscommunication.
21       Which reminds me of one other thing.  Please
22  wait until I finish my question and Mr. Preston finishes his
23  questions before you give an answer.  And we'll wait until
24  you finish your answer before we ask the next question.

5

1   Because the stenographer can't take down two people at the
2   same time.
3        If your attorney is going to interject or
4   interrupt, that's perfectly okay.  Let us work through our
5   issues before you continue your answer.
6        Are you taking any medication which would have
7   any adverse effect on your ability to give truthful answers?
8        A   No.
9        Q   Do you have any type of physical or any other
10  condition that we should know about that would impact on
11  this deposition?
12       A   No.
13       Q   I say that because there was a time I took a
14  deposition once of someone who was a diabetic who needed to
15  check her sugar periodically; and, if she did not, her
16  cognitive abilities diminished.  And that was important that
17  I know that.  Otherwise, the deposition process becomes
18  problematic and we don't want that.  So you don't have any
19  such conditions?
20       A   Nothing.
21       Q   Okay.  Do you have any questions for us before you
22  begin?
23       A   No.
24            MR. SCHERZER:  Okay.  Tom?

2  (Pages 2 to 5)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

6

1     MR. PRESTON: Steve, let me talk to you just
2  about one question. We'll be right back.
3     MR. SCHERZER: Off the record, please.
4     (Discussion held off the record.)
5        EXAMINATION
6  BY MR. PRESTON:
7   Q   Okay. Mr. Lynch, good morning. My name is Tom
8  Preston. And I represent Coinmaster USA.
9   A   Good morning.
10  Q   Would you describe for me your educational
11  background, please?
12  A   I left school at 15. That was the basic education.
13  Q   And what was your business before you became
14  involved with Coinmaster USA?
15  A   I have been self-employed one way or another. I
16  have owned businesses all my life.
17  Q   Okay.
18     (Discussion held off the record.
19  BY MR. PRESTON:
20  Q   Okay. Back to your description of your career prior
21  to being involved with Coinmaster USA. You said you --
22  A   I have been manufacturing gaming machines for
23  42 years, or thereabouts, or been involved with the
24  manufacture of game machines with various companies.

---

8

1  as of this morning. He said he would. So they are coming
2  to you, of course, without a cover letter.
3     Here is the original certification of Mr. Cox's
4  second set of interrogatories and here is a certification
5  concerning Coinmaster's answers to interrogatories.
6     MR. GUERKE: Thank you.
7     MR. SCHERZER: You're welcome.
8     MR. PRESTON: I also have one other document
9  that I want to provide to you. I guess since we are doing
10  housekeeping, this is as good a time as any.
11     This is a copy, a more complete copy of
12  licensing arrangements. It's between Coinmaster USA and
13  various entities and it's Bates'd CM-BR 1335.
14     MR. GUERKE: Thank you.
15     MR. PRESTON: Steve, do you have a copy of this
16  already?
17     MR. SCHERZER: Thank you very much.
18  BY MR. PRESTON:
19  Q   You were saying, Mr. Lynch, that you have been
20  involved in the manufacture of gaming machines since you
21  were 21?
22  A   Correct.
23  Q   Okay. And it's been for a total of 42 years?
24  A   About that, yes.

---

7

1   Q   And how did you become involved with gaming
2  machines?
3   A   When I was about 21, I was manufacturing signs and
4  displays and was requested by a local company called Ace
5  Coin Equipment to produce vacuum form plastic quizzing
6  screens.
7     MR. SCHERZER: Mr. Lynch, sometimes we have
8  very fast talkers, which in the normal discourse is fine.
9  But when we have a stenographer, that makes it difficult
10  sometimes if you're going too fast.
11     THE WITNESS: Okay.
12     MR. SCHERZER: Could we do a little bit of
13  housekeeping first?
14     THE WITNESS: Sure.
15     MR. SCHERZER: We had sent to Mr. Guerke, did I
16  pronounce it correctly?
17     MR. GUERKE: Guerke.
18     MR. SCHERZER: We had sent to Mr. Guerke
19  answers to interrogatories last week. But they did not have
20  verifications attached. There was an exchange of e-mail
21  messages, I believe the latter -- the early portion of last
22  week, which was a short week, given the Thanksgiving Day
23  holidays, about the fact that the verifications did not come
24  in, and asking whether or not Mr. Guerke would accept them

---

9

1   Q   Did there come a time when you formed a company by
2  the name of High View?
3   A   Absolutely, yes.
4   Q   Okay. And when was that company formed?
5   A   It must have been '83. Or 2003, I think. I'm not
6  sure of the dates.
7   Q   You filed an action in the Court of Chancery seeking
8  a receiver for High View, did you not?
9   A   That's correct.
10  Q   And you contend that there is a deadlock among the
11  directors of High View in that action?
12  A   That's correct.
13  Q   Who are the directors of High View?
14  A   Myself and Paul Cox.
15  Q   And who have been the directors in High View, of
16  High View since it was formed?
17  A   Myself and Paul Cox.
18  Q   What does the deadlock involve?
19  A   Paul Cox withdrew all support, couldn't fund it.
20  Even though extensive funding was required, he knew from the
21  beginning it was.
22  Q   Okay. My point is --
23  A   Sorry. Just to finish off.
24     He refused to allocate any shares to make the

---

3 (Pages 6 to 9)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

10

1  imbalance work out.
2     MR. SCHERZER:  I'm sorry, imbalance?
3     THE WITNESS:  Well, it was agreed in the early
4  stages that should his funding and my funding be unequal,
5  that it would be passing over of shares to make the funding
6  balance out according to the investment of the company, to
7  the shareholders.
8  BY MR. PRESTON:
9     Q   And is the allocation of shares, of additional
10  shares, which you contend should happen, has that been put
11  to a vote to the board of directors?
12     A   Paul Cox refused to do so.
13     Q   What efforts did you make to put it to a vote of the
14  directors?
15     A   I went to see Paul Cox at his offices.  I flew from
16  the UK to go see him to try to get it resolved and he
17  refused to do so.
18     Q   Did you call for a special meeting of the directors
19  to issue shares?
20     A   No.  He withdrew all support and all communication.
21     Q   Are there other deadlocks with respect to High View?
22     A   Not as far as I know.
23     Q   What assets does High View, Inc., currently own?
24     A   I would assume it is still in the development of the

11

1  early stages of the product that we produced.
2     Q   So the only assets of High View, to your knowledge,
3  are ownership of a machine?
4     A   There was no machine.
5     Q   All right.  Describe more fully for me, then, what
6  the assets are?
7     A   There was a prototype PCB board.  A PCB is a printed
8  circuit board of electronic components.
9     Q   Okay.  And that prototype was developed by whom?
10     A   By ML Solutions, Ltd.
11     Q   Under contract with anyone?
12     A   With High View obviously.
13     Q   Okay.  And is that PCB board developed as we sit
14  here today?
15     A   Indeed, it still exists, yes.
16     Q   Is it operational?
17     A   No.  Not in that format.
18     Q   Why is it not?
19     A   Because the development of that particular product
20  for High View stopped.
21     Q   Okay.  Was ML retained by any other entity, to your
22  knowledge, to develop a gaming machine similar to what High
23  View had been developing?
24     A   Indeed.  Auto Gaming.

12

1     Q   And Auto Gaming is a company that you formed?
2     A   Correct.
3     Q   And when did you form it?
4     A   I can't exactly recall.  About three years ago.  Two
5  or three years ago.  I can't remember the date.  I can
6  confirm the date later on, if you like.
7     Q   It is 2004, 2005?
8     A   Somewhere around there, yes.
9     Q   And what was the purpose for you forming that
10  company?
11     A   To produce a machine.
12     Q   To produce the same machine that High View had, was
13  working on?
14     A   To produce a machine.  Not the same machine.
15     Q   What's the difference between the machine that Auto
16  Gaming was or is producing versus that which High View was
17  developing?
18     A   Extensive software changes, multiplications, online
19  system multiplications.  Rewriting.  The whole game
20  structure is my game design, which is totally changed.
21     Q   Why were those changes made in the Auto Gaming?
22     A   They were necessary.
23     Q   For what purpose?
24     A   To make the product marketable.

13

1     Q   Okay.  So that you had made the determination that
2  the game High View was developing was not going to be
3  marketable?
4     A   It wasn't marketable.  It wasn't finished.
5     Q   And why did you choose to develop the game through
6  Auto Gaming?
7     A   Because Paul Cox, as I already stated to you,
8  refused to -- refused any communication with me.  He refused
9  to do anything.  He refused to fund the share of the
10  project.  He withdrew all his support.  He got rid of me
11  from Coinmaster.  And refused to balance the shares.
12     Q   When you say balance the shares, describe for me
13  exactly what you mean by that?
14     A   There are e-mails in the communication thing where I
15  quoted Paul I think about $250,000 to actually produce the
16  development of the product.  And Paul, after 30 -- I think
17  it was $38,000, withdrew his support.  So he knew that the
18  product could not be possibly finished with the monies that
19  were available.  Or even half finished.  So I told him at
20  the time that I was prepared to continue funding the project
21  to its completion, that I wanted a dilution of shares from
22  his side to counter that.
23     Q   I'm not sure that that answers my question, which
24  is, when you refer to balancing the shares, exactly what is

4  (Pages 10 to 13)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

## 14

1   it that you mean by that?
2     A  When I requested Cox, that the money, dollar for
3   dollar, the share structure should be on a similar basis.
4     Q  Dollar for dollar, the share structure should be on
5   a similar basis?
6     A  If you put 38,000 into something and I put 250,000
7   into something, I would expect more shares than you.
8     Q  Okay. And is it your testimony that you invested
9   $250,000 in cash?
10     A  I didn't say that. I didn't say that.
11     Q  Mr. Lynch, we are going to have to stop stepping on
12   each other's questions.
13     A  Okay.
14     Q  Let me just finish it. It may not be a question
15   that you think makes any sense but let me ask it anyhow and
16   then you answer.
17       Is it your testimony that you had put $250,000
18   in cash into High View?
19     A  No.
20     Q  Was the $250,000 figure you just testified a
21   hypothetical figure?
22     A  Not at all. There is e-mails to the effect of what
23   the costing would be and Cox acknowledged the fact that I
24   quoted this figure to him and he was saying he was concerned

## 15

1   about it and he was trying to obtain other investors in the
2   company to breach the difference.
3     Q  So the $250,000 is what you estimated it would cost
4   to bring the game that High View was developing to market?
5     A  Correct.
6     Q  Okay. Had you committed to investing that sum
7   yourself?
8     A  I informed Cox I was prepared to fund the balance of
9   the development if he restructured the company shares.
10     Q  And how much would that require of your personal
11   cash?
12     A  Obviously between what was on the table so far and
13   to the completion of $250,000 worth of effort.
14     Q  And how much was on the table already?
15     A  Well, I had already spent in excess of what Cox had
16   spent. I think I had already spent $50,000 or thereabouts.
17   Plus I spent something over a year and a half of my time or
18   a year of my time without being paid for it.
19     Q  Had Cox invested money in High View?
20     A  As I said to you earlier on, $38,000, as I remember.
21     Q  And Coinmaster USA invested funds in High View?
22     A  They invested nothing.
23     Q  You formed a company by the name of Coinmaster
24   Gaming, PLC?

## 16

1     A  That's correct.
2     Q  And when was that company formed?
3     A  That would have been 2002. Late 2002. Sometime in
4   2002.
5     Q  And was that a --
6     A  I can't remember the date.
7     Q  You think it was around 2002?
8     A  Yeah.
9     Q  Did you form a company by the name of Coinmaster
10   Gaming Products, Ltd.?
11     A  Yes, I did.
12     Q  And when was that company formed?
13     A  About the same time.
14     Q  Both were formed in 2002?
15     A  Yes.
16     Q  Okay. Were they publicly held companies?
17     A  The one was a public company. The one was an
18   ownership of the public company.
19     Q  And which was which?
20     A  Coinmaster Gaming Products was the public company.
21   Sorry. Coinmaster Gaming, PLC, was the public company and
22   the gaming company, of course, was the manufacturing arm,
23   was a hundred percent owned.
24     Q  Owned by PLC?

## 17

1     A  Um-hmm.
2       MR. SCHERZER: Yes?
3       THE WITNESS: Yes. Sorry.
4   BY MR. PRESTON:
5     Q  Were either of those companies formed from already
6   existing companies?
7     A  Yes, they were.
8     Q  What was the existing company?
9     A  Coinmaster Gaming, Ltd., and Coinmaster USA, Inc.
10     Q  And who owns Coinmaster Gaming, Ltd.?
11     A  Primarily, I did.
12     Q  Primarily, you did?
13     A  Yes.
14     Q  Okay. And you took PLC public in the UK?
15     A  That's correct.
16     Q  Okay. Were there any shares offered on any American
17   stock exchange?
18     A  No.
19     Q  And do you recall how many shares were offered in
20   PLC?
21     A  No.
22     Q  What percentage of the public shares did you retain
23   ownership of?
24     A  In excess of 51 percent.

5 (Pages 14 to 17)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

18

1  Q  And did you pay for those shares?
2  A  I was allocated the shares because of my ownership
3  of Coinmaster, Ltd., Coinmaster Gaming, Ltd.
4  Q  Who were the directors of PLC when it went public?
5  A  There is myself, Rory Allin, Ian Rock and some
6  advisors.  Plus -- sorry.  That was a question I didn't
7  expect to answer.
8      The technical director was -- I'm sorry.  I'll
9  have to refer back to you, come back to you with the
10  answers.
11  Q  Okay.  Rory Allin is your son-in-law?
12  A  That's correct.
13  Q  And who were the officers of PLC when it went
14  public?
15  A  Well, people you just asked me the names of.
16  Q  I asked you for the directors.
17  A  They were the same as the officers.  It was one and
18  the same thing.
19  Q  Okay.  Did PLC seek any public funding -- sorry, any
20  funding of the company's operations beyond what was raised
21  in the issuance of stock?
22  A  Borrowing from the bank.
23  Q  And how much?
24  A  I think it was about three million.

19

1  Q  Was that pounds or dollars?
2  A  Pounds.  I would need to refer to that.
3  Q  I'm sorry.  Say that again.
4  A  I would need to refer to the value to be precise
5  about it.
6  Q  About three million pounds?
7  A  Yes.
8  Q  And how much money was raised by the company in the
9  public offering?
10  A  I couldn't tell you without checking.
11  Q  Order of magnitude.  More than a million dollars?
12  A  About.  About a million pounds, I would think.
13  Q  Okay.  Did there come a time when PLC went into
14  receivership?
15  A  Yes, they did.
16  Q  And what was the date of that?
17  A  That was March 2003.
18  Q  Okay.  Is receivership the equivalent in the UK of
19  bankruptcy in the United States?
20  A  I don't know.  Unless you explain the laws of
21  bankruptcy, I couldn't tell you.
22  Q  As a result of going into receivership, did you lose
23  control of PLC?
24  A  I did.

20

1  Q  And who took over control of PLC?
2  A  That was the receiver.  The receiving company.  It
3  was who the bank appointed.
4  Q  And the receiver was what company?
5  A  I'm sorry.  Can I request an answer?
6  Q  No.  Even if Kevin knows, which is a scary thought.
7  You're not allowed to ask him.  Was it Ernst & Young?
8  A  Yes, it was.
9  Q  And was it the UK arm of the accounting firm known
10  as Ernst & Young?
11  A  Correct.  Based in Bristol.
12  Q  Did they then place management in the company?
13  A  They did.  That was on the 3rd of March.
14  Q  Of 2003?
15  A  Correct.
16  Q  And what happened with Coinmaster Gaming, PLC, and
17  Products Limited?
18  A  The bank's receiver entered the company, sold off
19  all the assets.  When the assets were recovered, as far as
20  they could recover them for the bank, they passed the
21  company back to the directors.
22  Q  Okay.  And is the company still in existence today?
23  A  As far as I know, yes.
24  Q  Do you have any involvement in either Gaming PLC or

21

1  Gaming Products, Ltd.?
2  A  I resigned as a director of both those companies
3  about 12 months ago and the companies are stagnant.  But as
4  far as I know, they haven't been struck off.  They still
5  exist.  And as they still exist, I still control interest.
6  I am still a 51 percent or greater shareholder in both of
7  them.
8  Q  But, to your knowledge, neither company is engaged
9  in any business activities?
10  A  Not as far as I know.
11  Q  And are you aware of who the officers and directors
12  of those companies are today?
13  A  No.  As I said, I resigned as director of both
14  companies.
15  Q  Okay.
16  A  That was I think about 12 months ago.
17      MR. SCHERZER:  Could I interject?  There seems
18  to have been a disconnect between the question and the
19  answer.  We heard that you resigned 12 months ago.
20      THE WITNESS:  Yes.
21      MR. SCHERZER:  But the question was, do you
22  know who the officers and directors are today?
23      THE WITNESS:  I don't.  Because they might have
24  resigned as well.

6  (Pages 18 to 21)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

22

1        MR. SCHERZER: Okay. Sorry, Tom.
2        MR. PRESTON: That's all right.
3        THE WITNESS: I haven't been with the company
4   for a year.
5   BY MR. PRESTON:
6        Q   Mr. Lynch, what was the reason that PLC and its
7   subsidiary, Products, Ltd., went into receivership?
8        A   Well, the gaming industry is quite complex. You're
9   as good as your last product. So if your last product
10  failed, you're under pressure to produce something else,
11  which can take a considerable length of time.
12       The California marketplace, which is a
13  marketplace that I started and looked at for some
14  considerable time before entering into it, is a lot more
15  technically difficult than one realizes at first glance.
16  For instance, there is a technology called SAS. And this is
17  a software interface which must be written into the gaming
18  machine you produce which talked about 17 different online
19  mainframe computers produced by different manufacturers.
20       The SAS technology is an IGT product.
21       Q   I'm sorry, a what?
22       A   The SAS technology is an IGT.
23       Q   Is that a company?
24       A   That's the largest company in the world making

23

1   gaming machines. It's the largest company in America making
2   gaming machines.
3        And they produced a SAS interface, which became
4   the standard for the industry. And they allowed, under
5   license, people to write their -- the SAS product of
6   protocol into the machines so that every machine that you
7   produce was able to talk to any one of these 17 online
8   systems.
9        And GLI, which is the body, there are two
10  bodies, but GLI's is the principal body that actually tests
11  all the software. The software is very complex and very
12  difficult to write. GLI tests the software thoroughly from
13  start to finish before they issue a license to say that,
14  yes, you're approved.
15       And in the early days of the SAS
16  communications, I realized that trying to get the system
17  approved for all 17 was beyond our abilities. So I reduced
18  it down into the particular casinos I was targeting and
19  particular online systems that they were working with. And
20  I had the GLI approvals at two casinos, which we entered
21  into.
22       Q   When did you have those approvals?
23       A   2002.
24       Q   Please continue.

24

1        A   The machines then worked in those two particular
2   casinos. I then assumed that most of the casinos we thought
3   were on the same system as the two majors we got after and
4   we went to the next casino and we were extremely surprised
5   to find that it uses a split SAS system. So that the ticket
6   in, ticket out, which is how people get paid, was on one
7   system and SAS was a separate system.
8        The technology that we had, the PCB board, the
9   electronic hardware circuit, wouldn't work on a split
10  system. It was only a single port.
11       So we lost the sale of that particular site and
12  I had a great deal of work to do. Consequently, I was
13  already scheduled to build about 17 machines for the
14  marketplace in California, which I found quite difficult to
15  produce that kind of product. And part of the funding from
16  the city was to try to fund that.
17       Q   I'm sorry. Part of the funding --
18       A   The funding from the city was in order to make that
19  happen.
20       Q   When you saw funding from the city, what are you
21  referring to?
22       A   Going public to raise money. That allows us to
23  spend money in developing the product to enter the
24  marketplace.

25

1        Q   Right.
2        A   But the SAS technology was, as I said, very
3   complicated and we had extreme difficulties that went on for
4   a long time. I think about a year and a half. So the
5   products I produced to enter into the marketplace sat in a
6   warehouse for over a year. And, in fact, it took about a
7   year and a half before they actually released them into the
8   casinos in California and to Coinmaster USA.
9        On top of which another product we produced at
10  the same time, which was a horse racing game, which was a
11  very large, complex product, which we spent probably about
12  two and a half million dollars developing. As far as the
13  engineering and the technology work, the actual game didn't
14  take the money that was necessary to make it pay for the
15  casinos. So after extensive tests, they sent the game back.
16  So I was in a situation --
17       Q   Who tested it? You say after an extensive test?
18       A   The test was on site in California Morango casino.
19       Q   And that was tested in a casino not by GLI?
20       A   It was pretested by GLI for approvals for the online
21  software. You aren't allowed to site any machine in any
22  casino in America, at least in American Indian casinos,
23  without having the GLI approval.
24       GLI approval is designed in such a way that

7 (Pages 22 to 25)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

26

1  they actually test the chips or the software where the
2  checks are numbered, which must match up with the checks
3  that are numbered on the certificate by GLI. So nothing can
4  be done without having first been approved by GLI.
5    Q  Okay. So you had these preapprovals from GLI, you
6  put the horse racing game, which is called, Winning Post,
7  wasn't it?
8    A  Correct.
9    Q  And you put that in a casino, Morango?
10   A  Correct.
11   Q  And it didn't function as required?
12   A  It functioned but it failed to take sufficient money
13  to make it pay.
14   Q  Okay. And so that game essentially failed as a
15  product?
16   A  Correct.
17   Q  And was it that failure that ultimately caused
18  Gaming, PLC, to fail as a business?
19   A  Well, it was a multitude of things. That failed.
20  The marketplace, because of the late delivery of the
21  machines that were in the warehouse, caused severe problems.
22  And on top of which in the UK marketplace, I employed legal
23  advisors. I managed to get the gaming board in the UK to
24  agree that my roulette machine was a legal product. And a

27

1  very complicated exercise for a gaming board and the legal
2  advice cost in excess of 120,000 U.S. dollars. And the
3  gaming board accepted our argument.
4    Q  This is a gaming board where?
5    A  In the UK.
6    Q  And this is to accept it as legal for distribution
7  in the UK?
8    A  Correct. For use in casinos in the UK. And it was
9  quite a complex argument. But they acknowledged that we did
10  comply with the Gaming Act, although they didn't like the
11  product.
12       It gave me a distinct advantage over my
13  competitors because only I knew and my lawyers how we
14  actually managed to achieve the approvals.
15       Regrettably, the gaming board informed my
16  primary competitor. It was a company over in Austria,
17  Neuromatic, a very powerful company, a company that turned
18  over in excess of today's value one and a half billion
19  dollars.
20       Once they saw how to get the plan approved
21  because they had filled, then they changed their system to
22  match mine and undersold me throughout the UK. So the
23  marketplace I had established in the UK fell from under me,
24  the California marketplace fell from under me. The horse

28

1  racing game fell from under me. I then was in extreme
2  difficulties.
3       I advised the bank that the marketplace I
4  targeted had all fallen to pieces and it would take in
5  excess of probably a year to turn it around.
6    Q  Now, during this period of time, that is from 2002
7  to March of 2003, was Coinmaster USA functioning as your USA
8  distributor of machines?
9    A  It was, yes.
10   Q  Okay. And were you serving as the CEO of Gaming,
11  PLC, during this period of time?
12   A  I was.
13   Q  And were you under contract?
14   A  I was.
15   Q  Okay. I'd like to show you a document that I will
16  mark as Defendant's Exhibit 1, and ask, sir, if you would
17  take a look at that document.
18       (Defendant's Exhibit No. 1 was marked for
19  identification.)
20       MR. PRESTON: Off the record for a moment.
21       (Discussion held off the record.)
22       MR. PRESTON: For the record, I have marked
23  this as Exhibit D-1.
24  BY MR. PRESTON:

29

1    Q  Do you recognize this agreement, Mr. Lynch?
2    A  Yes, I do.
3    Q  And is this the service agreement that you had with
4  Coinmaster Gaming, PLC, which designated you as the CEO of
5  that company?
6    A  That's correct.
7    Q  Now, this document is dated November 6, 2001?
8    A  Right.
9    Q  Does this refresh your recollection as to when
10  Gaming, PLC, went public?
11   A  Well, I take it this is the correct document. So it
12  would be the correct date.
13   Q  Let me ask the question differently.
14   A  I have a problem with dates in my head permanently.
15   Q  And what I'm trying to see if I can do is help you
16  recall.
17       Do you recall whether the Gaming, PLC, was a
18  public company at the time you entered into the service
19  agreement with PLC?
20   A  If it was formed, it must have been, yes.
21   Q  So it was formed sometime prior to November 6, 2001?
22   A  I would assume so, yes.
23   Q  Now, was this agreement in effect during the period
24  of time from November 2001 until March of 2003?

8  (Pages 26 to 29)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

**30**

1  A  Yes, I suppose you could say it was. But also it
2  was breached by the corporation. It failed to comply with
3  the payment terms to me. That was breached about December.
4  Q  December of what year?
5  A  2002.
6  Q  Okay. Would you turn, please, sir, to paragraph
7  6.5, which is on the fourth page of Exhibit D-1? And if you
8  would read that paragraph to yourself.
9  A  Right.
10  Q  Were you aware, sir, of the terms of paragraph 6.5
11  during the period of time this agreement was in effect?
12  A  I was.
13  Q  Okay. And, sir, would you turn to paragraph 17.1 on
14  page ten of Exhibit D-1? And, again, would you read that
15  paragraph to yourself?
16  A  I have read that.
17  Q  Were you aware of the terms of this paragraph during
18  the time this agreement was in effect?
19  A  Yes.
20  Q  Would you agree that these two paragraphs, when read
21  together, forbid you from holding any position other than as
22  chief executive of PLC in any other company associated with
23  Coinmaster, PLC?
24  A  No. There was a side letter with the company about

---

**31**

1  myself and some other corporations I was involved in.
2  Q  And side letter, what does that provide?
3  A  I would need to get you copies of it. I can't
4  remember.
5  Q  Well, have you produced copies thus far in this
6  case?
7  A  Not to my knowledge. But they are on record.
8      MR. PRESTON: Obviously we would like that.
9      MR. GUERKE: Sure.
10      MR. PRESTON: Have you seen that side letter?
11      MR. GUERKE: No.
12  BY MR. PRESTON:
13  Q  Is it your contention, Mr. Lynch, that you have
14  another agreement with Gaming, PLC, which in some fashion,
15  abrogates the provision of 6.5 and 17.1?
16  A  That's correct, yes.
17  Q  And when did you enter into that side letter?
18  A  About the same time this was done with the -- this
19  was formed by the company in London.
20  Q  I'm sorry?
21  A  At the same time as this was formed by the company
22  in London.
23  Q  And who signed the side letter that you contend you
24  have?

---

**32**

1  A  I cannot remember.
2  Q  Did you sign it?
3  A  I believe so. It was organized by my son-in-law,
4  who was a director of the company. Who was also involved in
5  some of the companies.
6  Q  Would you turn, please, sir, to the last page of
7  Exhibit D-1? Can you tell me who signed this document as
8  director?
9  A  Which one are you referring to?
10  Q  The one that says director at the top.
11  A  That's the last document, the penultimate document?
12      MR. GUERKE: Tom, there are several documents
13  attached to our copy.
14  BY MR. PRESTON:
15  Q  May I see your --
16      MR. PRESTON: Gentlemen, I apologize. The
17  November 15, 2002 letter obviously shouldn't be attached.
18  And with your permission, I'm going to simply take it off.
19      MR. SCHERZER: And is that Bates stamp 43?
20      MR. PRESTON: It starts at 43.
21      MR. GUERKE: There is also a resignation letter
22  and then there is also a note.
23      MR. PRESTON: Right.
24      MR. SCHERZER: So 43 through 46 is now being

---

**33**

1  taken out of D-1?
2      MR. PRESTON: Correct. D-1 should be CM-BR 26
3  through CM-BR 42.
4      THE WITNESS: Thanks.
5  BY MR. PRESTON:
6  Q  With that correction, Mr. Lynch, can you turn to the
7  last page of D-1 and tell me who has signed it on behalf of
8  Coinmaster Gaming, PLC?
9  A  Rory Allin, the company secretary, Graham Litt.
10  Q  Mr. Litt?
11  A  Yes.
12  Q  And that's L-i-t-t?
13  A  That's correct.
14  Q  And Rory Allin is A-l-l-i-n?
15  A  Correct.
16  Q  And you don't recall now who signed this side letter
17  to which you have referred?
18  A  No. We'll provide you with a copy as soon as
19  possible.
20  Q  Okay. Would you also look at page seven, paragraph
21  14 of this contract, or service agreement, Exhibit D-1?
22      And my question is, were you aware that there
23  was a restriction on your activity contained in paragraph 14
24  at the time this service agreement was in effect?

9 (Pages 30 to 33)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

### 34

1   A  Yes.
2   Q  Did the side letter that you say exists also
3  abrogate or compromise the provision of paragraph 14?
4   A  It specifically states in here, business of T&R
5  Operations Limited.
6   Q  Well, it says it accepts business of T&R Operations
7  Limited but it provides -- it applies to all other activity.
8   A  I appreciate that, yes.
9   Q  And my question is, did the side letter that you say
10  exists that we haven't seen --
11   A  Well, I think the side letter --
12   Q  Let me finish my question.
13   A  Okay.
14   Q  Did that side letter supposedly permit you to carry
15  on activities with other companies other than T&R Operations
16  Limited?
17   A  Not to my knowledge, no.  I think it might have been
18  just T&R.
19   Q  That's what the side letter provided for?
20   A  Yes.  This provision in here.
21   Q  Okay.  Did the side letter permit you to hold a
22  position with Coinmaster USA?
23   A  I already held that position prior to the formation
24  of the public company, I believe.  I would need to check it

### 35

1  out.  But I think I was already a director of Coinmaster USA
2  as of the time that the corporation was formed.
3   Q  If you look at paragraph 6.5, that provision states
4  that you are not entitled to receive remuneration or
5  expenses as a director or employee of the company beyond
6  that which is provided in this agreement.  Isn't that what
7  it states?
8   A  Yes.
9   Q  All right.  Did the side letter agreement that you
10  say exists permit you to receive remuneration or expenses?
11   A  I don't know what the side letter states.  I need to
12  look at that, as I said to you.
13   Q  My question is, as you're sitting here this
14  morning --
15   A  Yes.
16   Q  Do you recall any agreement with Gaming, PLC, which
17  permits you, in contrast to what the paragraph 6.5 says, to
18  receive remuneration or expenses from the company beyond
19  what is provided in this agreement?
20   A  I didn't receive any from them until this contract
21  was breached.
22   Q  Okay.  That's not my question.  Would you please
23  read the question back and see if you can answer that
24  question?

### 36

1   (The previous question was read back by the
2  reporter.)
3   THE WITNESS:  The answer is no.  There is no
4  other agreement which overrides that.
5   BY MR. PRESTON:
6   Q  And would you agree with me that, according to
7  paragraph 17.1 of Exhibit D-1, which is on page ten, that
8  when this contract uses the word company, it includes all
9  associated companies with Gaming, PLC?
10   A  I would need to take legal advice on that.
11   Q  Did you have an understanding of what 17.1 provided
12  when you entered into the service agreement?
13   A  I would say, yes, I understood that.
14   Q  And an associated company included Coinmaster USA,
15  didn't it?
16   A  Yes.
17   Q  So that according to 6.5, this forbade you from
18  receiving any remuneration or expenses from Coinmaster USA,
19  didn't it?
20   A  Correct.
21   Q  And you're not aware of any other agreement, which
22  would have permitted you to receive that, are you?
23   A  Yes.
24   Q  What agreement?

### 37

1   A  The agreement was cancelled when I was suspended in
2  February of 2003.
3   Q  The agreement in what?
4   A  This agreement was cancelled.
5   Q  But up to that point, this agreement was in effect,
6  correct?
7   A  Yes.
8   Q  Thank you.
9   I'm going to share with you, if I may --
10   A  Are you finished with this?
11   Q  You can put it aside, yes.  Thank you.
12   MR. SCHERZER:  I'm going to make a
13  recommendation that you leave it at one place and there be a
14  pile so we don't get confused at the end of this process.
15   BY MR. PRESTON:
16   Q  I want to show you actually a series of documents
17  and ask you, if you can, to identify them.  My apologies for
18  not being as well organized as I would like.
19   I am going to mark as Defendant's Exhibit D-2 a
20  facility letter.
21   (Defendant's Exhibit No. 2 was marked for
22  identification.)
23   MR. PRESTON:  And as Exhibit D-3 --
24   MR. SCHERZER:  Is the facility letter CM-BR

10 (Pages 34 to 37)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

38

1  334?
2          MR. PRESTON: The facility letter is that one,
3  yes.
4          And is Exhibit D-3 a letter dated February 25,
5  2002, from Eversheds, E-v-e-r-s-h-e-d-s. The first page is
6  Bates CM-BR 332.
7          (Defendant's Exhibit No. 3 was marked for
8  identification.)
9          MR. PRESTON: Exhibit D-4 is a corporate
10  guarantee, which begins with Bates number 642.
11          (Defendant's Exhibit No. 4 was marked for
12  identification.)
13          MR. PRESTON: And finally, D-5, is a security
14  agreement which begins with Bates 618.
15          (Defendant's Deposition Exhibit No. 5 was
16  marked for identification.)
17  BY MR. PRESTON:
18    Q  Would you take a moment, sir, and glance at those
19  documents? And my question will be whether you recognize
20  any or all of those documents?
21          Do you recognize those four documents, sir?
22    A  Three documents.
23    Q  You should have four.
24    A  Oh, this one also?

39

1    Q  Yes.
2    A  Well, I assume that they are the documents that were
3  in place.
4    Q  Were these documents, to the best of your knowledge,
5  documents that reflected the borrowings by PLC from the Bank
6  of Scotland?
7    A  Yes.
8    Q  Okay. And was Coinmaster USA bound to the terms of
9  those loan documents as a subsidiary company of PLC?
10    A  I couldn't answer that. I'm uncertain.
11    Q  Okay. Do you have any knowledge of why Eversheds
12  sent Mr. Cox copies of these documents in February of 2002?
13    A  I assume you would have to ask them.
14    Q  Did you ever discuss with Mr. Cox --
15    A  Can I explain something?
16    Q  Sure.
17    A  All of this documentation was handled by my
18  son-in-law and Ian Rock and they were counted on the board
19  and I signed these and agreed to them. When you ask me
20  questions, I can't answer because I wasn't personally
21  involved with actually the doing of it all. I would assume
22  that these documents are, indeed, correct.
23    Q  Okay. At the risk of stating something that I guess
24  is obvious, you can only tell me what you know.

40

1    A  Absolutely.
2    Q  And I understand that.
3    A  Okay.
4    Q  You were the CEO of this company. I assume that you
5  were aware that it was borrowing three million pounds from
6  the Bank of Scotland?
7    A  Of course.
8    Q  And I simply want to find out whether you were aware
9  that the subsidiary companies, including Coinmaster USA,
10  were bound by all of the covenants that bound PLC in its
11  loan documentation with Bank of Scotland. If you're not
12  aware of that, then you're not aware of that.
13    A  I am not certain of it.
14    Q  Okay. Are you aware of what restrictions, if any,
15  the loan documents imposed on PLC with respect to hiring
16  people, payment of officers and directors, et cetera?
17    A  Not in detail, no.
18    Q  Are you aware that there were such restrictions?
19    A  Undoubtedly.
20    Q  Mr. Lynch, are you aware that your counsel filed
21  answers to interrogatories in this litigation?
22    A  Yes. Of course.
23    Q  And did you participate in preparing those answers?
24    A  I would have been, yes.

41

1    Q  Now, did you review those answers before they were
2  provided to us and filed with the court?
3    A  Most certainly.
4    Q  And do you stand behind those answers?
5    A  As far as I know, yes.
6    Q  I ask the question because, as far as I'm aware, no
7  verification was ever provided for those answers. You very
8  happily signed those?
9          MR. GUERKE: I'll check. I thought we had
10  verifications.
11          MR. PRESTON: If you would check, I would
12  appreciate that.
13          MR. GUERKE: Certainly.
14  BY MR. PRESTON:
15    Q  But, in any case, you don't have any reason to
16  believe that those answers were incorrect?
17    A  No.
18    Q  Okay. You indicate in your answer to interrogatory
19  number four where you were asked to identify with names and
20  addresses all persons who have knowledge of the facts of
21  this case. You identify, oh, I don't know, 10 or 11 people.
22    A  Um-hmm.
23    Q  That's a yes?
24    A  I would assume so. You have the information. Or

11 (Pages 38 to 41)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

42

1  show me the document. I can verify whether it's right or
2  wrong.
3      Q   My question is, since these were filed, are you
4  aware -- and they were filed in September of '07. Have you
5  become aware of any other people with information on this
6  case?
7          MR. GUERKE: Objection to the form. You can
8  answer, if you know.
9          THE WITNESS: I don't know.
10 BY MR. PRESTON:
11     Q   You have identified, for the record, Paul and Mary
12 Cox, Brad Hutcheon, Ian Best, Will Robinson. Sorry. More
13 than 10 or 11. Ian Best, Will Robinson, Karen Over, Adrian
14 Wolstenholme, Ernst & Young, Graham Litt, Dan and Lynn
15 Lynch, the board of directors of Coinmaster Gaming, PLC, the
16 board of directors of Coinmaster Gaming Products, Ltd., Rory
17 Allin, the parties; attorneys, Allison Kellie and Michael
18 Lerwill.
19         Are you aware of any individuals or entities
20 with knowledge of the facts behind your lawsuit in addition
21 to those names I have just read to you?
22     A   Not as far as I'm aware.
23     Q   To your knowledge, have any of those individuals or
24 entities that you have just identified given statements to

43

1  you or to your counsel?
2      A   Graham Litt is the only person I know who has given
3  any statements.
4      Q   Okay. Were you present when that statement was
5  given?
6      A   Yes, I was.
7      Q   Okay. Was the statement in writing?
8      A   It is. Before a UK notary.
9      Q   Okay.
10         MR. GUERKE: You have it.
11         MR. PRESTON: Okay.
12 BY MR. PRESTON:
13     Q   What subject matter did the Litt statement cover?
14     A   It was in connection with the resignation letter.
15     Q   You're right. We do have it.
16         And Mr. Litt was on the board of directors of
17 PLC and Gaming Products?
18     A   Until he was also suspended by the incoming
19 receiver.
20     Q   Which would have been approximately March 1st of
21 2003?
22     A   And that was the last day of the previous month.
23 The last day of February.
24     Q   February 28th?

44

1      A   Yes. There would have been a prior meeting with the
2  receiver. And it was agreed that we would leave our office
3  at the end of February.
4      Q   Had Mr. Litt served in any capacity with your gaming
5  products companies prior to them going public?
6      A   Yes.
7      Q   What position did he serve?
8      A   He was the company accountant.
9      Q   Company accountant?
10     A   Yes.
11     Q   And for how long?
12     A   About a year, approximately, I would say.
13     Q   Approximately a year prior to the company's going
14 public?
15     A   Yes.
16     Q   Which I think we have established was sometime in
17 the latter part of 2001?
18     A   Okay.
19     Q   And had you had any relationship at all with Mr.
20 Litt prior to him becoming the company accountant?
21     A   No.
22     Q   To your knowledge, have any witnesses that were
23 identified in your answers to interrogatories, other than
24 Mr. Litt, been contacted by your counsel in connection with

45

1  this case?
2      A   Not as far as I know.
3      Q   Have you contacted any of those individuals?
4      A   No.
5      Q   No phone conversations or e-mail with any of them
6  regarding the lawsuit that is pending with Mr. Cox?
7      A   Obviously my son-in-law is aware that there was a
8  lawsuit. But I did not discuss any detail with him.
9      Q   To the best of your knowledge and information, have
10 your answers to interrogatories provided all of the
11 information requested in those answers?
12     A   As far as I know.
13     Q   Okay. I'd like to show you -- I don't have copies,
14 for which I apologize. But obviously feel free to look over
15 his shoulder.
16         But I'd like you to take a moment to look at
17 the answers to interrogatories that you provided. And feel
18 free to check the document to see that, indeed, it is your
19 answer to interrogatories. Then I will direct your
20 attention to the answer to interrogatory seven.
21         Have you had a chance to review that,
22 Mr. Lynch?
23     A   Okay. Yes, I have.
24     Q   Is the answer that you provided to seven complete?

12  (Pages 42 to 45)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

46

1    A    Yes.
2    Q    Okay.  Would you please review your answer to
3    interrogatory eight?
4    A    That's correct, as far as I know.
5    Q    And is it complete, so far as you know?
6    A    As far as I know.
7    Q    Okay.  And would you look at the answer to nine,
8    please, both the interrogatory and the answer?
9    A    That's correct, as far as I know.
10   Q    And would you look at the answer to 11, please?
11   A    Okay.
12   Q    And is that answer complete, sir?
13   A    As far as I know.
14   Q    May I have the interrogatories back?
15        Thank you.
16        Recognizing that the dates are not necessarily
17   your strong suit.
18   A    No, they are not.
19   Q    Approximately when do you recall Coinmaster USA
20   being formed?
21   A    2001, 2002.
22   Q    To the best of your recollection, was it formed
23   prior to PLC going public?
24   A    I believe it was.  But I would need to check the

47

1    dates.
2    Q    Okay.  Let me help, if I can, by showing you a
3    document that I have marked for identification as Exhibit
4    D-6, which is entitled, By-Laws of Coinmaster USA, Inc.
5        (Defendant's Exhibit No. 6 was marked for
6    identification.)
7    BY MR. PRESTON:
8    Q    I ask if you recognize that document.  Do you
9    recognize that document?
10   A    I recognize the document as being Coinmaster USA,
11   Inc.
12   Q    To the best of your knowledge and recollection, is
13   this a copy of the by-laws of Coinmaster USA?
14   A    I would assume so.
15   Q    Have you ever seen it before, that you can recall?
16   A    Yes, I have.
17   Q    Okay.  If you turn and look at paragraph 2.3, were
18   you aware that the members of the board of directors were to
19   be elected annually by the shareholders?
20   A    That's what it says there.
21   Q    Were you aware of that?
22   A    If you would have asked me was I aware of that
23   situation prior to me seeing this document, I would say I
24   wouldn't know.  There is so many by-laws in here for an

48

1    off-the-shelf company.
2    Q    An off-the-shelf company?
3    A    Well, a corporation and company chiefly set up in
4    Delaware.
5    Q    Hardly off the shelf.
6    A    You buy them off the shelf and change the name
7    accordingly.
8    Q    Okay.  But did you work with counsel in forming
9    CMUSA?
10   A    No.
11   Q    So you literally bought these by-laws from some
12   online service or --
13   A    No.
14   Q    Where did you get them?  Do you know?
15   A    Mr. Cox formed the company under my instructions.
16   Or request, I should say, rather than instructions.
17   Q    Did you review the bylaws before they were put into
18   effect?
19   A    Basically.
20   Q    And so you didn't give him just a carte blanche to
21   do anything he wanted to in forming Coinmaster USA?
22   A    I did more or less, yes.
23   Q    If you look at paragraph 3.2 of Exhibit D-6,
24   particularly directing your attention to the second

49

1    sentence, do you see where that provides that, quote, each
2    director shall hold office until the next annual meeting of
3    stockholders and until the successor is elected and
4    qualified?
5    A    Um-hmm.  Okay.  I see it, yes.
6    Q    And you're aware of that at the time this company
7    was formed?
8    A    I would have read this agreement, yes.
9    Q    Okay.  Let me show you, then, a document that I have
10   marked for identification as D-7.
11        (Defendant's Exhibit No. 7 was marked for
12   identification.)
13   BY MR. PRESTON:
14   Q    Which is a series of annual franchise tax reports,
15   and ask if you would take a moment and look through those,
16   please, sir?
17        My question is whether you have ever seen these
18   franchise tax reports?
19   A    No, not at all.
20   Q    Not at all?
21   A    No.
22   Q    Do you see that they apply to Coinmaster USA, at
23   least according to the face of the document?
24   A    Well, I see what it says on these documents.  This

13 (Pages 46 to 49)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

**50**

1  is the first time I have seen it.
2  Q   Okay. In order to attempt to save time, I'll
3  represent to you, Mr. Lynch, that these are the tax reports
4  for 2001, 2002, 2003 and 2004 and 2005 for Coinmaster USA,
5  Inc., filed with the Secretary of State of the State of
6  Delaware.
7  A   The exact filing dates or these documents?
8  Q   Well, if you look at the -- the document consists of
9  these tax reports for each of those years, two pages for
10  each year. The first is the franchise tax report. The
11  second is obviously a second page of that report in which
12  there is a handwritten date. And if you'll look at the
13  second page of the exhibit, the D-7, you'll see at the
14  bottom right corner, a handwritten date, in this case,
15  February 6, 2002. Do you see that?
16  A   Where are you referring to, please?
17  Q   The second page of the exhibit.
18  A   Right.
19  Q   All right. And if you page through, you'll see for
20  each year a similar handwritten date and the signature of
21  the officer filing this report?
22  A   With respect, sir, this doesn't mean anything, does
23  it? The exact dates these were filed other than Cox's
24  signature and date on record. The Secretary of State must

---

**51**

1  have received these on a specific day. And are those dates
2  available to me to be able to see if these are relevant
3  dates?
4  Q   Well, I'm quite certain this Mr. Guerke can provide
5  that information to you if you're interested in
6  investigating it.
7  A   Absolutely.
8  Q   And my question, I guess you have already answered
9  it, you have not seen these before?
10  A   I have never seen these documents. There is no
11  guarantee that these dates are correct as being the actual
12  filing date that they were entered into the state.
13  Q   Okay. In 2001, to your knowledge, were the
14  directors of CMUSA, yourself, Mr. Cox and Mr. Allin?
15  A   Correct.
16  Q   And in 2002, were the same three individuals the
17  directors of CMUSA?
18  A   Yes.
19  Q   And during 2003, did the directors become you and
20  Mr. Cox?
21  A   Correct.
22  Q   That's because Mr. Allin resigned?
23  A   Correct.
24  Q   And then in 2004, was Mr. Cox and Mr. Hutcheon, Brad

---

**52**

1  Hutcheon, the directors of CMUSA?
2  A   I wouldn't know.
3  Q   You don't know. Okay.
4      And in 2005, were Mr. Cox and Mr. Hutcheon the
5  directors of CMUSA?
6  A   I wouldn't know.
7  Q   All right.
8      (Defendant's Exhibit No. 8 was marked for
9  identification.)
10  BY MR. PRESTON:
11  Q   I have marked for identification a document that is
12  dated August 16, 2002, and has a Bates number LYN00157, and
13  ask if you recognize that Exhibit D-8?
14  A   I have never seen this document before.
15  Q   Were you aware that Mr. Hutcheon had an employment
16  agreement with Coinmaster USA?
17  A   Paul Cox handled all the documentation concerning
18  Brad Hutcheon.
19  Q   Okay. That doesn't quite answer my question.
20  A   Paul Cox never sent me copies of the documents.
21  Q   So is it your testimony that you were never aware
22  that Mr. Hutcheon --
23  A   I believe he did but I have not sited one.
24  Q   But you nonetheless believed that he did have an

---

**53**

1  employment contract?
2  A   Yes. I neither knew the terms nor had a sighted
3  document.
4  Q   Did you ask for a copy of the document?
5  A   No, I didn't.
6  Q   Recognizing that you have not seen this document
7  before, do the terms of the employment that are set forth in
8  this document, are they consistent with what you believe
9  were in effect with Mr. Hutcheon?
10  A   As I remember from e-mails from Paul Cox, Cox's
11  situation was in a state of flux with commissions that he
12  had discussed and decided with Brad Hutcheon and I was not a
13  party of the final details of any of those discussions. I
14  just know he had a contract.
15  Q   Okay. Do you know how, Mr. Lynch, you obtained a
16  copy of this document?
17  A   Which document?
18  Q   Exhibit D-8. And this isn't a trick question. But
19  you gave the document to us.
20  A   I don't know. There is a possibility I did. I just
21  don't remember it. There is a lot of documents.
22  Q   I understand. And only a lawyer would expect you to
23  remember everything from five years ago.
24  A   Absolutely.

---

14  (Pages 50 to 53)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

54

1  Q  So it is quite possible that you did have a copy of
2  this document in your file?
3  A  It's very possible. There are several thousand
4  documents, as you realize.
5  Q  Okay. Let me ask you to look at an exhibit that I
6  have marked for identification as D-9, which is a fax
7  transmission from Coinmaster USA, Mr. Cox, to an individual
8  named Graham dated September 11, 2002?
9      (Defendant's Exhibit No. 9 was marked for
10 identification.)
11 BY MR. PRESTON:
12 Q  And I would ask you to take a moment.
13     My question basically is whether you have ever
14 seen any of these documents before?
15     MR. SCHERZER:  And that's marked Bates stamp
16 418. It is a pretty extensive document. All the way
17 through 450.
18     THE WITNESS:  In answer to your question, in
19 connection with page 07 of this document, I haven't seen
20 this one before. I have to withdraw that. My signature is
21 on it.
22     You must understand the situation with going
23 public. I had specialized people involved in handling all
24 the documentation. They would present them to sign to me

55

1  and I would run through them very briefly. So they don't
2  register in my mind.
3  BY MR. PRESTON:
4  Q  Let me try to approach it this way, Mr. Lynch.
5     Do you recognize the various documents which go
6  to make up Exhibit D-9, that they are signature pages and
7  the like from the banking facility entered into between PLC
8  and Bank of Scotland?
9  A  Well, I have to say yes to that obviously.
10 Q  Does it refresh your recollection that Coinmaster
11 USA was likewise a party to that BoS bank facility?
12 A  I believe it was. Because there was a lot of
13 correspondence between both the bank, Graham Litt and the
14 officers handling the documentation.
15     MR. PRESTON: Take a five minute rest break.
16     (A brief recess was taken.)
17     (Defendant's Exhibit No. 10 was marked for
18 identification.)
19 BY MR. PRESTON:
20 Q  Let me show you, Mr. Lynch, a document that I have
21 marked for identification as Exhibit D-10, which is a set of
22 minutes of the special meeting of the board of Coinmaster
23 USA from September 11th, 2002, and ask whether you recognize
24 that document?

56

1  A  I don't remember the document, no.
2  Q  Do you recall the board meeting at which the board
3  was asked to consent to Coinmaster USA signing the Bank of
4  Scotland loan documents?
5  A  I don't remember it. That doesn't mean to say it
6  didn't happen.
7  Q  Do you have any reason to believe that you did not
8  participate by conference call in this meeting?
9  A  I'd like to refer back to my documentation to answer
10 that.
11 Q  Which documentation would that be?
12 A  E-mails, correspondence and the like.
13 Q  Did you attend board meetings of CMUSA by conference
14 call from time to time?
15 A  No.
16 Q  You don't ever recall attending such a meeting by
17 conference call?
18 A  If I did, I would have objected to it.
19 Q  So is it your contention that these minutes are
20 incorrect in referring to you as attending by conference
21 call?
22 A  I do not remember attending a conference call for
23 this meeting. So I can't say if they are correct or
24 incorrect. I just cannot remember.

57

1  Q  And you certainly don't remember whether the board
2  of CMUSA authorized CMUSA assigning the banking documents?
3  A  I would assume they did so for the bank loan.
4      (Defendant's Exhibit No. 12 was marked for
5  identification.)
6  BY MR. PRESTON:
7  Q  I'm marking as Exhibit D-12 a document, which is the
8  minutes of the annual meeting of the board of CMUSA from
9  November 8, 2002, and ask whether you recognize that
10 document?
11 A  I have seen this document, yes.
12 Q  Okay. Do you recall the meeting, the minutes of
13 which are recorded in Exhibit D-12?
14 A  No, I don't. But I have seen the document before.
15 Q  Do you recall any board meeting of Coinmaster USA in
16 which proposals for service agreements with you and Mr. Cox
17 were presented to the board for consideration?
18 A  Well, obviously I received the document from Paul
19 saying the way things were happening. Often Paul drafted
20 these things if I wasn't there or if we were communicating
21 on the phone or not. So I'm aware of the fact that there
22 were documents drafted for us to have contracts, yes.
23 Q  You just don't recall whether or not you attended a
24 meeting on November 8, 2002?

15 (Pages 54 to 57)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

58

1    A    That's correct.
2    Q    Did you ever attend any board meetings of Coinmaster
3    USA in person?
4    A    Yes.
5    Q    Did you ever attend any such meetings in Cocoa
6    Beach, Florida?
7    A    Possibly.  You mean physically?
8    Q    Physically.
9    A    No.  Not to my knowledge.
10   Q    Have you ever been to Cocoa Beach, Florida?
11   A    I have, indeed, yes.
12   Q    But not for the purpose of a CMUSA board meeting?
13   A    No.
14   Q    Do you recall any meeting at which you were
15   physically present at which the board of CMUSA considered
16   service agreements for you and Mr. Cox?
17   A    I believe it was in Arizona.
18   Q    Okay.
19   A    But I have difficulty without referring to the
20   documents.
21   Q    Do you recall any meeting in which a stock option
22   plan or scheme was considered by the CMUSA board?
23   A    Paul drafted such documents and sent them off to me.
24        MR. SCHERZER:  Let's go off the record for a

---

59

1    minute.
2         MR. PRESTON:  Sure.
3         (Discussion held off the record.)
4         MR. PRESTON:  Back on the record.
5    BY MR. PRESTON:
6    Q    The next document, which I have marked as D-11,
7    which is out of order chronologically, because I screwed up,
8    is minutes of an annual meeting of the stockholders of
9    Coinmaster from November 8, 2002?
10        (Defendant's Exhibit No. 11 was marked for
11   identification.)
12   BY MR. PRESTON:
13   Q    This is D-11.  Take a minute and look at that,
14   Mr. Lynch, if you would, and I'd ask whether you recognize
15   that document?
16   A    It is implying that I was there by telephone or in
17   person.
18        MR. SCHERZER:  Permit me to interject on
19   something.  I know, Mr. Lynch, this is the first time you
20   have ever had a deposition taken before.  So this is a whole
21   different way of communication that you have been used to
22   your entire life.  And you have had a lot of conversations
23   in your life.
24        This process is that we have the ability to ask

---

60

1    you questions.  And I know that you have a whole story that
2    you want to tell us and a lot of things you want to talk
3    about.
4         But if you would, please, and I'm sure the same
5    thing will go on tomorrow with Mr. Guerke and Mr. Green.
6         When we ask you a question, try to focus just
7    on the question.
8         THE WITNESS:  Okay.
9    BY MR. PRESTON:
10   Q    Now, when we are looking at Exhibit D-11, do you
11   recall attending an annual meeting of the stockholders of
12   CMUSA on November 8, 2002, at Cocoa Beach, Florida?
13   A    No, I don't.
14   Q    Do you recall attending such a meeting by telephone?
15   A    No.  But if I could cross check my records, I might
16   find something that will allow me to remember.
17   Q    Okay.  As of November of 2002, did Coinmaster Gaming
18   Products, Ltd., own the majority of the shares of CMUSA?
19   A    I would assume so.  If the public corporation was
20   already in being, then that would be yes.  Because the prior
21   company that owned the shares was Coinmaster Gaming, Ltd.,
22   and they would automatically have gone through to the public
23   corporation.
24   Q    All right.  Let me see if I can get this straight,

---

61

1    then.  Because I confess to being a little confused.
2    A    Okay.
3    Q    My understanding is that the public corporation,
4    from your prior testimony was Coinmaster Gaming, PLC?
5    A    Correct, yes.
6    Q    And that Coinmaster Gaming Products, Ltd., was a
7    wholly-owned subsidiary of PLC?
8    A    Which was formed, yes.
9    Q    So Products was not publicly held other than as a
10   subsidiary of a publicly held company?
11   A    Correct.
12   Q    But Products ended up with the shares of CMUSA, is
13   that correct?
14   A    I'll try to remember.  I'll explain to you
15   Coinmaster Gaming, Ltd., I think became Coinmaster Gaming
16   Products, Ltd., which then became wholly-owned by the public
17   corporation.
18   Q    By PLC?
19   A    Yes.
20   Q    Okay.  If you go about two-thirds of the way down
21   the first page of Exhibit D-11, you'll see a paragraph
22   beginning, the chairman noted.  Do you see that, sir?
23   A    Yes.
24   Q    And that refers to the election of directors for a

---

16 (Pages 58 to 61)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

62

1    three year period. Do you see that, sir?
2        A    I'm sorry. Okay. Yes.
3        Q    Was there any discussion at that meeting or
4    subsequently whether electing directors for a three year
5    period was consistent or inconsistent with the by-laws of
6    CMUSA?
7        A    Let me answer this carefully.
8            Mr. Cox drafted this. Mr. Cox drafted the
9    corporation with the lawyers who set it up for us. And
10   Mr. Cox was fundamentally in charge of all technical
11   communication, documentation, for the corporation. I did
12   not attend this meeting personally. So the only way I could
13   possibly have been at this meeting was by telephone
14   communication, if at all.
15           As I say, I would need to check that. But if
16   you say, do we understand the implications of this in
17   connection with the mandate of the company, the answer is
18   no.
19       Q    Okay. My question actually is a little simpler than
20   that.
21       A    Okay.
22       Q    Do you ever recall discussing with anyone whether
23   directors of CMUSA could be elected for three-year terms?
24       A    I have no idea.

---

63

1        Q    Do you recall at any stockholders' meeting the idea
2    of service agreements being entered into with you, Mr. Cox
3    and Mr. Allin?
4        A    Yes, I do.
5        Q    Okay. You recall that being discussed at a
6    stockholders' meeting?
7        A    I'm not sure if it was a stockholders' meeting but
8    it was certainly discussed in that period. I have
9    correspondence to this effect in my files.
10       Q    But you just don't know whether it was ever
11   discussed at the stockholders' meeting? You don't remember?
12       A    No.
13       Q    The last paragraph on page one of D-11 refers to
14   20 percent of the stock held by Coinmaster Gaming Products,
15   Ltd., being applied to a managerial stock option scheme. Do
16   you see that reference?
17       A    I do.
18       Q    Did the board of directors of Products ever approve
19   giving up 20 percent of its stock for a stock option scheme?
20       A    Not to my knowledge. Incidentally, I did not
21   suggest this. This was a Cox suggestion.
22       Q    At the time of this meeting, to the best of your
23   recollection, did Products and Mr. Cox together own a
24   hundred percent of the shares of CMUSA?

---

64

1        A    That's correct, yes.
2        Q    So that if stock was to be put into a stock option
3    plan, it had to come from one or the other or both of the
4    existing stockholders, didn't it?
5        A    I don't know if the directors of the company were
6    allowed to issue stock or not. I think I put a question
7    mark of that to Cox at the time, because it was a Cox
8    proposition, not mine.
9        Q    Did Coinmaster USA's board of directors ever approve
10   the issuance of new shares of stock for the purpose of a
11   stock option scheme?
12       A    I don't think so.
13       Q    Let me ask you to look, then, at an exhibit I have
14   marked for identification as D-13.
15           (Defendant's Exhibit No. 13 was marked for
16   identification.)
17   BY MR. PRESTON:
18       Q    Which is a November 15, 2002 letter addressed to
19   yourself and with Bates number LYN 149.
20           And do you recognize that document, sir?
21       A    Yes, I do. I signed it as well.
22       Q    So that is your signature on the second page?
23       A    Yes, indeed.
24       Q    And was this the service agreement that you entered

---

65

1    into between yourself and Coinmaster USA?
2        A    Yes, it was.
3        Q    Was there a predecessor to this agreement?
4        A    Not that I remember, no.
5        Q    Was there a successor to this agreement?
6        A    Not that I know of.
7        Q    So this is the one and only service agreement
8    between you and Coinmaster USA?
9        A    That's correct.
10       Q    Did you read this agreement before you signed it?
11       A    Yes, I did.
12       Q    And did you agree to its terms and conditions?
13       A    Yes.
14       Q    Did you negotiate with Mr. Cox over the terms and
15   conditions that are contained in this agreement?
16       A    No. Cox proposed them and I accepted them.
17       Q    In the first sentence on page one of D-13, it
18   states, we propose that the terms of the agreement between
19   yourself and Coinmaster USA, Inc., for the provision of your
20   services as chairman of Coinmaster USA, Inc., on an expenses
21   only basis be amended to the following with effect from
22   December 1, 2002.
23           Did you inquire of Mr. Cox at any time what was
24   meant by the phrase, quote, on an expenses only basis?

---

17 (Pages 62 to 65)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

66

1   A   Yes, I have.

2   Q   When did you inquire of him as to what that meant?

3   A   I'm not certain of the date.

4   Q   Was it subsequent or prior to executing this

5 agreement?

6   A   I don't remember. I'd have to look at my

7 documentation.

8   Q   Okay. But you remember discussing it with him?

9   A   Indeed.

10   Q   And do you see the last sentence in that same

11 paragraph, quote, please retain all receipts for travel in

12 case we are ever audited? End of quote. That's the last

13 sentence in the first paragraph of the exhibit.

14   A   Yes, I do.

15   Q   Did you retain all receipts for travel?

16   A   No.

17   Q   Why not?

18   A   Because there was never requested any receipts or

19 documentation.

20   Q   Did you see that the agreement provided that you

21 were to retain such receipts?

22   A   I see what the agreement says. It wasn't meant in

23 that manner.

24   Q   You said it wasn't meant?

67

1   A   No.

2   Q   Mr. Cox is quite a joker, isn't he?

3   A   Yes.

4   Q   And that this was just a joke?

5   A   Just like my signature was a joke.

6   Q   Why was your signature a joke?

7   A   Not on this document. The document he signed

8 purporting to be me.

9   Q   I'd like you to take a look at a document that I

10 have marked for identification as D-14.

11       (Defendant's Exhibit No. 14 was marked for

12 identification.)

13 BY MR. PRESTON:

14   Q   Which is also dated November 15, 2002. And ask if

15 you recognize that document?

16   A   Yes, I do.

17   Q   And is that your signature on the second page?

18   A   It is, yes.

19   Q   And is this a service agreement between Coinmaster

20 USA and Tri-County Entertainment, Inc.?

21   A   That's correct, yes.

22   Q   And is Mr. Cox the sole employee of Tri-County?

23   A   I wouldn't know.

24   Q   And was this to provide for Mr. Cox's services as

68

1 president and chief exec of Coinmaster USA?

2   A   If that's what it says, yes.

3   Q   Now, do you see where paragraph two in Exhibit D-14

4 states that, quote, your services will be provided on an as

5 required (time) basis, and the fee paid to Tri-County

6 Entertainment, Inc., to reflect these services? End of

7 quote.

8   A   I do.

9   Q   Now, that is a different wording from that which

10 appeared on the severance agreement with you, which we have

11 marked as D-13, is it not?

12   A   Cox drew up both of these agreements.

13   Q   I understand. But you agree that that's different

14 wording?

15   A   Completely.

16   Q   Did you ever inquire of Mr. Cox why D-14 was worded

17 the way it was and D-13 was worded the way it was?

18   A   No, I didn't.

19   Q   Did you ever attempt to determine what legal effect,

20 if any, the difference in the wording had?

21   A   No.

22   Q   Let me ask you to look at a document that I have

23 marked for identification as D-15.

24       (Defendant's Exhibit No. 15 was marked for

69

1 identification.)

2 BY MR. PRESTON:

3   Q   And ask if you have ever seen this document before,

4 sir?

5   A   Yes, I remember the document.

6   Q   Is this the proposed stock option scheme that

7 Mr. Cox drafted for Coinmaster USA?

8   A   It is, yes.

9   Q   Okay. To your knowledge, was this ever voted on by

10 the board of directors of Coinmaster USA?

11   A   No.

12   Q   It was not? Okay.

13       Was any other stock option scheme ever voted on

14 by the board of Coinmaster USA?

15   A   Not as far as I know.

16   Q   Now, the various agreements that we have just looked

17 at and the stock option scheme were all negotiated or put

18 into effect or at least discussed about 10 or 11 months

19 after Coinmaster USA was formed, isn't that true?

20   A   That's about right, yes.

21   Q   Was there any particular event, Mr. Lynch, that

22 caused this activity to be undertaken at that time?

23   A   I told him that Coinmaster in the UK was in a

24 problematic situation. And he then drafted these documents.

18 (Pages 66 to 69)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

70

1    Q    And what was the objective, as you understood it,
2    behind Coinmaster USA entering into these various agreements
3    at a time when you thought Coinmaster, PLC, was in
4    difficulty?
5    A    We wanted to try and purchase the Coinmaster USA
6    from the receiver, which looked almost on the cards was
7    going to go into receivership.
8    Q    You said it was almost in the cards? Is that what
9    you said?
10    A    Well, the company was in extreme difficulty. And I
11    couldn't see how to get out of those difficulties. The only
12    way we could sensibly achieve anything out of the company
13    was to try to get the machines approved in America. So the
14    only person who could actually solve that problem at that
15    time was me.
16    Q    How was the agreement entered into between you and
17    Coinmaster USA intended to help in this process of allowing
18    you to buy the shares of Coinmaster USA from the receiver?
19    How was it intended to operate, to facilitate that?
20    A    I don't understand your question.
21    Q    I don't either.
22         If I understood your testimony, the reason for
23    negotiating or entering into these service agreements and
24    developing the stock option plan was because, in your view,

71

1    PLC was in trouble and likely to go into receivership; is
2    that true?
3    A    No. I did not enter into the stock options. I
4    advised that they weren't logical or sensible at the time.
5    I shied away from that situation completely.
6    Q    So the stock options was shelved?
7    A    Yeah. Yes.
8    Q    Now, the two service agreements. As I understood
9    your testimony, they were entered into because you believed PLC
10    was about to go into receivership?
11    A    It was a possibility, yes.
12    Q    How was your service agreement intended to impact
13    the pending receivership of PLC?
14    A    I didn't give it a great deal of thought. It was
15    driven by Paul Cox. At that time, I was under extensive
16    pressure, as you probably realize.
17    Q    I understand. You owed three million pounds?
18    A    Correct.
19    Q    And things were falling apart about you?
20    A    I invested my pension fund into PLC as well, which
21    meant my pension fund was gone as well.
22    Q    Okay. Was the idea for the service agreement that
23    you entered into with Coinmaster USA something that came
24    from Paul Cox or did it come from you? I don't mean the

72

1    drafting of it. I mean the idea.
2    A    The idea came from Paul Cox.
3    Q    Okay. And did you have any understanding of what
4    the objective behind that service agreement was?
5    A    At the time, not particularly, no.
6    Q    You don't strike me as a man who just signs
7    agreements without understanding why you're entering into
8    them.
9    A    You must remember that Coinmaster USA was still in
10    difficulties. It had a great deal of stock in the
11    warehouse. It owed Coinmaster UK a great deal of money.
12    And none of those products were any good. They weren't any
13    good without me. Because I had to try and sort out the
14    technical issues and interface between the technicians
15    available.
16         So in entering into an agreement, in order to
17    try to buy the company back and get the technical issues
18    resolved we could get the company working so it was a viable
19    corporation.
20    Q    So Coinmaster USA had machines, you referred to it
21    as stock?
22    A    Stock, machines, yes. The same something.
23    Q    Not stock like --
24    A    No, machines. Finished machines.

73

1    Q    Okay. But they had technological problems with them
2    that prevented their being sold or leased to casinos?
3    A    Correct.
4    Q    And that required your involvement because of your
5    technical know how?
6    A    Correct.
7    Q    And Paul Cox never claimed to have that technical
8    know how, did he?
9    A    No.
10    Q    How did the difficulties of Coinmaster USA, which
11    you have just described, how were they impacted or helped by
12    entering into the service agreement with you that we have
13    just marked as an exhibit?
14    A    It meant that by tying me in, the stock became a
15    viable product given some time for me to resolve the issues.
16    Therefore, once the product was salable again, the company
17    became of some value. Indeed, that's exactly what happened.
18    I put several months of effort into resolving technical cool
19    issues and problems between the software people and served
20    specific rights to the software, et cetera. And the matters
21    were slowly put to bed. The machines were finished up on
22    site and Coinmaster USA became profitable and the bank
23    received the money back that was proposed to be paid for
24    part of the company.

19 (Pages 70 to 73)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

74

1    Q   Didn't those machines that were ultimately put out
2    into the stream of commerce quite rapidly become obsolete?
3    A   I don't fully understand your question.
4    Q   Didn't competitors of Coinmaster USA offer more
5    advanced, more modern, competitive machines at the same
6    point in time when Coinmaster USA was attempting to put
7    these machines, which had been in storage, out into the
8    marketplace?
9    A   It didn't affect the profitability of the product.
10   That's the question with this kind of product.  It isn't a
11   question of technology, it's a question of play appeal.
12        For instance, a children's game can be very,
13   very effective and sell thousands.  Another children's game
14   produced doesn't sell two.
15        We are in the same situation with the gaming
16   industry.  The product and the raw technology would take
17   more money than the most sophisticated product out there.
18        So it is a thing called play appeal, which is
19   very difficult to define.  This play appeal was in the
20   Coinmaster product, which I designed.  I designed the game,
21   I designed the features with the software people.  I was
22   the prime game designer of the whole product.  And that was
23   very successful in the marketplace.  I had tuned into the
24   marketplace.  It was very successful and it stayed

---

75

1    successful and it outtook all of its competitors until we
2    were removed off site under the governor's directions in the
3    early part of this year.
4        MR. SCHERZER:  Governor meaning the governor of
5    California?
6        THE WITNESS:  Yeah.
7        MR. PRESTON:  Could I have that answer read
8    back, please?
9        (The testimony referred to was read back by the
10   reporter.)
11   BY MR. PRESTON:
12   Q   Mr. Lynch, you have heard Mr. Blank read back your
13   testimony?
14   A   Yeah.  The end part isn't right.
15   Q   All right.  What did you say or what did you intend
16   to say at the end?
17   A   Your question to me was, was the technology old.
18   And to summarize that answer is, yes, it was old.  But the
19   technology worked.  It was very profitable.  So because the
20   product was profitable, it remained on site.  It wasn't
21   thrown off by somebody that had a more technically competent
22   product.  The play appeal of the game was as good, if not
23   better, than all our competitors that remained on site.
24   Q   Okay.

---

76

1    A   And until such time as the governor, I think it was
2    in February of this year, whereby roulette machines breached
3    the Act of 1865, I think it was, and had them all removed
4    from the site.
5    Q   Okay.  And that's the governor of California?
6    A   Correct.
7    Q   To whom you were referring.
8        And that happened in 2007, that California took
9    action against these machines?
10   A   Yes.
11   Q   And just for clarity of the record, the machine to
12   which you're referring is the multi-player roulette machine?
13   A   Yes.
14   Q   And in 2002, in November of 2002, when you entered
15   into these agreements, how many of those roulette machines
16   did Coinmaster USA have in the warehouse?
17   A   About 13 or 15.  Somewhere around there.
18   Q   And how many at that point in time were out in
19   casinos operating?
20   A   As I remember, maybe two or three.
21   Q   Two or three.
22        At the high water mark for Coinmaster USA, how
23   many roulette machines did it have out in the marketplace?
24   A   I wouldn't know.  That was under Cox's control.

---

77

1    Q   Well, to your knowledge, did they ever have more
2    than the 13 or 15, which were in the warehouse, out in the
3    marketplace?
4    A   I wouldn't know.
5    Q   To your knowledge, did Coinmaster USA ever secure
6    additional roulette games?
7    A   I think they might have.
8    Q   From whom?
9    A   From Capital, Ltd., was the corporation which took
10   over or purchased from the receiver the assets of my defunct
11   company.
12   Q   So you say you think they might have but you don't
13   know?
14   A   That's correct.
15   Q   And you don't know whether or not they ever even
16   succeeded in putting all the machines that were in the
17   warehouse out in the field, is that correct?
18   A   I would assume so because Cox wrote to me saying he
19   was buying more of them from Capital.
20   Q   Did Mr. Cox ever write to you and indicate that the
21   roulette game was becoming obsolete and the need was for
22   Coinmaster USA to develop new and more modern or more
23   advanced products?
24   A   Well, that was one of the principal objectives of me

---

20  (Pages 74 to 77)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

78

1  being part of Coinmaster ongoing and the reason why we
2  developed the corporation was to supply not just Coinmaster
3  but other companies. The company called High View.
4    Q   That was one of the reasons for forming High View,
5  to develop new games?
6    A   That's correct.
7    Q   And one of the principal reasons for forming High
8  View was that Capital was completely uncooperative with
9  Coinmaster USA, isn't that true?
10    A   No. It was earlier than that situation. Cox
11  actually pushed the fact he wanted to form a company and he
12  informed me he was forming a company called High View and he
13  wanted me to go over and introduce the machines properly.
14         To that end, we were having trouble with
15  Capital. Extensive trouble. But also we had the situation
16  we had by the purchase of the company from the receiver,
17  that's Coinmaster USA, wasn't yet fixed. It was being
18  negotiated. So if that failed, then we intended to use High
19  View to launch into the California marketplace.
20    Q   During what period of time was Coinmaster USA having
21  difficulties with Capital?
22    A   Throughout the period of 2003.
23    Q   Okay. Capital took over what was PLC and Products
24  after the receiver came in?

79

1    A   Correct. Well, the receiver sold the parts, the
2  assets software to them.
3    Q   And how soon after the receiver taking over control
4  did that occur, approximately?
5    A   Three months.
6    Q   So roughly early summer of 2003, Capital had control
7  of software?
8    A   Correct, yes.
9    Q   And everything.
10         And during that period of time, was Coinmaster
11  USA attempting to get Capital to work with it to provide
12  machines, spare parts, technological help, et cetera?
13    A   Yes, it was.
14    Q   And running into basically a stone wall?
15    A   Yes and no.
16    Q   Okay. Did Capital, during that period of time, view
17  Coinmaster as a potential threat to Capital's plans to
18  expand in the United States?
19    A   I wouldn't know. There was discussion with Capital
20  and the bank intimating that Capital was going to be funded
21  by the bank to take over Coinmaster USA. And that all came
22  from e-mails from Paul Cox.
23    Q   Okay.
24    A   I had no direct contact with the receiver or Capital

80

1  at that time.
2    Q   And it was at that point that the decision was made
3  that Coinmaster had to have an alternative source for
4  technological support, is that correct?
5    A   That's correct, yes.
6    Q   And that's where High View came into play?
7    A   No.
8    Q   No.
9    A   High View was formed to make machines.
10    Q   Right. To provide the technology that Coinmaster
11  didn't have?
12    A   Well, Coinmaster didn't have it, no. I had it.
13    Q   Now, during the period that the service agreements,
14  which we have just marked and discussed, were being entered
15  into, did you discuss with Mr. Cox how the service
16  agreements with USA, Coinmaster USA, related to the
17  agreements you already had with PLC?
18    A   I was concerned in about March, I think it was,
19  about March of '03. Certainly in the year '03. I sent him
20  an e-mail concerning the situation. And he told me that --
21  he sent me back a reply stating that he checked with his and
22  that my contract in USA, in Coinmaster USA, Inc., was quite
23  solid even against my contract in the UK.
24    Q   All right. Let me show you a document that you have

81

1  marked as D-16.
2         (Defendant's Exhibit No. 16 was marked for
3  identification.)
4  BY MR. PRESTON:
5    Q   Which is a document on Coinmaster USA stationery,
6  entitled, File Note. And it has Bates number LYN 44.
7         Have you seen that document before, sir?
8    A   No, I haven't.
9    Q   Now, this was produced by you. Do you know how you
10  came to have a copy of this?
11    A   No. It's possible I would have heard of it.
12    Q   Now, take a moment and read the document, if you
13  would, to yourself.
14    A   I did notify Cox that my contract may be in conflict
15  with the USA contract.
16    Q   You did?
17    A   I did, yes.
18    Q   Did you provide Mr. Cox with a copy of your PLC
19  agreement, services agreement?
20    A   I think I e-mailed or faxed it to him. I think
21  there is confirmation on the e-mails around.
22    Q   When did you e-mail it to him, to the best of your
23  knowledge?
24    A   It would have been early in '03.

21 (Pages 78 to 81)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

82

1    Q   Is it possible that you didn't send that agreement
2  to him until sometime in '04?
3    A   I'm not certain.
4    Q   This Exhibit D-15 -- I screwed up again.  It is
5  D-16.  I'm sorry.  It is D-16?
6        MR. SCHERZER:  The last document is D-16?
7        MR. PRESTON:  Yes.
8        MR. SCHERZER:  Right.
9  BY MR. PRESTON:
10   Q   D-16 is the file note dated November 29th, '02.
11  D-16 reports that you asked Mr. Cox to void the agreement
12  that you just entered into with Coinmaster USA if it proved
13  to be in conflict with the agreement you had with PLC.  Do
14  you see that?
15   A   I see what it says, yes.
16   Q   And is that accurate?
17   A   I don't think it is, no.  Well, you have had a copy
18  of my correspondence.  It's all on there.  It's in e-mails.
19   Q   What do you recall asking Mr. Cox to do in the event
20  there proved to be a conflict between PLC and Coinmaster
21  USA?
22   A   As I remember, I asked them to check it out with the
23  U.S. lawyers for Coinmaster and e-mail me back to say, yes,
24  he checked it out.  They said that there is no conflict and

---

83

1  this will stand up in Delaware law.  Words to that affect.
2    Q   But as of the discussion that's reflected in this
3  D-16, Mr. Cox didn't have a copy of your service agreement
4  with PLC, did he?
5    A   As far as I know, he did.  I would need to check it
6  out.  I would need to find out when I sent it to him.
7    Q   Or if you sent it to him?
8    A   Or if I sent it to him, yes.
9    Q   And you would agree with me, would you not, that
10  there was no way he could check out the validity of the
11  Coinmaster USA agreement without having the service
12  agreement with PLC?
13   A   Then I failed to see how the lawyers could have
14  possibly passed comment to say that there was no problem.
15   Q   Now, I'm going to ask you to take a look at D-17.
16       (Defendant's Exhibit No. 17 was marked for
17  identification.)
18  BY MR. PRESTON:
19   Q   Which is a copy of an e-mail from you to Mr. Cox,
20  dated January 10, 2003, and ask if you recall sending this
21  e-mail?
22   A   Very possibly.  I'd like to check my e-mails first
23  to confirm it.
24   Q   Okay.  Well, do you recall expressing to Mr. Cox

---

84

1  during this time period your need for cash from Coinmaster
2  USA?
3    A   Can you repeat the question, please?
4    Q   Yes, sir.
5        Do you recall discussing with Mr. Cox, during
6  the time period reflected on D-17, which is January of '03,
7  your need for cash from Coinmaster USA?
8    A   Well, if I have this, it's been expressed as part of
9  the e-mail.
10   Q   So you would agree that you did discuss this with
11  him?
12   A   As you see it there, yes.
13   Q   Now, if you have a contract that required you being
14  paid $8,000 per month, as you contend you do, why were you
15  not simply telling Coinmaster USA to live up to its
16  contract?
17   A   Why didn't Mr. Cox pay me?
18   Q   Why didn't you say that to him?  Why are you saying
19  it would be gratefully received?
20   A   Because there was funds available.  There were very
21  few machines out.  We were in a problem with the company.
22   Q   In fact, when you entered into the service
23  agreement, you were aware that Coinmaster USA didn't have
24  anything like the cash flow necessary to pay you $8,000 a

---

85

1  month; isn't that true?
2    A   That's not the projected proposal that came from
3  Mr. Cox, no.
4    Q   But the service agreement that you entered into on
5  November 8, 2002, required that you be paid $8,000 per
6  month?
7    A   Yes.
8    Q   According to you?
9    A   Yes.
10   Q   You knew at that time that Coinmaster didn't have
11  the cash flow to pay you that, didn't you?
12   A   I would need to check the figures.  But according to
13  the forecast that Cox put together during the period we were
14  supposed to draw the money, it shouldn't have been an issue.
15  Indeed, they finished up paying me $8,000 a month.
16   Q   Did they pay you in November of '02?
17   A   No.
18   Q   Did they pay you in December of '02?
19   A   No.
20   Q   Did they pay you in January of '03?
21   A   No.  I believe the funds started in about March or
22  April.
23   Q   And why, if you believe you were entitled to that
24  $8,000 per month and Coinmaster had the funds, why were you

---

22  (Pages 82 to 85)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

86

1  talking with Cox about taking perhaps $4,000 per month?
2      A    I was looking at the cash flow of the company but it
3  might not have been sufficient to pay me the full amount.
4  As soon as it was able to pay me the full amount, it did so.
5      Q    And were you, during that period of time, traveling
6  back and forth to the United States for Coinmaster USA
7  business?
8      A    Yes, I was.
9      Q    And were you also traveling to Belgium and other
10  places talking to people about technological issues
11  connected with producing games for Coinmaster USA?
12      A    No.  That was never discussed with anyone producing
13  games for Coinmaster USA.  Any supplier whatsoever.
14      Q    Okay.  Let me ask you to look at a document that I
15  have marked for identification as D-18, which is a
16  February 10, 2003 letter, with Bates LYN 155.
17          (Defendant's Exhibit No. 18 was marked for
18  identification.)
19  BY MR. PRESTON:
20      Q    And do you recognize that letter, sir?
21      A    Yes, I think I saw this at the time.
22      Q    Was Coinmaster USA at that point in time, that is
23  February of '03, attempting to secure independent long-term
24  funding for the Coinmaster USA business?

87

1      A    We were looking at various options of funding, yes.
2      Q    Was it clear to you that Coinmaster USA could not
3  stay in business if it didn't obtain some kind of funding?
4      A    It depended on the demands from the receiver for the
5  money outstanding to the corporation.
6      Q    For the stock?
7      A    Indeed.
8      Q    Essentially, the Products, Ltd.?
9      A    Yes.
10      Q    Did you raise with Mr. Cox at the time of this
11  letter whether Coinmaster USA could afford the employment
12  contract he was offering to Mr. Hutcheon at this time?
13      A    Cox drove that part of the company off.
14      Q    I'm sorry.  Say that again.
15      A    Cox was driving on the handling of the company, the
16  contracts and all that part of the information.  It wasn't a
17  function I was involved in, rather to be informed upon.  He
18  informed me of this letter.  He made the decision.
19      Q    But, Mr. Lynch, you were the chairman of the
20  company, weren't you?
21      A    It didn't mean a great deal, did it?
22      Q    I don't know.  I have never been the chairman of
23  Coinmaster USA.
24      A    No.

88

1      Q    Did you attempt to inquire of Mr. Cox whether the
2  agreement reflected in D-18 was an agreement that Coinmaster
3  USA could afford?
4      A    No, I didn't.  Cox was producing projections and
5  cash flows, which, from the appearance of it, should have
6  made everything possible.
7      Q    Did those projected cash flows depend upon the
8  successful placement in commerce of the machines that were
9  at that point in time in the warehouse?
10      A    Well, there was already a basis of the machine,
11  which was being paid for by Coinmaster, which gave its
12  stable base.  And obviously that would mean that the
13  machines in stock needed to go out to be able to pay Brad
14  Hutcheon.  The company in the UK had invoiced the machines
15  in the warehouse.  So, as a consequence, it would need to
16  keep expanding to make it all work.
17      Q    Understood.
18          At this time, in February of '03, CMUSA only
19  had two or three machines operating in casinos, didn't it?
20      A    I think so.  I need to verify the numbers.
21      Q    So two or three machines certainly was not going to
22  be sufficient to allow CMUSA to operate profitably, was it?
23      A    You must look at the value or the turnover that was
24  coming in at the time.  It was quite profitable even if it

89

1  didn't do anything else.
2      Q    Just on two or three machines, CMUSA would have been
3  quite profitable?
4      A    Yes, it was, indeed.  The Morango machines on site
5  were generating extensive profits.  They were paying the
6  capital cost of the machine in seven months.  The one in
7  Pechanga was similar until they went onto a rental basis, I
8  believe.  So the machines were highly profitable.
9      Q    When you say highly profitable --
10      A    They were turning capital every six months.  Six to
11  nine months maximum.
12      Q    When you say they were returning capital, what do
13  you mean by that?
14      A    If they cost the company $140,000, you could say the
15  company would get $140,000 back well within the first year.
16      Q    And so with two machines, that would be, in round
17  numbers, 280, $300,000 per year that the company could
18  expect to earn?
19      A    Without putting more machines out, yes.
20      Q    And the machines that were in the warehouse they
21  couldn't put out because they didn't function properly?
22      A    That's correct.
23      Q    So the upside of the company at that point in time,
24  February of '03, based upon what was operating in the field,

23 (Pages 86 to 89)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

90

1 was about $300,000 in revenue, is that correct?
2    A  I would think so. Somewhere in that area, yes. I
3 would need to look at the figures that Cox produced at the
4 time.
5    Q  But that's what you thought was the situation?
6    A  That's correct, yes.
7    Q  Okay. Thank you.
8        (Defendant's Exhibit No. 19 was marked for
9 identification.)
10 BY MR. PRESTON:
11    Q  D-19 is an e-mail dated February 12, 2003, and has a
12 Bates number of CM-BR 220, and ask if you have ever seen
13 this document before, sir?
14    A  Probably.
15    Q  Now, this is a report from Mr. Cox to Graham Litt,
16 who was the in-house accountant or chief financial officer?
17    A  Yes.
18    Q  At PLC?
19    A  Correct.
20    Q  All right. And this is just a few days prior to the
21 receiver coming in?
22    A  Right.
23    Q  Now, you see the bolded statement at the bottom in
24 the last paragraph that says, quote. Paul, please be

91

1 advised that no payments must be made to anyone without
2 authority from our bank. End of quote.
3    A  I see it, yes.
4    Q  Were you aware that, during that point in time, the
5 bank, and then subsequently the receiver, had to pass and
6 approve any payment made to anyone by CMUSA?
7    A  I don't think that was true.
8    Q  So you think Mr. Litt's statement to that --
9    A  Mr. Litt's statement I think is referring to
10 Coinmaster UK.  USA was a separate corporation. There was
11 no such demand from the bank or anybody else upon them.
12    Q  Why would Mr. Litt make the statement to Paul Cox,
13 who had no involvement in PLC?
14    A  You should ask Mr. Cox. He wrote the letter.
15    Q  Mr. Cox didn't write this letter?
16    A  It was to Mr. Cox, wasn't it?  He must have replied
17 to it.
18    Q  So you think Mr. Litt was, when he made the
19 statement, is referring to payments made by PLC after he was
20 approved from the bank?
21    A  I don't doubt that Mr. Litt is trying to restrict
22 any money going from any of the companies. But that didn't
23 impose a legal necessity to do so on Coinmaster USA, Inc.
24    Q  Mr. Lynch, let me ask you. Do you know that to be

92

1 true, based upon a review of the bank documents, or is that
2 simply a guess by you?
3    A  It's a guess, yes.
4    Q  If I told you that in signing the agreements, as we
5 have already seen from documents produced this morning,
6 CMUSA did do?
7    A  Right.
8    Q  That CMUSA agreed to the very same restrictions that
9 applied to PLC?
10    A  Fine.
11    Q  Would that be a surprise to you?
12    A  Not particularly, no. Banks are quite careful in
13 what they do.
14    Q  Right. And you would agree with me that if CMUSA
15 had agreed to the same restrictive covenants that applied to
16 PLC, then this statement by Mr. Litt is correct, that CMUSA
17 had to get bank approval prior to making payments?
18    A  I'm not certain of that. I would think the bank
19 would need to notify Coinmaster USA.
20    Q  To your knowledge, was the bank ever asked to
21 approve payments to you under your services agreement with
22 CMUSA?
23    A  No.
24        (Defendant's Exhibit No. 20 was marked for

93

1 identification.)
2 BY MR. PRESTON:
3    Q  I'd like to show you a document that I have marked
4 for identification as D-20, which has the Bates number of
5 LYN 282 on it, and ask if you have seen that document
6 before?
7    A  Yes, I have.
8    Q  This is a letter signed by you?
9    A  Yes, it is.
10    Q  And it's dated February 28th, 2003?
11    A  Yes, it is.
12    Q  Okay. And in it, you state that you resign as
13 director from Coinmaster Gaming, PLC, and Coinmaster
14 Products, Ltd.?
15    A  I do. Or I did. This was never issued to anybody.
16 And I strongly suggest you obtained it illegally.
17    Q  What caused you to write this letter?
18    A  Well, the receiver had called into the factory the
19 same day, the day before, and said that obviously all our
20 income of any nature is stopped and also the revenue for
21 that particular month had stopped. The month of February.
22 It wasn't to be paid. And he then said he wanted us on hand
23 to answer questions, if I would appear. I said I'm going on
24 holiday. And that evening, I gave that to my secretary.

24 (Pages 90 to 93)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

94

1   The following morning, he phoned up and said, please
2   withdraw this, there is no point in giving it. Because the
3   receiver has no authority to accept my resignation, only the
4   board of directors could. And there was no board of
5   directors. They had been suspended by the receiver. So
6   there was nobody to issue it to or accept it. As such, it
7   was never given to anyone. My secretary withdrew the piece
8   of paper. Twenty years she worked for me. It was put in
9   the files and it was then discovered by the receivers or the
10  directors of the company.
11         Because this person, Keith, was not a director
12  of my company. He is a person who took over Coinmaster
13  assets. And I'm sure he faxed there to Cox quite illegally
14  according to UK law.
15  Q   Keith worked for Capital?
16  A   I assume it is Keith Ingraham.
17  Q   For whom did he work?
18  A   Capital.
19  Q   And they took over the assets of PLC and Product,
20  Ltd.?
21  A   Correct, yes.
22  Q   When you wrote this letter, you directed it to the
23  board of directors of Gaming, PLC?
24  A   They didn't exist.

95

1   Q   But you directed it to them?
2   A   I did, yes.
3   Q   And you intended --
4   A   No, I gave it to my secretary and I asked her the
5   following day to withdraw it.
6   Q   I understand that.
7   A   Okay.
8   Q   I'm directing your attention to when you wrote this
9   letter on February 28, 2003.
10  A   Okay.
11  Q   You did direct it to the board of directors of PLC?
12  A   I asked my secretary to give it to the directors,
13  yes.
14  Q   And you intended it to go to the board of directors?
15  A   I changed my mind.
16  Q   Mr. Lynch, I understand. I am simply inquiring into
17  your intention when you wrote this and signed it on
18  February 28th, 2003.
19         Did you intend it to go to the board of
20  directors of PLC?
21  A   I did.
22  Q   And you intended, as it states, to resign your
23  position as director from both PLC and Products?
24  A   I did. And I changed my mind and withdrew it. I

96

1   actually confirmed to Cox that it would be withdrawn in
2   March 2003 in an e-mail, which he received. So Cox was
3   aware that it was being withdrawn in the very early days.
4   Q   Let me ask you to look, if you would, sir, at
5   Exhibit D-21, which is an e-mail from you to Mr. Cox on
6   March 21st, 2003. Do you recall sending that e-mail, sir?
7   And, indeed, receiving the e-mail from Mr. Cox. And this is
8   an exhibit with Bates No. CM-BR 130?
9         (Defendant's Exhibit No. 21 was marked for
10  identification.)
11         THE WITNESS: Yes.
12  BY MR. PRESTON:
13  Q   Do you remember sending this?
14  A   I do.
15  Q   Now, in Mr. Cox's e-mail, which is the bottom half
16  of this, he refers to your enjoying this, quote, out of
17  work, unquote, stuff. Do you see that reference?
18  A   Which page is it on?
19  Q   I'm sorry?
20  A   It is the first page.
21  Q   Right there.
22  A   Yes.
23  Q   Were you no longer working at that time?
24  A   What date was that?

97

1   Q   March 21st, 2003.
2   A   No. I had been suspended.
3   Q   And you had been suspended by the receiver from PLC,
4   Ltd.?
5   A   Absolutely.
6         Do you mind if we break?
7         MR. PRESTON: No. Absolutely. Let's go off
8   the record.
9         (A brief recess was taken.)
10  BY MR. PRESTON:
11  Q   I asked you to take a look at D-21. And you state
12  in the second paragraph, quote, it may be that we need to
13  change my arrangement date on my USA contract for the 5th of
14  this month, after I was made redundant, (I withdrew my
15  resignation, by the way, on the Friday before the receiver
16  came in.) End of quote. Do you see that, sir?
17  A   I do.
18  Q   Okay. To what are you referring when you say change
19  my arrangement date on my USA contract?
20  A   Well, I was obviously concerned with the dates of
21  the contract. And I suggested we should change it until
22  after I was suspended by the receiver, which meant they
23  breached my contract. So there was no contract any longer
24  between myself and Coinmaster USA or Coinmaster PLC.

25 (Pages 94 to 97)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

98

1    Q   So the USA contract to which you refer here is your
2    November 8th, 2002, contract?
3    A   Correct.
4    Q   And you're suggesting that it needed to be changed
5    to the 5th of March?
6    A   That's correct.
7    Q   Because that would be subsequent to your CEO
8    contract with PLC being terminated?
9    A   Correct.
10   Q   And why did you think that it needed to be changed?
11   A   I was concerned because of the wording obviously.
12   Q   That you were concerned that the CMUSA contract was
13   invalid?
14   A   It might be invalid.
15   Q   As of the time you wrote this e-mail, which we have
16   marked as D-21, you had sent your service agreement with PLC
17   to Mr. Cox?
18   A   As far as I knew, I had.
19   Q   Do you have a recollection of sending it prior to
20   this date?
21   A   Well, clearly you see here, I'm telling you I'm
22   going to fax it to him.  So I must have faxed it to him.
23   There was a great deal of E faxes.  So we lost all the E fax
24   records.

99

1    Q   I'm sorry.  Who lost them all?
2    A   Well, we used to E fax as well as e-mailing.  E fax
3    became a nightmare with junk mail ending up on your fax the
4    next day chewing up all your paper.  So I could well have E
5    faxed it to Paul.  All my E faxes have disappeared.  Since I
6    stopped using the service, it doesn't allow you to pull up
7    any records.
8    Q   But you acknowledge that in this e-mail, you say
9    that you will, quote, find my UK contract this weekend and
10   fax you a copy, end of quote?
11   A   Yes.
12   Q   So you agree with me that, based upon this, it
13   appears that you had not, as of this date, sent Mr. Cox a
14   copy of your service agreement with PLC?
15   A   I might have.  I don't know.  There is a strong
16   possibility I hadn't.  And I would agree with you.  Maybe I
17   hadn't.
18   Q   And do you recall faxing him a copy subsequent to
19   this e-mail?
20   A   I know I faxed him a copy of my agreement.  I'm not
21   certain what he wants.  If it was in this period, then it
22   was in this period.
23   Q   Okay.  Did Mr. Cox or you ever arrange to change the
24   date on your CMUSA contract?

100

1    A   Paul Cox said he sought advice from the company's
2    lawyers and the advice was there was no need, that the
3    Delaware law, the contract would stand up in Delaware law
4    and, therefore, there was no point superseding this contract
5    with another one in order to confuse the issue.  Words to
6    that effect.
7    Q   Let me show you a document I have marked for
8    identification as D-22.
9        (Defendant's Exhibit No. 22 was marked for
10   identification.)
11   BY MR. PRESTON:
12   Q   D-22, sir, is entitled, Prospective New Board of
13   Coinmaster USA.  And I ask if you have seen that document
14   before?
15   A   I have seen a letter similar to this but I would
16   need to check to make sure it is the same as the one I
17   actually have in mind.
18   Q   Mr. Lynch, do you recall a meeting with Mr. Cox in
19   Phoenix, Arizona, on or around April 7 and 8, 2003?
20   A   Yes.
21   Q   And during the course of that meeting, did you
22   discuss some or all of the points outlined in this Exhibit
23   D-22?
24   A   Possibly.

101

1    Q   And did you discuss then how the stock and,
2    therefore, the ownership of Coinmaster USA could be
3    achieved?
4    A   We discussed the distribution of the shares to be
5    able to purchase it from the receiver, yes.
6    Q   As of that point in time, early April of 2003, had
7    the receiver taken a position that it would not enter into
8    any deal for CMUSA if you were part of that deal?
9    A   Not at that time, to my knowledge.  That came later.
10   Q   That came later?
11   A   I must reiterate something.  No.  I withdraw it.
12   Forget it.
13   Q   Okay.
14       And the PAC referred to in this document, D-22,
15   refers to Paul A. Cox?
16   A   Correct.  Yes.
17   Q   Do you recall looking at a paper which set out a
18   proposed acquisition deal at this meeting?
19   A   We discussed what we should be offering for the
20   company.
21   Q   Okay.
22   A   And I think we finished up offering $3 million.
23   That's what we agreed on.  I think it was.
24   Q   And if you'd look at the second page under --

26  (Pages 98 to 101)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

**102**

1    A  Sorry. That might have been later. Sorry. It's
2  some years ago, as you appreciate.
3    Q  I do, indeed.
4    A  I know that I put forward that we should offer I
5  think it was $3 million and that went forward to the
6  receiver and the receiver, I understood, accepted that offer
7  and it was at a later date that Paul objected that we should
8  offer this much money, which again is documented.
9        (Defendant's Exhibit No. 23 was marked for
10  identification.)
11  BY MR. PRESTON:
12    Q  Let me ask you to look at a document I have marked
13  for identification as D-23, which has a Bates number of LYN
14  306, and ask if you recall that document?
15    A  I have seen a letter of this nature or something
16  similar to it, yes.
17    Q  Was this the agreement or similar to the agreement
18  that was circulated at the April meeting in Phoenix?
19    A  Well, I would obviously need to check to make sure
20  that the documents are the same. But it is very similar.
21    Q  Okay. Thank you.
22    A  Finished with that?
23    Q  I'm finished with that.
24        I'm going to ask you to look at a document that

---

**103**

1  I have marked for identification as D-24, which has Bates of
2  CM-BR 106. And ask if you recall seeing that before?
3        (Defendant's Exhibit No. 24 was marked for
4  identification.)
5  BY MR. PRESTON:
6    Q  And ask if you recall seeing that before?
7    A  Yes, I saw this.
8    Q  And this refers to getting the proper licenses which
9  were necessary in order to deal with the various casino
10  locations?
11    A  Yes.
12    Q  All right. And it includes Pechanga, Cache Creek,
13  Rincon, Barona and Chumash?
14    A  Um-hmm. Correct, yes.
15    Q  And at this point, you were located where?
16    A  I was in Spain.
17    Q  And Mr. Cox was in Florida, or at least in the U.S.?
18    A  In Florida.
19    Q  Okay. Now, he was sending back and forth to you the
20  various applications for licenses at each of these
21  locations?
22    A  Yes, he was.
23    Q  And you were fully aware that these were all
24  locations where CMUSA needed to get licenses in order to

---

**104**

1  place product?
2    A  Yes. They had been notarized in front of a British
3  notary as well.
4    Q  And Chumash is one of those locales?
5    A  Possibly.
6    Q  Do you see the reference to Chumash in the first
7  part?
8    A  I see that. But it was four or five years ago.
9    Q  I understand.
10        Chumash is the location where you contend that
11  your signature on the application was forged?
12    A  Absolutely. Do you have a copy of it?
13    Q  Sure.
14    A  I'd like to see it before I confirm it to you,
15  please.
16    Q  Okay. In due course, I will find it and it will be
17  coming up quite soon. Since it's not exactly certain which
18  document it is, you'll just have to contain your excitement
19  until then.
20        You see the reference to electronically
21  attaching your signature?
22    A  I do.
23    Q  And to getting Kellie to notarize that?
24    A  I do.

---

**105**

1    Q  Did you ever object to that procedure?
2    A  No. I didn't agree to it. I didn't object to it.
3  I stayed silent on the matter because I didn't think he was
4  serious.
5    Q  Well, did you write back to him and say you can't be
6  serious?
7    A  No. I was in the process of moving to Spain. I was
8  very seldom in connection -- in touch online. I was using
9  -- in Spain, the communications are extremely difficult. I
10  used to attend a hot spot in a cafe to down load and send
11  e-mails. And it was a quite difficult period.
12        I knew that Cox was a registered notary in
13  Florida. I wouldn't for one minute think for a moment that
14  anybody with intelligence would suggest breaking the law to
15  obtain gaming licenses where we could lose everything. I
16  didn't think it warranted a reply.
17    Q  You were aware that there were timing issues with
18  submitting these applications, were you not?
19    A  That didn't allow us to break the law.
20    Q  Were you aware that there were timing issues
21  Mr. Lynch had?
22    A  Of course there were problems. I was traveling.
23    Q  Now, if you look at Exhibit D-25, which is Bates
24  CM-BR 575.

---

27 (Pages 102 to 105)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

| 106 | 108 |
|---|---|
| 1    (Defendant's Exhibit No. 25 was marked for | 1   Q   Okay.  And -- |
| 2  identification.) | 2   A   And we were trying to reduce the amount of funds we |
| 3  BY MR. PRESTON: | 3  paid for it.  We offered three million.  We tried to drive |
| 4    Q   That is a letter dated May 6, 2003.  And have you | 4  it home, make it happen. |
| 5  seen that document before? | 5   Q   Also on the second page, at the bottom, refer to |
| 6    A   I don't think so. | 6  some of the difficulties that you're having with respect to |
| 7    Q   Okay.  You see where it sets a deadline of June 6, | 7  Capital and other sources of technology for CMUSA, is that |
| 8  2003, for submitting the completed applications and | 8  right? |
| 9  associated documents? | 9   A   Yes. |
| 10    A   I see that, yes. | 10   Q   What, again, caused that, caused you to write about |
| 11    Q   And did Mr. Cox tell you that he had this kind of | 11  that? |
| 12  deadline for the Chumash Tribal Gaming Agency license? | 12   A   I need to read it properly again. |
| 13    A   Not to my knowledge.  I would assure you, if that | 13        I was pointing out the difficulties again are |
| 14  was the case, that he needed my signature quickly, that he | 14  the technical issues to the people available. |
| 15  would have sent me an e-mail and confirmed it.  And also | 15   Q   And when you go down to the bottom of the second |
| 16  sent me a copy of this letter. | 16  page, you refer to Coinmaster USA having extremely expensive |
| 17    Q   Okay.  But you don't recall whether you have seen | 17  and outdated machines.  Do you see that? |
| 18  this before or not? | 18   A   Correct. |
| 19    A   I told you I didn't. | 19   Q   Wasn't that a concern of yours as of May of 2003? |
| 20    Q   Okay. | 20   A   It's been a concern of mine for 17 years.  The |
| 21    A   I don't think I have seen it before. | 21  product with the technology was 17 years old but the cost of |
| 22    Q   Let me show you a document.  D-26 is an e-mail from | 22  developing a new technology and the time involved, I |
| 23  you to Mr. Cox, May 6, 2003, CM-BR 134. | 23  realized was extremely extensive.  So I developed the |
| 24    (Defendant's Exhibit No. 26 was marked for | 24  technology for the horse racing game first, hence, the new |

| 107 | 109 |
|---|---|
| 1  identification.) | 1  horse racing game, which was going to be the backbone of the |
| 2  BY MR. PRESTON: | 2  ongoing product for the future. |
| 3    Q   Do you recall sending this e-mail, sir? | 3   Q   Except that it failed in the marketplace? |
| 4    A   Yes, I sent this to Cox. | 4   A   Only the game.  Not the technology. |
| 5    Q   And what was the genesis of this e-mail? | 5   Q   But without the game, you didn't have a source of |
| 6    A   What was the -- | 6  revenue production; isn't that true? |
| 7    Q   What caused you to send this e-mail? | 7   A   That's why I lost Coinmaster.  But I had developed a |
| 8    A   It goes back some years.  I have to read it all | 8  new technology, if that's what you're trying to imply.  That |
| 9  carefully first. | 9  new technology could be for any game, not just a horse |
| 10        Well, we were still trying to purchase the | 10  racing game. |
| 11  company from the receiver. | 11   Q   Okay.  Now, Exhibit D-27 is a fax to you with Bates |
| 12    Q   Right. | 12  CM-BR 107. |
| 13    A   And the legal complications of licensing, which is | 13    (Defendant's Exhibit No. 27 was marked for |
| 14  stated in there, meant that -- | 14  identification.) |
| 15    Q   Is what? | 15  BY MR. PRESTON: |
| 16    A   The legal complications of licensing, which is | 16   Q   Do you recall receiving that, sir? |
| 17  stated in here, meant that, as the board of directors of the | 17   A   Yes, I do. |
| 18  bank were controlling the receiver, the receiver was | 18   Q   Okay.  Now, this relates to Mr. Cox attempting to |
| 19  controlling the board of directors of Coinmaster.  And those | 19  receive the necessary information from you to apply for |
| 20  directors of the bank should be registered in the casinos as | 20  licenses at various -- |
| 21  shadow directors, at least.  Therefore, the complications of | 21   A   Yes. |
| 22  the licensing issues made it quite favorable for the | 22   Q   And you see where he says that the next ones are |
| 23  existing directors to buy the company.  I was trying to | 23  going to be Chumash and Barona? |
| 24  point out the various options that we had. | 24   A   Yes. |

28  (Pages 106 to 109)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

110

1    Q    And you were comfortable in sending and faxing this
2    material back to him?
3    A    I didn't fax it to him. I posted it to him.
4    Q    You posted it?
5    A    I think so.
6    Q    Snail mail?
7    A    Well, posted it via DHL or one of the express
8    couriers.
9    Q    So you were aware of all of these applications with
10   your information on them being filed?
11   A    I was aware that I had given him back signed
12   information, which he was going to get notarized. I wasn't
13   aware that Florida insisted that the person signing the
14   document needed to be in the presence of the notary. But
15   Cox was a registered notary and he knew what he was telling
16   me to do was illegal and improper. I didn't know. In fact,
17   having checked in California, in California where the
18   documents were used, it was quite legal, this process that
19   he entered into. But because the documents were actually
20   signed by the notary in Florida, it made them disallowable
21   in California. I wasn't aware of that technical issue until
22   I looked into it.
23   Q    What caused you to look into it?
24   A    I couldn't understand how he was claiming that no

111

1    further applications had been made to Indian tribes with my
2    name on it. And I couldn't see how, when I was a director
3    during that period, which, incidentally, I was a director,
4    then I wasn't a director. I then looked into -- I sent him
5    a request asking him to give me a copy of all those
6    documents, which he said there weren't any.
7         So he then contacted the Indian tribes, which I
8    knew he was approaching to put the machines into. I asked
9    if there were any applications from the company including me
10   as a director of the company. He said, yes. I managed to
11   get one of them to fax me a copy of the application before
12   it could be made by me and it was clearly Cox's handwriting
13   with my signature.
14        (Defendant's Exhibit No. 28 was marked for
15   identification.)
16   BY MR. PRESTON:
17   Q    Exhibit D-28, which is CM-BR 108, is an e-mail from
18   you to Mr. Cox telling him that you had sent back the
19   licensing forms?
20   A    Yes.
21   Q    Just one more step in the process of applying to
22   these various agencies, correct?
23   A    Okay.
24   Q    That's right?

112

1    A    Yes, it is.
2    Q    Okay. Let me ask you, have you ever seen the report
3    of the receiver on the two companies, PLC and Products?
4    A    Yes.
5         (Defendant's Exhibit No. 29 was marked for
6    identification.)
7    BY MR. PRESTON:
8    Q    And is this a copy of that report, which I have
9    marked for identification as D-29?
10   A    Yes.
11   Q    Have you ever reviewed the report?
12   A    Not in any depth, no.
13   Q    Do you know whether Mr. Wolstenholme, who prepared
14   it, was accurate in what he said? Did you attempt to
15   determine that?
16   A    Not really. I lost my money. I lost my fortune.
17   I lost my pension fund. I walked away.
18        MR. SCHERZER: No curiosity?
19        THE WITNESS: I told you what he found. I went
20   down. The company market went down five points all at the
21   same time. The most I could handle was two. I couldn't
22   handle all five.
23   BY MR. PRESTON:
24   Q    But do you believe that this is a copy of the report

113

1    prepared by the receiver?
2    A    Oh, yes. There is no concern.
3    Q    Okay. Let's move on, then.
4         (Defendant's Exhibit No. 30 was marked for
5    identification.)
6    BY MR. PRESTON:
7    Q    I have marked for identification as Exhibit D-30 an
8    e-mail with CM-BR 768. Do you recall receiving this, sir?
9    A    Yes, I do.
10   Q    All right. And in this, Mr. Cox indicates that he
11   is not putting the stock option scheme into effect?
12   A    I never thought they were a good idea in the first
13   place.
14   Q    But he did inform you of that and you agreed?
15   A    Yes, indeed.
16        (Defendant's Exhibit No. 31 was marked for
17   identification.)
18   BY MR. PRESTON:
19   Q    I have marked for identification a letter dated
20   July 2, 2003, with Bates LYN 210. Do you recall receiving
21   or seeing that?
22   A    No, I didn't receive it. Not to my knowledge,
23   anyway.
24        MR. SCHERZER: Can I ask you to give a

29 (Pages 110 to 113)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

114

1  clarification of the time that you didn't receive it and
2  then perhaps the time that you did receive it? I ask that
3  because the Bates stamp seems to indicate that it came from
4  your files.
5      THE WITNESS: Possibly. But I just don't
6  remember looking at this particular document.
7      MR. SCHERZER: Okay.
8  BY MR. PRESTON:
9      Q  Now, this --
10     A  Just to verify something. Cox was handling all of
11  this documentation. And the things that were sent me were a
12  copy, I glanced at it and put it away. It didn't seem to
13  register in your mind. Especially four or five years later.
14     Q  Is there any question in your mind that the
15  documentation that Coinmaster USA was filing with the
16  various regulatory authorities, it needed to file with,
17  whether they be Indian agencies or the State of Delaware, as
18  of July 2, 2003, was reporting to you as a director of
19  Coinmaster USA?
20     A  Would you please ask the question again?
21     Q  Let me try to make it better.
22         Did you, as of July 2, 2003, view yourself as a
23  director of CMUSA?
24     A  I was a director up until the time that I was

115

1  stopped being paid, if you like. And throughout this
2  reference to me from Cox is that I'm a director, I'm a
3  chairman, so on and so forth. I have never stopped being a
4  director, to my knowledge. I have never been dismissed. I
5  have never had notification of this being a meeting
6  resigning me from the board. I have had no notification of
7  any kind. So at today's date, as far as I'm concerned, I'm
8  still a director.
9      Q  And as a director, information on you had to be
10  reported on the application made to the various tribal
11  agencies, is that correct?
12     A  Correct.
13     Q  All right.
14         So did you ever inquire of Mr. Cox how he had
15  applied to the Chumash Indian Tribal Gaming Agency if you
16  had never signed the form?
17     A  I specifically asked him for copies of all
18  applications with my name on them.
19     Q  When did you ask for those?
20     A  You have a copy of my e-mails. I don't remember the
21  date.
22     Q  Was it after the dispute between you and Paul Cox
23  developed?
24     A  At about the period when I realized that he was

116

1  getting rid of me, possibly.
2      Q  As of July 2nd, 2003, you were still working
3  cooperatively with Mr. Cox?
4      A  Yes.
5      Q  To, among other things, buy CMUSA, correct?
6      A  Correct. Yes.
7      Q  And you knew at that point in time he was applying
8  to the Chumash Indian Tribal Agency, correct?
9      A  Well, he notified me he has applied to several of
10  them, yes.
11     Q  And at that time, did you say to him, I want copies
12  of anything on which my name appears?
13     A  I would assume he is supposed to do this as a matter
14  of fact, you know. If something has gone out to him, he is
15  supposed to send me back information. But Cox kept all
16  information to his chest very tightly and released only what
17  he wanted people to find out.
18     Q  Well, it appears that you received the document that
19  we have marked as D-31 because you're the one who produced
20  it in discovery in this case.
21     A  Fine.
22     Q  And unless you're contending that Mr. Guerke
23  surreptitiously obtained this and slipped it into your
24  files?

117

1      A  You have already seen that Cox is asking that I send
2  a number of documents presigned. So those presigned
3  documents could be one of these documents.
4      Q  Okay. But we know that you didn't sign or at least
5  contend you didn't sign the Chumash Indian documents?
6      A  Going back to what I just said to you. He has asked
7  me to sign a number of documents and send them back to him
8  so he could fill them out, which I did.
9      Q  Okay.
10     A  So one of those could have been my signature for
11  Chumash correctly. I became suspicious of how he was
12  obtaining licenses when he turned around and said -- I asked
13  him specifically to give me copies. He said, your name is
14  no longer on this. Since we did this arrangement with you,
15  the deal with you in July, we are no longer putting you
16  forward.
17     Q  But that was in 2004, wasn't it?
18     A  Probably.
19     Q  So as of 2003, you knew that he was applying and you
20  knew that you were signing some documents and presumably
21  didn't sign others?
22     A  No, I did not know at that stage. I did not sign
23  documents that purportedly had my signature on. That was
24  nonsense.

30  (Pages 114 to 117)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

118

1    Q   But you did know he was applying to Chumash?
2    A   You say that. I don't know it. I filled out
3  documents that he requested me to have signed so he could
4  fill them out and have signed for licensing.
5        I understand you're saying I've got this
6  document in front of me. But you must also remember that at
7  that time I was under extreme stress having been divorced,
8  moving from one country to the next, trying to reestablish
9  and sort myself out. I left this entirely in Cox's hands.
10   Q   All right.
11   A   He asked me to presign documents, which I thought
12 was quite correct. So I presigned them and sent them back.
13 So they had my signature on. When I looked into this and
14 found -- I wanted to find a copy of that document, because I
15 did not believe I signed it, I got the information back via
16 fax, it was not my signature, it was Paul Cox's. That was
17 the first time I was aware that Cox was actually purportedly
18 putting my signature on documents.
19   Q   And that's the only documents, so far as you know,
20 that you contend Mr. Cox signed?
21   A   It's the only one I could get a copy of. There were
22 at least two other casinos where they acknowledged the fact
23 that my signatures were on documents that I knew I hadn't
24 applied for but they would not issue copies of them. Only

119

1  the one casino would issue copies.
2    Q   Did you have a record, did you maintain a record of
3  which casino applications you signed and which you did not?
4    A   No.
5    Q   So how do you know that there are -- let me ask the
6  question.
7    A   Okay.
8    Q   Let me ask the question. It may be a bad question
9  but it's mine and I like it.
10       How do you purport to know that applications
11 were signed with your name that you did not sign, in fact,
12 if you didn't keep a record of it?
13   A   Because he was expanding into casinos where I knew I
14 could not have been a signature on those documents.
15   Q   How did you know if you weren't keeping record of
16 it?
17   A   Because I had a letter from him saying he had
18 applied to these places and I knew I hadn't signed them.
19   Q   Where is the letter back from you to him saying, in
20 effect, what are you doing, stop it?
21   A   Why do I need to? If you say you're going to go and
22 rob a bank, you know, I'm not stupid enough to say, well,
23 don't do it or do it. I did not comment on him requesting
24 to use a rubber stamp for my name. I have never let anyone

120

1  sign my signature in my life. He knew it was a criminal
2  act. He knew what he was doing and I did not reply. And
3  silence does not denote acceptance.
4    Q   You were chairman of the board of directors of
5  CMUSA?
6    A   Well, not according to your client, I wasn't.
7    Q   Well, according to your belief and your statement,
8  you were?
9    A   Indeed.
10   Q   And you just let the CEO do something that you
11 thought was a criminal act without comment; is that your
12 testimony, sir?
13   A   How am I supposed to know he signed my signature?
14 He hasn't shown me the documents.
15   Q   Did you object to anything he was doing?
16   A   I asked him for copies.
17   Q   In 2004. What did you do in 2003 to stop what you
18 have just told us you believe was a criminal act?
19   A   It did not dawn on me what he was doing until much
20 later. He wasn't actually telling me, was he?
21   Q   Well, you knew he was submitting these applications.
22   A   Then why did he send me copies of these illegal
23 documents?
24   Q   Didn't you know he was submitting the applications?

121

1    A   No, I did not. Not with my forged signature on it.
2    Q   How did you think that Coinmaster USA was getting
3  permission to place machines at these various tribal
4  casinos?
5    A   He tells you in the reply when I requested copies of
6  all documents bearing my signature. He didn't send them
7  back. And he said your signature is not on any of these
8  documents since we did this deal with you in July of 2004.
9    Q   And so far as you know, that's an absolutely correct
10 statement, isn't it?
11   A   Completely.
12   Q   My question is, in 2003, how did you think that
13 Coinmaster USA was gaining access to the tribal casinos if
14 they weren't submitting applications to the agencies?
15   A   I queried that later date and I asked him for copies
16 and he refused to send them to me.
17   Q   That's '04. I want to know what you did in '03?
18   A   I wasn't aware of it at that time. If I was, I
19 would have done something about it.
20       (Defendant's Exhibit No. 32 was marked for
21 identification.)
22 BY MR. PRESTON:
23   Q   I have marked for identification as D-32 an e-mail
24 with Bates CM-BR 792. Do you recall sending that e-mail to

31 (Pages 118 to 121)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

122

1  Mr. Cox?
2     A   Yes, I do.
3     Q   And you, in that July 17, 2003 e-mail, request that
4  Mr. Cox provide you with a letter that you could use with
5  Spanish customers?
6     A   Yes.
7     Q   And you give him the text that you want in the
8  letter, correct?
9     A   Yes. Something like that.
10     Q   And you state in that text that your contract with
11  Coinmaster expired in late 2003?
12     A   Yes.
13     Q   All right. And the contract to which you're
14  referring is the service agreement between you and
15  Coinmaster USA, isn't it?
16     A   No.
17     Q   Well, Mr. Cox --
18     A   Late February 2003 was the date that my contract
19  expired with Coinmaster UK. I was spending a great deal of
20  time in America.
21     Q   Well, Mr. Cox wouldn't know from personal knowledge
22  whether your contract with PLC expired on February 2003 or
23  any other date, would he?
24     A   Of course he did. He knew he had suspended the

---

123

1  company.
2     Q   How could he? He wasn't an officer of Coinmaster or
3  PLC, was he?
4     A   He knew very closely what was happening with the
5  company.
6     Q   Was he an officer with PLC?
7     A   Not at all.
8     Q   Did he have any control of the receiver of PLC?
9     A   Possibly to an extent, yes.
10     Q   Would Mr. Cox have been in a position to cause your
11  contract with PLC to expire?
12     A   Not at all, no.
13     Q   And so to the extent that you're asking Mr. Cox to
14  write to the Spanish customs a letter representing your
15  status, he could only represent what your status was with
16  Coinmaster USA; isn't that true?
17     A   To an extent, yes. But the customs in Spain were
18  insisting that I give information, that I was finishing in
19  California, finishing up in America. I was no longer living
20  in America and I shipped my vehicle from America back to
21  Europe and I sold my UK property, or my American property,
22  put it on the marketplace for sale. So, fundamentally, I
23  was moving back to Europe. They wanted confirmation that I
24  was moving back to Europe.

---

124

1     Q   Sure. And what Mr. Cox could confirm is, as far as
2  CMUSA was concerned, you were back in Europe, you weren't in
3  the U.S., correct?
4     A   That's true.
5     Q   And that's what you were asking him to confirm?
6     A   Yes. It was true.
7     Q   Right. And, of course, you wouldn't want him to
8  confirm anything that wasn't accurate?
9     A   No. He actually put in writing that I was working
10  from Europe. Where is the problem?
11     Q   Okay. Now we get to the exciting part.
12     A   Maybe we should break now. Do you want to break
13  now? It's nearly half past.
14     Q   It is up to you. Is this a convenient time?
15     A   Please.
16         MR. PRESTON: All right.
17         (A luncheon recess was taken from 12:37 p.m. to
18  1:08 p.m.)
19  BY MR. PRESTON:
20     Q   Mr. Lynch, I'd like you to take a look at a document
21  that I have marked for identification as D-33.
22         (Defendant's Exhibit No. 33 was marked for
23  identification.)
24  BY MR. PRESTON:

---

125

1     Q   Which is a balance sheet dated July 31st, 2003, that
2  begins with the Bates LYN 124. Do you recall seeing that
3  previously, sir?
4     A   Possibly.
5     Q   Is that your handwriting in the upper right-hand
6  corner?
7     A   Where is that?
8     Q   The first --
9     A   There?
10     Q   Yes.
11     A   I don't think so.
12     Q   Do you have any idea what 12 Amended means?
13     A   Nope.
14     Q   Do you remember receiving financials on Coinmaster
15  USA from time to time?
16     A   Yes, I do.
17     Q   During this period? Okay.
18         This shows total current assets of
19  approximately 2.9 million and current liabilities of
20  approximately 2.6 million.
21     A   Yes.
22     Q   Does that refresh your recollection as to the status
23  of CMUSA at that point in time?
24     A   Obviously we had agreed to the money back in the UK.

---

32 (Pages 122 to 125)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

126

1  So it would have to be.
2  Q   In fact, it indicates they owe to Coinmaster Gaming,
3  Ltd., some 2.5 million?
4  A   Yes.
5  Q   Do you have any reason to believe that the
6  performance of the company from a financial perspective was
7  actually significantly better than is reflected on these
8  financials?
9  A   I wouldn't know in truth.
10  Q   Okay.  You don't have any information that would
11  suggest that these are wrong?
12  A   No, I don't.
13  Q   Let me show you, sir, a document that I have marked
14  for identification as D-34?
15       (Defendant's Exhibit No. 34 was marked for
16  identification.)
17  BY MR. PRESTON:
18  Q   Which has the Bates LYN 147.  And ask if you
19  remember seeing that in the past?
20  A   Yes.  Cox included this in a resume' of the company
21  to the people interested in purchasing the company.
22  Q   So this was prepared by Paul Cox in or around August
23  of 2003?
24  A   I would think so, yes.

127

1  Q   And was intended to be distributed with other
2  information to those potential bidders for acquisition of
3  Coinmaster USA?
4  A   It was.
5  Q   And this reports your contribution to Coinmaster
6  USA, does it not?
7  A   Indeed, yes.
8  Q   And also reports on the disagreement as to the
9  validity of your CMUSA service agreement?
10  A   Will you repeat that question?
11  Q   And this also reports on the disagreement between
12  the receiver and CMUSA?
13  A   Yes.
14  Q   Now, I'll give you two exhibits to look at now.
15  Exhibit 35, D-35 is an e-mail with CM-BR 152?
16       (Defendant's Exhibit No. 35 was marked for
17  identification.)
18  BY MR. PRESTON:
19  Q   And then the next is a letter, which I have marked
20  as D-36 from Ernst & Young dated 21 August 2003 and
21  addressed to Mr. Cox with CM-BR 24?
22       (Defendant's Exhibit No. 36 was marked for
23  identification.)
24  BY MR. PRESTON:

128

1  Q   Take a minute and look at those to see if you have
2  seen them in the past?
3  A   I recognize this, yes.
4  Q   You're referring to D-35?
5  A   Yes, I am.
6  Q   Okay.  The first line of D-35 refers to a contract
7  and a letter from the receiver.  Is D-36 the letter from the
8  receiver to which you were referring?
9  A   When are you talking about?
10  Q   In Exhibit D-35, which is the e-mail from you to
11  Paul Cox, states, hi, Paul.  I will read the contract and
12  the letter from the receiver later.
13  A   I am assuming the dates are very similar.
14  Q   It's a little confusing because the letter from
15  D-36, the letter from Ernst & Young, is dated 21 August.
16  And the e-mail is dated 18 August.
17  A   I would need to check my files in that case.
18  Q   Do you have a recollection of any other letter from
19  the receiver that you would have been reviewing about this
20  time?
21  A   No.
22  Q   Okay.  Let me refer you to D-35 for a moment.  In
23  the bottom portion, which is an e-mail from Paul Cox to you,
24  dated August 15th, 2003, Mr. Cox suggests that all

129

1  manufacturing work -- sorry.  That High View have control
2  over all manufacturing work.  Do you see that?
3  A   I do.
4  Q   And is that a reference to manufacturing of gaming
5  machines to be sold by Coinmaster USA?
6  A   There was no agreement to sell machines to
7  Coinmaster USA by High View in place.
8  Q   That is not my question.
9  A   Okay.
10  Q   Did you understand that Mr. Cox was referring to
11  maintaining in High View all manufacturing of machines to be
12  sold by Coinmaster USA?
13  A   That was the situation.  It was never going to be
14  any different.
15  Q   And with respect to D-36, the August 21st letter.
16  Have you seen this letter before?
17  A   I remember seeing the letter from the receiver.  I
18  need to look at my documents to see if this is the direct
19  letter or not.
20  Q   This letter is addressed to Mr. Cox.  The first
21  numbered paragraph states, in the first sentence, quote,
22  Tony Lynch resigned as director of both PLC and Coinmaster
23  Gaming Products, Ltd., on 28 February 2003.
24       Do you see that in the very first numbered

33 (Pages 126 to 129)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

130

1   paragraph?
2      A   Yes.
3      Q   Do you recall seeing the receiver make that
4   statement?
5      A   At this moment in time, no.  No, I don't remember
6   seeing this letter.  But that doesn't mean I didn't receive
7   it.
8      Q   Did you ever respond to that belief by the receiver
9   that you had resigned as a director of those two companies?
10     A   Not to my recollection, no.
11     Q   The receiver goes on to analyze the relationship
12  between your Coinmaster USA contract, service contract, and
13  the contract you had with the UK companies.  Do you see
14  that, sir?
15     A   Sorry.  Repeat the question.
16     Q   Yes.  The receiver in this letter, D-36, goes on to
17  analyze the relationship between the CMUSA service agreement
18  that you had and your service agreement with the UK
19  companies?
20     A   Right.
21     Q   Do you ever recall responding to this analysis back
22  to the receiver?
23     A   No, I don't.  I don't remember responding.
24     Q   Did you ever respond to Paul Cox objecting or

131

1   disagreeing with this analysis?
2      A   At that time, Paul had informed me that he had taken
3   legal advice upon my contractual arrangements and said that
4   my contract with the USA was quite valid and sound.  So I
5   didn't see any issues at all.
6      Q   So you never did object to what the receiver
7   recorded in this document?
8      A   Not that I remember of, no.
9          (Defendant's Exhibit No. 37 was marked for
10  identification.)
11     Q   D-37, with a Bates of CM-BR 829, is an e-mail from
12  Mr. Cox to Adrian Wolstenholme.  Do you ever recall seeing
13  this document before, sir?
14     A   Yes, I remember seeing this.
15     Q   And Mr. Wolstenholme is the author of the letter we
16  have just looked at?
17     A   Yes.
18     Q   Which we have marked as D-36?
19     A   Yes.
20     Q   So as of the date of this reply by Paul Cox back to
21  Mr. Wolstenholme, he states, he, Mr. Cox, states that he has
22  never seen your UK contract, isn't that right?
23     A   He does.
24     Q   And you don't have any reason to believe that that's

132

1   an untrue statement, do you?
2      A   Other than the fact that there are lots of
3   statements that he has made that are quite untrue.
4      Q   Well, whether that's accurate or not.  You don't
5   have any reason, as you sit here this afternoon, to believe
6   that Mr. Cox had, in fact, seen your service agreement with
7   PLC by that time?
8      A   I would like to go back to the date I sent him an
9   e-mail saying I would fax him a copy of my contract.  If I
10  said I was going to do something, normally I would do it.
11  What date was on my e-mail?
12     Q   Well, it was either March or April of 2003, I will
13  represent to you.  We can go dig through and go back if you
14  want to do it.
15     A   I must assume he must have received a copy of my
16  contract.
17     Q   So you contend that Mr. Cox, for some reason, lied
18  to Mr. Wolstenholme when he sent this e-mail about whether
19  he had seen your UK contract?
20     A   It's typical of Cox's way of doing business, yes.
21     Q   So notwithstanding his lie about seeing your
22  contract, Mr. Cox then goes on to state that he regards you
23  as a, quote, essential part of the board and management
24  team, unquote.

133

1      A   Yes.
2      Q   Referring there to your role with CMUSA?
3      A   Yes.
4      Q   He further states, in fact, before that, states,
5   quote, if I had thought at that time that his U.S. contract
6   was invalid, I would have put in place another one replacing
7   expenses with salary.  End of quote.
8          Do you see where he says that?
9      A   I do.
10     Q   So he is in effect fighting to maintain your right
11  to receive whatever you are entitled to receive under the
12  Coinmaster USA contract, isn't he?
13     A   No.
14     Q   He is not?
15     A   No.  Cox was playing games.  If you look at an
16  e-mail from the receiver asking whether Cox had informed him
17  orally over the telephone that my contract was unsigned and
18  in a safe, which was completely untrue.  You should look at
19  the matter in context.
20     Q   I just want to make sure, Mr. Lynch, I understand.
21         Do you have any doubt in your mind that D-37 is
22  a response to the letter we have marked as D-36?
23     A   I have no - Cox wrote this letter.  Yes, I agree.
24     Q   And he wrote it in response to D-36?

34  (Pages 130 to 133)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

134

1    A   I assume so, yes. I don't remember seeing this. I
2   would check my files to see if anything came back to me.
3    Q   And do you have any question that he is attempting
4   to refute what Mr. Wolstenholme has written in his letter of
5   D-36?
6    A   As I just explained to you, Cox was playing a long
7   game. He was playing games with all of us.
8    Q   Okay.
9    A   So nothing that he says, to my view, can be taken as
10   read.
11   Q   Is what?
12   A   Nothing could be taken as read. It is all double
13   meanings and double uses.
14       (Defendant's Exhibit No. 38 was marked for
15   identification.)
16   BY MR. PRESTON:
17   Q   I have marked as D-38 an e-mail from
18   Mr. Wolstenholme, which is addressed to Mr. Cox and dated
19   August 29th, 2003. Just a week after the exchange we have
20   just seen. Have you ever seen this before? By the way, for
21   the record, it is CM-BR 831.
22   A   I don't think so.
23   Q   You see on the first page about two-thirds or
24   three-quarters of the way down Mr. Wolstenholme writes that

135

1   he will write to Cox separately on your contract because
2   there is a difference in, quote, legal views, unquote, with
3   respect to those contracts?
4    A   Yes.
5    Q   So you would agree with me that this is a continuing
6   response in the dialogue over the legality of your CMUSA
7   contract, vis-a-vis the UK contract?
8    A   Evidently, yes.
9    Q   Now, if you turn to the second page, you see the Cox
10   e-mail to Wolstenholme, which is what Wolstenholme is
11   replying to in the first page?
12   A   Yes.
13   Q   Do you see that?
14       And he first talks -- Mr. Cox first talks about
15   the information package, which Cox is putting together for
16   the benefit of the receiver to send to potential bidders,
17   right?
18   A   Yes.
19   Q   And on the next page, which is the third page of
20   Exhibit D-38, in paragraph number two, Mr. Cox restates that
21   his attorneys are adamant about the validity of your U.S.
22   contract?
23   A   Well, as you're both your attorneys, is that correct?
24   Q   I'm sorry?

136

1    A   As you're both his attorneys, is that correct?
2    Q   Not then I wasn't.
3        MR. SCHERZER:  Let's explain the process to you
4   a bit. In deposition, we ask you the questions.
5        THE WITNESS:  All right.
6        I see what you say, yes. And I hear what you
7   say.
8   BY MR. PRESTON:
9    Q   Again, is it your contention that Mr. Cox's efforts
10   to defend your contract at this point is all part of his
11   nefarious game?
12   A   Yes.
13   Q   Now, D-39, which is CM-BR 835, is an e-mail from you
14   to Mr. Cox.
15       (Defendant's Exhibit No. 39 was marked for
16   identification.)
17   BY MR. PRESTON:
18   Q   Do you recall sending that?
19   A   I do.
20   Q   And do you recall receiving the e-mail from Mr. Cox,
21   which is reflected on the bottom portion of --
22   A   Indeed.
23   Q   Okay. Now, in this, Mr. Cox assures you that the
24   CMUSA contract is, quote, unaffected by the arguments raised

137

1   by the UK receiver. End of quote.
2        Do you see that?
3    A   That is what he is saying his lawyers are saying,
4   yes.
5    Q   At this point in time, do you know, to a certainty,
6   whether you had sent to Paul Cox your UK contract?
7    A   Well, as I keep saying to you, I e-mailed him saying
8   I was sending the contract on. I have no reason to assume
9   why I haven't.
10   Q   Have you seen any document or do you have any
11   document in your possession which would show that you have,
12   in fact, sent that document by this date?
13   A   I don't know. I would need to review the documents
14   to that effect.
15   Q   Let me see if I can get to the bottom of this.
16       I can assure you that I have reviewed the
17   documents that have been produced in this case and there is
18   no such document.
19       My question to you, then, is whether there are
20   additional documents that might contain such a cover page or
21   other indicia that you sent that? Are there other such
22   documents which you have not produced in this case?
23   A   As I explained to you early on, some of the
24   correspondence was done by E fax. And when we withdrew the

35  (Pages 134 to 137)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

138

1    E fax service, I lost all those documents.
2    Q   Well --
3    A   So the answer is, I don't know. What's lost is
4    lost. All I have is my e-mail file, which I sent you a full
5    and frank disclosure on.
6    Q   That's legally what I'm getting at. You have given
7    us everything --
8    A   That I have available.
9    Q   That you have available?
10   A   Yes.
11   Q   Okay. And you have reviewed all of that before you
12   gave it to us, I assume?
13   A   Yes. There is a mountain of it, yes.
14   Q   Yes, sir. At least a small mountain.
15       Do you have any recollection from your review
16   of that small mountain of documents of anything that
17   establishes when or even if you ever provided to Paul Cox a
18   copy of your UK contract?
19   A   Only the e-mail that we have looked at earlier on
20   where I say I'm about to send you a fax of my contract.
21   Q   D-40, which is CM-BR 116, is a September 3rd, '03
22   e-mail from Paul Cox to you?
23       (Defendant's Exhibit No. 40 was marked for
24   identification.)

139

1    BY MR. PRESTON:
2    Q   Do you remember receiving this, sir?
3    A   Yes, I do.
4    Q   Now, this reports in the first paragraph that the
5    bank and the receiver absolutely refuses to do a deal for
6    CMUSA if you're involved, is that correct?
7    A   I see that, yes.
8    Q   To the best of your recollection, Mr. Lynch, before
9    September of '03, did you know that this was the position
10   the receiver and the bank were taking?
11   A   Not particularly, no. No, that's not true. Because
12   July, I think it was about July that he started telling me,
13   Cox started to inform me that the bank was not happy being
14   involved and they would not do the deal without it being so.
15   He then drafted a contract for me to be removed from the
16   company in a side letter to come back into the company at a
17   later date when the bank finished its affiliation or
18   association with Coinmaster USA. Tying down the dates in my
19   head is quite difficult.
20       MR. SCHERZER: So you knew that in July?
21       THE WITNESS: About July. Maybe June even.
22   BY MR. PRESTON:
23   Q   Now, this contract was --
24   A   Which one are you referring to?

140

1    Q   Let me describe it for you.
2        You just referred to a contract to, quote,
3    remove you from the company and then a side letter?
4    A   Yeah.
5    Q   To be more specific. The contract was going to be
6    between you and the receiver to settle any and all claims
7    you had or thought you had against the receiver and the
8    bank, is that correct?
9    A   That's what I thought, first of all. But Cox was
10   drafting the contract, not the receiver.
11   Q   All right. But that was what you thought the
12   contract was being drafted for?
13   A   Yes.
14   Q   And that was a necessary element, in fact, an
15   essential element, because the receiver insisted that any
16   claims between you and the receiver or the Bank of Scotland
17   be put to rest before they sold the stock in CMUSA?
18   A   That's what Cox informed me.
19   Q   And then Cox said, I will also agree to enter into a
20   sidebar agreement, a letter agreement, that says, in due
21   course, you can come back in and acquire one-third of CMUSA?
22   A   Correct.
23   Q   All right. Now, those documents were not drafted
24   until the early summer of 2004; isn't that true?

141

1    A   I told you, I have a problem with dates.
2    Q   Okay. And I'm not trying to --
3    A   It could be 2003, it could be 2004. I have a severe
4    problem with dates.
5    Q   In any case, it's after -- the actual drafting of
6    those agreements occurred sometime after this e-mail that we
7    have marked as D-40; would you agree with that?
8    A   I didn't check the dates. If you tell me that's the
9    fact, that's the fact. I would need to check it out.
10   Q   Well, we'll get to that in due course.
11       The rest of this e-mail is a discussion about
12   budgeting and development expenses in connection with
13   Coinmaster USA and High View, is it not?
14   A   That's correct, yes.
15   Q   So at this point, Coinmaster is, or at least from
16   the perspective of Paul Cox and you, Coinmaster USA is going
17   to rely on High View to develop the machines that Coinmaster
18   USA is going to sell, correct?
19   A   I think it went without saying that High View
20   developed a machine, our personal involvement in Coinmaster
21   with both of us meant that Coinmaster would have to plan for
22   the sale and use in California.
23   Q   Okay. Thank you.
24       The document that I'm going to mark for

36 (Pages 138 to 141)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

142

1    identification as D-41, which has CM-BR 155, is a contract
2    between High View and ML Solutions, correct?
3    A    Yes.
4        (Defendant's Exhibit No. 41 was marked for
5    identification.)
6    BY MR. PRESTON:
7    Q    And why did High View enter into this contract with
8    ML Solutions?
9    A    Well, to develop software and hardware.
10    Q    And, in your view, Mike Lerwill was the best person
11    to develop that software?
12    A    Well, he is a person.  He is the one I have worked
13    with for a number of years, yes.
14    Q    And the development of this software was, once
15    again, to aid in the development of the machines that CMUSA
16    would use in California?
17    A    That's correct, yes.
18    MR. SCHERZER:  Was this signed?
19    THE WITNESS:  It was signed, yes.
20    MR. SCHERZER:  It was signed?
21    THE WITNESS:  It was signed, yes.
22    MR. SCHERZER:  Do you have a signed copy?
23    THE WITNESS:  Not with me.
24    MR. GUERKE:  You have a signed copy.

143

1    MR. SCHERZER:  Okay.
2    BY MR. PRESTON:
3    Q    I have marked for identification as D-42 a document
4    with Bates stamp CM-BR 878, which is an e-mail to Adrian
5    Parker at Capital Gaming from Paul Cox?
6        (Defendant's Exhibit No. 42 was marked for
7    identification.)
8    BY MR. PRESTON:
9    Q    Do you recall seeing this, sir?
10    A    I think Cox might have sent this on to me.
11    Q    In this e-mail, both the one from Adrian Parker to
12    Paul Cox and the one on the other preceding page or
13    succeeding page from Cox to Parker, they are discussing a
14    September 17, 2003 meeting between Cox and Capital.
15        Do you know why Mr. Cox was meeting with
16    Capital?
17    A    If it was the meeting that I have in mind, it was at
18    the exhibition in Las Vegas.
19    Q    Okay.  That's where it was going to take place.  Why
20    was it going to take place?
21    A    To discuss their potential bid for the company.
22    Q    And Capital also states in paragraph two that you
23    are not to be involved in any deal for the company, correct?
24    A    Well, according to this, yes.

144

1    Q    What understanding did you have of why Capital
2    wanted you out?
3    A    They refused to work with me and my employees and
4    they had taken some silly legal actions against me, which
5    fell on stormy ground, which was not true.  They generated
6    bad feelings towards me towards the end.
7    Q    They worked for you at PLC?
8    A    Well, they worked for me many years before that
9    personally.
10        (Defendant's Exhibit No. 43 was marked for
11    identification.)
12    BY MR. PRESTON:
13    Q    I have marked as D-43 an e-mail of you to Mr. Cox,
14    which also has an e-mail to you from Mr. Cox.  This is Bates
15    CM-BR 47.
16        Do you remember receiving that?
17    A    Yes, I do.
18    Q    And Mr. Cox had sent you, if you will, an advance
19    copy.  What he proposed to send to the receiver dealing with
20    the effort by the management of CMUSA to buy out the shares
21    of CMUSA; is that what this is?
22    A    I need to read it first.
23    Q    Okay.  You do, indeed.
24    A    I think this is correct, yes.

145

1    Q    Okay.  So this e-mail from Cox to Best is dated the
2    23rd of September.  It refers to a meeting that Cox had with
3    Capital Gaming.  He says last week.  So that would have been
4    the September 17th meeting we have already seen reference
5    to, right?
6    A    Are you referring to this letter here?
7    Q    Correct.
8    A    I'm not certain if I have actually seen this letter
9    as I sit here.
10    Q    I'm sorry.  D-43 at the bottom.
11    A    Sorry.
12    Q    Where Cox is sharing with you his proposed message
13    to Ian Best.  Do you see that?
14        Actually, I say it is proposed.  It is not
15    proposed.  It is the actual message that he sent to Best,
16    right?
17    A    Well, he has obviously copied me in, yes.
18    Q    So he sent you apparently a blind copy of the
19    message that he sent to Ian Best?
20    A    If you say so.
21    Q    Okay.  Well, is that what you understood you were
22    receiving when you got this e-mail?
23    A    Cox sent this to the receiver in an attempt by the
24    company, I agree.

37 (Pages 142 to 145)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

146

1    Q    And he sent you a copy of it?
2    A    Yes.
3    Q    It is a, quote, excellent e-mail to the receiver?
4    A    Yes.
5    Q    End of quote.  Okay.
6    A    Yes.
7    Q    Now, in this e-mail, Cox refers to a number of
8    things?
9    A    Yes.
10   Q    I'm talking about the e-mail to Best.  First he says
11   he has met with Capital Gaming to try to get them to provide
12   the necessary support, technical support?
13   A    Yes.
14   Q    Okay.  So that's what the meeting with Capital was
15   about in September of '03, correct?
16   A    Probably.
17   Q    Okay.  And he also outlines how he and Hutcheon are
18   going to buy the stock of CMUSA?
19   A    That's correct.
20   Q    And what's to be paid for it, et cetera, basically
21   the terms of the buyout proposal, correct?
22   A    Yes.
23   Q    And you read this and you were in agreement with it?
24   A    Yes.

147

1    Q    Okay.  In order for Cox and Hutcheon to buy CMUSA, a
2    necessary step was to get your claims against the receiver
3    and the bank settled, correct?
4    A    On the surface of it, yes.  But that was instigated
5    by Cox.
6    Q    Well, whether he instigated it or not, that was what
7    the receiver was saying had to happen?
8    A    Indeed.
9    Q    And you were aware of that as you read this memo to
10   Best in September of '03?
11   A    Yes.
12   Q    Okay.  So you knew that the buyout by Cox and
13   Hutcheon of CMUSA required first that you enter into a
14   settlement agreement, in effect, with the receiver?
15   A    Yes.
16   Q    Okay.  See, that wasn't hard.
17        All right.  Let me show you a document that I
18   have marked as D-44?
19        (Defendant's Exhibit No. 44 was marked for
20   identification.)
21   BY MR. PRESTON:
22   Q    And D-44, which has a Bates of CM-BR 887, is an
23   e-mail from you, sir, to Paul Cox, also on September 23rd,
24   2003?

148

1    A    Yes.
2    Q    And in your message at the top of D-44, you're
3    responding to his message at the bottom, which says, hey,
4    the terms of your settlement of your departure have to be
5    worked out with the receiver, correct?
6    A    Yes.
7    Q    And you're raising certain questions about that in
8    the top portion, are you not?
9    A    Correct.
10   Q    All right.  And the question you're raising is
11   whether you're going to agree to a non-compete if Cox and
12   Hutcheon can't buy CMUSA?
13   A    Correct.
14   Q    All right.  So you, in September of '03, were fully
15   aware of what -- at least the outline of the terms of your
16   settlement agreement with the receiver and the Bank of
17   Scotland --
18   A    It wasn't the receiver driving the information on,
19   it was Cox.  Cox tried to make contact, not the receiver.
20   Q    Is there someplace in here that you wrote to Cox and
21   said, in effect, get out of the way, I want to deal with the
22   receiver myself on the terms of my settlement?
23   A    No.  Maybe I did.
24   Q    Sorry?

149

1    A    Maybe I did.  I can't remember.  Yes, I remember Cox
2    referring to me, go to him directly if you want to.
3    Q    That's Cox telling you.  What I'm saying is, did you
4    ever tell Cox, stay out of this, I want to negotiate my own
5    settlement agreement with the receiver?
6    A    No.  Not to my knowledge.
7    Q    Now, D-45 is an e-mail from you to Cox on
8    October 29th of '03, CM-BR 910?
9        (Defendant's Exhibit No. 45 was marked for
10   identification.)
11   BY MR. PRESTON:
12   Q    And do you recall sending this one?
13   A    Yes, I did.
14   Q    And, again, this, a month later, just reflects, at
15   least in part, the ongoing negotiations between Cox and the
16   receiver, right?
17   A    Indeed, yeah.
18   Q    And what you viewed as problems in fixing the
19   machines, at least as I take it, the machines that CMUSA had
20   in the warehouse?
21   A    Well, being able to put them in a working order, to
22   be able to site them in casinos with different technology.
23   Q    So at this point, as of the time that D-45 was
24   written, was there any change in the receiver's view of your

38  (Pages 146 to 149)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

150

1  potential involvement in CMUSA?
2     A   I wasn't dealing directly with the receiver. Cox
3  was. So I don't know.
4     Q   Had Cox informed you of any change in the receiver's
5  attitude?
6     A   Not as far as I know, no.
7     Q   D-46, which is LYN 367, is entitled, Heads of
8  Agreement?
9        (Defendant's Exhibit No. 46 was marked for
10  identification.)
11  BY MR. PRESTON:
12    Q   Do you recognize that?
13    A   Yes, I do.
14    Q   What is it?
15    A   It's what it says. It is an agreement between Mike
16  Lerwill and myself on behalf of TL and Paul Cox. TL being
17  myself.
18    Q   And this was essentially an agreement to enter into
19  a written agreement, right?
20    A   Correct, yes.
21    Q   And with whom was this agreement to be negotiated?
22  Between what parties?
23    A   Myself, Cox and the company we were forming.
24    Q   Which was what company?

151

1     A   That was High View.
2     Q   High View?
3        MR. COX: Sorry. I know I'm not supposed to
4  speak.
5        MR. PRESTON: Right.
6        MR. COX: Can I interject? I think there is a
7  mistake on the timing of this document. The Brits write
8  dates differently than we do here. This is actually
9  June 11th.
10       MR. PRESTON: You're absolutely right.
11       MR. COX: And it predates the contract with
12  Lerwill.
13       THE WITNESS: That is correct.
14  BY MR. PRESTON:
15    Q   This is June 11th, 2003, not November 6, 2003?
16    A   No, June 11th.
17    Q   My apologies.
18       MR. COX: Sorry for interjecting.
19       MR. PRESTON: Thank you for straightening me
20  out. I should have picked that up.
21       So 46 is out of place and we have already gone
22  through the Lerwill contract. So it is unimportant.
23  BY MR. PRESTON:
24    Q   All right. D-47 is CM-BR 928. Again, it is an

152

1  e-mail. This one is dated November 1, 2003, from Mr. Best
2  to Paul Cox.
3        (Defendant's Exhibit No. 47 was marked for
4  identification.)
5  BY MR. PRESTON:
6     Q   Did Mr. Cox share this with you?
7     A   Possibly, yes.
8     Q   Again, it begins with Mr. Best stating that a
9  precondition to any deal on CMUSA is the achievement of a
10  satisfactory settlement of your contract?
11    A   Correct.
12    Q   So at that point in time, did you contact the
13  receiver to tell him that you wanted to deal directly with
14  him on that negotiation?
15    A   No.
16    Q   And I take it that, when you saw this, it didn't
17  surprise you that that was a necessary precondition to the
18  CMUSA deal?
19    A   Well, I was initially told by Cox. You said he was
20  fighting in my corner. So if it wasn't necessary, I
21  wouldn't have thought he would have pursued the way.
22    Q   And you don't have any reason to believe that
23  Mr. Best would write an e-mail like this saying it was a
24  necessary precondition if it wasn't, do you?

153

1     A   As I told you, there was an earlier e-mail from Best
2  to Cox confirming discussions on the phone which changes the
3  whole context of things.
4     Q   You mean a discussion that predated the e-mail we
5  have marked as D-47?
6     A   I think so. There was an e-mail from Best, which we
7  hadn't seen until a few weeks ago.
8     Q   And has that e-mail been marked today?
9     A   Not from you.
10    Q   And what is it you contend that e-mail says?
11    A   It says that the receiver, Best is telling Cox or
12  Wolstenholme was telling Cox, that the receivership was
13  taken over by somebody else.
14    Q   Best came after Wolstenholme?
15    A   Yes. One of the other people. And that he is
16  asking Cox to verify an oral statement he made on the phone
17  to him that my contract was unsigned and in the safe. And
18  that was the first time that the receiver started to
19  question my position with Coinmaster USA.
20    Q   But the contract that Best is referencing in D-47 is
21  your contract with PLC, isn't it?
22    A   Is that what you're referring to now?
23    Q   D-47 is this e-mail.
24       It was that contract that had to be negotiated

39 (Pages 150 to 153)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

154

1 and settled?
2   A   I assume he is talking about the contract with
3 Coinmaster USA. Isn't that what we were talking about?
4   Q   Well, I guess we'll see.
5       Is that what you thought all this time, that he
6 was worried about the Coinmaster USA contract?
7   A   Absolutely.
8   Q   Okay. It was not your understanding that the
9 receiver was insisting on all claims that you might have
10 being resolved regardless of whether they were with PLC or
11 CMUSA or somebody else?
12   A   There were no claims in the UK. The only thing that
13 was outstanding with the receiver was my contract with
14 Coinmaster USA, which I had been assured by Cox that the
15 lawyers had looked at and said it was sound.
16       (Defendant's Exhibit No. 48 was marked for
17 identification.)
18 BY MR. PRESTON:
19   Q   I have marked for identification as D-48 a
20 November 12, 2003 e-mail from you to Mr. Cox Bates CM-BR 50.
21 Do you recall sending this e-mail?
22   A   Yes, I do.
23   Q   Now, this followed an e-mail that Cox had sent to
24 you on the 11th of November, correct?

155

1   A   Probably.
2   Q   And as part of the chain of e-mail that was included
3 or is included in this Exhibit D-48, there are a series of,
4 if you will, conversations back and forth between Cox and
5 Ian Best, the receiver, correct?
6   A   Sorry. Will you ask the question? I'm getting a
7 bit tired.
8   Q   Also included as part of this exhibit are a chain of
9 e-mails?
10   A   It's difficult to read them. So I assume you're
11 right.
12   Q   Between Cox and Ian Best?
13   A   I assume you're correct, yes.
14   Q   Okay. If you look on the third page of Exhibit
15 D-48, in the middle, you see where Mr. Cox writes about the
16 issue of Tony, quote, unquote. Are those terms, which he
17 lays out in the rest of this page, terms to which you were
18 in agreement?
19   A   Yes.
20   Q   Okay.
21       MR. SCHERZER: Even referring to the lunch
22 wine?
23       MR. PRESTON: The what line?
24       MR. SCHERZER: The lunch wine.

156

1       MR. PRESTON: Okay.
2 BY MR. PRESTON:
3   Q   But you are in agreement with these?
4   A   Well, I was. But I wrote to him so I must have been
5 concerned about part of them.
6   Q   Okay. You also discuss in this between you and Cox
7 the side letter that we previously mentioned?
8   A   Yes.
9   Q   Explain to me what your concern is regarding the
10 payment of $50,000 and the tax consequences?
11   A   The tax consequences weren't my suggestion, that was
12 Paul Cox's.
13       I could see the situation between myself and
14 Paul being slowly manipulated away from my reasonable
15 position or unreasonable position. In other words, we
16 agreed, yes, that I agreed to go on the understanding that I
17 came back in at a later date when the bank had finished
18 their involvement with Coinmaster USA.
19       And I would buy into the company. Or I would
20 receive a third of the company. I didn't in any way want to
21 be in a situation where a third of the company in three
22 years time was costing two million. There would be little
23 point in buying in at two million. Where would I find two
24 million from?

157

1       So I said to Cox that I would actually pay for
2 the value of the shares at the same time he paid for the
3 value of the shares.
4   Q   In other words, right away?
5   A   Absolutely. If he paid 50,000, I would pay my share
6 of that value. So they were paid for and held by Cox or his
7 wife or whoever would hold them and at a later date they
8 would be assigned to me so that there should be little or no
9 tax implications on each transfer of shares or options, if
10 you like.
11   Q   But that wasn't consistent with the receiver's
12 insistence that you have nothing to do with Coinmaster USA
13 until they were paid off; isn't that true?
14   A   Well, it would have been a situation. The option
15 would have been that I pay him for the shares as an option
16 for a dollar or something in three years time or whatever to
17 take one-third of the company. They were one-third gone.
18 It is a straightforward and simple proposition.
19   Q   But you would have had a legal right, then, to the
20 shares?
21   A   Once the bank had gone, yes.
22   Q   So that would have been an involvement with
23 Coinmaster USA, wouldn't it?
24   A   Well --

40 (Pages 154 to 157)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

158

1 Q Which was exactly what the receiver said it wouldn't
2 agree to?
3 A That I wouldn't have any involvement until they were
4 gone.
5 Q But you would have a right?
6 A Only after they were gone. That's all they cared
7 about.
8 Q I have marked as D-49 a document entitled, Terms
9 Sheet, which has Bates LYN 299.
10 (Defendant's Exhibit No. 49 was marked for
11 identification.)
12 BY MR. PRESTON:
13 Q It starts with that. Do you recognize that
14 document?
15 A Yes, I do.
16 Q And what is it?
17 A It's a terms sheet that was drafted up. The non
18 binding terms sheet that was drafted up by myself and Cox
19 and sent to me to be signed off.
20 Q In the top right-hand corner, there are several
21 numbers, a date of November 17, 2003, and the initials RES.
22 Do you see that?
23 A Yes.
24 Q Who is RES?

159

1 A No idea. I didn't draft the document.
2 Q Do you know whether, in fact, Mr. Cox drafted the
3 document?
4 A I believe he and his lawyers did, yes. Or the
5 lawyers of the company did.
6 Q Okay.
7 MR. SCHERZER: RES could be referring to Robert
8 E. Salad, a lawyer in my office. In fact, the second page
9 has a Cooper, which was then Cooper Perskey, tag on the
10 bottom left.
11 BY MR. PRESTON:
12 Q Coinmaster, PLC, as well as USA, were parties to
13 this terms sheet, correct?
14 A The terms sheet was never concluded.
15 Q But they were parties to this terms sheet as it's
16 drafted?
17 A Yes.
18 Q What, if anything, did you disagree with in this
19 terms sheet?
20 A Well, the terms varied. So the original document,
21 which Cox had sent me, which is a proposal to enter into an
22 agreement, and they changed dramatically on the final
23 contract. When I objected to -- when I informed Cox --
24 Q We'll get to the final. What I'm interested in is,

160

1 did you agree to the terms as laid out in D-49?
2 A I agreed to the terms of the non binding contract,
3 yes. But I didn't agree to these terms.
4 Q And what was it about these terms in D-49 that you
5 disagreed with?
6 A If you give me a chance to read it, I'll tell you.
7 I wasn't satisfied with the bank's involvement.
8 They could retain the five percent involvement forever and
9 keep me from buying back into the company, which is what I
10 didn't like.
11 Q And where is that set forth?
12 A For the purposes of this terms sheet, the bank
13 satisfaction shall mean the satisfaction --
14 MR. SCHERZER: I take it you're reading from
15 the subparagraph, Future Consideration?
16 THE WITNESS: Yes.
17 MR. SCHERZER: Three-quarters of the way down?
18 THE WITNESS: Yes.
19 BY MR. PRESTON:
20 Q Okay. And the offensive language is the quote, for
21 all purposes of this terms sheet, the bank's satisfaction
22 shall mean the satisfaction in full of all obligations owed
23 by PLC to Bank of Scotland?
24 A Correct. I found that a very open-ended statement.

161

1 Q Okay. Anything else about this agreement with which
2 you disagree?
3 A Well, clearly the principal thing being, when you
4 come back into Coinmaster USA, was only relevant if the bank
5 had gone. If the bank never went, I could never come back
6 in. Then they could just block me from forever being a
7 shareholder of Coinmaster USA, Inc.
8 Q And explain to me how you perceived that they could
9 maintain an interest in the company forever?
10 A I think they already have. They still retain
11 shares, I understand, in the company. On an ongoing basis.
12 Q I'm trying to understand where that is set forth in
13 this terms sheet.
14 A That's the whole point, isn't it? If they decide
15 they never intend to relinquish the full amount of shares
16 forever and they intend to hold on a two percent or three
17 percent basis, I could never, ever come back in. Because
18 the deal was, I could only come back in after the bank has
19 been fully satisfied and is no longer involved in the
20 company.
21 Q Where does it say that in this agreement?
22 A For purposes of this terms sheet, the bank's
23 satisfaction shall mean the satisfaction in full of all
24 obligations owed by PLC to the Bank of Scotland.

41 (Pages 158 to 161)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

162

1   Q   Right. And where does that statement limit your
2   potential involvement with Coinmaster USA?
3   A   Well, if they never dispose of all the shares, the
4   bank is still involved, aren't they?
5   Q   I suppose that's true.
6   A   Well, that's the situation I currently understand,
7   that the bank still owns shares.
8   Q   So--
9   A   Because the bank doesn't want me involved in the
10  company.
11  Q   I'm trying to understand your testimony.
12      What you're saying is that you were concerned
13  that, as this is drafted, the bank could sell all but some
14  de minimis percentage of its ownership and thereby block you
15  ever being paid, which you're entitled?
16  A   No, I didn't say that. It would block me ever
17  owning the 30 percent shares in the company that Cox and
18  Brad Hutcheon agreed to.
19  Q   But, Mr. Lynch, it doesn't say that anywhere in this
20  terms sheet, does it?
21  A   Well, it's the same thing. The bank is still
22  involved. They don't want me in. They kicked me out.
23  Q   But that isn't stated in this terms sheet, is it?
24  A   That is what I was concerned with. That is exactly

163

1   what was happening.
2   Q   Okay.
3   A   And if I finish off, to turn the page over, you're
4   asking me why I was concerned about it. It was point two.
5   Shall not directly or indirectly be an owner, employee,
6   independent contractor or affiliate of any operation that is
7   involved in the business of gaming machine sales, marketing
8   or operations in any area of the continental United States
9   west of the Mississippi River.
10  Q   And you think that was intended to refer to your
11  ownership in Coinmaster USA?
12  A   I think it stopped me from doing business.
13  Q   In competition with Coinmaster USA or no?
14  A   Absolutely. In any way, shape or form. It simply
15  stopped me from doing business.
16  Q   Okay. D-50 is a one-page letter with the Bates LYN
17  276.
18      (Defendant's Exhibit No. 50 was marked for
19  identification.)
20  BY MR. PRESTON:
21  Q   Do you recall receiving this from Mr. Cox?
22  A   Yes, I do.
23  Q   Now, he is sending you application information for
24  Aqua Caliente and Trump 29?

164

1   A   Yes.
2   Q   Two casinos?
3   A   Yes.
4   Q   And here he tells you specifically to keep copies of
5   the application for your records?
6   A   Yes.
7   Q   And did you do so in this case?
8   A   I don't have copies now. That's what I'm replying.
9   I moved homes three or four times and lost a great deal of
10  documents in the process.
11  Q   This actually reminds me to ask you something I
12  meant to ask you earlier.
13      We were talking about the Chumash Tribal
14  application, which was in May/June of 2003, correct?
15  A   Yes.
16  Q   Some four or five months before this D-50.
17      Do you remember the letter in which Mr. Cox is
18  informed that he must have the application completed and
19  submitted by June 6th?
20  A   I told you, as far as I know, I had never seen that
21  letter before.
22  Q   But you remember seeing it today?
23  A   Yes, I did.
24  Q   And it was not unusual, to your recollection, for

165

1   the gaming agencies to require that the paperwork be on a
2   specific date, was it?
3   A   I don't know that for a fact at all.
4   Q   Do you recall that during the time period in early
5   June of 2003, Mr. Cox's house was struck by lightning?
6   A   Yes.
7   Q   And do you recall what the result of that lightning
8   strike was?
9   A   He lost all his information.
10  Q   And was there a period of time in which he was not
11  able to go to the office because he was trying to correct
12  that situation?
13  A   If you say so.
14  Q   Well, did you have any contact with him which lead
15  you to conclude --
16  A   I didn't know that for a fact.
17  Q   I understand. But did you have contact during that
18  period of time which led you to that conclusion?
19  A   He said he was trying to resolve his situation. I
20  don't know how long he spent away from his office. I
21  wouldn't have a clue.
22  Q   During this same period of time, was the Chumash
23  application filed?
24  A   I have no idea.

42 (Pages 162 to 165)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

166

1   Q  So you wouldn't have any reason to dispute that if
2  that were the testimony?
3   A  Dispute what?
4   Q  That that was the same period of time which the
5  Chumash Indian gaming application was filed?
6   A  I have no idea.
7   Q  Okay. Let me show you a document I have marked as
8  D-51.
9        (Defendant's Exhibit No. 51 was marked for
10  identification.)
11  BY MR. PRESTON:
12   Q  Do you recognize these documents? They begin with
13  CM-BR 393 and are a series of financials. Do you recognize
14  these documents?
15   A  I can't remember receiving the documents. Possibly
16  I have.
17   Q  Would you agree that these appear to be audited
18  financial statements?
19   A  Yes, indeed.
20   Q  On Coinmaster USA for the years ending 12/31/02 and
21  '03?
22   A  Yes.
23   Q  And were audited financials prepared in connection
24  with the receiver's efforts to sell Coinmaster USA?

---

167

1   A  Well, these audits were obviously prepared by the
2  company accountants.
3   Q  But were they prepared as part of the sale process?
4   A  Possibly. I don't know.
5   Q  Do you have any reason to believe that these
6  financials are less than accurate?
7   A  I don't think that they are inaccurate, that they
8  are incorrect, no.
9   Q  Do you recall receiving the financials, D-51, at or
10  about the time they were prepared?
11   A  I received a batch of documents from Paul. I agree.
12  And they could well have been in there. At that point in
13  time, my life was in turmoil.
14   Q  Just for the record, the letter, the transmittal
15  letter of the accountant, is dated February 27, 2004. Does
16  that help at all in determining when you might have received
17  these?
18   A  I received a whole batch of documents from Paul to
19  prepare for the sale. I skimmed through them. But I had
20  other priorities at that moment in time in my life.
21   Q  Okay. All right. I have marked as Exhibit D-52 an
22  e-mail, which is Bates CM-BR 58.
23        (Defendant's Exhibit No. 52 was marked for
24  identification.)

---

168

1  BY MR. PRESTON:
2   Q  Do you ever recall seeing this e-mail before, sir?
3   A  No.
4   Q  This is dated January 14, 2004. And it's an
5  exchange between Paul Cox and Ian Best, again, talking about
6  the settlement agreement or settlement contract involving
7  you. During this period of time, do you recall that Mr. Cox
8  was keeping you advised as to what the receiver was
9  proposing with respect to your --
10   A  Not in detail, no.
11   Q  Were you making any effort to keep in close contact
12  with what the negotiations involved during that period of
13  time?
14   A  Paul informed me by e-mail of how he saw things were
15  going. I left it in his capable hands.
16   Q  D-53 is an e-mail with Bates CM-BR 1022. And it is
17  dated February 21st, 2004. The first one in the series is
18  from you to Paul Cox, Mr. Lynch. Actually, I guess that's
19  the only one on this one.
20        (Defendant's Exhibit No. 53 was marked for
21  identification.)
22  BY MR. PRESTON:
23   Q  Do you recall writing this to Mr. Cox?
24   A  Yes, I have.

---

169

1   Q  And what was the purpose behind this e-mail?
2   A  Well, we had an extreme difficulty at the time with
3  the company who bought the software rights.
4   Q  Capital Gaming?
5   A  Capital Gaming. And, in particular, Capital Gaming
6  that pushed the receiver into giving them exclusive rights.
7  It gave Coinmaster USA extreme problems. And there were
8  bugs in the software. In consequence, I had to look into
9  the copyright and design acts and rules and regulations in
10  the UK concerning them. And it became obvious to me that,
11  if there were faults in the software, that it would allow us
12  to reverse engineer the software and correct and fix those
13  faults without the necessity of gaining the rights to do so
14  by the license, the copyright holder, which was Capital.
15  And this is what -- this is the advice I had from my London
16  barristers. So, in consequence, we had an option other than
17  Capital --
18   Q  Other than Capital?
19   A  We had an option other than Capital to do something
20  to resolve our issues.
21   Q  And who was it that you were proposing would handle
22  the reverse engineering?
23   A  Mike Lerwill.
24   Q  On behalf of High View or on behalf of Coinmaster

---

43 (Pages 166 to 169)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

170

1  USA?
2    A   On behalf of Coinmaster.  It was to fix bugs.
3    Q   Okay.
4    A   You know, High View had no commercial interest
5  whatsoever in the Coinmaster previous product.  The only
6  reason there was any consequence was in keeping Coinmaster
7  in a profitable position.
8    Q   When you looked at the financials that we have just
9  marked as Exhibit D-51, did you see there a profitable
10  company in Coinmaster USA?
11    A   I saw the potential of Coinmaster becoming a highly
12  profitable company, as, indeed, did Cox.  Otherwise, I
13  wouldn't have pursued the purchase of it.
14    Q   Was it profitable as of 12/31/03, your view?
15    A   It was viable rather than profitable.  It isn't just
16  profitability with any company.
17    Q   Well, let's start with profitability.  Was it
18  profitable as of 12/31/03?
19    A   It had a good revenue stream, which covered its
20  running costs, yes.
21    Q   And from that, you determined that it had a viable
22  future?
23    A   Absolutely.
24    Q   Now, I have marked as D-54 an e-mail from you to

171

1  Paul Cox with a Bates CM-BR 248.
2        (Defendant's Exhibit No. 54 was marked for
3  identification.)
4  BY MR. PRESTON:
5    Q   Do you remember that, sir?  This is dated
6  February 24th.  Just a couple days after D-53.
7    A   Yes, it is.
8    Q   Now, here you raise the question, do you not, of
9  whether purchasing Coinmaster even makes sense?
10    A   Yes, I did.
11    Q   And why was that?
12    A   Because the aggravation we were receiving from
13  Capital and the problematic position with the copyrights on
14  the software.  Even though reverse engineering was an
15  option, it was a major -- a major achievement to make that
16  happen.  It was easy to say.  But making it happen was a
17  major accomplishment.  Or would have been.  And I thought at
18  that stage, maybe it was easier just to say goodbye to it
19  all and start again.
20    Q   And start again with High View?
21    A   Indeed.
22    Q   High View using the contacts that Coinmaster had
23  developed with the various Indian agencies?
24    A   Bear in mind, I opened that marketplace.  They were

172

1  my contacts initially.
2    Q   Initially, weren't they contacts that belonged to
3  Coinmaster USA?
4    A   They are companies that do business.  They don't --
5  they are not owned by anybody.  Once I have been dismissed
6  from Coinmaster USA, UK, I was open to do business with
7  anyone.  Should I not be allowed to make a living?
8    Q   What was the basis for the ultimate decision to go
9  forward with the acquisition of Coinmaster USA's stock,
10  given your doubts as expressed in this e-mail, D-54?
11    A   Well, everything is open for discussion.  And every
12  option should be really looked at and considered carefully
13  to see which is the best way to go.  Paul didn't think this
14  was the best way to go.  On reflection, it probably wasn't
15  the best way to go.  Because there was an ongoing cash flow
16  in the product there and resolving the issues with the
17  product was obviously paramount.  There were also licenses
18  in place and being there they would be quite difficult to
19  obtain.  So it was just a view, an idea.
20    Q   But you were persuaded ultimately that that wasn't
21  the right approach?
22    A   Well that's the way -- that's the way we went
23  anyway, yes.
24    Q   I'd like you to look at a document that I have

173

1  marked as D-55, which has Bates CM-BR 1079 as the first
2  page.  This is a Cox to Lynch e-mail of May 29th, '04, with
3  attachments.
4        (Defendant's Exhibit No. 55 was marked for
5  identification.)
6  BY MR. PRESTON:
7    Q   Do you recall receiving this?
8    A   Yes, I do.
9    Q   Now, in the cover e-mail, Mr. Cox refers to a new
10  and updated version of the terms of separation involving you
11  and the receiver.  Do you see that?
12    A   I'm sorry.  Repeat that again.
13    Q   Mr. Cox refers in the first paragraph to an updated
14  version of the terms of separation involving you.
15        MR. SCHERZER:  Paragraph one.
16        THE WITNESS:  Yeah.
17  BY MR. PRESTON:
18    Q   Okay.  So, at this point, Mr. Cox is attempting to
19  respond to your concerns?
20    A   Yes.
21    Q   And he also increases the amount of compensation to
22  be paid to you from 190,000 up to $214,000?
23    A   You say might be paid to me?
24    Q   Well, was to be paid to you under the agreement?

44  (Pages 170 to 173)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

174

1    A    If the company kept going.
2    Q    And then he also includes a version, I should say,
3    of the proposed side letter agreement with you?
4    A    Yes.
5    Q    Did you understand that these two agreements were
6    inextricably intertwined?
7    A    Yes. That is my understanding of the situation.
8    Q    Now, if you go back to the terms sheet, which is at
9    the back of Exhibit D-55. My question to you is, is the
10    same as the last time. Did you agree to these terms as
11    reflected in this terms sheet?
12    A    No, I didn't. I didn't sign them.
13    Q    You didn't sign the terms sheet?
14    A    No. I signed -- I had an agreement which was non
15    binding. I did not sign this terms sheet.
16    Q    And why did you not?
17    A    Because I didn't feel it was sensible to sign it.
18    Q    For what reason?
19    A    Principally --
20    Q    Or reasons.
21    A    The principal reason being that Cox had slowly
22    changed the terms into the 30 percent reentry back to the
23    marketplace. I wrote to him about my concern about the
24    amount of money he was now talking about and how it would be

175

1    viable for me to even consider purchasing the shares at a
2    highly inflated rate.
3    Q    Were those concerns the cost of you buying back into
4    CMUSA reflected in the terms sheet?
5    A    It was part of my concerns, yes.
6    Q    But my question is, were those the terms by which
7    you would get CMUSA stock in the terms sheet or were they in
8    the side letter?
9    A    They were in the side letter.
10    Q    And my question is, what about the terms sheet
11    covenants did you dislike or disagree with?
12    A    I was principally more concerned about the side
13    letter and the purchase of coming back into the company.
14    Q    Okay. And where in the side letter did you find
15    terms with which you could not agree?
16    A    Well, they changed dramatically from the time that
17    we first had an agreement, had principal discussions on them
18    all, e-mails back and forth, where it was going to cost me
19    nothing. It was going to cost me whatever amount the
20    corporation was worth. I would have to sit back and go
21    through it carefully and come back with an answer on that.
22    I was very uncomfortable with what was
23    happening. The terms were slowly changing.
24    Q    In paragraph five on the second page of the terms

176

1    sheet, there is a reference to you needing to -- that you
2    would be required to pay for the stock for IRS concerns?
3    A    Indeed.
4    Q    Okay. And that would suggest that the purchase
5    price would be $238,000 for the stock?
6    A    It could be. It could be higher. I would be
7    allowed to pay this over three years. If you look at the
8    limited income coming from Coinmaster to me, which would be
9    chopped in half by Mr. Cox, it was an impossible target
10    being sent to me.
11    Q    Even though he opined that the real value of the
12    stock might well be at $2 million?
13    A    Well, if he says that's the case, I don't have a
14    view on that, which is why I wanted to participate in the
15    value of the purchase of shares up front in the very
16    beginning.
17    Q    Which was the condition that the receiver had said
18    absolutely could not happen; isn't that true?
19    A    I haven't seen that.
20    Q    Really?
21    A    Where is the statement saying that?
22    Q    Well, I think we have discussed it at least three
23    times that I can recall.
24    A    I haven't seen anywhere where the receiver makes a

177

1    statement that I cannot have an option to buy back into the
2    company after they finish their affiliation with the
3    company.
4    Q    Doesn't the receiver state in every single
5    opportunity, at every single opportunity, that he will not
6    deal with Cox and Hutcheon if you are going to have anything
7    to do with Coinmaster USA?
8    A    An option is an option. It does not let me back in
9    the company.
10    Q    But you would agree that that's what the receiver
11    said?
12    A    I would not say that it covered the option
13    situation. I don't think that was ever put to the receiver.
14    Q    You didn't think the receiver was definitive enough
15    in his statement about whether you could be involved?
16    A    Cox would only consent to me coming back into the
17    company after the bank had been repaid; and, therefore, if
18    the bank had been repaid and I took up the option to buy
19    some shares back in Coinmaster at a fixed fee that they
20    entered the agreement with, I wouldn't have a big tax
21    problem at a later date. A big cost.
22    Q    I have marked as D-56 an e-mail that you, Mr. Lynch,
23    sent to Mr. Cox the day after receiving the document that we
24    have marked as D-55.

45 (Pages 174 to 177)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

---

178

1      (Defendant's Exhibit No. 56 was marked for
2  identification.)
3  BY MR. PRESTON:
4      Q   And in that, you state that you agree with the terms
5  sheet?
6      A   Yes.
7      Q   And that you request that it be drawn up into a
8  contract?
9      A   I thought more about it and disagreed with it at a
10  later date.
11         MR. SCHERZER:  Wait for the question.
12         THE WITNESS:  Sorry.
13  BY MR. PRESTON:
14      Q   You did write it?
15      A   Yes, I did write it.
16      Q   And, likewise, you agreed to the side letter, did
17  you not?
18      A   No, I didn't.  I wrote to him I thought and asked to
19  change it and pointed out specific items in it, which I was
20  concerned about.  That his answers weren't satisfactory.
21      (Defendant's Deposition Exhibit No. 57 was
22  marked for identification.)
23  BY MR. PRESTON:
24      Q   Well, didn't you send the e-mail that was just

---

179

1  marked as Exhibit D-57, which was CM-BR 1090?
2      A   Yes.  Once again, it was -- yes, I did.
3      Q   And you agree that that says that you have no
4  problem with the side letter, that you can draft the final
5  document?
6      A   At that moment in time, yes.
7      Q   I have marked as D-58 an e-mail from you to Mr. Cox.
8  Do you recall sending that?
9      A   Yes, I do.
10      (Defendant's Exhibit No. 58 was marked for
11  identification.)
12  BY MR. PRESTON:
13      Q   This all dealt with minutes of a High View, Inc.,
14  board meeting?
15      A   That's correct.
16      Q   And this is where you say that you have invested a
17  hundred thousand dollars in High View?
18      A   I had.  In cash and effort.
19      Q   And this isn't a hundred thousand dollars, this is
20  some amount of dollars and some amount of sweat equity?
21      A   Absolutely.
22      Q   And what caused you to demand that at this point
23  that additional shares be issued to you?
24      A   Cox was trying to find alternative funders for the

---

180

1  business.  I thought he made it very, very clear that he had
2  no intention of putting anymore money in than $38,000.  This
3  is where he came to the end of his crap shoot.  His words.
4  Not mine.
5      Q   The crap shoot being the future of High View?
6      A   The crap shoot being $38,000.
7      Q   At this point, you were a fifty-fifty owner of the
8  shares of High View, were you not?
9      A   Correct.
10      Q   And it was your contention that because you had
11  devoted some efforts to developing software, that you were
12  entitled to more than 50 percent of the shares?
13      A   I was the design engineer.  Do you think I should
14  work for nothing?
15      Q   Was there a contract that you had with High View?
16      A   No, there wasn't a contract.
17      Q   Let me finish the question.
18      A   Okay.
19      Q   Or I just assumed that that would be your answer no
20  matter what my question was.
21      Did you have any kind of agreement with High
22  View to pay you for your design efforts?
23      A   No.
24      Q   Now, Mr. Cox sent you back a response to your

---

181

1  e-mail, did he not?
2      A   Probably.
3      Q   All right.  Let me see if this is it.
4      (Defendant's Exhibit No. 59 was marked for
5  identification.)
6  BY MR. PRESTON:
7      Q   This is D-59.  And I ask whether this document that
8  I have marked for identification as D-59, which starts with
9  Bates CM-BR 205, is that Mr. Cox's response to your e-mail
10  of D-58?
11      A   Yes, he sent me this.
12      Q   Okay.  And he does not disagree with you that if you
13  invest a hundred thousand dollars in cash, you should have
14  more than 50 percent of the stock?
15      A   That's correct.
16      Q   And he references contributions that he has made in
17  cash to High View and that Coinmaster USA have made to High
18  View?
19      A   Coinmaster USA made no investment in High View at
20  all.
21      Q   And what's the basis for your statement that
22  Coinmaster didn't invest any money?
23      A   If you look at all the e-mails that Cox sent me and
24  myself, the payments to Mike Lerwill and the effort that he

---

46 (Pages 178 to 181)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

|  | 182 |
|---|---|
| 1 | was going to put in as a retainer and, therefore, it did not |
| 2 | go into Coinmaster. It didn't come to Coinmaster. It went |
| 3 | into Mike Lerwill's pocket. So I failed to see how High |
| 4 | View was paid anything. |
| 5 | Q  So it's your testimony that everything that Lerwill |
| 6 | was doing, he was doing for Coinmaster and not for High |
| 7 | View? |
| 8 | A  That's not what I said. |
| 9 | Q  I didn't understand it. |
| 10 |     Didn't Lerwill provide services to High View? |
| 11 | A  Absolutely. |
| 12 | Q  And didn't he -- |
| 13 | A  And also to Coinmaster. |
| 14 | Q  Okay. And didn't he bill High View for those |
| 15 | services? |
| 16 | A  Yes, he did. |
| 17 | Q  And wasn't he paid at least in part for those |
| 18 | services? |
| 19 | A  He was paid all of it, I hope. |
| 20 | Q  Okay. And did you write him checks to pay him for |
| 21 | those services? |
| 22 | A  I wrote him personal checks, yes. |
| 23 | Q  And nobody else paid him anything for his services? |
| 24 | A  Yes. Coinmaster paid him for his services, which he |

|  | 183 |
|---|---|
| 1 | was acting as a backup on the components and parts and |
| 2 | supporting them. |
| 3 | Q  But it's your testimony and belief that Coinmaster |
| 4 | didn't pay him for any services rendered to High View? |
| 5 | A  Not at all. |
| 6 | Q  What's the basis for your knowledge? |
| 7 | A  Because Cox, if you look through the e-mails, Cox |
| 8 | has confirmed that throughout. |
| 9 |     MR. SCHERZER: Did you say you paid him |
| 10 | personally? |
| 11 |     THE WITNESS: Yes, I did. |
| 12 |     MR. SCHERZER: Personally means -- |
| 13 |     THE WITNESS: Money coming out of my pocket, |
| 14 | yes. |
| 15 | BY MR. PRESTON: |
| 16 | Q  Was that part of the $48,000? |
| 17 | A  Absolutely. |
| 18 | Q  That you say you paid? |
| 19 | A  Absolutely. |
| 20 | Q  Now, Mr. Cox does not disagree with you that the |
| 21 | holdings in High View should be adjusted in due course; |
| 22 | isn't that true? |
| 23 | A  Yes. I flew to see him to ask him to do so. He |
| 24 | refused. |

|  | 184 |
|---|---|
| 1 | Q  What he says in this e-mail and subsequently is that |
| 2 | the time for adjusting that is when the investment of cash |
| 3 | or -- the investments of whatever into High View are |
| 4 | ultimately determined, correct? |
| 5 | A  Yes. |
| 6 | Q  But you disagreed with that? |
| 7 | A  I told him I would fund it. |
| 8 | Q  And did you have the cash to fund it at that point? |
| 9 | A  I had the means to resolve that issue, yes. |
| 10 | Q  And what were those means? |
| 11 | A  Selling properties I owned. |
| 12 | Q  Real property? |
| 13 | A  Yes. |
| 14 |     MR. SCHERZER: You know what real property |
| 15 | means in this country? |
| 16 |     THE WITNESS: Real estate. |
| 17 | BY MR. PRESTON: |
| 18 | Q  Now, this document, D-59, was sent to you on |
| 19 | April 27th, 2004. Did you write a response to that? Do you |
| 20 | recall? |
| 21 | A  Possibly. Probably. |
| 22 |     (Defendant's Exhibit No. D-60 was marked for |
| 23 | identification.) |
| 24 | BY MR. PRESTON: |

|  | 185 |
|---|---|
| 1 | Q  I have marked for identification as D-60 a May 2, |
| 2 | 2004 letter, which has the Bates on the front of it, CM-BR |
| 3 | 74. |
| 4 |     Is this your response to Paul Cox's e-mail? |
| 5 | A  Yes, it is. |
| 6 | Q  In this e-mail, which is dated May 2nd, 2004, you |
| 7 | raise a number of issues as you view them with respect to |
| 8 | both High View and CMUSA, do you not? |
| 9 | A  Yes. |
| 10 | Q  What has changed between your acceptance of the |
| 11 | terms of your settlement with the receiver and your |
| 12 | acceptance of the side letter and the date of this letter? |
| 13 | A  My opinion comes to the conclusion that Cox was |
| 14 | deliberately sidelining me never to be a part of Coinmaster |
| 15 | USA ever again. That's what triggered this letter. |
| 16 | Q  You don't say that to him, do you? |
| 17 | A  In the penultimate paragraph. During the last |
| 18 | weeks, I felt your nervousness. The e-mail and the last |
| 19 | phone calls we had. I could feel your tension on the phone |
| 20 | line. The previous call you stated that your cash input to |
| 21 | High View would be miniscule compared to mine started to |
| 22 | ring alarm bells. |
| 23 | Q  That all deals with High View? |
| 24 | A  Say that again. |

47 (Pages 182 to 185)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

186

1    Q    That deals with High View, that doesn't deal with
2    CMUSA, does it?
3    A    It also dealt with Coinmaster USA, yes.
4    Q    You say on page two, quote.  As a close friend, I
5    completely trust you even though I have been slightly
6    concerned with not receiving any backup documentation from
7    the receiver.
8    A    Yes.
9    Q    This you explained early on was due to a
10   confidentiality agreement that you had to sign for the
11   receiver.
12   A    Yes.
13   Q    You wrote that, did you not?
14   A    I did.
15   Q    And what backup documentation from the receiver had
16   you requested that you didn't receive?
17   A    A copy of this confidentiality agreement, which he
18   claimed he had signed.
19   Q    You request that here.  What other documentation
20   prior to this letter did you ever request it from the
21   receiver?
22   A    I hadn't.  As far as I know.
23   Q    So how can you be concerned about not receiving any
24   backup documentation when you hadn't requested any?

187

1    A    I had.  I requested it in this document.  I actually
2    flew to America and asked him for a copy.
3    Q    So you agree, this is the first time you requested
4    any documentation from the receiver?
5    A    This is the first I started to get deeply concerned
6    about Paul Cox's intent.
7    Q    But you have known, at least from July of 2003, at
8    least from then, that the receiver has taken the position,
9    according to Paul Cox?
10   A    According to Paul Cox, yes.
11   Q    That any involvement with you in Coinmaster USA
12   would kill the deal?
13   A    Potentially.  Not probably.  We were the only
14   bidders.
15   Q    So, in your view, it was only a potential concern,
16   not an actual concern by the receiver and the Bank of
17   Scotland?
18   A    I think that if Paul Cox had wanted to and stood his
19   ground, the situation wouldn't have occurred.  And Paul Cox
20   kept everybody isolated from everybody so that he stayed in
21   the middle controlling everything, including any information
22   anybody received.
23   Q    And what, Mr. Lynch, is the basis for your
24   contention that Mr. Cox could have convinced the receiver to

188

1    accept you into the CMUSA deal?
2    A    Because long term-wise, I was probably the only
3    person that could really make the development of a product
4    and a new product happen.
5    Q    Isn't it true that the Bank of Scotland and the
6    receiver believed that you had absolutely wasted three
7    million pounds that you had borrowed from them?
8    A    If I wasted it, I gave a lot of it back, didn't I?
9    Q    Not through your efforts, did they?
10   A    Didn't they?
11       MR. SCHERZER:  The question is, did you
12   understand that that's what they believed?
13       THE WITNESS:  Potentially.  Everything that I
14   understood from the receiver was coming back via Cox.  They
15   weren't obviously happy at losing the money.  So I did
16   everything in my power to make certain that they recovered
17   it.
18   BY MR. PRESTON:
19   Q    Now, Mr. Cox responded to your May 2nd letter, did
20   he not?
21   A    He did, yes.
22       (Defendant's Exhibit No. 61 was marked for
23   identification.)
24   BY MR. PRESTON:

189

1    Q    And is the document I have just marked as D-61 his
2    response?  It's a May 2nd, 2004 e-mail with Bates CM-BR 77.
3    A    Yes.
4    Q    And he responds to all of the points you have
5    raised, does he not?
6    A    No.
7    Q    He doesn't?
8    A    No.
9    Q    Which ones would you think he does not respond to?
10   A    I never said I was uncomfortable putting in more
11   money, first of all.  It was his assessment of the
12   situation.
13       And then he mentions Dual Cooper.  I
14   consecutively requested information with Dual Cooper, who I
15   knew, to obtain further information with Dual Cooper's
16   involvement in the company.
17   Q    Dual Cooper was a potential investor in High View?
18   A    So Paul Cox says.
19   Q    Doesn't he, in connection with High View, suggest
20   once again that the allocation of stock should depend upon
21   how the investment in the company is made?
22   A    Yes.
23   Q    And that's not an unreasonable position, is it?
24   A    If he says all he could put in is $38,000.

48  (Pages 186 to 189)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

190

1  Q   Say that again.
2  A   If he says he can only put $38,000 in at the outset
3  of this development, he knew it was going to be $250,000
4  minimum, the answer is, yes, particularly when I tell him
5  I'm prepared to pay the balance.
6  Q   He states that he is willing to significantly dilute
7  his position in the company, doesn't he?
8  A   He didn't do so when I requested him to do so.
9  Q   And up to the point of this letter, have you
10 committed to putting all of the remaining funds necessary to
11 fund High View's activities?
12 A   Not until it had -- no, I didn't.  Straightforward,
13 no.
14 Q   So what he is saying in this first portion of
15 Exhibit D-61 is that the allocation of stock has to wait
16 until we find out who is going to invest what?
17 A   I told him I would do so.  And he refused to
18 allocate the stock.
19 Q   But you haven't told him anywhere, you just
20 testified you didn't tell him that you prepared to fund --
21 A   I did at the meeting that I went to.  There is an
22 e-mail to confirm it.
23 Q   Now, as to Coinmaster USA, he continues to say that
24 you are a valuable asset for the company, doesn't he?

191

1  A   Yes.
2  Q   And he explains the tax issues with you trying to
3  get the same percentage ownership as he and Mr. Hutcheon
4  without paying for it?
5  A   Is there a paragraph you're looking at now, please?
6  Q   The next page.  The second page.
7  A   Which paragraph?
8  Q   The first full paragraph.
9  A   Okay.
10 Q   Does he state anywhere in this letter that he is
11 attempting to cut you out?
12 A   I think he is making it very clear, isn't he?
13 Q   Does he state anywhere in here that he is doing
14 anything other than attempting to provide for an entrance
15 into the company that's consistent with the tax laws and
16 with what other people have put in?
17 A   It was my opinion that Cox was trying to force me
18 out of the company, never to return.
19 Q   By this point in time, hadn't, in fact, Cox
20 negotiated the deal with the receiver keeping you fully
21 informed at each step of the way?
22 A   I don't believe he did fully.
23 Q   What was it that he withheld from you?
24 A   How do I know what he has withheld?  I don't know

192

1  how to answer that.
2  Q   Well, you have filed suit.  You looked at the
3  papers.  What was it that he withheld?
4  A   He withheld the so-called secret deal with the
5  receiver.  I asked him to show it to me.
6  Q   The what?
7  A   He said he had a secret deal with the receiver which
8  disallowed him to discuss it, the terms and conditions of
9  the contract.
10 Q   He told you all the terms and conditions of the
11 contract, he shared the proposals that he sent to you?
12 A   Why did he do a secret deal, then?
13 Q   How do you know that he had a secret deal?
14 A   Because he says so.
15 Q   He said he had a confidentiality agreement.  Is that
16 what you're referring to?
17 A   How can he have a confidentiality agreement when I'm
18 a director of the company without the board approving it.
19 Q   Well, according to the receiver, you aren't a
20 director.  You mean a director of CMUSA?
21 A   That's right.
22 Q   That sort of begs the question, doesn't it?  Because
23 since the receiver said it wouldn't do a deal with you and
24 Cox and Hutcheon, he would only deal with Cox and Hutcheon,

193

1  quite clearly, you weren't going to be in a position where
2  your vote was needed at the time the deal was finalized;
3  isn't that true?
4  A   I was still a director and, as such, I was.
5  Q   But you wouldn't be a director at the time the deal
6  was approved, would you?
7  A   If there is an agreement in place with Cox and the
8  receiver prior to my leaving as a director, I'm still
9  entitled to see that document.
10 Q   Not if that deal is contingent upon you giving up
11 all positions in the company.  Isn't that a fact?
12 A   I disagree with you.
13 Q   Ain't America great?
14 A   Say that again.
15 Q   You responded to Mr. Cox's e-mail?
16 A   Which one?
17 Q   The one that I just showed you, which is D-61?
18 A   Probably.
19 Q   Okay.  Is that what I have marked as D-62 your
20 response?  D-62 begins with CM-BR 80.
21     (Defendant's Exhibit No. 62 was marked for
22 identification.)
23 BY MR. PRESTON:
24 Q   Was there anything in here that you left unsaid in

49  (Pages 190 to 193)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

194

1  terms of your concerns about the various transactions that
2  were on the board at that time?
3  A  I had read it and refer to my concerns. I don't
4  know. I know I covered a great deal of it.
5  Q  Okay.
6  MR. SCHERZER: Would you like to take a break?
7  THE WITNESS: I would, indeed, yes.
8  MR. PRESTON: Okay.
9  (A brief recess was taken.)
10  (Defendant's Exhibit No. 63 was marked for
11  identification.)
12  BY MR. PRESTON:
13  Q  Mr. Lynch, let me show you a document I have marked
14  as D-63, which is an e-mail from you to Mr. Cox, Bates CM-BR
15  208. Do you recognize this document?
16  A  Yes.
17  Q  What did you mean when you wrote, I see no problem
18  with you back to backing your shares into CM?
19  A  To see what Cox is offering to do.
20  Q  What does that mean?
21  A  I think you should ask your client.
22  Q  What did you mean when you wrote it?
23  A  I didn't write it. He did. This was his words from
24  a previous e-mail.

195

1  Q  What did you understand was the meaning when you
2  replied as you did with D-63?
3  A  Let me read it a second. He was talking about
4  putting his shares of High View into Coinmaster, as he
5  understood it.
6  Q  Okay. D-64 is an e-mail from you to Mr. Cox dated
7  May 17, 2004.
8  (Defendant's Exhibit No. 64 was marked for
9  identification.)
10  BY MR. PRESTON:
11  Q  Do you recognize that e-mail? It's CM-BR 209.
12  A  Yes, I wrote this.
13  Q  This is a further response to the plans that Mr. Cox
14  had outlined in his letter or e-mail, rather, that we have
15  marked as D-61, is it not?
16  A  Yes.
17  Q  And at this point, you're offering to invest an
18  additional $64,000 in either High View or Coinmaster USA?
19  A  Yes.
20  Q  So given the anticipated cost of fully developing
21  the games, the machines that High View was working on, there
22  would still be the requirement for an additional investment
23  beyond what you were prepared to put in, would there not?
24  A  This isn't what this is saying here.

196

1  Q  No, I understand that. But didn't you anticipate
2  that it would require between two hundred and two hundred
3  and fifty thousand dollars?
4  A  Indeed.
5  Q  And you were offering to put another sixty-four in
6  here?
7  A  Plus a remortgaged property.
8  Q  Okay.
9  (Defendant's Exhibit No. 65 was marked for
10  identification.)
11  BY MR. PRESTON:
12  Q  D-65 is an e-mail, Bates number CM-BR 1163. Do you
13  recall receiving this from Mr. Cox and responding to it?
14  A  Yes, I do.
15  Q  You see the third paragraph in Mr. Cox's e-mail to
16  you beginning, I also believe?
17  MR. SCHERZER: Fourth.
18  MR. PRESTON: Well, I guess if Hi, Tony, is a
19  paragraph, yes, it is the fourth.
20  THE WITNESS: Okay. Yes. I understand.
21  BY MR. PRESTON:
22  Q  I also believe that I understand. That paragraph.
23  Was there anything in that paragraph that you
24  had not understood prior to receipt of this e-mail?

197

1  A  I understood that the -- that there was separation,
2  as it says in here. I also believe that I understand your
3  deep frustration you feel as a result of treatment you're
4  receiving from the bank. It proposes that you will be
5  separated from Coinmaster USA, Inc., until they are repaid.
6  Q  Right. Did you understand that the bank and the
7  receiver acting on behalf of the bank were insisting that
8  you have no involvement with Coinmaster USA until they were
9  fully repaid?
10  A  According to this e-mail, yes. But that wasn't the
11  truth of the situation.
12  Q  And what is the basis for your contending that that
13  was not the truth?
14  A  My e-mail to the receiver later on when the receiver
15  said that the bank had no issue with me and that was driven
16  from the U.S.
17  Q  And when was that? When was that e-mail to the
18  receiver?
19  A  I'm sure you have a copy of it. I don't know.
20  MR. SCHERZER: That was from you to the
21  receiver?
22  THE WITNESS: Yes.
23  MR. SCHERZER: Did Mr. Cox get a copy of that
24  contemporaneously with the sending?

50  (Pages 194 to 197)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

198

1    THE WITNESS: What does contemporaneously mean?
2    MR. SCHERZER: At the same time you sent the
3  e-mail to the receiver, did you copy Mr. Cox?
4    THE WITNESS: No. But the receiver did.
5  Because the receiver told me. I might have done it but
6  certainly the receiver had a copy.
7    (Defendant's Exhibit No. 66 was marked for
8  identification.)
9  BY MR. PRESTON:
10   Q    I have marked as D-66 an e-mail from Mr. Cox to you.
11  CM-BR 412. Did you receive this?
12   A    I received this, yes.
13   Q    Okay. Did you understand that Mr. Cox was outlining
14  for you what he understood to be the last points of the deal
15  with the receiver for the purchase of the Coinmaster stock?
16   A    That's what he says, yes.
17   Q    Okay. And at this point, had you made an effort to
18  be personally involved with negotiating that deal with the
19  receiver?
20   A    No.
21   Q    And at this point, did you have any disagreement
22  with what Mr. Cox describes as the quote, upside for you,
23  unquote?
24   A    Well, he said here, I couldn't see how we could make

199

1  this situation be true, which is why he was asking questions
2  about it. But I sent a letter of reference to the value of
3  the purchase of the stock back. I had been becoming
4  concerned about the whole situation.
5    Q    Which part of this do you not understand how it
6  could be true?
7    A    He refers to stock at no ultimate cost to me. Yet,
8  he is telling me I'm going to pay the market value. Which
9  statement is true?
10   Q    And you understand what he is saying about the
11  ownership of stock in High View?
12   A    Yes.
13   Q    Which is essentially dependent upon how the
14  investment in High View works out?
15   A    Yes.
16   (Defendant's Exhibit No. 67 was marked for
17  identification.)
18  BY MR. PRESTON:
19   Q    D-67 is a copy of the settlement agreement between
20  you and Coinmaster USA and Gaming, PLC, is it not?
21   A    I never signed this agreement.
22   Q    I understand that. Is this a copy of the draft that
23  was presented to you?
24   A    Probably. I didn't get it. I don't see why it

200

1  wouldn't be.
2    Q    Do you have any recollection as to which provisions
3  in this agreement caused you to refuse to sign it?
4    A    I was deeply concerned about the whole way Cox was
5  handling things in general. I felt that he was out to
6  obtain full value or controlling interest in Coinmaster and
7  never allowing me back in.
8    Q    Even though he was willing to enter into the side
9  agreement?
10   A    I don't think that meant very much.
11   Q    Why is that? Why did you conclude that?
12   A    Because he is very tricky in what he does.
13   Q    Other than him being tricky, was there any more
14  specific reason as to why you felt that the -- let me finish
15  my question.
16    Was there any particular reason why you felt
17  the side agreement would not protect you in your effort to
18  come back into Coinmaster USA?
19   A    I didn't figure I could do very much against him for
20  the future. You have already seen the documents here
21  yourself, that one where he says it is going to cost me
22  nothing and the next one he says it is going to cost me a
23  great deal of money. Which statement is true?
24   Q    Other than that statement, was there anything that

201

1  caused you to reject the side agreement as being protective
2  of your rights?
3    A    Well, I was also trying to make inquiries with Cox
4  in connection with the side agreement he had with the
5  receiver, which I did not believe existed. And it didn't
6  exist. He obviously couldn't show it to me. When I
7  requested it, why wouldn't he show it to me.
8    Next there was the question of Dual Cooper, who
9  was going to be involved in all this. And my view with Dual
10  Cooper was he didn't exist as a financier. I know Dual
11  Cooper.
12   Q    You mean Cooper was not prepared to put money into
13  either Coinmaster or HV?
14   A    I requested Dual Cooper's contact information. I
15  lost contact with him some years ago. He was a man I dealt
16  with in California before. Before Cox ever became involved
17  in the company when Coinmaster directly from the USA was
18  supplying. I was concerned if the man existed at all other
19  than to manipulate me.
20   Q    Who walked away from signing this agreement that I
21  have marked as D-67?
22   A    I did.
23   Q    You did?
24   A    Yes.

51 (Pages 198 to 201)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

202

1    Q   Did you understand that the side agreement between
2    you and Mr. Cox was contingent upon you agreeing to this
3    settlement agreement?
4    A   I didn't think the side agreement meant anything.
5    Like I said to you, one time he is telling me it is going to
6    cost me nothing, the next minute he is telling me it is
7    going to cost me market value.  I did not trust his side
8    letter.
9    Q   Did you understand that the side letter was tied to
10   this settlement agreement; that is, that you had to agree to
11   the settlement agreement in some form before the side letter
12   became operative?
13   A   I didn't agree to the contract.  Therefore, the side
14   letter would become immaterial.
15   Q   So it became immaterial once you walked away from
16   this D-67?
17   A   Yes.
18        (Defendant's Exhibit No. 68 was marked for
19   identification.)
20   BY MR. PRESTON:
21   Q   I have marked as D-68 an e-mail which is CM-BR 93.
22   Mr. Lynch, do you recall sending this e-mail, D-68, to
23   Mr. Cox?
24   A   Yes, I recognize this.

203

1    Q   Where were you traveling home from?
2    A   The states at issue.
3    Q   I'm sorry?
4    A   America, I would assume.  I wouldn't take sleeping
5    tablets on a plane.  It was an overnight flight.  Overnight
6    flights are from America.
7    Q   He says in paragraph two, you need, quote, you need
8    to decide your attitude to signing the Coinmaster separation
9    agreement and let me know so I can feed this into the
10   process.
11        Three.  I need to close the CMUSA purchase deal
12   ASAP.  End of quote.
13        And you state in your response that you do not
14   visualize any problems.  Is that what you said?
15   A   That's what I say, yes.
16   Q   So as of June 9th, 2004, you were telling Mr. Cox
17   that you were going to agree to the settlement agreement and
18   the side letter, is that not correct?
19   A   I did.  But at the same time, I was deeply concerned
20   about him.
21        (Defendant's Exhibit No. 69 was marked for
22   identification.)
23   BY MR. PRESTON:
24   Q   I have marked as Exhibit D-60 an e-mail from Cox to

204

1    you of June 10th, which is CM-BR 94.
2        Do you recall receiving this?
3    A   Yes.
4    Q   And as of June 10th, had you told Mr. Cox that you
5    weren't going to agree to the settlement agreement?
6    A   I'm not certain.
7    Q   He sent you another e-mail on June 11th, which I
8    have marked for identification as D-70.
9        (Defendant's Exhibit No. 70 was marked for
10   identification.)
11   BY MR. PRESTON:
12   Q   This is CM-BR 95.  Do you recognize or do you
13   remember receiving this e-mail from Mr. Cox on or around
14   June 11th, 2004?
15   A   I remember receiving this, yes.
16   Q   By this time, you had told him that you had some
17   doubts about the settlement agreement?
18   A   You have seen my letters of concern already.
19   Q   Had you told him in June of '04 that you weren't
20   going to sign the settlement agreement?
21   A   I can't answer that.  Because I don't remember.
22   Q   Okay.  If you go down to the third from the bottom
23   paragraph.  Should you not sign.  Do you see that?
24   A   I do.

205

1    Q   Okay.  Did you understand why Mr. Cox was concerned
2    about what position your refusal to sign would impose on the
3    entire structure of the deal for CMUSA?
4    A   Well, none, as far as I can tell.  It didn't have
5    any consequences on the deal, I guess.
6    Q   So you thought the concerns he expressed in that
7    paragraph were unfounded?
8    A   I think he was just part of Cox's manipulations.
9    Q   How was that paragraph an effort to manipulate
10   someone?
11   A   Well, he says I will be in nowhere land, which isn't
12   exactly true.  That wasn't exactly true.  Like I say, I
13   think he just manipulated the whole situation to suit
14   himself.  Hence, we were at the table.
15   Q   I'm sorry.  What was the last part of that?
16   A   That's why we are all here.
17   Q   I have marked as Exhibit D-71 an e-mail from you to
18   Paul Cox dated July 1st, 2004, CM-BR 99.
19        (Defendant's Deposition Exhibit No. 71 was
20   marked for identification.)
21   BY MR. PRESTON:
22   Q   Do you recall sending that?
23   A   Yes, I do.
24   Q   Had you ever, prior to this e-mail, claimed that the

52  (Pages 202 to 205)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

<table>
<tr><td colspan="2">

**206**

1   intellectual property design rights in the game being

2   developed by High View belonged to you?

3     A   They automatically do. I didn't have a contract

4   with High View. I think you remember that statement.

5     Q   So it's your contention that, if you don't have a

6   contract with High View, nothing belongs to High View?

7     A   Nothing I designed belonged to High View. I wasn't

8   being paid. I had no contract. So intellectual property

9   rights under British law certainly states I own it. I would

10   think the American law is similar.

11     Q   Did you consult with anyone in coming to that

12   conclusion?

13     A   I told you I've been in the business 42 years and

14   I'm well aware of the legal aspects of copyright.

15     Q   May I assume from that answer that you did not

16   consult with anyone on that conclusion?

17     A   No, I didn't.

18       (Defendant's Exhibit No. 72 was marked for

19   identification.)

20   BY MR. PRESTON:

21     Q   I have marked as Exhibit D-72 -- actually, it's an

22   e-mail in Cox to Mr. Salad but it's the e-mail underneath

23   that from Mr. Lynch to Mr. Cox that I'm interested in.

24       You sent that to Mr. Cox on July 12, 2004?

</td></tr>
</table>

**208**

1     Q   Hadn't you repeatedly said that you anticipated that

2   the development costs would be between two hundred and two

3   hundred and fifty thousand dollars?

4     A   I had.

5     Q   And that was for the whole game?

6     A   That was for the game. Without any input from me,

7   I'm assuming that's the hardware cost and the software

8   costs. It is not the game design and the rest of my effort.

9     Q   Well, where did the PCB fit into the two hundred to

10   two hundred and fifty thousand dollars you anticipated?

11     A   PCB holds the software and the software is part of

12   the game design, which I designed.

13     Q   Wasn't that to be part of the development of the

14   game for two hundred to two hundred and fifty thousand

15   dollars?

16     A   No. I wasn't being paid.

17     Q   When you anticipated that the cost of development

18   would be between two hundred and two hundred and fifty, did

19   you include software in that development?

20     A   That was the cost of actually putting the project

21   together. Nobody paid me. I spent over a year on the

22   project.

23     Q   But what you worked on was part of the machine to be

24   developed for High View, was it not?

**207**

1     A   I did.

2     Q   And how did you determine that the development of

3   the High View PCB was worth $350,000?

4     A   I didn't say the PCB. I thought the whole gaming

5   design was worth that kind of money and it is worth that

6   kind of money.

7     Q   Doesn't the invoice say for the development of High

8   View, Inc., PCB? Isn't that what you wrote?

9     A   Possibly.

10     Q   Is it or isn't it what you wrote, sir?

11     A   It is what I wrote, yes.

12     Q   And you valued that, according to the rest of what

13   you wrote in this e-mail, at $350,000, correct?

14     A   Correct, yes.

15     Q   And how did you determine that it was worth

16   $350,000?

17     A   Market value. I spoke what it's worth. If you

18   would have contracted any company to produce what I have

19   produced, you would pay more than that money.

20     Q   And that's based on your years of experience?

21     A   Not only that. On Cox's e-mail where he pointed out

22   that developing a product for the price quoted would be a

23   steal. This contract would be developed for about

24   $1.2 million in correspondence that was made earlier.

**209**

1     A   What I worked on was the machine we were designing

2   and developing with my efforts, yes. I wasn't paid for my

3   efforts.

4     Q   I understand you weren't paid. But the point is --

5     A   What I'm pointing out to him was my value, my

6   effort, was worth that much money.

7     Q   Was worth three hundred and fifty as opposed to two

8   hundred to two hundred and fifty?

9     A   Absolutely.

10       (Defendant's Exhibit No. 73 was marked for

11   identification.)

12   BY MR. PRESTON:

13     Q   I have marked as Exhibit D-73 an e-mail with Bates

14   CM-BR 1216. Do you recall sending that document?

15     A   That was my feeling at the time, yes.

16     Q   Did you ever talk with Dual Cooper to determine what

17   had been said to him about investing in either Coinmaster or

18   High View?

19     A   I requested Cox to give me the information of how to

20   contact Dual Cooper. I searched for Dual Cooper's name on

21   the Internet. I searched for his postal address in

22   California. He used to work in Pechanga and I contacted

23   Pechanga to see if they had a follow-up address for him.

24   They didn't. Again, I think I requested at least two times

53 (Pages 206 to 209)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

210

1  for Cox to provide me with the information regarding Dual
2  Cooper to discuss the whole situation with him. I was never
3  given the information.
4      Q  Did Mr. Cox respond to your e-mail of July 13th?
5      A  I don't remember. I don't have a copy of that in
6  mind.
7          (Defendant's Exhibit No. 74 was marked for
8  identification.)
9  BY MR. PRESTON:
10     Q  I have marked as D-74 an e-mail, which has Bates
11 CM-BR 102. Do you recall receiving this?
12     A  Yes, I do.
13     Q  Was this a response to the e-mail that we have just
14 marked as D-73?
15     A  I would think so, yes.
16     Q  You see paragraph one where he says, I quote, I
17 cannot change the Coinmaster separation document. That's a
18 receiver driven item. End of quote.
19     A  Yes.
20     Q  Do you have any reason to believe that that's not a
21 true statement?
22     A  I think it was a Cox driven item.
23     Q  And what's the basis for that?
24     A  The whole great cloud he is putting around

211

1  everything.
2      Q  Anything else?
3      A  I have given you my view.
4      Q  Okay. I'll take that as a no.
5      A  Well, I didn't say no.
6      Q  Well, is there anything else on which your
7  contention that that first statement is inaccurate?
8      A  I was concerned that I was completely out of the
9  receiver loop. Cox is making one statement and then a
10 totally different statement. He is making references to
11 people I tried to contact and ask for information he doesn't
12 give me. I became totally to distrust Cox and his attitude.
13     Q  In the second paragraph, he states that there was no
14 agreement that either partner would charge for their time.
15         Is that an accurate statement?
16     A  There was no discussions on the issue, no.
17     Q  Did he ever bill High View or you as a 50 percent
18 owner in High View for the time he spent on High View?
19     A  His input was miniscule to mine.
20     Q  That's your opinion?
21     A  Completely.
22     Q  Did you make any offer to buy him, to buy Mr. Cox
23 and Coinmaster USA, out of their interest in High View?
24     A  Coinmaster USA did not have any interest in High

212

1  View.
2      Q  Did you make any offer to buy out whatever interest
3  Coinmaster or Mr. Cox had?
4      A  I just said to you Coinmaster didn't have any
5  interest and I didn't offer to buy out Cox either. I think
6  when it was discussed, he tried to put terms into it which
7  weren't acceptable.
8      Q  I have marked as Exhibit D-75 a certificate of
9  incorporation of Auto Gaming, Inc.
10         (Defendant's Exhibit No. 75 was marked for
11 identification.)
12 BY MR. PRESTON:
13     Q  Do you recognize that document?
14     A  Yes, I do.
15     Q  There is reference to an incorporation date of July
16 16, 2004?
17     A  Yes.
18     Q  Does that refresh your recollection as to when Auto
19 Gaming was incorporated?
20     A  Obviously on this day.
21     Q  And this is after your disagreement with Mr. Cox
22 regarding both how Coinmaster USA was to be acquired and
23 also the stock of High View divided up?
24     A  Yes.

213

1      Q  Was it your intent to use Auto Gaming as a vehicle
2  for the work you had done on the High View machine for which
3  you had not been paid?
4      A  Not at all. It was my intention to start a business
5  on my own, which I did.
6      Q  And was the first thing that you decided to use with
7  Auto Gaming the software that you had worked on in
8  connection with the --
9      A  Not at all. The first effort I put into this effort
10 was to build a cabinet.
11     Q  And when, if ever, did you use the software that you
12 developed while working for High View although you weren't
13 paid for it?
14     A  After I purchased it back from Mike Lerwill from ML
15 Solutions, Ltd.
16     Q  You purchased what back?
17     A  The PCB board and the software, the use of the
18 software.
19     Q  So ML Solutions owned the PCB board and the
20 software?
21     A  They did when they weren't paid, yes. After the
22 period of retention was up, the title retention.
23     Q  And how much did you pay for the software and the
24 PCB board?

54  (Pages 210 to 213)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

| 214 | |
|---|---|

1    A    About $17,000.  Around there.  Approximately.
2    Q    Was that market value?
3    A    I was probably the only person to pick up on the
4    product.  Besides which I don't think anybody else would
5    want it.
6    Q    So that was, in your opinion, a fair price?
7    A    Indeed.
8         (Defendant's Exhibit No. 76 was marked for
9    identification.)
10   BY MR. PRESTON:
11   Q    Mr. Lynch, I have marked as Exhibit D-76 an
12   August 9, 2004 letter from you to Ian Best, which begins
13   with CM-BR 295.  Do you recall that letter?
14   A    Yes.
15   Q    Did you sign it?
16   A    Probably.  Obviously my signature is on the back of
17   it.
18   Q    And did you send this to Mr. Best in his capacity as
19   receiver for PLC?
20   A    I did.
21   Q    That's a yes?
22   A    I did, yes.
23   Q    And had you communicated with Mr. Best or his
24   predecessor prior to August 9, 2004, on the terms either of

| 216 | |
|---|---|

1    Q    But was that your intention?
2    A    Not particularly.
3    Q    Okay.  What was your intention in sending this
4    letter?
5    A    My intention was to get him to try to withdraw his
6    attitude about me being part of the buyout.
7    Q    To, in effect, let you become part of the buyout
8    team?
9    A    Indeed.
10   Q    And that was the purpose behind this Exhibit D-76?
11   A    Yes.
12   Q    Okay.  And did he, Mr. Best, respond to you?
13   A    Probably.  I don't remember offhand.
14        (Defendant's Exhibit No. 77 was marked for
15   identification.)
16   BY MR. PRESTON:
17   Q    I have marked as D-77 an e-mail from Best to you
18   dated August 26th, 2004, which is CM-BR 103.  Do you recall
19   receiving that?
20   A    Yes, I did.
21   Q    And this is about 18 days after your August 9th
22   letter.  Seventeen days.  Whatever it is?
23   A    Yes.  I received an e-mail, first of all, from Ian
24   Best's office from his number two.

| 215 | |
|---|---|

1    the acquisition of CMUSA stock or your settlement agreement
2    with the receiver?
3    A    Not that I can remember, no.
4    Q    Why did you write this letter?
5    A    Why did I?
6    Q    Yes.
7    A    Did I write it?
8    Q    Yes, sir.
9    A    I told you I felt that Cox was out to do nothing but
10   to stitch me up, to put it bluntly.
11   Q    What does stitch me up mean?
12   A    Well, I think that's an easy enough phrase.
13   Q    It's a what phrase?
14   A    It's I think a simple enough phrase.  I didn't trust
15   Mr. Cox whatsoever toward the end of the dealings.  I didn't
16   feel anything he was telling me was true.  I didn't feel
17   that he had my best intentions at heart and I didn't feel he
18   had anything but trickery up his sleeves.
19   Q    So what was your intention in sending this letter to
20   Mr. Best?
21   A    I was just totally irritated with everything.
22   Q    Were you trying to negotiate a deal to acquire
23   Coinmaster USA?
24   A    That wouldn't have happened anyway.

| 217 | |
|---|---|

1    Q    From Karen Over?
2    A    Correct.
3    Q    Indicating that Mr. Best was out of town on
4    vacation?
5    A    And that the situation in America was driven by not
6    the bank but by the American corporation.  Not Coinmaster
7    USA.
8    Q    And that exchange of e-mail is the precursor to the
9    final e-mail which is at the top of Exhibit D-77?
10   A    Yes.
11   Q    Okay.  And in this e-mail, does Mr. Best state that
12   the bank and the receiver would not be supportive of you
13   being involved in either the UK or the U.S. going forward?
14   A    He does, yes.
15   Q    Any reason that Mr. Best would have lied to you, in
16   your opinion?
17   A    Mr. Best was out to try and make certain that the
18   company got sold.  I think that he might be careful how he
19   worded things.  For instance, why would he say this and yet,
20   his number two, Karen, say the bank had no interest.  It was
21   a conflict of statements from the same company.
22   Q    Mr. Best was the receiver, was he not?
23   A    Correct.
24   Q    Karen Ober was not the receiver, was she?

55 (Pages 214 to 217)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

| 218 |
|---|
| 1   A   She worked for him. |
| 2   Q   But he was the receiver? |
| 3   A   Yes. Well, the company was the receiver. |
| 4   Q   And do you have any evidence that would suggest that |
| 5   this statement by Mr. Best is an untrue statement? |
| 6   A   No. Let me just reflect on this statement. No, |
| 7   with the Karen e-mail, whereby she is saying that the bank |
| 8   is not driving it on. |
| 9        MR. SCHERZER: Is that part of this package? |
| 10  D-77, Karen's e-mail? |
| 11       MR. PRESTON: No. |
| 12       (Defendant's Exhibit No. 78 was marked for |
| 13  identification.) |
| 14  BY MR. PRESTON: |
| 15  Q   We have marked as Exhibit D-78 a letter from Ernst & |
| 16  Young dated November 20, 2006, Bates LYN 279. |
| 17       Do you recall receiving this? |
| 18  A   Yes, I did. |
| 19  Q   Did you respond to this? |
| 20  A   Never did. |
| 21  Q   Why did you not? |
| 22  A   The first thing I did on receiving this was to go to |
| 23  the company's house and resign as director. I did not wish |
| 24  to take up the company again afterwards. He said if I |

| 219 |
|---|
| 1   didn't reply, he would just destroy the books anyway. So I |
| 2   had no vested interest in picking up the books. |
| 3        (Defendant's Exhibit No. 79 was marked for |
| 4   identification.) |
| 5   BY MR. PRESTON: |
| 6   Q   I have marked as Exhibit D-79 a document dated |
| 7   June 8, 2007. And I ask if you recognize that? |
| 8   A   Yes, I do. |
| 9   Q   And is this the statement from Mr. Litt? |
| 10  A   It is, yes. |
| 11  Q   To which you referred earlier in our deposition? |
| 12  A   That is correct. |
| 13  Q   And who drafted this statement, if you know? |
| 14  A   Probably me. I certainly helped him with it. |
| 15  Q   And did you discuss the wording of this statement |
| 16  with anyone? |
| 17  A   Only to make sure he was comfortable with the |
| 18  information contained in it. |
| 19  Q   So the only person you discussed it with was Mr. |
| 20  Litt? |
| 21  A   Correct. |
| 22  Q   And when did you have this document prepared? |
| 23  A   Shortly before he signed it. In June '07. |
| 24  Q   Mr. Litt states that on February 25, 2003, he and |

| 220 |
|---|
| 1   the board of directors of Gaming Products, Ltd., and Gaming, |
| 2   PLC, were suspended; is that accurate? |
| 3   A   Yes. The receiver came in and asked us to leave. |
| 4   Suspended us. |
| 5   Q   Thank you. |
| 6        (Defendant's Exhibit No. 80 was marked for |
| 7   identification.) |
| 8   BY MR. PRESTON: |
| 9   Q   I have marked as Exhibit D-80 a document which |
| 10  begins with Bates LYN 342. Do you recognize that document, |
| 11  sir? |
| 12  A   I think this is a copy of the document I have back |
| 13  from the agency, yes. |
| 14  Q   This is the application for a license with the |
| 15  Chumash Tribal Gaming Agency? |
| 16  A   That's what it is, yes. |
| 17  Q   And you secured this from that agency? |
| 18  A   If this is the copy I have had back, yes. |
| 19  Q   Okay. And you produced this in the course of this |
| 20  litigation? |
| 21  A   I would assume so. |
| 22  Q   And is this the application that you contend was |
| 23  signed improperly by Mr. Cox on your behalf? |
| 24  A   Yes. |

| 221 |
|---|
| 1   Q   And where do you contend that Mr. Cox has signed |
| 2   your name? |
| 3   A   Where it says signed. On both pages. |
| 4   Q   That would be page LYN 355? |
| 5   A   The last page. Page 13 of 13. |
| 6   Q   13 of 13, which is LYN 355? |
| 7   A   And also page 12 of 13. |
| 8   Q   Which is LYN 354? |
| 9   A   Yes. |
| 10  Q   And, specifically, it's the signature which appears |
| 11  above the typed applicant's signature? |
| 12  A   The written applicant's signature, yes. |
| 13  Q   And then on page 13, it simply says, signature. And |
| 14  there it says D. A. Lynch? |
| 15  A   That is correct. |
| 16  Q   And that you contend is Mr. Cox's? |
| 17  A   Absolutely. |
| 18  Q   And what is the basis for your contention that that |
| 19  is Mr. Cox's writing? |
| 20  A   Well, I didn't sign it. Mr. Cox notarized it in |
| 21  front of Kellie Baker. So it is either his signature or his |
| 22  wife's signature. It certainly isn't my signature. |
| 23  Q   So you don't know whether it is Mr. Cox's signature |
| 24  or not? |

56 (Pages 218 to 221)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

222

1    A    Well, Kellie Baker acknowledged that the signature,
2   the writing on the document, looked like Cox's.  And she
3   dealt with lots of documents for Cox.
4    Q    And where do you contend that Ms. Baker made that
5   statement?
6    A    If it's not in here, it's in the letters to the -- I
7   forget.  It's in the correspondence somewhere.
8    Q    But you don't have any personal knowledge as to who
9   signed this?
10    A    Any what?
11    Q    Personal knowledge as to who signed this document in
12   either place?
13    A    I can't be certain, no.
14        MR. SCHERZER:  Have we seen any correspondence
15   emanating from Ms. Baker?
16        MR. GUERKE:  Yes.
17        MR. SCHERZER:  Okay.
18   BY MR. PRESTON:
19    Q    And the place on each page where it says, initial,
20   and there is what appears to be an L.  Who put that L?
21    A    Not me, as far as I know.
22    Q    Do you know that you didn't?
23    A    I'm pretty certain that it's not mine.  If it's a
24   forgery.  Obviously it looks like my initial.  But I don't

223

1   think I ever signed it.  I certainly did not sign these
2   documents.  Therefore, if I did not sign those documents,
3   this is not my initial.
4    Q    Mr. Lynch, I'm not asking about who signed them.
5   I'm now asking about the initial.  Do you know for a fact
6   whether you did or did not initial the 13 pages?
7    A    Not to my knowledge.
8        MR. PRESTON:  I have nothing further.  Thank
9   you very much.
10        EXAMINATION
11   BY MR. SCHERZER:
12    Q    Mr. Lynch, I know I introduced myself early on.  And
13   in stating that, I know that it is a quarter of four.
14   Mr. Preston did, in my opinion, a marvelous job during this
15   deposition.  It's a long day.  And I know we have been at
16   this since 9:00 o'clock.  It's not my intention to start
17   from square number one and move all the way through.  I only
18   want to highlight certain things that perhaps I'm confused
19   about.  I'm estimating that this process will take no more
20   than 15, 20 minutes.  So if you can bear with me, we can get
21   through this and call it a day.
22    A    Fine.  That's what I'm here for.
23    Q    Thank you very much.
24        Let's start where Mr. Preston left off with

224

1   D-80.
2    A    This?
3    Q    Yes.
4    A    Okay.
5    Q    You have had this document for quite some time?
6    A    It's been in my possession obviously since I got the
7   copy from the agency.
8    Q    Yes.  Frankly, you procured this document through
9   your efforts?
10    A    I obtained it, yes.
11    Q    You have reviewed it, of course?
12    A    Yes.
13    Q    Is there anything in this documentation, other than
14   the fact that you allege that it's not your signature, is
15   there any facts in this documentation which you contend is
16   not accurate?
17    A    I didn't look at them.  I was looking for the
18   signature at the time.  I didn't start with the rest of the
19   document.  I would need to go through it and come back to
20   you, I'm afraid.
21    Q    But you have not done so up until now?
22    A    No.  I was only concerned with the application of
23   who signed the thing.
24    Q    I understand.

225

1        And you understood along this process that
2   there were applications that had to be made to these Indian
3   tribes or licenses would not be granted?
4    A    Absolutely.
5    Q    And both before and after this document was signed,
6   you had, in fact, reviewed similar applications and had
7   signed them, correct?
8    A    I would think so, yes.
9    Q    Is there any reason to believe that you would not
10   have signed this document?
11    A    It isn't my signature.
12    Q    I understand.
13        Had it been presented to you for signature,
14   would you have signed it?
15    A    There was no reason why I wouldn't have done it.
16    Q    Okay.  In what way, aside from the fact it was not
17   your signature.  I understand that.
18        Aside from that, is there any way that you were
19   monetarily damaged by the submission of this document?
20    A    I think -- I don't know how to answer that.  I think
21   it is all part of the Cox package scenario.
22    Q    I want to limit the question --
23    A    I understand.
24    Q    To this document, the license that was granted

57  (Pages 222 to 225)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

### 226

1  pursuant to this application. How were you damaged?
2     A   Financially, I don't think I was.
3     Q   Okay. There came a point in time where you felt
4  pretty strongly about Mr. Cox and you no longer believed
5  what he was telling you?
6     A   That's right.
7     Q   And we have seen an exchange of correspondence
8  during the spring and summer, if I recall, of -- let me make
9  sure I have my era correct -- 2004?
10    A   Sorry. Reask me the question, please.
11    Q   Sure. There came a point in time where you decided
12  that Mr. Cox was not telling you the truth?
13    A   There was a point I strongly suspected as the
14  situation got worse, yes.
15    Q   And it was at that point in time that you became
16  concerned that he was trying to steal the company from you?
17    A   It wasn't a question of stealing the company. We
18  already lost the company. It was a question I think that I
19  utilized my services to obtain the company for himself. He
20  breached an agreement that we had for sharing the company
21  equally between the three of us.
22    Q   And when did you have those strong suspicions that
23  he was no longer being frank and honest with you?
24    A   When he phoned me. I'm uncertain. It was in July.

### 227

1  Either June or July. In the summer period. I was actually
2  in a town in southern Spain.
3     Q   Are you talking about 2004?
4     A   It must have been 2003, 2004. I'm not certain which
5  year that was. It was when he was asking me to sign the
6  agreement, the first agreement to have an agreement.
7     Q   Let's go back to some of the documents you have in
8  front of you. Perhaps it will refresh your recollection as
9  to the year.
10        If I recall, we had the --
11    A   It must be July 2003.
12    Q   2003?
13    A   Yes. I think so.
14    Q   And that is when you were presented with agreements
15  that you were not going to sign?
16    A   It wasn't the agreement, it was the phone call and
17  the state of his voice and attitude over the phone.
18    Q   Okay. And from that point on, summer of 2003 --
19    A   I became suspicious of his action, yes.
20    Q   And subsequent to that point in time, you and he had
21  discussed the possibility of entering into a side agreement
22  and an agreement with other entities, including the receiver
23  in order to purchase USA?
24    A   Which other entities are you referring to?

### 228

1     Q   Let's go through some of these agreements.
2     A   Okay.
3     Q   Take a look at D-67. Do you have that in front of
4  you?
5     A   Which number?
6     Q   D-67.
7     A   Yes.
8     Q   Okay. You had been involved in the negotiation of
9  this settlement agreement?
10    A   Well, yes and no. Cox drafted the settlement
11  agreement saying this is what we were going to do. I looked
12  at it. It seemed to be okay. We made changes and things
13  went on.
14    Q   You looked at it and it seemed okay?
15    A   Yeah.
16    Q   And then changes went on?
17    A   The original agreement I had with him was to enter
18  into an a settlement agreement. I signed a non binding
19  contract with him.
20    Q   Okay. The letter of intent?
21    A   The letter of intent. Whatever you want to call it.
22  From that, the final contract made me exceptionally nervous.
23    Q   And that final contract includes D-67?
24    A   Yes.

### 229

1     Q   And I apologize if this question was asked to you
2  before by Mr. Preston.
3     A   Sure.
4     Q   What portion of D-67 did you find to be
5  objectionable?
6     A   I didn't feel the contract was that favorable to me.
7  And I felt that it was restrictive and I became very nervous
8  of the whole thing. And it was about that time I realized
9  that this contract wasn't drafted by the receiver, it was
10  drafted by Cox.
11    Q   I understand. Now, I understand that it was not
12  acceptable to you because you didn't sign it, correct?
13    A   Correct.
14    Q   Tell us what part of it that you found to be
15  objectionable?
16    A   Well, as I said earlier, I wasn't happy with it. I
17  wasn't happy with the restrictions. I wasn't happy with the
18  way it was drafted.
19    Q   What restrictions in D-67 did you have a problem
20  with?
21    A   I just didn't like it generally. I wasn't happy. I
22  wasn't happy with any part of it.
23    Q   When did you find or consider that you weren't happy
24  with any part?

58 (Pages 226 to 229)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

230

1    A    When the restrictions became more prohibitive than
2    the initial agreement I had.
3    Q    And what restrictions changed?
4    A    Well, the restrictions that we not be involved in
5    Gaming and just generally unhappy with it.
6    Q    And those restrictions changed?
7    A    From the original term agreement, yes.
8    Q    Did you tell anyone?
9    A    I went to see a lawyer about it.
10   Q    Did you tell Mr. Cox that the restrictions had
11   changed, they were more onerous and you were not in
12   agreement?
13   A    Yes.
14   Q    When and how?
15   A    By e-mail and the fact that he had been contacted by
16   the lawyer in Delaware where he was asked to review the
17   situation.  And he insisted or threatened if he didn't stop
18   going down that path, that all negotiations would cease
19   between us.
20   Q    And that was in the summer of 2004?
21   A    Whatever the date was on the letter from Cox.
22   Q    Okay.
23   A    I told you, I have a problem with dates.
24   Q    As we get older, we all do.

231

1    A    I have always been.  It's been all my life, I'm
2    afraid.
3    Q    Let's go back to the beginning and the contract that
4    you originally signed to provide you with, as I recall, it
5    was $8,000 a month?
6    A    Correct.
7    Q    Okay.  And as part of this lawsuit, you're looking
8    for that $8,000 a month by Coinmaster USA?
9    A    Say that again.
10   Q    Are you looking for Coinmaster USA to pay that money
11   to you?
12   A    Absolutely.
13   Q    Are you also looking for Mr. Cox individually to pay
14   that money?
15   A    I think that the company has made profits which have
16   been diluted and that I'm involved in a share of the profit
17   from the company according to that contract, if the contract
18   is valid.  Therefore, if Cox is taking the money, I want to
19   be remunerated accordingly.
20   Q    Let's take a step back and take it point for point.
21   Okay?
22   A    Yes.
23   Q    Did Mr. Cox personally guarantee this contract to
24   pay you $8,000 per month?

232

1    A    He didn't.
2    Q    So your theory is not based upon personal guarantee,
3    correct?
4    A    Correct.
5    Q    Your theory is based upon an allegation that there
6    were monies paid to Mr. Cox along the way?
7    A    Correct.
8    Q    And that he should be obligated to disgorge those
9    monies to pay you under this contract?
10   A    Under part of it, yes.
11   Q    Do I have it right?  I don't mean to put words in
12   your mouth.
13   A    Well, it is difficult, you know.  Cox, I believe, in
14   my view, was taking monies out of the company, which weren't
15   justified in being taken out.  And which would accumulate as
16   part of the profits of the company had he not taken them
17   out.  And, therefore, I feel that Cox should be paying that
18   proportion which was agreed as my percentage of the profit.
19   Q    What money should he be taking out?
20   A    Well, if you look at his balance sheet that he gave
21   me, which was an unaudited balance sheet, some of the costs
22   were complete nonsense.  Some of the running costs of R&D I
23   think worked out to $25,000 a week.
24   Q    So you believe that USA has an action against Cox to

233

1    disgorge that money?
2    A    I didn't say that to you.
3    Q    That's what I'm asking.
4    A    All I said was, I should be able to pay the backup
5    costs to reduce the profitability of USA.  I don't have any
6    way of driving USA on as a company.  My claim is against
7    Cox.
8    Q    As we sit here today, you don't have a shareholder
9    interest in USA, correct?
10   A    Correct.
11   Q    And you're not a director of USA?
12   A    I don't know.  I never had notice to say that I'm
13   not a director.
14   Q    You're certainly not an officer of USA, correct?
15   A    What do you mean by the difference between officer
16   and director?  Explain the difference.
17   Q    Sure.  An officer is a person who is appointed by
18   the board to serve as CEO, president, secretary.
19   A    As far as I know, I was appointed by the board.  You
20   have shown me the documents.  I have never seen a document
21   where it removed me from the board.
22   Q    Are you an officer of the corporation?
23   A    As I just said to you, I have never seen a document
24   which stopped me from being it.  In other words, I was.  But

59 (Pages 230 to 233)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

234

1  I haven't seen a document which says I no longer am.
2      Q    All right. Have you submitted any expenses that you
3  incurred on behalf of USA?
4      A    No.
5      Q    Aside from this November 15, 2002 contract wherein
6  you are to be paid --
7      A    Which document, please? In what sheet is it?
8          MR. PRESTON: November 15th, 2002.
9  BY MR. SCHERZER:
10     Q    D-13. It's probably over there.
11     A    Oh, in this pile?
12     Q    Yes. D-13 was about 10:00 o'clock this morning.
13         Do you have them in order, Tom?
14     A    They are not in order, no. Okay. D-13.
15     Q    Is that it?
16     A    It looks like 15. Is that the one you're referring
17  to?
18     Q    No.
19     A    The actual writing is ambiguous.
20     Q    D-13 is the contract that gives you $8,000 a month
21  against expenses?
22     A    Yes.
23     Q    Do you see that?
24     A    I do.

235

1      Q    Okay. Aside from this contract, do you believe that
2  Mr. Cox individually owes you any money?
3      A    No. Not for the contract. But, anyway. I don't
4  know how to answer that. Not for the contract clearly.
5      Q    For anything else?
6      A    Well, he deprived me from the 30 percent
7  shareholder. I should have had 33 and a third share from
8  Coinmaster. So son on that ground, yes.
9      Q    How has he deprived you from 33 percent ownership?
10     A    Because I think he deliberately went out of his way
11  to make sure I could never attain it.
12     Q    Did you sign any agreement with him in which you
13  would be entitled to 33 percent?
14     A    We had an older agreement to that effect, which is
15  also in writing.
16     Q    Is that the letter of intent?
17     A    No. The previous e-mails and discussions with Brad
18  Hutcheon. It was clearly laid out in various e-mails.
19     Q    Okay. I got e-mails.
20         Do you have any signed agreement that entitled
21  you to the 33 percent?
22     A    Other than the fact that what you say is no longer
23  valid.
24     Q    Anything else?

236

1      A    Not as far as I know.
2      Q    Is there any other area in which you believe Mr. Cox
3  individually owes you money?
4      A    No.
5      Q    When the receiver was appointed and the receiver
6  terminated you from -- what have we been calling this? PLC?
7      A    PLC, yes.
8      Q    Do you believe and is it your contention that all of
9  the terms and conditions of your agreement with PLC came to
10  a close?
11     A    Well, they breached my contract. Put it that way.
12  In failing to pay me from December, par value, and then
13  terminate the contract without paying me for the month I
14  worked. They breached the contract. They failed to pay
15  those fees to me.
16     Q    Let's work on the term breach for a minute. I want
17  to make sure we don't have a cultural disconnect on breach.
18         A breach, as I understand it, means someone
19  does something wrong in terms of contracts, disobeys a
20  contract. Is that how you understand it?
21     A    Well, absolutely. I was scheduled to be paid a
22  certain amount per month which stopped.
23     Q    When the receiver came in and terminated you, he
24  breached his agreement with you?

237

1      A    It wasn't his agreement in the first place. It was
2  an agreement I had with the company.
3      Q    Okay. Which then entitled you to enforce that
4  agreement?
5      A    It could have been done, yes. But I think the
6  receivership stopped all that anyway. It allowed the
7  receiver to do whatever he wanted to do to have whatever
8  monies from the bank.
9      Q    I want to make sure what I have is right, Tony. If
10  I don't, let me know.
11         When the receiver came in and terminated you I
12  believe circa February 25, 2003?
13     A    About then, yes.
14     Q    That constituted a breach of the agreement that you
15  had with PLC?
16     A    Indeed.
17     Q    And that entitled you, in your opinion, to bring an
18  action against the receiver or whomever was in charge of
19  PLC?
20     A    I didn't say that. You did.
21     Q    That's what I'm asking you.
22     A    I don't know. I didn't consider the situation.
23     Q    Okay. But the receiver did breach the agreement
24  with you?

60  (Pages 234 to 237)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

238

1   A   He breached my contract with Coinmaster, PLC.
2   Q   Okay. Subsequent to the time that the receiver
3   terminated his relationship between you and PLC, what did
4   you believe was your relationship with USA?
5   A   Paul Cox was a very close friend of mine for
6   20 years. I had been to his wedding. He has been to my
7   daughter's wedding. I have been to his house many times and
8   he has been to some of my properties. I would say he was my
9   closest friend, which is why I trusted him so deeply. That
10  changed about the period of June or July 2003.
11  Q   Okay. And what do you believe your relationship was
12  with USA? Were you a shareholder in USA?
13  A   Me personally, no.
14  Q   Okay. You weren't a shareholder but you think
15  you're still a director and you're still an officer?
16  A   As I said, I have never had notification of the fact
17  that I have been dismissed as a director.
18  Q   Okay. And you're aware of the fact that USA had
19  annual meetings?
20  A   Yes, it did have annual meetings.
21  Q   And at those annual meetings, there were elections
22  to the board?
23  A   I would assume so. I only attended one, that I can
24  remember.

239

1   Q   And you attended one or more and you think you
2   attended a couple by telephone?
3   A   Well, that's what Cox put in writing. But after I
4   wasn't there, he just drafted it up.
5   Q   And you're not telling us that you didn't attend by
6   telephone on occasion?
7   A   It's possible.
8   Q   When was the last time that you personally attended
9   an annual shareholders' meeting? When I say personally
10  attended --
11  A   I was never a shareholder. My company was a
12  shareholder when I owned the company.
13  Q   I understand.
14  A   I have never been a personal shareholder. I
15  couldn't attend as a shareholder.
16  Q   I understand. But there are annual shareholder
17  meetings, correct?
18  A   Yes.
19  Q   And you attended them in your capacity as an owner
20  of PLC, correct?
21  A   That would have been prior to PLC going into
22  liquidation. So it must have been 2002.
23  Q   Any question is relatively easy, Tony. When is the
24  last meeting you attended?

240

1   A   Sometime in 2002.
2   Q   Okay. So from 2003 on, you were not there either
3   personally or by telephone?
4   A   I'm not trying to be tricky. I find that the
5   question is quite difficult. Without documentation in front
6   of me, I can't tell you what I attended unless I refer back
7   to it.
8   Q   You know you didn't attend a meeting of USA in 2006,
9   correct?
10  A   2006, no.
11  Q   And certainly not in 2007?
12  A   No. Nor 2005.
13  Q   And probably not in 2004 either. How are we doing?
14  A   So the last meeting I assume I attended was say
15  2002, 2003.
16  Q   Okay.
17  A   I don't know. I can't remember.
18  Q   And you have no reason to believe that those
19  meetings did not occur, do you?
20      MR. GUERKE: Objection to the form.
21  BY MR. SCHERZER:
22  Q   You can answer the question, if you can.
23  A   Ask the question again, please.
24  Q   Do you know whether or not those meetings occurred?

241

1   A   Which ones?
2   Q   Annual meetings of the shareholders.
3       MR. GUERKE: Objection to form.
4       THE WITNESS: I don't understand how to answer
5   it because I don't know if they happened or they didn't
6   happen unless they received notification from Cox.
7   BY MR. SCHERZER:
8   Q   That's my answer. Okay.
9       Are you aware of any law or any by-laws or any
10  requirement that requires USA to give you notice that you're
11  no longer a director or an officer?
12      MR. GUERKE: Objection to form.
13      THE WITNESS: I don't know.
14      MR. SCHERZER: That was 15 minutes. No further
15  questions.
16      MR. GUERKE: Are you finished?
17      MR. PRESTON: May I ask him to identify one
18  document?
19      MR. GUERKE: Certainly.
20      EXAMINATION
21  BY MR. PRESTON:
22  Q   Mr. Lynch, I have got a document that I will
23  photograph and mark as D-81?
24      (Defendant's Exhibit No. 81 was marked for

61 (Pages 238 to 241)

Lynch v. Coinmaster USA, Inc.
DANIEL ANTHONY LYNCH

242

1    identification.)
2    BY MR. PRESTON:
3    Q   Which is an e-mail dated June 10, 2003. And for
4    reasons I can't possibly explain. Oh, yes, I can. It
5    doesn't have a Bates number. But I will get a copy that
6    does have a Bates number.
7         My question is, do you have any recollection of
8    receiving that e-mail?
9    A   Yes, I do.
10   Q   And what's the date of that e-mail?
11   A   The 10th of June, 2003.
12   Q   And to what does it refer?
13   A   About the lightning strike he had in his home.
14   Q   He being Mr. Cox?
15   A   Correct.
16   Q   And how long does it say he has been out-of-pocket
17   as a result of that?
18   A   Out of pocket? He said it knocked me out for nearly
19   eight days.
20   Q   Eight days?
21   A   Yes.
22   Q   So he sent it on the 10th of June and that means he
23   has been out since the 2nd of June?
24   A   I don't certainly understand the question you're

243

1    trying to ask me.
2    Q   If he has been out of work or out of the ability to
3    work for nearly eight days --
4    A   Well, he doesn't have the ability to work at all,
5    does he? He ran an office as well as his home.
6    Q   And do you have any knowledge as to whether he was
7    at the office during the eight day period that he was
8    knocked out?
9    A   Unless I look back into my records to see if I
10   received some e-mails, I don't know.
11        MR. PRESTON: Okay. Very good. I have nothing
12   further. Thank you.
13   I will get this copied.
14        MR. SCHERZER: Kevin?
15        MR. GUERKE: No questions.
16        MR. PRESTON: Okay. We're done.
17        (Deposition concluded at 4:12 p.m.)
18
19
20
21
22
23
24

244

INDEX

1
2    DEPONENT: DANIEL ANTHONY LYNCH          PAGE
3      Examination by Mr. Scherzer      2
       Examination by Mr. Preston       6
4      Examination by Mr. Scherzer     223
       Examination by Mr. Preston      241
5
6         E X H I B I T S
7
    DEFENDANT'S DEPOSITION
8
    NUMBER       DESCRIPTION         MARKED
9
      1   Document Bates stamped CM-BR 26      28
10        through 42
11    2   Document Bates stamped CM-BR 334     37
          through 375
12
      3   Document Bates stamped CM-BR 332     38
13        through 333
14    4   Document Bates stamped CM-BR 642     38
          through 659
15
      5   Document Bates stamped CM-BR 618     38
16        through 641
17    6   Document Bates stamped LYN00004      47
          through LYN 275
18
      7   Document Bates stamped LYN 266       49
19        through 275
20    8   Document Bates stamped LYN00157      52
          through LYN00158
21
      9   Document Bates stamped CM-BR         54
22        418 through 450
23   10   Document Bates stamped LYN00039      55
24

245

1         INDEX
2
3         E X H I B I T S
4
5    DEFENDANT'S DEPOSITION
     NUMBER       DESCRIPTION        MARKED
6    11   Document Bates stamped LYN00040      59
          through LYN00041
7
     12   Document Bates stamped LYN00042      57
8         through LYN00043
9    13   Document Bates stamped LYN00149      64
          through LYN00150
10
     14   Document Bates stamped LYN00151      67
11        through LYN00153
12   15   Document Bates stamped LYN00046      68
          LYN00047
13
     16   Document Bates stamped LYN00044      81
14
     17   Document Bates stamped CM-BR 216     83
15
     18   Document Bates stamped LYN00155      86
16        through LYN00156
17   19   Document Bates stamped CM-BR 220     90
18   20   Document Bates stamped LYN 82        92
19   21   Document Bates stamped CM-BR 130     96
          131
20
     22   Document Bates stamped LYN 301       100
21        through 305
22   23   Document Bates stamped LYN 306       102
          through 309
23
24   24   Document Bates stamped CM-BR 106     103

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

# EXHIBIT B

 

**3001, ALOMA AVENUE, WINTER PARK, FL 32792**
TEL: 1 407 672 1250                                    FAX: 1 407 678 4751

November 15, 2002

Mr. Daniel A. Lynch
69707 Camino Pacifico
St. Augustine
Rancho Mirage, CA 92270

Dear Mr. Lynch,

We propose that the terms of the Agreement between yourself and Coinmaster USA Inc., for the provision of your services, as Chairman of Coinmaster USA Inc. on an expenses only basis, be amended to the following with effect from December 1, 2002. This will now take account of the extensive travelling required for you to perform your duties. Please retain all receipts for travel, in case we are ever audited.

1. This agreement will be perpetual in nature, in recognition of the value of your services to the business.

2. Your services will be provided on an as required (time) basis, and the expenses paid to yourself, will be on the following scale:

| | |
|---|---|
| 2003 Financial Year | $8,000 per month |
| 2004 Financial Year | $12,000 per month |
| 2005 Financial Year | $14,000 per month |

You may choose to defer payment or receive payment on this basis, at your choice.
This scale will be increased by 5% per month annually, beginning in January 2006.

3. You will be entitled to an annual bonus of 5% of the Company's net profit each year, as recorded by the Company's accountants. Such bonus will be paid in the month after the Company's accountants report is submitted, or later as you choose. (It must however be in the same business year.) This will be declared to the IRS as income, as required by law.

5. A stock option scheme will be put in place by January 2003, giving you a further incentive to achieve a high performance.

HEAD OFFICE: COINMASTER GAMING PRODUCTS LTD.  321 PENARTH ROAD, CARDIFF, CF11 8TT UK EUROPE
TEL: +44 (0) 29 2064 9500   FAX: +44 (0) 29 2064 9549    
www.coinmaster-gaming.com

**LYN00149**

2

6. In the event that Coinmaster USA Inc. decides to terminate this relationship for any reason, or to change your position in the organization, at any time, compensation for this loss, to be paid to yourself, will be

| | |
|---|---|
| In the 2003 year | $500,000 |
| In the 2004 year | $600,000 |
| In the 2005 year | $700,000 |
| Thereafter | $800,000 |

This obligation must be met in full, on the date of termination.

All rights to stock options accrued will be retained in these circumstances, and entitlement to annual bonus will be on a pro rata monthly basis.

7. You may give the corporation one year's notice of your intent to terminate this agreement, at any time. Unless the corporation agrees otherwise in writing, the notice must be fully worked, and all the obligations of the corporation relating to this agreement will be terminated at the end of this notice period, with the exception of any stock option rights and any bonus due.

We trust that you will find this new basis for our relationship exciting, and we look forward to our mutual success.

Please signal your acceptance of the terms of this arrangement, by signing below and returning the original to our corporate office. The second copy is for your file.

If any part of this Agreement is found to be legally invalid, it shall not invalidate the rest of the Agreement. This Agreement shall be interpreted under the laws of the State of Delaware.

Regards,

P. A. Cox
President

I accept the terms of this proposal in full.

D. A. Lynch                                    Dated  11/17/02
Chairman
Coinmaster USA Inc.



HEAD OFFICE: COINMASTER GAMING PRODUCTS LTD.  321 PENARTH ROAD, CARDIFF, CFII 8TT UK EUROPE
TEL: +44 (0) 29 2064 9500  FAX:  +44 (0) 29 2064 9549
www.coinmaster-gaming.com

**LYN00150**

# EXHIBIT C

D-14

# COINMASTER® USA Inc.

**3001, ALOMA AVENUE, WINTER PARK, FL 32792**
TEL: 1 407 672 1250                          FAX: 1 407 678 4751

November 15, 2002

Mr. Paul A. Cox
Tri-County Entertainment Inc.
752 Coachlight Drive
Fern Park, FL 32730-3120

Dear Mr. Cox,

We propose that the terms of the Agreement between Tri-County Entertainment Inc. and Coinmaster USA Inc., for the provision of your services, as President and Chief Executive Officer of Coinmaster USA Inc. on a fee basis, be amended to the following with effect from December 1, 2002.

1. This agreement will be perpetual in nature, in recognition of the value of your services to the business.

2. Your services will be provided on an as required (time) basis, and the fee paid to Tri-County Entertainment Inc. to reflect these services, will be on the following scale:

| | |
|---|---|
| With six sited participation machines | $3,500 per month |
| With eight sited participation machines | $4,500 per month |
| With ten sited participation machines | $5,500 per month |
| With twelve sited participation machines | $6,500 per month |
| With fourteen sited participation machines | $7,000 per month |
| With sixteen sited participation machines | $7,500 per month |

And a further $1,000 per month for every eight participation machines thereafter.

Tri-County Entertainment Inc. may invoice, Coinmaster USA Inc. on this basis in the month following installation of sited machines. You may choose to defer payment or invoice on this basis, at your choice.

This scale will be increased by 2.5% per month annually, beginning in January 2004.

3. You may in addition claim reasonable business expenses for business trips and Trade Show visits that may be necessary from time to time, and for expenses to do with the performance of your duties. Receipts must be provided for all expenses claimed.

4. You will be entitled to an annual bonus of 3% of the Company's net profit each year, as recorded by the Company's accountants. Such bonus shall be invoiced by Tri-County in the month after the Company's accountants report is submitted, or later as you choose.
(It must however be in the same business year.)

HEAD OFFICE: COINMASTER GAMING PRODUCTS LTD.   321 PENARTH ROAD, CARDIFF, CFII 8TT UK EUROPE
TEL: +44 (0) 29 2064 9500   FAX:  +44 (0) 29 2064 9549
www.coinmaster-gaming.com



**LYN00151**

2

5. A stock option scheme will be put in place by January 2003, for Tri-County Entertainment Inc. giving you a further incentive to achieve a high performance.

6. In the event that Coinmaster USA Inc. decides to terminate this relationship for any reason, at any time, or to change your position in the organization, compensation for this loss or change, to be paid to Tri-County Entertainment Inc., will be

| | |
|---|---|
| In the 2003 year | $300,000 |
| In the 2004 year | $400,000 |
| In the 2005 year | $500,000 |
| Thereafter | $600,000 |

In the event that Coinmaster USA Inc., opts to exercise this option for termination, in the early years, and because there will be no established value to the stock, at this point in time, Coinmaster USA Inc, must simultaneously pay you $300,000 for the 10% stock you hold in the corporation if exercised in 2003, and $400,000 if in 2004, and $500,000 if in 2005. By accepting this agreement, you accept the obligation to sell your stock to the corporation in these circumstances. If a prior listing, for the US Corporation has taken place, the responsibility to undertake this stock transaction is waived by both parties.

These obligations must be met in full, on the date of termination.

All rights to stock options accrued will be retained in these circumstances, and entitlement to annual bonus will be on a pro rata monthly basis.

7. You may give the corporation one year's notice of your intent to terminate this agreement, at any time. Unless the corporation agrees otherwise in writing, the notice must be fully worked, and all the obligations of the corporation relating to this agreement will be terminated at the end of this notice period, with the exception of any stock option rights and, any bonus due.

We trust that you will find this new basis for our relationship exciting, and we look forward to our mutual success.

Please signal your acceptance of the terms of this arrangement, by signing below and returning the original to our corporate office. The second copy is for your file.

If any part of this Agreement is found to be legally invalid, it shall not invalidate the rest of the Agreement. This Agreement shall be interpreted under the laws of the State of Delaware.

Regards

Daniel. A. Lynch
Chairman

HEAD OFFICE: COINMASTER GAMING PRODUCTS LTD.   321 PENARTH ROAD, CARDIFF, CF11 8TT UK EUROPE
TEL. +44 (0) 29 2064 9500   FAX.  +44 (0) 29 2064 9549
www.coinmaster-gaming.com



LYN00152

3

I accept the terms of this proposal in full, on behalf of Tri-County Entertainment Inc.

*Paul A. Cox*

Paul A. Cox                                    Dated   11/17/02
Chairman
Tri-County Entertainment Inc.

HEAD OFFICE: COINMASTER GAMING PRODUCTS LTD.   321 PENARTH ROAD, CARDIFF, CF11 8TT UK EUROPE
TEL: +44 (0) 29 2064 9500   FAX:  +44 (0) 29 2064 9549
www.coinmaster-gaming.com

LYN00153

# EXHIBIT D

6

DATED   6 November 2001

(1)   COINMASTER GAMING PLC

- and -

(2)  TONY LYNCH

SERVICE AGREEMENT

FINERS STEPHENS INNOCENT
179 Great Portland Street
London W1N 6LS

Tel: 020 7323 4000
Fax: 020 7580 7069
DX: 42739 (Oxford Circus North)
Ref:C148/531726.1

CM-BR 000026

<u>SERVICE AGREEMENT</u> dated    6 November 2001

<u>PARTIES</u>:

(1)    <u>COINMASTER GAMING PLC</u> a company registered in England under Number 2253400 whose registered office is at 321 Penarth Road, Cardiff CF11 8TT <u>(the "Company")</u>.

(2)    <u>TONY LYNCH</u> of Tree Tops, Bridge Road, Old St Mellons, Cardiff CF3 6UY <u>(the "Executive")</u>.

<u>IT IS AGREED</u> as follows:-

1.    **DEFINITIONS AND INTERPRETATION**

In this Agreement (which expression shall be deemed to include the Schedule and Appendices hereto):-

1.1    unless the context otherwise requires:

the <u>"Act"</u> means the Employment Rights Act 1996;

<u>"Associated Company"</u> means a company which is from time to time a subsidiary or a holding company of the Company or any other subsidiary of a holding company of the Company;

the <u>"Auditors"</u> means the auditors of the Company from time to time;

the <u>"Board"</u> means directors of the Company present at a meeting of them or of a committee of them duly convened constituted and held;

the <u>"Commencement Date"</u> means the date of commencement of the Executive's employment hereunder as specified in the Schedule;

<u>"exploitation"</u> means, in relation to any Products, the manufacture, production, assembly, sale, leasing, hiring, licensing, servicing, writing, design or development thereof;

<u>"intellectual property rights"</u> means patents, trade marks, service marks, registered designs, applications for any of the foregoing, copyright, design rights, know-how, confidential information, trade and business names and any other similar protected rights in any country (whether alone or jointly with any other person) while in the service of the Company (whether before or after the date of this Agreement and whether at the Company's premises or elsewhere) and which in any way affects or relates to or is capable of being used or adapted for use in connection with the business of the Company;

<u>"Invention"</u> means any invention, discovery, process, formula, idea, solution, improvement, computer program, semiconductor product topography, plan, specification, drawing, design, model, prototype or device of whatever nature and whether patentable or not which is made, written or discovered by the Executive (whether alone or jointly with any other person) while in the service of the

FSI-1482952-1

8 November 2001

CM-BR 000027

Company (whether before or after the date of this Agreement and whether at the Company's premises or elsewhere) and which in any way affects or relates to or is capable of being used or adapted for use in connection with the business of the Company;

"Patentable Invention" means an Invention which is patentable under the Patents Act 1977;

"Registrable Rights" means patents, registered designs, trade marks, service marks or similar commercial monopoly rights created by registration (whether in the United Kingdom or elsewhere in the world)

"Salary" the salary payable pursuant to Clause 6.1, as reviewed from time to time;

1.2 references to any statutes or statutory provisions include those statutes or statutory provisions as amended, extended, consolidated, re-enacted or replaced from time to time and any orders, regulations, instruments or other subordinate legislation made thereunder;

1.3 save as herein otherwise expressly defined, words or phrases defined in Part XXVI of the Companies Act 1985 bear the same respective meanings;

1.4 unless otherwise specified, words importing the singular include the plural, words importing any gender include every gender and words importing persons include bodies corporate and unincorporate; and (in each case) vice versa;

1.5 references to clauses and other provisions are references to clauses and other provisions of this Agreement;

1.6 the clause headings shall not affect interpretation.

2. APPOINTMENT

2.1 The Company hereby agrees to employ the Executive and the Executive agrees to serve the Company as Chief Executive Officer in such other position of no less responsibility as the Board may require.

2.2 The Executive warrants to the Company that by virtue of entering into this Agreement he will not be in breach of any express or implied terms of any contract with or of any other obligation to any third party binding upon him.

3. TERM

3.1 Subject to earlier termination as hereinafter provided, the Executive's employment pursuant to this Agreement shall commence on the Commencement Date for a fixed period of one year and shall continue thereafter unless and until his employment hereunder shall be terminated by either party giving to the other not less than twelve months' notice in writing to that effect to expire on the last day of the said fixed period or at any time thereafter.

3.2 The Executive's period of continuous employment with the Company shall be deemed to have begun on the date specified in the Schedule.

3.3 The Company shall be under no obligation to vest in or assign to the Executive any powers or duties or to provide any work for the Executive during any period of notice as referred to in clause 3.1 or at any other time, and the Company reserves the right (at its option):-

1 November 2001

CM-BR 000028

3.3.1    to pay the Executive in lieu of the whole or any part of such period of notice; and/or

3.3.2    to suspend the Executive from the performance of his duties under this Agreement with full salary and other benefits to which he may be entitled under this Agreement during the whole or any part of such period of notice (the exact period to be fixed at the discretion of the Company) and during that period to exclude him from any premises of the Company; and/or

3.3.3    to require the Executive to resign from any directorship, trusteeship or other office he may hold with the Company or with any pension scheme, employee share scheme or other trust established by the Company and upon being so required the Executive shall be deemed simultaneously to have submitted his resignation and he shall have no claim or right of action against the Company for compensation, damages or otherwise in respect of such resignation, but this provision shall not otherwise prejudice any of his rights in respect of the termination of this Agreement or of his employment.

## 4.    POWERS AND DUTIES

During the continuance of his employment hereunder the Executive shall:

4.1    devote the normal business hours of the Company (as specified in the Schedule) and such other time as is required by the Company to carrying out his duties hereunder and shall not without the prior consent of the Company engage in any activity likely to require him to be absent from work during the normal business hours of the Company or to affect his ability properly to perform his duties hereunder;

4.2    exercise such powers and perform such duties in relation to the business of the Company which are compatible with his job title and as may from time to time be vested in or assigned to him by the Board;

4.3    comply with all reasonable directions from time to time given to him by the Board and with all rules and regulations from time to time laid down by the Company concerning its employees which are consistent with this Agreement;

4.4    carry out his duties in a proper and efficient manner and use his best endeavours to promote and maintain the interests and reputation of the Company; and

4.5    at all times promptly give to the Board (in writing if so requested) all such information and explanations as the Board may require in connection with his employment hereunder or with the business of the Company.

## 5.    PLACE OF WORK

The Executive's place or area of work shall be as specified in the Schedule, but subject thereto the Company shall not without the prior written consent of the Executive require him regularly to work at any place which would necessitate his changing his place of residence.

## 6.    SALARY AND EXPENSES

6.1    As remuneration for his services during his employment hereunder the Company shall pay to the Executive a Salary at the rate of £130,000 per annum, payable by

FSI-1482952-1

1 November 2001

CM-BR 000029

equal monthly instalments in arrears on the last day of every month to a bank account designated by the Executive.

6.2    As further remuneration for his services, the Executive shall also be entitled to the commission payments (if any) specified in Appendix A.

6.3    Such Salary shall be reviewed in the manner specified in the Schedule.

6.4    All remuneration payable to the Executive under this Agreement shall be deemed to accrue from day to day.

6.5    Notwithstanding anything to the contrary contained in the articles of association of the Company the Executive shall not be entitled to any remuneration or expenses as a director or employee of the Company in addition to those specified in this Agreement.

6.6    In the event of any variation in the remuneration payable to the Executive hereunder being made by agreement between the parties hereto (and whether or not such agreement shall be evidenced by a written endorsement hereto), such variation shall not constitute a new agreement but (subject to any express written agreement to the contrary) the employment of the Executive hereunder shall continue subject in all respects to the terms and conditions of this Agreement with such variation as aforesaid.

6.7    The Company shall be entitled to deduct from any remuneration payable to the Executive any moneys which may at any time be owed by the Executive to the Company.

6.8    The Company shall pay or reimburse to the Executive (subject to production of such vouchers and/or other evidence as it may require) all proper and reasonable expenses wholly, exclusively and necessarily incurred by him in connection within his duties hereunder.

6.9    The Company shall reimburse the Executive for the cost (including VAT) of telephone calls made on his domestic telephone in the performance of his duties hereunder plus the rental charge thereof.

## 7.    MOTOR CAR

7.1    To assist him in the performance of his duties hereunder the Company shall during the continuance of his employment hereunder provide to the Executive a motor vehicle allowance as specified in the Schedule which shall provide solely for the purchase of a vehicle suitable to a person of his status and pay all running expenses of the vehicle properly incurred by the Executive in connection with his duties hereunder and shall bear the cost of insuring, testing, taxing, repairing and maintaining the same, except where damage is incurred as a result of the Executive's negligent use of the vehicle (which damage shall be paid for by the Executive).

7.2    The Executive shall take good care of the vehicle and procure that the provisions and conditions of any policy of insurance relating thereto are observed, shall be subject to any rules, regulations or restrictions imposed on the Company or agreed with the Inland Revenue in relation to any private use of such vehicle, and shall not take or permit to be taken such vehicle out of the United Kingdom without the prior consent in writing of the Company.

FSI-1482952-1

- 4 -

1 November 2001

CM-BR 000030

7.3    Subject as provided in clause 7.2, the Company shall permit the Executive to use such vehicle for private use.

7.4    The Executive shall ensure at all times that when the vehicle is driven on the road it is in the state and condition required by law and that if so required a current test certificate is in force in respect of it. The Executive shall also (so far as the law permits) at all times be the holder of a current driving licence entitling him to drive motor cars in the United Kingdom and shall produce it to the Company on request.

7.5    At all times the vehicle shall remain the property of the Company

7.6    Upon the giving of notice of termination of his employment (howsoever arising) hereunder the Executive shall forthwith produce the vehicle and its registration documents and keys to the Company.

8.    **CONFIDENTIALITY**

8.1    The Executive shall not (except as authorised or required by his employment hereunder) during the continuance of his employment hereunder or after the termination thereof disclose to any person whatsoever any information relating to the organisation, business or finances of the Company or any of its customers, agents or suppliers or any of its trade secrets or details of any its dealings, transactions or affairs or any information in respect of which the Company is bound by an obligation of confidence to a third party of which (in each case) he is or may become possessed during his employment hereunder and shall keep with inviolable secrecy all matters entrusted to him and shall not use, nor attempt to use, nor permit others to use, any such information in any manner which may injure or cause loss whether directly or indirectly to the Company.

8.2    Any notes or memoranda made by the Executive during the subsistence of this Agreement or at any time thereafter relating to any matter within the scope of the business of the Company or concerning any of its dealings, transactions or affairs shall be the property of the Company, and the Executive will not either during the subsistence of this Agreement or at any time thereafter use or permit to be used any such notes or memoranda otherwise than for the benefit of the Company and on request at any time during the subsistence of this Agreement or thereafter shall forthwith return such notes and memoranda to the Company.

8.3    The Executive's obligations under clauses 8.1 and 8.2 shall be in addition to and not in substitution for any obligations imposed upon him by law in relation to abuse of confidential information.

8.4    The Executive's obligations shall cease to apply to information which shall come into the public domain other than by a breach of this clause 8 or which for any other reason, other than through the Executive's fault, shall have ceased to be confidential.

9.    **HOLIDAYS AND HOLIDAY PAY**

The Executive shall be entitled (in addition to statutory and bank holidays) to the number of working days' holiday in each holiday year (as defined in the Schedule) specified in the Schedule calculated from the Commencement Date (and which must include one period of not less than 14 consecutive days) to be taken at such time or times as may be convenient to the Company. To the extent that any holiday entitlement is not taken in any holiday year the same shall lapse.

21/08 '03 11:01 FAX 0121 535 2448    ERNST & YOUNG    ☑011

10.    **PENSION**

The Company shall make a contribution of 7.5% of the annual gross salary (excluding any bonus payments or other additional payments) of the Executive from time to time to such personal pension scheme(s) as the Executive may from time to time specify, such contribution to be paid monthly at the same time as Salary subject to deduction for tax and national contributions at source as necessary.

11.    **NOTIFICATION OF SICKNESS AND MEDICAL EXAMINATIONS**

11.1    In the event of illness, injury or accident preventing the Executive from performing his duties hereunder, he shall notify the Company by way of self-certificate in a form prescribed by the Company of the nature of such illness, injury or accident during the first 7 days thereof and thereafter the Executive shall provide the Company with a doctor's certificate in respect thereof at such intervals as the Company shall prescribe and shall inform the Company of details of any entitlement to statutory sick pay, or any other sickness or injury benefit payable to him by any government department or authority.

11.2    The Company may at its expense require that the Executive submit to such medical examinations and tests with doctors appointed by the Company as the Company may require from time to time.

12.    **INCAPACITY**

12.1    If the Executive shall at any time be incapacitated by illness, injury or accident from performing his duties under this Agreement and shall supply the Company with satisfactory evidence of such incapacity (as more particularly described in clause 11), he shall be entitled to his full salary and commission (if any) for the next consecutive period of 13 weeks of such incapacity in any one period of fifty-two weeks and to half his salary and commission (if any) for the next consecutive period of 13 weeks of such incapacity, in each case less an amount equal to any statutory sick pay or sickness or injury benefit payable to him by the Company or by any governmental department or authority and thereafter entitlement to salary shall be at the discretion of the Company.

12.2    The Executive shall give all assistance reasonably required by the Company to enable it to reclaim any statutory sick pay entitlement paid to the Executive, in default of which the Company shall be entitled to recover from the Executive or to deduct from any subsequent remuneration payable to the Executive any amount which the Company has been unable to reclaim in consequence.

12.3    This clause shall not in any way affect the right of the Company to terminate this Agreement in the event of the Executive being prevented from performing his duties for the periods provided in clause 16.2.

13.    **PROPERTY RIGHTS**

13.1    The whole interest of the Executive in any Invention and in all intellectual property rights relating thereto or obtained or capable of being obtained in respect thereof shall be the absolute property of the Company. The Executive shall promptly communicate to the Company full particulars of all Inventions and shall keep the same absolutely confidential and shall not disclose the same to any other person without the prior written consent of the Company. The Executive undertakes that if and whenever required by the Company, he will apply or join with the Company in applying for any Registrable Right for any such Invention and will do all things and execute all documents for vesting such Registrable Right and the full right, title and

1 November 2001

CM-BR 000032

interest to and in the same, in the Company as sole beneficial owner, or in such other person as the Board may specify.

13.2    The Executive hereby waives any moral rights (as provided by Chapter IV Copyright Designs and Patents Act 1998 or any similar provisions of law in any jurisdiction) in all intellectual property rights created by the Executive in pursuance of clause 12.1 above.

## 14.    RESTRICTIONS DURING EMPLOYMENT

Without prejudice to the provisions of clause 4.1, save for in relation to the business of **T & R** Operations Limited and except with the prior written consent of the Board, the Executive shall not during his employment hereunder whether directly or indirectly or whether solely or jointly with or as agent, director, partner, manager, employee, consultant, shareholder or independent contractor of or in any other person engage in, carry on or be interested in any other business; Provided that nothing in this clause shall preclude the Executive from being the holder or beneficial owner of any securities in any other company which are listed or dealt in on any recognised stock exchange by way of bona fide investment only and where the Executive (together with his spouse, children, parents and parents' issue) neither holds nor is beneficially interested in more than a total of 5 per cent of any single class of the securities in that company.

## 15.    POST TERMINATION OBLIGATIONS

15.1    The Executive shall not, whether directly or indirectly, or whether solely or jointly with or as agent, director, officer, partner, promoter, manager, employee, consultant, shareholder, participator or independent contractor of or in any other person do any of the following things without the prior written consent of the Company:-

15.1.1    during the period of six months after termination of his employment, carry on or be engaged or concerned within England, Wales, Scotland, Northern Ireland, the Republic of Ireland or any other part of the world where the Company does business to a material extent in any trade or business competing with any trade or business of the Company as carried on at the date of such termination or at any time during the previous two years with which the Executive shall have been at any time personally concerned to a material extent while employed by the Company; Provided that this restriction shall not apply where the Executive's interest in such other trade or business is solely as an employee or a consultant and where his work or duties shall relate to services of a kind or nature with which the Executive shall not have been concerned to a material extent during the period of two years prior to the termination of his employment;

15.1.2    during the period of one year after the termination of his employment, solicit or endeavour to entice away from or discourage from dealing with the Company any person who was at the date of such termination or at any time during the period of two years or such shorter period before termination during which the employee was employed immediately preceding such termination a customer or client of the Company or had agreed to become such whether or not such person would commit a breach of contract by reason of transferring business and with whom the Executive shall have had personal contact during his employment;

15.1.3    during the period of one year after the termination of his employment, supply or provide any products or services to any person who was at

1 November 2001

CM-BR 000033

any time during the period of two years immediately preceding such termination a customer or client of the Company to whom the Company had during that period supplied or provided products or services of the same or a similar nature in the ordinary course of its business or who was at the date of such termination in the process of negotiating for the supply of any products or services of the same or a similar nature from the Company and (in either case) with whom the Executive shall have had personal contact during his employment;

15.1.4    at any time after the termination of his employment, cause or seek to cause to be terminated or adversely affected or otherwise interfere with any agreement or arrangement of any kind to which the Company is at the date of termination a party or from which the Company benefits;

15.1.5    during the period of one year after the termination of his employment, solicit or endeavour to entice away from or discourage from dealing with the Company any person who was at the date of such termination or at any time during the period of two years immediately preceding such termination a manufacturer for or supplier, distributor, agent or independent contractor of or to the Company or had agreed to become such whether or not such person would commit a breach of contract by reason of transferring business or leaving service provided that this restriction shall only apply to manufacturers, suppliers, distributors, agents and independent contractors with whom the Executive shall have had personal contact while employed by the Company;

15.1.6    during the period of six months after the termination of his employment, solicit or endeavour to entice away from or discourage from being employed by the Company any employee whose rate of gross contractual salary falls within the range of gross contractual salaries paid to the top 25 per cent. highest paid employees of the Company and with whom the Executive shall have had personal contact while he was employed by the Company and whether or not such employee would commit any breach of contract by reason of leaving service;

15.1.7    during the period of six months after the termination of his employment, employ or engage or attempt to employ or engage, or negotiate or arrange the employment or engagement by any other person of any individual who was at the date of termination, or was at any time within the period of three months immediately prior to that date, an employee of the Company whose rate of gross contractual salary falls or, at the date he left service, fell within the range of gross contractual salaries paid to the top 25 per cent. highest paid employees of the Company and with whom the Executive shall have had personal contact while he was employed by the Company and where such employment or engagement would require such individual to exercise skills or knowledge of the same or a similar nature to those acquired or used by that individual while employed by the Company and whether or not such individual would commit any breach of contract by reason of leaving service;

15.1.8    at any time after the termination of his employment, in any way make use of any corporate, business, product or service name which is identical or similar to, or likely to be confused with, the corporate name or any business, product or service name used by the Company or which might suggest a connection with the Company;

FSI-1482952-1

- 8 -

1 November 2001

CM-BR 000034

15.1.9    at any time after the termination of his employment, in any way hold himself out as employed by, representing, or acting for, the Company;

15.1.10    during the period of one year after the termination of his employment, accept employment or engagement in any capacity with any person who is at the date of such termination or was at any time during the period of two years immediately preceding such termination, a customer or client of the Company and with whom the Executive shall have had personal contact during his employment and where the Executive's duties or work shall relate to a material extent to services of a kind or nature the same as or similar to any services supplied by the Executive to that client or customer on behalf of the Company at any time during the said period of two years.

15.2    Each of clauses 15.1.1 to 15.1.10 shall be treated as a separate obligation and shall be severally enforceable as such.

15.3    Without prejudice to the operation of clause 17, the expression the "Company" where used in clauses 15.1.1 to 15.1.10 includes (where the context admits) each of the Associated Companies to the intent and effect that each of such sub-clauses shall apply (as a separate covenant in each case) in relation to each Associated Company as they apply in relation to the Company.

15.4    Nothing in this clause shall preclude the Executive from being the holder or beneficial owner of any securities in any other company which are listed or dealt in on any recognised stock exchange by way of bona fide investment only and where the Executive (together with his spouse, their parents and their parents' lineal descendants and any person or entity whom the Employee controls) neither holds nor is beneficially interested in more than a total of 5 per cent of any single class of the securities in that company.

15.5    The parties consider the restrictions in clause 15.1 to be reasonable, but if a court of competent jurisdiction finds any of them to be unenforceable the parties agree to accept any modification as to the area, extent or duration of the restriction concerned which the court sees fit to impose or, if it does not see fit, which is reasonably necessary to render the restriction enforceable.

16.    **TERMINATION**

16.1    Notwithstanding any other provision of this Agreement, the Company (without prejudice to its other rights and remedies) may terminate this Agreement forthwith by written notice to the Executive if he shall:

16.1.1    commit any serious or persistent breach of any of his obligations under this Agreement or shall neglect or fail (otherwise than by reason of accident or ill health) or refuse to carry out the duties required of him hereunder or to comply with any lawful orders or directions given to him by the Board consistent with the terms of this Agreement;

16.1.2    be guilty of any fraud, dishonesty, serious breach of duty or serious misconduct or any other conduct calculated or likely to affect prejudicially the interests or reputation of the Company;

16.1.3    be convicted of any criminal offence (other than an offence under the Road Traffic Acts not involving his disqualification from driving);

16.1.4    become bankrupt or make any arrangement or composition with his creditors;

16.1.5    shall be or become prohibited by law from being a director, or shall be removed from the office of director of the Company or (if under the articles of association from time to time of the Company he shall be obliged to retire by rotation or otherwise) shall, having retired, not be immediately re-elected; or

16.1.6    be or become of unsound mind or be or become a patient for any purpose of any enactment relating to mental health

Provided that no notice under clause 16.1.3 shall be given by the Company to the Executive by reason only of the Executive's disqualification from driving if the Executive can make suitable alternative arrangements at his own expense.

16.2    The Company shall be entitled by 3 months' notice in writing to terminate this Agreement if by reason of illness, accident or for any other cause the Executive shall at any time become or be unable properly to perform in whole or in part his duties hereunder either:

16.2.1    for an unbroken period of 13 consecutive weeks (but so that periods of less than 5 consecutive working days actually worked shall for these purposes be deemed not to break the continuity of such incapacity); or

16.2.2    for a period or periods aggregating 90 days (whether working days or not) in any period of 26 consecutive weeks (and notwithstanding in either case that during the period of any such notice any such incapacity may cease in whole or in part)

but any such notice of termination may only be given by the Company within 3 months after such unbroken period of 13 consecutive weeks or such period or periods aggregating 90 days.

17.    **ASSOCIATED COMPANIES**

17.1    It is hereby declared that the expression the "Company", when used in this Agreement, shall mean and include, where the context admits, the Company as defined in the heading to this Agreement and all Associated Companies (if any), and the Executive may be required to exercise and perform his powers and duties hereunder in relation to any Associated Company.

17.2    In carrying out his duties hereunder, the Executive shall at all times be governed by the terms of this Agreement, and it is hereby expressly agreed that no contract of employment arises by virtue of this Agreement between the Executive and any Associated Company.

18.    **GENERAL**

18.1    The Executive (if a director of the Company) shall not be entitled during the continuance of this Agreement to resign his directorship or disqualify himself from holding office as a director. On the termination of this Agreement, howsoever occasioned, the Executive shall be deemed simultaneously to have submitted his resignation as:-

18.1.1    if then an officer of the Company, as such officer; and

FSI-1482952-1

- 10 -

1 November 2001

CM-BR 000036

18.1.2    if then a trustee, as trustee of any pension scheme, employee share scheme or other trust established by the Company

and he shall have no claim or right of action against the Company for compensation, damages or otherwise in respect of such resignation, but this provision shall not otherwise prejudice any of his rights in respect of the termination of this Agreement or of his employment.

18.2    If this Agreement be terminated in accordance with its terms the Executive shall have no claim or right of action against the Company for compensation, damages or otherwise in respect of such termination or the termination of his employment.

18.3    If the employment of the Executive hereunder be terminated before the expiration of this Agreement by reason of the liquidation of the Company for the purpose of amalgamation or reconstruction, or as part of any arrangement for the amalgamation of the Company's undertaking not involving liquidation, and if he be offered employment with the amalgamated or reconstructed company for a period of not less than the unexpired period of this Agreement and on terms no less favourable to him than the terms in effect under this Agreement, he shall have no claim against the Company in respect of such termination.

18.4    If the Executive shall have refused or failed to agree to accept employment offered to him on terms no less favourable to him than the terms in effect under this Agreement either by a person which has acquired or agreed to acquire the whole or substantially the whole of the undertaking and assets of the Company or which shall own or have agreed to acquire the whole or not less than ninety per cent of the equity share capital of the Company or by another person controlled by such first person or the company if any to which the Executive shall then be seconded hereunder, the Executive shall have no claim against the Company by reason of the termination of this Agreement by the Company within one month after such refusal or failure to agree.

18.5    The lawful expiration or termination of this Agreement shall not prejudice any claim which either party may have against the other in respect of any antecedent breach or contravention of or non-compliance with any provision hereof nor shall it prejudice the coming into force or the continuance in force of any provision hereof which is expressly or by implication intended to come into or continue in force on or after such expiration or termination.

18.6    On the expiration or termination of this Agreement howsoever caused the Executive shall at his own expense forthwith return to the Company at its principal place of business (free of any condition, restriction, lien or other encumbrance) all the items mentioned in clauses 7.5 and 8.2 and all other property of the Company, being in each case in the Executive's possession or under his control and the Company may repossess such items and for this purpose the Executive hereby grants to the Company and its employees and agents an irrevocable right and licence to enter upon any premises occupied by the Executive with or without vehicles and to remove such items, and all costs incurred by the Company is repossessing such items shall be borne by the Executive.

18.7    All notices which are required to be given hereunder shall be in writing and shall in the case of the Company be sent to its registered office from time to time and in the case of the Executive be sent to his address set out in this Agreement or to such other address in England as he may designate by notice given in accordance with the provision to this clause. Any such notice may be delivered personally or by first class prepaid letter, telex or facsimile transmission and shall be deemed to have been served if by delivery when delivered if by first class post 48 hours after

posting and if by telex or facsimile transmission when despatched. Any notice to be given to the Company shall be addressed for the attention of the person specified in the Schedule and marked "strictly private and confidential".

18.8  This Agreement is entered into in substitution for all rights and liabilities of the Company and the Executive expressed or implied in all former agreements or arrangements, whether written, oral or implied, between the Company and the Executive relating to the employment of the Executive, and the waiver of all such rights and release of all such liabilities is evidenced by the signature hereof. This Agreement sets forth the entire understanding of the parties subject as herein expressly contained and the parties warrant to each other that they are not entering into this Agreement in reliance on any representation not expressly set out herein. Any sums paid to or on behalf of the Executive in relation to his employment in respect of any period since the Commencement Date shall be deemed to have been received by the Executive on account of the remuneration payable to him hereunder.

18.9  The Executive shall not, in the event of the termination of his employment hereunder for whatever reason, have any claim on the Company arising out of the lapse, by virtue of such termination, of any option then held by him to subscribe for shares from and in the Company.

18.10  The Executive shall at all times observe the London Stock Exchange's "Model Code for Securities Transactions by Directors" (or such other Code adopted by the Company in lieu thereof) relating to share dealings in each case from time to time current, of which he is deemed hereunder to have notice.

18.11  This Agreement shall be governed by and construed in accordance with the laws of England and the parties submit to the non-exclusive jurisdiction of the English Courts.

18.12  Notwithstanding that the whole or any part of any provision of this Agreement (including, without limitation, clauses 15.1.1 to 15.1.10 hereof) may prove to be illegal or unenforceable the other provisions of this Agreement and the remainder of the provision in question shall continue in full force and effect.

19.  **STATUTORY NOTICES**

19.1  This Agreement constitutes written particulars of the Executive's terms of employment with the Company for the purposes of the Act and any legislation amending, replacing or re-enacting the same, and this Agreement replaces all previous notices under the Act and any other such legislation.

19.2  The provisions of item 18 of the Schedule are a note required to be given to every employee pursuant to Section 3 of the Act.

20.  **VARIATIONS IN TERMS**

The Company reserves the right to vary the terms of the Executive's employment with it. Minor changes may be made following notice to the Executive. Major changes will only be made with the Executive's agreement.

<u>EXECUTED</u> as a deed in two originals the day and year first before written.

FSI-1482952-1

1 November 2001

- 12 -

CM-BR 000038

## THE SCHEDULE

1.    Name: Tony Lynch

2.    Residential Address:

Tree Tops
Bridge Road
Old St Mellons
Cardiff
CF3 6UY

3.    Commencement Date:

6 November 2001

4.    Position and Job Title (clause 2.1):

Chief Executive Officer

5.    Fixed period (clause 3.1):

One year

6.    Notice period (clause 3.1):

12 months

7.    Date continuous employment began (clause 3.2):

6 November 2001

8.    Periods of employment with prior persons which count as part of the Executive's period of continuous employment (clause 3.2):

None

9.    Working time (clause 4.1):

Normal office hours 9 a.m. to 5.30 p.m. Monday to Friday (inclusive), provided that the Executive shall be obliged where the Company considers it necessary to work beyond those hours and at weekends and bank holidays without extra remuneration

10.    Place/area of work (clause 5.1):

The Company's premises at 321 Penarth Road, Cardiff CF11 8TT

FSI-1482952-1

- 18 -

8 November 2001

CM-BR 000039

11. <u>Salary and method of payment (clause 6.1):</u>

£130,000 per annum, payable by equal monthly instalments in arrears on the last day of every month to a bank account designated by the Executive

12. <u>Salary Review (clause 6.3):</u>

The Executive's salary shall be reviewed annually with effect from 1st March in each year (the first such review to be with effect from 1st March 2003 or such other date as the Board may notify the Executive) but without commitment to increase

13. <u>Motor Vehicle (clause 7.1):</u>

An allowance of £50,000 to be paid annually or as shall be in conformity with the Company's car policy from time

14. <u>Holiday year (clause 9.1):</u>

1st January to 31st December

15. <u>Holiday entitlement (clause 9.1):</u>

25 working days

16. <u>Benefit schemes:</u>

Company Health Care Scheme (for the benefit of the Executive, his wife and children under the age of 21 or remaining in full-time education and not exceeding 24 years of age)

17. <u>Addressee for notices to the Company (clause 19.7):</u>

The Chairman

18. <u>Disciplinary procedure (clause 20.2):</u>

There are no fixed disciplinary rules applicable to the Executive. In the event of the Executive being dissatisfied with any disciplinary action taken against him, or if he has any grievance relating to his employment, he should refer such disciplinary decision or grievance to the Board and the reference will be dealt with by discussion and decision of a Board Meeting.

FSI-1482952-1

- 14 -

1 November 2001

CM-BR 000039.1

21/08 '03 11:05 FAX 0121 535 2448          ERNST & YOUNG                                     ☒020

## APPENDIX A

### *(Commission linked to profits)*

1.  As further remuneration for his services the Company shall pay to the Executive a Bonus (the "Bonus") at the rate specified below in the event of the Company achieving certain target net profit figures (the "Basic Figure") in each accounting reference period of the Company.

1.1  The Bonus to be paid to the Executive for the year ending 28 February 2002 is as follows:

1.1.1  a sum equal to 10% of the Executives annual salary where the Basic Figure exceeds £1.1 million;

1.1.2  a sum equal to 20% of the Executives annual salary where the Basic Figure exceeds £1.3 million;

1.1.3  a sum equal to 30% of the Executives annual salary where the Basic Figure exceeds £1.5 million;

1.1.4  a sum equal to 40% of the Executives annual salary where the Basic Figure exceeds £1.7 million;

1.1.5  a sum equal to 50% of the Executives annual salary where the Basic Figure exceeds £1.9 million.

2.  The Bonus and Basic Figure shall be reviewed annually with effect from 1st March in each year (the first such review to be with effect from 1st March 2002 or such other date as the Board may notify the Executive) by the remuneration committee.

3.  In this Appendix "remuneration committee" means a committee comprising of the Chief Executive Officer, the Managing Director and two Non-Executive Directors of the Company and which shall be chaired by one of those Non-Executive Directors.

4.  In this Appendix "net profits" means the profits shown by the audited consolidated profit and loss account of the Company for the relevant accounting reference period of the Company as certified by the Auditors with the following adjustments (unless already taken into account in such profit and loss account):

4.1  after deducting all expenses and outgoings of working and management properly incurred, directors' remuneration (including salaries and fees and Bonuses or commission to be paid), depreciation as charged, interest on borrowed monies, and any revenue expenses charged directly against reserves

4.2  before deducting any taxation on profits (including corporation tax and any similar, additional or substituted tax) or on chargeable gains;

4.3  without taking into account profits and losses of a capital nature arising on a disposal of fixed assets, investments, plant or any other property;

4.4  after deducting such proportion of the profits or adding back such proportion of the losses (as the case may be) of any subsidiaries and associated companies which shall not be owned by the Company or by any subsidiary on the last day of such accounting reference period; and

FSI-1482952-1

- 5 -

1 November 2001

CM-BR 000040

4.5     after making any further adjustments which the Auditors may consider fair and reasonable or as may be agreed.

5.     Notwithstanding the foregoing, the Executive's commission for any accounting reference period shall not exceed an amount equal to 50 per cent of the Executive's basic annual rate of Salary in effect on the last day of such accounting reference period (the "Ceiling Figure").

6.     If any accounting reference period of the Company is a period longer or shorter than a year the Basic Figure and the Ceiling Figure shall be increased or reduced proportionately on a time basis calculated in days.

7.     Commission payable hereunder for each accounting reference period shall be paid within 90 days after the audited accounts for that period shall have been approved by the directors of the Company.

8.     The Executive shall be entitled to receive true copies of the audited balance sheets and accounts of the Company in respect of each accounting reference period during which he shall have been employed hereunder, whether or not he then be a director or member of the Company.

9.     A Bonus will only be paid to the Executive if he has acted in the service of the Company for the full relevant accounting reference period.

10.    Any dispute or difference which may arise between the Company and the Executive in connection with this Appendix shall be referred to the Auditors who shall act as experts and not as arbitrators and whose determination shall be final, conclusive and binding save for manifest error.

FSI-1482952-1

- 16 -

1 November 2001

CM-BR 000041

21/08 '03 11:07 FAX 0121 535 2448        ERNST & YOUNG                        ☑022

EXECUTED as a deed by                    )        Director:
COINMASTER GAMING PLC                    )
and signed by two duly                   )
authorised officers on its behalf:-      )        Director/Secretary:


EXECUTED and DELIVERED                   )
a deed by THE EXECUTIVE in               )
the presence of:-                        )

Signature of Witness:

Name of Witness:      DAN WILLMOT

Address of Witness:   48 Bishopsgate
                      London EC2N 4AJ.

Occupation of Witness:   Investment Banker

FSI-1482952-1                                     1 November 2001

                       - 7 -                      CM-BR 000042

# EXHIBIT E

D-40



47

## Main Identity

**From:** "Paul A. Cox" <paulcoxflorida@mindspring.com>
**To:** "tony lynch" <t.lynch17@ntlworld.com>
**Sent:** Wednesday, September 03, 2003 9:49 AM
**Subject:** Re: new development

Hi Tony.

It has taken me a long time to realize that you meant an email of June 8, not August 6.

Having now re read your email, I regarded it as a ramble over possibilities, not an attempt to establish a Development Budget for a new product! At the time I was trying to see if there was an option to put the companies back together again. You will also note that my email capability was eliminated on June 2, by lightening, and I wasn't back on line again until June 10!

All that having been said, I don't find the proposed budget horrendous. In fact, if we can produce a good cash taking reliable new game for the amount you have identified, it would be a steal! My concerns lie in the following areas:

1. You're ramping up the costs before we have proven long term control of Coinmaster USA, Inc. (We have no chance of pursuing the project with the early high running costs if we don't get control of Coinmaster USA Inc. That isn't sensible!) I've told you of the Bank and Receiver's apparent fixation with making sure that you do not have a continuing presence with Coinmaster USA Inc. I believe that they don't care if I'm a casualty of this also! (War is hell!) They will in my view grab any stupid bid that doesn't include you! I've tried to paint a realistic picture of the business in the information pack, so there should be no bidders! But I believe that GET almost don't care. They need bulk, so they can float! See my earlier email on this subject. Also in June I think, or maybe May! We know that our contracts are a barrier to entry, but as you said the other day, they may just fire us, and tell us they'll see us in court! (Then we have to use our cash to get our contracts enforced!) I'm sure we would win this but again, it would be time consuming, and would undermine the pursuit of the project!

2. We still have no budget. (I recognize that you will send the info. for this for me to put in spreadsheet format, after our conversation.)

3. We have not identified a long term partner who could put up the money if we don't have control of Coinmaster USA Inc. I recognize that we have variously talked about selling to the winner or loser of the Coinmaster USA "auction." We have also more recently rambled over the possibilities of Anthony, Kevin etc. When we have a Budget / Plan document, we have a realistic chance of finding a good corporate partner. We must also be clear what we are prepared to give away to get the funds. We also need to know what funds we need. I'm prepared to commit $3,000 per month. You have to remember that my Coinmaster salary is not as high as yours, in the current scenario! You also have to remember that your income has to cover any real expenses you incur, like visiting US shows. The Receiver is watching what I do, and looking for any chance to say your income isn't about real expenses! I can't change that for now. He also wouldn't miss the chance to try to get me fired for double paying your expenses. Remember if he gets rid of my Contract he wins too! (It's just not as easy to figure out how to do as getting rid of you. Ho! Ho!)

4. Development costs always seem to over-run. They never seem to be under spent! I understand this. How can you predict the unknown? But to build a Plan that uses all the cash we're getting in, from Day 1, isn't sensible! (We have no reserves left to use on over-runs!)

2/11/2005

CM-BR 000116

5. This isn't a race! (I kind of know it is in a way, but we won't be the first in the market anyway!) We need competitive information! If Sega / ShuffleMaster, Novamatic and Uniblock really do produce machines in the next few months, we may be better to see what they get wrong, and then judge what has to be done!
It may be that price is the key factor that can give us an advantage! But right now we don't know! (maybe we'll find out at G2E.)

6. We need a "High View Inc." Board Meeting to figure out what has to be done. This can be documented as our position!

7. The project needs to be in a shape that can go ahead, whether or not we control Coinmaster USA Inc. Telling staff you can't pay them, and breaking Mike L's contract after only two or three months isn't the way to go! We'd never get their support back again even if we then managed to get the funding! You need to hold off recruiting until this is clear.

8. In the short term we have to fund "High View Inc." so that we can pay Mike at least! I cannot pay your checks to "High View Inc.", only to Tony Lynch! You have to write a check to "High View Inc." We're going to pay Mike $2,500 per month from Coinmaster USA Inc., for his ongoing on-line systems support, (in the total absence of anything from Capital Gaming this is entirely justifiable! Anyway, Mike's also cheaper!) I've put this amount in the accounts payable for July and August! We than have to pay him the balance of almost $2,500 per month from "High View Inc." You need to pay say $3,000 into High View for your share of July and August. I've already put $2,000 in, so I'll put another $1,000 in. (Sometime I will recover the costs of setting up the corporation, but it's relatively trivial, and I can do it at a convenient time.) If we've incurred other one of costs, like the Board design, that's fine, and we need to put the appropriate amount into High View. But I believe that all other spend must be held until we have agreed on all the above!

That's my rambling on the same subject matter!
I await your response with interest.

Regards,

Paul
High View Inc.

2/11/2005

CM-BR 000117

# EXHIBIT F



D-77

37

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| **From:** | <ibest@UK.EY.COM> |
| **To:** | <tony.lynch@hvillas.e.telefonica.net> |
| **Sent:** | Thursday, August 26, 2004 3:33 AM |
| **Subject:** | Re: Coinmaster USA Inc. [Virus checked] |

Without Prejudice

Tony,

Following your note, I have looked again at the correspondence whilst I was away on holiday. You need to understand that the Bank are inevitably disappointed at the overall position that they find themselves in following the receivership of the UK Companies. As a result, they would not be supportive of you being involved in either the UK or the US going forward.

Any proposals that do not have your involvement as a key feature would of course still be considered and I would be happy for you to send them to me.

Regards

Ian

Ian Best
Transaction Advisory Partner - Corporate Restructuring
DL: 0121 535 2370
DF: 0121 535 2448
Mobile: 07785 355896


"tony lynch"
<tony.lynch@hvillas.e.tele        To:      "Ian Best"
<ibest@UK.EY.COM>
fonica.net>                       cc:
                          Subject:  Re: Coinmaster USA Inc. [Virus
checked]
            25/08/2004 09:06


Hi Ian,

6/1/2006

CM-BR 000103

I understand your position, however I thought dialogue may have produced a solution.

Regards  Tony Lynch
----- Original Message -----
From: Ian Best
To: tony lynch
Sent: Tuesday, August 24, 2004 5:22 PM
Subject: Re: Coinmaster USA Inc.


Tony,

I am due back tomorrow.

However, given the current position and the threat of litigation, I have been advised not to discuss matters with you.

Regards

Ian Best


------------------------

Sent from my BlackBerry Wireless Handheld




----- Original Message -----
From: "tony lynch" [tony.lynch@hvillas.e.telefonica.net]
Sent: 13/08/2004 10:39
To: Ian Best
Subject: Coinmaster USA Inc.


Hi Ian,
    I would appreciate a phone call on your return, my phone numbers are 00 34 630 666 274 mobile & 00 34 966 774 360 home.

Regards  Tony Lynch
----------------------------------------------------
The information contained in this communication is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it. It may contain confidential or legally

6/1/2006

CM-BR 000104

privileged information. If you are not the intended recipient you are
hereby notified that any disclosure, copying, distribution or taking any
action in reliance on the contents of this information is strictly
prohibited and may be unlawful. If you have received this communication in
error, please notify us immediately by responding to this email and then
delete it from your system. Ernst & Young is neither liable for the proper
and complete transmission of the information contained in this
communication nor for any delay in its receipt.

Ernst & Young is proud to sponsor Art of the Garden at Tate Britain (3rd
June - 30th August 2004). This is the first major exhibition to examine the
relationship of the garden and British art. Advance booking is
recommended.

Information and tickets:  www.tate.org.uk/artofthegarden

This e-mail and any attachment are confidential and contain proprietary
information, some or all of which may be legally privileged. It is
intended solely for the use of the individual or entity to which it is
addressed. If you are not the intended recipient, please notify the author
immediately by telephone or by replying to this e-mail, and then delete all
copies of the e-mail on your system. If you are not the intended
recipient, you must not use, disclose, distribute, copy, print or rely on
this e-mail.

Whilst we have taken reasonable precautions to ensure that this e-mail and
any attachment has been checked for viruses, we cannot guarantee that they
are virus free and we cannot accept liability for any damage sustained as a
result of software viruses. We would advise that you carry out your own
virus checks, especially before opening an attachment.

The UK firm Ernst & Young LLP is a limited liability partnership registered
in England and Wales with registered number OC300001 and is a member
practice of Ernst & Young Global. A list of members' names is available
for inspection at 1 More London Place, London, SE1 2AF, the firm's
principal place of business and its registered office.

# EXHIBIT G

D - 43

7

## Main Identity

| | |
|---|---|
| **From:** | "tony lynch" <t.lynch17@ntlworld.com> |
| **To:** | "Paul A. Cox" <PaulCoxFlorida@MindSpring.com> |
| **Sent:** | Tuesday, September 23, 2003 12:06 PM |
| **Subject:** | Re: Coinmaster USA Inc |

Hi Paul,

an excellent email to the receiver, if they come back for more info I think we are strong candidates for the purchase!

Good luck at 5pm when you are expecting the return call.

regards Tony

----- Original Message -----
From: "Paul A. Cox" <PaulCoxFlorida@MindSpring.com>
To: "Free Tony" <T.Lynch17@ntlworld.com>
Sent: Tuesday, September 23, 2003 2:34 PM
Subject: Fw: Coinmaster USA Inc


> Hi Tony. I decided to make the offer as shown below. I believe that
> Receivers have a short attention span! They can ask for details!
>
> I'm going into Orlando in thirty minutes, so please use the cell phone after
> that time.
>
> Regards,
>
> Paul
> Coinmaster USA Inc.
> ----- Original Message -----
> From: "Paul A. Cox" <PaulCoxFlorida@MindSpring.com>
> To: "Ian Best" <IBest@UK.EY.com>
> Cc: <Gavin_Reid@bankofscotland.co.uk>; <kover@UK.EY.COM>
> Sent: Tuesday, September 23, 2003 9:13 AM
> Subject: Coinmaster USA Inc
>
>
> >
> > Confidential and Subject to Contract.
> >
> > Dear Ian,
> >
> > As you know management interest in purchasing the Coinmaster Gaming Ltd
> > stock in Coinmaster USA Inc. has been low since Capital Gaming Ltd stopped
> > supporting essential software and on-line systems work in April 2003.
> >
> > Having met with Capital Gaming's management team last week, we now have

5/30/2006

CM-BR 000047

>> renewed confidence that they will resume the necessary support to enable
>> Coinmaster USA Inc. to continue trading.
>>
>> We are aware that you are talking to various other parties on this
issue.
> We
>> acknowledge that we are unwilling to provide much in the way of up front
>> financing, but we can offer full repayment of the Bank's cash over the
>> shortest manageable time, and a healthy premium for the stock held by
>> Coinmaster Gaming Products Ltd.
>>
>> We are also now willing to propose that the bid be mounted by myself and
>> Brad Hutcheon, alone. We have reached an affordable agreement with Tony
>> Lynch that he will accept a lump sum for separation, and release of his
>> contract, in return for which he will give a written two year
operational
>> non-compete with Coinmaster USA Inc. in California. We think this is
>> preferable to lengthy and costly litigation.
>>
>> In outline our proposal is as follows:
>>
>> 1. Full repayment of the outstanding loan balance outstanding at
closing,
>> over 24 months, with interest chargeable at 2.25% over bank rate.
>> 2. Management cash injection of $50,000 at closing, as a loan, not
> repayable
>> until after the bank loan has been repaid and all the stock purchased.
>> 3. 20% of stock to be placed in a stock option scheme at closing, for
the
>> equal benefit of myself, and Brad Hutcheon. To be released on full
> repayment
>> of the bank loan, interest, and balance of stock purchase.
>> 4. Balance of stock (70%) to be purchased for $500,000 within a year of
> the
>> loan and interest being repaid. (No interest to accumulate on this
debt.)
>> 5. New machine purchases, of up to twelve in a year to be funded by a
>> combination of deposits from casinos, and cash from our US bankers, Bank
> of
>> America as may be necessary. (A tentative agreement has been reached
with
>> Bank of America in this respect. We do not see this as a problem)
>> 6. Any existing machines sold to casinos would be priced at a level of
>> retail price less 1/60th of that price, per month placed on
participation
>> prior to sale. 75% of all proceeds from such transactions would
> immediately
>> be passed to Coinmaster Gaming Products Ltd., as a reduction in the bank
>> loan, and would then reduce future payments of this loan so that the
loan
>> was still repaid over the two year period.

5/30/2006

CM-BR 000048

>> 7. It is our intent that the business would ultimately be owned 2/3rds by
>> myself, and 1/3rd by Brad Hutcheon.
>>
>> We recognize that you may prefer a cash bid. We are unfortunately not in a
>> position to offer this. We urge you however to consider the benefits of
> our
>> bid:
>>
>>                    1. We are the management team that brought the
>> business this far.
>>                    2. We have been cash positive now for 17
> months,
>> and have successfully cash managed the business to repay debt left
>> outstanding by                          the failure
>> of Coinmaster Gaming PLC without disruption to the business.
>>                    3. We are fully licensed for trading in
>> California.
>>                    4. We have survived a six month period without
>> software support from Capital Gaming Ltd.
>>                    5. We are the only team that can promise no
>> litigation in relation to management contracts.
>>                    6. We have provided impeccable financial
>> information to the Receivers for the last six months.
>>                    7. I own three other businesses, with
> partners,
>> and have an income in excess of $100,000 per year without Coinmaster USA
>> Inc.
>>                    (I have had no day to day management role
> in
>> these businesses for seven years.)
>>                    8. I have been Chairman and Chief Executive
>> (before choosing retirement at age 42) of three businesses each employing
>> more than 4,000                          people, and one
> with
>> sales in excess of $5 billion per year.
>>                    9. I was Chairman and Chief Executive of the
>> UK's largest Gaming Machine Operation for five years, with 46,000
> machines.
>>                    (I completed in excess of 20 business
>> acquisitions during this period.)
>>                    10. Brad is extremely well respected by casino
>> managements throughout California and  has an excellent working
> relationship

5/30/2006

CM-BR 000049

# EXHIBIT H



**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| **From:** | "tony lynch" <t.lynch17@ntlworld.com> |
| **To:** | <Paulcoxflorida@mindspring.com> |
| **Sent:** | Wednesday, November 12, 2003 3:56 AM |
| **Subject:** | Re: Sale of the Share Capital in Coinmaster USA Inc. |

Hi Paul,

　　　Having slept on you proposals, I consider this to be probably the best way out. The bank and their receiver should find this proposal acceptable, and it should enhance your standing with them regarding your ability to solve problems.

The side letter between you and I,  I would be more comfortable if I pay you (personally) my share of the $50k, this could possibly be done as an option to take up my shareholding when the bank have been discharged. I am concerned that at a later date I may be, by not having contributed to the early payment be charged by the tax authorities of receiving a benefit in kind, and taxed on a third value of Coinmaster. This could have severe cash consequences. Your thoughts please.


Regards Tony


----- Original Message -----
From: "Paulcoxflorida@mindspring.com" <paulcoxflorida@mindspring.com>
To: "Tony" <T.Lynch17@ntlworld.com>
Sent: Tuesday, November 11, 2003 3:33 PM
Subject: Fw: Sale of the Share Capital in Coinmaster USA Inc.


> Hi Tony.
>
> Please  see below. I know it means at least two years without cash from
> here, but at least you get a note, which has good value providing we don't
> go bust! I don't know whether you would be able to borrow against it if
you
> need cash. (I was under the impression that you were hoping that your
> Spanish properties would support you when you are rid of the penthouse?
> Hence this suggestion to get the Bank of the hook.) Also if we get High
View
> into production next year, then this would be income producing anyway!
>
> If you find this acceptable, then you and I would also have a side letter
> setting out the terms of your purchase of stock in the business, after
this
> hiatus period. (We need to take account of the tax situation anyway.) This
> letter would remain entirely confidential to you and me, but Brad would be
> told the necessary outline.
>
> I can put a Draft of such a letter together quickly for your perusal. We
can

5/30/2006

CM-BR 000050

> sign it the day we close on the business, or earlier subject to that
> closing.
>
> The October income mentioned below, is due to the fact that I had to hold
> your payment and mine at the month end due to lack of cash! Only two casinos
> paid us, and the payments were down. (You'll see, when I send you the
> October report.)
>
> As a result of this contribution, the discussion the Receiver and I were
> going to have today has been deferred until tomorrow afternoon your time. So
> he can consult the Bank I guess.
>
> I await your response.
>
> Regards,
>
> Paul
> Coinmaster USA Inc.
> ----- Original Message -----
> From: "Paulcoxflorida@mindspring.com" <paulcoxflorida@mindspring.com>
> To: <ibest@UK.EY.COM>
> Cc: <kover@UK.EY.COM>
> Sent: Tuesday, November 11, 2003 7:42 AM
> Subject: Re: Sale of the Share Capital in Coinmaster USA Inc.
>
>
> > Hi Ian.
> >
> > I would say that price is the least of our concerns. You will note that
> our
> > September 23 email actually said the Balance Sheet value at closing. You
> > seem to be trying to put a baseline on it before closing.
> >
> > What we need are certainties that we can afford the deal:
> >
> > 1. We have to have a clear GLI certificate. Trying to repay the Bank loan
> > with five machines off site for a lengthy period isn't going to work. We
> can
> > simply wait until the GLI situation happens. We don't have a problem with
> > this. Then no contingency would be necessary.
> > 2. We need certainty that Capital will accept a two year fixed deal that
> > gives them $3K per month for doing our work, and gives Mike Lerwill
> another
> > $3K per month for actually doing our work. Capital to pay Mike if any
> excess
> > is actually needed.
> > 3. We need contractual certainty that the shut off code will be disabled

> by
> > Capital so it cannot be used as a form of leverage against us during the
> > time we need to repay the Bank. (Up to three years.)
> >
> > We have no problem with Items 2 and 3 being linked to a territorial
> > re-distribution, for anywhere outside the Western USA.
> >
> > 4. We cannot leave the Winning Post games in a warehouse where they cost
> us
> > $1,000+ per month for storage. Capital have sold one machine in South
> > America recently(?) Why can't we ship the machines back to them, at our
> > cost, and get an agreed credit against another roulette machine. They
> don't
> > need the printers etc. that we have taken out of them.
> >
> >
> > I have revisited the issue of Tony! I have still not talked to him about
> it,
> > but now want to do so. I do not think the attorneys will agree on
> anything
> > except the lunch wine when they meet at our joint expense next week.
> > Whatever the Bank's position, I feel honor bound to reach an amicable
> > settlement with Tony. He's given me nothing but help over the last three
> > years, and I am not happy to litigate against him in the USA. I
> recognize
> > that the Bank's only real interest is in making sure Tony doesn't get
> > anything more in their watch. I propose the following:
> >
> > Tony resigns now, and surrenders his contract in return for the
> following:
> >
> > 1. He gets the October payment I reserved for. This will be the last
> such
> > payment.
> > 2. He will get a deferred payment of $190,000 with interest at 5% fixed,
> > payable three months after the Bank Loan and Stock purchase are finally
> > completed with the Bank.
> > 3. He will be an unsecured debtor until the Bank is fully repaid, after
> > which he can become secured against our assets if he chooses.
> > 4. We stop the attorneys meeting.
> >
> > In return for this, Tony gives us a two year guarantee that he will not
> set
> > up an operation himself or with any other party, directly or indirectly
> to
> > operationally compete with us in any State West of the Mississippi.
> Should
> > this be breached, Items 2 and 3 above are void.
> >
> > I don't know that Tony will accept this. In which case we simply proceed
> > with Plan A, and let the attorneys meet and the chips fall where they

> will.
> >
> >
> > In relation to my own contractual situation, I propose the following:
> >
> > 1. My paid salary is capped at it's current level, of $6,500 per month.
> > 2. I keep my profit related bonus. The bonus due for 2003 would be
> payable,
> > when due. After all it's now November. I can choose to defer payment at
my
> > choice.
> > 3. A new bonus is introduced, related to Bank repayment, on whatever
> numbers
> > are finally agreed (dependent on Bank attitude to financing machines
etc),
> > but payment of any bonus earned is totally deferred until three months
> after
> > full repayment of the Bank Loan and the Stock purchase.
> > 4. I will accept a new contract with severance clause of $150,000. (This
> is
> > no longer an insignificant business. We need to make a profit of at
least
> $1
> > million next year.) This amount of severance is not out of line with
such
> > payments in the US.
> >
> > Please note that I am not prepared to work for three years to repay the
> Bank
> > in full for any kind of reduction in my payment package.
> >
> >
> > I await your response with Interest.
> >
> > Regards,
> >
> > Paul
> > Paul A. Cox
> > Coinmaster USA Inc.
> >
>
>

5/30/2006

CM-BR 000053

# EXHIBIT I

11/17/03

D-49

## TERM SHEET

**Parties:** COINMASTER USA, INC. ("USA"), COINMASTER GAMING, PLC ("PLC") and TONY LYNCH ("Lynch").

**Lynch Resignation:** Pursuant to the terms of the Definitive Agreement, as hereinafter defined, Lynch shall resign all direct and indirect positions and affiliations that he may have with USA.

**Mutual Releases:** Lynch, on the one hand, and USA and PLC, on the other, shall execute and deliver to one another mutual general releases upon the full execution of the Definitive Agreement.

**October 2003 Payment:** In accordance with the November 15, 2002 Letter Agreement between USA and Lynch, USA shall pay to Lynch Eight Thousand ($8,000.00) Dollars representing the October 2003 payment. No further payments will be made by USA to Lynch except for the Additional Consideration, as hereinafter defined.

**Future Consideration:** Ninety (90) days subsequent to the later of the Stock Purchase as hereinafter defined, or the Bank Satisfaction, as hereinafter defined, with such later event being defined as the "Triggering Event," Lynch shall be paid the amount of One Hundred Ninety Thousand ($190,000.00) Dollars, together with simple interest, at the rate of five (5%) percent (collectively, the "Additional Consideration") that shall begin accruing as of the date of execution of the Definitive Agreement. For all purposes of this Term Sheet, the Stock Purchase shall mean the consummation of the acquisition of all shares of stock currently owned by PLC in USA by Paul Cox and Brad Hutcheon. For all purposes of this Term Sheet, the Bank Satisfaction shall mean the satisfaction in full of all obligations owed by PLC to Bank of Scotland. The Triggering Event shall be evidenced by written instruments reasonably satisfactory to counsel to USA.

**Security:** As security for the Additional Consideration, USA shall, upon the Bank Satisfaction, execute and deliver to Lynch a security agreement and financing statements through which USA shall provide Lynch with a first perfected security interest in the operating assets of USA. Prior to the date of the Bank Satisfaction, Lynch shall be an unsecured creditor of USA.

LYN 299

**Covenant-Not-To-Compete:** Commencing upon the date of execution of the Definitive Agreement and continuing for a period of two (2) consecutive years thereafter, Lynch shall not directly or indirectly be an owner, employee, independent contractor or affiliate of any operation that is involved in the business of gaming machine sales, marketing or operations in any area of the Continental United States that is west of the Mississippi River. The remedy for a breach of this covenant-not-to-compete shall be the forfeiture and/or disgorgement, as the case may be, of the Additional Consideration.

**Definitive Agreement:** This Term Sheet shall be non-binding. Nonetheless, the parties hereto shall, upon acceptance of this Term Sheet, use reasonable efforts to negotiate and implement a definitive agreement (the "Definitive Agreement") such that the transactions contemplated hereby may be effectuated as quickly as possible.

COINMASTER USA, INC.

Attest:

_____     Dated: _____     By: _____

COINMASTER GAMING , PLC

Attest:

_____     Dated: _____     By: _____

Witness:

_____     Dated: _____     _____
                                                        TONY LYNCH

CPAC;410325.2

2

LYN 300

# EXHIBIT J

D-55

## Paulcoxflorida@mindspring.com

| | |
|---|---|
| **From:** | "Paulcoxflorida@mindspring.com" <paulcoxflorida@mindspring.com> |
| **To:** | "tony lynch" <tony.lynch@hvillas.e.telefonica.net> |
| **Sent:** | Monday, March 29, 2004 4:12 PM |
| **Attach:** | Tony Re the future March 29 04.dot; Tony Term Sheet March 29 04 Version.DOC |
| **Subject:** | The Deal |

Hi Tony.

Attached are two documents.

1 The first document is an updated version of the Terms of Separation for yourself, that we last corresponded about in January. I have taken account of your proposed changes where the other parties were agreeable to these. I have also increased the total amount payable under this arrangement at the tail end to $214,000 to take some account of the lengthy delay in implementing this proposal. I do not believe that any other changes to this document are negotiable by me on your behalf! (For instance I could not get the up-front payment increased. The Bank are emotional about this, and would rather litigate with you, no matter how irrational this is!)

2. The second document is my proposed side letter relating to the future, beyond the Bank's involvement in our dealings. There are some facets of the future of our business which are currently obscure to me, but the letter attempts to capture the spirit of what we intend. Clearly I have written this letter without the help of legal advice. Because of the nature of the letter I do not consider it practical or desirable to involve legal advisors in this process. As you know, documents I write usually hold up well!

I need your comments on both these documents as soon as practical!

Good reading!

Regards,

Paul
Coinmaster USA Inc.

5/31/2006

CM-BR 001079



**3001, ALOMA AVENUE, WINTER PARK, FL 32792**
TEL: 1 407 672 1250                                    FAX: 1 407 678 4751

**Subject to Contract and Without Prejudice**

March 29, 2004

Sent by e-mail

Daniel A. (Tony) Lynch
75 Croeso Villas
Calle Pablo Sarasate
Verdamar II
Urb. Villamartin
Orihuela Costa 03189
Costa Blanca
Spain.

**Re: Our future relationship.**

Dear Tony,

Further to the proposed settlement of your contract that I have separately written to you about, I would like to set out a proposal for your re-entry to the business when the original Bank Debt has been repaid, and the corporation, or its management has bought the balance of our corporate stock!

This (side) letter is personal to you, our immediate live-in partners and myself! The contents of this letter should not be divulged to any other parties until after the Bank of Scotland no longer has any involvement in Coinmaster USA Inc. It is intended to be binding on us both.

Essentially, I confirm our ultimate ambition is to end up in the situation we thought we were at, in April 2003, when we met in Phoenix! That is, three equal, stockholding, working partners, earning roughly equal amounts from the business. (Coinmaster USA Inc.)

I recognize that the situation I am outlining could be two to three years away. (Let's hope it's not any more than that!) I actually think it could be earlier than two years depending on how successful we are at obtaining finance for placing new machines, once I am in a position to talk to Bank of America, and other Banks about this. It is my intention that the offer contained in this letter will be put into physical effect one month after you have received full payment under the proposed settlement of your contract mentioned earlier.

The proposal made below is made to you personally, and is not assignable in any way during your lifetime. The proposal will become invalid should you be indicted and convicted on any criminal charges in any jurisdiction, in the period between signing this document and the date it crystallises. It will also become invalid should you breach the non-compete agreement with Coinmaster USA Inc. that you have separately signed. It will obviously also lapse should the business not make it to the end of the Bank repayment road! That having been said, this is the real position we expect to reach.

CM-BR 001080

My proposal is as follows:

1. You would re-join the Board, with the same base salary as Brad, and myself, and a bonus scheme based on business profitability, identical to mine. (Whatever that is.) Your job title will be discussed, and decided on, at that time. Your home base can be anywhere in the USA.

   Should you choose for your home base to be outside the USA, then, your salary will be halved to reflect the lack of daily input on a pragmatic basis. You can then be based anywhere on the planet providing it has a usable high-speed Internet connection.

   You will be expected to attend our two Board meetings per year, and accept a range of appropriate duties that you agree at that time. Obviously expenses will be billable by you for attendance at these meetings on the same basis as my own. Whatever that is at the time. (Private jet travel, six star hotel, etc. Ho! Ho! )

   Your salary can be paid, either through the US tax-system, or as a fee to a corporation or in any other way that is legally permissible according to our accountant's advice at the time we put it in place.

2. There will be no accounting for lost salary in the period that has gone by since you were last fully in the business.

3. Your contract would be identical to mine, and Brad's, in terms of duration and severance options.

4. You will be given the option to buy, over time, one third of the stock, in issue in the business that is in management control. The intent being that we ultimately return to three equal stockholding partners.

   It is not entirely clear to us, exactly where this stock will have to come from. It could be from the corporation, or from Brad, or myself or some combination of these! In any event, I guarantee the result! (I'm the one who usually delivers when promised!)

   This situation arises because it's not yet totally clear where the stock will be at the time we have to put this offer into effect, (There are some conditions we have to meet that could change ownership arrangements, and also some tax considerations. It may also be that in the meantime, we have to give away some limited amounts of stock, to forge essential strategic alliances with third parties!)

   In any event, I can't see any situation arising where I don't personally control over half the stock in issue, at the time we need to meet this commitment, and can therefore get approved any appropriate minute required to make it happen.

5. You will unfortunately have to pay for the stock! The IRS and my other partner demand this! The price you will have to pay will be fair market value as established by the price we buy from the Bank a few months previously. (This is currently forecast as being $500,000 for 70% of the stock. This would mean your stock purchase price could be

about $238,000!) You would be allowed to pay for this stock over up to three years, at your choice. (You would receive it as you paid.) There should be no untoward tax implications for this transaction for either you, or the corporation, since we have an established market price at that time!

You will have one month from the time this opportunity is triggered by us to give us written acceptance of the offer and to say how you intend to take up the stock and what payment arrangements you wish to make. After that, the offer will lapse for all time!

(It seems probable that the real value of the stock you are buying at that time could be in excess of $2 million! I'm not guaranteeing this of course! On the other hand it could be worth $50, but then you wouldn't take up the option would you!)

6.  Our salaries will be set for the duration of your stock purchase period, so that this purchase is not a financial burden for you. That is, in anticipation of say a three-year purchase, we will go for salary additions for each of us that are about $80,000 more than we would otherwise be receiving. (Assuming the business can afford this! Our model says it can easily!) We will need to decide on the precise amount of salary addition based on your chosen income tax position. This will also mean that there is no penalty arising to either Brad or myself from your stock purchase. (We cannot make the same offer over two or one year, since the business would struggle with this option!)

7.  In the interim, until the Bank is no longer involved, you will continue to assist me personally in all ways possible to continue to make the business a success, giving advice etc on reasonable request. (Your physical presence will not be required.) For the record, not doing this will not be counted as an act of default under this agreement!

8.  Should you wish to sell your stock, at any time, after you gain ownership, you must in the first instance offer it for sale to the other management stockholders equally, at fair market value. I do mean fair market value! As assessed by a person agreed by all three of us as being capable of deciding on such a value. (Or maybe you should persuade us that we should all sell to whomever at that time!) If necessary you will agree to arbitrate this matter with an arbitrator agreed by all of us.

9.  Should you be unfortunate enough to die prior to the consummation of this deal then the option to purchase stock part of this deal will be willable to whomever you wish. Sadly the salary arrangements, salary addition, expense arrangements, and Board appointment are unique to you, and are not willable.

10. You agree that any other gaming machine products you decide to design, produce or manufacture for distribution in the US market, personally or using another corporation, before or after the arrangement covered by this letter is triggered, and which are legally allowable in the State of California, will in the first instance be offered to Coinmaster USA Inc. as a sole distributorship for the State of California, at margins of no less than 25%. Coinmaster USA Inc. will have the right to accept such an offer, in writing, within one month of the offer being made, in writing.

11. This contents of this letter shall be binding on our heirs.

CM-BR 001082

This Agreement is written under the laws of the State of Delaware.

Should any Clause be found by a court to be legally invalid at any point in time, it will not invalidate the remaining clauses.

Sincerely,

*Paul A. Cox*

Paul A. Cox
President and CEO

I accept the terms of the Proposal outlined in this letter in full.

Sincerely,

Daniel A. (Tony) Lynch                    Dated: _____

# TERM SHEET

| | |
|---|---|
| **Parties:** | **COINMASTER USA, INC.** of 3001 Aloma Avenue, Winter Park, FL 32792 ("USA"), **COINMASTER GAMING, PLC** whose registered office is at One Bridewell Street, Bristol, BS1 2AA ("PLC"), **COINMASTER GAMING PRODUCTS LIMITED** whose registered office is at One Bridewell Street, Bristol, BS1 2AA ("LTD"), **IAN BEST** of Messrs. Ernst and Young of One Bridewell Street, Bristol, BS1 2AA ("Receiver") and **DANIEL ANTHONY LYNCH** of [to be confirmed] ("Lynch"). |
| **Lynch Resignation:** | Pursuant to the terms of the Definitive Agreement, as hereinafter defined, Lynch shall resign all direct and indirect positions and affiliations that he may have with USA. |
| **Mutual Releases:** | Lynch, on the one hand, and USA, PLC and/or LTD as appropriate on the other, shall execute and deliver to one another mutual releases, in form and content acceptable to the parties and their counsel, upon the full execution of the Definitive Agreement, which releases shall have no force or effect until the Debt Satisfaction and Stock Consideration, both as hereinafter defined, shall occur. |
| **October 2003 Payment:** | In accordance with the November 15, 2002 Letter Agreement between USA and Lynch, USA shall pay to Lynch Eight Thousand ($8,000.00) US Dollars representing the October 2003 payment. No further payments will be made by USA to Lynch (or by PLC or LTD to Lynch), except for the Additional Consideration (as hereinafter defined), if any, payable by USA to Lynch. |
| **Future Consideration:** | Ninety-one (91) days subsequent to the date on which the Debt Satisfaction and Stock Consideration are satisfied in full, USA shall pay to Lynch the amount of two hundred fourteen thousand ($214,000.00) US Dollars, together with simple interest, at the rate of five (5%) percent (collectively, the "Additional Consideration") that shall begin accruing as of the date of execution of the Definitive Agreement by all parties hereto. For all purposes of this Term Sheet, the "Debt Satisfaction" shall mean the satisfaction in full of all liabilities and obligations owed by USA to PLC and LTD. The balance owed by USA to PLC and LTD as of February 29, 2004, as per the USA balance sheet, was |

116112.01000/40133528v4

CM-BR 001084

2,080,241.10 US Dollars.   The amount of the Debt Satisfaction shall be specified in the Definitive Agreement and shall not be subject to offset or deduction after the amount thereof has been agreed to by the parties thereto.   The date on which the Stock Consideration is satisfied in full shall be triggered by written instruments in a form reasonably satisfactory to the legal representatives to USA and the Receiver ("Written Instruments").

**Security:**

As security for the Additional Consideration, USA shall, upon the satisfaction in full of the Stock Consideration, as evidenced by the Written Instruments, and upon written demand from Lynch, execute and deliver to Lynch a security agreement and financing statements through which USA shall provide Lynch with a first lien security interest in the operating assets of USA.   Prior to the date of the Written Instruments, Lynch shall not be entitled to the Additional Consideration and shall be an unsecured contingent creditor of USA.

**Acknowledgment of Bank's**
**Continuing Security**

Lynch hereby confirms and affirms, and shall re-affirm in the Definitive Agreement, the Bank's continuing first lien security interest in the operating assets of USA, which security interests shall continue in full force and effect until the Stock Consideration has taken place.

**Covenant-Not-To-**
**Compete:**

Commencing upon the date of execution of the Definitive Agreement and continuing for a period of two (2) consecutive years thereafter, Lynch shall not directly or indirectly compete with Coinmaster USA Inc. in any area of the Continental United States that is west of the Mississippi River.   The remedy for a breach of this covenant-not-to-compete shall be the forfeiture and/or disgorgement, as the case may be, of the Additional Consideration, and such additional remedies as may be available at law and/or in equity.

**Definitive Agreement;**
**Stock Purchase**
**Condition:**

This Term Sheet shall be non-binding.   Nonetheless, the parties hereto shall, upon acceptance of this Term Sheet, use reasonable efforts to negotiate and implement a definitive agreement in good faith (the "Definitive Agreement") such that the transactions contemplated hereby may be effectuated as quickly as possible. Further, the closing of the transaction contemplated herein is expressly contingent upon the sale of all shares of stock held by

2

CM-BR 001085

LTD in USA such that Paul Cox and Brad Hutcheon shall be the only stockholders of USA. The consideration ($500,000.00 US Dollars) to be paid to LTD for the shares of stock as referenced in this paragraph is herein referred to as the "Stock Consideration." The Stock Consideration shall be paid to LTD subsequent to the Debt Satisfaction.

**Receiver acts without personal liability:** Notwithstanding that this Term Sheet is, in any event, non-binding, the Receiver has entered into this Term Sheet and will execute the Definitive Agreement and any other supporting documentation for or on behalf of PLC and LTD and neither the Receiver or his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatever in respect of any obligation undertaken by PLC, LTD or any other party to this Term Sheet, the Definitive Agreement or any other supporting documentation or in respect of any failure on the part of PLC, LTD or any other party to observe, perform or comply with any such obligations or under or in relation to any associated arrangements or negotiations or under any assurance made pursuant to this Term Sheet. The Receiver is a party to this Term Sheet in his personal capacity only for the purposes of receiving the benefit of this clause.

**Governing Law:** This Term Sheet and the Definitive Agreement, and all matters arising hereunder or thereunder, shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts or choice of law principles.

**[ Signature Page Follows ]**

116112.01000/40133528v4

3

CM-BR 001086

Attest:                                      **COINMASTER USA, INC.**

_____   Dated: _____   By: _____

Attest:

_____   Dated: _____   By: _____

Witness:

_____   Dated: _____   _____
                                             **DANIEL ANTHONY LYNCH**


Signed by the Receiver for and on behalf of Coinmaster Gaming, PLC without personal liability

_____

**IAN BEST**

Signed by the Receiver for and on behalf of Coinmaster Gaming Products Limited without personal liability

_____

**IAN BEST**

Signed by the Receiver for and on behalf of the Receiver without personal liability

_____

**IAN BEST**

116112.01000/40133528v4

CM-BR 001087

# EXHIBIT K

*Confidential*
*Blank Rome Draft Dated June 4, 2004*
*For Discussion Purposes Only*

## SETTLEMENT AGREEMENT
### (Lynch)

**SETTLEMENT AGREEMENT** ("*Settlement Agreement*") dated as of _____, 2004, by and among **COINMASTER USA INC.**, with offices at 3001 Aloma Avenue, Winter Park, Florida 32792 ("*USA*"), **COINMASTER GAMING, PLC**, whose registered office is at One Bridewell Street, Bristol, BS1 2AA ("*PLC*"), **COINMASTER GAMING PRODUCTS LIMITED**, whose registered office is at One Bridewell Street, Bristol, BS1 2AA ("*LTD*"), **IAN BEST**, of Messrs. Ernst and Young of One Bridewell Street, Bristol, BS1 2AA ("*Receiver*") and **DANIEL ANTHONY LYNCH**, of 75 Croeso Villas, Calle Pablo Sarasate, Verdemar II, Villamartin, Orihuela Costa, Costa Blanca, Spain 03189 ("*Lynch*").

### Background

A.     PLC and LTD are both in administrative receivership.

B.     Receiver serves, without personal liability, as receiver to PLC and LTD.

C.     USA, PLC, LTD, Receiver, Tri-County Entertainment Inc., Paul A. Cox and Bradley Hutcheon are contemporaneously entering into a Master Settlement Agreement dated as of the date hereof ("*Master Agreement*") whereby the parties to the Master Agreement have agreed upon certain terms and conditions regarding, among other things: (1) the payoff and satisfaction of the indebtedness owed by USA to LTD (such payoff and satisfaction in accordance with the Master Agreement is hereinafter referred to as the "*Debt Satisfaction*"), and (2) subsequent to the Debt Satisfaction, the repurchase by USA of an aggregate amount of 1,006 shares of its common stock from PLC and LTD in exchange for a payment from USA of Five Hundred Thousand US Dollars ($500,000) in accordance with the Master Agreement (the payment of such consideration to LTD for the common stock of USA in accordance with the Master Agreement is hereinafter referred to as the "*Stock Consideration Payment*").

D.     Lynch and USA are parties to a letter agreement, dated November 15, 2002 by USA, and accepted November 17, 2002 by Lynch, regarding, among other things, the provision of Lynch's services to USA (the "*2002 Letter Agreement*").

E.     Lynch and USA have agreed to cancel the 2002 Letter Agreement as set forth herein.

F.     Lynch and the other parties hereto now desire to enter into this Settlement Agreement to set forth their various understandings and agreements.

CM-BR 000404

## Agreement

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements hereinafter set forth, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.  <u>Lynch Resignation</u>. Lynch hereby resigns, effective immediately, all direct and indirect positions and affiliations that he has or may be deemed to have with USA, including his positions as an officer and director of USA.

2.  <u>Mutual Releases</u>. Lynch, on the one hand, and USA, PLC and LTD, on the other, hereby agree that immediately upon the Stock Consideration Payment, each of the releases set forth Sections 2.1 and 2.3 below shall become binding and in full force and effect, with no further action required by any of Lynch, USA, PLC or LTD; it being understood that the releases set forth in Sections 2.1 and 2.3 below shall have no force or effect until both the Debt Satisfaction and the Stock Consideration Payment shall have occurred.

   2.1   <u>Release by Lynch</u>. Lynch, for himself and on behalf of his estate, heirs, personal representatives, beneficiaries, agents, successors and assigns (collectively, the "*Lynch Parties*"), hereby releases, remises and forever discharges USA, PLC, LTD and Receiver, and their respective predecessors, successors and assigns, and the directors, officers, employees, agents and representatives of the foregoing (collectively, the "*USA Releasees*"), of and from any and all actions, causes of action, suits, claims, demands, accountings, covenants, contracts, agreements (including, but not limited to, the 2002 Letter Agreement), debts, liabilities and obligations of any nature, fixed or contingent, known or unknown, whether at law or in equity, by reason of any event, occurrence, circumstance or matter of any nature (collectively, the "*Claims*") which occurred or existed at any time on or before the effective date hereof, provided, however, that this release pursuant to this Section 2.1 shall not in any manner affect or release the obligations of USA, PLC or LTD, or their respective successors and assigns under this Settlement Agreement.

   2.2   <u>Covenant by Lynch Not to File Claims</u>. Lynch, on behalf of himself and the Lynch Parties, covenants and agrees to never pursue or file any Claims against any of the USA Releasees or allow any other party acting on his or any of the Lynch Parties' behalf to pursue or file any Claims against any of the USA Releasees based on any Claims that are released in Section 2.1.

   2.3   <u>Release by USA, PLC and LTD</u>. Each of USA, PLC and LTD, each for itself and on behalf of its respective successors and assigns (collectively, the "*USA Parties*"), hereby releases, remises and forever discharges Lynch and his estate, heirs, personal representatives, beneficiaries, agents, successors and assigns (collectively, the "*Lynch Releasees*"), of and from any and all Claims which occurred or existed at any time on or before the effective date hereof, provided, however, that this release pursuant to this Section 2.3 shall not in any manner affect or release the obligations of Lynch or his estate, heirs, personal representatives, beneficiaries, agents, successors and assigns: (a) under this Settlement

1161 12.01000/11312498v8

CM-BR 000405

Agreement, or (b) under any other written agreement entered into in connection with this Settlement Agreement.

2.4    Covenant by USA, PLC and LTD Not to File Claims. Each of USA, PLC and LTD, on its own behalf and on behalf of the USA Parties, covenants and agrees to never pursue or file any Claims against any of the Lynch Releasees or allow any other party acting on its or any of the USA Parties' behalf to pursue or file any Claims against any of the Lynch Releasees based on any Claims that are released in Section 2.3.

3.    Payment to Lynch Upon Execution of Settlement Agreement. USA shall pay to Lynch Eight Thousand US Dollars ($8,000) (the "*Signing Payment*") on the date hereof immediately following the execution and delivery of this Settlement Agreement by all the parties hereto, which amount shall be in consideration for the covenants contained herein (including in Section 9) and in full satisfaction of all claims Lynch may have under the 2002 Letter Agreement or otherwise. Such payment shall be by check or wire transfer to an account specified by Lynch.

4.    Contingent Additional Consideration Payable to Lynch. Ninety-one (91) days after to the date upon which both the Debt Satisfaction and the Stock Consideration Payment shall have occurred, USA shall pay to Lynch an amount calculated as follows: Two Hundred Fourteen Thousand US Dollars ($214,000), together with simple interest, at the rate of five percent (5%) per annum accruing from the date of this Settlement Agreement through but not including the payment date (collectively, the "*Additional Consideration*"); provided, however, that if such 91st day is not a business day on which banks in the State of Florida are open for business, then USA shall pay Lynch the Additional Consideration on the next succeeding business day, together with interest for the interim day or days. The parties hereto agree that if the Debt Satisfaction and the Stock Consideration Payment do not occur for any reason, then Lynch shall neither be paid, nor be entitled to payment of any portion of, the Additional Consideration.

5.    No Other Payments to Lynch. Other than the Signing Payment, and if payable, the Additional Consideration, no other payments to Lynch (whether by USA, PLC, LTD, Receiver or otherwise) are provided for by this Settlement Agreement or any other agreement by or between any of the parties hereto.

6.    Security Interest in Operating Assets of USA for the Additional Consideration. As security for the Additional Consideration, USA shall, upon the occurrence of the Stock Consideration Payment and promptly following written demand from Lynch, execute and deliver to Lynch a security agreement and authorize the filing of Uniform Commercial Code financing statements through which USA shall provide Lynch with a perfected first lien security interest in the operating assets of USA. Lynch agrees that he shall be an unsecured contingent creditor of USA at all times prior to the date the Stock Consideration Payment occurs and agrees not to take any contrary position relative to USA and its assets.

7.    Acknowledgement of The Bank of Scotland's Security Interest. Lynch hereby acknowledges, agrees and confirms that The Bank of Scotland has a continuing first lien security interest in the assets of USA, and that such security interest shall continue in full force and effect until the Stock Consideration Payment occurs. Lynch hereby agrees not to seek to encumber,

acquire, lien or impair in any manner any assets of USA until after the Stock Consideration Payment shall have occurred, and agrees that all claims he may have against USA shall be junior to and subordinated to, the senior and prior rights of The Bank of Scotland.

8.     Acknowledgement of LTD's Security Interest.  Lynch hereby acknowledges, agrees and confirms that LTD has a continuing second lien security interest in the assets of USA, and that such security interest shall continue in full force and effect until the Stock Consideration Payment occurs.  Lynch hereby agrees not to seek to encumber, acquire, lien or impair in any manner any assets of USA until after the Stock Consideration Payment shall have occurred, and agrees that all claims he may have against USA shall be junior to and subordinated to, the senior and prior rights of LTD.

9.     Restrictive Covenants.

9.1     Lynch hereby covenants and agrees that, he shall not, from the date hereof and continuing for a period of two (2) consecutive years hereafter, directly or indirectly, compete with USA in any area of the continental United States that is west of the Mississippi river.

9.2     Lynch acknowledges and agrees that in the event of his breach of any of his obligations under this Section 9, he shall forfeit any entitlement to the payment by USA of the Additional Consideration, and to the extent the Additional Consideration shall have already been paid to Lynch, Lynch hereby covenants and agrees to return all of the Additional Consideration to USA.  In addition, Lynch acknowledges and agrees that the remedy at law available to USA, PLC, LTD and Receiver for breach of any of his obligations under this Section 9 would be inadequate, and that damages flowing from such a breach may not readily be susceptible to being measured in monetary terms.  Accordingly, Lynch acknowledges, consents and agrees that, in addition to any other rights or remedies which USA, PLC, LTD and/or Receiver may have at law, in equity or under this Settlement Agreement, USA, PLC, LTD and/or Receiver shall be entitled to (i) immediate injunctive relief and may obtain a temporary order restraining any threatened or further breach, without the necessity of proof of actual damage or the posting of any bond; and (ii) indemnification and reimbursement by Lynch of such parties' attorneys' fees and costs in connection with enforcing such parties' rights in connection with or relating to a breach by Lynch of his obligations under this Section 9.

9.3     Lynch acknowledges and agrees that the covenants set forth in this Section 9 are reasonable and valid in geographical and temporal scope and in all other respects.  If any of such covenants or such other provisions of this Agreement are found to be invalid or unenforceable by a final determination of a court of competent jurisdiction (i) the remaining terms and provisions hereof shall be unimpaired and (ii) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

9.4     Lynch understands that the provisions of this Section 9 may limit his ability to earn a livelihood in a business similar to the business of USA but he nevertheless agrees and hereby acknowledges that (i) such provisions do not impose a greater restraint than is necessary to protect the goodwill or other business interests of USA, (ii) such provisions contain reasonable limitations as to time and scope of activity to be restrained, (iii) such provisions are

not harmful to the general public, (iv) such provisions are not unduly burdensome to Lynch, and (v) the consideration provided hereunder is sufficient to compensate Lynch for the restrictions contained in this Section 9. In consideration of the foregoing and in light of Lynch's education, skills and abilities and his ability to earn a livelihood notwithstanding the provisions of this Section 9, Lynch agrees that he shall not assert that, and it should not be considered that, any provisions of this Section 9 otherwise are void, voidable or unenforceable or should be voided or held unenforceable.

10. <u>Receiver Acts Without Personal Liability</u>. The Receiver has entered into this Settlement Agreement for or on behalf of PLC and LTD, and neither the Receiver nor his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever in respect of any agreement made or obligation undertaken by PLC, LTD or any other party to this Settlement Agreement or any other supporting documentation or in respect of any failure on the part of PLC, LTD or any other party hereto to observe, perform or comply with any such agreements or obligations or under or in relation to any associated arrangements or negotiations or under any assurance made pursuant to this Settlement Agreement. The Receiver is a party to this Settlement Agreement in his personal capacity solely for the purposes of receiving the benefits of (i) this Section and (ii) the exclusions, limitations, undertakings, covenants and indemnities in his favor contained in this Settlement Agreement.

11. <u>Binding Nature.</u> Each of the parties represents and warrants to each other party that (a) he or it has the absolute and unrestricted right, power, authority and capacity to enter into, execute, deliver and perform all of his or its obligations under this Settlement Agreement, and (b) this Settlement Agreement has been duly and validly executed by each party and constitutes a valid and binding obligation of each party, enforceable against each party in accordance with its terms.

12. <u>Counterparts; Facsimile Signatures</u>. This Settlement Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. For purposes of this Settlement Agreement, a facsimile of an executed counterpart shall constitute an original.

13. <u>Amendments</u>. No modification, amendment or termination of this Settlement Agreement, or waiver of any of its provisions, shall be valid or enforceable between the parties unless in writing and signed by all the parties hereto.

14. <u>Severability</u>. If any term or provision of this Settlement Agreement or the application thereof to the parties or any other person shall, to any extent, be invalid or unenforceable, the remainder of this Settlement Agreement, or the application of such term or provision to the parties or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Settlement Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. <u>Governing Law; Jurisdiction</u>. This Settlement Agreement, and all matters relating to or arising in connection with this Settlement Agreement and with respect to the subject matter of this Settlement Agreement, shall be governed by and construed in accordance with the laws of

CM-BR 000408

the State of Delaware, without regard to conflicts or choice of law principles. The parties hereto irrevocably consent to the jurisdiction of the state and federal courts located in the State of Delaware in any and all actions and proceedings whether arising hereunder or under any other agreement or undertaking.

16.    Binding Effect; Neutral Construction. This Settlement Agreement shall be binding upon the parties, and their legal representatives, heirs, successors and assigns. The parties have negotiated this Settlement Agreement and all of the terms and conditions contained in this Settlement Agreement in good faith and at arms' length, and each party has been represented by counsel during such negotiations. No term, condition, or provision contained in this Settlement Agreement shall be construed against any party or in favor of any party (i) because such party or such party's counsel drafted, revised, commented upon, or did not comment upon, such term, condition, or provision, or (ii) because of any presumption as to any inequality of bargaining power between or among the parties. Furthermore, all terms, conditions, and provisions contained in this Settlement Agreement shall be construed and interpreted in a manner which is consistent with all other terms, conditions, and provisions contained in this Settlement Agreement.

17.    Entire Agreement. This Settlement Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and thereof and supersedes all earlier and contemporaneous oral and written communication and agreements with respect to the same subject matter.

*{Signature Page Follows}*

6

CM-BR 000409

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned have executed this Settlement Agreement as of the day and year first above written.

COINMASTER USA INC.

By: _____
        Name:
        Title:

_____
DANIEL ANTHONY LYNCH

Signed by the Receiver for and on behalf of COINMASTER GAMING, PLC without personal liability

_____
IAN BEST

Signed by the Receiver for and on behalf of COINMASTER GAMING PRODUCTS LIMITED without personal liability

_____
IAN BEST

Signed by the Receiver for and on behalf of the Receiver without personal liability and solely to obtain the benefits running to the Receiver under the Settlement Agreement.

_____
IAN BEST

*{Signature Page to Settlement Agreement}*

116112.01000/11312498v8

CM-BR 000410

# EXHIBIT L

- 38

**Main Identity**

From:    "Paul A. Cox" <PaulCoxFlorida@MindSpring.com>
To:      "Free Tony" <T.Lynch17@ntworld.com>
Sent:    Friday, May 02, 2003 5:34 AM
Subject: URGENT Licensing Applications

Hi Tony,

I would appreciate it if you could complete and return to me the Pechanga
Licensing package you took home with you. We will then use this as the model
to complete Cache Creek, (which we have already submitted), Rincon and
Barona, which we will have completed by next Wednesday, and Chumach which we
will have completed by next Friday! Unfortunately, in the new circumstances,
we're probably all going to have to submit each time we fill in an
application. However Mary is now trained to do them, so the pain for us guys
should be minimal!

With your approval, we will "electronically" attach your signature to each
package, and I'll get Kellie to notarize them. (If you could have a rubber
stamp of your signature made, and send it to me that would be very helpful!
Seriously!)

We will still need photographs from you. Maybe if you could send me a dozen
or so that would be helpful since each application takes two. Also I'll
still intermittently need to send you fingerprint cards! (For instance, in
the current batch, Rincon is the only one that needs them.)

I don't know whether our licensing will be held up until you complete your
packages or not. (In the "old days" we could have got licensing without your
package being looked over first, now I'm not so sure. Certainly not ones
like Pechanga re-licensing anyway!)

Regards,

Paul
Coinmaster USA Inc.
paulcoxflorida@mindspring.com

2/11/2005

CM-BR 000106

# EXHIBIT M

D-27

May 06 03 12:04p     Paul A. Cox          321 783 6884



P-1

39



3001, ALOMA AVENUE, WINTER PARK, FL 32792

TEL 1407 672 1250                                    FAX 1407 670 4751

**This is a seven-page fax to Tony Lynch, on 011 44 292 037 8246**

6th May 2003

Re: Pechanga, Cache Creek and Rincon

Dear Tony,

There follow six pages, relating to the licensing applications for the above noted casinos. Please simply sign them all, and print your name, as needed. **Please do not date these documents.** I'll get Kellie to do this as she notarizes them for us. **Also, please do not enter your social security number.** Since you're a UK resident, this isn't needed.

We've used your Pechanga answers to complete Cache Creek, and Rincon. We'll only come back to you where the Gaming Commissions ask a question we don't know the answer too! (Next are Chumash and Barona, and a re-licensing at Sycuan.)

Please send all your responses to 407 540 9449 (My Efax number.)

Thanks.

Regards,

Paul

Paul

Hi Paul,

all done.

Regards Tony

P:PAGE:  1          6429202782446          K          07-MAY-03 11:28

CM-BR 000107