# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DANIEL ANTHONY LYNCH, | ) | |
| | ) | C.A. No. 06-365 JJF |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COINMASTER USA, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff, | ) | |
| | ) | |
| PAUL A. COX, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AUTO GAMING, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## PLAINTIFF AND THIRD-PARTY DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

JAMES S. GREEN (DE 0481)
KEVIN A. GUERKE (DE 4096)
SEITZ, VAN OGTROP & GREEN, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600
    Attorneys for
    Plaintiff Daniel Anthony Lynch and
    Third-Party Defendant Autogaming, Inc.

DATED: January 31, 2008

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................i

TABLE OF CITATIONS ..........................................................................ii

    I.     STATEMENT OF THE NATURE AND STAGE
          OF PROCEEDINGS...........................................................1

    II.    SUMMARY OF ARGUMENT .......................................................2

    III.   STATEMENT OF FACTS ..................................................3

    IV.   ARGUMENT ................................................................14

          A. SUMMARY JUDGMENT STANDARD...................................14

          B. BREACH OF CONTRACT ...........................................14

          C. FRAUD ...................................................................18

          D. FORGERY ................................................................22

    V.    CONCLUSION...................................................................24

62901v1

## TABLE OF CITATIONS

Cases

Abrams v. Sachnoff & Weaver, LTD, 922 A.2d 414 (Del 2007)................................................. 23

Celotex Corp. v. Catrett, 477 US 317 (1986) .............................................................. 14

Comrie v. Enterasys Networks, Inc., 2004 WL 293337 (Del. Ch.) ............................................. 14

Continental Insurance Company v. Rutledge & Company, Inc.,
750 A.2d 1219 (Del. Ch. 2000).......................................................................... 17

Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300 (3rd Cir. 1995) .................... 14, 22

Julin v. Julin, 787 A.2d 82 (Del. 2001).................................................................. 17

Tarsi v. Pittsburgh National Bank, 555 F.2d 1152 (3rd Cir. 1977) ................................... 23

Word v. Johnson, 2005 WL 2899684 (Del. Ch. 2005) ........................................................ 18

Other Authorities

Federal Civil Rules of Procedure ........................................................................ 14

62901v1

## I.    STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

Daniel Anthony Lynch's ("Lynch") Complaint against Paul Cox ("Cox") and Coinmaster USA, Inc. ("CMUSA") was removed to this Court on May 31, 2006.  (D.I. 1)  Cox and CMUSA filed Counterclaims against Lynch and Third-Party Complaints against Autogaming, Inc. ("Autogaming").  (D.I. 29)  This is Lynch's and Autogaming's Answering Brief in Opposition to Defendants' Motion for Summary Judgment.

## II.    SUMMARY OF ARGUMENT

1.    Summary judgment must be denied because CMUSA already determined Lynch's Service Agreement was valid and enforceable and performed according to its terms. Summary judgment should also be denied for several other reasons. First, CMUSA and Cox have no right to enforce the terms of the Coinmaster Gaming PLC ("PLC") contract. Second, the terms of the PLC contract do not void the Service Agreement. Third, CMUSA acquiesced to and ratified the Service Agreement. Fourth, PLC breached the contract and terminated Lynch before he was paid under the Service Agreement.

2.    Summary judgment must be denied on Lynch's fraud claim because the record is full of Cox's material misrepresentation upon which Lynch relied. At bottom, Lynch was only willing to negotiate his exit from CMUSA because he believed Cox's misrepresentations regarding the Bank of Scotland and his communications with the bank's administrative receiver.

3.    Summary judgment must be denied on the forgery aspect of Lynch's claim because Cox is simply wrong on the facts, and the cases and law he relies upon are inapplicable.

2

### III.    STATEMENT OF FACTS

#### The Formation of CMUSA

Lynch has been a casino game designer and manufacturer for 42 years. (B1) Lynch was the majority shareholder in a British company, Coinmaster Gaming PLC. (B3)  PLC was a holding company for 100% of the stock of Coinmaster Gaming Products Ltd. ("LTD"), another public British company in the business of manufacturing and distributing gaming equipment. (B69) Lynch was director of both companies. (B68-69).  LTD is a subsidiary of PLC.  (B335)

On January 10, 2001, CMUSA was formed in Delaware as a sales and distribution company that was primarily aimed at developing business in the Native American Indian gaming market. (B70, 314)  Long time friends, Lynch and Cox, started CMUSA. (B44)  LTD was the majority shareholder of CMUSA, owning 90 percent of the stock. (B315-316)  Cox was the initial director of CMUSA and was also a 10% shareholder when it was formed.  (B313, 315)

At a November 5, 2001 CMUSA annual general meeting of stockholders ("AGM"), Lynch, Cox and Rory Allin were elected to CMUSA's board of directors. (B318, 108)  Lynch was elected Chairman of the Board at CMUSA's annual board of directors meeting held the same day. (B318)  Cox was elected President and Secretary of CMUSA. (B318)  Through PLC, Lynch controlled LTD's 90% interest, and, thus, controlled CMUSA.  PLC owned no stock in CMUSA.

On November 6, 2001, Lynch entered into an employment contract with PLC for his services as its chief executive officer. (B45-62)  Lynch was already a director of CMUSA when he signed the contract with PLC. (B13-14)  The term of the employment contract was one year with renewal.  The PLC contract required PLC to pay Lynch £10,833.33 per month.  PLC stopped paying Lynch his salary in late 2002, and, therefore, breached the contract. (B11)

Cox had no connection to PLC or LTD.  He was never a shareholder of either company. (B144) He was never a director, officer, or employee of either PLC or LTD. (B144)

3

**Lynch and CMUSA Enter into the Service Agreement**

Lynch signed the November 15, 2002 service agreement on November 17, 2002 ("Service Agreement") to compensate him for the work and services he provided to CMUSA. (B182-183) Cox drafted the Service Agreement. (B18) The Service Agreement was approved at a November 8, 2002 CMUSA AGM, and, by its terms, became effective on December 1, 2002. (B320, 182) At that AGM, Lynch, Cox, and Allin were again elected to the board of directors of CMUSA. (B320) Lynch was re-elected Chairman of CMUSA's board for a three year term on November 8, 2002. (B321)

Lynch's payments under the Service Agreement were meant to cover Lynch's work for CMUSA, including expenses for travel and moving to the U.S. (B342, 112) Lynch provided valuable and critical services to CMUSA under the Service Agreement. (B20-22) He was in daily contact with Cox regarding CMUSA business. (B129) Lynch's work for CMUSA continued into 2004. (B129) He traveled back and forth between Great Britain and the United States on CMUSA business. (B26)

According to the Service Agreement, Lynch was to be paid $8,000 per month for the year 2003 and $12,000 a month for the year 2004. Specifically, the Service Agreement states: "Your services will be provided on an as required (time) basis, and the expenses paid to yourself, will be on the following scale…" (B182) Lynch is also entitled to a 5% annual bonus, stock options, and a scaled buyout should CMUSA terminate the Service Agreement or change Lynch's position within the company at any time. (B182-183)

Although the monthly service fee is described as "expenses" in the Service Agreement, it was never tied to any actual expenses. In fact, Cox, who had a similar agreement, referred to the Service Agreement payments as "salary" and "income": "You have to remember that my Coinmaster salary is not as high as yours, in the current scenario! You also have to remember

4

that your <u>income</u> has to cover any real expenses you incur, like visiting US shows." (B342) (Emphasis added) The Service Agreement does not require Lynch to submit expense documentation. (B112, B121)

In February 2002, PLC entered into a £3,000,000 revolving line of credit with the Bank of Scotland.  Within a year of that transaction, one of PLC's main products had technical difficulties in the California market.  (B7-10)  As a result, PLC and LTD could not meet their financial obligations to the Bank of Scotland or pay Lynch's salary.  (B14, 43)  The bank, therefore, invoked the receivership clause of the loan contract and Lynch lost control of PLC and LTD. (B4)

### PLC and LTD Go into Administrative Receivership

PLC went into administrative receivership on March 3, 2003. (B4)  Ernst & Young was appointed as the receiver for both PLC and LTD ("Receiver"). (B5, 63, 71)  Lynch remained majority shareholder in PLC. (B6)  The Receiver suspended the PLC and LTD board of directors, including Lynch, and cancelled Lynch's contract with PLC. (B327, 15, 27)

After this occurred, CMUSA made its first Service Agreement payment to Lynch for $8,000 in March 2003. (B114)  CMUSA also paid Lynch $8,000 under the Service Agreement in April, May, June, July, August, and September 2003. (B114-119, 121)  Lynch was paid regardless of whether he actually incurred any expenses for his work with CMUSA. (B121)  CMUSA never requested supporting documentation from Lynch to support his $8,000.00 month salary. (B119)  Lynch did not retain travel and other expense receipts or documentation because CMUSA never requested them. (B19)  Consistent with its actions, CMUSA maintained that Lynch's Service Agreement was valid and enforceable. (B23)

5

**Lynch and Cox Form High View, Inc.**

The Receiver wanted to sell LTD's CMUSA stock to recoup LTD debt. With the prospect of losing control of CMUSA, Lynch and Cox started another Delaware corporation, High View, Inc. ("High View"). High View was formed on June 11, 2003 to produce a mechanical roulette machine. (B166, 333) Lynch and Cox were each 50% shareholders of High View. On October 29, 2003, ML Solutions , Ltd. ("ML Solutions") signed a contract with High View for technical support, on-line system testing and modifications, and new product development. The contract was retroactive to June 1, 2003 when ML Solutions began to provide services to High View. (B286-288, 457, 463) Also, on October 29, 2003, High View signed a Retention of Title Agreement with ML Solutions giving ML Solutions the right to dispose of any hardware or software it developed to recover outstanding money due ML Solutions from High View.

CMUSA did not have a contract with High View. CMUSA never asserted a claim against High View and never asserted a claim against ML Solutions. (B170)

**The Receiver Questions the Service Agreement but is Refuted by CMUSA and its Lawyers**

It was in the Receiver's interest, in 2003, to eliminate CMUSA's $500,000.00 buyout obligation in the Service Agreement, which would ultimately increase its net return on the sale of CMUSA stock - an asset of LTD.

To this end, the Receiver faxed Cox a letter regarding the validity of Lynch's Service Agreement. (B217-218) In the letter, the Receiver explains to Cox its reasons why it deemed the Service Agreement invalid as follows:

1.  Tony Lynch resigned as a director of both PLC and Coinmaster Gaming Products Limited on 28 February 2003, prior to my appointment as joint administrative receiver of those companies (copy resignation letter enclosed as Schedule 3). Subsequently, on

6

my appointment on 3 March 2003, Tony's UK Contract was terminated, if it still subsisted, for reasons of redundancy.

2.    Under clauses 17 and 18.1 of the UK Contract, Tony was deemed simultaneously with such termination to have submitted his resignation as an officer of all other group companies, which included the Company. As Tony is deemed to have resigned from his position with the Company, no compensation will be payable by the Company to Tony pursuant to the terms of the US Contract.

3.    If you disagree with the above and maintain that the US Contract is valid and still subsists, I note that Tony has not been working for or carrying out any duties in respect of any employment with the Company for several months now. In addition, although Tony is purportedly employed on an expenses only basis he does not appear to have been incurring any bona fide business expenses or submitting or retaining his receipts in respect of those expenses in accordance with his US Contract. Clearly the payment of round sum expenses without any support may also have IRS/tax implications as deemed remuneration.

4.    I consider that non-performance of his duties to the Company is a fundamental breach repudiating the terms of the US Contract which the Company should accept immediately, thereby terminating Tony's employment and the US Contract. It is obviously not in the best interests of the Company to continue paying an employee who is not fulfilling his obligations to the Company.

(B217-218)

Lynch never resigned from CMUSA and, in 2003, no action was taken to remove him

from its board. (B29-30, 110, 126) Cox responded to the Receiver's fax the same day refuting

the Receiver's arguments:

1.    I have never seen Tony's UK Contract. (I guess I will when I get the faxed version.) His US contract was not regarded as being in force by me until after his UK contract was clearly no longer in place. If I had thought at that time that his US Contract was invalid, I would have put in place another one, replacing expenses with salary.

2.    I still regard Tony as an essential part of the Board and management team. He has been performing his duties properly to date. I don't know how you would know otherwise since I am largely your sole point of contact with this business. He is in contact wherever he is physically. His contract does not require

7

> him to be in the United States. As an example we talked on the phone yesterday for over two hours, and again for an hour today concerning the current problem with roulette software. (He may be the only person that can determine how to solve this problem.)

(B225)

Cox and CMUSA investigated and determined Lynch's Service Agreement was valid despite an alleged conflict with the PLC contract. (B325) On August 25, 2003, CMUSA discussed the Receiver's position on the Service Agreement with its attorneys, Cooper Levenson April Neidelman & Wagonheim, PA, and sent them a copy of the Receiver's August 21 letter. (B450-453) Lynch was aware of CMUSA's lawyers' review. (B32) CMUSA, with the advice of its counsel, informed Lynch that his Service Agreement was sound and valid under Delaware law. (B24-25, 31) Therefore, Lynch did not need to take further action on the subject. (B28) Cox confirmed the Service Agreement was valid and enforceable and conveyed CMUSA's position on the Service Agreement through email to Lynch stating:

> 1. Our attorneys are adamant that your Contract is perfectly in order, and unaffected by the arguments raised by the UK Receiver. They are perfectly prepared to defend this position in Court if necessary. They don't think the Receiver will pursue this. Although legally they agree we could institute another Contract they feel the one you have is so sound that they wouldn't want to specter of another one behind it! (We should discuss this further by phone.)

(B225)

After reviewing the PLC Contract and discussing it with its attorneys, Cox rejected the Receiver's arguments in an email to the Receiver dated August 28, 2003 stating:

> 2. My attorneys are adamant and unanimous that Tony's US Contract is intact and that your arguments have no merit in a US (Delaware) setting. I therefore intend to record this as the position in the package I send out. I will however note your dissenting position, and will include your letter on this subject with the package providing you have no objection to this, (but I will not include Tony's UK Contract.) From a practical point of view, Tony remains a member of the US Board, and will be paid as per his Contract.

8

(B223)

The Receiver entertained offers from outsiders to maximize its potential return on the sale of CMUSA stock. At the Receiver's request, Cox put together an information packet for the Receiver to provide to potential CMUSA purchasers. (B139-140)  In the packet, CMUSA's organizational chart shows Lynch as the Chairman of CMUSA's board (B324), which role was confirmed throughout the packet.  (B325)  Cox had in his possession a copy of Lynch's PLC contract when he sent the information packet. (B141)

When the information packet was sent out, and despite the Receiver's arguments about the validity of the Service Agreement, it was CMUSA's stance that the Service Agreement was valid. (B152)  Cox included CMUSA's stance on the Service Agreement in the information packet sent to potential bidders as follows:

> Mr. Lynch has been Chairman of Coinmaster USA Inc. since its inception.  He was very largely responsible for the Corporations entry and progress in the California marketplace.

> The Receiver of the UK Coinmaster Companies recently challenged the validity of Mr. Lynch's Contract with Coinmaster USA Inc.  Although his arguments were well thought through, the attorneys for Coinmaster USA Inc. have advised the Corporation that the Receiver's arguments are without merit in the Corporation's home State of Delaware.

(B201)

### Accepting Lynch's Service Agreement as Valid, CMUSA Negotiates a Buyout

Lynch continued to work for CMUSA and was paid for his services, which he had provided through 2003.  (B126, 153-154)[1]  In Cox's words: "What he was expected to do was to

---

[1] Evidence of Lynch's service as a CMUSA's Chairman is his participation in the February, April, July and November 2003 CMUSA board of directors meetings.  (B323, 507, 517-519)  Additionally, on CMUSA's 2002 annual franchise tax report filed January 13, 2003, Lynch was titled as Chairman of the Board.  On CMUSA's 2003 annual franchise tax report filed January 20, 2004, Lynch was again listed as Chairman of the Board. (B172-178)  In

9

provide technical advice, which he did excellently. He knew the game better than anybody in the universe. And he received expenses for that with traveling." (B154)

CMUSA, with the Receiver's blessing, negotiated a severance buyout of the Service Agreement. (B33-38, 95-101, 93-94, 84-92, 82-83) A non-binding Term Sheet was drafted to pay Lynch to resign from the board and buyout the Service Agreement. (B82-83) That document, dated November 17, 2003, required Lynch to resign his board position at CMUSA in exchange for $8,000.00 in cash, plus a $190,000.00 lump sum payment at 5% interest to Lynch when CMUSA repays the Bank of Scotland. (B82-83) Lynch would also receive a security interest in CMUSA's assets and gave a limited non-compete agreement. The payoff was later increased to $214,000.00. (B97)

Also at this time, Cox was negotiating a deal with the Receiver to purchase CMUSA's stock. An agreement was consummated for a management buyout without Lynch. On June 24, 2004, Cox, Hutcheon, CMUSA, and the Receiver signed a Master Settlement Agreement (the "Deal"). (B343-447) Lynch was not a party to the Deal. Nor was he involved in the negotiations. Lynch became suspicious of Cox and balked at signing a severance agreement with CMUSA. This began the breakup of Lynch, Cox and CMUSA. (B149) Lynch suspected Cox was lying to him in an effort to exclude Lynch from the future of CMUSA. The dispute came to a head in June 2004 when Lynch refused to sign the settlement documents and Cox refused to communicate or work with Lynch as a result.

On July 1, 2004, Cox informed Lynch that "until this matter is resolved all co-operation between Coinmaster USA Inc and yourself, will cease. The SAS tools will not be provided to Mike, [ML Solutions] and no other activity will take place." (B102)

---

a letter to the Sycuan Gaming Commission dated April 16, 2004, Cox represented that Lynch was resigning that

**Lynch Started Autogaming when Cox abandoned High View**

In July, 2004, Cox and CMUSA removed all support related to High View and both informed Lynch they would have no further contact with him. (B211)  In October 2004, Cox described his actions to the Receiver: "I stopped investing at the first sign of this problem, and have refused so far to discuss anything concerning the future of High View, Inc. with Tony, except to tell him that I do not approve of the route he has chosen." (B260)

Lynch formed Autogaming, Inc. ("Autogaming") on July 19, 2004. (B40, 103)  ML Solutions had not been paid for the work it performed for High View in July 2004 because Cox cut off funding and communications.  High View had three unpaid invoices totaling $14,687.03. (B462-465) Autogaming purchased from ML Solutions certain hardware and software Lynch developed with ML Solutions under the High View contract. (B41, 337-338, 464)

**Cox and CMUSA Do an About Face on Lynch's Service Agreement**

When it became clear that Lynch would not go quietly or complicity, Cox and CMUSA reversed their position on the validity of the Service Agreement.  On July 23, 2004, Cox emailed the Receiver claiming that CMUSA's attorneys and "I are still grappling with the question as to whether Tony is actually still a director of Coinmaster USA or not." (B236)  Cox then suggested the Receiver file a lawsuit against Lynch:

> The question is, if Tony is still trying to maintain that he is a Director of Coinmaster USA Inc., then isn't this a clear breach of his UK contractual obligations?  If so, then should we (you) be suing him in the UK?  Also, are there any other items that you want to take up, that may make him much less willing to go for a US judgment?

(B237)

---

month (B326) in anticipation of his execution of a buyout agreement.

The Receiver replied to Cox's urgings with an e-mail outlining the same rationale for challenging the Service Agreement it presented to Cox in August 2003. (B160)  Ultimately, however, the Receiver took no action on Lynch's contract, but discussed with Cox "firing" him from CMUSA's board. (B208-209)

Then, on August 26, 2004, Cox emailed the Receiver suggesting he contact Lynch to express that "there is no way that the Bank of Scotland will accept him as a Director of the business, or for him to have a presence in the business in any other way, whilst they are involved." (B253-254)  The same day, after Cox' prompting, the Receiver, through email, informed Lynch the Bank of Scotland "would not be supportive of you being involved in either the UK or the US [business] going forward". (B256)[2]

### CMUSA Removes Lynch as its Chairman of the Board of Directors

CMUSA did not hold an AGM in 2003. (B171)  Lynch was a director of CMUSA since the 2002 AGM because CMUSA's by-laws stated that "[e]ach Director shall hold office until the next annual meeting of stockholders and until his successor is elected and qualified, provided, however, that a director may resign at any time." (B312)  In order to vote a new board of directors, that would not include Lynch, Cox scheduled a delayed 2003 CMUSA AGM in September 2004. (B262)  Since there was no 2003 AGM, Lynch remained a director until new elections were held. (B16)

The 2003 AGM was held October 4, 2004.  Minutes reflecting that meeting are dated October 25, 2004.  At the 2003 AGM, Cox and Hutcheon were elected to the CMUSA board of directors. (B449)  Lynch was not re-elected to the board.  He was removed as director because he did not sign the deal with the Receiver. (B110)  This action triggered the termination provision

of the Service Agreement. Paragraph 6 states "In the event that Coinmaster USA Inc. decides to terminate this relationship for any reason, or to change your position in the organization, at any time, compensation for this loss, to be paid to yourself, will be ... In the 2004 year $600,000 ... This obligation must be met in full, on the date of termination." (B183)

---

[2] Interestingly, Cox relies on this e-mail to support his theory that the Bank of Scotland would not negotiate a buyout that included Lynch. (Opening Brief, Ex. F)

## IV.   ARGUMENT

### A.   SUMMARY JUDGMENT STANDARD

Federal Civil Rules of Procedure 56(c) provides that a Court should grant summary judgment when the record shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment is appropriate, when the court reviewing the record as a whole and drawing reasonable inferences in the light most favorable to the non-moving party, determines that the above Rule 56(c) standard has been met. See Celotex Corp. v. Catrett, 477 US 317,322-24 (1986) "Facts that could alter the outcome are 'material'; and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3rd Cir. 1995).

### B.   BREACH OF CONTRACT

Cox's argument related to the PLC contract is simply wrong for numerous reasons. First, CMUSA and Cox have no right to enforce the terms of the PLC contract. Second, the terms of the PLC contract do not void the Service Agreement. Third, CMUSA acquiesced to and ratified the Service Agreement. Fourth, PLC breached the contract and terminated Lynch before he was paid under the Service Agreement.

#### 1.   No Power To Enforce

Neither CMUSA nor Cox has the power or the right to enforce the PLC contract. They are not parties to the contract. "As a general rule, a nonparty to a contract has no legal right to enforce it." Comrie v. Enterasys Networks, Inc., 2004 WL 293337, *2 (Del. Ch.). Neither CMUSA nor Cox was ever an officer, employee, director, or shareholder of PLC. (B144)

14

Importantly, Cox admitted specifically at his deposition that he and CMUSA have no right to enforce the PLC contract. (B145)

Moreover, CMUSA and the Receiver, which controlled PLC, negotiated a substantial buyout of the Service Agreement well after the alleged conflict between the Service Agreement and the PLC contract arose. (B354, 364)  Neither PLC nor the Receiver ever took legal action against Lynch for breach of contract or to void the Service Agreement.  (B151)  PLC dissolved and no longer exists. (B334) The statute of limitations on that claim has passed.  Since CMUSA has no power to enforce the terms of the PLC contract, CMUSA's argument fails.

> 2.    **The PLC Contract Does Not Affect The Validity Of The Service Agreement**

The clear language of the PLC contract does not preclude or void the Service Agreement. In its Opening Brief, CMUSA relies on Sections 6.5., 17.1, and 14 of the PLC contract to support its argument.  However, those sections are misread and misunderstood.  CMUSA is not and never was a subsidiary or holding company of PLC.

Section 6.5 states in its entirety:  "Notwithstanding anything to the contrary contained in the articles of association of the Company, the Executive [Lynch] shall not be entitled to any remuneration or expenses as a director or employee of the Company in addition to those specified in this Agreement."  (B49)  All this means is what Lynch is entitled to for his PLC work was contained within the four corners of the PLC contract.

"Company" is defined as Coinmaster Gaming PLC.  Specifically, section 17.1 states:

> 17.1    It is hereby declared that the expression the "Company", when used in this Agreement, shall mean and include, where the context admits, the Company as defined in the heading to this Agreement and all Associated Companies (if any), and the Executive may be required to exercise and perform his powers and duties hereunder in relation to any Associated Company.

(B55)

"Associated Company" means, according to Section 1.1, "a company which is from time to time a subsidiary or a holding company of the Company or any other subsidiary of a holding company of the Company." (B46) CMUSA, by definition, is not an "Associated Company." LTD is a subsidiary of PLC. CMUSA is a subsidiary of LTD. However, a subsidiary of a subsidiary is not an "Associated Company" under Section 1.1. Nor is it a subsidiary of a holding company of the Company, i.e. a sister company. Rather, PLC is a holding company of all of LTD's stock. LTD was majority shareholder in CMUSA. Thus, none of the terms of the PLC contract CMUSA rely upon in its Opening Brief apply to the Service Agreement.

Therefore, a careful reading of the terms of the PLC contract proves it does not void or in any way invalidate the Service Agreement.

### 3.    CMUSA's Acquiescence And Ratification Of The Service Agreement

CMUSA cannot argue the Service Agreement is invalid or void. It waived that argument long ago. The Receiver raised all of CMUSA's arguments in August 2003. (B217-218) At that time, CMUSA adamantly refuted the Receiver's position that the Service Agreement was void – the same position CMUSA has adopted in this litigation. (B223, 225, 234-237, 142-143) In response to the Receiver, CMUSA took the official position that the Service Agreement was valid despite the terms of the PLC contract and how Lynch's pay was classified. (B220) It obtained professional legal advice on the subject and adopted that position in the September 2003 information packet. (B201) Cox admitted at his deposition that CMUSA's position was the same as the Receiver's from August 2003 and July 2004. (B160)

CMUSA acquiesced to and ratified the Service Agreement with full knowledge of the facts and the Receiver's challenge. "Acquiescence is an equitable defense which is assertable against a party who remains inactive for a considerable period of time, or who recognizes the validity of the complained of act or who acts in a manner inconsistent with the subsequent

16

repudiation and thus leads the other party to believe the act has been approved." <u>Julin v. Julin</u>, 787 A.2d 82, 84 (Del. 2001) (citations omitted); <u>See also</u> <u>Continental Insurance Company v.</u> <u>Rutledge & Company, Inc.</u>, 750 A.2d 1219, 1240 (Del. Ch. 2000) ("Under this doctrine, one who has full knowledge of and accepts the benefits of a transaction may be denied equitable relief if he or she thereafter attacks the same transaction.").

PLC and the Receiver were aware of and complicit in at least seven $8,000.00 payments to Lynch according to the terms of the Service Agreement, thus, ratifying it. (B114-121) Those payments were for Lynch's services, not merely to cover his expenses. (B342)[3]  Because the Service Agreement was valid and enforceable, after CMUSA conveyed its position on the agreement to the Receiver in August 2003, it paid Lynch $8,000 for the month of September. It held firm on that position for well over a year - until it became convenient to reverse course.

CMUSA informed Lynch that the Service Agreement was valid and enforceable under Delaware law - going so far as admitting if there was a conflict CMUSA would have simply replaced the Service Agreement with another contract. Lynch relied upon CMUSA's position and took no protective action as a result. CMUSA cannot be allowed to assert a position entirely inconsistent with that which Lynch relied upon in August 2003.

### 4.    PLC's Breach

PLC was in breach of the PLC contract before Lynch signed the Service Agreement and before he received any payments from CMUSA. (B11)  PLC stopped paying him and the Receiver terminated the PLC contract. (B43)  Lynch was suspended from PLC on February 25,

---

[3] In its 2003 financial statement, prepared by its accountants, CMUSA acknowledged "it paid $8,000 per month for services performed by Tony Lynch as Chairman. For the year ended December 31, 2003, payments to Tony Lynch totaled $64,000. As of December 31, 2003, the Company owed Tony Lynch $8,000.00." (B307) It also identifies a $15,400 bonus due Cox under his Service Agreements. (B307) Lynch did not receive his 2003 bonus even though it was based on the same calculations as Cox's agreement. (B113)

2003. (B104-105)  The Receiver suspended PLC's board of directors and did not permit it to
conduct business. (B104-105)

Once  PLC materially breached the contract, Lynch, as the non-breaching party, was
relieved of any contract obligations.  "It is a basic tenet of contract law that a party is excused
from performance under a contract if the other party is in material breach thereof."  Word v.
Johnson, 2005 WL 2899684 (Del. Ch. 2005)  Not only did PLC materially breach by not paying,
it terminated the PLC contract.  Therefore, Lynch is not bound by the terms of the PLC contract,
even if they conflict with the Service Agreement.

### C.    FRAUD

Contrary to Cox's assertions, the record reflects countless instances of Cox's mis-
statements and misrepresentations regarding the Deal to acquire CMUSA stock and in his
communications with the Receiver.  Cox did not keep Lynch fully informed as he claims in his
Opening Brief.  Instead, he fed Lynch misinformation to reduce Lynch's buyout and to keep
CMUSA's stock for himself.

Cox continuously misrepresented to Lynch the content of his communications with the
Receiver and the Receiver's position related to Lynch.  From the beginning of his negotiations
with the Receiver for a management buyout of CMUSA, Cox misrepresented that his
communications, negotiations, and agreement with the Receiver were confidential.  He claimed
he was bound by a confidentiality/non-disclosure agreement.  Specifically, on May 25, 2004,
Cox stated there was a non-disclosure agreement precluding any discussion of the Deal with
Lynch. (B204)  He maintained that position at his deposition.  Cox refused to disclose the
negotiations and terms of the Deal to Lynch because of this alleged confidentiality agreement.
(B131-132, 146-148)  However, there was never a confidentiality agreement.  Cox had no choice

but to admit that fact when his attorneys produced the Deal after he refused to testify on the subject at his deposition. (B343)

In addition, Cox made material misrepresentations of fact regarding the Receiver's negotiated buyout of the Service Agreement. Cox agreed to Lynch's continued directorship and one-third ownership of CMUSA, along with Cox and Hutcheon, at a meeting in Phoenix, Arizona in April 2003. "[W]e agreed in Phoenix that it was going to be a three person party at the end of the day." (B150)

> 2.1 Who does what? It was agreed that PAC's role would not change as a result of the deal, and that BH will be re-titled Operations Director, and manage all field operations. DAL will pick up the liaison with manufacturing role, and new product development, in association with Newco and others. The titles for DAL and PAC will not change. The change in BH's title will take effect after the deal is finally concluded.

(B508)

Cox's first management bid in June 2003 to the Receiver included Lynch. (B133-136) The Receiver did not object to Lynch's inclusion in the stock purchase. In fact, the Receiver agreed to Lynch being part of the management buyout. (B195-196)

Cox told Lynch the Receiver objected. However, he explained at his deposition that he was driving the terms of the Deal, not the Receiver. Cox stated that if the Receiver did object, "he didn't get a vote. If I wanted to put a bid together including somebody he didn't know, he didn't get a vote as far as I was concerned...It is not up to him to determine who is on the team and makes the bid." (B136-137)

At some point between June and September 2003, Cox decided he didn't want Lynch involved, keeping the lion's share to himself. He lied to Lynch to accomplish that goal. Cox put together a second management offer for CMUSA stock. (B155-156) Since Cox had convinced

Lynch that the Receiver would not allow his inclusion in any deal, Lynch agreed not to be a party to the second management bid. (B226-229)[4]

On November 10, 2003, the Receiver responded to the offer. (B230) In that e-mail response, the Receiver states "[t]he terms set out in your e-mail of 23 September 2003 are acceptable." The only mention of Lynch or the Service Agreement in the Receiver's response is: "We need to achieve a satisfactory settlement of Tony Lynch's contract." (B230)

However, Cox relays to Lynch an entirely false statement about the Receiver's response to the bid in an e-mail an hour later. "[The Receiver] doesn't like our deal for you to go! He thinks its way too expensive. That is, you should go at much lower cost! (Preferably no cost, and recovery of what we've already paid you!)." (B232) The Receiver never made those statements. Cox made it up. He was lying to both Lynch and the Receiver at various times throughout the negotiations to work a better deal for himself. (B259)

In the same e-mail, Cox misrepresented his reply to the Receiver in relation to its six part response to the bid. "I wrote [the Receiver] an e-mail saying no, no, no, no, so what, and explain!" (Cox Depo. 32) In reality, Cox had written the Receiver approximately 20 minutes before his e-mail to Lynch. Cox did not state what he later told Lynch.[5] (B157-159) Lynch is not discussed at all in Cox's November 10, 2003 e-mail to the Receiver (B138)

Cox's argument in his Opening Brief that the Receiver did not want to deal with Lynch is not accurate. Cox was the driving wedge between the Receiver and Lynch. (B253-256, 247) Cox told Lynch: "I cannot change the Coinmaster separation document. That's a Receiver driven item." (B125) However, Lynch inquired of the Receiver about his inclusion in the Deal.

---

[4] Cox explained the reason for excluding Lynch was the Receiver's "unequivocal opposition to Tony being included." (B156, 514) There is no such communication in the record.

The Receiver revealed that Lynch's exclusion was driven by CMUSA, not the Bank of Scotland. (B247-249) Cox claims this to be a mere misunderstanding. (B161) Cox, at that time, already signed the Deal without Lynch, informing Lynch no more negotiation of Lynch's severance could take place. However, the Deal did not preclude further negotiations with Lynch. Cox lied about that too.

Cox made false representations to the Receiver that Lynch never signed the Service Agreement and that it was held, unsigned, in a CMUSA safe. (B212) This was the likely cause of the Receiver's interest in the validity of the Service Agreement in the first place.

Finally, Cox's testimony is not believable. It is chalk full of inconsistencies. The jury should be permitted to decide the issue of fraud and judge Cox's credibility. For example, the main issue in this case is Lynch's claim for breach of the Service Agreement and Cox's defense that it was somehow invalid. On that issue, Cox testified as follows:

> Q    Is it your contention today that when this contract was signed and drafted, that it was somehow invalid?
>
> A    I got to do a Bill Clinton here. It depends what you mean by the word invalid. It has a purpose.
>
> Q    Was it legally enforceable --
>
> A    You're the attorney.
>
> Q    When it was signed?
>
> A    I don't know. You're the attorney. You tell me.
>
> Q    Do you have any reason to believe that it wasn't?
>
> A    I don't know. It never went before an attorney for judgment.

(B124)

---

[5] Cox maintained at his deposition that he spoke to the Receiver by telephone. This assertion is unbelievable considering the sequence and timing of the email exchange and significant time zone difference.

Cox professed ignorance on the subject throughout his deposition despite the fact that he was in the best position to know as (i) CMUSA's President, (ii) one of two directors and, (iii) one of two of CMUSA's shareholders. Summary judgment should be denied because there is ample evidence for a reasonable juror to find in Lynch's favor on his fraud claim and because Cox's credibility must be evaluated by the jury. See Horowitz, 57 F.3d at n.1.

### D. FORGERY

Lynch asserts claims for Deceptive Trade Practices, 6 Del. C. §2531, et seq., and Intentional Interference with Prospective Business Relations in his Complaint. (Complaint, Count II, III) (D.I. 1) Lynch alleges in the Complaint "Cox made false representations to the Receiver, Tribal authorities, and Lynch, representing that Lynch had resigned from Coinmaster, that the forged Application was authentic and that Lynch had actually made the forged Application, and that the Receiver required Lynch to resign from Coinmaster." (Complaint ¶33)

In his Opening Brief, Cox only challenges the forgery aspect of the claim alleging Lynch knew of and participated in the forgery. (Opening Brief, p.16) Cox goes so far as to say "Lynch has no proof that Cox had any responsibility for the alleged 'forgery'." Nothing could be farther from the truth.

Cox testified that he filled out the Santa Ynez gaming application. (B162) He admitted he forged Lynch's signature and had the forged signature notarized by his Florida Notary, Kelly Baker. (B162-163) Cox justifies his actions by stating, "I didn't sign it. I wrote in Tony's name. There is a distinct difference." (B162) Contrary to his current argument, Cox admitted he did not have Lynch's authorization to forge his signature and have it notarized. (B164, 165) After a complaint and investigation, the State of Florida issued Kelly Baker a formal reprimand for her conduct related to the forgery. (B516)

Notwithstanding, Cox offers no analysis of the Deceptive Trade Practices Act, 6 <u>Del</u>. <u>C</u>. §2531. That failure is fatal to his argument. Also, the cases he cites to support his argument are not applicable.

The <u>Tarasi</u> case is an insider trading securities fraud case. <u>Tarsi v. Pittsburgh National Bank</u>, 555 F.2d 1152 (3rd Cir. 1977). <u>In pari delicto</u>, as it is described in <u>Tarsi</u>, does not apply because that doctrine requires joint participation in wrongdoing. <u>Id</u>. at 1156-1157. Lynch did nothing wrong. If Kelly Baker, the Notary, was suing Cox, he could use the doctrine as a defense, but not in a case against Lynch. "Only in those cases where it can fairly be said that the plaintiffs' fault is substantially equal to that of the defendant will recovery be precluded. Moreover, a court may look only to conduct associated with the transaction before it, and may not forbid recovery on account of a plaintiff's activities in a separate setting." <u>Id</u>. Equally inapposite is <u>Abrams v. Sachnoff & Weaver, LTD</u>, 922 A.2d 414 (Del 2007).

It is undisputed that Cox submitted a forged application without Lynch's authority. Lynch testified Cox filed similar false applications at least three times. There is simply no basis to grant summary judgment.

III.    **CONCLUSION**

For the above reasons, every aspect of Defendants' Motion for Summary Judgment should be denied.

**SEITS, VAN OGTROP & GREEN, P.A.**

/s/ Kevin A. Guerke
JAMES S. GREEN (DE 0481)
KEVIN A. GUERKE (DE 4096)
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE  19899
(302) 888-0600
    Attorneys for
    Plaintiff Daniel Anthony Lynch and
    Third-Party Defendant Autogaming, Inc.

DATED: January 31, 2008