**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

DANIEL ANTHONY LYNCH,                )
                                     )    C.A. No. 06-365 JJF
        Plaintiff,                   )
                                     )
            v.                       )
                                     )
COINMASTER USA, INC.,                )
a Delaware corporation,              )
                                     )
        Defendant/Counterclaim Plaintiff,    )
                                     )
PAUL A. COX,                         )
                                     )
        Defendant/Counterclaim Plaintiff and    )
        Third-Party Plaintiff,       )
                                     )
            v.                       )
                                     )
AUTO GAMING, INC.,                   )
                                     )
        Third-Party Defendant.       )

**APPENDIX TO PLAINTIFF AND THIRD-PARTY DEFENDANT'S
ANNSWERING BRIEF
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

JAMES S. GREEN (DE 0481)
KEVIN A. GUERKE (DE 4096)
SEITZ, VAN OGTROP & GREEN, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE  19899
(302) 888-0600
Attorneys for
        Plaintiff Daniel Anthony Lynch and
        Third-Party Defendant Autogaming,  Inc.

DATED: January 31, 2008

**TABLE OF CONTENTS**

Deposition Transcript of Daniel Anthony Lynch ...................................................................B1-44

Deposition Exhibits of Daniel Anthony Lynch ..................................................................B45-105
..............................................................................................................................................B507-511

Deposition Transcript of Paul A. Cox......................................................................................B106-171
..............................................................................................................................................B512-515

Deposition Exhibits of Paul A. Cox..........................................................................................B172-311

Documents Produced by Daniel Anthony Lynch ...............................................................B312-341
..............................................................................................................................................B516

Documents Produced by Coinmaster USA, Inc..................................................................B342-453
..............................................................................................................................................B517-519

Deposition of Mike Lerwill .......................................................................................................B454-497

Deposition Exhibits of Mike Lerwill ......................................................................................B498-506

DANIEL ANTHONY LYNCH                     6

1              MR. PRESTON:  Steve, let me talk to you just

2     about one question.  We'll be right back.

3              MR. SCHERZER:  Off the record, please.

4              (Discussion held off the record.)

5                       EXAMINATION

6     BY MR. PRESTON:

7        Q    Okay.  Mr. Lynch, good morning.  My name is Tom

8     Preston.  And I represent Coinmaster USA.

9        A    Good morning.

10       Q    Would you describe for me your educational

11    background, please?

12       A    I left school at 15.  That was the basic education.

13       Q    And what was your business before you became

14    involved with Coinmaster USA?

15       A    I have been self-employed one way or another.  I

16    have owned businesses all my life.

17       Q    Okay.

18              (Discussion held off the record.

19    BY MR. PRESTON:

20       Q    Okay.  Back to your description of your career prior

21    to being involved with Coinmaster USA.  You said you --

22       A    I have been manufacturing gaming machines for

23    42 years, or thereabouts, or been involved with the

24    manufacture of game machines with various companies.

B    1

1    early stages of the product that we produced.

2        Q    So the only assets of High View, to your knowledge,

3    are ownership of a machine?

4        A    There was no machine.

5        Q    All right.  Describe more fully for me, then, what

6    the assets are?

7        A    There was a prototype PCB board.  A PCB is a printed

8    circuit board of electronic components.

9        Q    Okay.  And that prototype was developed by whom?

10       A    By ML Solutions, Ltd.

11       Q    Under contract with anyone?

12       A    With High View obviously.

13       Q    Okay.  And is that PCB board developed as we sit

14   here today?

15       A    Indeed, it still exists, yes.

16       Q    Is it operational?

17       A    No.  Not in that format.

18       Q    Why is it not?

19       A    Because the development of that particular product

20   for High View stopped.

21       Q    Okay.  Was ML retained by any other entity, to your

22   knowledge, to develop a gaming machine similar to what High

23   View had been developing?

24       A    Indeed.  Auto Gaming.

DANIEL ANTHONY LYNCH                17

1      A    Um-hmm.

2           MR. SCHERZER:  Yes?

3           THE WITNESS:  Yes.  Sorry.

4    BY MR. PRESTON:

5      Q    Were either of those companies formed from already

6    existing companies?

7      A    Yes, they were.

8      Q    What was the existing company?

9      A    Coinmaster Gaming, Ltd., and Coinmaster USA, Inc.

10     Q    And who owns Coinmaster Gaming, Ltd.?

11     A    Primarily, I did.

12     Q    Primarily, you did?

13     A    Yes.

14     Q    Okay.  And you took PLC public in the UK?

15     A    That's correct.

16     Q    Okay.  Were there any shares offered on any American

17   stock exchange?

18     A    No.

19     Q    And do you recall how many shares were offered in

20   PLC?

21     A    No.

22     Q    What percentage of the public shares did you retain

23   ownership of?

24     A    In excess of 51 percent.

1    Q    Was that pounds or dollars?

2    A    Pounds.  I would need to refer to that.

3    Q    I'm sorry.  Say that again.

4    A    I would need to refer to the value to be precise

5    about it.

6    Q    About three million pounds?

7    A    Yes.

8    Q    And how much money was raised by the company in the

9    public offering?

10    A    I couldn't tell you without checking.

11    Q    Order of magnitude.  More than a million dollars?

12    A    About.  About a million pounds, I would think.

13    Q    Okay.  Did there come a time when PLC went into

14    receivership?

15    A    Yes, they did.

16    Q    And what was the date of that?

17    A    That was March 2003.

18    Q    Okay.  Is receivership the equivalent in the UK of

19    bankruptcy in the United States?

20    A    I don't know.  Unless you explain the laws of

21    bankruptcy, I couldn't tell you.

22    Q    As a result of going into receivership, did you lose

23    control of PLC?

24    A    I did.

DANIEL ANTHONY LYNCH                20

1      Q    And who took over control of PLC?

2      A    That was the receiver.  The receiving company.  It

3    was who the bank appointed.

4      Q    And the receiver was what company?

5      A    I'm sorry.  Can I request an answer?

6      Q    No.  Even if Kevin knows, which is a scary thought.

7    You're not allowed to ask him.  Was it Ernst & Young?

8      A    Yes, it was.

9      Q    And was it the UK arm of the accounting firm known

10   as Ernst & Young?

11     A    Correct.  Based in Bristol.

12     Q    Did they then place management in the company?

13     A    They did.  That was on the 3rd of March.

14     Q    Of 2003?

15     A    Correct.

16     Q    And what happened with Coinmaster Gaming, PLC, and

17   Products Limited?

18     A    The bank's receiver entered the company, sold off

19   all the assets.  When the assets were recovered, as far as

20   they could recover them for the bank, they passed the

21   company back to the directors.

22     Q    Okay.  And is the company still in existence today?

23     A    As far as I know, yes.

24     Q    Do you have any involvement in either Gaming PLC or

DANIEL ANTHONY LYNCH                21

1    Gaming Products, Ltd.?

2        A    I resigned as a director of both those companies

3    about 12 months ago and the companies are stagnant.  But as

4    far as I know, they haven't been struck off.  They still

5    exist.  And as they still exist, I still control interest.

6    I am still a 51 percent or greater shareholder in both of

7    them.

8        Q    But, to your knowledge, neither company is engaged

9    in any business activities?

10       A    Not as far as I know.

11       Q    And are you aware of who the officers and directors

12   of those companies are today?

13       A    No.  As I said, I resigned as director of both

14   companies.

15       Q    Okay.

16       A    That was I think about 12 months ago.

17              MR. SCHERZER:  Could I interject?  There seems

18   to have been a disconnect between the question and the

19   answer.  We heard that you resigned 12 months ago.

20              THE WITNESS:  Yes.

21              MR. SCHERZER:  But the question was, do you

22   know who the officers and directors are today?

23              THE WITNESS:  I don't.  Because they might have

24   resigned as well.

1              MR. SCHERZER:  Okay.  Sorry, Tom.

2              MR. PRESTON:  That's all right.

3              THE WITNESS:  I haven't been with the company

4      for a year.

5      BY MR. PRESTON:

6      Q    Mr. Lynch, what was the reason that PLC and its

7      subsidiary, Products, Ltd., went into receivership?

8      A    Well, the gaming industry is quite complex.  You're

9      as good as your last product.  So if your last product

10     failed, you're under pressure to produce something else,

11     which can take a considerable length of time.

12             The California marketplace, which is a

13     marketplace that I started and looked at for some

14     considerable time before entering into it, is a lot more

15     technically difficult than one realizes at first glance.

16     For instance, there is a technology called SAS.  And this is

17     a software interface which must be written into the gaming

18     machine you produce which talked about 17 different online

19     mainframe computers produced by different manufacturers.

20             The SAS technology is an IGT product.

21     Q    I'm sorry, a what?

22     A    The SAS technology is an IGT.

23     Q    Is that a company?

24     A    That's the largest company in the world making

1    gaming machines.  It's the largest company in America making

2    gaming machines.

3            And they produced a SAS interface, which became

4    the standard for the industry.  And they allowed, under

5    license, people to write their -- the SAS product of

6    protocol into the machines so that every machine that you

7    produce was able to talk to any one of these 17 online

8    systems.

9            And GLI, which is the body, there are two

10   bodies, but GLI's is the principal body that actually tests

11   all the software.  The software is very complex and very

12   difficult to write.  GLI tests the software thoroughly from

13   start to finish before they issue a license to say that,

14   yes, you're approved.

15           And in the early days of the SAS

16   communications, I realized that trying to get the system

17   approved for all 17 was beyond our abilities.  So I reduced

18   it down into the particular casinos I was targeting and

19   particular online systems that they were working with.  And

20   I had the GLI approvals at two casinos, which we entered

21   into.

22   Q    When did you have those approvals?

23   A    2002.

24   Q    Please continue.

1      A    The machines then worked in those two particular

2    casinos.  I then assumed that most of the casinos we thought

3    were on the same system as the two majors we got after and

4    we went to the next casino and we were extremely surprised

5    to find that it uses a split SAS system.  So that the ticket

6    in, ticket out, which is how people get paid, was on one

7    system and SAS was a separate system.

8             The technology that we had, the PCB board, the

9    electronic hardware circuit, wouldn't work on a split

10   system.  It was only a single port.

11            So we lost the sale of that particular site and

12   I had a great deal of work to do.  Consequently, I was

13   already scheduled to build about 17 machines for the

14   marketplace in California, which I found quite difficult to

15   produce that kind of product.  And part of the funding from

16   the city was to try to fund that.

17     Q    I'm sorry.  Part of the funding --

18     A    The funding from the city was in order to make that

19   happen.

20     Q    When you saw funding from the city, what are you

21   referring to?

22     A    Going public to raise money.  That allows us to

23   spend money in developing the product to enter the

24   marketplace.

1     Q    Right.

2     A    But the SAS technology was, as I said, very

3     complicated and we had extreme difficulties that went on for

4     a long time.  I think about a year and a half.  So the

5     products I produced to enter into the marketplace sat in a

6     warehouse for over a year.  And, in fact, it took about a

7     year and a half before they actually released them into the

8     casinos in California and to Coinmaster USA.

9               On top of which another product we produced at

10    the same time, which was a horse racing game, which was a

11    very large, complex product, which we spent probably about

12    two and a half million dollars developing.  As far as the

13    engineering and the technology work, the actual game didn't

14    take the money that was necessary to make it pay for the

15    casinos.  So after extensive tests, they sent the game back.

16    So I was in a situation --

17    Q    Who tested it?  You say after an extensive test?

18    A    The test was on site in California Morango casino.

19    Q    And that was tested in a casino not by GLI?

20    A    It was pretested by GLI for approvals for the online

21    software.  You aren't allowed to site any machine in any

22    casino in America, at least in American Indian casinos,

23    without having the GLI approval.

24              GLI approval is designed in such a way that

1       A    Yes, I suppose you could say it was.  But also it
2   was breached by the corporation.  It failed to comply with
3   the payment terms to me.  That was breached about December.
4       Q    December of what year?
5       A    2002.
6       Q    Okay.  Would you turn, please, sir, to paragraph
7   6.5, which is on the fourth page of Exhibit D-1?  And if you
8   would read that paragraph to yourself.
9       A    Right.
10      Q    Were you aware, sir, of the terms of paragraph 6.5
11  during the period of time this agreement was in effect?
12      A    I was.
13      Q    Okay.  And, sir, would you turn to paragraph 17.1 on
14  page ten of Exhibit D-1?  And, again, would you read that
15  paragraph to yourself?
16      A    I have read that.
17      Q    Were you aware of the terms of this paragraph during
18  the time this agreement was in effect?
19      A    Yes.
20      Q    Would you agree that these two paragraphs, when read
21  together, forbid you from holding any position other than as
22  chief executive of PLC in any other company associated with
23  Coinmaster, PLC?
24      A    No.  There was a side letter with the company about

DANIEL ANTHONY LYNCH                    32

1      A    I cannot remember.

2      Q    Did you sign it?

3      A    I believe so.  It was organized by my son-in-law,

4    who was a director of the company.  Who was also involved in

5    some of the companies.

6      Q    Would you turn, please, sir, to the last page of

7    Exhibit D-1?  Can you tell me who signed this document as

8    director?

9      A    Which one are you referring to?

10     Q    The one that says director at the top.

11     A    That's the last document, the penultimate document?

12            MR. GUERKE:  Tom, there are several documents

13    attached to our copy.

14    BY MR. PRESTON:

15     Q    May I see your --

16            MR. PRESTON:  Gentlemen, I apologize.  The

17    November 15, 2002 letter obviously shouldn't be attached.

18    And with your permission, I'm going to simply take it off.

19            MR. SCHERZER:  And is that Bates stamp 43?

20            MR. PRESTON:  It starts at 43.

21            MR. GUERKE:  There is also a resignation letter

22    and then there is also a note.

23            MR. PRESTON:  Right.

24            MR. SCHERZER:  So 43 through 46 is now being

DANIEL ANTHONY LYNCH                34

1     A    Yes.

2     Q    Did the side letter that you say exists also

3     abrogate or compromise the provision of paragraph 14?

4     A    It specifically states in here, business of T&R

5     Operations Limited.

6     Q    Well, it says it accepts business of T&R Operations

7     Limited but it provides -- it applies to all other activity.

8     A    I appreciate that, yes.

9     Q    And my question is, did the side letter that you say

10    exists that we haven't seen --

11    A    Well, I think the side letter --

12    Q    Let me finish my question.

13    A    Okay.

14    Q    Did that side letter supposedly permit you to carry

15    on activities with other companies other than T&R Operations

16    Limited?

17    A    Not to my knowledge, no.  I think it might have been

18    just T&R.

19    Q    That's what the side letter provided for?

20    A    Yes.  This provision in here.

21    Q    Okay.  Did the side letter permit you to hold a

22    position with Coinmaster USA?

23    A    I already held that position prior to the formation

24    of the public company, I believe.  I would need to check it

1       out.  But I think I was already a director of Coinmaster USA

2       as of the time that the corporation was formed.

3           Q    If you look at paragraph 6.5, that provision states

4       that you are not entitled to receive remuneration or

5       expenses as a director or employee of the company beyond

6       that which is provided in this agreement.  Isn't that what

7       it states?

8           A    Yes.

9           Q    All right.  Did the side letter agreement that you

10      say exists permit you to receive remuneration or expenses?

11          A    I don't know what the side letter states.  I need to

12      look at that, as I said to you.

13          Q    My question is, as you're sitting here this

14      morning --

15          A    Yes.

16          Q    Do you recall any agreement with Gaming, PLC, which

17      permits you, in contrast to what the paragraph 6.5 says, to

18      receive remuneration or expenses from the company beyond

19      what is provided in this agreement?

20          A    I didn't receive any from them until this contract

21      was breached.

22          Q    Okay.  That's not my question.  Would you please

23      read the question back and see if you can answer that

24      question?

```
 1      A      The agreement was cancelled when I was suspended in

 2    February of 2003.

 3      Q      The agreement in what?

 4      A      This agreement was cancelled.

 5      Q      But up to that point, this agreement was in effect,

 6    correct?

 7      A      Yes.

 8      Q      Thank you.

 9             I'm going to share with you, if I may --

10      A      Are you finished with this?

11      Q      You can put it aside, yes.  Thank you.

12             MR. SCHERZER:  I'm going to make a

13    recommendation that you leave it at one place and there be a

14    pile so we don't get confused at the end of this process.

15    BY MR. PRESTON:

16      Q      I want to show you actually a series of documents

17    and ask you, if you can, to identify them.  My apologies for

18    not being as well organized as I would like.

19             I am going to mark as Defendant's Exhibit D-2 a

20    facility letter.

21             (Defendant's Exhibit No. 2 was marked for

22    identification.)

23             MR. PRESTON:  And as Exhibit D-3 --

24             MR. SCHERZER:  Is the facility letter CM-BR
```

1    sentence, do you see where that provides that, quote, each

2    director shall hold office until the next annual meeting of

3    stockholders and until the successor is elected and

4    qualified?

5        A    Um-hmm.  Okay.  I see it, yes.

6        Q    And you're aware of that at the time this company

7    was formed?

8        A    I would have read this agreement, yes.

9        Q    Okay.  Let me show you, then, a document that I have

10   marked for identification as D-7.

11              (Defendant's Exhibit No. 7 was marked for

12   identification.)

13   BY MR. PRESTON:

14       Q    Which is a series of annual franchise tax reports,

15   and ask if you would take a moment and look through those,

16   please, sir?

17              My question is whether you have ever seen these

18   franchise tax reports?

19       A    No, not at all.

20       Q    Not at all?

21       A    No.

22       Q    Do you see that they apply to Coinmaster USA, at

23   least according to the face of the document?

24       A    Well, I see what it says on these documents.  This

1    then.  Because I confess to being a little confused.

2       A    Okay.

3       Q    My understanding is that the public corporation,

4    from your prior testimony was Coinmaster Gaming, PLC?

5       A    Correct, yes.

6       Q    And that Coinmaster Gaming Products, Ltd., was a

7    wholly-owned subsidiary of PLC?

8       A    Which was formed, yes.

9       Q    So Products was not publicly held other than as a

10   subsidiary of a publicly held company?

11      A    Correct.

12      Q    But Products ended up with the shares of CMUSA, is

13   that correct?

14      A    I'll try to remember.  I'll explain to you

15   Coinmaster Gaming, Ltd., I think became Coinmaster Gaming

16   Products, Ltd., which then became wholly-owned by the public

17   corporation.

18      Q    By PLC?

19      A    Yes.

20      Q    Okay.  If you go about two-thirds of the way down

21   the first page of Exhibit D-11, you'll see a paragraph

22   beginning, the chairman noted.  Do you see that, sir?

23      A    Yes.

24      Q    And that refers to the election of directors for a

DANIEL ANTHONY LYNCH                    65

1    into between yourself and Coinmaster USA?

2        A    Yes, it was.

3        Q    Was there a predecessor to this agreement?

4        A    Not that I remember, no.

5        Q    Was there a successor to this agreement?

6        A    Not that I know of.

7        Q    So this is the one and only service agreement

8    between you and Coinmaster USA?

9        A    That's correct.

10       Q    Did you read this agreement before you signed it?

11       A    Yes, I did.

12       Q    And did you agree to its terms and conditions?

13       A    Yes.

14       Q    Did you negotiate with Mr. Cox over the terms and

15   conditions that are contained in this agreement?

16       A    No.  Cox proposed them and I accepted them.

17       Q    In the first sentence on page one of D-13, it

18   states, we propose that the terms of the agreement between

19   yourself and Coinmaster USA, Inc., for the provision of your

20   services as chairman of Coinmaster USA, Inc., on an expenses

21   only basis be amended to the following with effect from

22   December 1, 2002.

23             Did you inquire of Mr. Cox at any time what was

24   meant by the phrase, quote, on an expenses only basis?

1    A    Yes, I have.

2    Q    When did you inquire of him as to what that meant?

3    A    I'm not certain of the date.

4    Q    Was it subsequent or prior to executing this

5    agreement?

6    A    I don't remember.  I'd have to look at my

7    documentation.

8    Q    Okay.  But you remember discussing it with him?

9    A    Indeed.

10   Q    And do you see the last sentence in that same

11   paragraph, quote, please retain all receipts for travel in

12   case we are ever audited?  End of quote.  That's the last

13   sentence in the first paragraph of the exhibit.

14   A    Yes, I do.

15   Q    Did you retain all receipts for travel?

16   A    No.

17   Q    Why not?

18   A    Because there was never requested any receipts or

19   documentation.

20   Q    Did you see that the agreement provided that you

21   were to retain such receipts?

22   A    I see what the agreement says.  It wasn't meant in

23   that manner.

24   Q    You said it wasn't meant?

1     Q    Okay.  But they had technological problems with them

2     that prevented their being sold or leased to casinos?

3     A    Correct.

4     Q    And that required your involvement because of your

5     technical know how?

6     A    Correct.

7     Q    And Paul Cox never claimed to have that technical

8     know how, did he?

9     A    No.

10    Q    How did the difficulties of Coinmaster USA, which

11    you have just described, how were they impacted or helped by

12    entering into the service agreement with you that we have

13    just marked as an exhibit?

14    A    It meant that by tying me in, the stock became a

15    viable product given some time for me to resolve the issues.

16    Therefore, once the product was salable again, the company

17    became of some value.  Indeed, that's exactly what happened.

18    I put several months of effort into resolving technical cool

19    issues and problems between the software people and served

20    specific rights to the software, et cetera.  And the matters

21    were slowly put to bed.  The machines were finished up on

22    site and Coinmaster USA became profitable and the bank

23    received the money back that was proposed to be paid for

24    part of the company.

1      Q    Didn't those machines that were ultimately put out

2    into the stream of commerce quite rapidly become obsolete?

3      A    I don't fully understand your question.

4      Q    Didn't competitors of Coinmaster USA offer more

5    advanced, more modern, competitive machines at the same

6    point in time when Coinmaster USA was attempting to put

7    these machines, which had been in storage, out into the

8    marketplace?

9      A    It didn't affect the profitability of the product.

10    That's the question with this kind of product.  It isn't a

11    question of technology, it's a question of play appeal.

12             For instance, a children's game can be very,

13    very effective and sell thousands.  Another children's game

14    produced doesn't sell two.

15             We are in the same situation with the gaming

16    industry.  The product and the raw technology would take

17    more money than the most sophisticated product out there.

18             So it is a thing called play appeal, which is

19    very difficult to define.  This play appeal was in the

20    Coinmaster product, which I designed.  I designed the game,

21    I designed the features with the software people.  I was

22    the prime game designer of the whole product.  And that was

23    very successful in the marketplace.  I had tuned into the

24    marketplace.  It was very successful and it stayed

DANIEL ANTHONY LYNCH                76

1       A     And until such time as the governor, I think it was

2    in February of this year, whereby roulette machines breached

3    the Act of 1865, I think it was, and had them all removed

4    from the site.

5       Q     Okay.  And that's the governor of California?

6       A     Correct.

7       Q     To whom you were referring.

8             And that happened in 2007, that California took

9    action against these machines?

10      A     Yes.

11      Q     And just for clarity of the record, the machine to

12   which you're referring is the multi-player roulette machine?

13      A     Yes.

14      Q     And in 2002, in November of 2002, when you entered

15   into these agreements, how many of those roulette machines

16   did Coinmaster USA have in the warehouse?

17      A     About 13 or 15.  Somewhere around there.

18      Q     And how many at that point in time were out in

19   casinos operating?

20      A     As I remember, maybe two or three.

21      Q     Two or three.

22            At the high water mark for Coinmaster USA, how

23   many roulette machines did it have out in the marketplace?

24      A     I wouldn't know.  That was under Cox's control.

DANIEL ANTHONY LYNCH                80

1      at that time.

2          Q    And it was at that point that the decision was made

3      that Coinmaster had to have an alternative source for

4      technological support, is that correct?

5          A    That's correct, yes.

6          Q    And that's where High View came into play?

7          A    No.

8          Q    No.

9          A    High View was formed to make machines.

10         Q    Right.  To provide the technology that Coinmaster

11     didn't have?

12         A    Well, Coinmaster didn't have it, no.  I had it.

13         Q    Now, during the period that the service agreements,

14     which we have just marked and discussed, were being entered

15     into, did you discuss with Mr. Cox how the service

16     agreements with USA, Coinmaster USA, related to the

17     agreements you already had with PLC?

18         A    I was concerned in about March, I think it was,

19     about March of '03.  Certainly in the year '03.  I sent him

20     an e-mail concerning the situation.  And he told me that --

21     he sent me back a reply stating that he checked with his and

22     that my contract in USA, in Coinmaster USA, Inc., was quite

23     solid even against my contract in the UK.

24         Q    All right.  Let me show you a document that you have

DANIEL ANTHONY LYNCH          82

1      Q    Is it possible that you didn't send that agreement

2    to him until sometime in '04?

3      A    I'm not certain.

4      Q    This Exhibit D-15 -- I screwed up again.  It is

5    D-16.  I'm sorry.  It is D-16?

6                MR. SCHERZER:  The last document is D-16?

7                MR. PRESTON:  Yes.

8                MR. SCHERZER:  Right.

9    BY MR. PRESTON:

10     Q    D-16 is the file note dated November 29th, '02.

11   D-16 reports that you asked Mr. Cox to void the agreement

12   that you just entered into with Coinmaster USA if it proved

13   to be in conflict with the agreement you had with PLC.  Do

14   you see that?

15     A    I see what it says, yes.

16     Q    And is that accurate?

17     A    I don't think it is, no.  Well, you have had a copy

18   of my correspondence.  It's all on there.  It's in e-mails.

19     Q    What do you recall asking Mr. Cox to do in the event

20   there proved to be a conflict between PLC and Coinmaster

21   USA?

22     A    As I remember, I asked them to check it out with the

23   U.S. lawyers for Coinmaster and e-mail me back to say, yes,

24   he checked it out.  They said that there is no conflict and

DANIEL ANTHONY LYNCH          83

1     this will stand up in Delaware law.  Words to that affect.

2        Q    But as of the discussion that's reflected in this

3     D-16, Mr. Cox didn't have a copy of your service agreement

4     with PLC, did he?

5        A    As far as I know, he did.  I would need to check it

6     out.  I would need to find out when I sent it to him.

7        Q    Or if you sent it to him?

8        A    Or if I sent it to him, yes.

9        Q    And you would agree with me, would you not, that

10    there was no way he could check out the validity of the

11    Coinmaster USA agreement without having the service

12    agreement with PLC?

13       A    Then I failed to see how the lawyers could have

14    possibly passed comment to say that there was no problem.

15       Q    Now, I'm going to ask you to take a look at D-17.

16                 (Defendant's Exhibit No. 17 was marked for

17    identification.)

18    BY MR. PRESTON:

19       Q    Which is a copy of an e-mail from you to Mr. Cox,

20    dated January 10, 2003, and ask if you recall sending this

21    e-mail?

22       A    Very possibly.  I'd like to check my e-mails first

23    to confirm it.

24       Q    Okay.  Well, do you recall expressing to Mr. Cox

1    talking with Cox about taking perhaps $4,000 per month?

2    A    I was looking at the cash flow of the company but it

3    might not have been sufficient to pay me the full amount.

4    As soon as it was able to pay me the full amount, it did so.

5    Q    And were you, during that period of time, traveling

6    back and forth to the United States for Coinmaster USA

7    business?

8    A    Yes, I was.

9    Q    And were you also traveling to Belgium and other

10   places talking to people about technological issues

11   connected with producing games for Coinmaster USA?

12   A    No.   That was never discussed with anyone producing

13   games for Coinmaster USA.   Any supplier whatsoever.

14   Q    Okay.   Let me ask you to look at a document that I

15   have marked for identification as D-18, which is a

16   February 10, 2003 letter, with Bates LYN 155.

17            (Defendant's Exhibit No. 18 was marked for

18   identification.)

19   BY MR. PRESTON:

20   Q    And do you recognize that letter, sir?

21   A    Yes, I think I saw this at the time.

22   Q    Was Coinmaster USA at that point in time, that is

23   February of '03, attempting to secure independent long-term

24   funding for the Coinmaster USA business?

DANIEL ANTHONY LYNCH                    97

1      Q    March 21st, 2003.

2      A    No.  I had been suspended.

3      Q    And you had been suspended by the receiver from PLC,

4      Ltd.?

5      A    Absolutely.

6                Do you mind if we break?

7                MR. PRESTON:  No.  Absolutely.  Let's go off

8      the record.

9                (A brief recess was taken.)

10     BY MR. PRESTON:

11     Q    I asked you to take a look at D-21.  And you state

12     in the second paragraph, quote, it may be that we need to

13     change my arrangement date on my USA contract for the 5th of

14     this month, after I was made redundant, (I withdrew my

15     resignation, by the way, on the Friday before the receiver

16     came in.) End of quote.  Do you see that, sir?

17     A    I do.

18     Q    Okay.  To what are you referring when you say change

19     my arrangement date on my USA contract?

20     A    Well, I was obviously concerned with the dates of

21     the contract.  And I suggested we should change it until

22     after I was suspended by the receiver, which meant they

23     breached my contract.  So there was no contract any longer

24     between myself and Coinmaster USA or Coinmaster PLC.

DANIEL ANTHONY LYNCH          100

1      A    Paul Cox said he sought advice from the company's

2    lawyers and the advice was there was no need, that the

3    Delaware law, the contract would stand up in Delaware law

4    and, therefore, there was no point superseding this contract

5    with another one in order to confuse the issue.  Words to

6    that effect.

7      Q    Let me show you a document I have marked for

8    identification as D-22.

9              (Defendant's Exhibit No. 22 was marked for

10    identification.)

11   BY MR. PRESTON:

12     Q    D-22, sir, is entitled, Prospective New Board of

13   Coinmaster USA.  And I ask if you have seen that document

14   before?

15     A    I have seen a letter similar to this but I would

16   need to check to make sure it is the same as the one I

17   actually have in mind.

18     Q    Mr. Lynch, do you recall a meeting with Mr. Cox in

19   Phoenix, Arizona, on or around April 7 and 8, 2003?

20     A    Yes.

21     Q    And during the course of that meeting, did you

22   discuss some or all of the points outlined in this Exhibit

23   D-22?

24     A    Possibly.

DANIEL ANTHONY LYNCH          114

1    clarification of the time that you didn't receive it and

2    then perhaps the time that you did receive it?  I ask that

3    because the Bates stamp seems to indicate that it came from

4    your files.

5              THE WITNESS:  Possibly.  But I just don't

6    remember looking at this particular document.

7              MR. SCHERZER:  Okay.

8    BY MR. PRESTON:

9        Q    Now, this --

10       A    Just to verify something.  Cox was handling all of

11   this documentation.  And the things that were sent me were a

12   copy, I glanced at it and put it away.  It didn't seem to

13   register in your mind.  Especially four or five years later.

14       Q    Is there any question in your mind that the

15   documentation that Coinmaster USA was filing with the

16   various regulatory authorities, it needed to file with,

17   whether they be Indian agencies or the State of Delaware, as

18   of July 2, 2003, was reporting to you as a director of

19   Coinmaster USA?

20       A    Would you please ask the question again?

21       Q    Let me try to make it better.

22              Did you, as of July 2, 2003, view yourself as a

23   director of CMUSA?

24       A    I was a director up until the time that I was

DANIEL ANTHONY LYNCH                    115

1    stopped being paid, if you like.  And throughout this

2    reference to me from Cox is that I'm a director, I'm a

3    chairman, so on and so forth.  I have never stopped being a

4    director, to my knowledge.  I have never been dismissed.  I

5    have never had notification of this being a meeting

6    resigning me from the board.  I have had no notification of

7    any kind.  So at today's date, as far as I'm concerned, I'm

8    still a director.

9        Q    And as a director, information on you had to be

10   reported on the application made to the various tribal

11   agencies, is that correct?

12       A    Correct.

13       Q    All right.

14            So did you ever inquire of Mr. Cox how he had

15   applied to the Chumash Indian Tribal Gaming Agency if you

16   had never signed the form?

17       A    I specifically asked him for copies of all

18   applications with my name on them.

19       Q    When did you ask for those?

20       A    You have a copy of my e-mails.  I don't remember the

21   date.

22       Q    Was it after the dispute between you and Paul Cox

23   developed?

24       A    At about the period when I realized that he was

1    disagreeing with this analysis?

2        A    At that time, Paul had informed me that he had taken

3    legal advice upon my contractual arrangements and said that

4    my contract with the USA was quite valid and sound.  So I

5    didn't see any issues at all.

6        Q    So you never did object to what the receiver

7    recorded in this document?

8        A    Not that I remember of, no.

9                    (Defendant's Exhibit No. 37 was marked for

10    identification.)

11        Q    D-37, with a Bates of CM-BR 829, is an e-mail from

12    Mr. Cox to Adrian Wolstenholme.  Do you ever recall seeing

13    this document before, sir?

14        A    Yes, I remember seeing this.

15        Q    And Mr. Wolstenholme is the author of the letter we

16    have just looked at?

17        A    Yes.

18        Q    Which we have marked as D-36?

19        A    Yes.

20        Q    So as of the date of this reply by Paul Cox back to

21    Mr. Wolstenholme, he states, he, Mr. Cox, states that he has

22    never seen your UK contract, isn't that right?

23        A    He does.

24        Q    And you don't have any reason to believe that that's

DANIEL ANTHONY LYNCH                154

1    and settled?

2       A    I assume he is talking about the contract with

3    Coinmaster USA.  Isn't that what we were talking about?

4       Q    Well, I guess we'll see.

5            Is that what you thought all this time, that he

6    was worried about the Coinmaster USA contract?

7       A    Absolutely.

8       Q    Okay.  It was not your understanding that the

9    receiver was insisting on all claims that you might have

10   being resolved regardless of whether they were with PLC or

11   CMUSA or somebody else?

12      A    There were no claims in the UK.  The only thing that

13   was outstanding with the receiver was my contract with

14   Coinmaster USA, which I had been assured by Cox that the

15   lawyers had looked at and said it was sound.

16            (Defendant's Exhibit No. 48 was marked for

17   identification.)

18   BY MR. PRESTON:

19      Q    I have marked for identification as D-48 a

20   November 12, 2003 e-mail from you to Mr. Cox Bates CM-BR 50.

21   Do you recall sending this e-mail?

22      A    Yes, I do.

23      Q    Now, this followed an e-mail that Cox had sent to

24   you on the 11th of November, correct?

1    Q    Which was exactly what the receiver said it wouldn't

2    agree to?

3    A    That I wouldn't have any involvement until they were

4    gone.

5    Q    But you would have a right?

6    A    Only after they were gone.  That's all they cared

7    about.

8    Q    I have marked as D-49 a document entitled, Terms

9    Sheet, which has Bates LYN 299.

10              (Defendant's Exhibit No. 49 was marked for

11   identification.)

12   BY MR. PRESTON:

13   Q    It starts with that.  Do you recognize that

14   document?

15   A    Yes, I do.

16   Q    And what is it?

17   A    It's a terms sheet that was drafted up.  The non

18   binding terms sheet that was drafted up by myself and Cox

19   and sent to me to be signed off.

20   Q    In the top right-hand corner, there are several

21   numbers, a date of November 17, 2003, and the initials RES.

22   Do you see that?

23   A    Yes.

24   Q    Who is RES?

1     A     No idea.  I didn't draft the document.

2     Q     Do you know whether, in fact, Mr. Cox drafted the

3     document?

4     A     I believe he and his lawyers did, yes.  Or the

5     lawyers of the company did.

6     Q     Okay.

7           MR. SCHERZER:  RES could be referring to Robert

8     E. Salad, a lawyer in my office.  In fact, the second page

9     has a Cooper, which was then Cooper Perskey, tag on the

10    bottom left.

11    BY MR. PRESTON:

12    Q     Coinmaster, PLC, as well as USA, were parties to

13    this terms sheet, correct?

14    A     The terms sheet was never concluded.

15    Q     But they were parties to this terms sheet as it's

16    drafted?

17    A     Yes.

18    Q     What, if anything, did you disagree with in this

19    terms sheet?

20    A     Well, the terms varied.  So the original document,

21    which Cox had sent me, which is a proposal to enter into an

22    agreement, and they changed dramatically on the final

23    contract.  When I objected to -- when I informed Cox --

24    Q     We'll get to the final.  What I'm interested in is,

DANIEL ANTHONY LYNCH        199

1    this situation be true, which is why he was asking questions

2    about it.  But I sent a letter of reference to the value of

3    the purchase of the stock back.  I had been becoming

4    concerned about the whole situation.

5        Q    Which part of this do you not understand how it

6    could be true?

7        A    He refers to stock at no ultimate cost to me.  Yet,

8    he is telling me I'm going to pay the market value.  Which

9    statement is true?

10       Q    And you understand what he is saying about the

11   ownership of stock in High View?

12       A    Yes.

13       Q    Which is essentially dependent upon how the

14   investment in High View works out?

15       A    Yes.

16              (Defendant's Exhibit No. 67 was marked for

17   identification.)

18   BY MR. PRESTON:

19       Q    D-67 is a copy of the settlement agreement between

20   you and Coinmaster USA and Gaming, PLC, is it not?

21       A    I never signed this agreement.

22       Q    I understand that.  Is this a copy of the draft that

23   was presented to you?

24       A    Probably.  I didn't get it.  I don't see why it

1    wouldn't be.

2        Q    Do you have any recollection as to which provisions

3    in this agreement caused you to refuse to sign it?

4        A    I was deeply concerned about the whole way Cox was

5    handling things in general.  I felt that he was out to

6    obtain full value or controlling interest in Coinmaster and

7    never allowing me back in.

8        Q    Even though he was willing to enter into the side

9    agreement?

10       A    I don't think that meant very much.

11       Q    Why is that?  Why did you conclude that?

12       A    Because he is very tricky in what he does.

13       Q    Other than him being tricky, was there any more

14   specific reason as to why you felt that the -- let me finish

15   my question.

16            Was there any particular reason why you felt

17   the side agreement would not protect you in your effort to

18   come back into Coinmaster USA?

19       A    I didn't figure I could do very much against him for

20   the future.  You have already seen the documents here

21   yourself, that one where he says it is going to cost me

22   nothing and the next one he says it is going to cost me a

23   great deal of money.  Which statement is true?

24       Q    Other than that statement, was there anything that

1     caused you to reject the side agreement as being protective

2     of your rights?

3        A     Well, I was also trying to make inquiries with Cox

4     in connection with the side agreement he had with the

5     receiver, which I did not believe existed.  And it didn't

6     exist.  He obviously couldn't show it to me.  When I

7     requested it, why wouldn't he show it to me.

8              Next there was the question of Dual Cooper, who

9     was going to be involved in all this.  And my view with Dual

10    Cooper was he didn't exist as a financier.  I know Dual

11    Cooper.

12       Q     You mean Cooper was not prepared to put money into

13    either Coinmaster or HV?

14       A     I requested Dual Cooper's contact information.  I

15    lost contact with him some years ago.  He was a man I dealt

16    with in California before.  Before Cox ever became involved

17    in the company when Coinmaster directly from the USA was

18    supplying.  I was concerned if the man existed at all other

19    than to manipulate me.

20       Q     Who walked away from signing this agreement that I

21    have marked as D-67?

22       A     I did.

23       Q     You did?

24       A     Yes.

1    Q    Did you understand that the side agreement between

2    you and Mr. Cox was contingent upon you agreeing to this

3    settlement agreement?

4    A    I didn't think the side agreement meant anything.

5    Like I said to you, one time he is telling me it is going to

6    cost me nothing, the next minute he is telling me it is

7    going to cost me market value.  I did not trust his side

8    letter.

9    Q    Did you understand that the side letter was tied to

10   this settlement agreement; that is, that you had to agree to

11   the settlement agreement in some form before the side letter

12   became operative?

13   A    I didn't agree to the contract.  Therefore, the side

14   letter would become immaterial.

15   Q    So it became immaterial once you walked away from

16   this D-67?

17   A    Yes.

18            (Defendant's Exhibit No. 68 was marked for

19   identification.)

20   BY MR. PRESTON:

21   Q    I have marked as D-68 an e-mail which is CM-BR 93.

22   Mr. Lynch, do you recall sending this e-mail, D-68, to

23   Mr. Cox?

24   A    Yes, I recognize this.

1    intellectual property design rights in the game being

2    developed by High View belonged to you?

3        A    They automatically do.  I didn't have a contract

4    with High View.  I think you remember that statement.

5        Q    So it's your contention that, if you don't have a

6    contract with High View, nothing belongs to High View?

7        A    Nothing I designed belonged to High View.  I wasn't

8    being paid.  I had no contract.  So intellectual property

9    rights under British law certainly states I own it.  I would

10   think the American law is similar.

11       Q    Did you consult with anyone in coming to that

12   conclusion?

13       A    I told you I've been in the business 42 years and

14   I'm well aware of the legal aspects of copyright.

15       Q    May I assume from that answer that you did not

16   consult with anyone on that conclusion?

17       A    No, I didn't.

18               (Defendant's Exhibit No. 72 was marked for

19   identification.)

20   BY MR. PRESTON:

21       Q    I have marked as Exhibit D-72 -- actually, it's an

22   e-mail in Cox to Mr. Salad but it's the e-mail underneath

23   that from Mr. Lynch to Mr. Cox that I'm interested in.

24               You sent that to Mr. Cox on July 12, 2004?

DANIEL ANTHONY LYNCH          212

1    View.

2        Q    Did you make any offer to buy out whatever interest

3    Coinmaster or Mr. Cox had?

4        A    I just said to you Coinmaster didn't have any

5    interest and I didn't offer to buy out Cox either.  I think

6    when it was discussed, he tried to put terms into it which

7    weren't acceptable.

8        Q    I have marked as Exhibit D-75 a certificate of

9    incorporation of Auto Gaming, Inc.

10               (Defendant's Exhibit No. 75 was marked for

11   identification.)

12   BY MR. PRESTON:

13       Q    Do you recognize that document?

14       A    Yes, I do.

15       Q    There is reference to an incorporation date of July

16   16, 2004?

17       A    Yes.

18       Q    Does that refresh your recollection as to when Auto

19   Gaming was incorporated?

20       A    Obviously on this day.

21       Q    And this is after your disagreement with Mr. Cox

22   regarding both how Coinmaster USA was to be acquired and

23   also the stock of High View divided up?

24       A    Yes.

1    Q   Was it your intent to use Auto Gaming as a vehicle

2    for the work you had done on the High View machine for which

3    you had not been paid?

4    A   Not at all.  It was my intention to start a business

5    on my own, which I did.

6    Q   And was the first thing that you decided to use with

7    Auto Gaming the software that you had worked on in

8    connection with the --

9    A   Not at all.  The first effort I put into this effort

10    was to build a cabinet.

11    Q   And when, if ever, did you use the software that you

12    developed while working for High View although you weren't

13    paid for it?

14    A   After I purchased it back from Mike Lerwill from ML

15    Solutions, Ltd.

16    Q   You purchased what back?

17    A   The PCB board and the software, the use of the

18    software.

19    Q   So ML Solutions owned the PCB board and the

20    software?

21    A   They did when they weren't paid, yes.  After the

22    period of retention was up, the title retention.

23    Q   And how much did you pay for the software and the

24    PCB board?

DANIEL ANTHONY LYNCH          214

1     A     About $17,000.  Around there.  Approximately.

2     Q     Was that market value?

3     A     I was probably the only person to pick up on the

4     product.  Besides which I don't think anybody else would

5     want it.

6     Q     So that was, in your opinion, a fair price?

7     A     Indeed.

8           (Defendant's Exhibit No. 76 was marked for

9     identification.)

10    BY MR. PRESTON:

11    Q     Mr. Lynch, I have marked as Exhibit D-76 an

12    August 9, 2004 letter from you to Ian Best, which begins

13    with CM-BR 295.  Do you recall that letter?

14    A     Yes.

15    Q     Did you sign it?

16    A     Probably.  Obviously my signature is on the back of

17    it.

18    Q     And did you send this to Mr. Best in his capacity as

19    receiver for PLC?

20    A     I did.

21    Q     That's a yes?

22    A     I did, yes.

23    Q     And had you communicated with Mr. Best or his

24    predecessor prior to August 9, 2004, on the terms either of

DANIEL ANTHONY LYNCH          237

1     A    It wasn't his agreement in the first place.  It was

2    an agreement I had with the company.

3     Q    Okay.  Which then entitled you to enforce that

4    agreement?

5     A    It could have been done, yes.  But I think the

6    receivership stopped all that anyway.  It allowed the

7    receiver to do whatever he wanted to do to have whatever

8    monies from the bank.

9     Q    I want to make sure what I have is right, Tony.  If

10    I don't, let me know.

11          When the receiver came in and terminated you I

12    believe circa February 25, 2003?

13    A    About then, yes.

14    Q    That constituted a breach of the agreement that you

15    had with PLC?

16    A    Indeed.

17    Q    And that entitled you, in your opinion, to bring an

18    action against the receiver or whomever was in charge of

19    PLC?

20    A    I didn't say that.  You did.

21    Q    That's what I'm asking you.

22    A    I don't know.  I didn't consider the situation.

23    Q    Okay.  But the receiver did breach the agreement

24    with you?

1    A    He breached my contract with Coinmaster, PLC.

2    Q    Okay.  Subsequent to the time that the receiver

3    terminated his relationship between you and PLC, what did

4    you believe was your relationship with USA?

5    A    Paul Cox was a very close friend of mine for

6    20 years.  I had been to his wedding.  He has been to my

7    daughter's wedding.  I have been to his house many times and

8    he has been to some of my properties.  I would say he was my

9    closest friend, which is why I trusted him so deeply.  That

10   changed about the period of June or July 2003.

11   Q    Okay.  And what do you believe your relationship was

12   with USA?  Were you a shareholder in USA?

13   A    Me personally, no.

14   Q    Okay.  You weren't a shareholder but you think

15   you're still a director and you're still an officer?

16   A    As I said, I have never had notification of the fact

17   that I have been dismissed as a director.

18   Q    Okay.  And you're aware of the fact that USA had

19   annual meetings?

20   A    Yes, it did have annual meetings.

21   Q    And at those annual meetings, there were elections

22   to the board?

23   A    I would assume so.  I only attended one, that I can

24   remember.

6

<u>DATED    6 November 2001</u>

(1)    COINMASTER GAMING PLC

- and -

(2)    TONY LYNCH

---

### SERVICE AGREEMENT

---

**FINERS STEPHENS INNOCENT**
179 Great Portland Street
London W1N 6LS

Tel: 020 7323 4000
Fax: 020 7580 7069
DX: 42739 (Oxford Circus North)
Ref:C148/531726.1

CM-BR 000026

<u>SERVICE AGREEMENT</u> dated     6 November 2001

<u>PARTIES:</u>

(1)    <u>COINMASTER GAMING PLC</u> a company registered in England under Number 2253400 whose registered office is at 321 Penarth Road, Cardiff CF11 8TT <u>(the "Company")</u>.

(2)    <u>TONY LYNCH</u> of Tree Tops, Bridge Road, Old St Mellons, Cardiff CF3 6UY <u>(the "Executive")</u>.

<u>IT IS AGREED</u> as follows:-

**1.    DEFINITIONS AND INTERPRETATION**

In this Agreement (which expression shall be deemed to include the Schedule and Appendices hereto):-

1.1    unless the context otherwise requires:

the <u>"Act"</u> means the Employment Rights Act 1996;

<u>"Associated Company"</u> means a company which is from time to time a subsidiary or a holding company of the Company or any other subsidiary of a holding company of the Company;

the <u>"Auditors"</u> means the auditors of the Company from time to time;

the <u>"Board"</u> means directors of the Company present at a meeting of them or of a committee of them duly convened constituted and held;

the <u>"Commencement Date"</u> means the date of commencement of the Executive's employment hereunder as specified in the Schedule;

<u>"exploitation"</u> means, in relation to any Products, the manufacture, production, assembly, sale, leasing, hiring, licensing, servicing, writing, design or development thereof;

<u>"intellectual property rights"</u> means patents, trade marks, service marks, registered designs, applications for any of the foregoing, copyright, design rights, know-how, confidential information, trade and business names and any other similar protected rights in any country (whether alone or jointly with any other person) while in the service of the Company (whether before or after the date of this Agreement and whether at the Company's premises or elsewhere) and which in any way affects or relates to or is capable of being used or adapted for use in connection with the business of the Company;

<u>"Invention"</u> means any invention, discovery, process, formula, idea, solution, improvement, computer program, semiconductor product topography, plan, specification, drawing, design, model, prototype or device of whatever nature and whether patentable or not which is made, written or discovered by the Executive (whether alone or jointly with any other person) while in the service of the

FSI-1482952-1

8 November 2001

CM-BR 000027

B   46

Company (whether before or after the date of this Agreement and whether at the Company's premises or elsewhere) and which in any way affects or relates to or is capable of being used or adapted for use in connection with the business of the Company;

"Patentable Invention" means an Invention which is patentable under the Patents Act 1977;

"Registrable Rights" means patents, registered designs, trade marks, service marks or similar commercial monopoly rights created by registration (whether in the United Kingdom or elsewhere in the world)

"Salary" the salary payable pursuant to Clause 6.1, as reviewed from time to time;

1.2     references to any statutes or statutory provisions include those statutes or statutory provisions as amended, extended, consolidated, re-enacted or replaced from time to time and any orders, regulations, instruments or other subordinate legislation made thereunder;

1.3     save as herein otherwise expressly defined, words or phrases defined in Part XXVI of the Companies Act 1985 bear the same respective meanings;

1.4     unless otherwise specified, words importing the singular include the plural, words importing any gender include every gender and words importing persons include bodies corporate and unincorporate; and (in each case) vice versa;

1.5     references to clauses and other provisions are references to clauses and other provisions of this Agreement;

1.6     the clause headings shall not affect interpretation.

2.     **APPOINTMENT**

2.1     The Company hereby agrees to employ the Executive and the Executive agrees to serve the Company as Chief Executive Officer in such other position of no less responsibility as the Board may require.

2.2     The Executive warrants to the Company that by virtue of entering into this Agreement he will not be in breach of any express or implied terms of any contract with or of any other obligation to any third party binding upon him.

3.     **TERM**

3.1     Subject to earlier termination as hereinafter provided, the Executive's employment pursuant to this Agreement shall commence on the Commencement Date for a fixed period of one year and shall continue thereafter unless and until his employment hereunder shall be terminated by either party giving to the other not less than twelve months' notice in writing to that effect to expire on the last day of the said fixed period or at any time thereafter.

3.2     The Executive's period of continuous employment with the Company shall be deemed to have begun on the date specified in the Schedule.

3.3     The Company shall be under no obligation to vest in or assign to the Executive any powers or duties or to provide any work for the Executive during any period of notice as referred to in clause 3.1 or at any other time, and the Company reserves the right (at its option):-

3.3.1   to pay the Executive in lieu of the whole or any part of such period of notice; and/or

3.3.2   to suspend the Executive from the performance of his duties under this Agreement with full salary and other benefits to which he may be entitled under this Agreement during the whole or any part of such period of notice (the exact period to be fixed at the discretion of the Company) and during that period to exclude him from any premises of the Company; and/or

3.3.3   to require the Executive to resign from any directorship, trusteeship or other office he may hold with the Company or with any pension scheme, employee share scheme or other trust established by the Company and upon being so required the Executive shall be deemed simultaneously to have submitted his resignation and he shall have no claim or right of action against the Company for compensation, damages or otherwise in respect of such resignation, but this provision shall not otherwise prejudice any of his rights in respect of the termination of this Agreement or of his employment.

4.     **POWERS AND DUTIES**

During the continuance of his employment hereunder the Executive shall:

4.1    devote the normal business hours of the Company (as specified in the Schedule) and such other time as is required by the Company to carrying out his duties hereunder and shall not without the prior consent of the Company engage in any activity likely to require him to be absent from work during the normal business hours of the Company or to affect his ability properly to perform his duties hereunder;

4.2    exercise such powers and perform such duties in relation to the business of the Company which are compatible with his job title and as may from time to time be vested in or assigned to him by the Board;

4.3    comply with all reasonable directions from time to time given to him by the Board and with all rules and regulations from time to time laid down by the Company concerning its employees which are consistent with this Agreement;

4.4    carry out his duties in a proper and efficient manner and use his best endeavours to promote and maintain the interests and reputation of the Company; and

4.5    at all times promptly give to the Board (in writing if so requested) all such information and explanations as the Board may require in connection with his employment hereunder or with the business of the Company.

5.     **PLACE OF WORK**

The Executive's place or area of work shall be as specified in the Schedule, but subject thereto the Company shall not without the prior written consent of the Executive require him regularly to work at any place which would necessitate his changing his place of residence.

6.     **SALARY AND EXPENSES**

6.1    As remuneration for his services during his employment hereunder the Company shall pay to the Executive a Salary at the rate of £130,000 per annum, payable by

equal monthly instalments in arrears on the last day of every month to a bank account designated by the Executive.

6.2    As further remuneration for his services, the Executive shall also be entitled to the commission payments (if any) specified in Appendix A.

6.3    Such Salary shall be reviewed in the manner specified in the Schedule.

6.4    All remuneration payable to the Executive under this Agreement shall be deemed to accrue from day to day.

6.5    Notwithstanding anything to the contrary contained in the articles of association of the Company the Executive shall not be entitled to any remuneration or expenses as a director or employee of the Company in addition to those specified in this Agreement.

6.6    In the event of any variation in the remuneration payable to the Executive hereunder being made by agreement between the parties hereto (and whether or not such agreement shall be evidenced by a written endorsement hereto), such variation shall not constitute a new agreement but (subject to any express written agreement to the contrary) the employment of the Executive hereunder shall continue subject in all respects to the terms and conditions of this Agreement with such variation as aforesaid.

6.7    The Company shall be entitled to deduct from any remuneration payable to the Executive any moneys which may at any time be owed by the Executive to the Company.

6.8    The Company shall pay or reimburse to the Executive (subject to production of such vouchers and/or other evidence as it may require) all proper and reasonable expenses wholly, exclusively and necessarily incurred by him in connection within his duties hereunder.

6.9    The Company shall reimburse the Executive for the cost (including VAT) of telephone calls made on his domestic telephone in the performance of his duties hereunder plus the rental charge thereof.

## 7.    MOTOR CAR

7.1    To assist him in the performance of his duties hereunder the Company shall during the continuance of his employment hereunder provide to the Executive a motor vehicle allowance as specified in the Schedule which shall provide solely for the purchase of a vehicle suitable to a person of his status and pay all running expenses of the vehicle properly incurred by the Executive in connection with his duties hereunder and shall bear the cost of insuring, testing, taxing, repairing and maintaining the same, except where damage is incurred as a result of the Executive's negligent use of the vehicle (which damage shall be paid for by the Executive).

7.2    The Executive shall take good care of the vehicle and procure that the provisions and conditions of any policy of insurance relating thereto are observed, shall be subject to any rules, regulations or restrictions imposed on the Company or agreed with the Inland Revenue in relation to any private use of such vehicle, and shall not take or permit to be taken such vehicle out of the United Kingdom without the prior consent in writing of the Company.

- 4 -

1 November 2001

CM-BR 000030

7.3     Subject as provided in clause 7.2, the Company shall permit the Executive to use such vehicle for private use.

7.4     The Executive shall ensure at all times that when the vehicle is driven on the road it is in the state and condition required by law and that if so required a current test certificate is in force in respect of it. The Executive shall also (so far as the law permits) at all times be the holder of a current driving licence entitling him to drive motor cars in the United Kingdom and shall produce it to the Company on request.

7.5     At all times the vehicle shall remain the property of the Company

7.6     Upon the giving of notice of termination of his employment (howsoever arising) hereunder the Executive shall forthwith produce the vehicle and its registration documents and keys to the Company.

8.      **CONFIDENTIALITY**

8.1     The Executive shall not (except as authorised or required by his employment hereunder) during the continuance of his employment hereunder or after the termination thereof disclose to any person whatsoever any information relating to the organisation, business or finances of the Company or any of its customers, agents or suppliers or any of its trade secrets or details of any its dealings, transactions or affairs or any information in respect of which the Company is bound by an obligation of confidence to a third party of which (in each case) he is or may become possessed during his employment hereunder and shall keep with inviolable secrecy all matters entrusted to him and shall not use, nor attempt to use, nor permit others to use, any such information in any manner which may injure or cause loss whether directly or indirectly to the Company.

8.2     Any notes or memoranda made by the Executive during the subsistence of this Agreement or at any time thereafter relating to any matter within the scope of the business of the Company or concerning any of its dealings, transactions or affairs shall be the property of the Company, and the Executive will not either during the subsistence of this Agreement or at any time thereafter use or permit to be used any such notes or memoranda otherwise than for the benefit of the Company and on request at any time during the subsistence of this Agreement or thereafter shall forthwith return such notes and memoranda to the Company.

8.3     The Executive's obligations under clauses 8.1 and 8.2 shall be in addition to and not in substitution for any obligations imposed upon him by law in relation to abuse of confidential information.

8.4     The Executive's obligations shall cease to apply to information which shall come into the public domain other than by a breach of this clause 8 or which for any other reason, other than through the Executive's fault, shall have ceased to be confidential.

9.      **HOLIDAYS AND HOLIDAY PAY**

The Executive shall be entitled (in addition to statutory and bank holidays) to the number of working days' holiday in each holiday year (as defined in the Schedule) specified in the Schedule calculated from the Commencement Date (and which must include one period of not less than 14 consecutive days) to be taken at such time or times as may be convenient to the Company. To the extent that any holiday entitlement is not taken in any holiday year the same shall lapse.

FSI-1482952-1

- 5 -

1 November 2001

CM-BR 000031

B    50

## 10. PENSION

The Company shall make a contribution of 7.5% of the annual gross salary (excluding any bonus payments or other additional payments) of the Executive from time to time to such personal pension scheme(s) as the Executive may from time to time specify, such contribution to be paid monthly at the same time as Salary subject to deduction for tax and national contributions at source as necessary.

## 11. NOTIFICATION OF SICKNESS AND MEDICAL EXAMINATIONS

11.1   In the event of illness, injury or accident preventing the Executive from performing his duties hereunder, he shall notify the Company by way of self-certificate in a form prescribed by the Company of the nature of such illness, injury or accident during the first 7 days thereof and thereafter the Executive shall provide the Company with a doctor's certificate in respect thereof at such intervals as the Company shall prescribe and shall inform the Company of details of any entitlement to statutory sick pay, or any other sickness or injury benefit payable to him by any government department or authority.

11.2   The Company may at its expense require that the Executive submit to such medical examinations and tests with doctors appointed by the Company as the Company may require from time to time.

## 12. INCAPACITY

12.1   If the Executive shall at any time be incapacitated by illness, injury or accident from performing his duties under this Agreement and shall supply the Company with satisfactory evidence of such incapacity (as more particularly described in clause 11), he shall be entitled to his full salary and commission (if any) for the next consecutive period of 13 weeks of such incapacity in any one period of fifty-two weeks and to half his salary and commission (if any) for the next consecutive period of 13 weeks of such incapacity, in each case less an amount equal to any statutory sick pay or sickness or injury benefit payable to him by the Company or by any governmental department or authority and thereafter entitlement to salary shall be at the discretion of the Company.

12.2   The Executive shall give all assistance reasonably required by the Company to enable it to reclaim any statutory sick pay entitlement paid to the Executive, in default of which the Company shall be entitled to recover from the Executive or to deduct from any subsequent remuneration payable to the Executive any amount which the Company has been unable to reclaim in consequence.

12.3   This clause shall not in any way affect the right of the Company to terminate this Agreement in the event of the Executive being prevented from performing his duties for the periods provided in clause 16.2.

## 13. PROPERTY RIGHTS

13.1   The whole interest of the Executive in any Invention and in all intellectual property rights relating thereto or obtained or capable of being obtained in respect thereof shall be the absolute property of the Company.   The Executive shall promptly communicate to the Company full particulars of all Inventions and shall keep the same absolutely confidential and shall not disclose the same to any other person without the prior written consent of the Company. The Executive undertakes that if and whenever required by the Company, he will apply or join with the Company in applying for any Registrable Right for any such Invention and will do all things and execute all documents for vesting such Registrable Right and the full right, title and

FSI-1482952-1

1 November 2001

CM-BR 000032

interest to and in the same, in the Company as sole beneficial owner, or in such other person as the Board may specify.

13.2 The Executive hereby waives any moral rights (as provided by Chapter IV Copyright Designs and Patents Act 1998 or any similar provisions of law in any jurisdiction) in all intellectual property rights created by the Executive in pursuance of clause 12.1 above.

## 14. RESTRICTIONS DURING EMPLOYMENT

Without prejudice to the provisions of clause 4.1, save for in relation to the business of T & R Operations Limited and except with the prior written consent of the Board, the Executive shall not during his employment hereunder whether directly or indirectly or whether solely or jointly with or as agent, director, partner, manager, employee, consultant, shareholder or independent contractor of or in any other person engage in, carry on or be interested in any other business; Provided that nothing in this clause shall preclude the Executive from being the holder or beneficial owner of any securities in any other company which are listed or dealt in on any recognised stock exchange by way of bona fide investment only and where the Executive (together with his spouse, children, parents and parents' issue) neither holds nor is beneficially interested in more than a total of 5 per cent of any single class of the securities in that company.

## 15. POST TERMINATION OBLIGATIONS

15.1 The Executive shall not, whether directly or indirectly, or whether solely or jointly with or as agent, director, officer, partner, promoter, manager, employee, consultant, shareholder, participator or independent contractor of or in any other person do any of the following things without the prior written consent of the Company:-

15.1.1 during the period of six months after termination of his employment, carry on or be engaged or concerned within England, Wales, Scotland, Northern Ireland, the Republic of Ireland or any other part of the world where the Company does business to a material extent in any trade or business competing with any trade or business of the Company as carried on at the date of such termination or at any time during the previous two years with which the Executive shall have been at any time personally concerned to a material extent while employed by the Company; Provided that this restriction shall not apply where the Executive's interest in such other trade or business is solely as an employee or a consultant and where his work or duties shall relate to services of a kind or nature with which the Executive shall not have been concerned to a material extent during the period of two years prior to the termination of his employment;

15.1.2 during the period of one year after the termination of his employment, solicit or endeavour to entice away from or discourage from dealing with the Company any person who was at the date of such termination or at any time during the period of two years or such shorter period before termination during which the employee was employed immediately preceding such termination a customer or client of the Company or had agreed to become such whether or not such person would commit a breach of contract by reason of transferring business and with whom the Executive shall have had personal contact during his employment;

15.1.3 during the period of one year after the termination of his employment, supply or provide any products or services to any person who was at

1 November 2001

CM-BR 000033

any time during the period of two years immediately preceding such termination a customer or client of the Company to whom the Company had during that period supplied or provided products or services of the same or a similar nature in the ordinary course of its business or who was at the date of such termination in the process of negotiating for the supply of any products or services of the same or a similar nature from the Company and (in either case) with whom the Executive shall have had personal contact during his employment;

15.1.4   at any time after the termination of his employment, cause or seek to cause to be terminated or adversely affected or otherwise interfere with any agreement or arrangement of any kind to which the Company is at the date of termination a party or from which the Company benefits;

15.1.5   during the period of one year after the termination of his employment, solicit or endeavour to entice away from or discourage from dealing with the Company any person who was at the date of such termination or at any time during the period of two years immediately preceding such termination a manufacturer for or supplier, distributor, agent or independent contractor of or to the Company or had agreed to become such whether or not such person would commit a breach of contract by reason of transferring business or leaving service provided that this restriction shall only apply to manufacturers, suppliers, distributors, agents and independent contractors with whom the Executive shall have had personal contact while employed by the Company;

15.1.6   during the period of six months after the termination of his employment, solicit or endeavour to entice away from or discourage from being employed by the Company any employee whose rate of gross contractual salary falls within the range of gross contractual salaries paid to the top 25 per cent highest paid employees of the Company and with whom the Executive shall have had personal contact while he was employed by the Company and whether or not such employee would commit any breach of contract by reason of leaving service;

15.1.7   during the period of six months after the termination of his employment, employ or engage or attempt to employ or engage, or negotiate or arrange the employment or engagement by any other person of any individual who was at the date of termination, or was at any time within the period of three months immediately prior to that date, an employee of the Company whose rate of gross contractual salary falls or, at the date he left service, fell within the range of gross contractual salaries paid to the top 25 per cent highest paid employees of the Company and with whom the Executive shall have had personal contact while he was employed by the Company and where such employment or engagement would require such individual to exercise skills or knowledge of the same or a similar nature to those acquired or used by that individual while employed by the Company and whether or not such individual would commit any breach of contract by reason of leaving service;

15.1.8   at any time after the termination of his employment, in any way make use of any corporate, business, product or service name which is identical or similar to, or likely to be confused with, the corporate name or any business, product or service name used by the Company or which might suggest a connection with the Company;

1 November 2001

CM-BR 000034

B   53

15.1.9    at any time after the termination of his employment, in any way hold himself out as employed by, representing, or acting for, the Company;

15.1.10   during the period of one year after the termination of his employment, accept employment or engagement in any capacity with any person who is at the date of such termination or was at any time during the period of two years immediately preceding such termination, a customer or client of the Company and with whom the Executive shall have had personal contact during his employment and where the Executive's duties or work shall relate to a material extent to services of a kind or nature the same as or similar to any services supplied by the Executive to that client or customer on behalf of the Company at any time during the said period of two years.

15.2    Each of clauses 15.1.1 to 15.1.10 shall be treated as a separate obligation and shall be severally enforceable as such.

15.3    Without prejudice to the operation of clause 17, the expression the "Company" where used in clauses 15.1.1 to 15.1.10 includes (where the context admits) each of the Associated Companies to the intent and effect that each of such sub-clauses shall apply (as a separate covenant in each case) in relation to each Associated Company as they apply in relation to the Company.

15.4    Nothing in this clause shall preclude the Executive from being the holder or beneficial owner of any securities in any other company which are listed or dealt in on any recognised stock exchange by way of bona fide investment only and where the Executive (together with his spouse, their parents and their parents' lineal descendants and any person or entity whom the Employee controls) neither holds nor is beneficially interested in more than a total of 5 per cent of any single class of the securities in that company.

15.5    The parties consider the restrictions in clause 15.1 to be reasonable, but if a court of competent jurisdiction finds any of them to be unenforceable the parties agree to accept any modification as to the area, extent or duration of the restriction concerned which the court sees fit to impose or, if it does not see fit, which is reasonably necessary to render the restriction enforceable.

16.    **TERMINATION**

16.1    Notwithstanding any other provision of this Agreement, the Company (without prejudice to its other rights and remedies) may terminate this Agreement forthwith by written notice to the Executive if he shall:

16.1.1    commit any serious or persistent breach of any of his obligations under this Agreement or shall neglect or fail (otherwise than by reason of accident or ill health) or refuse to carry out the duties required of him hereunder or to comply with any lawful orders or directions given to him by the Board consistent with the terms of this Agreement;

16.1.2    be guilty of any fraud, dishonesty, serious breach of duty or serious misconduct or any other conduct calculated or likely to affect prejudicially the interests or reputation of the Company;

16.1.3    be convicted of any criminal offence (other than an offence under the Road Traffic Acts not involving his disqualification from driving);

FSI-1482952-1

- 9 -

1 November 2001

CM-BR 000035

B   54

16.1.4 — become bankrupt or make any arrangement or composition with his creditors;

16.1.5 shall be or become prohibited by law from being a director, or shall be removed from the office of director of the Company or (if under the articles of association from time to time of the Company he shall be obliged to retire by rotation or otherwise) shall, having retired, not be immediately re-elected; or

16.1.6 be or become of unsound mind or be or become a patient for any purpose of any enactment relating to mental health

Provided that no notice under clause 16.1.3 shall be given by the Company to the Executive by reason only of the Executive's disqualification from driving if the Executive can make suitable alternative arrangements at his own expense.

16.2 The Company shall be entitled by 3 months' notice in writing to terminate this Agreement if by reason of illness, accident or for any other cause the Executive shall at any time become or be unable properly to perform in whole or in part his duties hereunder either:

16.2.1 for an unbroken period of 13 consecutive weeks (but so that periods of less than 5 consecutive working days actually worked shall for these purposes be deemed not to break the continuity of such incapacity); or

16.2.2 for a period or periods aggregating 90 days (whether working days or not) in any period of 26 consecutive weeks (and notwithstanding in either case that during the period of any such notice any such incapacity may cease in whole or in part)

but any such notice of termination may only be given by the Company within 3 months after such unbroken period of 13 consecutive weeks or such period or periods aggregating 90 days.

17. **ASSOCIATED COMPANIES**

17.1 It is hereby declared that the expression the "Company", when used in this Agreement, shall mean and include, where the context admits, the Company as defined in the heading to this Agreement and all Associated Companies (if any), and the Executive may be required to exercise and perform his powers and duties hereunder in relation to any Associated Company.

17.2 In carrying out his duties hereunder, the Executive shall at all times be governed by the terms of this Agreement, and it is hereby expressly agreed that no contract of employment arises by virtue of this Agreement between the Executive and any Associated Company.

18. **GENERAL**

18.1 The Executive (if a director of the Company) shall not be entitled during the continuance of this Agreement to resign his directorship or disqualify himself from holding office as a director. On the termination of this Agreement, howsoever occasioned, the Executive shall be deemed simultaneously to have submitted his resignation as:-

18.1.1 if then an officer of the Company, as such officer; and

18.1.2 if then a trustee, as trustee of any pension scheme, employee share scheme or other trust established by the Company

and he shall have no claim or right of action against the Company for compensation, damages or otherwise in respect of such resignation, but this provision shall not otherwise prejudice any of his rights in respect of the termination of this Agreement or of his employment.

18.2 If this Agreement be terminated in accordance with its terms the Executive shall have no claim or right of action against the Company for compensation, damages or otherwise in respect of such termination or the termination of his employment.

18.3. If the employment of the Executive hereunder be terminated before the expiration of this Agreement by reason of the liquidation of the Company for the purpose of amalgamation or reconstruction, or as part of any arrangement for the amalgamation of the Company's undertaking and assets not involving liquidation, and if he be offered employment with the amalgamated or reconstructed company for a period of not less than the unexpired period of this Agreement and on terms no less favourable to him than the terms in effect under this Agreement, he shall have no claim against the Company in respect of such termination.

18.4 If the Executive shall have refused or failed to agree to accept employment offered to him on terms no less favourable to him than the terms in effect under this Agreement either by a person which has acquired or agreed to acquire the whole or substantially the whole of the undertaking and assets of the Company or which shall own or have agreed to acquire the whole or not less than ninety per cent of the equity share capital of the Company or by another person controlled by such first person or the company if any to which the Executive shall then be seconded hereunder, the Executive shall have no claim against the Company by reason of the termination of this Agreement by the Company within one month after such refusal or failure to agree.

18.5 The lawful expiration or termination of this Agreement shall not prejudice any claim which either party may have against the other in respect of any antecedent breach or contravention of or non-compliance with any provision hereof nor shall it prejudice the coming into force or the continuance in force of any provision hereof which is expressly or by implication intended to come into or continue in force on or after such expiration or termination.

18.6 On the expiration or termination of this Agreement howsoever caused the Executive shall at his own expense forthwith return to the Company at its principal place of business (free of any condition, restriction, lien or other encumbrance) all the items mentioned in clauses 7.5 and 8.2 and all other property of the Company, being in each case in the Executive's possession or under his control and the Company may repossess such items and for this purpose the Executive hereby grants to the Company and its employees and agents an irrevocable right and licence to enter upon any premises occupied by the Executive with or without vehicles and to remove such items, and all costs incurred by the Company is repossessing such items shall be borne by the Executive.

18.7 All notices which are required to be given hereunder shall be in writing and shall in the case of the Company be sent to its registered office from time to time and in the case of the Executive be sent to his address set out in this Agreement or to such other address in England as he may designate by notice given in accordance with the provision to this clause. Any such notice may be delivered personally or by first class prepaid letter, telex or facsimile transmission and shall be deemed to have been served if by delivery when delivered if by first class post 48 hours after

1 November 2001

- 1 -

CM-BR 000037

posting and if by telex or facsimile transmission when despatched. Any notice to be given to the Company shall be addressed for the attention of the person specified in the Schedule and marked "strictly private and confidential".

18.8    This Agreement is entered into in substitution for all rights and liabilities of the Company and the Executive expressed or implied in all former agreements or arrangements, whether written, oral or implied, between the Company and the Executive relating to the employment of the Executive, and the waiver of all such rights and release of all such liabilities is evidenced by the signature hereof. This Agreement sets forth the entire understanding of the parties subject as herein expressly contained and the parties warrant to each other that they are not entering into this Agreement in reliance on any representation not expressly set out herein. Any sums paid to or on behalf of the Executive in relation to his employment in respect of any period since the Commencement Date shall be deemed to have been received by the Executive on account of the remuneration payable to him hereunder.

18.9    The Executive shall not, in the event of the termination of his employment hereunder for whatever reason, have any claim on the Company arising out of the lapse, by virtue of such termination, of any option then held by him to subscribe for shares from and in the Company.

18.10   The Executive shall at all times observe the London Stock Exchange's "Model Code for Securities Transactions by Directors" (or such other Code adopted by the Company in lieu thereof) relating to share dealings in each case from time to time current, of which he is deemed hereunder to have notice.

18.11   This Agreement shall be governed by and construed in accordance with the laws of England and the parties submit to the non-exclusive jurisdiction of the English Courts.

18.12   Notwithstanding that the whole or any part of any provision of this Agreement (including, without limitation, clauses 15.1.1 to 15.1.10 hereof) may prove to be illegal or unenforceable the other provisions of this Agreement and the remainder of the provision in question shall continue in full force and effect.

19.     **STATUTORY NOTICES**

19.1    This Agreement constitutes written particulars of the Executive's terms of employment with the Company for the purposes of the Act and any legislation amending, replacing or re-enacting the same, and this Agreement replaces all previous notices under the Act and any other such legislation.

19.2    The provisions of item 18 of the Schedule are a note required to be given to every employee pursuant to Section 3 of the Act.

20.     **VARIATIONS IN TERMS**

The Company reserves the right to vary the terms of the Executive's employment with it. Minor changes may be made following notice to the Executive. Major changes will only be made with the Executive's agreement.

EXECUTED as a deed in two originals the day and year first before written.

1 November 2001

CM-BR 000038

B    57

## THE SCHEDULE

1.  Name: Tony Lynch

2.  Residential Address:

    Tree Tops
    Bridge Road
    Old St Mellons
    Cardiff
    CF3 6UY

3.  Commencement Date:

    6 November 2001

4.  Position and Job Title (clause 2.1):

    Chief Executive Officer

5.  Fixed period (clause 3.1):

    One year

6.  Notice period (clause 3.1):

    12 months

7.  Date continuous employment began (clause 3.2):

    6 November 2001

8.  Periods of employment with prior persons which count as part of the Executive's period of continuous employment (clause 3.2):

    None

9.  Working time (clause 4.1):

    Normal office hours 9 a.m. to 5.30 p.m. Monday to Friday (inclusive), provided that the Executive shall be obliged where the Company considers it necessary to work beyond those hours and at weekends and bank holidays without extra remuneration

10. Place/area of work (clause 5.1):

    The Company's premises at 321 Penarth Road, Cardiff CF11 8TT

FSI-1482952-1

8 November 2001

CM-BR 000039

B    58

11. <u>Salary and method of payment (clause 6.1)</u>:

£130,000 per annum, payable by equal monthly instalments in arrears on the last day of every month to a bank account designated by the Executive

12. <u>Salary Review (clause 6.3)</u>:

The Executive's salary shall be reviewed annually with effect from 1st March in each year (the first such review to be with effect from 1st March 2003 or such other date as the Board may notify the Executive) but without commitment to increase

13. <u>Motor Vehicle (clause 7.1)</u>:

An allowance of £50,000 to be paid annually or as shall be in conformity with the Company's car policy from time

14. <u>Holiday year (clause 9.1)</u>:

1st January to 31st December

15. <u>Holiday entitlement (clause 9.1)</u>:

25 working days

16. <u>Benefit schemes</u>:

Company Health Care Scheme (for the benefit of the Executive, his wife and children under the age of 21 or remaining in full-time education and not exceeding 24 years of age)

17. <u>Addressee for notices to the Company (clause 19.7)</u>:

The Chairman

18. <u>Disciplinary procedure (clause 20.2)</u>:

There are no fixed disciplinary rules applicable to the Executive. In the event of the Executive being dissatisfied with any disciplinary action taken against him, or if he has any grievance relating to his employment, he should refer such disciplinary decision or grievance to the Board and the reference will be dealt with by discussion and decision of a Board Meeting.

FST-1482952-1

1 November 2001

- 14 -

CM-BR 000039.1

B 59

<u>APPENDIX A</u>

*(Commission linked to profits)*

1. As further remuneration for his services the Company shall pay to the Executive a Bonus (the "Bonus") at the rate specified below in the event of the Company achieving certain target net profit figures *(the "Basic Figure")* in each accounting reference period of the Company.

1.1 The Bonus to be paid to the Executive for the year ending 28 February 2002 is as follows:

1.1.1 a sum equal to 10% of the Executives annual salary where the Basic Figure exceeds £1.1 million;

1.1.2 a sum equal to 20% of the Executives annual salary where the Basic Figure exceeds £1.3 million;

1.1.3 a sum equal to 30% of the Executives annual salary where the Basic Figure exceeds £1.5 million;

1.1.4 a sum equal to 40% of the Executives annual salary where the Basic Figure exceeds £1.7 million;

1.1.5 a sum equal to 50% of the Executives annual salary where the Basic Figure exceeds £1.9 million.

2. The Bonus and Basic Figure shall be reviewed annually with effect from 1st March in each year (the first such review to be with effect from 1st March 2002 or such other date as the Board may notify the Executive) by the remuneration committee.

3. In this Appendix "remuneration committee" means a committee comprising of the Chief Executive Officer, the Managing Director and two Non-Executive Directors of the Company and which shall be chaired by one of those Non-Executive Directors.

4. In this Appendix "net profits" means the profits shown by the audited consolidated profit and loss account of the Company for the relevant accounting reference period of the Company as certified by the Auditors with the following adjustments (unless already taken into account in such profit and loss account):

4.1 after deducting all expenses and outgoings of working and management properly incurred, directors' remuneration (including salaries and fees and Bonuses or commission to be paid), depreciation as charged, interest on borrowed monies, and any revenue expenses charged directly against reserves

4.2 before deducting any taxation on profits (including corporation tax and any similar, additional or substituted tax) or on chargeable gains;

4.3 without taking into account profits and losses of a capital nature arising on a disposal of fixed assets, investments, plant or any other property;

4.4 after deducting such proportion of the profits or adding back such proportion of the losses (as the case may be) of any subsidiaries and associated companies which shall not be owned by the Company or by any subsidiary on the last day of such accounting reference period; and

FSI-1482952-1

- 5 -

1 November 2001

CM-BR 000040

4.5     after making any further adjustments which the Auditors may consider fair and reasonable or as may be agreed.

5.     Notwithstanding the foregoing, the Executive's commission for any accounting reference period shall not exceed an amount equal to 50 per cent of the Executive's basic annual rate of Salary in effect on the last day of such accounting reference period (the "Ceiling Figure").

6.     If any accounting reference period of the Company is a period longer or shorter than a year the Basic Figure and the Ceiling Figure shall be increased or reduced proportionately on a time basis calculated in days.

7.     Commission payable hereunder for each accounting reference period shall be paid within 90 days after the audited accounts for that period shall have been approved by the directors of the Company.

8.     The Executive shall be entitled to receive true copies of the audited balance sheets and accounts of the Company in respect of each accounting reference period during which he shall have been employed hereunder, whether or not he then be a director or member of the Company.

9.     A Bonus will only be paid to the Executive if he has acted in the service of the Company for the full relevant accounting reference period.

10.     Any dispute or difference which may arise between the Company and the Executive in connection with this Appendix shall be referred to the Auditors who shall act as experts and not as arbitrators and whose determination shall be final, conclusive and binding save for manifest error.

CM-BR 000041

B    61

__EXECUTED__ as a deed by
__COINMASTER GAMING PLC__
and signed by two duly
authorised officers on its behalf:-

)
)
)
)
)

Director:

Director/Secretary:


__EXECUTED__ and __DELIVERED__
a deed by __THE EXECUTIVE__ in
the presence of:-

)
)
)

Signature of Witness:

Name of Witness: _Dan Willmot_

Address of Witness: _48 Bishopsgate London EC2N 4AJ._

Occupation of Witness: _Investment Banker_

FSI-1482952-1

- 17 -

1 November 2001

CM-BR 000042

B    62

D - 29



**ᴈ⫿ ERNST & YOUNG**

▣ Ernst & Young LLP    ☎ Phone:   0117 981 2050
One Bridewell Street        Fax:      0117 981 2051
Bristol BS1 2AA             www.ey.com/uk

TO ALL CREDITORS

16 May 2003

LB/KLO/BR0087&8/21

Laurence Blackwell

Direct Line: 0117 981 2315
Direct Fax: 0117 981 2051

Dear Sirs

**Coinmaster Gaming Plc and Coinmaster Gaming Products Limited (Both In Administrative Receivership) ("The Companies")**

I write further to my appointment as Joint Administrative Receiver of the Companies and enclose a copy of my report to creditors in accordance with Section 48 of the Insolvency Act 1986.

The Act requires that a meeting of creditors be held within three months of the appointment of an Administrative Receiver. Accordingly, I enclose with the report a notice of the meeting, the purpose of which is to present the report to the Companies' creditors and, if thought fit, to appoint a creditors' committee. I also enclose a form of proxy to enable you, if you wish, to nominate a representative to attend on your behalf.

Yours faithfully
For The Companies



A Wolstenholme
Joint Administrative Receiver

THE JOINT ADMINISTRATIVE RECEIVERS CONTRACT ONLY AS AGENTS OF THE COMPANIES AND WITHOUT PERSONAL LIABILITY

The Institute of Chartered Accountants in England and Wales authorises Adrian Wolstenholme and Ian Best to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986.

Enc    Receivers' report
       Notice of meeting
       Form of proxy
       Directors' Estimated Statement of Affairs and Receivers' comments

AR099.04
INVESTOR IN PEOPLE

▣ The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member practice of Ernst & Young Global. A list of members' names is available for inspection at Becket House, 1 Lambeth Palace Road, London SE1 7EU, the firm's principal place of business and registered office.

CM-BR 000001

B    63

INSOLVENCY ACT 1986

MEETING OF CREDITORS

COINMASTER GAMING PLC AND

COINMASTER GAMING PRODUCTS LIMITED

(BOTH IN ADMINISTRATIVE RECEIVERSHIP)

NOTICE IS HEREBY GIVEN pursuant to Section 48 of the Insolvency Act 1986, that a meeting of the creditors of the Companies will be held at The Holiday Inn, Cardiff City Centre, Castle Street, Cardiff, CF1 2XD at 10:30 am on 2 June 2003 to receive the report of the Joint Administrative Receivers and to decide if committees of creditors should be appointed.

Creditors whose claims are wholly secured are not entitled to attend or to be represented at the meeting.

Please note the following if you intend to vote at the meeting:

1    A written statement of claim must be lodged with the Administrative Receivers by 12 noon on the business day before the meeting at One Bridewell Street, Bristol, BS1 2AA.

2    A proxy form is enclosed and this must be completed and lodged with the Administrative Receivers before the meeting.

A Wolstenholme

Joint Administrative Receiver

9 May 2003

AR09B.06

CM-BR 000002

B    64

COINMASTER GAMING PLC AND
COINMASTER GAMING PRODUCTS LIMITED
(BOTH IN ADMINISTRATIVE RECEIVERSHIP)

JOINT ADMINISTRATIVE RECEIVERS' REPORT

PURSUANT TO SECTION 48
OF THE INSOLVENCY ACT 1986

16 MAY 2003

CM-BR 000003

B    65

COINMASTER GAMING PLC AND
COINMASTER GAMING PRODUCTS LIMITED
(BOTH IN ADMINISTRATIVE RECEIVERSHIP)

ADRIAN WOLSTENHOLME AND IAN BEST APPOINTED JOINT
ADMINISTRATIVE RECEIVERS ON 3 MARCH 2003

## CONTENTS

**Section**

1. Abbreviations

2. Statutory information

3. Details of Administrative Receivership

4. Events leading up to the appointment of the Joint Administrative Receivers

5. Realisation of assets and trading

6. Statement of Affairs

7. Report on directors' conduct

8. Creditors

**Appendices**

1. Coinmaster Gaming Plc – Summary of Receivers' Receipts and Payments

2. Coinmaster Gaming Products Limited – Summary of Receivers' Receipts and Payments

3. Coinmaster Gaming Plc – Directors' Statement of Affairs

4. Coinmaster Gaming Products Limited – Directors' Statement of Affairs

5. Joint Administrative Receivers' Comments on Statements of Affairs

CM-BR 000004

**COINMASTER GAMING PLC AND
COINMASTER GAMING PRODUCTS LIMITED
(BOTH IN ADMINISTRATIVE RECEIVERSHIP)**

**REPORT OF THE JOINT ADMINISTRATIVE RECEIVERS UNDER THE
PROVISIONS OF SECTION 48 OF THE INSOLVENCY ACT 1986**

1.  **ABBREVIATIONS**

| | |
|---|---|
| Plc | Coinmaster Gaming Plc |
| Products | Coinmaster Gaming Products Limited |
| The Companies | Coinmaster Gaming Plc and Coinmaster Gaming Products Limited |
| USA Inc | Coinmaster USA Inc. |
| Capital | Capital Gaming Limited |

CM-BR 000005

COINMASTER GAMING PLC AND
COINMASTER GAMING PRODUCTS LIMITED
(BOTH IN ADMINISTRATIVE RECEIVERSHIP)

REPORT OF THE JOINT ADMINISTRATIVE RECEIVERS UNDER THE
PROVISIONS OF SECTION 48 OF THE INSOLVENCY ACT 1986

2.    STATUTORY INFORMATION

**Coinmaster Gaming Plc:**

| | |
|---|---|
| Company Number: | 2253400 |
| Date of Incorporation: | 9 May 1988 |
| Nature of Business: | Holding Company |
| Main Trading Address: | 321 Penarth Road<br>Cardiff<br>CF11 8TT |
| Directors: | Adrian Malcolm William Godfrey<br>Graham Leslie Litt<br>Ian Rock<br>Brian Adrian Edward Parker<br>Daniel Anthony Lynch<br>Michael Alan John (Resigned 31 January 2003)<br>Derek James Burns (Resigned 9 January 2003)<br>Rory Conrad Craig Allin (Resigned 31 July 2002) |
| Company Secretary: | Graham Leslie Litt |
| Registered Office: | One Bridewell Street<br>Bristol<br>BS1 2AA |
| Formerly: | 321 Penarth Road<br>Cardiff<br>CF11 8TT |
| Issued Share Capital: | 12,946,002 Ordinary Shares of £0.05 each |

CM-BR 000006

**Coinmaster Gaming Products Limited:**

| | |
|---|---|
| Company Number: | 1471272 |
| Date of Incorporation: | 4 January 1980 |
| Nature of Business: | Manufacture and Distribution of Gaming Equipment |
| Main Trading Address: | 321 Penarth Road<br>Cardiff<br>CF11 8TT |
| Directors: | Adrian Malcolm William Godfrey<br>Graham Leslie Litt<br>Ian Rock<br>Brian Adrian Edward Parker<br>Daniel Anthony Lynch<br>Michael Alan John (Resigned 31 January 2003)<br>Derek James Burns (Resigned 9 January 2003)<br>Rory Conrad Craig Allin (Resigned 31 July 2002)<br>George Eric Kennedy (Resigned 3 September 2001) |
| Company Secretary: | Graham Leslie Litt |
| Registered Office: | One Bridewell Street<br>Bristol<br>BS1 2AA |
| Formerly: | 321 Penarth Road<br>Cardiff<br>CF11 8TT |
| Issued Share Capital: | 134,900 Ordinary Shares of £1 each held by Coinmaster<br>Gaming Plc<br>280,000 Preference Shares of £1 each held by<br>Coinmaster Gaming Plc |

CM-BR 000007

3.  **DETAILS OF ADMINISTRATIVE RECEIVERSHIP**

Names of Joint Administrative Receivers:           Adrian Wolstenholme
Ian Best

Date of Appointment:                        3 March 2003

Dates of Debentures:

Coinmaster Gaming Plc:                    28 February 2002

Coinmaster Gaming Products Limited:                    28 February 2002

Joint Indebtedness (including interest) of the companies to The Bank of Scotland at the date of appointment:                   £3,812,116

4.  **EVENTS LEADING UP TO THE APPOINTMENT OF THE JOINT ADMINISTRATIVE RECEIVERS**

4.1  The Group was involved in the design, manufacture and installation of casino gaming equipment. Their main markets were the UK, Continental Europe, Russia and South America. In 2002, the decision was made to establish USA Inc, a sales and distribution company in the USA, that was primarily aimed at developing the business into the Native Indian gaming market in the USA.

4.2  In view of the fact that Plc only acted as a holding company of Products and USA Inc, we consider it appropriate to prepare a single report to deal with both Companies.

4.2  Set out below are extracts from the accounts of Products:-

|  | Period ended 30 November 2002 (9 months) | Year ended 28 February 2002 | Year ended 28 February 2001 | Year ended 28 February 2000 |
|---|---|---|---|---|
|  | Unaudited | Audited | Audited | Audited |
|  | £'000 | £'000 | £'000 | £'000 |
| **Turnover** | 2,534 | 7,687 | 6,963 | 3,372 |
| **Gross Profit** | 925 | 3,867 | 2,996 | 1,819 |
| **Net Profit/(Loss) before tax** | (1,703) | 738 | 355 | 205 |
| **Retained Profit/(Loss)** | (104) | 1,088 | 523 | 168 |

4.3  Prior to our appointment Products had expended considerable funds in developing new products and also in funding the development of the US based business through USA Inc. The business had also suffered a major downturn in its traditional markets. Sales of both existing and new products were not sufficient to sustain the operating costs and as a result significant losses were incurred. Products had also suffered from problems with

CM-BR 000008

the collection of a number of major book debts and this further increased the cash flow difficulties.

4.4 Since 30 November 2002, the Companies had incurred significant further losses as a result of limited sales.

4.4 The management of the Companies had been in discussions with several parties, trying to secure either a sale of the Companies or an investment into the business.

4.5 Unfortunately, they were unable to achieve a sale and on 3 March 2003 the Directors requested the appointment of Joint Administrative Receivers of the Companies under the terms of the debentures set out at Section 3 above. The debentures granted fixed and floating charges over the undertaking and all property and assets, present and future, of the Companies.

5. REALISATION OF ASSETS AND TRADING

5.1 Attached at Appendices 1 and 2 are schedules of receipts and payments for each company to 6 May 2003.

5.2 Following our appointment, we took the decision to continue to trade the Companies' UK business to a very limited extent in order to increase stock realisations and also look to achieve a sale of the business and assets as a going concern. We also considered that the continued trading would assist us in relation to the collection of book debts. The finished goods and other stocks were likely to be of negligible value, in the event that it was necessary to dispose of them outside of the trading scenario. We therefore considered that trading to a limited extent represented the best way of achieving the highest level of realisations for the assets.

5.3 The ongoing trading consisted of limited sales of machines that were effectively complete at the time of our appointment and purchases of a small amount of stocks. We ultimately completed the sale of 5 machines achieving total gross realisations of £163,229.

5.4 Following our appointment and throughout the trading period, we continually reviewed the number of employees required for ongoing trading. Of the 30 employees, 18 were made redundant and two left shortly after our appointment.

5.5 The majority of the company vehicles were leased and due to the limited nature of trading these were returned to the leasing companies. No payments were made in respect of assets that were subject to hire or lease agreements.

5.6 The Companies traded from leasehold premises located at 321 Penarth Road, Cardiff, and also at Splott, Cardiff. Agreements were reached with both landlords to enable continued occupation. Neither of these properties had any value due to the short-term nature of the leases.

5.7 As previously advised, prior to our appointment the management of the Companies had been in discussions with several parties, trying to secure either a sale of the Companies or an investment into the business. The decision to continue to trade allowed us to continue to pursue these interests and also to pursue interest that was shown by a number of other parties in relation to achieving sales of either the whole or parts of the business.

5.8 After our appointment, we commenced negotiations with these parties. We ultimately achieved a sale of the business and assets of the Companies as a going concern to Capital on 11 April 2003. The terms of the sale are confidential.

5.9 At the date of our appointment, there were book debts shown as outstanding to Products, totalling £4,247,744, of this £1,846,197 related to the inter-company debt outstanding

CM-BR 000009

from USA Inc which is discussed below. Of the external trade debtors of £2,401,547, we have to date collected £686,907. Whilst we are continuing to pursue a number of further balances, almost all of these are well overdue or disputed. There is therefore a significant level of uncertainty over the likelihood of any further collections.

5.10    Plc owns 90% of the shares of USA Inc. USA Inc also had a substantial inter-company debt outstanding to Products of £1,846,197 at the date of our appointment. Negotiations with regard to the sale of this investment and collection of this debt are continuing

## 6.    STATEMENT OF AFFAIRS

6.1    As required by Section 48 of the Insolvency Act 1986, we have attached at Appendices 3 and 4, copies of the Directors' Statements of Affairs with regard to each of the Companies and at Appendix 5 our comments thereon.

## 7.    REPORT OF DIRECTORS CONDUCT

7.1    We will shortly be commencing our investigations under the provisions of the Company Directors Disqualification Act 1986 and our report on the conduct of the Directors will be submitted to the Department of Trade and Industry once investigations have been completed. This report is confidential and we are unable to disclose any findings that are included.

## 8.    CREDITORS

8.1    The level of likely returns for the debenture holder is ultimately dependent upon the amounts that are received in relation to book debts and USA Inc. We currently anticipate that the debenture holder is unlikely to be repaid in full.

8.2    Preferential claims are estimated as follows:

|  | £ |
|---|---|
| Inland Revenue – PAYE/NIC | 85,047 |
| HM Customs and Excise – VAT | 0 |
| Arrears of wages and holiday pay | 10,836 |
| Pension Contributions | 6,315 |
|  | 102,198 |

8.3    We consider that sufficient funds will be available from floating charge realisations to enable preferential creditors to be paid in full.

8.4    We consider that it is unlikely that non-preferential creditors will receive any return.

8.5    This report will be presented to a meeting of creditors to be held in accordance with the attached notice.

A Wolstenholme & I Best
Joint Administrative Receivers

CM-BR 000010

APPENDIX 1

**COINMASTER GAMING PLC**
**(IN ADMINISTRATIVE RECEIVERSHIP)**

**RECEIPTS AND PAYMENTS ACCOUNT FOR THE PERIOD 3 MARCH 2003 TO**
**6 MAY 2003**

|  | Total (£) |
|---|---|
| **RECEIPTS** | 0 |
|  | 0 |
|  |  |
| **PAYMENTS** | 0 |
|  | 0 |
| Balance at bank as at 6 May 2003 | 0 |
|  | 0 |

APPENDIX 2

**COINMASTER GAMING PRODUCTS LIMITED**
**(IN ADMINISTRATIVE RECEIVERSHIP)**

RECEIPTS AND PAYMENTS ACCOUNT FOR THE PERIOD 3 MARCH 2003 TO
6 MAY 2003

|  | Total £ |
|---|---|
| **RECEIPTS** | |
| Book Debts | 686,907 |
| Stocks and Work in Progress | 613,229 |
| Goodwill and Intellectual Property | 1,050,000 |
| Cash in Hand | 1,196 |
| Interest | 90 |
| Pre-Appointment Insurance Refund | 4,738 |
| Sundry | 767 |
| Output VAT | 7,000 |
|  | 2,363,927 |
| | |
| **PAYMENTS** | |
| Employees | 37,773 |
| Raw Materials | 1,100 |
| Rent | 9,162 |
| Legal Fees | 735 |
| Debt Collection Fees | 2,325 |
| Agent's Fees | 2,194 |
| Receivers' Remuneration | 40,000 |
| Secured Creditor | 1,600,000 |
| Statutory Advertising | 348 |
| Bank Charges | 80 |
| Petty Cash | 2,804 |
| Sundry | 264 |
| Input VAT | 9,708 |
|  | 1,706,493 |
| | |
| Balance at Bank as at 6 May 2003 | 657,434 |
|  | 2,363,927 |

CM-BR 000012

B     74

Rule 3.4

Form 3.2

## Statement of Affairs
Statement as to the Affairs of Coinmaster Gaming PLC

On 3 March 2003 the date of the Joint Administrative Receivers' Appointment

### Affidavit

This Affidavit must be sworn before a Solicitor or Commissioner of Oaths or an officer of the court duly authorised to administer oaths when you have completed the rest of this form.

I, _GRAHAM LESLIE LITT_

of _2 EXFORD GROVE, GILWERN,_
_ABERGAVENNY, MONMOUTHSHIRE, NP7 0RW._

Swear/affirm that the several pages exhibited hereto and marked _1 - 3_ are to the best of my knowledge and belief a full, true and complete statement as to the affairs of the above named company as at 3 March 2003 the date of the appointment of the joint administrative receivers and that the said company carried on business as

_MANUFACTURERS & DESIGNERS OF GAMING MACHINES_

Sworn/affirmed at _62 Newport Road, Cardiff_

Date _1st April 2003_

Signatures _G Litt_

Before me _R H Jago_          _1.4.03_

A Solicitor or ~~Commissioner of Oaths~~

The Solicitor or Commissioner is particularly requested, before swearing the affidavit, to make sure that the full name, address and description of the Deponent are stated, and to initial any crossings-out or other alterations in the printed form. A deficiency in the affidavit in any of the above respects will mean that it is refused by the court, and will necessitate its being re-sworn

CM-BR 000013

*1*

## A-Summary of Assets

| ASSETS | Book Value £ | Estimated to Realise £ |
|---|---|---|
| Assets specifically pledged:- | | |
| | | |
| INVESTMENTS | | |
| – COINMASTER GAMING PRODUCTS LTD | 136,886 | NIL |
| – COINMASTER USA INC | 2,250 | NIL |
| | | |
| DEBTORS | | |
| DUE FROM COINMASTER GAMING PRODUCTS LTD | 1,620,301 | NIL |
| | | |
| | 1,759,137 | NIL |
| Assets not specifically pledged:- | | |
| | | |
| Estimated total assets available for preferential creditors | £1,759,137 | NIL |

Signature _____  Date  1 / 4 / 03

Z

A1– Summary of Liabilities

|  |  | Estimated to realise £ |
|---|---|---|
| Estimated total assets available for preferential creditors (carried from Page A) | £ | NIL |
| Liabilities  Preferential creditors:– |  |  |
| Estimated deficiency/surplus as regards preferential creditors | £ | NIL |
| Debts secured by a floating charge:– | £ |  |
| BANK OF SCOTLAND PLC ( ALL ALLOCATED AGAINST  COINMASTER GAMING PRODUCTS LTD) | — |  |
| Estimated deficiency/surplus of assets available for non-preferential creditors | £ | NIL |
| MICRODLCON EXECUTIVE PENSION SCHEME |  | (62,000) |
| Non-preferential claims:– | £ |  |
| Estimated deficiency/surplus as regards creditors | £ | (62,000) |
| Issued and called up capital:– | £ |  |
| SHARE CAPITAL | (64,780) |  |
| SHARE PREMIUM ACCOUNT | (1,605,571) |  |
|  |  | (1670,301) |
| Estimated total deficiency/surplus as regards members | £ | (1,732,801) |

Signature _____ Date 1 / 4 / 03

CM-BR 000015

Rule 3.4                                                          Form 3.2

## Statement of Affairs

Statement as to the Affairs of Coinmaster Gaming Products Limited

On 3 March 2003 the date of the Joint Administrative Receivers' Appointment

### Affidavit

This Affidavit must be sworn before a Solicitor or Commissioner of Oaths or an officer of the court duly authorised to administer oaths when you have completed the rest of this form.

I  _GRAHAM   LESLIE   LITT_

of  _2  EXFORD  GROVE ,  GILWERN ,_

_ABERGAVENNY ,  MONMOUTHSHIRE ,  NP7  0RW_

Swear/affirm that the several pages exhibited hereto and marked  _1 - 8_  are to the best of my knowledge and belief a full, true and complete statement as to the affairs of the above named company as at 3 March 2003 the date of the appointment of the joint administrative receivers and that the said company carried on business as

_MANUFACTURERS  ×  DESIGNERS  OF  GAMING  MACHINES._

Sworn/affirmed at  _62  Newport R.d.  Cardiff_

Date  _1st  APRIL  2003_

Signatures  _GLLitt_

Before me  _Pat J.B. G...b_          _1. 04. 03_

A Solicitor or Commissioner of Oaths

The Solicitor or Commissioner is particularly requested, before swearing the affidavit, to make sure that the full name, address and description of the Deponent are stated, and to initial any crossings-out or other alterations in the printed form. A deficiency in the affidavit in any of the above respects will mean that it is refused by the court, and will necessitate its being re-sworn

CM-BR 000016

*I*

A–Summary of Assets

| ASSETS | Book Value £ | Estimated to Realise £ |
|---|---|---|
| Assets specifically pledged:– | | |
| **DEBTORS** | | |
| – TRADE DEBTORS | 2,096,826 | 1,032,600 |
| – COINMASTER USA INC. | 1,846,197 | 1,750,000 |
| **MACHINES** | | |
| – Ex CROWN BINGO MACHINES (7) | 205,144 | 205,144 |
| | 4,148,167 | 2,987,744 |
| LESS: SECURED CREDITOR – BANK OF SCOTLAND PLC | (3,654,994) | (3,654,994) |
| SURPLUS/SHORTFALL ON SECURED LENDING | 493,173 | (667,250) |
| | | |
| Assets not specifically pledged:– | | |
| **FIXED ASSETS** | | |
| LEASEHOLD IMPROVEMENTS | 28,452 | NIL |
| PLANT, MACHINERY, MOTOR VEHICLE, COMPUTER AND OFFICE EQUIPMENT, TOOLING | 111,548 | 10,000 |
| **DEBTORS** | | |
| HM CUSTOMS & EXCISE | 6,006 | 6,006 |
| **STOCK** | | |
| FINISHED GOODS AND WORK IN PROGRESS | 286,971 | 115,227 |
| RAW MATERIALS | 967,898 | 384,000 |
| **SUNDRY ASSETS** | | |
| PREPAYMENTS | 145,747 | NIL |
| | | |
| **Estimated total assets available for preferential creditors** | £1,846,322 | 815,283 |

Signature _____    Date _1/4/03_

CM-BR 000017

2

A1- Summary of Liabilities

|  | | Estimated to realise £ |
|---|---|---|
| Estimated total assets available for preferential creditors (carried from Page A) | £ | 815,23. |
| **Liabilities** | £ | |
| Preferential creditors:- | | |
| INLAND REVENUE (PAYE/NI) | | (85,046, |
| Estimated deficiency/surplus as regards preferential creditors | £ | 430,187 |
| Debts secured by a floating charge:- | £ | |
| BANK OF SCOTLAND PLC - SHORTFALL UNDER FIXED CHARGE | | (667,250) |
| Estimated deficiency/surplus of assets available for non-preferential creditors | £ | (237,063) |
| TRADE CREDITORS | | (1,428,727) |
| EMPLOYEES | | (12,500) |
| HIRE PURCHASE | | (28,197) |
| COINMASTER GAMING PLC | | (1,620,801) |
| Non-preferential claims:- | £ | |
| LOAN - FINANCE WALES PLC | | (34,722) |
| Estimated deficiency/surplus as regards creditors | £ | (3,361,810) |
| Issued and called up capital:- | £ | |
| ORDINARY SHARES | (134,900) | |
| PREFERENCE SHARES | (280,000) | (414,900) |
| Estimated total deficiency/surplus as regards members | £ | (3,776,410) |

Signature _____    Date _1 / 4 / 03_

CM-BR 000018

APPENDIX 5

**Coinmaster Gaming Plc and Coinmaster Gaming Products Limited**
**(Both In Administrative Receivership)**

**Joint Administrative Receivers' comments on the Directors' Statements**
**Of Affairs As At 3 March 2003**

<u>Coinmaster Gaming Plc</u>

1. The Directors have estimated that the investment in USA Inc will have no realisable value, however, negotiations are ongoing in this regard.

2. The Statement of Affairs for Plc does not include the debt outstanding to Bank of Scotland, however, Plc has cross-guaranteed the debt and is therefore liable for any shortfall.

3. The Statement has been prepared before any costs of realisation.

<u>Coinmaster Gaming Products Limited</u>

1. To date we have collected £686,907 and although we are continuing to pursue a number of further debts there is considerable uncertainty as to the level of likely future collections.

2. Negotiations in relation to the debt outstanding from USA Inc are ongoing.

3. We do not consider that there will be any further separate realisations in relation to the Crown bingo machines.

4. The indebtedness to the Bank as per their letters of demand totalled £3,812,116, compared £3,654,994 as set out in the Statement of Affairs.

5. As set out in paragraph 8.2 above, we currently estimate that claims from preferential creditors will be £102,198 as compared to £85,046 in the Statement of Affairs.

6. The Statement has been prepared before taking account of any costs of realisation and does not take into account the potential non-preferential claims of employees under their contracts of employment.

7. We believe that the overall shortfall is likely to exceed that set out in the Statement of Affairs, however, we agree with the view that preferential creditors are likely to receive payment in full and no funds will be available for a distribution to non-preferential creditors.

Signed: .....*Adna Wolstenholme*............................

A Wolstenholme, Joint Administrative Receiver

Dated..........*15 May 2003*....................

CM-BR 000019

# TERM SHEET

**Parties:**  COINMASTER USA, INC. ("USA"), COINMASTER GAMING, PLC ("PLC") and TONY LYNCH ("Lynch").

**Lynch Resignation:**  Pursuant to the terms of the Definitive Agreement, as hereinafter defined, Lynch shall resign all direct and indirect positions and affiliations that he may have with USA.

**Mutual Releases:**  Lynch, on the one hand, and USA and PLC, on the other, shall execute and deliver to one another mutual general releases upon the full execution of the Definitive Agreement.

**October 2003 Payment:**  In accordance with the November 15, 2002 Letter Agreement between USA and Lynch, USA shall pay to Lynch Eight Thousand ($8,000.00) Dollars representing the October 2003 payment. No further payments will be made by USA to Lynch except for the Additional Consideration, as hereinafter defined.

**Future Consideration:**  Ninety (90) days subsequent to the later of the Stock Purchase as hereinafter defined, or the Bank Satisfaction, as hereinafter defined, with such later event being defined as the "Triggering Event," Lynch shall be paid the amount of One Hundred Ninety Thousand ($190,000.00) Dollars, together with simple interest, at the rate of five (5%) percent (collectively, the "Additional Consideration") that shall begin accruing as of the date of execution of the Definitive Agreement. For all purposes of this Term Sheet, the Stock Purchase shall mean the consummation of the acquisition of all shares of stock currently owned by PLC in USA by Paul Cox and Brad Hutcheon. For all purposes of this Term Sheet, the Bank Satisfaction shall mean the satisfaction in full of all obligations owed by PLC to Bank of Scotland. The Triggering Event shall be evidenced by written instruments reasonably satisfactory to counsel to USA.

**Security:**  As security for the Additional Consideration, USA shall, upon the Bank Satisfaction, execute and deliver to Lynch a security agreement and financing statements through which USA shall provide Lynch with a first perfected security interest in the operating assets of USA. Prior to the date of the Bank Satisfaction, Lynch shall be an unsecured creditor of USA.

LYN 299

**Covenant-Not-To-Compete:** Commencing upon the date of execution of the Definitive Agreement and continuing for a period of two (2) consecutive years thereafter, Lynch shall not directly or indirectly be an owner, employee, independent contractor or affiliate of any operation that is involved in the business of gaming machine sales, marketing or operations in any area of the Continental United States that is west of the Mississippi River. The remedy for a breach of this covenant-not-to-compete shall be the forfeiture and/or disgorgement, as the case may be, of the Additional Consideration.

**Definitive Agreement:** This Term Sheet shall be non-binding. Nonetheless, the parties hereto shall, upon acceptance of this Term Sheet, use reasonable efforts to negotiate and implement a definitive agreement (the "Definitive Agreement") such that the transactions contemplated hereby may be effectuated as quickly as possible.

COINMASTER USA, INC.

Attest:

Dated: _____    By: _____

_____

COINMASTER GAMING , PLC

Attest:

Dated: _____    By: _____

_____

Witness:

Dated: _____    _____

_____    TONY LYNCH

CPAC;410325.2

2

LYN 300

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| **From:** | "Paulcoxflorida@mindspring.com" <paulcoxflorida@mindspring.com> |
| **To:** | "tony lynch" <tony.lynch@hvillas.e.telefonica.net> |
| **Sent:** | Monday, March 29, 2004 4:12 PM |
| **Attach:** | Tony Re the future March 29 04.dot; Tony Term Sheet March 29 04 Version.DOC |
| **Subject:** | The Deal |

Hi Tony.

Attached are two documents.

1 The first document is an updated version of the Terms of Separation for yourself, that we last corresponded about in January. I have taken account of your proposed changes where the other parties were agreeable to these. I have also increased the total amount payable under this arrangement at the tail end to $214,000 to take some account of the lengthy delay in implementing this proposal. I do not believe that any other changes to this document are negotiable by me on your behalf! (For instance I could not get the up-front payment increased. The Bank are emotional about this, and would rather litigate with you, no matter how irrational this is!)

2. The second document is my proposed side letter relating to the future, beyond the Bank's involvement in our dealings. There are some facets of the future of our business which are currently obscure to me, but the letter attempts to capture the spirit of what we intend. Clearly I have written this letter without the help of legal advice. Because of the nature of the letter I do not consider it practical or desirable to involve legal advisors in this process. As you know, documents I write usually hold up well!

I need your comments on both these documents as soon as practical!

Good reading!

Regards,

Paul
Coinmaster USA Inc.



**3001, ALOMA AVENUE, WINTER PARK, FL 32792**

TEL: 1 407 672 1250                                    FAX: 1 407 678 4751

**Subject to Contract and Without Prejudice**

March 29, 2004

Sent by e-mail

Daniel A. (Tony) Lynch
75 Croeso Villas
Calle Pablo Sarasate
Verdamar II
Urb. Villamartin
Orihuela Costa 03189
Costa Blanca
Spain.

**Re: Our future relationship.**

Dear Tony,

Further to the proposed settlement of your contract that I have separately written to you about, I would like to set out a proposal for your re-entry to the business when the original Bank Debt has been repaid, and the corporation, or its management has bought the balance of our corporate stock!

This (side) letter is personal to you, our immediate live-in partners and myself! The contents of this letter should not be divulged to any other parties until after the Bank of Scotland no longer has any involvement in Coinmaster USA Inc. It is intended to be binding on us both.

Essentially, I confirm our ultimate ambition is to end up in the situation we thought we were at, in April 2003, when we met in Phoenix! That is, three equal, stockholding, working partners, earning roughly equal amounts from the business. (Coinmaster USA Inc.)

I recognize that the situation I am outlining could be two to three years away. (Let's hope it's not any more than that!) I actually think it could be earlier than two years depending on how successful we are at obtaining finance for placing new machines, once I am in a position to talk to Bank of America, and other Banks about this. It is my intention that the offer contained in this letter will be put into physical effect one month after you have received full payment under the proposed settlement of your contract mentioned earlier.

The proposal made below is made to you personally, and is not assignable in any way during your lifetime. The proposal will become invalid should you be indicted and convicted on any criminal charges in any jurisdiction, in the period between signing this document and the date it crystallises. It will also become invalid should you breach the non-compete agreement with Coinmaster USA Inc. that you have separately signed. It will obviously also lapse should the business not make it to the end of the Bank repayment road! That having been said, this is the real position we expect to reach.

CM-BR 001080

B    85

My proposal is as follows:

1. You would re-join the Board, with the same base salary as Brad, and myself, and a bonus scheme based on business profitability, identical to mine. (Whatever that is.) Your job title will be discussed, and decided on, at that time. Your home base can be anywhere in the USA.

   Should you choose for your home base to be outside the USA, then, your salary will be halved to reflect the lack of daily input on a pragmatic basis. You can then be based anywhere on the planet providing it has a usable high-speed Internet connection.

   You will be expected to attend our two Board meetings per year, and accept a range of appropriate duties that you agree at that time. Obviously expenses will be billable by you for attendance at these meetings on the same basis as my own. Whatever that is at the time. (Private jet travel, six star hotel, etc. Ho! Ho! )

   Your salary can be paid, either through the US tax-system, or as a fee to a corporation or in any other way that is legally permissible according to our accountant's advice at the time we put it in place.

2. There will be no accounting for lost salary in the period that has gone by since you were last fully in the business.

3. Your contract would be identical to mine, and Brad's, in terms of duration and severance options.

4. You will be given the option to buy, over time, one third of the stock, in issue in the business that is in management control. The intent being that we ultimately return to three equal stockholding partners.

   It is not entirely clear to us, exactly where this stock will have to come from. It could be from the corporation, or from Brad, or myself or some combination of these! In any event, I guarantee the result! (I'm the one who usually delivers when promised!)

   This situation arises because it's not yet totally clear where the stock will be at the time we have to put this offer into effect, (There are some conditions we have to meet that could change ownership arrangements, and also some tax considerations. It may also be that in the meantime, we have to give away some limited amounts of stock, to forge essential strategic alliances with third parties!)

   In any event, I can't see any situation arising where I don't personally control over half the stock in issue, at the time we need to meet this commitment, and can therefore get approved any appropriate minute required to make it happen.

5. You will unfortunately have to pay for the stock! The IRS and my other partner demand this! The price you will have to pay will be fair market value as established by the price we buy from the Bank a few months previously. (This is currently forecast as being $500,000 for 70% of the stock. This would mean your stock purchase price could be

CM-BR 001081

about $238,000!) You would be allowed to pay for this stock over up to three years, at your choice. (You would receive it as you paid.) There should be no untoward tax implications for this transaction for either you, or the corporation, since we have an established market price at that time!

You will have one month from the time this opportunity is triggered by us to give us written acceptance of the offer and to say how you intend to take up the stock and what payment arrangements you wish to make. After that, the offer will lapse for all time!

(It seems probable that the real value of the stock you are buying at that time could be in excess of $2 million! I'm not guaranteeing this of course! On the other hand it could be worth $50, but then you wouldn't take up the option would you!)

6. Our salaries will be set for the duration of your stock purchase period, so that this purchase is not a financial burden for you. That is, in anticipation of say a three-year purchase, we will go for salary additions for each of us that are about $80,000 more than we would otherwise be receiving. (Assuming the business can afford this! Our model says it can easily!) We will need to decide on the precise amount of salary addition based on your chosen income tax position. This will also mean that there is no penalty arising to either Brad or myself from your stock purchase. (We cannot make the same offer over two or one year, since the business would struggle with this option!)

7. In the interim, until the Bank is no longer involved, you will continue to assist me personally in all ways possible to continue to make the business a success, giving advice etc on reasonable request. (Your physical presence will not be required.) For the record, not doing this will not be counted as an act of default under this agreement!

8. Should you wish to sell your stock, at any time, after you gain ownership, you must in the first instance offer it for sale to the other management stockholders equally, at fair market value. I do mean fair market value! As assessed by a person agreed by all three of us as being capable of deciding on such a value. (Or maybe you should persuade us that we should all sell to whomever at that time!) If necessary you will agree to arbitrate this matter with an arbitrator agreed by all of us.

9. Should you be unfortunate enough to die prior to the consummation of this deal then the option to purchase stock part of this deal will be willable to whomever you wish. Sadly the salary arrangements, salary addition, expense arrangements, and Board appointment are unique to you, and are not willable.

10. You agree that any other gaming machine products you decide to design, produce or manufacture for distribution in the US market, personally or using another corporation, before or after the arrangement covered by this letter is triggered, and which are legally allowable in the State of California, will in the first instance be offered to Coinmaster USA Inc. as a sole distributorship for the State of California, at margins of no less than 25%. Coinmaster USA Inc. will have the right to accept such an offer, in writing, within one month of the offer being made, in writing.

11. This contents of this letter shall be binding on our heirs.

CM-BR 001082

This Agreement is written under the laws of the State of Delaware.

Should any Clause be found by a court to be legally invalid at any point in time, it will not invalidate the remaining clauses.

Sincerely,

*Paul A. Cox*

Paul A. Cox
President and CEO

I accept the terms of the Proposal outlined in this letter in full.

Sincerely,

Daniel A. (Tony) Lynch                Dated: _____

CM-BR 001083

# TERM SHEET

**Parties:**                           **COINMASTER USA, INC.** of 3001 Aloma Avenue, Winter Park, FL 32792 ("USA"), **COINMASTER GAMING, PLC** whose registered office is at One Bridewell Street, Bristol, BS1 2AA ("PLC"), **COINMASTER GAMING PRODUCTS LIMITED** whose registered office is at One Bridewell Street, Bristol, BS1 2AA ("LTD"), **IAN BEST** of Messrs. Ernst and Young of One Bridewell Street, Bristol, BS1 2AA ("Receiver") and **DANIEL ANTHONY LYNCH** of [to be confirmed] ("Lynch").

**Lynch Resignation:**        Pursuant to the terms of the Definitive Agreement, as hereinafter defined, Lynch shall resign all direct and indirect positions and affiliations that he may have with USA.

**Mutual Releases:**             Lynch, on the one hand, and USA, PLC and/or LTD as appropriate on the other, shall execute and deliver to one another mutual releases, in form and content acceptable to the parties and their counsel, upon the full execution of the Definitive Agreement, which releases shall have no force or effect until the Debt Satisfaction and Stock Consideration, both as hereinafter defined, shall occur.

**October 2003 Payment:**     In accordance with the November 15, 2002 Letter Agreement between USA and Lynch, USA shall pay to Lynch Eight Thousand ($8,000.00) US Dollars representing the October 2003 payment. No further payments will be made by USA to Lynch (or by PLC or LTD to Lynch), except for the Additional Consideration (as hereinafter defined), if any, payable by USA to Lynch.

**Future Consideration:**       Ninety-one (91) days subsequent to the date on which the Debt Satisfaction and Stock Consideration are satisfied in full, USA shall pay to Lynch the amount of two hundred fourteen thousand ($214,000.00) US Dollars, together with simple interest, at the rate of five (5%) percent (collectively, the "Additional Consideration") that shall begin accruing as of the date of execution of the Definitive Agreement by all parties hereto. For all purposes of this Term Sheet, the "Debt Satisfaction" shall mean the satisfaction in full of all liabilities and obligations owed by USA to PLC and LTD. The balance owed by USA to PLC and LTD as of February 29, 2004, as per the USA balance sheet, was

CM-BR 001084

B    89

2,080,241.10 US Dollars.    The amount of the Debt Satisfaction shall be specified in the Definitive Agreement and shall not be subject to offset or deduction after the amount thereof has been agreed to by the parties thereto.    The date on which the Stock Consideration is satisfied in full shall be triggered by written instruments in a form reasonably satisfactory to the legal representatives to USA and the Receiver ("Written Instruments").

**Security:**

As security for the Additional Consideration, USA shall, upon the satisfaction in full of the Stock Consideration, as evidenced by the Written Instruments, and upon written demand from Lynch, execute and deliver to Lynch a security agreement and financing statements through which USA shall provide Lynch with a first lien security interest in the operating assets of USA. Prior to the date of the Written Instruments, Lynch shall not be entitled to the Additional Consideration and shall be an unsecured contingent creditor of USA.

**Acknowledgment of Bank's**
**Continuing Security**

Lynch hereby confirms and affirms, and shall re-affirm in the Definitive Agreement, the Bank's continuing first lien security interest in the operating assets of USA, which security interests shall continue in full force and effect until the Stock Consideration has taken place.

**Covenant-Not-To-**
**Compete:**

Commencing upon the date of execution of the Definitive Agreement and continuing for a period of two (2) consecutive years thereafter, Lynch shall not directly or indirectly compete with Coinmaster USA Inc. in any area of the Continental United States that is west of the Mississippi River. The remedy for a breach of this covenant-not-to-compete shall be the forfeiture and/or disgorgement, as the case may be, of the Additional Consideration, and such additional remedies as may be available at law and/or in equity.

**Definitive Agreement;**
**Stock Purchase**
**Condition:**

This Term Sheet shall be non-binding. Nonetheless, the parties hereto shall, upon acceptance of this Term Sheet, use reasonable efforts to negotiate and implement a definitive agreement in good faith (the "Definitive Agreement") such that the transactions contemplated hereby may be effectuated as quickly as possible. Further, the closing of the transaction contemplated herein is expressly contingent upon the sale of all shares of stock held by

116112.01000/40133528v4

CM-BR 001085

B    90

LTD in USA such that Paul Cox and Brad Hutcheon shall be the only stockholders of USA. The consideration ($500,000.00 US Dollars) to be paid to LTD for the shares of stock as referenced in this paragraph is herein referred to as the "Stock Consideration." The Stock Consideration shall be paid to LTD subsequent to the Debt Satisfaction.

**Receiver acts without personal liability:**

Notwithstanding that this Term Sheet is, in any event, non-binding, the Receiver has entered into this Term Sheet and will execute the Definitive Agreement and any other supporting documentation for or on behalf of PLC and LTD and neither the Receiver or his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatever in respect of any obligation undertaken by PLC, LTD or any other party to this Term Sheet, the Definitive Agreement or any other supporting documentation or in respect of any failure on the part of PLC, LTD or any other party to observe, perform or comply with any such obligations or under or in relation to any associated arrangements or negotiations or under any assurance made pursuant to this Term Sheet. The Receiver is a party to this Term Sheet in his personal capacity only for the purposes of receiving the benefit of this clause.

**Governing Law:**

This Term Sheet and the Definitive Agreement, and all matters arising hereunder or thereunder, shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts or choice of law principles.

[ Signature Page Follows ]

3

CM-BR 001086

B    91

Attest:                                           **COINMASTER USA, INC.**

_____   Dated: _____    By: _____

Attest:

_____   Dated: _____    By: _____

Witness:

_____   Dated: _____    _____

                                                 **DANIEL ANTHONY LYNCH**


Signed by the Receiver for and on behalf of Coinmaster Gaming, PLC without personal liability

_____

**IAN BEST**

Signed by the Receiver for and on behalf of Coinmaster Gaming Products Limited without personal liability

_____

**IAN BEST**

Signed by the Receiver for and on behalf of the Receiver without personal liability

_____

**IAN BEST**

4

116112.01000/40133528v4

CM-BR 001087

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| **From:** | "Paulcoxflorida@mindspring.com" <paulcoxflorida@mindspring.com> |
| **To:** | "tony highview" <tonyhighview@hvillas.e.telefonica.net> |
| **Sent:** | Tuesday, May 25, 2004 8:41 AM |
| **Subject:** | Legal Work |

Subject.to Contract

Hi Tony.

I think I've finished my input to the deal with the Receiver. The last few comments I have went off yesterday. (Our attorney still has a couple of technical items to clear up with the Receiver's attorney, then we're done, I think.) My comments on the proposed deal with Dual also went off yesterday.

Assuming that the documents are OK when they return, I propose to send you:

1. The legal version of the proposed deal between yourself and Coinmaster USA Inc. I believe that I've got all the stupidities out of the legal version. It looks a lot different to the document you signed off on last December, but so far as I can tell it's only because of legal language, not content. You are of course free to show it to any attorney you wish. (Remember it's a document formulated under Delaware law.)

2. The deal Coinmaster USA Inc is doing with Dual, which is potentially a very good deal for all parties! (I hope!) The terms are largely ones I put together, but the legal drafting is by Dual's attorney. They haven't cheated at all on the drafting. (Our attorney, who hasn't seen this deal yet, will review the next Draft also.)

As I see it the upside for you is as follows:

1. You get one third of the available stock in Coinmaster USA Inc once the Bank has transferred the bulk of the stock, at no ultimate cost to you, and a cash sum of $214,000 to cover the cessation of your old contract. You also get a new contract, whose terms only depend on where you choose to live. We have to decide who does what in Coinmaster USA once we reach the point that you are back in the business. As you know, my plan is to opt out of the business at that stage from a management point of view. I expect to have all the paperwork routines covered by someone else by then. I'm also very open to considering a stock exit at that stage providing we can agree a suitable price.

Coinmaster USA will be licensed widely by the time this happens, because in the deal with Dual it is the licensed body, and the owner of all machines. You will obviously get the largest share of whatever development and manufacturing upside this will produce.

2. You will own whatever percentage of stock in High View that you eventually settle on.

High View has a distribution agreement with Coinmaster USA Inc for California, and potentially one with Coinmaster USA and Dual for the rest of the USA if it wants one, using Coinmaster USA's licensing and servicing, and Dual's cash sources. Clearly there is room for maneuver here in relation to HighView enjoying some share of the participation profits outside California.

The deal with Dual essentially takes all costs from the participation income, including financing, licensing, servicing etc, gives 10% each to the site finder and finance provider, and splits the rest 50/50 until the financing cost is repaid, and then splits the income 80/20 in Dual's favor. Coinmaster USA gets machine ownership, and all depreciation benefits. If a machine is sold the benefit goes 70/30 to Dual.

Since I now see you plan to come here next week, I guess we can sort out anything else then.

Regards,

11/22/2004

CM-BR 000412

Page 2 of 2

Paul
Coinmaster USA Inc.

11/22/2004

b-67

*Confidential*
*Blank Rome Draft Dated June 4, 2004*
*For Discussion Purposes Only*

## SETTLEMENT AGREEMENT
### (Lynch)

SETTLEMENT AGREEMENT (*"Settlement Agreement"*) dated as of _____, 2004, by and among **COINMASTER USA INC.**, with offices at 3001 Aloma Avenue, Winter Park, Florida 32792 (*"USA"*), **COINMASTER GAMING, PLC**, whose registered office is at One Bridewell Street, Bristol, BS1 2AA (*"PLC"*), **COINMASTER GAMING PRODUCTS LIMITED**, whose registered office is at One Bridewell Street, Bristol, BS1 2AA (*"LTD"*), **IAN BEST**, of Messrs. Ernst and Young of One Bridewell Street, Bristol, BS1 2AA (*"Receiver"*) and **DANIEL ANTHONY LYNCH**, of 75 Croeso Villas, Calle Pablo Sarasate, Verdemar II, Villamartin, Orihuela Costa, Costa Blanca, Spain 03189 (*"Lynch"*).

### Background

A.    PLC and LTD are both in administrative receivership.

B.    Receiver serves, without personal liability, as receiver to PLC and LTD.

C.    USA, PLC, LTD, Receiver, Tri-County Entertainment Inc., Paul A. Cox and Bradley Hutcheon are contemporaneously entering into a Master Settlement Agreement dated as of the date hereof (*"Master Agreement"*) whereby the parties to the Master Agreement have agreed upon certain terms and conditions regarding, among other things:  (1) the payoff and satisfaction of the indebtedness owed by USA to LTD (such payoff and satisfaction in accordance with the Master Agreement is hereinafter referred to as the *"Debt Satisfaction"*), and (2) subsequent to the Debt Satisfaction, the repurchase by USA of an aggregate amount of 1,006 shares of its common stock from PLC and LTD in exchange for a payment from USA of Five Hundred Thousand US Dollars ($500,000) in accordance with the Master Agreement (the payment of such consideration to LTD for the common stock of USA in accordance with the Master Agreement is hereinafter referred to as the *"Stock Consideration Payment"*).

D.    Lynch and USA are parties to a letter agreement, dated November 15, 2002 by USA, and accepted November 17, 2002 by Lynch, regarding, among other things, the provision of Lynch's services to USA (the *"2002 Letter Agreement"*).

E.    Lynch and USA have agreed to cancel the 2002 Letter Agreement as set forth herein.

F.    Lynch and the other parties hereto now desire to enter into this Settlement Agreement to set forth their various understandings and agreements.

116112.01000/11312498v8

CM-BR 000404

B    95

## Agreement

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements hereinafter set forth, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    <u>Lynch Resignation</u>. Lynch hereby resigns, effective immediately, all direct and indirect positions and affiliations that he has or may be deemed to have with USA, including his positions as an officer and director of USA.

2.    <u>Mutual Releases</u>.  Lynch, on the one hand, and USA, PLC and LTD, on the other, hereby agree that immediately upon the Stock Consideration Payment, each of the releases set forth Sections 2.1 and 2.3 below shall become binding and in full force and effect, with no further action required by any of Lynch, USA, PLC or LTD; it being understood that the releases set forth in Sections 2.1 and 2.3 below shall have no force or effect until both the Debt Satisfaction and the Stock Consideration Payment shall have occurred.

2.1    <u>Release by Lynch</u>.  Lynch, for himself and on behalf of his estate, heirs, personal representatives, beneficiaries, agents, successors and assigns (collectively, the "*Lynch Parties*"), hereby releases, remises and forever discharges USA, PLC, LTD and Receiver, and their respective predecessors, successors and assigns, and the directors, officers, employees, agents and representatives of the foregoing (collectively, the "*USA Releasees*"), of and from any and all actions, causes of action, suits, claims, demands, accountings, covenants, contracts, agreements (including, but not limited to, the 2002 Letter Agreement), debts, liabilities and obligations of any nature, fixed or contingent, known or unknown, whether at law or in equity, by reason of any event, occurrence, circumstance or matter of any nature (collectively, the "*Claims*") which occurred or existed at any time on or before the effective date hereof, provided, however, that this release pursuant to this Section 2.1 shall not in any manner affect or release the obligations of USA, PLC or LTD, or their respective successors and assigns under this Settlement Agreement.

2.2    <u>Covenant by Lynch Not to File Claims</u>.  Lynch, on behalf of himself and the Lynch Parties, covenants and agrees to never pursue or file any Claims against any of the USA Releasees or allow any other party acting on his or any of the Lynch Parties' behalf to pursue or file any Claims against any of the USA Releasees based on any Claims that are released in Section 2.1.

2.3    <u>Release by USA, PLC and LTD</u>.  Each of USA, PLC and LTD, each for itself and on behalf of its respective successors and assigns (collectively, the "*USA Parties*"), hereby releases, remises and forever discharges Lynch and his estate, heirs, personal representatives, beneficiaries, agents, successors and assigns (collectively, the "*Lynch Releasees*"), of and from any and all Claims which occurred or existed at any time on or before the effective date hereof, provided, however, that this release pursuant to this Section 2.3 shall not in any manner affect or release the obligations of Lynch or his estate, heirs, personal representatives, beneficiaries, agents, successors and assigns:  (a) under this Settlement

1161 12.01000/11312498v8

CM-BR 000405

B   96

Agreement, or (b) under any other written agreement entered into in connection with this Settlement Agreement.

    2.4    <u>Covenant by USA, PLC and LTD Not to File Claims</u>. Each of USA, PLC and LTD, on its own behalf and on behalf of the USA Parties, covenants and agrees to never pursue or file any Claims against any of the Lynch Releasees or allow any other party acting on its or any of the USA Parties' behalf to pursue or file any Claims against any of the Lynch Releasees based on any Claims that are released in Section 2.3.

    3.    <u>Payment to Lynch Upon Execution of Settlement Agreement</u>. USA shall pay to Lynch Eight Thousand US Dollars ($8,000) (the "***Signing Payment***") on the date hereof immediately following the execution and delivery of this Settlement Agreement by all the parties hereto, which amount shall be in consideration for the covenants contained herein (including in Section 9) and in full satisfaction of all claims Lynch may have under the 2002 Letter Agreement or otherwise. Such payment shall be by check or wire transfer to an account specified by Lynch.

    4.    <u>Contingent Additional Consideration Payable to Lynch</u>. Ninety-one (91) days after to the date upon which both the Debt Satisfaction and the Stock Consideration Payment shall have occurred, USA shall pay to Lynch an amount calculated as follows: Two Hundred Fourteen Thousand US Dollars ($214,000), together with simple interest, at the rate of five percent (5%) per annum accruing from the date of this Settlement Agreement through but not including the payment date (collectively, the "***Additional Consideration***"); provided, however, that if such 91st day is not a business day on which banks in the State of Florida are open for business, then USA shall pay Lynch the Additional Consideration on the next succeeding business day, together with interest for the interim day or days. The parties hereto agree that if the Debt Satisfaction and the Stock Consideration Payment do not occur for any reason, then Lynch shall neither be paid, nor be entitled to payment of any portion of, the Additional Consideration.

    5.    <u>No Other Payments to Lynch</u>. Other than the Signing Payment, and if payable, the Additional Consideration, no other payments to Lynch (whether by USA, PLC, LTD, Receiver or otherwise) are provided for by this Settlement Agreement or any other agreement by or between any of the parties hereto.

    6.    <u>Security Interest in Operating Assets of USA for the Additional Consideration</u>. As security for the Additional Consideration, USA shall, upon the occurrence of the Stock Consideration Payment and promptly following written demand from Lynch, execute and deliver to Lynch a security agreement and authorize the filing of Uniform Commercial Code financing statements through which USA shall provide Lynch with a perfected first lien interest in the operating assets of USA. Lynch agrees that he shall be an unsecured contingent creditor of USA at all times prior to the date the Stock Consideration Payment occurs and agrees not to take any contrary position relative to USA and its assets.

    7.    <u>Acknowledgement of The Bank of Scotland's Security Interest</u>. Lynch hereby acknowledges, agrees and confirms that The Bank of Scotland has a continuing first lien security interest in the assets of USA, and that such security interest shall continue in full force and effect until the Stock Consideration Payment occurs. Lynch hereby agrees not to seek to encumber,

acquire, lien or impair in any manner any assets of USA until after the Stock Consideration Payment shall have occurred, and agrees that all claims he may have against USA shall be junior to and subordinated to, the senior and prior rights of The Bank of Scotland.

8.    **Acknowledgement of LTD's Security Interest.**  Lynch hereby acknowledges, agrees and confirms that LTD has a continuing second lien security interest in the assets of USA, and that such security interest shall continue in full force and effect until the Stock Consideration Payment occurs.  Lynch hereby agrees not to seek to encumber, acquire, lien or impair in any manner any assets of USA until after the Stock Consideration Payment shall have occurred, and agrees that all claims he may have against USA shall be junior to and subordinated to, the senior and prior rights of LTD.

9.    **Restrictive Covenants.**

9.1    Lynch hereby covenants and agrees that, he shall not, from the date hereof and continuing for a period of two (2) consecutive years hereafter, directly or indirectly, compete with USA in any area of the continental United States that is west of the Mississippi river.

9.2    Lynch acknowledges and agrees that in the event of his breach of any of his obligations under this Section 9, he shall forfeit any entitlement to the payment by USA of the Additional Consideration, and to the extent the Additional Consideration shall have already been paid to Lynch, Lynch hereby covenants and agrees to return all of the Additional Consideration to USA.  In addition, Lynch acknowledges and agrees that the remedy at law available to USA, PLC, LTD and Receiver for breach of any of his obligations under this Section 9 would be inadequate, and that damages flowing from such a breach may not readily be susceptible to being measured in monetary terms.  Accordingly, Lynch acknowledges, consents and agrees that, in addition to any other rights or remedies which USA, PLC, LTD and/or Receiver may have at law, in equity or under this Settlement Agreement, USA, PLC, LTD and/or Receiver shall be entitled to (i) immediate injunctive relief and may obtain a temporary order restraining any threatened or further breach, without the necessity of proof of actual damage or the posting of any bond; and (ii) indemnification and reimbursement by Lynch of such parties' attorneys' fees and costs in connection with enforcing such parties' rights in connection with or relating to a breach by Lynch of his obligations under this Section 9.

9.3    Lynch acknowledges and agrees that the covenants set forth in this Section 9 are reasonable and valid in geographical and temporal scope and in all other respects.  If any of such covenants or such other provisions of this Agreement are found to be invalid or unenforceable by a final determination of a court of competent jurisdiction (i) the remaining terms and provisions hereof shall be unimpaired and (ii) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

9.4    Lynch understands that the provisions of this Section 9 may limit his ability to earn a livelihood in a business similar to the business of USA but he nevertheless agrees and hereby acknowledges that (i) such provisions do not impose a greater restraint than is necessary to protect the goodwill or other business interests of USA, (ii) such provisions contain reasonable limitations as to time and scope of activity to be restrained, (iii) such provisions are

not harmful to the general public, (iv) such provisions are not unduly burdensome to Lynch, and (v) the consideration provided hereunder is sufficient to compensate Lynch for the restrictions contained in this Section 9. In consideration of the foregoing and in light of Lynch's education, skills and abilities and his ability to earn a livelihood notwithstanding the provisions of this Section 9, Lynch agrees that he shall not assert that, and it should not be considered that, any provisions of this Section 9 otherwise are void, voidable or unenforceable or should be voided or held unenforceable.

10.    <u>Receiver Acts Without Personal Liability</u>. The Receiver has entered into this Settlement Agreement for or on behalf of PLC and LTD, and neither the Receiver nor his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever in respect of any agreement made or obligation undertaken by PLC, LTD or any other party to this Settlement Agreement or any other supporting documentation or in respect of any failure on the part of PLC, LTD or any other party hereto to observe, perform or comply with any such agreements or obligations or under or in relation to any associated arrangements or negotiations or under any assurance made pursuant to this Settlement Agreement. The Receiver is a party to this Settlement Agreement in his personal capacity solely for the purposes of receiving the benefits of (i) this Section and (ii) the exclusions, limitations, undertakings, covenants and indemnities in his favor contained in this Settlement Agreement.

11.    <u>Binding Nature.</u> Each of the parties represents and warrants to each other party that (a) he or it has the absolute and unrestricted right, power, authority and capacity to enter into, execute, deliver and perform all of his or its obligations under this Settlement Agreement, and (b) this Settlement Agreement has been duly and validly executed by each party and constitutes a valid and binding obligation of each party, enforceable against each party in accordance with its terms.

12.    <u>Counterparts; Facsimile Signatures</u>. This Settlement Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. For purposes of this Settlement Agreement, a facsimile of an executed counterpart shall constitute an original.

13.    <u>Amendments</u>. No modification, amendment or termination of this Settlement Agreement, or waiver of any of its provisions, shall be valid or enforceable between the parties unless in writing and signed by all the parties hereto.

14.    <u>Severability</u>. If any term or provision of this Settlement Agreement or the application thereof to the parties or any other person shall, to any extent, be invalid or unenforceable, the remainder of this Settlement Agreement, or the application of such term or provision to the parties or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Settlement Agreement shall be valid and be enforced to the fullest extent permitted by law.

15.    <u>Governing Law; Jurisdiction</u>. This Settlement Agreement, and all matters relating to or arising in connection with this Settlement Agreement and with respect to the subject matter of this Settlement Agreement, shall be governed by and construed in accordance with the laws of

CM-BR 000408

B    99

the State of Delaware, without regard to conflicts or choice of law principles. The parties hereto irrevocably consent to the jurisdiction of the state and federal courts located in the State of Delaware in any and all actions and proceedings whether arising hereunder or under any other agreement or undertaking.

16.    Binding Effect: Neutral Construction. This Settlement Agreement shall be binding upon the parties, and their legal representatives, heirs, successors and assigns. The parties have negotiated this Settlement Agreement and all of the terms and conditions contained in this Settlement Agreement in good faith and at arms' length, and each party has been represented by counsel during such negotiations. No term, condition, or provision contained in this Settlement Agreement shall be construed against any party or in favor of any party (i) because such party or such party's counsel drafted, revised, commented upon, or did not comment upon, such term, condition, or provision, or (ii) because of any presumption as to any inequality of bargaining power between or among the parties. Furthermore, all terms, conditions, and provisions contained in this Settlement Agreement shall be construed and interpreted in a manner which is consistent with all other terms, conditions, and provisions contained in this Settlement Agreement.

17.    Entire Agreement. This Settlement Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and thereof and supersedes all earlier and contemporaneous oral and written communication and agreements with respect to the same subject matter.

*{Signature Page Follows}*

116112.01000/11312498v8

CM-BR 000409

B 100

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned have executed this Settlement Agreement as of the day and year first above written.

COINMASTER USA INC.

By:_____
     Name:
     Title:

_____
**DANIEL ANTHONY LYNCH**

Signed by the Receiver for and on behalf of COINMASTER GAMING, PLC without personal liability

_____
**IAN BEST**

Signed by the Receiver for and on behalf of COINMASTER GAMING PRODUCTS LIMITED without personal liability

_____
**IAN BEST**

Signed by the Receiver for and on behalf of the Receiver without personal liability and solely to obtain the benefits running to the Receiver under the Settlement Agreement.

_____
**IAN BEST**

*{Signature Page to Settlement Agreement}*

116112.01000/11312498v8

CM-BR 000410

B 101

D-15

33

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| From: | "tony lynch" <tony.lynch@hvillas.e.telefonica.net> |
| To: | <Paulcoxflorida@mindspring.com> |
| Sent: | Thursday, July 01, 2004 1:46 PM |
| Subject: | Re: Settlement |

Hi Paul,
    I am surprised at your outburst regarding the letter from my lawyer, you are being requested to supply information that should be available to me by right.
It is up to you if you wish to withdraw the offer made, I have not declined it.

Regarding your withdrawal of all support, again this is your decision.

High View Inc.
        As you have stated you are unable to fund further development cost, and I have made an offer to you that I thought you have had time to reply to by now.
Please bear in mind that the intellectual property design rights in this game are mine, I estimate the value of this to be $400,000 that is owed to me.
With the deal that I finance the balance of the R&D and be assigned 70% of the total stock that 30% could be exchanged after the Receiver is satisfied for 33.3% of Coinmaster stock a balanced position.

Please give this some thought.

Regards

Tony Lynch


—— Original Message ——
From: Paulcoxflorida@mindspring.com
To: tony highview
Sent: Thursday, July 01, 2004 3:45 PM
Subject: Settlement

Hi Tony.

I've just had a letter from your attorney implying that you are trying to renegotiate the settlement agreement between yourself and Coinmaster USA Inc, rather than just mute the "legalese". This was not my understanding of what you were trying to do.

I hope this is a mistake on his part!

In the meantime, until this matter is resolved all co-operation between Coinmaster USA Inc and yourself, will cease. The SAS tools will not be provided to Mike, and no other activity will take place.

Should progress not be made rapidly in this matter, the settlement offer will be withdrawn, and the matter can be settled in the Delaware courts.

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.


6/1/2006

CM-BR 000099

B 102

D-75

State of Delaware
Secretary of State
Division of Corporations
Delivered 08:30 AM 07/19/2004
FILED 08:30 AM 07/19/2004
SRV 040526339 - 3830354 FILE

# Certificate Of Incorporation
## Of
## AutoGaming Inc.

**First:**     The name of the Corporation is AutoGaming Inc..

**Second:**     The name and address of the registered agent is James Folsom, 1215 King Street, New Castle County, Wilmington, Delaware 19801.

**Third:**     The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

**Fourth:**     The total number of shares of stock which the Corporation shall have authority to issue is 1,500 shares of common stock with no par value.

**Fifth:**     The name and mailing address of the incorporator is James Folsom, 1215 King Street, New Castle County, Wilmington, Delaware 19801.

**Sixth:**     The period during which the Corporation shall be continued is perpetual.

**Seventh:**     The original By-Laws of the Corporation shall be adopted by the incorporator. Thereafter, the power to make, alter or repeal By-Laws shall be in the Directors of the Corporation.

**Eighth:**     Directors of the Corporation shall not be liable to either the Corporation or its stockholders for monetary damages for the breach of fiducial duties unless the breach is one which involve: (1) a director's duty of loyalty to the Corporation or its stockholders; (2) acts or omissions not in good faith or which involve intentional misconduct or knowing violation of law; (3) liability for unlawful payments of dividends or unlawful stock purchases or redemption by the Corporation; or (4) a transaction from which the director derived an improper personal benefit.

THE UNDERSIGNED, being the incorporator for the purpose of forming a corporation pursuant to Chapter 1, Title 8, of the Delaware Code entitled, "General Corporation Law" and files this Certificate of Incorporation, hereby declaring and certifying that said instrument is his act and deed and that the facts stated herein are true and according has set his hand and seal the 16th day of July, 2004.

_____                     _____
James Folsom, Incorporator                      Witness, Teresa Davenport

CM-BR 000318

B 103

b-79



**United Kingdom of Great Britain & Northern Ireland**
**City of Cardiff**

On the 8th day of June 2007 before me Fay Alberta Mortimer of 36 Church Road Whitchurch in the city of Cardiff, Wales, a duly authorised Notary Public , personally appeared Graham Leslie Litt identified to me as the holder of United Kingdom passport number 450010835 and the person whose name is subscribed to the attached document who acknowledged that he executed the same voluntarily and for the purposes therein contained.

IN WITNESS WHEREOF I have hereunto set my hand and official seal

Fay Alberta Mortimer
Notary Public
Cardiff
UK
My Commission expires on death



Graham Leslie Litt ACMA
2 Exford Grove
Gilwern
Abergavenny
Monmouthshire
NP7 0RW
4th. June 2007.

<u>TO WHOM IT MAY CONCERN</u>

<u>Re:- Coinmaster Gaming Plc & Coinmaster Gaming Products Ltd</u>

I, Graham L. Litt am a qualified Chartered Management Accountant and was the Company Secretary from 1st. November 2000 until I resigned on 27th. December 2006.

On the 25th February 2003 myself and the Board of Directors of Coinmaster Gaming Products Ltd. & Coinmaster Gaming Plc were suspended by Bank of Scotland's Administrative Receiver acting on the bank's legal charge. The Receiver (Ernst & Young of 1 Colmore Square, Birmingham England) officially took up their appointment on 3rd. March 2003 and relinquished their position on 20th. November 2006.

    During the Receiver's period in charge of Coinmaster Gaming Plc & Coinmaster Gaming Products, the appointed Board of Directors and The Company Secretary were suspended and not allowed to conduct any business pertaining to these two companies.

    I accepted the resignation of Mr. D.A. Tony Lynch as a Director of both companies on 27th. December 2006. As in accordance with the UK Companies Act this resignation was sent to Companies House within the statutory fourteen days and recorded in their records.

Any Director resigning from a Company requires the resignation form from Companies House (288b) to be completed by the resigning Director and must be signed by The Company Secretary or a Board Director and returned to Companies House within 14 days of the resignation date.

    Any resignation from a Director to the Board of Coinmaster would need to be presented to the Board by myself as Company Secretary, after this I would register the resignation with Companies House in Cardiff.

Neither I nor the Board that disbanded on 25th. February 2003 and have not reconvened since, have had sight of any other resignation document from Mr. Lynch other than the resignation on 27th. December 2006.

Yours faithfully,

Graham Leslie Litt CMA



Signed in my presence
8TH June 2007

Notary Public
Bristol UK

B1105

284

Graham Leslie Litt ACMA
2 Exford Grove
Gilwern
Abergavenny
Monmouthshire
NP7 0RW
4th. June 2007.

<u>TO WHOM IT MAY CONCERN</u>

<u>Re:- Coinmaster Gaming Plc & Coinmaster Gaming Products Ltd</u>

I, Graham L. Litt am a qualified Chartered Management Accountant and was the Company Secretary from 1st. November 2000 until I resigned on 27th. December 2006.

On the 25th February 2003 myself and the Board of Directors of Coinmaster Gaming Products Ltd. & Coinmaster Gaming Plc were suspended by Bank of Scotland's Administrative Receiver acting on the bank's legal charge. The Receiver (Ernst & Young of 1 Colmore Square, Birmingham England) officially took up their appointment on 3rd. March 2003 and relinquished their position on 20th. November 2006.

During the Receiver's period in charge of Coinmaster Gaming Plc & Coinmaster Gaming Products, the appointed Board of Directors and The Company Secretary were suspended and not allowed to conduct any business pertaining to these two companies.

I accepted the resignation of Mr. D.A. Tony Lynch as a Director of both companies on 27th. December 2006. As in accordance with the UK Companies Act this resignation was sent to Companies House within the statutory fourteen days and recorded in their records.

Any Director resigning from a Company requires the resignation form from Companies House (288b) to be completed by the resigning Director and must be signed by The Company Secretary or a Board Director and returned to Companies House within 14 days of the resignation date.

Any resignation from a Director to the Board of Coinmaster would need to be presented to the Board by myself as Company Secretary, after this I would register the resignation with Companies House in Cardiff.

Neither I nor the Board that disbanded on 25th. February 2003 and have not reconvened since, have had sight of any other resignation document from Mr. Lynch other than the resignation on 27th. December 2006.

Yours faithfully,

Graham Leslie Litt CMA

Signed in my presence
8TH June 2007

Notary Public
Br63ll. UK



254

PAUL A. COX                    4

1      A    Yes.

2      Q    At that time, were there only two members of the

3   board of directors?

4      A    Yes.

5      Q    At some point in 2002 and 2003, Tony Lynch was a

6   director of the board of Coinmaster USA, right?

7      A    Correct.

8      Q    When did Mr. Lynch's tenure as a director of

9   Coinmaster end?

10     A    I have no idea.

11     Q    You're a director of Coinmaster, right?

12     A    Correct.

13     Q    You're also an officer of Coinmaster?

14     A    Correct.

15     Q    In 2003, were you the only officer of Coinmaster?

16     A    No.  When you say officer, no.

17     Q    I'm distinguishing between being a director simply

18   and then an official such as the president or CEO,

19   secretary, et cetera.

20     A    Okay.  There is still a secretary, of course.

21     Q    Who is the secretary?

22     A    But she isn't on the board.

23     Q    Who is the secretary?

24     A    My wife, Mary.

PAUL A. COX                    7

1    Q    In that case, is Mary Cox present in some way?

2    A    Yes.  She is beside me.

3    Q    If you're on the computer?

4    A    Yes.

5    Q    She is beside you?

6    A    Or on the phone.

7    Q    Do you believe Tony Lynch is correctly a director of

8    Coinmaster USA?

9    A    No.

10   Q    When did he cease being a director?

11   A    You tell me.

12   Q    You are the president and CEO and a director?

13   A    Absolutely.

14   Q    With the exception of Mr. Lynch, would anyone have

15   more knowledge of his departure as a director of Coinmaster

16   USA than you?

17   A    Possibly the attorney sitting to my left.

18   Q    Mr. Lynch was the chairman of the board of

19   Coinmaster, correct?

20   A    Coinmaster?  Which one?

21   Q    Coinmaster USA.

22        MR. SCHERZER:  Would you like to continue to

23   refer to Coinmaster USA as Coinmaster?  If you do, it's

24   okay.  We just need to know the terms of art.

PAUL A. COX                    8

1    BY MR. GUERKE:

2        Q    I'm referring to Coinmaster USA unless I say

3    Coinmaster UK.  You understand?

4        A    Okay.

5        Q    My question is, from the beginning of Coinmaster

6    USA, Tony Lynch was the chairman of the board of directors?

7        A    No.

8        Q    Shortly after it was formed, Mr. Lynch became the

9    chairman of the board of directors, is that right?

10       A    No.

11       Q    Was he ever the chairman of the board of directors?

12       A    Yes.

13       Q    When did Mr. Lynch become the chairman of the board

14   of directors of Coinmaster?

15       A    November 2001.

16       Q    Chairman of the board in November of 2001?

17       A    Correct.

18       Q    How long was he the chairman of the board of

19   directors?

20       A    I have no idea.

21       Q    How many board meetings, board of director meetings,

22   did Coinmaster hold in 2003?

23       A    I have no idea.

24       Q    Was there --

PAUL A. COX                12

1       Q    As of that date, January 20th, 2004, you believe

2   that Mr. Lynch was the chairman of the board of directors of

3   Coinmaster USA, is that right?

4       A    As of that date, I didn't know whether he was or

5   not.

6       Q    Why would you then fill this out with him listed as

7   a director and identify him as the chairman?

8       A    Because it was the best option.

9       Q    In what way?  Explain that to me.

10      A    Because I didn't know whether he was a director or

11  not.  There was conflicting information.  I had to fill in a

12  return.  It was safest to fill it in this way.

13      Q    If you flip two pages.  The next report that's

14  signed by you dated January 6, 2005.  Do you see that?

15      A    Yes.

16      Q    Here the directors are listed as Paul Cox and

17  Bradley Hutcheon?

18      A    Yes.

19      Q    Mr. Lynch is not listed?

20      A    Correct.

21      Q    Why is Mr. Lynch not listed as a member of the board

22  of directors or as the chairman of the board of directors?

23      A    Because he clearly wasn't a director at that time.

24      Q    Didn't you testify earlier that you didn't know

PAUL A. COX                    13

1    whether he was a director or not?

2        A    No.   But I know at that time, he wasn't a director.

3    You were asking me an earlier period.

4        Q    So as of January 6, 2005, Tony Lynch was no longer a

5    director of Coinmaster USA?

6        A    Correct.

7        Q    What happened between the last report, January 20th,

8    2004, and January 6, 2005, that caused Mr. Lynch to no

9    longer be a member of the board of directors?

10       A    He didn't sign on for the deal with the Bank of

11   Scotland and he decided to pursue his own line of action.

12       Q    What actions were taken to remove him from the board

13   between January 20th, 2004, and January 6, 2005?

14       A    None.

15       Q    No action?

16       A    No.

17       Q    You didn't take any action to remove Mr. Lynch from

18   the board?

19       A    No.   That begs the question of whether he was a

20   director in the earlier years.

21       Q    Did the Bank of Scotland, as the receiver for

22   Coinmaster UK, take any action to remove Mr. Lynch?

23       A    You'll have to ask them.

24       Q    Wouldn't you know?  You were the other director and

PAUL A. COX                16

1    reporter.)

2              THE WITNESS:  The stockholders had the power to

3    remove him as a director.  It's a moot point whether he is

4    chairman if he is removed as a director.  Because he is not

5    available to be elected as chairman by the directors.

6    BY MR. GUERKE:

7        Q    When Coinmaster was formed, Coinmaster USA, who was

8    the majority shareholder?

9        A    Coinmaster Gaming, Ltd.  I always get confused

10   between Coinmaster Gaming, Ltd., and Coinmaster Gaming

11   Machines, Ltd.

12       Q    So do I.

13       A    I think it was Games, Ltd.  It may have been

14   Machines, Ltd.  Whichever one existed at the time was the

15   90 percent stockholder.

16       Q    And that is the company that went into receivership?

17       A    That is one of -- no.  It's the other one.  Well,

18   that became something else.  It either became Coinmaster

19   Gaming, Ltd., or Coinmaster Gaming Machines, Ltd.  And they

20   both became a subsidiary of Coinmaster Gaming, PLC.  And the

21   two remaining companies went into receivership.

22       Q    When I refer to Coinmaster UK, do you understand

23   that I am referring to the majority shareholder of

24   Coinmaster USA?

PAUL A. COX                    19

1      Q    Why was the term expenses used in this contract

2   versus say salary or monthly stipend or something like that?

3      A    Because it was meant to be expenses for travel,

4   moving to the U.S.  Whatever.  You've got to remember

5   Mr. Lynch was a salaried employee of Coinmaster UK,

6   whichever one existed at the time.  So expenses is what was

7   agreed upon.

8      Q    And the $8,000 per month would cover whatever

9   expenses Mr. Lynch incurred in his role as the chairman of

10  Coinmaster USA; is that accurate?

11     A    Yes.  But, of course, subject to providing whatever

12  documentation is required.  I think that's in here

13  somewhere.

14     Q    Is there anything in this document, any term in this

15  contract, that requires Mr. Lynch to submit any expense

16  documentation to you?

17     A    Not on a regular basis, no.

18     Q    When was the first $8,000 payment made to Mr. Lynch

19  under this contract?

20     A    I would have to look at the accountants to see that.

21  I think Tony testified yesterday that it was March 2003.  It

22  may have been.  It may have been February.  It may have been

23  April.  I don't think it was until then.

24     Q    Why wasn't he paid in December of 2002?

B 112

1    A    Because you would have to know the purpose of the

2    contract.

3    Q    Could you explain to me the purpose of the contract?

4    A    The contract was a -- an attempt to keep control of

5    Coinmaster USA.  Whatever happened to Coinmaster UK, it was

6    not per se a contract of employment.  Although it's written

7    as one.

8    Q    According to the paragraph numbered three, it states

9    that you will be entitled to an annual bonus of five percent

10   of the company's net profit each year; is that accurate?

11   A    That is what it states.

12   Q    Do you know whether Mr. Lynch was ever paid an

13   annual bonus from Coinmaster USA at any time?

14   A    No, he wasn't.

15   Q    Were you ever paid an annual bonus from Coinmaster

16   USA at any time?

17   A    Yes.

18   Q    Would you tell me in what years you were paid that

19   annual bonus?

20   A    Again, I would have to refer to the accountant.

21   From memory, 2005, 2006, 2007.

22   Q    Is that bonus based on the company's net profit?

23   A    Yes.

24   Q    In 2005, then, Coinmaster USA made a net profit?

PAUL A. COX                    22

1      identification.)

2      BY MR. GUERKE:

3      Q    Would you identify this document, please?

4      A    It seems to be an e-mail from me to Tony on

5      March 19th, 2003.

6      Q    This is an e-mail from you, correct?

7      A    Correct.

8      Q    To Mr. Lynch?

9      A    Yes.

10      Q    In the first paragraph, it states, I'm banking your

11      $8,000 -- I'm sorry, your $8K this morning.  Is that

12      accurate?

13      A    Yes.

14      Q    Did you, in fact, deposit $8,000 into Mr. Lynch's

15      account?

16      A    I don't know.  I would have to look up the records.

17      If I said I did, my guess would be I did.  Otherwise, he

18      would have told me I didn't.

19      Q    Sitting here today, do you have any reason to

20      believe that on or about March 19th, that you did not

21      deposit $8,000 into his account?

22      A    No.

23      Q    What was that $8,000 for?

24      A    Expenses as agreed.

PAUL A. COX                    23

1    Q    Under his Coinmaster USA contract?

2    A    Correct.

3    Q    As of March 19, 2003, had you requested any expense

4    documents from Mr. Lynch?

5    A    No.

6    Q    If you go down to almost the end, it says,

7    requesting documents.  One of the documents you are

8    requesting is a copy of your UK contract.  Do you see that?

9    A    Yes.

10    Q    Did Mr. Lynch send you a copy of his UK contract?

11    A    I don't think so.  This wasn't the first request.

12    Q    When was the first request?

13    A    November of 2002.

14    Q    Did he send you a copy in November of 2002?

15    A    No.

16    Q    When did you first receive a copy of Mr. Lynch's CM

17    UK contract?

18    A    As far as I am aware, the first copy I received was

19    from the UK receiver at that time.  Sometime in August.  It

20    might have been the 17th, 18th, 19th of August, 2003.

21    Q    This March 19th e-mail.  Do you know whether this

22    was the first $8,000 payment you made?

23    A    I do not.  I would have to look back at the banking

24    records of the corporation.

PAUL A. COX                    24

1    Q    Have you produced the banking records of the
2    corporation?
3    A    What do you mean produced them?
4    Q    Have you provided banking records --
5    A    You haven't asked for them, I don't think.  What do
6    you want, the receipts?  Physical receipts?
7    Q    What banking records would you require to know for
8    sure whether you made this $8,000 payment that we are
9    discussing?
10    A    A printout from my computer showing whether I did or
11    not.
12    Q    Do you know whether you have provided that printout
13    or a similar printout in this litigation?
14    A    I don't believe I have been asked for it.
15    Q    Is that a no, you don't believe that you have
16    provided that document?
17    A    No, I don't believe I have provided that document.
18    Q    But it does exist?
19    A    Oh, yeah.  For sure.
20             MR. GUERKE:  Would you mark this, please?
21             (Cox Deposition Exhibit No. 4 was marked for
22    identification.)
23    BY MR. GUERKE:
24    Q    Can you identify this document, please?

PAUL A. COX                    25

1      A    Another e-mail from myself to Tony dated May 28th,

2    2003.

3      Q    In this document, you stated, hi, Tony.  I paid

4    $8,000 into your U.S. account today.

5      A    Correct.

6      Q    Do you have any reason to believe that you did not

7    make that $8,000 payment?

8      A    No.

9      Q    Do you know if in April 2003 an $8,000 payment was

10   made to Mr. Lynch?

11     A    No, I don't know.

12     Q    But your records would reveal that?

13     A    Absolutely.

14     Q    Do you have any reason to believe that you didn't

15   make that payment in April of 2003?

16     A    I have no way of knowing either way without

17   referring to that document.

18     Q    As of this date, May 28th, 2003, had you requested

19   any expense documents from Mr. Lynch?

20     A    No.

21              MR. GUERKE:  Would you mark that, please?

22              (Cox Deposition Exhibit No. 5 was marked for

23   identification.)

24   BY MR. GUERKE:

PAUL A. COX                26

1    Q    Would you identify this document, please?

2    A    It's another e-mail from myself to Tony Lynch dated

3    June 23rd, 2003.

4    Q    Paragraph numbered one, it says, I have today placed

5    June's payment of $8,000 into your bank account, is that

6    right?

7    A    That's what it says.

8    Q    Do you have any reason to believe that you did not

9    make that $8,000 payment?

10   A    No.

11   Q    And you have records that would show you

12   definitively one way or the other whether that payment was

13   made, correct?

14   A    Yes.

15   Q    As of June 23rd, 2003, did you make any requests on

16   Mr. Lynch for any expense documents?

17   A    No.

18   Q    Did you ever make any requests to Mr. Lynch for

19   expense documents through 2004?

20   A    When you say through 2004, do you mean the beginning

21   of 2004 or the end of 2004?

22   Q    December 31, 2004.

23   A    I wouldn't have had any reason to ask him for the

24   documents for 2004 because the payments stopped from -- this

PAUL A. COX                    27

1      is from memory.  Again, I'd have to consult the same kind of

2      document stream.  The payments stopped sometime in 2003.

3         Q    As of the date the last $8,000 payment was made to

4      Mr. Lynch under his Coinmaster USA contract?

5         A    Um-hmm.

6         Q    Had you requested any expenses, receipts or expense

7      documents from Mr. Lynch?

8         A    No.

9                    MR. GUERKE:  Would you mark this, please?

10                   (Cox Deposition Exhibit No. 6 was marked for

11     identification.)

12     BY MR. GUERKE:

13        Q    Would you identify this document, please?

14        A    It's an e-mail from myself to Tony Lynch dated

15     September 25th, 2003.

16        Q    And this e-mail states in the beginning, where shall

17     I send your payment this month.

18                   Is that referring to the $8,000 payment under

19     his contract?

20        A    I would infer that.

21        Q    Do you believe that you made a September 2003

22     payment to Mr. Lynch?

23        A    I probably did.  I would have to refer to them.

24        Q    The expense report?

PAUL A. COX                    28

```
 1      A    Um-hmm.  Whatever.

 2      Q    Or whatever your log is.

 3                 Did you pay Mr. Lynch the $8,000 contract sum

 4      in October of 2003?

 5      A    I don't know.  I would have to look at the same log.

 6      Q    Do you know when your last payment to Mr. Lynch --

 7      A    I would have to look at the same payment.  Sorry.

 8      Have you finished the question?

 9      Q    Do you have any reason to believe that you made any

10      $8,000 payments to Mr. Lynch in 2004?

11      A    I do not believe I did.

12      Q    According to the contract, in 2004, his payment

13      would increase from 8,000 to 12,000, is that right?

14      A    I can look back at the contract?

15      Q    Sure.  It's in your pile there.

16      A    That's what the contract says.

17      Q    As far as you know, did Coinmaster USA ever make a

18      $12,000 payment to Mr. Lynch?

19      A    No.

20      Q    Any payments that were made from Coinmaster USA to

21      Mr. Lynch were for the sum of $8,000 even, correct?

22      A    Correct.

23      Q    For his Coinmaster USA contract?

24      A    Yes.  For the expenses contained therein.
```

PAUL A. COX                    29

1      Q    If Mr. Lynch did not incur any expenses in let's say

2    June of 2003, he was still paid the $8,000 payment, right?

3      A    His contract entitled him to $8,000 in expenses.  He

4    wasn't required to supply vouchers to me on a routine basis.

5    I don't know whether he spent the eight thousand on expenses

6    or not.  That would have been between him and the IRS in

7    terms of audit.

8      Q    Was this contract set up as an expense payment for

9    tax purposes?

10     A    No.  It was set up to cover expenses.

11     Q    You never requested any expenses in 2003, right?

12     A    You mean I didn't request any expense receipts?

13     Q    Correct.

14     A    The contract didn't require me to do that.

15     Q    It didn't require Mr. Lynch to submit them, correct?

16     A    Exactly.

17     Q    In May or June of 2003, if you knew that Mr. Lynch

18   had not incurred expenses as part of his role with

19   Coinmaster USA, you would have still made that $8,000

20   payment to him according to his contract, right?

21              MR. SCHERZER:  Objection to the form of the

22   question.  There is nothing in the record to indicate those

23   facts at all.

24              THE WITNESS:  I wouldn't have known whether he

PAUL A. COX                30

1    spent eight thousand or not.  He may have spent 12 thousand

2    in January and four thousand in June.  There was nothing

3    that told me what he had spent.  The agreement was eight

4    thousand a month because he thought that would cover his

5    expenses flying backwards and forwards, hotels.  You name

6    it.  He didn't see why the UK company should incur that.

7    BY MR. GUERKE:

8        Q    Who drafted his Coinmaster USA contract?

9        A    I did under his direction.  He filled in the number.

10       Q    So everything that doesn't have a number is the part

11   that you drafted, Tony was responsible for the numbers?

12       A    Exactly.  But he may have altered the drafting.  You

13   know, I didn't keep the original drafts.  Who knew I was

14   going to need them four or five years later?

15       Q    The terms of the Coinmaster USA contract that are

16   numbered one through seven --

17       A    Sorry.  Are we going back to that?

18       Q    Yes.  Please.  Exhibit 2.

19            MR. SCHERZER:  Cox 2.

20   BY MR. GUERKE:

21       Q    It's your testimony that those are the terms that

22   you drafted, correct?

23       A    With whatever amendment Tony Lynch put in.

24       Q    Let's talk about paragraph number one.  It says,

1    this agreement will be perpetual in nature.  In recognition

2    of the value of your investments to the business.

3              That is a provision that you drafted, correct?

4    A    I don't know that I did.

5    Q    Paragraph three.  The first phrase says, you will be

6    entitled to an annual bonus of five percent of the company's

7    net profit each year.

8              Is that a provision that you drafted?

9    A    I think I drafted the paragraph.  I don't know that

10   I put the five percent in.

11   Q    Paragraph six states, in the first part before the

12   numbers, in the event that Coinmaster USA, Inc., decides to

13   terminate this relationship for any reason or to change your

14   position in the organization at any time, compensation for

15   this loss to be paid to yourself will be -- and then it

16   lists some figures there.

17             Is that phrase that I just read to you part of

18   the contract that you drafted?

19   A    Yes.  Subject to whatever alteration Mrs. Lynch

20   made.

21   Q    Is it your contention that this contract, when it

22   was signed, was invalid?

23   A    The contract was meant to be a contract that would

24   allow Tony to negotiate with financiers for financing from a

PAUL A. COX                    32

1    position of some strength.

2              MR. GUERKE:  Would you repeat my earlier

3    question, please?

4              (The question referred to was read back by the

5    reporter.)

6    BY MR. GUERKE:

7    Q    Is it your contention today that when this contract

8    was signed and drafted, that it was somehow invalid?

9    A    I got to do a Bill Clinton here.  It depends what

10   you mean by the word invalid.  It had a purpose.

11   Q    Was it legally enforceable --

12   A    You're the attorney.

13   Q    When it was signed?

14   A    I don't know.  You're the attorney.  You tell me.

15   Q    Do you have any reason to believe that it wasn't?

16   A    I don't know.  It never went before an attorney for

17   judgment.  We are done with that one?

18   Q    For now, yes.  I'm sorry.  We are not done.

19              When was this contract signed by you?

20   A    I would guess it was November 15th, 2002.

21   Q    When was it signed by Mr. Lynch?

22   A    November 17th, '02.  Looking at this document.  I

23   have no reason to know any other dates.

24   Q    How was it signed?  Were you two together?

PAUL A. COX                    33

1    A    No.

2    Q    The dates are different.  So you weren't together.

3    A    No.

4    Q    How was this document executed?

5    A    My guess is -- am I allowed to guess?  I believe it

6    was sent to him by some form of express mail.  I don't know.

7    Q    And then he signed it and mailed it back to you?

8    A    Yes.

9    Q    What did you do with it after you received it?

10   A    Put it in a file.

11   Q    Where is that file located?

12   A    3001 Aloma Avenue, Winter Park, Florida 32792.

13   Q    So is it fair to say that, by the end of

14   November 2002, you had a fully executed copy of this in your

15   records?

16   A    Yes.  As far as I'm aware.

17   Q    You also had a service agreement with Coinmaster

18   USA, is that right?

19   A    Yes.

20            MR. GUERKE:  Would you mark this, please?

21            (Cox Deposition Exhibit No. 7 was marked for

22   identification.)

23   BY MR. GUERKE:

24   Q    Would you identify the document I just put before

PAUL A. COX                    37

1           THE WITNESS:  Well, I can't see how anybody

2    else could have told me that.  No is the answer.  No.

3    Strike my earlier answer.

4    BY MR. GUERKE:

5        Q    Did Mr. Lynch ever offer his resignation to

6    Coinmaster USA?

7        A    Inc., no.

8        Q    Did Mr. Lynch ever offer his resignation to you as

9    an officer --

10       A    Sorry.  I need to go back and qualify that answer.

11       Q    Okay.

12       A    There was negotiation towards the end of 2003, which

13   would have led to Mr. Lynch leaving Coinmaster USA.  It's a

14   moot point, or maybe not, as to whether he was a director at

15   that time.

16       Q    Why is it a moot point?

17       A    Because I didn't know.

18       Q    What didn't you know?

19       A    I didn't know whether he was a director at that

20   time.

21       Q    At that time, you were operating as if he was a

22   director, though?

23       A    Correct.

24       Q    As you're sitting here today, who would have made

PAUL A. COX                    39

1       Q     In 2003, who was your counsel that you're referring

2    to?

3       A     Members of Cooper Levenson and members -- not my

4    counsel but Coinmaster UK's counsel were Blank Rome.

5       Q     And what was the conflict?

6             MR. SCHERZER:  Objection to the form.  I'm

7    certainly not going to permit you to go down the road of

8    inquiring as to what counsel told him on any advice.  So to

9    the extent that he received counsel from my law firm as

10   attorneys for Paul Cox, that's sacrosanct.

11            MR. GUERKE:  I don't think you're right.

12            MR. SCHERZER:  You don't think I'm right?  You

13   don't think that the advice my law firm gives him as his

14   counsel is protected by the privilege?

15            MR. GUERKE:  I think that that privilege in

16   specific circumstances has been waived in this case.

17            MR. SCHERZER:  Wow.  No.  No, thank you.

18            You're not to answer any question concerning

19   what information or opinions you got from my law firm or

20   counsel in this case.

21            Make a motion.

22   BY MR. GUERKE:

23      Q     Other than Cooper Levenson, did you have any other

24   counsel personally, Paul Cox or Coinmaster USA in 2003?

PAUL A. COX                    40

1      A     Not directly.

2      Q     So far as you are aware as an officer and director

3    of Coinmaster USA, Mr. Lynch never resigned from that

4    company, right?

5      A     I have to say to you he probably did or was removed

6    in March 2003.  But I didn't know it.

7      Q     What you're describing is actions in a situation

8    that occurred with his other company, Coinmaster UK,

9    correct?

10     A     The actions of the receiver on taking control of

11   those corporations, yes.

12     Q     When did the Coinmaster UK receiver come on the

13   scene?

14     A     So far as I was concerned, sometime around

15   March 3rd, 2003.

16     Q     Could you briefly explain what happened with

17   Coinmaster UK that caused the receiver to step in?

18     A     No.

19             MR. SCHERZER:  To the extent that you know.

20             THE WITNESS:  No.  I wasn't involved in

21   Coinmaster UK.

22   BY MR. GUERKE:

23     Q     When did you first learn that a Coinmaster UK

24   receiver would be put in place?

PAUL A. COX                    41

1    A    Sometime within a week of that date.

2    Q    Beginning of March 2003?

3    A    Probably in the latter half, the latter bit of

4    February.

5    Q    In 2003, was Mr. Lynch working for Coinmaster USA?

6    A    He was providing services to Coinmaster UK.  I'm

7    sorry, USA, yes.

8    Q    What services in 2003 was he providing?

9    A    He was giving technical assistance particularly.  It

10   was a difficult time when the machines largely didn't work.

11   I can't think of anything else because he was largely

12   absorbed with his own life, wives, homes, moving countries,

13   getting cars out of America.  The receiver.  Whatever.  I

14   don't know.

15   Q    In 2003, you were in either daily or weekly contact

16   with Mr. Lynch via e-mail, is that right?

17   A    Absolutely.

18   Q    And you were both working for Coinmaster USA's

19   interest at that point, 2003?

20   A    Absolutely.

21   Q    Did Mr. Lynch also provide services to Coinmaster

22   USA in 2004?

23   A    For some time, yes.  Not through the whole year.

24   Q    Did Mr. Lynch provide any services to Coinmaster USA

PAUL A. COX                    42

1     in 2005?

2        A     No.

3        Q     Who was Coinmaster USA's accountant in 2002?

4        A     What do you mean by accountant?

5        Q     Did Coinmaster USA have an accountant in 2002?

6        A     Do you mean the person who prepared the tax returns

7     or the person who kept the books?

8        Q     Was there a person that prepared the tax returns in

9     2006?

10       A     Yes.

11       Q     Who was that person?

12       A     It will come to me.  I may need to look it up.

13             I'll have to look it up.

14       Q     You mentioned a possible bookkeeper.  Was there

15    someone that kept the books for Coinmaster USA?

16       A     Yes.

17       Q     Who was that?

18       A     Me.

19       Q     Was it always you from the beginning until today?

20       A     Absolutely.

21       Q     There was no outside bookkeeper?

22       A     No.

23       Q     But there was an outside accountant that provided

24    accounting services?

PAUL A. COX                    43

1       A    Audit.   Whatever.

2       Q    Was it the same company from the beginning to today

3    for Coinmaster USA?

4       A    Yes.

5       Q    Did you or Coinmaster USA ever sign a

6    confidentiality agreement or non disclosure with the bank

7    receiver?

8       A    I don't know.  I don't know whether there was a

9    document entitled that or -- there was a -- no, I won't move

10   on from there.  I don't know that I had a document entitled

11   whatever title you gave.

12      Q    Was there any document or agreement that required or

13   provided that you keep communications with the receiver

14   confidential?

15      A    I believe so.

16      Q    Could you describe that document?

17      A    No.

18      Q    Was it a contract?

19      A    I don't know.

20      Q    Do you recall the terms of the document?

21      A    No.

22      Q    Do you recall when, approximately, either you or

23   Coinmaster USA entered into it?

24      A    No.

PAUL A. COX                    44

1    Q    Was it an e-mail or was it something else?

2    A    I just told you, I don't know the form of the

3    document.

4    Q    But you believe there was some type of

5    confidentiality agreement between you --

6    A    I believe that was part of some document, yes.

7            MR. GUERKE:  Would you mark that, please?

8            (Cox Deposition Exhibit No. 8 was marked for

9    identification.)

10   BY MR. GUERKE:

11   Q    Would you identify this document, please?

12   A    It's a -- two e-mails, one from myself to Tony Lynch

13   and one from him to me.

14   Q    The one from you to Tony Lynch, the bottom part of

15   the page, in the second sentence states, I'm going to make a

16   deposit into your account (probably Monday) using the last

17   deposit slip I have.

18   A    Yes.

19   Q    Is that referring to July 2003's $8,000 payment to

20   Mr. Lynch?

21   A    Probably.

22   Q    Do you have any reason to believe that that payment

23   was not made?

24   A    No.

PAUL A. COX                    50

1    Q    How is this file note kept?

2    A    It was in the company's books.

3    Q    In Florida, in your office essentially?

4    A    Yes.

5              MR. GUERKE:  Would you mark that, please?

6              (Cox Deposition Exhibit No. 12 was marked for

7    identification.)

8    BY MR. GUERKE:

9    Q    After you have had a chance to review this, could

10   you identify this document, please?

11   A    This was an e-mail from myself -- I'm sorry.  Sorry.

12   There is an attachment.  Let me read that.

13              This is an e-mail from myself to Adrian

14   Wolstenholme, who was at the time the receiver of the UK

15   companies working for Ernst & Young under the direction of

16   the bank, I guess.  I got one from him and then a reply one

17   from him to me.

18   Q    This is dated June of 2003, is that right, your

19   initial e-mail?

20   A    Yes.

21   Q    June 18th, 2003?

22   A    June 18th, and then June 22nd.

23   Q    You sent him a draft of a proposal which was

24   essentially a management bid to buy the Coinmaster UK stock;

PAUL A. COX                    51

1      is that generally an accurate description?

2          A    No, I don't think so.  I think this was an attempt

3      by him to reach an agreement with me as to on what basis he

4      could sell the company to a third party.  I think.  Just

5      reading it quickly.  It seems to -- I mean I haven't got the

6      attachment.  You haven't provided the attachment?  Is that

7      because you don't have the attachment?

8          Q    I honestly don't know as we sit here.

9          A    Okay.  But I think it's -- looking at his reply,

10     which is the only thing that gives me a clue, it seems to

11     imply that he will pay to management certain sums in the

12     event that we are killed in war, as it were.  Sorry.  We are

13     forced to leave the company when he sells it.  I think.  I

14     don't think it's anything to do with the management buying

15     the company.

16         Q    In this time period, the spring or early summer of

17     2003, you put together some type of bid, management bid, for

18     the company's stock; is that accurate?

19         A    Yes.

20         Q    Could you describe what that management bid

21     included?

22         A    No.  I would need the document in front of me to

23     talk from.  If you've got it in there, we'll use it, if you

24     want.

PAUL A. COX                    52

1           These things are very complicated.  You know, I

2    can't just tritely give you an answer.

3       Q    Who were the managers or the directors that were

4    included in that bid?

5       A    Myself, Tony Lynch and Brad Hutcheon.

6       Q    At this point in 2003, Mr. Hutcheon was not yet a

7    director?

8       A    Correct.

9       Q    But the bid, if accepted, he would become a

10   director; is that accurate?

11      A    Yes, I think so.  I mean I don't remember.  I would

12   need to look at, again, the documents.  My belief is he

13   probably would.  And certainly that was my intent.  He was

14   the important third member in the team.

15      Q    Did you make a formal bid to the UK receiver for

16   Coinmaster UK's stock in the June 2003 time frame?

17      A    I would need to see the document.  But the answer is

18   almost certainly yes.

19      Q    Do you recall generally what their response was to

20   that bid?

21      A    Well, I think it's really covered almost by the one

22   that we've got in front of us, which is, yes, okay, you can

23   put a bid in.  But we need to see other bids.  And, you

24   know, let's talk about, in considering your bid, let's talk

1    about what the other bids, what you would do in the event

2    that the other bids, you know, have to be made.  In other

3    words, if management would cooperate with the other bids.

4        Q    This bid in 2003, June 2003, you put together

5    included Mr. Lynch, correct?

6        A    Sorry.  The bid?

7        Q    Yes.

8        A    Yes.

9        Q    The buyout?

10        A    Absolutely.

11        Q    And there was no objection from the receiver at that

12    point objecting to Mr. Lynch's participation in that buyout,

13    right?

14        A    You're saying that, not me.  Right?  Is that a

15    question?

16        Q    I'm asking you.

17        A    I would have to say, yes, there was.

18        Q    The receiver objected to including Mr. Lynch at that

19    point?

20        A    Yeah.  But he didn't get a vote.  If I wanted to put

21    a bid together including somebody he didn't know, he didn't

22    get a vote.  As far as I was concerned.

23        Q    Who didn't get a vote?

24        A    The receiver.  It is not up to him to determine who

PAUL A. COX                    54

1     is on the team and makes the bid.

2         Q     You made two separate bids for Coinmaster UK stock;

3     is that fair?

4         A     What are you referring to?  When and how?

5         Q     The bid that we just discussed.

6         A     We made several.

7         Q     How many?  Do you know?

8         A     No, I don't.  I'd have to refer to the document.

9     All of which I think you have.  If you've got the e-mail,

10    you've got the document.

11        Q     I probably do.  I don't want to disturb my pile.

12    We'll get to it.

13        A     Okay.

14        Q     If we could just focus on the document that you have

15    before you.

16        A     Okay.

17        Q     In number three paragraph, it says, one and 3.2.  In

18    order to properly incentivize management, we propose:

19                    If consideration paid is equal or less than

20    $1.5 million, U.S. management receives a lump sum of

21    $250,000.

22                    Do you see that?

23        A     Yes.

24        Q     What is the purpose of that $250,000 payment?  Do

PAUL A. COX                55

1    you know?

2    A    To make us cooperate with the potential sale of the

3    business to a third party.

4    Q    Does that include Mr. Lynch?

5    A    It includes whoever I chose to include.  It was

6    written to me.

7    Q    At that time, did you include Mr. Lynch?

8    A    We never got to the stage where we actually broke

9    this down or got into the nitty-gritty of it because the

10   receiver was unable to proceed at this time with getting

11   together a series of bids from outside.

12   Q    At this time, was it your intent to include

13   Mr. Lynch in that $250,000 sum?

14   A    Yes.

15   Q    Was that sum to buy out your two contracts?

16   A    No.  It was for cooperation.  It says that in here,

17   actually.  The exact form of this in terms of stock purchase

18   or termination of contracts is not an issue from our

19   perspective.

20   Q    So you would have received $250,000 plus whatever

21   your contracts provided, is that right?

22   A    No.  That's not right.  That's not what this

23   document says.

24   Q    In general?

PAUL A. COX                    56

1        A    No.   This document says the contracts go with the

2    deal.   That's for the -- whoever the new owner is, if there

3    are any contracts in place.   We are giving you this to

4    cooperate.

5        Q    So this $250,000 was for cooperation and not for the

6    contracts?

7        A    Correct.

8              MR. GUERKE:   Would you mark this, please?

9              (Cox Deposition Exhibit No. 13 was marked for

10   identification.)

11   BY MR. GUERKE:

12       Q    After you have had a chance to review, would you

13   identify this document, please?

14       A    Yes.   This is a -- sorry.   Let me read it more

15   fully.

16             This is a cover letter to a pack of information

17   sent to potential purchasers of Coinmaster USA, Inc., put

18   together by myself as a pack for the purpose of the receiver

19   being able to market his stock in Coinmaster USA.

20       Q    The packet essentially was a binder that included

21   documents.   Is it fair to say it was your attempt to give an

22   overview of what Coinmaster USA was and its financial state?

23       A    Yes.

24       Q    Is it fair to say the purpose was to give potential

PAUL A. COX                    57

1    bidders or buyers an understanding of what they are buying?

2        A    All the information -- yes.  To give them all the

3    information about the corporation in as honest a way as I

4    could at that point in time.

5        Q    Who received that packet?  Do you know?

6        A    I can't -- you know, I can't remember off the top of

7    my head.  I mean there were four or five bidders.

8        Q    Was it sent to the receiver and then distributed or

9    did you send it directly to those four or five bidders?

10       A    I believe I sent it directly to the four or five

11   bidders.

12       Q    Did you send it to the receiver?

13       A    Yes.

14       Q    Did the receiver object to any of the content?

15       A    It doesn't matter whether he did or not.  He didn't

16   get a vote.

17       Q    Did the receiver object to any of the content?

18       A    He didn't like some of the content.

19       Q    Specifically, what parts of the packet?

20       A    I would need to review the whole packet.  If you

21   have it there, I'll do that.

22       Q    At the time that you put this packet together, you

23   were being honest and truthful, to the best of your ability,

24   is that right?

1              I already told you, I believe, that I was in

2      the don't know category from receipt -- the receiver's

3      letter with the attachment of Mr. Lynch's UK contract, his

4      resignation and whatever other documents were attached,

5      which I'm sure you have in that pile somewhere.

6      BY MR. GUERKE:

7          Q    But by the time this packet was sent on

8      September 1st or 2nd of 2003, you had a copy of that UK

9      contract?

10         A    Exactly.  So I was in the don't know category.

11         Q    And I did record that the receiver objected.  If

12     you recall, somewhere in that document.  If you want to show

13     me the document, I'll point it out to you.  I think it's the

14     next one.

15         A    Okay.

16              MR. GUERKE:  Would you mark this, please?

17              (Cox Deposition Exhibit No. 15 was marked for

18     identification.)

19     BY MR. GUERKE:

20         Q    Would you identify this document, please?

21         A    This is one of the documents contained within the

22     aforementioned package that was sent to potential buyers of

23     Coinmaster USA, Inc., in or around September 2003.

24         Q    The first sentence of this document states,

1       Mr. Lynch has been chairman of Coinmaster USA, Inc., since

2       its inception.  He was very largely responsible for the

3       corporation's entry and progress in the California

4       marketplace.

5                    Is that a fair and accurate statement?

6       A    It's qualified by the next paragraph.

7       Q    The second paragraph -- I'm sorry.  The second

8       sentence of this document states, he was very largely

9       responsible for the corporation's entry and progress in the

10      California market.  Is that sentence accurate?

11      A    Yes.

12      Q    The next paragraph states, the receiver of the UK

13      Coinmaster companies recently challenged the validity of

14      Mr. Lynch's contract with Coinmaster USA, Inc.  Although his

15      arguments were well thought through, the attorneys for the

16      Coinmaster USA, Inc., have advised the corporation that the

17      receiver's arguments are without merit in the corporation's

18      home State of Delaware.

19                   Is that an accurate reading?

20      A    You have read it accurately.

21      Q    This was included in that September 2003 information

22      packet, correct?

23      A    Yes.

24      Q    And at this point, you had received the receiver's

1    position on Mr. Lynch's contract?

2        A    Yes.  That's stated here.

3        Q    After having received the receiver's position, it

4    was your position that Mr. Lynch's contract was intact and

5    he remained a director of the Coinmaster USA board?

6        A    I had no other advice at this time than that stated

7    here.

8        Q    The second to last paragraph states that Mr. Lynch,

9    therefore, continues to work with the corporation and to

10   receive the benefits outlined in his contract.

11            Is that a fair and accurate statement?  Did he

12   continue to work for the corporation?

13       A    Yes.  With the corporation, yes.

14       Q    Did he continue to receive his benefits as outlined

15   in the contract?

16       A    Yes.

17            MR. GUERKE:  Would you mark that, please?

18            (Cox Deposition Exhibit No. 16 was marked for

19   identification.)

20   BY MR. GUERKE:

21       Q    Would you identify this document, please?

22       A    This is a copy of a purported document that attempts

23   to show that Mr. Lynch resigned from the board of directors

24   of Coinmaster Gaming, PLC, on the 28th of February, 2003.

PAUL A. COX                    67

1      A     Myself and my wife I'm certain of.  Mr. Lynch I'm

2    not certain of.

3              MR. SCHERZER:  Guys, we have been at this for

4    about an hour and 40 minutes.  Can I make a suggestion that

5    we have a morning break and then push forward toward the

6    luncheon break after that?

7              MR. GUERKE:  That's fine by me.

8              (A brief recess was taken.)

9    BY MR. GUERKE:

10     Q     Mr. Cox, were you ever a shareholder of any of the

11   Coinmaster UK companies?

12     A     No.

13     Q     Were you ever an officer or employee of any of the

14   Coinmaster UK companies?

15     A     No.

16     Q     Were you ever a director of any of the Coinmaster UK

17   companies?

18     A     No.

19     Q     You don't have any right to enforce any of the

20   Coinmaster UK contracts, right?

21              MR. SCHERZER:  Objection to the form of the

22   question.  That may call for a legal conclusion.  Because

23   there are times that people are third party beneficiaries.

24   At times.  I obviously don't have a problem with him

PAUL A. COX                    68

1    answering.  But that answer is, of course, his view as a lay

2    person as opposed to an attorney.

3                    If you can answer the question, please do.

4                    THE WITNESS:  Could you repeat the question?  I

5    have forgotten what it was.

6    BY MR. GUERKE:

7    Q    You as Paul Cox have no right to enforce any

8    Coinmaster UK contracts, right?

9    A    Am I speaking as president and CEO of Coinmaster USA

10   or as Paul Cox?

11   Q    Paul Cox.

12   A    No.

13   Q    As president and CEO and all that of Coinmaster USA,

14   do you, Paul Cox, have any power to enforce any Coinmaster

15   UK contracts?

16   A    No.

17   Q    Did you ever have such power?

18   A    No.

19   Q    Did Coinmaster USA ever have the power to enforce

20   any contract rights of Coinmaster UK?

21   A    It depends what its parent company told it to do.

22   Q    One of Coinmaster USA's defenses to Mr. Lynch's

23   breach of contract claim is that Mr. Lynch resigned from

24   Coinmaster UK, is that right?

PAUL A. COX                72

1      A     To anybody.

2      Q     To anybody?  Is that fair?

3      A     That's fair.  Isn't that usual?

4      Q     So it's your testimony there was, in fact, a non

5    disclosure document of some sort?

6      A     It was an agreement with the receiver that there

7    would be non disclosure.

8      Q  .  What were the terms of this agreement with the

9    receiver?

10           MR. SCHERZER:  Let me object and hold you

11    there.

12           And I can say this on the record or off the

13    record.  I'm comfortable on the record.

14           I haven't seen that document which, of course,

15    is no fault of anyone but me.  But I'm reluctant to have the

16    witness testify as to what is in a document when the

17    document expressly provides non disclosure without having

18    further reviewed the document because, by offering this

19    testimony right now, he may be creating a cause of action

20    and a breach of that document.

21           So you have already inquired as to whether or

22    not a document exists.  It does.  Whether or not it

23    prohibits disclosure.  It does.

24           But now Kevin you're asking him to disclose.

PAUL A. COX                    74

1              MR. GUERKE:  Sure.

2              (Discussion held off the record.)

3              MR. SCHERZER:  I don't have a problem with him

4    testifying as to what he was not permitted to disclose in

5    generic terms.  But obviously I would have a problem with

6    him disclosing exactly what he is prohibited from

7    disclosing.

8              THE WITNESS:  So can you repeat the question?

9    BY MR. GUERKE:

10        Q    Generally, what were you prohibited from disclosing?

11        A    Anything to do with the deal between Brad Hutcheon,

12   myself, the receiver, the Bank of Scotland, Coinmaster as it

13   was then in the UK, Coinmaster USA.

14        Q    Who were the parties to that agreement?

15        A    All the people I have named.

16        Q    In May of 2004, Mr. Lynch was a director of

17   Coinmaster USA, right?

18        A    No.  You have asked me that eight times so far.

19   I'll give you the same answer I gave you before.  I don't

20   know.

21        Q    If he was, he would be entitled to that non

22   disclosure agreement, correct?

23        A    No.  Because it was between Brad Hutcheon, myself,

24   Coinmaster USA.  He was specifically excluded.

PAUL A. COX                    76

1       want to clarify something in my own mind.

2                  MR. GUERKE:  Sure.

3                  (A brief recess was taken.)

4       BY MR. GUERKE:

5          Q    I just have some very basic questions about this non

6       disclosure that we have been discussing.

7                  MR. SCHERZER:  Kevin, do you want to put any of

8       that on the record?

9                  MR. PRESTON:  It is entirely up to you if you

10      want to.

11                 MR. GUERKE:  Sure.  On the record.  I just had

12      a discussion with counsel regarding production of a non

13      disclosure agreement that we have been discussing during

14      this deposition and we agreed that Mr. Preston and I will

15      discuss it further after the deposition.

16      BY MR. GUERKE:

17         Q    This should be my last question on the non

18      disclosure.

19         A    Okay.

20         Q    Was there a written document that represented the

21      non disclosure or was it an oral agreement?

22         A    I think I have to say I don't know until counsel has

23      been through all these documents.  You have to understand

24      that this agreement was full of hundreds, thousands of

PAUL A. COX                    80

1    spring and summer of 2004; is that accurate?

2       A    I think by the date of June 10th, I already had a

3    separate deal with Mr. Lynch.  That is my recollection.  I

4    need to see the document.  If it's in your pile, let's go to

5    it.

6       Q    We might get to it.  I can't recall what's in my

7    pile, to be honest with you.

8              Would it be fair to say that the deal with

9    Mr. Lynch, separation from Coinmaster USA, more favorable

10   terms to Coinmaster USA would be favorable to you down the

11   road?

12      A    What's your question?  I'm sorry.

13      Q    Generally, would it be fair to say that the worse

14   the deal is with Tony, the better the deal would be with you

15   and the UK receiver?

16      A    I don't think that's worthy of calling, actually.

17   Because these were all negotiated documents.  And they fell

18   where they fell.

19      Q    Would it be fair to say that your business

20   relationship with Tony, with Mr. Lynch, caused the breakup

21   of your personal relationship with Mr. Lynch?

22      A    Yes.

23      Q    For this deal that's being discussed with Tony, with

24   Mr. Lynch, in this June 10th, 2004 e-mail, he is to receive

PAUL A. COX                    90

1    as I told you last week!

2                Who would you be firing in this e-mail?

3    A    Tony Lynch.

4    Q    Would you be firing him as director of Coinmaster

5    USA?

6    A    You have to recollect that in order to get the

7    receiver to accept that there was any need to do a deal with

8    Tony, okay, I had to take a stance with him that Tony was a

9    director of Coinmaster USA even though I did not know

10   whether Tony was a director of Coinmaster USA or not.  Okay.

11   Otherwise, there would have been no deal in relation to Tony

12   at all.  If I took the point of view that he didn't have a

13   deal, no deal would be required.

14   Q    Were you taking that position because he was your

15   friend?

16   A    I was taking that position because I valued his

17   input to Coinmaster USA and wanted him, and we had agreed in

18   Phoenix that it was going to be a three person party at the

19   end of the day.

20   Q    You state that, I'm prepared to fire him.

21                Did you ever fire him?

22   A    No, I never fired him.

23   Q    Could you turn to the front page?  Mr. Best's

24   response.

PAUL A. COX                        92

1    I'll gladly qualify that.

2       Q    Is there another $8,000 payment that it would --

3       A    I don't know whether you're correct on which month

4    it was.  Was it October, November, December?  I don't know.

5    Show me the document.

6       Q    Did the UK receiver ever pursue any litigation

7    against Mr. Lynch?

8       A    Not yet.

9       Q    Are they planning to?

10      A    Ask the UK receiver.

11      Q    Is the UK receiver still the majority shareholder of

12   Coinmaster USA?

13      A    No.

14      Q    Is Coinmaster UK still the majority shareholder of

15   Coinmaster USA?

16      A    No.

17            MR. GUERKE:  Would you mark that, please?

18            (Cox Deposition Exhibit No. 23 was marked for

19   identification.)

20   BY MR. GUERKE:

21      Q    This is an e-mail from you to Mr. Lynch dated July

22   1st, 2004, right?

23      A    Yes.

24      Q    In the third paragraph, it says, in the meantime,

PAUL A. COX                    111

1     A    Yes.

2     Q    This is essentially what you told Mr. Lynch earlier

3     in the day about your position and the advice you received?

4     A    No.  It was about the advice I received.

5     Q    You sent this to the receiver in response to his

6     August 21, 2003 letter?

7     A    Whatever date it was, yes.

8     Q    So in a nutshell, the receiver's position was Tony's

9     contract is invalid and Coinmaster USA's official position

10    was, it's valid?

11    A    Yes.

12    Q    And as far as Coinmaster USA was concerned, from a

13    practical point of view, Tony remained a member of the U.S.

14    board and would be paid according to his contract, correct?

15    A    That's what he says.

16    Q    And if you flip to the front of this document, you

17    go down three-fourths of the way.  The receiver says, under

18    the line, Tony Lynch contract, I will write to you

19    separately on Tony's contract as we clearly have some

20    differences in legal views which we need to discuss.

21    A    That's what he says, yes.

22         MR. GUERKE:  Why don't we break.

23         MR. SCHERZER:  Sure.

24         (A luncheon recess was taken from 12:23 p.m. to

PAUL A. COX                    114

1      Q    But if you look --

2      A    Oh, it's a fax.  Sorry.  I was wondering how I had

3    it on the same day that it was written.  I guess it was

4    faxed to me.  Okay.  So I guess this is my off-the-cuff

5    response.

6      Q    Okay.  If you go down to the first paragraph,

7    numbered paragraph, you say, you should note the following.

8    I have never seen Tony's UK contract.  I guess I will when I

9    get the faxed version.  His U.S. contract was not regarded

10   as being in force by me until after his UK contract was

11   clearly no longer in place.  If I had thought at the time

12   that his U.S. contract was invalid, I would have put in

13   place another one replacing expenses with salary.

14              Is that an accurate reading of that paragraph?

15     A    Yes, it is.

16     Q    Explain to me why you wrote that?

17     A    Because I was getting bored with the receiver's

18   fixation with Tony's contract and I simply wanted to step up

19   the heat on him by posturing to his letter.

20     Q    In essence, you're saying --

21     A    It's me posturing.

22     Q    Regardless of what you're saying, Mr. Receiver,

23   there are other ways around this?

24     A    Yes.  Me posturing saying if you want to be

PAUL A. COX                    115

1   difficult, I'll be difficult.  Let's step the heat up.

2       Q    Paragraph two states, I still regard Tony as an

3   essential part of the board and management team.  He has

4   been performing his duties properly to date.

5              Was that true as of August 21st, 2003, as far

6   as you know?

7       A    That's true, yes.

8       Q    He was performing his duties properly at that point?

9       A    Yeah.  What he was expected to do was to provide

10  technical advice, which he did excellently.  He knew the

11  game better than anybody in the universe.  And he received

12  expenses for that with traveling.

13      Q    If you go to paragraph three.  Be assured that I

14  will not give Tony sight of the materials that you have sent

15  me on the subject of his contract.

16              Why is that?  Why are you making that

17  statement?

18      A    Because he asked me to.

19      Q    He asked you not to tell Mr. Lynch --

20      A    At this stage.

21      Q    Your next sentence says, I would regard it as

22  improper of you to contact Tony in any way concerning this

23  matter.

24              Why did you make that statement?

PAUL A. COX                117

1    attached down below, correct?  An e-mail that you sent to

2    the receiver?

3        A    There is three e-mails on there.

4        Q    The second e-mail is from you to Mr. Lynch.  The

5    third e-mail is from you to Mr. Best and some other people?

6        A    Indeed.

7        Q    The bottom e-mail outlines -- a bid for Coinmaster

8    USA, correct?

9        A    Yes.

10       Q    And you sent that bid to Mr. Lynch above and then

11   Mr. Lynch responded, that's what this says?

12       A    Yes.

13       Q    Was there a confidential communication with

14   Mr. Best?

15       A    It was confidential from the point of view that I

16   wanted Mr. Best to believe it was confidential.  He didn't

17   ask if it was confidential.

18       Q    We discussed earlier today a confidentiality

19   agreement?

20       A    It has nothing to do with that.  That was a year

21   later.

22       Q    So it was not in place at this point?

23       A    No.

24       Q    If you go down to the beginning of the second page.

PAUL A. COX                    118

1          It look likes the first full paragraph.  It says, we are

2          also now willing to propose that the bid be mounted by

3          myself and Brad Hutcheon alone.  We have reached an

4          affordable agreement with Tony Lynch that he will accept a

5          lump sum for separation and release of his contract, in

6          return for which he will give a written two-year operational

7          non-compete with Coinmaster USA, Inc., in California.

8                    The first question.  Is this the second formal

9          bid, management bid, for Coinmaster USA stock?

10         A    It may be the second.  It's certainly a bid.  I

11         don't know whether it's the second.  I don't know whether we

12         did another one between the one in May and September.  I

13         just don't remember.  It's certainly a bid.

14         Q    Here Tony is not included as he was before, it's now

15         Brad Hutcheon, is that correct?

16         A    Brad was always included.  The difference is Tony

17         was excluded on this time.

18         Q    Is this the first time he was excluded?  Do you

19         know?

20         A    Yes.

21         Q    What happened between either the first or second bid

22         and this bid that caused you to remove Mr. Lynch from the

23         equation?

24         A    The receiver's unequivocal opposition to Tony being

PAUL A. COX                    121

1    when they occurred?

2        A    This was a continuing dialogue.  You know, it was a,

3    you know, we used to talk regularly.  He would call me and

4    say, what about this, what about that.  I don't remember.

5        Q    Under the pre conditions, it says, we need to

6    achieve a satisfactory settlement of Tony Lynch's contract.

7        A    Yep.

8        Q    And then under terms, about an inch down the line.

9    It says, the terms set out in your e-mail of September 23,

10   2003, are acceptable.

11       A    Okay.

12       Q    Is it your understanding that that was referring to

13   Exhibit 30, which we just talked about?

14       A    Probably to some elements of that, yeah.  Because

15   that one also covered the subject of Tony's contract.

16       Q    Okay.

17            MR. GUERKE:  Mark that, please?

18            (Cox Deposition Exhibit No. 32 was marked for

19   identification.)

20   BY MR. GUERKE:

21       Q    This is an e-mail from you to Mr. Lynch dated

22   November 10th, 2003, is that right?

23       A    Yes, it is.

24       Q    Is this e-mail in response to the e-mail you

PAUL A. COX          122

1    received from Mr. Best that was about an hour and 15 minutes

2    before that?

3      A    Not in response to that.  Because that would be to

4    Mr. Best.  It's as a consequence of that.

5      Q    Is it fair to say that you received Mr. Best's

6    response and you're recapping that response from Mr. Lynch

7    in this e-mail?

8      A    Yes.

9      Q    It states in the beginning, I did get a proposal

10   from the receiver today.

11              Do you understand that to be the proposal that

12   we just discussed on November 10, 2003?

13     A    Yes.

14     Q    Okay.  And the second paragraph numbered one states,

15   he doesn't like our deal for you to go!  He thinks it's way

16   too expensive.  That is, you should go at a much lower cost!

17   (Preferably no cost, and recovery of what we have already

18   paid you!)

19              Was it your understanding that that was what

20   Mr. Best said in this e-mail of November 10th, 2003?

21     A    I spoke to him for clarification on what he meant

22   about Tony's contract.  Because I had already told him what

23   it was going to cost to get rid of Tony's contract.

24     Q    Do you recall what you told him it would cost?

PAUL A. COX                   123

1      A    Yes.  It's in my previous September 23rd e-mail.

2      Q    I think that states that you had reached a

3    satisfactory --

4      A    Okay.

5      Q    The numbers I think at this point are $214,000?

6      A    I think at that time, it was one ninety plus a very

7    limited non-compete.

8      Q    His response was that was too expensive?  The

9    receiver's response was that was too expensive?

10     A    Yes.

11     Q    When did you have that conversation between when you

12   received this --

13     A    Yeah.  Because I wanted a clarification fast.  The

14   situation was moving on.

15     Q    I take it you called him, the receiver?

16     A    Yes.

17            MR. GUERKE:  Could you mark this, please?

18            (Cox Deposition Exhibit No. 33 was marked for

19   identification.)

20   BY MR. GUERKE:

21     Q    This is an e-mail from you to Mr. Lynch dated

22   July 14, 2004, right?

23     A    Yes.

24     Q    In here, you state, paragraph numbered one, I cannot

PAUL A. COX                129

1      UK and U.S. legal advisors in relation to Tony's contract.

2                And then she goes on to list a few reasons

3      why -- she goes on to list the UK legal advice and the U.S.

4      legal advice that she received.  Is that fair?

5      A    Yes.

6      Q    Would it be fair to say that this July 28, 2004

7      position of the receiver on Tony's contract is nearly

8      identical to their September -- I'm sorry, August 21st,

9      2003, position?

10     A    Yes.

11     Q    That August 21st, 2003 position of the receiver is a

12     position that you and Coinmaster USA refuted at that point,

13     correct?

14     A    Yes.  From our U.S. advice, yes.  When you say you,

15     I'm talking as president of Coinmaster USA.

16                MR. GUERKE:  Would you mark that, please?

17                (Cox Deposition Exhibit No. 35 was marked for

18     identification.)

19     BY MR. GUERKE:

20     Q    This is an August 9th, 2004, e-mail from Ms. Over to

21     you cc:'ing a couple of Ernst & Young people.  And in this

22     e-mail, Ms. Over attaches a copy of a letter that she

23     received from Tony Lynch, is that right?

24     A    Yes.

PAUL A. COX                    136

1       A    Do you mind if I read the e-mail?

2       Q    Please do.

3       A    Okay.  Sorry.  What was your question?

4       Q    In Mr. Lynch's e-mail, which is the first of this

5    string, he is asking Ms. Over about why he is not part of

6    the management?

7       A    Right.

8       Q    In her response, she states, please note that this

9    matter is being driven by Coinmaster USA.

10      A    Yes.

11      Q    Do you know why she would have written that?

12      A    Yes.  Absolutely.  Because it was after the deal had

13   been signed between the UK company, the receiver, the Bank

14   of Scotland, Brad and myself.  She couldn't do a thing.

15      Q    So it was your call, the arrangement with Mr. Lynch

16   at this point?

17      A    No.  It was governed by the agreement that was

18   signed at that time, which had contained within it a

19   settlement severance agreement with Mr. Lynch.  Nobody could

20   move from that position.

21      Q    Do you know the receiver's position as of

22   August 10th, 2004, regarding Mr. Lynch's participation in a

23   management buyout?

24      A    Ask the receiver.

PAUL A. COX                    150

```
 1      A    I think there are probably three different people

 2    that filled this out.

 3      Q    Who were those three people?

 4      A    Myself, Kelly Baker and the third one may be either

 5    Mary or it may be somebody else.

 6      Q    Mary Cox, your wife?

 7      A    Um-hmm.

 8      Q    Who would that someone else possibly be?

 9      A    One of the other girls in the office building who

10    used to fill in applications for me.

11      Q    Who signed the last two pages of this application?

12      A    Nobody signed it apart from Kelly Baker.  I wrote in

13    Tony Lynch's name.

14      Q    Above where it says applicant's signature?

15      A    Above where it says applicant's signature.

16      Q    So you signed this document --

17      A    I didn't sign it.  I wrote in Tony's name.  There is

18    a distinct difference.

19      Q    Explain to me the difference.

20      A    Sure.  The process for completing documents of this

21    sort, you have to remember it's a kind of boring process and

22    a routine process carried out for each tribe.  However many

23    tribes there are.  And it was conducted by a number of

24    people over time.  Okay.
```

PAUL A. COX                    151

1           And some of them weren't fully trained at this

2      point in time.  I used to do a shadow copy, if you like, in

3      other words, a shadow copy, which would complete.  And I

4      would leave it on the table and say, okay, when the other

5      one comes in, compare it with that one; and, if it's the

6      same, put it in the envelope and send it off.

7      Q    So in the last two pages, you filled in D. A.

8      Lynch's name?

9      A    Absolute.

10     Q    And you had Miss Baker notarize that?

11     A    No.

12     Q    How was it notarized?

13     A    Well, Kellie Baker obviously notarized it.

14     Q    Explain to me the process where this document was

15     notarized by Ms. Baker?

16     A    I can't speculate but I can tell you what I think

17     happened.  I'm not speculating.  I'll stop when I start

18     speculating.  I'll tell you the facts.

19     Q    Tell me the facts.

20     A    Okay.  I was not at the office between June 2nd, and

21     June 10th, 2003.  My house got zapped by lightning.  It

22     couldn't have happened any other way.

23           This document had to be in the hands of the

24     tribe by something like June 4th.  I don't remember the

1    and Mr. Lynch, when you were both working at Coinmaster USA,

2    reference applications that you sent to Mr. Lynch and he

3    sent back?

4       A    Or parts of applications.

5       Q    Or parts.

6            Why, again, was this not done in that manner?

7       A    It was going to be done.  It was sitting on my desk

8    waiting to be done.  And I didn't go back.  It's usually the

9    last thing we do because he is the most difficult person to

10   get hold of.  He is just not there.  I didn't know where he

11   was.

12      Q    Did you have Mr. Lynch's permission to fill this out

13   on his behalf?

14      A    Well, the document itself?

15      Q    The document itself.

16      A    The whole document or the whole types of documents?

17   Yes.

18      Q    How about this document and these two authorizations

19   and affidavits at the end?

20      A    No.  Absolutely not.  And we didn't fill them out on

21   his behalf.

22      Q    You didn't have his permission to fill this out?

23      A    We had his permission to fill in the document with

24   the information.  Absolutely.  If I would have been in the

PAUL A. COX                    156

1    office, I would have faxed the last two pages.  He would

2    have signed them.  Kellie would have notarized them.  They

3    would have been put together, gone to Chumash and we would

4    have got a license, just like we did.

5       Q    Did Mr. Lynch ever tell you to go ahead and sign on

6    my behalf or anything to that effect?

7       A    Absolutely not.  But I did suggest we get a rubber

8    stamp.  You don't think the chairman of ITT signs all these

9    things, do you?

10      Q    Did you get a rubber stamp?

11      A    No.  Never.  But I wanted to.

12      Q    Do you recall the last application to any gaming

13   institution that Mr. Lynch was a part of on behalf of

14   Coinmaster USA?

15      A    No.

16      Q    Do you recall if any were submitted in 2004?

17      A    No.

18      Q    You don't recall?

19      A    I don't recall.

20             MR. GUERKE:  Would you mark that, please?

21             (Cox Deposition Exhibit No. 46 was marked for

22   identification.)

23   BY MR. GUERKE:

24      Q    This is a cover letter dated March 11, 2005, from

1           (Cox Deposition Exhibit No. 47 was marked for

2      identification.)

3      BY MR. GUERKE:

4      Q    Please identify the document, Exhibit 47, I just put

5      in front of you.

6      A    It's an agreement between High View, Inc., and ML

7      Solutions, Ltd.

8      Q    Who is or what is ML Solutions, Ltd.?

9      A    So far as I'm aware, it's the private vehicle of

10     Mike Lerwill through which he conducts consultancy, advice,

11     et cetera, in relation to software for the game industry.

12     He may do other things.  I have no knowledge of that.

13     Q    What does High View, Inc., do today?

14     A    Nothing.

15     Q    When was it formed?

16     A    Sometime in June, I think, 2003.

17     Q    What was the purpose at this point of forming High

18     View, Inc.?

19     A    To produce a newer technology gaming machine.

20     Sorry.  Forget gaming machine.  Mechanical roulette machine

21     for the use of Coinmaster USA, Inc., primarily.

22     Q    You say primarily.  Once it was developed, it could

23     have been sold to --

24     A    No.  Primarily meaning secondarily.  It may have

PAUL A. COX                182

1    2002, the company paid management fees of $65,000 and

2    $16,000 respectively.  Paul Cox is also entitled to a bonus

3    based on a percentage of the net income.  As of

4    December 31st, 2003, the company owed Tri-County

5    Entertainment $65,000 for management fees --

6              MR. SCHERZER:  Sixty-five hundred.

7    BY MR. GUERKE:

8    Q    $6,500 for management fees and $15,400 for the

9    bonus.

10             Is that $6,500 management fee in that last

11   sentence I just read to you a management fee that would be

12   due to you under your Coinmaster USA contract dated

13   November 2002?

14   A    Yes.

15   Q    And the $15,400 bonus for year ending in

16   December 31st, 2003, was that based on the terms of your

17   Coinmaster USA contract also?

18   A    Yes.

19   Q    Were you paid that sum, $15,400?

20   A    I probably -- well, Tri-County Entertainment

21   probably was.  I wasn't.

22   Q    Wouldn't Tony also be entitled to a bonus for the

23   year ending December 31, 2003, under his contract?

24   A    I have said this 11 times.  Maybe 12.  I am not

PAUL A. COX                193

1          What happens at the year end is the accountants

2     send me a list of amendments to my books, these books which

3     we enter.  So the two are in line.  They are not in line

4     with the tax accounts, I don't think.  The tax accounts

5     differ.  Because the government plays somehow with the

6     depreciation over time.

7          Q    How much cash does Coinmaster USA have on hand?

8          A    Today?

9          Q    Today.  Roughly.

10         A    $200,000, roughly.

11         Q    How much did you pay for the additional shares that

12    you acquired in Coinmaster USA?

13         A    Nothing.

14         Q    The same as Mr. Hutcheon?

15         A    Yes.

16         Q    We discussed earlier your claim through High View

17    regarding Mr. Lynch's absconding with the devices or assets.

18    Could you explain to me your claim on behalf of Coinmaster

19    USA for those assets or devices?

20         A    Sure.  It's my contention, and there are e-mails to

21    that effect that you have, that Coinmaster USA, Inc., has a

22    position in relation to High View, Inc.  In fact, it has

23    several positions.

24              Firstly, the machines that High View produced

Case 1:06-cv-00365-JJF    Document 69-7    Filed 02/01/2008    Page 19 of 25

1    were supposed to be sold to Coinmaster USA.  That was the

2    agreement of the director of High View, Inc., myself and

3    Tony Lynch.  That was the purpose of forming the company.

4    Okay?

5            Secondly, Coinmaster USA provided money to Mike

6    Lerwill which in the first instance was to go to supporting

7    Coinmaster USA, Inc.; and, in the second instance, was to be

8    spent on the development of the High View software, et

9    cetera, to supplement what Tony and I were putting in

10   personally.  Okay?

11           To the extent that that money is there, there

12   was never an agreement as to whether that should be stock

13   alone or what have you.  It was one of those matters that

14   was never sorted that had been to sorted out.  It was never

15   sorted out because of the ending of the discussion between

16   the parties.  Okay?

17           Tony wrote an e-mail in -- I don't know whether

18   it was April, May, June 2004, to move that on, identifying

19   for Mike Lerwill how much of the money was spent on work for

20   Coinmaster and how much of the money was spent on work for

21   High View.

22           So to the extent that we can do the arithmetic

23   using that as the numbers, we'll know how much Coinmaster

24   USA actually contributed to High View.

PAUL A. COX                    195

1    Q    Did Coinmaster USA contribute money directly to High

2    View?

3    A    No.

4    Q    Explain how the process worked?

5    A    Coinmaster USA paid Mike Lerwill a retainer, right,

6    for primarily supporting Coinmaster USA.  However, it was

7    agreed that any money that wasn't used for that purpose on a

8    monthly basis, recognizing the thing probably fluctuated up

9    and down, depending on how much work he had to do on

10   Coinmaster USA.  Anything that was surplus he would put his

11   time into High View to that volume.

12   Q    Was that retainer that was paid to ML Solutions, was

13   that written on a Coinmaster USA check or was that from your

14   Tri-County company?

15   A    It was written on a Coinmaster USA check.

16   Q    So the funds that you're claiming that were

17   contributed to ML Solutions directly was directly in a

18   Coinmaster USA bank account, is that right?

19   A    And other sources, yes.

20   Q    Has Coinmaster USA brought a claim against High View

21   for breach of contract or breach of agreement?

22   A    No.

23   Q    Did Coinmaster USA bring any claim or lawsuit

24   against ML Solutions for anything?

PAUL A. COX                    199

1       A    Okay.

2       Q    Do you recall, Mr. Cox, whether there was a meeting

3    of the shareholders during calendar year 2003?

4       A    I don't believe there was.

5       Q    Was there a meeting of the shareholders -- I'm

6    talking about shareholders of Coinmaster USA -- in the first

7    few weeks of 2004?

8       A    I don't believe there was.

9       Q    Was there any annual meeting of the shareholders,

10   then, during that time period consistent with the

11   requirements of the bylaws of CMUSA?

12      A    I don't believe there was.

13      Q    When is the last shareholder meeting you can recall?

14      A    What, before that date?

15      Q    The last one you can recall at any time.

16      A    It was probably November 2006.

17      Q    And prior to that, when do you think?

18      A    Probably sometime around November 2005.

19      Q    And prior to that?

20      A    Probably sometime around November 2004.

21      Q    But then not one at all in '03?

22      A    No.

23      Q    Why was that?

24      A    I didn't know who to invite.

# 2001 ANNUAL FRANCHISE TAX REPORT

DO NOT ALTER FILE NUMBER

| FILE NUMBER | CORPORATION NAME | | PHONE NUMBER |
|---|---|---|---|
| 3342221 | COINMASTER USA INC. | | |

| FEDERAL EMPLOYER ID NO. | INCORPORATION DATE | RENEWAL/REVOCATION DATE | DATE OF INACTIVITY | FROM | TO |
|---|---|---|---|---|---|
| | JANUARY 10, 2001 | | / / | / / | / / |

| AUTHORIZED STOCK | | DESIGNATION OR STOCK CLASS | NO. OF SHARES | PAR VALUE/SHARE | NO. SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE | ASSETS FOR REGULATED INVESTMENT CORPS |
|---|---|---|---|---|---|---|---|---|
| BEGIN DATE | ENDING DATE | | | | | | | JAN. 1st |
| 01-10-2001 | | COMMON | 1,500 | | | | | DEC. 31st |

| FRANCHISE TAX | $50.00 PENALTY | 1.5% MONTHLY INTEREST | ANN. FILING FEE | PREV CREDIT OR BALANCE | PREPAID QRTY. PAYMENTS |
|---|---|---|---|---|---|
| $ 30.00 | $ | $ | $ 20.00 | $ | $ |
| | | | | | AMOUNT DUE |
| | | | | | $ 50.00 |

REGISTERED AGENT   9246740
DELAWARE INTERCORP, INC.
113 BARKSDALE PROFESSIONAL
CENTER
NEWARK , DE 19711-3258

MAKE CHECK PAYABLE TO:
DELAWARE SECRETARY OF STATE

| CHECK NO. | AMOUNT ENCLOSED |
|---|---|
| 532 | 50.00 |

2   030102   3342221   000005000 0   4

$50.00 PENALTY if not Received on or before
MAR 1, 2002 Plus 1.5% interest per month.

LYN 266
B 172

**SEND INVOICE AND PAYMENT ONLY - NO ATTACHMENTS - NO ADDITIONAL PAGES**

| NATURE OF BUSINESS | PRINCIPAL PLACE OF BUSINESS OUTSIDE OF DELAWARE |
|---|---|
| Any lawful activity | 3001 Aloma Avenue, Winter Park, FL 32792 |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. | Tony Lynch | 3001 Aloma Avenue, Winter Park, FL 32792 | 1 Yr (until repl) |
| 2. | Paul A. Cox | 3001 Aloma Avenue, Winter Park, FL 32792 | 1 Yr (until repl) |
| 3. | Rory Allin | 3001 Aloma Avenue, Winter Park, FL 32792 | 1 Yr (until repl) |
| 4. | | | |
| 5. | | | |
| 6. | | | |

**DO NOT WRITE IN THIS SPACE - FOR BANK USE ONLY**

| OFFICERS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. | Tony Lynch | Chairman | 3001 Aloma Avenue, Winter Park, FL 32792 | 1 Yr |
| 2. | Paul A. Cox | President | 3001 Aloma Avenue, Winter Park, FL 32792 | 1 Yr |

| ORIGINAL SIGNATURE (OFFICER, DIRECTOR OR INCORPORATOR) | TITLE | DATE |
|---|---|---|
| X Paul A. Cox | President | 2/06/02 |

LYN 267
B 173

# 2002 ANNUAL FRANCHISE TAX REPORT

| DO NOT ALTER FILE NUMBER | | | | |
|---|---|---|---|---|
| FILE NUMBER 3342221 | CORPORATION NAME COINMASTER USA INC. | | | PHONE NUMBER |
| FEDERAL EMPLOYER ID NO. | INCORPORATION DATE JANUARY 10, 2001 | RENEWAL/REVOCATION DATE | DATE OF INACTIVITY / / | FROM / / TO / / |

| AUTHORIZED STOCK BEGIN DATE  ENDING DATE 01-10-2001 | DESIGNATION OR STOCK CLASS COMMON | NO. OF SHARES 1,500 | PAR VALUE/SHARE | NO. SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE | ASSETS FOR REGULATED INVESTMENT CORPS JAN. 1st DEC. 31st |

| FRANCHISE TAX $ 30.00 | $50.00 PENALTY $ | 1.5% MONTHLY INTEREST $ | ANN. FILING FEE $ 20.00 | PREV CREDIT OR BALANCE $ | PREPAID QRTY. PAYMENTS $ |
|---|---|---|---|---|---|
| | | | | | AMOUNT DUE $ 50.00 |

REGISTERED AGENT  9246760
DELAWARE INTERCORP, INC.
113 BARKSDALE PROFESSIONAL
CENTER
NEWARK , DE 19711-3258

## MAKE CHECK PAYABLE TO:
## DELAWARE SECRETARY OF STATE

| CHECK NO. 686 | AMOUNT ENCLOSED 50.00 |
|---|---|

2    030103    3342221    000005000 0    3

$50.00 PENALTY if not Received on or before
MAR 1, 2003 Plus 1.5% interest per month.

LYN 268
B 174

SEND INVOICE AND PAYMENT ONLY - NO ATTACHMENTS - NO ADDITIONAL PAGES

| NATURE OF BUSINESS | | PRINCIPAL PLACE OF BUSINESS OUTSIDE OF DELAWARE | |
|---|---|---|---|
| Any Lawful Activity | | 3001 Aloma Avenue, Winter Park, FL 32792 | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. | Tony Lynch | 3001 Aloma Avenue, Winter Park, FL 32792 | |
| 2. | Paul A. Cox | 3001 Aloma Avenue, Winter Park, FL 32792 | |
| 3. | Rory Allin | 3001 Aloma Avenue, Winter Park, FL 32792 | |
| 4. | | | |
| 5. | | | |
| 6. | | | |

DO NOT WRITE IN THIS SPACE - FOR BANK USE ONLY

| OFFICERS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. Chairman | Tony Lynch | 3001 Aloma Ave, Winter Park, FL 32792 | |
| 2. President | Paul A. Cox | 3001 Aloma Ave, Winter Park, FL 32792 | |

| ORIGINAL SIGNATURE (OFFICER, DIRECTOR OR INCORPORATOR) | TITLE | DATE |
|---|---|---|
| X  Paul A. Cox | President | 1/13/03 |

LYN 269
B 175

000439
EDTAR

# STATE OF DELAWARE

## 2003 ANNUAL FRANCHISE TAX REPORT

| DO NOT ALTER FILE NUMBER | | | | PHONE NUMBER | | |
|---|---|---|---|---|---|---|
| FILE NUMBER  3342221 | CORPORATION NAME  COINMASTER USA INC. | | | | | |
| FEDERAL EMPLOYER ID NO. | INCORPORATION DATE  JANUARY 10, 2001 | RENEWAL/REVOCATION DATE | DATE OF INACTIVITY | FROM  / / | TO  / / | |
| AUTHORIZED STOCK BEGIN DATE  01-10-2001 | ENDING DATE | DESIGNATION OR STOCK CLASS  CONMON | NO. OF SHARES  1,500 | PAR VALUE/SHARE | NO. SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE | ASSETS FOR REGULATED INVESTMENT CORPS  JAN. 1st  DEC. 31st |

| FRANCHISE TAX  $ 35.00 | $100.00 PENALTY  $ | 1.5% MONTHLY INTEREST  $ | ANN. FILING FEE  $ 25.00 | PREV CREDIT OR BALANCE  $ | PREPAID QRTY. PAYMENTS  $ |
|---|---|---|---|---|---|
| | | | | | AMOUNT DUE  $ 60.00 |

**MAKE CHECK PAYABLE TO:**
**DELAWARE SECRETARY OF STATE**

REGISTERED AGENT  9246740
DELAWARE INTERCORP, INC.
113 BARKSDALE PROFESSIONAL
CENTER
NEWARK , DE 19711-3258

| CHECK NO.  1155 | AMOUNT ENCLOSED  60.00 |
|---|---|

2    030104    3342221    000006000 0    0

$100.00 PENALTY if not Received on or before
MAR 1, 2004 Plus 1.5% interest per month.

Case 1:05-cv-00365-JJF Document 20-8 Filed 12/20/2008 Page 2 of 25

| NATURE OF BUSINESS | PRINCIPAL CLASS OF BUSINESS OUTSIDE OF DELAWARE | |
|---|---|---|
| Machine Sales & Distribution | 3001 Aloma Avenue, Winter Park, FL 32782 | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. | Lynch, Daniel A. | 3001 Aloma Avenue, Winter Park, FL 32792 | |
| 2. | Cox, Paul A. | 3001 Aloma Avenue, Winter Park, FL 32792 | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |

**DO NOT WRITE IN THIS SPACE · FOR BANK USE ONLY**

01/29/04 12 554101 16      173
48

| OFFICERS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. CHAIRMAN | DANIEL A. LYNCH | 3001 ALOMA AVENUE WINTER PARK FL 32792 | 6/05 |
| 2. PRESIDENT | PAUL A. COX | " " " " " | 6/05 |

| ORIGINAL SIGNATURE (OFFICER, DIRECTOR OR INCORPORATOR) | TITLE | DATE |
|---|---|---|
| X  Paul A. Cox | President | 1/20/04 |

LYN 271
B 177

# 2004 ANNUAL FRANCHISE TAX REPORT

DO NOT ALTER FILE NUMBER

| FILE NUMBER | CORPORATION NAME | | | RENEWAL/REVOCATION DATE | | DATE OF INACTIVITY | PHONE NUMBER | FROM / / | TO / / |
|---|---|---|---|---|---|---|---|---|---|
| 3342221 | COINMASTER USA INC. | | | | | | | | |

| FEDERAL EMPLOYER ID NO. | INCORPORATION DATE | NO. OF SHARES | PAR VALUE/SHARE | NO. SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE | ASSETS FOR REGULATED INVESTMENT CORPS |
|---|---|---|---|---|---|---|---|
| | JANUARY 10, 2001 | | | | | | JAN. 1st / DEC. 31st |

| AUTHORIZED STOCK BEGIN DATE | ENDING DATE | DESIGNATION OR STOCK CLASS | NO. OF SHARES | |
|---|---|---|---|---|
| 01-10-2001 | | COMMON | 1,500 | |

| FRANCHISE TAX | $100.00 PENALTY | 1.5% MONTHLY INTEREST | ANN. FILING FEE | PREV CREDIT OR BALANCE | PREPAID QRTY. PAYMENTS |
|---|---|---|---|---|---|
| $ 35.00 | $ | $ | $ 25.00 | $ | $ |

AMOUNT DUE $ 60.00

## MAKE CHECK PAYABLE TO:
## DELAWARE SECRETARY OF STATE

REGISTERED AGENT  9246740
DELAWARE INTERCORP, INC.
113 BARKSDALE PROFESSIONAL
CENTER
NEWARK , DE 19711-3258

| CHECK NO. | AMOUNT ENCLOSED |
|---|---|
| 1420 | 60.00 |

2   030105   3342221   000006000 0   9

$100.00 PENALTY If not Received on or before
MAR 1, 2005 Plus 1.5% Interest per month.

LYN 272
B 178

| NATURE OF BUSINESS | | PRINCIPAL PLACE OF BUSINESS OUTSIDE OF DELAWARE | |
|---|---|---|---|

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. President | PAUL A. COX | 3001 ALOMA AVENUE WINTER PARK FL 32742 | 10/06 |
| 2. Director | BRADLEY T. HUTCHEON | 565 BOYSENBERRY WAY OCEANSIDE CA 92057 | 10/06 |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |

DO NOT WRITE IN THIS SPACE - FOR BANK USE ONLY

| OFFICERS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. President | PAUL A. COX | As above | 10/06 |
| 2. Secretary | MARY COX | As Paul A. Cox | 10/06 |

ORIGINAL SIGNATURE (OFFICER, DIRECTOR OR INCORPORATOR)

X  Paul A. Cox

TITLE: President

DATE: 1/06/05

LYN 273
B 179

# 2005 ANNUAL FRANCHISE TAX REPORT

DO NOT ALTER FILE NUMBER

| FILE NUMBER | CORPORATION NAME | | PHONE NUMBER |
|---|---|---|---|
| 3342221 | COINMASTER USA INC. | | |

| FEDERAL EMPLOYER ID NO. | - | INCORPORATION DATE JANUARY 10, 2001 | RENEWAL/REVOCATION DATE | DATE OF INACTIVITY / / | FROM / / | TO / / |
|---|---|---|---|---|---|---|

| AUTHORIZED STOCK BEGIN DATE 01-10-2001 | ENDING DATE | DESIGNATION OR STOCK CLASS COMMON | NO. OF SHARES 1,500 | PAR VALUE/SHARE | NO. SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE | ASSETS FOR REGULATED INVESTMENT CORPS JAN. 1st DEC. 31st |
|---|---|---|---|---|---|---|---|---|

| FRANCHISE TAX | $100.00 PENALTY | 1.5% MONTHLY INTEREST | ANN. FILING FEE | PREV CREDIT OR BALANCE | PREPAID QRTY. PAYMENTS |
|---|---|---|---|---|---|
| $ 35.00 | $ | $ | $ 25.00 | $ | |
| | | | | | AMOUNT DUE $ 60.00 |

REGISTERED AGENT 9246740
DELAWARE INTERCORP, INC.
113 BARKSDALE PROFESSIONAL
CENTER
NEWARK , DE 19711-3258

**MAKE CHECK PAYABLE TO:**
**DELAWARE SECRETARY OF STATE**

| CHECK NO. | AMOUNT ENCLOSED |
|---|---|
| 1772 | 60.00 |

2   030106   3342221   000006000 0   8

$100.00 PENALTY if not Received on or before
MAR 1, 2006 Plus 1.5% interest per month.

LYN 274
B 180

| NATURE OF BUSINESS | PRINCIPAL PLACE OF BUSINESS OUTSIDE OF DELAWARE | | |
|---|---|---|---|
| Machine | | | |

| DIRECTORS | NAME | STREET/CITY,STATE,ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. President | PAUL A. COX | 3001 ALOMA AVENUE, WINTER PARK, FL 32792 | 10/06 |
| 2. Director | BRADLEY T. HUTCHEON | 585 BOYSENBERRY WAY, OCEANSIDE, CA 92057 | 10/06 |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |

--- DO NOT WRITE IN THIS SPACE – FOR BANK USE ONLY ---

| OFFICERS | NAME | STREET/CITY,STATE,ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. PRESIDENT | PAUL A. COX | As above. | 10/06 |
| 2. SECRETARY | MARY COX | As for Paul A. Cox | 10/06 |

| ORIGINAL SIGNATURE (OFFICER, DIRECTOR OR INCORPORATOR) | TITLE | DATE |
|---|---|---|
| X _Paul A. Cox_ | President | 1.06/06 |



# COINMASTER USA Inc.

**3001, ALOMA AVENUE, WINTER PARK, FL 32792**

TEL: 1 407 672 1250                                                                 FAX: 1 407 678 4751

November 15, 2002

Mr. Daniel A. Lynch
69707 Camino Pacifico
St. Augustine
Rancho Mirage, CA 92270

Dear Mr. Lynch,

We propose that the terms of the Agreement between yourself and Coinmaster USA Inc., for the provision of your services, as Chairman of Coinmaster USA Inc. on an expenses only basis, be amended to the following with effect from December 1, 2002. This will now take account of the extensive travelling required for you to perform your duties. Please retain all receipts for travel, in case we are ever audited.

1. This agreement will be perpetual in nature, in recognition of the value of your services to the business.

2. Your services will be provided on an as required (time) basis, and the expenses paid to yourself, will be on the following scale:

|                     |                     |
|---------------------|---------------------|
| 2003 Financial Year | $8,000 per month    |
| 2004 Financial Year | $12,000 per month   |
| 2005 Financial Year | $14,000 per month   |

You may choose to defer payment or receive payment on this basis, at your choice.
This scale will be increased by 5% per month annually, beginning in January 2006.

3. You will be entitled to an annual bonus of 5% of the Company's net profit each year, as recorded by the Company's accountants. Such bonus will be paid in the month after the Company's accountants report is submitted, or later as you choose. (It must however be in the same business year.) This will be declared to the IRS as income, as required by law.

5. A stock option scheme will be put in place by January 2003, giving you a further incentive to achieve a high performance.

HEAD OFFICE: COINMASTER GAMING PRODUCTS LTD.   321 PENARTH ROAD, CARDIFF, CF11 8TT UK EUROPE
TEL: +44 (0) 29 2064 9500   FAX: +44 (0) 29 2064 9549
www.coinmaster-gaming.com



**LYN00149**
B 182

6. In the event that Coinmaster USA Inc. decides to terminate this relationship for any reason, or to change your position in the organization, at any time, compensation for this loss, to be paid to yourself, will be

| | |
|---|---|
| In the 2003 year | $500,000 |
| In the 2004 year | $600,000 |
| In the 2005 year | $700,000 |
| Thereafter | $800,000 |

This obligation must be met in full, on the date of termination.

All rights to stock options accrued will be retained in these circumstances, and entitlement to annual bonus will be on a pro rata monthly basis.

7. You may give the corporation one year's notice of your intent to terminate this agreement, at any time. Unless the corporation agrees otherwise in writing, the notice must be fully worked, and all the obligations of the corporation relating to this agreement will be terminated at the end of this notice period, with the exception of any stock option rights and any bonus due.

We trust that you will find this new basis for our relationship exciting, and we look forward to our mutual success.

Please signal your acceptance of the terms of this arrangement, by signing below and returning the original to our corporate office. The second copy is for your file.

If any part of this Agreement is found to be legally invalid, it shall not invalidate the rest of the Agreement. This Agreement shall be interpreted under the laws of the State of Delaware.

Regards,

P. A. Cox
President

I accept the terms of this proposal in full.

D. A. Lynch                                   Dated  11/17/02
Chairman
Coinmaster USA Inc.

HEAD OFFICE: COINMASTER GAMING PRODUCTS LTD.  321 PENARTH ROAD, CARDIFF, CF11 8TT UK EUROPE 
TEL: +44 (0) 29 2064 9500  FAX: +44 (0) 29 2064 9549
www.coinmaster-gaming.com

LYN00150
B 183

| From: | 'Paul A. Cox' <PaulCoxFlorida@MindSpring.com> |
|---|---|
| To: | Free Tony<T.Lynch17@ntlworld.com> |
| Sent: | Wednesday, March 19, 2003 6:09 AM |
| Subject: | Miscellany |

Hi Tony.

1. I'm banking your $8K this morning. Regrettably, the auto payment will
have to wait a little while.

2. Your non-prescription item hasn't arrived here yet!
I'll send it on as
soon as it does.

3. Some documents from you whenever you can:
Auto title, purchase docs, and
insurance docs.
Some Bank deposit slips
A copy of your UK Contract
(which is probably invalid now anyway?)

Regards,


Paul
paulcoxflorida@mindspring.com

( 4 )

**From:**       'Paul A. Cox' <PaulCoxFlorida@MindSpring.com>
**To:**          Free Tony<T.Lynch17@ntlworld.com>
**Sent:**        Wednesday, May 28, 2003 9:53 AM
**Subject:**     Expenses

Hi Tony.

I paid $8K into your US Account today.

Regards

Paul
Coinmaster USA Inc.
paulcoxflorida@mindspring.com

B 185

| | |
|---|---|
| **From:** | 'Paul A. Cox' <PaulCoxFlorida@MindSpring.com> |
| **To:** | Free Tony<T.Lynch17@ntlworld.com> |
| **Sent:** | Monday, June 23, 2003 8:04 AM |
| **~ubject:** | Payments etc. |

Hi Tony.

1. I've  today placed June's payment of $8K into your
Bank Account.

2. I'm down to my last deposit slip. Please send more!

3. Can you please now let me have Title to the Company
vehicle? (It's still
insured in your name until we complete this.)

4. Can you also please let me have the release I sent
you to get the Mazda
off the insurance policy?

Thanks,
Paul
Coinmaster USA Inc.
paulcoxflorida@mindspring.com

| | |
|---|---|
| From: | 'Paul A. Cox' <PaulCoxFlorida@MindSpring.com> |
| To: | Free Tony<T.Lynch17@ntlworld.com> |
| Sent: | Thursday, September 25, 2003 2:50 AM |
| Subject: | Payment |

Hi Tony.

Where shall I send your payment this month?

Shall I FedEx it so you can take it to Spain? (It would
get to you Monday if
I do it today.)

Regards,

Paul
Coinmaster USA Inc.
paulcoxflorida@mindspring.com

B 187

 

**3001, ALOMA AVENUE, WINTER PARK, FL 32792**
TEL: 1 407 672 1250                                                    FAX: 1 407 678 4751

November 15, 2002

Mr. Paul A. Cox
Tri-County Entertainment Inc.
752 Coachlight Drive
Fern Park, FL 32730-3120

Dear Mr. Cox,

We propose that the terms of the Agreement between Tri-County Entertainment Inc. and Coinmaster USA Inc., for the provision of your services, as President and Chief Executive Officer of Coinmaster USA Inc. on a fee basis, be amended to the following with effect from December 1, 2002.

1. This agreement will be perpetual in nature, in recognition of the value of your services to the business.

2. Your services will be provided on an as required (time) basis, and the fee paid to Tri-County Entertainment Inc. to reflect these services, will be on the following scale:

| | |
|---|---|
| With six sited participation machines | $3,500 per month |
| With eight sited participation machines | $4,500 per month |
| With ten sited participation machines | $5,500 per month |
| With twelve sited participation machines | $6,500 per month |
| With fourteen sited participation machines | $7,000 per month |
| With sixteen sited participation machines | $7,500 per month |

And a further $1,000 per month for every eight participation machines thereafter.

Tri-County Entertainment Inc. may invoice, Coinmaster USA Inc. on this basis in the month following installation of sited machines. You may choose to defer payment or invoice on this basis, at your choice.

This scale will be increased by 2.5% per month annually, beginning in January 2004.

3. You may in addition claim reasonable business expenses for business trips and Trade Show visits that may be necessary from time to time, and for expenses to do with the performance of your duties. Receipts must be provided for all expenses claimed.

4. You will be entitled to an annual bonus of 3% of the Company's net profit each year, as recorded by the Company's accountants. Such bonus shall be invoiced by Tri-County in the month after the Company's accountants report is submitted, or later as you choose.
(It must however be in the same business year.)

HEAD OFFICE: COINMASTER GAMING PRODUCTS LTD.  321 PENARTH ROAD, CARDIFF, CF11 8TT UK EUROPE
TEL: +44 (0) 29 2064 9500  FAX: +44 (0) 29 2064 9549
www.coinmaster-gaming.com



**LYN00151**
**B 188**

5. A stock option scheme will be put in place by January 2003, for Tri-County Entertainment Inc. giving you a further incentive to achieve a high performance.

6. In the event that Coinmaster USA Inc. decides to terminate this relationship for any reason, at any time, or to change your position in the organization, compensation for this loss or change, to be paid to Tri-County Entertainment Inc., will be

|                    |           |
|--------------------|-----------|
| In the 2003 year   | $300,000  |
| In the 2004 year   | $400,000  |
| In the 2005 year   | $500,000  |
| Thereafter         | $600,000  |

In the event that Coinmaster USA Inc., opts to exercise this option for termination, in the early years, and because there will be no established value to the stock, at this point in time, Coinmaster USA Inc, must simultaneously pay you $300,000 for the 10% stock you hold in the corporation if exercised in 2003, and $400,000 if in 2004, and $500,000 if in 2005. By accepting this agreement, you accept the obligation to sell your stock to the corporation in these circumstances. If a prior listing, for the US Corporation has taken place, the responsibility to undertake this stock transaction is waived by both parties.

These obligations must be met in full, on the date of termination.

All rights to stock options accrued will be retained in these circumstances, and entitlement to annual bonus will be on a pro rata monthly basis.

7. You may give the corporation one year's notice of your intent to terminate this agreement, at any time. Unless the corporation agrees otherwise in writing, the notice must be fully worked, and all the obligations of the corporation relating to this agreement will be terminated at the end of this notice period, with the exception of any stock option rights and, any bonus due.

We trust that you will find this new basis for our relationship exciting, and we look forward to our mutual success.

Please signal your acceptance of the terms of this arrangement, by signing below and returning the original to our corporate office. The second copy is for your file.

If any part of this Agreement is found to be legally invalid, it shall not invalidate the rest of the Agreement. This Agreement shall be interpreted under the laws of the State of Delaware.

Regards

Daniel. A. Lynch
Chairman

HEAD OFFICE COINMASTER GAMING PRODUCTS LTD.  321 PENARTH ROAD, CARDIFF, CFII 8TT UK EUROPE
TEL: +44 (0) 29 2064 9500  FAX: +44 (0) 29 2064 9549
www.coinmaster-gaming.com



LYN00152
B 189

I accept the terms of this proposal in full, on behalf of Tri-County Entertainment Inc.

Paul A. Cox
Chairman
Tri-County Entertainment Inc.

Dated   11/17/02

LYN00153
B 190

**Main Identity**

| | |
|---|---|
| **From:** | <t.lynch17@ntlworld.com> |
| **To:** | "Paul A. Cox" <PaulCoxFlorida@MindSpring.com> |
| **Sent:** | Tuesday, July 29, 2003 7:20 AM |
| **Subject:** | Re: Misc. |

Hi Paul,
     I will organize the slips by mid next month. The amount you have deposited, is it half the normal fee?  we need to start paying Mike L this month. Can you email him with the Co. name to send his invoice to.

My Spanish address is 75 Verdemar II, Croseo Villas
Villamartin, Torrevieja Nr. Alicante. Spain.
>
> From: "Paul A. Cox" <PaulCoxFlorida@MindSpring.com>
> Date: 2003/07/25 Fri PM 12:01:44 GMT
> To: "Free Tony" <T.Lynch17@ntlworld.com>
> Subject: Misc.
>
> Hi Tony
>
> First a reminder. I'm going to make a deposit into your account (probably
> Monday) using the last deposit slip I have.
> Please send more! Making a deposit to a California account, in Florida
> without a deposit slip is very time consuming.
>
> Second I need a mailing address. I have mail for you.
>
> Regards
>
> Paul
> Coinmaster USA Inc.
> paulcoxflorida@mindspring.com
>
>
>

------------------------------------------------
Email provided by http://www.ntlhome.com/

CM-BR 000799

5/26/2006

B 191

# COINMASTER USA INC.
### A DELAWARE COMPANY
113 Barksdale Professional Center
Newark, DE 19711

## Special Board Meeting

Held on November 29, 2002, at 10 a.m.

Present: Mr. D. A. Lynch, Mr. P. A. Cox.

Also Present Mrs. M. Cox, as Secretary

Apologies were received from Mr. R. Allin.

Mr. D. A. Lynch chaired the meeting.

## Special Item

Mr. Cox presented a proposal for a Stock Option Scheme.

This proposal was approved without alteration

It was proposed by the Chairman, and unanimously approved that 5% of the Corporations stock, be allocated as options, in the manner agreed, to Mr. D. A. Lynch, Mr. R.R. Allin, Mr. P. A. Cox, and Mr. B Hutcheon.

Mr. Lynch agreed to try to clarify the ongoing position of Mr. Allin, as soon as practical.

Mr. Cox was directed to allocate the stock options as time permitted.

There being no further business, the meeting closed at 10.40 a.m.

*Mary Cox*
Secretary

LYN00045

B 192

⑩

## COINMASTER USA INC.
A DELAWARE COMPANY
113 Barksdale Professional Center
Newark, DE 19711

**Board Meeting**

Held on July 3, 2003, at 10 a.m.

Present: Mr. D. A. Lynch, Mr. P. A. Cox.

Also Present Mrs. M. Cox, as Secretary

Mr. D. A. Lynch chaired the meeting.

Item

Mr. Cox presented a paper suggesting a more pragmatic approach to machine sales.

This paper was approved without alteration as corporate policy.

Mr. Cox was directed to brief Mr. Hutcheon personally, and in detail, and to allow him to undertake machine sales whenever necessary, extracting extra participation agreements in return if possible, or maintenance arrangements if not.

There being no further business, the meeting closed at 10.40 a.m.

Mary Cox
Secretary

**LYN00050**

B 193

# COINMASTER USA INC.
### A DELAWARE COMPANY
113 Barksdale Professional Center
Newark, DE 19711

11/29/02

File Note

Mr. Lynch reported to Mr. Cox, that the terms of his proposed Agreement with the Corporation may be in conflict with the Terms of a Service Agreement he has with Coinmaster Gaming Products Ltd, (CGPL), in the UK.

Mr. Lynch agreed to provide a copy of the Agreement with CGPL to Mr. Cox, for review by the Corporation's attorneys.

If this review concludes that there is a conflict, Mr. Lynch asked that the Coinmaster USA Inc. Agreement be voided.

Paul A. Cox
President

LYN00044

B 194

## Main Identity

| | |
|---|---|
| **From:** | <awolstenhol@UK.EY.COM> |
| **To:** | <PaulCoxFlorida@MindSpring.com> |
| **Cc:** | <kover@UK.EY.COM> |
| **Sent:** | Sunday, June 22, 2003 10:07 AM |
| **Subject:** | Re: Coinmaster USA Inc – without prejudice |

Paul

Without prejudice and subject to contract

Thank you for the email and further to our discussion I would make the following comments as to a revised proposal:

Agreement paragraphs

1 . Agreed subject to the directors having the normal statutory duties in respect of the provision of information. The directors must also agree to fully cooperate with any proposed sale process and any failure to do so will render this agreement null and void.

2 . Agreed.

3. 1 & 3.2 In order to properly incentivise management , we propose:

If Consideration paid is equal or less than $1.5million – US management receive a lump sum of $250,000 . The exact form of this in terms of stock purchase or termination of contracts is not an issue from our perspective although we will require the shareholding to be transferred as you suggest.

For Consideration between $1.5m and $2.0m, management receive 20% of the additional consideration (i.e upto $100,000)

For Consideration between $2.0m and $3.0m, management receive 25% of the additional consideration (i.e upto $250,000). Therefore if Consideration is $3.0m the total package will be $600,000.

For Consideration above $3.0m, management receive 25% of the additional consideration with no upper limits.

Consideration is defined as the net figure actually paid by the purchaser after reflecting any assumed obligations (e.g GLI , RERogers) taken on by the Purchaser and also after deduction of (1)Vendor legal costs connected directly with the sale (2) Any other payments directly required to facilitate the sale to regulatory or other parties.

Any amounts due to management under this agreement in respect of deferred Consideration will be settled on a "paid when paid" basis

CM-BR 000769

5/26/2006

B 195

within 5 days of receipt .

Managment will be responsible for dealing with any tax liabilities
arising from the payments.

Payment mechanism is agreed, however all funds payable by the Purchaser
will be to a lawyers' account we nominate, from which the settlement
payments will be made to Tri-County Entertainment Inc

Amounts payable on completion will only be made subject to all of the
directors:
   Confirming that all service agreements and any other claims they have
   against the company are extinguished.
   Delivering up resignation documents.
   Any failure by any director to provide the above, will render this
   agreement null and void.

3.3 Agreed, subject to Brad Hutcheon delivering on completion a
confirmation that he accepts the payment of $25,000 on the basis of
cancellation of any rights under the stock option. The position regarding
Brad's employment contract and any rights under it will obviously depend on
the nature of the Purchaser's offer (i.e stock or assets).

4. See above - % for proceeds above increased from 20% to 25% to
incentivise management

5. Agreed, however in practice there maybe some need to wrap up / liquidate
the company in the event of a asset rather than a stock sale. I suggest we
deal with that once the form of any sale is understood.

6. Agreed - exclusion of personal documents is understood except to the
extent that these relate in any way to the business and affairs of
Coinmaster USA Inc or Coinmaster Gaming Products Limited /Coinmaster Gaming
plc. The point I am trying to make here is that that the fact a document is
sensitive should not meant it is expunged if it is of a business nature.

7. Agreed

I am on holiday next week Tuesday - Friday however should be contactable if
required . My mobile was lost/stolen this weekend so the revised number is
44 7960 399006 for the time being

Regards


Adrian Wolstenholme
Joint Administrative Receiver acting as agent for the Companies and without
personal liability

The Institute of Chartered Accountants of England and Wales authorise
Adrian Wolstenholme and Ian Best to act as Insolvency Practitioners under

CM-BR 000770

5/26/2006

B 196

s390 of the Insolvency Act 1986

Ernst & Young LLP
One Colmore Row
Birmingham
B3 2DB

Office      – 0121 535 2000
Direct line – 0121 535 2656
Fax         – 0121 535 2448
Mobile      – 07785 355904


"Paul A. Cox"
<PaulCoxFlorida@Mind      To:    "Adrian Wolstenholme"
<AWolstenhol@UK.EY.com>
Spring.com>              cc:
                        Subject: Coinmaster USA Inc  [Virus checked] (Attachments
Removed)
18/06/2003 16:18


Hi Adrian,

Attached is my attempt to Draft out what we discussed yesterday. Feel free
to amend it as you set fit, and return it to me for further consideration.

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.
paulcoxflorida@mindspring.com


#### Outline of agreement with Receiver June 18 03.dot has been removed
from this note on June 22 2003 by Adrian Wolstenholme


This e-mail contains proprietary information some or all of which may
be legally privileged. It is for the intended recipient only. If an
addressing or transmission error has misdirected this e-mail, please
notify the author by replying to this e-mail. If you are not the
intended recipient you must not use, disclose, distribute, copy,
print or rely on this e-mail. The UK firm Ernst & Young LLP is a

CM-BR 000771

5/26/2006

B 197

limited liability partnership registered in England and Wales with
registered number OC300001 and is a member practice of Ernst & Young
Global.  A list of members' names is available for inspection at
Becket House, 1 Lambeth Palace Road, London SE1 7EU, the firm's
principal place of business and its registered office.

Ernst & Young is proud to sponsor Art Deco 1910-1939 at the V&A Museum
(27th March - 20th July 2003). This exhibition will be the first to
explore Art Deco as a global phenomenon. Advance booking is recommended.

Information and tickets:
http://www.vam.ac.uk/vastatic/microsites/1157_art_deco/

CM-BR 000772

5/26/2006

B 198



# COINMASTER® USA Inc.

**3001, ALOMA AVENUE, WINTER PARK, FL 32792**

TEL: 1 407 672 1250                                         FAX: 1 407 678 4751

September 2, 2003

To: All Recipients of this Information Pack

Re: Contents of Pack

Dear Recipient,

The enclosed "Information Pack" has been put together at the request of the "Receiver of the UK Coinmaster Companies", Adrian Wolstenholme. It is intended to give you sufficient information to decide whether you are interested in making an investment in Coinmaster USA Inc., by purchase of the majority of the Corporation's Stock held by Coinmaster Gaming Products Ltd, or possibly by some other means.

We have attempted to keep the pack as factual as possible. Where we have given opinions they are my own honest opinions, based on the almost three years experience I have in managing this business. They are not the opinions of the Receiver. I must confess to having an interest in how this situation plays out, but I have genuinely tried not to let this influence the opinions I have given.

The pack has been put together without staples, for easier handling, and has been lightly sealed to avoid pages dropping out in transit. We have checked the contents three times, and are sure that all the information that we meant to present is in fact contained in the pack.

Should you have any questions of clarification, please call me at the number listed at the head of this page. If I am not available, I will try to respond as quickly as possible. If you have any requests for further information, please direct these to Adrian, who will consider your request. Any new information sent out would I believe be issued simultaneously to all Recipients of this pack who are still interested in the investment prospect at that time.

Sincerely,

Paul A. Cox
President and CEO

LYN00146

Coinmaster USA Inc.

Organization: People



As at June 1, 2003

Board of Directors

(There are no other Directors, at this time.)

**A.D. (Tony) Lynch**
Chairman (UK Based)

**Paul A. Cox**
President & C.E.O.

**Brad Hutcheon**
Sales Manager

**John Perretta III**
**Anthony Kealoha**
(+ Other Technicians on appointment)

B 200

**Mr. Lynch**

Mr. Lynch has been Chairman of Coinmaster USA Inc. since it's inception. He was very largely responsible for the Corporations entry and progress in the California marketplace.

The Receiver of the UK Coinmaster Companies recently challenged the validity of Mr. Lynch's Contract with Coinmaster USA Inc. Although his arguments were well thought through, the attorneys for Coinmaster USA Inc. have advised the Corporation that the Receiver's arguments are without merit in the Corporation's home State of Delaware.

Mr. Lynch therefore continues to work with the Corporation and to receive the benefits outlined in his contract.

It is hoped that this matter will not lead to litigation.

PAC
August 2003

LYN00147

B 201

(16)

D.A. Lynch
134 The Aspect
Queen Street
Cardiff  CF10 2GP 28th Feb 2003.


The Board of Directors
Coinmaster Gaming PLC.
321 Penarth Road
Cardiff CF11 8TT


I Tony (DA) Lynch resign as a director at this date from Coinmaster Gaming Plc, and Coinmaster Products Ltd.


Yours faithfully


DA Tony Lynch.


Received from Keith

10/11/04

⑰

| From: | 'tony lynch' <tony.lynch@hvillas.e.telefonica.net> |
|-------|-----|
| To: | Paul A. Cox<PaulCoxFlorida@MindSpring.com> |
| Sent: | Monday, May 24, 2004 9:47 AM |
| Subject: | Coinmaster |

Hi Paul,
        I do not intend to do anything, only to point out options that may be worth considering.

Regards    Tony.


—— Original Message ——
From: Paulcoxflorida@mindspring.com
To: tony highview
Sent: Monday, May 24, 2004 12:05 PM
Subject: Re: Silence

Hi Tony.

I took the week end off.

Everything we have done to date is consistent with the promotion of the best interests of Coinmaster USA Inc.

I see your recent emails as straying well away from this position. I understand the logic, and in fact I have pointed out the hypocrisy of the current situation to the Receiver and his deputy at various times during this process.

I also believe that I understand the deep frustration you feel as a result of the treatment you are receiving from the Bank, in the proposal that you be separated from Coinmaster USA Inc until they are repaid. (I do not believe that this position can continue beyond that time.)

However the fact remains that you and I, as Directors, owe a clear fiduciary duty to Coinmaster USA Inc. Anything that is inconsistent with this is not allowable.

Should you wish to resign from the Board of Coinmaster USA Inc at this time, then you can clearly do whatever you wish, subject to any lingering constraints that may exist under the laws of the State of Delaware. (I am not aware of any, but I'm not an attorney.)

I would not advise or wish you to take this course of action. However we are clearly at a crossroads.

My position is straight forward. I have a crystal clear responsibility to Coinmaster USA Inc. I intend to see this through.

No doubt you will let me know what you plan to do.

Regards,

Paul
Coinmaster USA Inc.

| | |
|---|---|
| **From:** | 'Paulcoxflorida@mindspring.com' <paulcoxflorida@mindspring.com> |
| **To:** | tony highview<tonyhighview@hvillas.e.telefonica.net> |
| **Sent:** | Tuesday, May 25, 2004 7:58 AM |
| **Attachments:** | Sycuan Renewal Letter, April 16 2004.dot |
| **Subject:** | Fw: meeting |

Hi Tony.

I thought that I would get the some of the content of your proposed meeting Agenda out of the way so that you can add more items if you wish.

Please see below.

—— Original Message ——
**From:** tony lynch
**To:** Paul A. Cox
**Sent:** Tuesday, May 25, 2004 9:12 AM
**Subject:** meeting

Hi Paul,
         I request a meeting with you next week, I will come and see you at your convenience.

I would like to view and discuss the following:-

1. Non disclosure you signed with the Receiver
I cannot show you this! I don't understand its importance to you anyway.

2. The proposed contract with the Receiver
I can only show you the document proposed for the settlement with yourself, at this time. (Which I was planning to send to you anyway. See my earlier email.)
The Receiver has in the last few minutes agreed all the changes I proposed to the documents yesterday, and "promised" me the final version of all documents by Friday, subject to the attorneys getting it done!

3.All applications for existing, new or renewal of licences by Indian casinos where I am included in the application.
You haven't been included in any applications directly since you agreed in principle to the proposed buy-out deal. We have not submitted any information which has been prepared since that time, relating to yourself to any tribe. (Since you were living in Spain, largely inactive in the business and have agreed to exit in principle.) We have used the type of letter as per the attached example, to handle this difficult period, when required to do so. The licensing authorities have universally accepted this. In some instances we have chosen to update the date for separation, as the legal work continued.

4. To discuss a resolution of the position with HV
Fine. The sooner the better.

5. To supply me with a cheque book and be a signature at the bank of HV.
Fine. We will also need to agree how cash is controlled in this environment.


You are welcome to stay at our house in Casselberry. (We have largely moved during the week, from the beach to Casselberry. Gareth remains in Cocoa Beach.)

Regards  Tony.

Regards,

Paul
Coinmaster USA Inc.

19

**From:**      'Paulcoxflorida@mindspring.com' <paulcoxflorida@mindspring.com>
**To:**        tony highview<tonyhighview@hvillas.e.telefonica.net>
**Sent:**      Thursday, June 10, 2004 7:16 AM
**Subject:**   The Coinmaster USA Inc. Deal

Hi Tony.

Somewhat surprisingly, we've fixed all the outstanding points in this proposed deal, with a six person conference call, this morning!

Assuming the documents come out as predicted, then we intend to close on Wednesday, next week! (There were no further changes to the document proposed as a settlement with yourself. I think there were a few legal changes made by the attorneys last week. Dotting "i's" and crossing "t's" again!)

As I said to you, the key things are that I'm the person who judges default under your agreement, and the reasons for default, are only those contained in paragraph 9.1.

You must decide whether you want to sign this agreement, or not. Clearly it looks fairly tedious when written in "legalese", but it also has some benefits! (The release from any Receiver or Bank attack, however unlikely, and the payment due, assuming we survive!)

I'll send you the proposed signature document, when I have it. I guess the Blank Rome attorneys will co-ordinate the signature process.

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.

20

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| **From:** | "COINMASTER" <coinmaster@cox.net> |
| **To:** | "Paul Cox" <paulcoxflorida@mindspring.com> |
| **Sent:** | Wednesday, June 16, 2004 10:45 AM |
| **Subject:** | Tony Lynch |

Paul,

After yesterday's talk I'm deeply concerned that Tony may turn out to be that dog you can't shake off your leg! In the event we close and fire Tony, what are the chances of you and me facing litigation from Tony in the near future? Also, I don't think I'm out of line for requesting this but if he continues to pull these shenanigans, I'd like to be granted 1/2 of the shares of CMUSA stock that you were going to give to him upon repayment of the debt and subsequent stock repurchase. You would still be majority stockholder and the guys who are going to make this whole thing work, you and I, will benefit according to the role we played. Keep in touch.

Sincerely,
BRAD HUTCHEON
COINMASTER USA
(760) 533-8676 PH
(760) 726-4458 FAX

6/1/2006

CM-BR 001193

B 206

### Paulcoxflorida@mindspring.com

| | |
|---|---|
| **From:** | "Paulcoxflorida@mindspring.com" <paulcoxflorida@mindspring.com> |
| **To:** | "COINMASTER" <coinmaster@cox.net> |
| **Sent:** | Wednesday, June 16, 2004 11:24 AM |
| **Subject:** | Re: Tony Lynch |

Hi Brad.

I don't disagree with your sentiments. I thought that I was being kind, by ultimately returning the situation to what we agree in Phoenix, in 2003.

Now I just don't know. I don't know whether Tony is friend or greedy foe. I guess the next few days will tell. Nobody has written to me from the UK since the Tony issue happened yesterday. I think they're in waiting mode. The attorneys are quiet too! I guess this may roll on for a while.

In relation to stock, once again I feel sympathetic to your views. Thanks for your checks. I've filed them out of harm's way.

Regards
Paul
Paul A. Cox
Coinmaster USA Inc.

CM-BR 001187

B 207

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| **From:** | <ibest@UK.EY.COM> |
| **To:** | <Paulcoxflorida@mindspring.com> |
| **Cc:** | "Guarton, Gregory B." <Guarton@BlankRome.com>; <kover@UK.EY.COM>; "Rob Salad" <RSalad@CooperLevenson.com> |
| **Sent:** | Thursday, June 17, 2004 6:20 AM |
| **Subject:** | Re: Tony Lynch |

Paul,

We seem to be getting close to final documents.

If Tony refuses to sign, then I suggest we proceed as follows:

We sign up all the documents and complete the deal.
Post completion you should approach Tony to see if he will sign up the agreement.
If he refuses, we should discuss Tony's position and particularly whether dismissing him is the right way forward. I haven't looked at this closely for more than 6 months but I suspect that may be the only option.
The UK receivers would want to be involved in any litigation that ensued and be fully consulted before any additional money beyond the $8,000 was offered up front in settlement.

I hope this helps.

Regards

Ian

Ian Best
Transaction Advisory Partner – Corporate Restructuring
DL: 0121 535 2370
DF: 0121 535 2448
Mobile: 07785 355896


"Paulcoxflorida@mind
spring.com"          To:
<ibest@UK.EY.COM>
         <paulcoxflorida          cc:      "Guarton, Gregory B." <Guarton@BlankRome.com>,
<kover@UK.EY.COM>, "Rob Salad"
                          <RSalad@CooperLevenson.com>
         15/06/2004 17:43          Subject:  Re: Tony Lynch

6/1/2006

CM-BR 001194

B 208

Please respond to
Paulcoxflorida

Hi Ian.

You guys believe that Tony has no contract with us that is valid anyway.
(We
didn't hold that view, but you may be right.) It may be weeks before Tony's
attorney contacts us. Tony gave me the impression he wanted to play this
slowly! (Tony will use normal mail to get any documents to his new
attorney!)

If he doesn't want to sign the document as is, I'm prepared to "fire him"
(as I told you last week!) Then he can pursue us through the courts.
Regarding Tony as a continuing Director because of his inactions isn't a
sensible proposition at this stage.

What I'm not prepared to do is wait around at Tony's pleasure.

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.

Ernst & Young is proud to sponsor Art of the Garden at Tate Britain (3rd
June - 30th August 2004). This is the first major exhibition to examine
the relationship of the garden and British art. Advance booking is
recommended.

Information and tickets:   www.tate.org.uk/artofthegarden

This e-mail and any attachment are confidential and contain proprietary
information, some or all of which may be legally privileged. It is
intended solely for the use of the individual or entity to which it is
addressed. If you are not the intended recipient, please notify the
author immediately by telephone or by replying to this e-mail, and then
delete all copies of the e-mail on your system. If you are not the
intended recipient, you must not use, disclose, distribute, copy, print
or rely on this e-mail.

6/1/2006

CM-BR 001195

B 209

Whilst we have taken reasonable precautions to ensure that this e-mail
and any attachment has been checked for viruses, we cannot guarantee
that they are virus free and we cannot accept liability for any damage
sustained as a result of software viruses.  We would advise that you
carry out your own virus checks, especially before opening an
attachment.

The UK firm Ernst & Young LLP is a limited liability partnership
registered in England and Wales with registered number OC300001 and is a
member practice of Ernst & Young Global.  A list of members' names is
available for inspection at 1 More London Place, London, SE1 2AF, the
firm's principal place of business and its registered office.

6/1/2006

CM-BR 001196

B 210

23

| | |
|---|---|
| **From:** | 'Paulcoxflorida@mindspring.com' <paulcoxflorida@mindspring.com> |
| **To:** | tony highview<tonyhighview@hvillas.e.telefonica.net> |
| **Sent:** | Thursday, July 01, 2004 6:45 AM |
| **Subject:** | Settlement |

Hi Tony.

I've just had a letter from your attorney implying that you are trying to renegotiate the settlement agreement between yourself and Coinmaster USA Inc, rather than just mute the "legalese". This was not my understanding of what you were trying to do.

I hope this is a mistake on his part!

In the meantime, until this matter is resolved all co-operation between Coinmaster USA Inc and yourself, will cease. The SAS tools will not be provided to Mike, and no other activity will take place.

Should progress not be made rapidly in this matter, the settlement offer will be withdrawn, and the matter can be settled in the Delaware courts.

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.

## Main Identity

| | |
|---|---|
| **From:** | <awolstenhol@UK.EY.COM> |
| **To:** | <PaulCoxFlorida@MindSpring.com> |
| **Sent:** | Wednesday, July 23, 2003 1:53 PM |
| **Subject:** | Coinmaster USA Inc Re: Fee Agreement Subject to Contract |

Paul

Thank you for your response.

By way of background the draft I sent you is being reviewed by our lawyers as we speak to there are further changes which will come through on the next version in any event.

Dealing with your points:

1a. Brad Hutcheon

The position regarding Brad's option has been somewhat unclear ; I refer in particular to your email of 23 May which stated that
"I intend to increase Brad's salary from June 1 and implement the management stock option scheme previously approved".

I had worked on the basis that this was the case and this was to some degree clarified in our conversation on Friday. In principle I am happy to cover Brad in a separate side letter however before doing so my lawyers have asked for clarification on the nature/form of the "promise" made to Brad. Please could you supply details/copies of the form of promise to allow me to cover this off.

1b . Directors Service Contracts

I recall from our previous conversations that you indicated that Tony's contract had not actually been entered into and was currently held in a safe. Please could you clarify the position on this.

2. The Inter-Company Debt

I am only in a position to use what information is contained within the management accounts until you have made the necessary adjustments to the accounts for items paid on behalf of UK, so this is really in your court.

I do not accept the position regarding Winning Post being on trial without first seeing documentary proof. Is this trial indefinite ? Please can you provide this evidence give you the ability to return it for a full credit despite its use / wear and tear / revenue generated.

In addition your note of 16 July indicates that the machine formerly at Pechanga is being broken up for spares to leave empty cabinets for return

CM-BR 000793

5/26/2006

B 212

to Capital / scrap.  Clearly this does not seem logical if the machine is
on trial and needs to be returned as a complete machine?

3. Management Assurances

Unfortunately the draft I sent you missed one additional clause as 3.1, I
was proposing to cover the overriding obligations of the directors - my
suggested wording was

3.1 "The Management will at all times continue to carry out their duties in
accordance with the bylaws of Coinmaster USA Inc and in accordance with
Delaware law".

With regard to the clauses within 3 , I am somewhat struggling to see which
of these you find so unreasonable:

I assume Cl's 3.2.1 & 3.2.2 are ok other than my lawyers have suggested
Cl 3.2.1 covers management both in respect of their directors position
and also their employment.

With respect to Cl 3.3 & 3.4 these are designed to ensure we get a
reasonable level of cooperation both in respect of the sale process and
also being informed of changes in the business - is this really an
unreasonable requirement? As an extreme example I fail to see why we
should pay a fee  in a scenario where Management acted in a totally
unreasonable way (effectively amounting to gross misconduct under which
we would probably be entitled to terminated any service agreements) and
by doing so breached Cl 3.2-3.11 as this would clearly effect the value
obtained for the business and our recovery. Are there particular clauses
you have an issue with ?

One suggestion I would make is that in the event of a default under Cl.
3 we add a clause to say that we are required to serve a default notice
on Management and in the event that this happens the Fee would be held
by the nominated solicitors pending resolution of the dispute ? Both
sides would be required to fund their own costs of a resolution process.

The point regarding providing truthful information is noted but it has
never suggested by me to be otherwise. I do not see being truthful and
honest as being in any way uncooperative. Maybe we could add a clause in to
cover your obligations here if the suggested Cl 3.1 above is not sufficient
to cover your obligations in this regard ?

4. Seller Assurances

The issue of the best net bid is not purely a question of $ value it is
also about other factors such as:
    nature of the offer (upfront consideration versus deferred / contingent
    earnout etc)
    any conditions precedent,
    completion timescale,

CM-BR 000794

5/26/2006

B  213

availability of funding both in respect of upfront and any deferred consideration. Clearly our preference is for upfront consideration and comfort of the ability to pay any deferred elements

Clearly it is in our interest to get the best return overall weighing up these factors however we cannot be found purely into accepting the "highest" offer whatever the basis given there is an large element of subjectivity.

Clearly from a directors perspective you have a duty to the shareholders and creditors when you sell any assets and therefore a duty to get the best overall price in the circumstances. On a business and assets ("B+A") sale, the directors would be executing the B+A sale agreement on behalf of US Inc therefore you have the ability to block this type of sale, however you simply wont get a fee. I do not consider we are looking to be able to force you to execute a B+A sale irrespective.

With regard to a sale of the 90 % shares that must be our decision as to what we sell for.

I can't see the logic behind the "Bait and Switch" argument at all - why would we want to accept an unrealistically low offer as we have nothing to gain from this ? This really doesn't make sense. In any event you would get $250k from a sale which may constitute a large part of the net consideration if we sold for a very low price.

Regarding a sale to management - I will amend the agreement to reflect that no fee is payable in this scenario.

Management Offer

With regards to your offer, this is noted however given the overall terms and the time that has now elapsed since our discussions originally commenced I do not consider that we are in a position to consider this until the company / business has been properly offered for sale and the level of interest in acquiring the business has been assessed.

I would imagine that from a US directors perspective (duties to act in the best interest of the creditors / shareholders etc ) the same applies given the clear conflict of interest that exists in management executing a B+A sale on behalf of US Inc and as seller and purchaser.

Clearly given our previous discussions I would be grateful for confirmation of your funding to support the offer and any conditions precedent on this funding in the meantime.

Confidentiality Agreement

As per my previous Email could you confirm whether these have now been received from the current interested parties ?

CM-BR 000795

5/26/2006

B 214

Operational Issues & Machine Sales

As per my email of 18 July I would like to arrange the conference call with Brad and you and talk through in detail the issues for each machine so we are fully aware of the facts and what needs to be disclosed to interested parties
This clearly has a major influence on the potential value of the business/shares as part of any evaluation of offers.

In advance of this, the schedules I suggested both with regarding to the status of each manchine and potential machines sales opportunities/repayment mechanism would be very useful

Could we speak either Thursday or Friday on this ?

GET Request

I will respond separately on the GET info request

Regards

Adrian Wolstenholme
Partner - Corporate Restructuring

Ernst & Young LLP
One Colmore Row
Birmingham
B3 2DB

| | |
|---|---|
| Office | - 0121 535 2000 |
| Direct line | - 0121 535 2656 |
| Fax | - 0121 535 2448 |
| Mobile | - 07785 355904 |

|  |  |  |
|---|---|---|
| "Paul A. Cox" <PaulCoxFlorida@Mind Spring.com> | To: | "Adrian Wolstenholme" <AWolstenhol@UK.EY.com> |
|  | cc: |  |
| 20/07/2003 14:54 | Subject: | Fee Agreement [Virus checked] (Attachments Removed) |

Hi Adrian.

Please see the attachment.

CM-BR 000796

5/26/2006

B 215

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.
paulcoxflorida@mindspring.com

#### PAC response to Fee Agreement 1st Draft July 20 03.dot has been
removed from this note on July 23 2003 by Adrian Wolstenholme

This e-mail contains proprietary information some or all of which may be
legally privileged. It is for the intended recipient only. If an addressing
or transmission error has misdirected this e-mail, please notify the author
by replying to this e-mail. If you are not the intended recipient you must
not use, disclose, distribute, copy, print or rely on this e-mail. The UK
firm Ernst & Young LLP is a limited liability partnership registered in
England and Wales with registered number OC300001 and is a member practice
of Ernst & Young Global. A list of members' names is available for
inspection at Becket House, 1 Lambeth Palace Road, London SE1 7EU, the
firm's principal place of business and its registered office.

CM-BR 000797

5/26/2006

B 216

**⧠⧠ ERNST & YOUNG**

■ Ernst & Young LLP
One Colmore Row
Birmingham B3 2DB

■ Phone:  0121 535 2000
  Fax:    0121 535 2001
  www.ey.com/uk

**Private and confidential**

Mr P Cox
Coinmaster USA Inc
3001 Aloma Avenue
Winter Park
FL 32792

21 August 2003

Our ref: le-ajw628a/nr

Direct Line: 0121 535 2656
Direct Fax: 0121 535 2448

Dear Paul
**Coinmaster USA Inc ("Company")**
**Tony Lynch's Service Contract dated 15 November 2002 ("US Contract")**

As you know a number of concerns have been raised about the validity of Tony Lynch's US service contract and employment with the Company. I have now had the opportunity to take legal advice and review the US Contract and the terms of Tony's employment contract with Coinmaster Gaming PLC ("PLC" and "UK Contract" respectively). I enclose copies of both the US and UK Contracts (Schedules 1 & 2). The UK contract was only supplied to us by the former UK legal advisors on 17 July 2003 as the file copy from the company's records appeared to be missing.

The review has been based on the faxed copy of the US contract you have supplied as we have not had sight of the original at this stage.

There appear to be strong grounds to support the view that the US Contract has already been terminated. If the Company is still paying Tony pursuant to the US Contract, my view is that it should cease doing so (and consider requesting back sums paid to Tony since the US Contract's termination), for the following reasons:

1.  Tony Lynch resigned as a director of both PLC and Coinmaster Gaming Products Limited on 28 February 2003, prior to my appointment as joint administrative receiver of those companies (copy resignation letter enclosed as Schedule 3). Subsequently, on my appointment on 3 March 2003, Tony's UK Contract was terminated, if it still subsisted, for reasons of redundancy.

    Under clauses 17 and 18.1 of the UK Contract, Tony was deemed simultaneously with such termination to have submitted his resignation as an officer of all other group companies, which included the Company. As Tony is deemed to have resigned from his position with the Company, no compensation will be payable by the Company to Tony pursuant to the terms of the US Contract.

2.  If you disagree with the above and maintain that the US Contract is valid and still subsists, I note that Tony has not been working for or carrying out any duties in respect of any employment with the Company for several months now. In addition, although Tony is purportedly employed on an expenses only basis he does not appear to have been incurring any bona fide business expenses or submitting or retaining his receipts in respect of those

■ The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member practice of Ernst & Young Global. A list of members' names is available for inspection at Becket House, 1 Lambeth Palace Road, London SE1 7EU, the firm's principal place of business and registered office.

CM-BR 000024

B 217

 ERNST & YOUNG                                    21 August 2003     2

expenses in accordance with his US Contract. Clearly the payment of round sum expenses without any support may also have IRS/tax implications as deemed remuneration.

I consider that non-performance of his duties to the Company is a fundamental breach repudiating the terms of the US Contract which the Company should accept immediately, thereby terminating Tony's employment and the US Contract. It is obviously not in the best interests of the Company to continue paying an employee who is not fulfilling his obligations to the Company.

In light of the above, I consider that the Company should cease paying Tony under the US Contract, whether because (i) he is deemed to have resigned from his position with the Company, or (ii) the Company accepts Tony's repudiatory breach of and non-performance under the US Contract.

In the circumstances, I cannot see that any compensation would be payable to Tony pursuant to the terms of the US Contract.

In addition I consider that the US contract was in direct conflict of Tony's UK contract given the provisions in the UK contract in clauses 6.5 (also see definition of "the Company" under clause 17). From the undated file note you prepared (copy attached as Schedule 4 to this letter), I note that Tony was intending to provide a copy of his UK contract to you to allow legal advice on whether the US contract was in fact in breach of his UK contract. In the event that it was in conflict, it appeared to be accepted by all parties per the file note that the US Contract would be void. This appears to be the case.

I would therefore be grateful if you could provide me with details of any further legal advice on this point. In the event that no further advice was provided, I would intend to write directly to Tony on this.

I had also understood that you have previously taken legal advice on the validity of Tony's US contract solely from a US perspective and would be grateful if you would supply this, for my further consideration.

I would very much welcome your views on the above and doubtless you will seek your own legal advice in due course. I would be grateful if you could contact me once you have had a chance to review this letter so that we can discuss how to proceed.

Yours sincerely



A J Wolstenholme
Joint Administrative Receiver

Enc

The Joint Administrative Receivers acting as agent for Coinmaster Gaming plc and Coinmaster Gaming Products Limited and without personal liability

The Institute of Chartered Accountants of England and Wales authorise Adrian Wolstenholme and Ian Best to act as Insolvency Practitioners under s390(2)(a) of the Insolvency Act 1986

CM-BR 000025

B 218

**Main Identity**

| | |
|---|---|
| **From:** | "Paul A. Cox" <paulcoxflorida@mindspring.com> |
| **To:** | <awolstenhol@UK.EY.COM> |
| **Sent:** | Friday, August 22, 2003 11:47 AM |
| **Subject:** | Re: Coinmaster USA Inc |

Dear Adrian,

Please note:

1. We are still awaiting appropriate legal advice concerning the issues you have raised. The matter is complex and requires both multi-State and International consideration. This advice could not have been sought at any earlier stage in a situation which has been continuously changing. There is no point in discussing these matters until we receive this advice. We have a right to appropriate legal advice.

2. We have not held up the provision of information. No single body or Group has provided us with an unqualified Confidentiality / Disclosure Agreement. (In fact, only one Group replied at all.) Until we have our requested legal advice, it is not clear precisely what our obligations are in the provision of such information.

3. We have become increasingly frustrated at the difficulty in managing our business in the new environment in the UK in the aftermath of the demise of Coinmaster Plc and it's UK subsidiaries. To date we have been waiting 15 weeks for a solution to the Acres situation. The position in relation to the required new software fix has been sent to Capital. Hopefully they will recognize this for the disaster it could be. We shall see.

I will call you when I have the appropriate legal advice. I am expecting the first batch later today or early next week. It is unlikely I will have any feed back about the issue you raised concerning Tony's Contract until at least this time next week. (I checked my files. The original advice I received on this subject was verbal in response to a clear brief I had prepared.)

Regards,

Paul A. Cox
President and CEO
Coinmaster USA Inc.

CM-BR 000826

5/30/2006

B 219

| | |
|---|---|
| **From:** | 'Paul A. Cox' <PaulCoxFlorida@MindSpring.com> |
| **To:** | Free Tony<T.Lynch17@ntlworld.com> |
| **Sent:** | Thursday, August 28, 2003 2:19 PM |
| **~~~ject:** | Contract etc. |

Hi Tony.

Too late in your day to call you, but I thought that
you'd want to know:

1. Our attorneys are adamant that your Contract is
perfectly in order, and
unaffected by the arguments raised by the UK Receiver.
They are perfectly
prepared to defend this position in Court if necessary.
They don't think the
Receiver will pursue this. Although legally they agree
we could institute
another Contract they feel the one you have is so sound
that they wouldn't
want the specter of another one behind it! (We should
discuss this further
by phone.)

2. The information pack is to go out. probably Tuesday.

3. Our attorneys feel they could pursue the IP case if
necessary in the US.
They believe we could bring a case here. The only
virtues of this however
would be to muddy the water and cause Capital some
   ming Licensing problems
   re. If we also chose to pursue the Receiver, that
would considerably muddy
the waters.
From a point of view of collecting damages, albeit we
could only pursue
Capital, they feel the UK should be our venue.
(Obviously with a UK law
firm.) They propose in the first instance, a cease and
desist type letter to
Capital, with my first draft improved by them and sent
on their headed
paper. (If you agree, I will work on this next week
after the info. package
goes out and after we have your legal team's input!)

4. Remember Monday is a Bank Holiday here. I'm going to
be in Orlando,
working on the Info. package Friday, and maybe Saturday.
Any calls you make
to me during that time period should be on my CELL
PHONE! (I won't be
reading my email after 8 am our time tomorrow, until
Sunday!)

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.
~aulcoxflorida@mindspring.com

## Main Identity

| | |
|---|---|
| **From:** | <awolstenhol@UK.EY.COM> |
| **To:** | <PaulCoxFlorida@MindSpring.com> |
| **Cc:** | <kover@UK.EY.COM> |
| **Sent:** | Friday, August 29, 2003 6:42 AM |
| **Subject:** | Re: Various Matters Coinmaster USA Inc |

Paul

Thank you for your note.

Information request

I am pleased that we are now able to make progress on the information request. I would be grateful if a full copy of the information pack could be sent to me (I assume by courier) as well so I understand the information that is being provided to the interested parties.

Please can you provide copies of any updated commentary by fax and the August management accounts when available.

Confidentiality agreements

I will be faxing a copy of a further confidentiality agreement from another interested party (a lawyer Albert Atallah acting for a Kevin MacDonald) this morning. Our discussions with Albert/Kevin have to date been very limited.

I have also requested a further signed copy of the confidentiality agreement from Mark Kallenbach; as per my previous email the only caveat I have indicated to Mark is allowed is that the confidentiality agreement cannot relate to information they are already aware of, or that is in the public domain.

Tony Lynch contract

I will write to you separately on Tony's contract as we clearly have some difference in the legal views which we need to discuss.

Regards

Adrian Wolstenholme
Joint Administrative Receiver acting as agent for Coinmaster Gaming plc and Coinmaster Gaming Products Limited and without personal liability

The Institute of Chartered Accountants of England and Wales authorise Adrian Wolstenholme and Ian Best to act as Insolvency Practitioners under s390 of the Insolvency Act 1986

CM-BR 000831

5/30/2006

B 221

Ernst & Young LLP
One Colmore Row
Birmingham
B3 2DB

| | |
|---|---|
| Office | - 0121 535 2000 |
| Direct line | - 0121 535 2656 |
| Fax | - 0121 535 2448 |
| Mobile | - 07785 355904 |

"Paul A. Cox"
<PaulCoxFlorida@Mind        To:    "Adrian Wolstenholme"
<AWolstenhol@UK.EY.com>
       Spring.com>              cc:
                        Subject:  Various Matters Coinmaster USA Inc.
       28/08/2003 23:03

Hi Adrian.

Sorry this communication is so late in your day, making voice communication impractical. My call to our attorneys was unavoidably delayed from their end. However I now have had the call and feel I have everything straight in my head.

1. The information pack will go out. Having not been at the office today, I only know of the signed Confidentiality Agreement from Gaming and Entertainment Group. If there are more signed Agreements in the office when I get there tomorrow, it will go to those parties too. I will try to stick closely to your split of the original GET information list, sending out those Items on List 1.
I need to clean up some of the "commentaries" I put together over a month ago to supplement and explain information when it first looked like we were going to send the package out. (Thus hopefully cutting down on future questions.) I have someone set up to do the photocopying job for me tomorrow. The vast majority of the package is pre-assembled. I will use FedEx to send the package out. (I am emailing Greg to ask him where he wants
the package sending to.) The signed copy of the confidentiality package will
go back with the package. The package is unlikely to be completed tomorrow, but should be in the hands of the recipients on Wednesday next week. (Monday
is a Bank Holiday here.)
Anything that is missing, such as the UCC1's I asked you to send me today

CM-BR 000832

5/30/2006

B 222

will not be allowed to delay the package. The results to the end of July
will go out as part of the package. I will send the August results out when
they are completed a few days later.
One item that will slow me down tomorrow is a summary of all the papers we
are finally sending to show that they were sent, and received. However we
will work as quickly as possible.

2. My attorneys are adamant and unanimous that Tony's US Contract is intact
and that your arguments have no merit in a US (Delaware) setting. I
therefore intend to record this as the position in the package I send out.
I
will however note your dissenting position, and will include your letter on
this subject with the package providing you have no objection to this, (but
I will not include Tony's UK Contract.) From a practical point of view,
Tony
remains a member of the US Board, and will be paid as per his Contract.

Please note that I'm planning to be in Orlando near the large fast office
photocopiers all day Friday and Saturday. I shall not therefore be looking
at my email as regularly as I normally do during this period.

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.
paulcoxflorida@mindspring.com

This e-mail and any attachment are confidential and contain proprietary
information, some or all of which may be legally privileged. It is
intended solely for the use of the individual or entity to which it is
addressed. If you are not the intended recipient, please notify the author
immediately by telephone or by replying to this e-mail, and then delete all
copies of the e-mail on your system. If you are not the intended
recipient, you must not use, disclose, distribute, copy, print or rely on
this e-mail.
If you are our client, the opinions and advice in this e-mail and any
attachment are subject to the terms and conditions of our client engagement
letter. Any comment, opinion, conclusion or other information in this
e-mail or any attachment that do not relate to the official business of the
firm are neither given nor endorsed by it.
Whilst we have taken reasonable precautions to ensure that this e-mail and
any attachment has been checked for viruses, we cannot guarantee that they
are virus free and we cannot accept liability for any damage sustained as a
result of software viruses. We would advise that you carry out your own
virus checks, especially before opening an attachment.
Please note that other Ernst & Young LLP personnel and agents may view

CM-BR 000833

5/30/2006

communications sent by or to any person through our computer systems. The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member practice of Ernst & Young Global. A list of members' names is available for inspection at Becket House, 1 Lambeth Palace Road, London SE1 7EU, the firm's principal place of business and its registered office.

CM-BR 000834

5/30/2006

B 224

## Main Identity

**From:**     "Paul A. Cox" <paulcoxflorida@mindspring.com>
**To:**       <awolstenhol@UK.EY.COM>
**Sent:**     Thursday, August 21, 2003 10:52 AM
**Subject:**  Re: Coinmaster letter [Virus checked]

Dear Adrian

Thank you for your letter concerning Tony Lynch's Service Contract. This will go to our attorneys for Review, along with the faxed attachments, after I retrieve them.

You should note the following:
1. I have never seen Tony's UK Contract. (I guess I will when I get the faxed version.) His US contract was not regarded as being in force by me until after his UK contract was clearly no longer in place. If I had thought at that time that his US Contract was invalid, I would have put in place another one, replacing expenses with salary.

2. I still regard Tony as an essential part of the Board and management team. He has been performing his duties properly to date. I don't know how you would know otherwise since I am largely your sole point of contact with this business. He is in contact wherever he is physically. His contract does not require him to be in the United States. As an example we talked on the phone yesterday for over two hours, and again for an hour today concerning the current problem with roulette software. (He may be the only person that can determine how to solve this problem.)

3. Be assured that I will not give Tony sight of the materials you have sent me on the subject of his contract. I would regard it as improper of you to contact Tony in any way concerning this matter.

4. The matter of IRS interest is one that I am well aware of. The individual was made aware of this issue at the time of implementation. Appropriate and correct information will be provided to the IRS at the end of the year the expenses have been paid in, which is the current fiscal year.

I do not see in any point in further contact concerning this matter until I have had proper and appropriate legal advice. This may necessitate me taking an opinion in the UK as well as the US. I will let you know when this has occurred.

Regards,

Paul A. Cox
President and CEO
Coinmaster USA Inc.

CM-BR 000829

5/30/2006

**From:**          'tony lynch' <t.lynch17@ntlworld.com>
**To:**            Paul A. Cox<PaulCoxFlorida@MindSpring.com>
**Sent:**          Tuesday, September 23, 2003 1:06 PM
    **~ject:**    Re: Coinmaster USA Inc


Hi Paul,
an excellent email to the receiver, if they come back
for more
info I think we are strong candidates for the purchase!

Good luck at 5pm when you are expecting the return
call.

regards  Tony
----- Original Message -----
From: "Paul A. Cox" <PaulCoxFlorida@MindSpring.com>
To: "Free Tony" <T.Lynch17@ntlworld.com>
Sent: Tuesday, September 23, 2003 2:34 PM
Subject: Fw: Coinmaster USA Inc


> Hi Tony. I decided to make the offer as shown below. I
believe that
> Receivers have a short attention span! They can ask
for details!
>
> I'm going into Orlando in thirty minutes, so please
use the cell phone
after
> that time.
>
`  Regards,

/  Paul
> Coinmaster USA Inc.
> ----- Original Message -----
> From: "Paul A. Cox" <PaulCoxFlorida@MindSpring.com>
> To: "Ian Best" <IBest@UK.EY.com>
> Cc: <Gavin_Reid@bankofscotland.co.uk>;
<kover@UK.EY.COM>
> Sent: Tuesday, September 23, 2003 9:13 AM
> Subject: Coinmaster USA Inc
>
>
> >
> > Confidential and Subject to Contract.
> >
> > Dear Ian,
> >
> > As you know management interest in purchasing the
Coinmaster Gaming Ltd
> > stock in Coinmaster USA Inc. has been low since
Capital Gaming Ltd
stopped
> > supporting essential software and on-line systems
work in April 2003.
> >
> > Having met with Capital Gaming's management team
last week, we now have
> > renewed confidence that they will resume the
necessary support to enable
> > Coinmaster USA Inc. to continue trading.

    We are aware that you are talking to various other
parties on this
issue.

> We
> > acknowledge that we are unwilling to provide much in
the way of up front
> > financing, but we can offer full repayment of the
ฯnk's cash over the
   > shortest manageable time, and a healthy premium for
ฺne stock held by
> > Coinmaster Gaming Products Ltd.
> >
> > We are also now willing to propose that the bid be
mounted by myself and
> > Brad Hutcheon, alone. We have reached an affordable
agreement with Tony
> > Lynch that he will accept a lump sum for separation,
and release of his
> > contract, in return for which he will give a written
two year
operational
> > non-compete with Coinmaster USA Inc. in California.
We think this is
> > preferable to lengthy and costly litigation.
> >
> > In outline our proposal is as follows:
> >
> > 1. Full repayment of the outstanding loan balance
outstanding at
closing,
> > over 24 months, with interest chargeable at 2.25%
over bank rate.
> > 2. Management cash injection of $50,000 at closing,
as a loan, not
> repayable
> > until after the bank loan has been repaid and all
the stock purchased.
> > 3. 20% of stock to be placed in a stock option
   heme at closing, for
   ฺe
> > equal benefit of myself, and Brad Hutcheon. To be
released on full
> repayment
> > of the bank loan, interest, and balance of stock
purchase.
> > 4. Balance of stock (70%) to be purchased for
$500,000 within a year of
> the
> > loan and interest being repaid. (No interest to
accumulate on this
debt.)
> > 5. New machine purchases, of up to twelve in a year
to be funded by a
> > combination of deposits from casinos, and cash from
our US bankers, Bank
> of
> > America as may be necessary. (A tentative agreement
has been reached
with
> > Bank of America in this respect. We do not see this
as a problem)
> > 6. Any existing machines sold to casinos would be
priced at a level of
> > retail price less 1/60th of that price, per month
placed on
participation
> > prior to sale. 75% of all proceeds from such
transactions would
ꞌ immediately
   > be passed to Coinmaster Gaming Products Ltd., as a
ฺeduction in the bank
> > loan, and would then reduce future payments of this
loan so that the

loan
> > was still repaid over the two year period.
> > 7. It is our intent that the business would
ultimately be owned 2/3rds
by
  > myself, and 1/3rd by Brad Hutcheon.
  >
> > We recognize that you may prefer a cash bid. We are
unfortunately not in
a
> > position to offer this. We urge you however to
consider the benefits of
> our
> > bid:
> >
> >                        1. We are the management
team that brought
the
> > business this far.
> >                        2. We have been cash
positive now for 17
> months,
> > and have successfully cash managed the business to
repay debt left
> > outstanding by
        the
failure
> > of Coinmaster Gaming PLC without disruption to the
business.
> >                        3. We are fully licensed
for trading in
> > California.
> >                        4. We have survived a
six month period
without
  > software support from Capital Gaming Ltd.
  >                        5. We are the only team
that can promise no
> > litigation in relation to management contracts.
> >                        6. We have provided
impeccable financial
> > information to the Receivers for the last six
months.
> >                        7. I own three other
businesses, with
> partners,
> > and have an income in excess of $100,000 per year
without Coinmaster USA
> > Inc.
> >                        (I have had no day
to day management
role
> in
> > these businesses for seven years.)
> >                        8. I have been Chairman
and Chief Executive
> > (before choosing retirement at age 42) of three
businesses each
employing
> > more than 4,000
  people, and one
> with
> > sales in excess of $5 billion per year.
> >                        9. I was Chairman and
Chief Executive of the
> > UK's largest Gaming Machine Operation for five
  ırs, with 46,000
  machines.
> >                        (I completed in
excess of 20 business

> > acquisitions during this period.)
> >                                10. Brad is extremely
well respected by
casino
` > managements throughout California and  has an
  cellent working
. relationship
> > with the casinos.
> >                                He is extremely
reluctant to work in
any
> > other management environment for this business.
> >                                11. We have demonstrated
our commitment to
the
> > business over the last six months, and our
willingness to behave totally
> > honorably
        in repaying
> the
> > bank loan in full.
> >
> > We await your response with interest. We would
obviously consider any
> > counter proposals you may wish to put to us. We are
prepared to complete
> > this matter quickly.
> >
> > Regards,
> >
> > Paul A. Cox
> > President and CEO
> > Coinmaster USA Inc.
> > paulcoxflorida@mindspring.com
> >

B 229

Paulcoxflorida@mindspring.com

| | |
|---|---|
| **From:** | <ibest@UK.EY.COM> |
| **To:** | <paulcoxflorida@mindspring.com> |
| **Cc:** | <kover@UK.EY.COM> |
| **Sent:** | Monday, November 10, 2003 12:55 PM |
| **Subject:** | Sale of the Share Capital in Coinmaster USA Inc. |

SUBJECT TO CONTRACT

Paul,

Further to our recent discussions, I am writing to outline my thoughts / proposals for the way forward.

Preconditions:

We need to achieve a satisfactory settlement of Tony Lynch's contract. We need to put in place a new contract for you (see below) and for any other employees that you feel are key to the business. Confirmation of the availability of Management's cash injection. Agreement of the balance due to the UK and agreement on no further deductions.

Terms:

The terms set out in your e-mail of 23 September 2003 are acceptable.

Paul Cox contract:

We would propose a base salary for you of $4,000 per month from 1 January 2004 with a bonus of 3% of sums remitted to the UK providing that sums remitted to the UK exceeded $500,000 every 6 months. The bonus would be paid on 15 July and 15 January after each half year.

The compensation payable on termination of your contract would be $50,000 plus any bonus accrued on the terms above.

Share Options:

10% to vest after 1 year if sums remitted to the UK exceed $1.25m in 2004.

Balance of 10% (or 20%) to vest on full repayment of the intercompany debt including interest.

Other Matters:

5/30/2006

CM-BR 000928

B 230

We will assist with Capital Gaming where possible.

We will catch up with you tomorrow.

Regards

Ian


Ian Best
Corporate Restructuring Partner
DL: 0121 535 2370
DF: 0121 535 2448
Mobile: 07785 355896


This e-mail and any attachment are confidential and contain proprietary
information, some or all of which may be legally privileged. It is
intended solely for the use of the individual or entity to which it is
addressed. If you are not the intended recipient, please notify the
author immediately by telephone or by replying to this e-mail, and then
delete all copies of the e-mail on your system. If you are not the
intended recipient, you must not use, disclose, distribute, copy, print
or rely on this e-mail.
Whilst we have taken reasonable precautions to ensure that this e-mail
and any attachment has been checked for viruses, we cannot guarantee
that they are virus free and we cannot accept liability for any damage
sustained as a result of software viruses. We would advise that you
carry out your own virus checks, especially before opening an
attachment.
The UK firm Ernst & Young LLP is a limited liability partnership registered
in England and Wales with registered number OC300001 and is a member
practice of Ernst & Young Global. A list of members' names is available
for inspection at 1 More London Place, London, SE1 2AF, the firm's
principal place of business and its registered office.

32

| From: | 'Paulcoxflorida@mindspring.com' <paulcoxflorida@mindspring.com> |
|---|---|
| To: | Tony<T.Lynch17@ntlworld.com> |
| Sent: | Monday, November 10, 2003 2:11 PM |
| Subject: | Proposal |

Hi Tony.

I did get a proposal from the Receiver today. In essence:

1. He doesn't like our deal for you to go! He thinks it's way too expensive. That is, you should go at much lower cost! (Preferably no cost, and recovery of what we've already paid you!)

2. He wants me to simply surrender my contract and take a $2,5K per month salary reduction, fixed for three years. He is proposing to replace my profit related bonus with a similar size one, but related to very high levels of Bank repayment. He is offering a $50K settlement figure if I subsequently get fired. (Against $300K in my contract!)

3. He's trying to figure a way to get Brad's contract changed to his liking. (I don't think he means upwards!)

4. He regards the (high) price we offered on September 23, as fixed!

5. He will make half the shares on option available to Brad and I after one year if we achieve a high Bank repayment level. (That is a total of 10% of the equity.) Whoopee!

6. He will assist with Capital Gaming where he can. Whatever that means.

I wrote him an email saying No, no, no, no, so what, and explain! We're talking tomorrow!

I'm diverting the issue of your contract to attorneys. He says the Bank favors litigation with you in the US and UK over settlement. What nonsense is this! (I think it's just posturing.) I'm not litigating against you! I think the chances of attorneys agreeing on anything are pretty well zero!

Where shall we hold the one-year anniversary of our period in limbo? Maybe a certain steakhouse in Palm Springs?

Don't you just love bean-counters! I have to laugh. Eight months so far, for this! Now it's time for me to play hardball again!

Don't panic! Remember we are the only game left in town.
(Except Capital! The fall-back Plan? Maybe I should panic!)

I'll write to you tomorrow. These things tend to happen late in your day!

Regards,

Paul
Coinmaster USA Inc.

# Paulcoxflorida@mindspring.com

**From:** "Paulcoxflorida@mindspring.com" <paulcoxflorida@mindspring.com>
**To:** "tony highview" <tonyhighview@hvillas.e.telefonica.net>
**Sent:** Wednesday, July 14, 2004 11:35 AM
**Subject:** The future

Hi Tony.

I see your last e-mail as so far from the truth that it's not even funny. I don't see the point of getting into a blow by blow fight with you over that, and I don't really want to waste a lot of corporate cash on attorneys unless I really have to.

I know that you're going to be absent for three weeks starting sometime this week. I've also fixed to be in California during this period for ten days.

I suggest we both think of what we want to achieve over this period and attempt to work things out when we both return.

You should however note:

1. I cannot change the Coinmaster separation document. That's a Receiver driven item.

2. I can shred the side letter, but, you approved it and signed it without alteration. Whatever you may believe, the tax situation is still the driver here. In fact I fear the tax situation is worse than my earlier view. I will research this further.

3. I'm not for letting you steal High View. There was no agreement that either partner would charge for their time use. I could easily draft an invoice charging $350K for my time and skill use over the last year too. (In fact if you persist down this route, I will do exactly that.) I do understand that legitimate travel expenses can be charged and have no problem with that. (I never have had a problem with that.) You also seem to be ignoring Coinmaster USA's cash input so far to the business. According to our Plan, the only cash still to go into the business is almost bound to be further part paid by Coinmaster USA. The idea that your cash input requirement from now on is huge, just doesn't look credible to me. I've not seen any revised cash Plan beyond the one we produced in March, 2004. Smoke and mirrors won't disguise the reality of this.

4. I am quite happy to separate the ownership of the businesses if you like. It doesn't worry me if you want to buy me and Coinmaster USA out of High View, and in return if you have no part of Coinmaster USA . This would give you the ability to do whatever you want with the High View machine in 99% of the planet's land mass. However this can only be done if Coinmaster USA Inc. has distribution rights either just in California or in the whole area West of the Mississippi. After all the single reason we started down this route was to give Coinmaster USA Inc an alternative machine.

These are not final positions, just how I see things right now. I'll use the next three weeks to ponder these matters. I believe that you should too.

If you want Mike to have the SAS tools whilst you're away I can do that if you will just confirm that you are clear that Coinmaster USA does have an exclusive on the High View Game for California.

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.

6/1/2006

CM-BR 001217

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| **From:** | <kover@UK.EY.COM> |
| **To:** | <Paulcoxflorida@mindspring.com> |
| **Cc:** | <ibest@UK.EY.COM>; "Rob Salad" <RSalad@CooperLevenson.com>; <Seamas.Gray@dla.com>; <berger@blankrome.com>; <lblackwell@UK.EY.COM> |
| **Sent:** | Wednesday, July 28, 2004 7:41 AM |
| **Subject:** | Re: Tony Lynch |

Dear Paul

Thanks for your e-mail concerning Tony Lynch. I note your concerns that
Tony may be considering fighting his position in relation to his US
contract and his attorneys demands for information. I summarise below the
advice that I have received from both my UK and US legal advisors in
relation to Tony's contract: -

A summary of the UK legal advice is as follows: -

By virtue of the termination of the UK contract of employment, howsoever
caused, Tony is deemed to have resigned from all other office holdings
within the Group which would therefore include his office holding within
Inc as Chairman. Therefore, the Inc contract fell away on 3 March 2003,
if indeed there was a valid contract in the first instance.
In any event, the Inc contract was invalid by virtue of the conflict
with the Plc contract which expressly prohibited Tony from receiving any
other remuneration or expenses other than those stipulated in the Plc
contract.
Any argument that the Inc contract replaced or varied the Plc contract
is without merit.
Tony entering into the Inc contract appeared to have been contrary to
the best interests of the Group and is in clear conflict with his Plc
contract, which suggests improper activity and a possible claim of
breach of his fiduciary duties as a Director.

A summary of the US legal advice is as follows: -

Delaware law applies to the contract.
Inc's by-laws state that "each Director shall hold office until the next
annual meeting of stockholders and until his successor is elected and
qualified". It's by-laws also state, that "an annual meeting of
stockholders shall be held each year within five months after the close
of the fiscal year of the Corporation". Notwithstanding these
provisions, Tony's agreement sets forth compensation for 3 years and
thereafter. Moreover, the agreement is "perpetual in nature". These
agreements conflict with the by-laws which provide for the annual
election of directors, and thus the agreement is arguably void.

6/1/2006

CM-BR 001219

B 234

Also, the by-laws state that "Directors shall receive such reasonable compensation fo their services on the Board, whether in the form of salary or a fixed fee for attendance at metings , or both, with expenses, if any as the Board of Directors may from time to time determine." Tony's agreement does not set forth a salary or fixed fee, rather the monthly payments are for expenses. The "if any" language would appear to require proof of actual expenses, rather than set payment amounts on a monthly basis. Accordingly, the compensation provisions of Tony's agreement appear to conflict with the by-laws and are most likely void.

Tony's service agreement may be invalidated under breach of fiduciary duty principles. Because Tony fixed his own compensation, he engaged in "self-dealing". Consequently, if it can be shown that the compensation terms are unfair, the compensation terms will be invalidated.

Tony awarded himself compensation that appears to bear no reasonable relationship to his services and contributions to Inc, and thus arguably he committed "corporate waste"

Tony's US agreement conflicts with his UK agreement. Unless written agreement of the UK board exists, Tony appears to have been prohibited from serving as a director for Inc.

The US advisors recommended that, assuming that Lynch does not agree to his position and waive any and all rights to compensation under his Service Agreement, an action should be brought under Delaware law seeking to nullify his agreement for the reasons mentioned above.

It would therefore seem that both the US and UK advice is that Tony's contract with Inc can be challenged as being invalid for a variety of reasons.

I would suggest that it is now appropriate for you to obtain your own legal advice (presumably from Cooper Levenson) on the areas set out above.

In my opinion, Tony should not be provided with the information that hs is requesting as I do not consider that he is a validly appointed Officer of Inc.

Yours Sincerely
KL Over
for I Best
Administrative Receiver

THE ADMINISTRATIVE RECEIVER CONTRACTS AS AGENT OF THE COMPANIES AND WITHOUT
PERSONAL LIABILITY

The Institute of Chartered Accountants in England and Wales authorises Ian Best to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.

6/1/2006

CM-BR 001220

Karen Over of Ernst & Young LLP can be contacted as follows:
Mrs Karen L Over, Assistant Director
Tel: 0117 981 2218
Fax: 0117 981 2051
Mobile: 07899 060764
E-Mail: kover@uk.ey.com
Address: Ernst & Young, One Bridewell Street, Bristol BS1 2AA


|  |  |  |  |
|---|---|---|---|
| "Paulcoxflorida@mind spring.com" <kover@UK.EY.COM> | To: | <ibest@UK.EY.COM>, |  |
| <paulcoxflorida <RSalad@CooperLevenson.com> | cc: | "Rob Salad" |  |
|  | Subject: | Tony Lynch |  |
| 23/07/2004 18:25 Please respond to Paulcoxflorida |  |  |  |


Hi Ian, Karen.

I thought that I should update you on this situation and seek some input
that might determine what we jointly agree to do!

The current situation is that Tony's chosen attorney, James Folsom is
persistently seeking to get us to give him copies of virtually every
document of a corporate nature, including all Board minutes, using Delaware
Law that allows a current Director to seek such information.

Rob Salad and I are still grappling with the question as to whether Tony is
actually still a director of Coinmaster USA or not. Meantime Mr. Folsom has
written telling us that he will sue me if I don't provide the information.

(The information itself is no big deal, since Tony already has all of it
within a copy of the information package that we sent to potential
purchasers last year.)

It looks like they may be lining up to go for broke in relation to Tony's
US contract. If we provide the information, thus acknowledging that Tony is
a Director, then our case may be a little weakened. (That's me talking, not
Rob!) This is a long way away from reviewing the "legalese" language within
the document written by Greg a few weeks ago. Also I can't fire Tony if he
isn't a Director now!

6/1/2006

CM-BR 001221

B 236

The question is, if Tony is still trying to maintain that he is a Director of Coinmaster USA Inc, then isn't this a clear breach of his UK contractual obligations? If so, then should we (you) be suing him in the UK? Also, are there any other items that you want to take up, that may make him much less willing to go for a US judgment? I need to know, are you prepared to go down this route or not? Remember "Greg's document" gave Tony a full release from any outstanding UK claims by you guys. He only needs that if there is something for you to go at!

Sorry to burden you with this but we need to decide how to move this situation on! Also sorry that this is so late in your day! I'm in California to visit casinos and banks with Brad, hence its only 10.25 in the morning here. (I guess you may not even receive this to review until Monday.)

I look forward to your response.

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.


Ernst & Young is proud to sponsor Art of the Garden at Tate Britain (3rd June - 30th August 2004). This is the first major exhibition to examine the relationship of the garden and British art. Advance booking is recommended.

Information and tickets:  www.tate.org.uk/artofthegarden


This e-mail and any attachment are confidential and contain proprietary information, some or all of which may be legally privileged. It is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient, please notify the author immediately by telephone or by replying to this e-mail, and then delete all copies of the e-mail on your system. If you are not the intended recipient, you must not use, disclose, distribute, copy, print or rely on this e-mail.

Whilst we have taken reasonable precautions to ensure that this e-mail and any attachment has been checked for viruses, we cannot guarantee that they are virus free and we cannot accept liability for any damage sustained as a result of software viruses. We would advise that you carry out your own virus checks, especially before opening an attachment.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member

practice of Ernst & Young Global.  A list of members' names is available for inspection at 1 More London Place, London, SE1 2AF, the firm's principal place of business and its registered office.

6/1/2006

CM-BR 001223

35

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| **From:** | <kover@UK.EY.COM> |
| **To:** | <PaulCoxFlorida@MindSpring.com> |
| **Cc:** | <ibest@UK.EY.COM>; <lblackwell@UK.EY.COM> |
| **Sent:** | Monday, August 09, 2004 10:33 AM |
| **Attach:** | Lynch letter page 1 9-8-04.ZIP; Lynch letter page 2 9-8-04.ZIP; Lynch letter page 3 9-8-04.ZIP |
| **Subject:** | Coinmaster Gaming Plc and Coinmaster Gaming Products Limited (Both in Administrative Receivership) [Virus checked] |

Paul

As discussed, I attach a copy of the letter received from Tony Lynch.
Perhaps you could give me a call later in the week to agree on a response.

(See attached file: Lynch letter page 1 9-8-04.ZIP)(See attached file:
Lynch letter page 2 9-8-04.ZIP)(See attached file: Lynch letter page 3
9-8-04.ZIP)

Regards
Karen

KL Over
for I Best
Administrative Receiver

THE ADMINISTRATIVE RECEIVER CONTRACTS AS AGENT OF THE COMPANIES AND
WITHOUT
PERSONAL LIABILITY

The Institute of Chartered Accountants in England and Wales authorises Ian
Best to act as an Insolvency Practitioner under section 390(2)(a) of the
Insolvency Act 1986.

Karen Over of Ernst & Young LLP can be contacted as follows:
Mrs Karen L Over, Assistant Director
Tel: 0117 981 2218
Fax: 0117 981 2051
Mobile: 07899 060764
E-Mail: kover@uk.ey.com
Address: Ernst & Young, One Bridewell Street, Bristol BS1 2AA

Ernst & Young is proud to sponsor Art of the Garden at Tate Britain (3rd
June - 30th August 2004). This is the first major exhibition to examine the
relationship of the garden and British art. Advance booking is
recommended.

6/1/2006

CM-BR 001228

Information and tickets:  www.tate.org.uk/artofthegarden

This e-mail and any attachment are confidential and contain proprietary
information, some or all of which may be legally privileged.  It is
intended solely for the use of the individual or entity to which it is
addressed.  If you are not the intended recipient, please notify the author
immediately by telephone or by replying to this e-mail, and then delete all
copies of the e-mail on your system.  If you are not the intended
recipient, you must not use, disclose, distribute, copy, print or rely on
this e-mail.

Whilst we have taken reasonable precautions to ensure that this e-mail and
any attachment has been checked for viruses, we cannot guarantee that they
are virus free and we cannot accept liability for any damage sustained as a
result of software viruses.  We would advise that you carry out your own
virus checks, especially before opening an attachment.

The UK firm Ernst & Young LLP is a limited liability partnership registered
in England and Wales with registered number OC300001 and is a member
practice of Ernst & Young Global.  A list of members' names is available
for inspection at 1 More London Place, London, SE1 2AF, the firm's
principal place of business and its registered office.

6/1/2006

CM-BR 001229

B 240

**Tony Lynch**
**Croeso Villas**
**Calle Pablo Sarasate 75**
**Verdemar II**
**rb. Villamartin**
**ihuela Costa 03189**
**Costa Blanca**
**Spain.   0034 966 774 360 phone/fax**
**Mobile  0034 630 666 274**
**Email  tony.lynch@hvillas.e.telefonica.net**

9ᵗʰ. August 2004.

Mr. I. Best
Ernst & Young LLP
One Bridewell Street
Bristol BS1 2AA
England


Sirs,
    Ref: Coinmaster USA Inc. & D.A. Tony Lynch contract.

Due to the restrictive covenants inserted into the Term Agreement that I informed Mr.
Cox the CEO of Coinmaster USA Inc. were unacceptable in the non-binding arrangement
that I signed and requested the removal in the full term agreement.

 I will therefor not be entering into this Term agreement.

 egal advice from Coinmaster's lawyer last year made clear that my contract was legally
nding and could be enforced in the American Courts. I will be taking steps to
ommence an action for breach of contract to recover all outstanding payments due to
me and request the Court to award me the monies due for the duration of the contract.

Last year I met with Paul Cox and Brad Hutcheon and we had an oral agreement to make
a management bid for Coinmaster USA Inc. on the basis of equal partners with one third
of Coinmaster USA Inc. each.
 Paul Cox and I decided on a stratagem to make a bid and the value of the bid was
suggested by me and Paul Cox went forward with this bid to the Receiver of Coinmaster
Plc that was eventually accepted.
Sometime later, Paul Cox informed me that my position was unacceptable to the Bank
of Scotland, hence the reason to stop paying me and the attempt to come to an
arrangement regarding my contract.

I have a meeting arranged for the first week of September with a specialist contract
lawyer in Delaware, this Law firm are prepared to work on a no win no fee basis.
 Once I have entered into a contract with this firm I will no longer be in a position to
withdraw from any action that may be commenced.

I do not believe this is the best course of action for any of the parties involved and I
suggest the following proposal and the reasons behind my proposal that I make
"Without Prejudice".

CM-BR 001230

The management structure of Coinmaster USA Inc that was agreed upon for the bid to the Receiver was well balanced. Paul Cox admin and licensing as CEO, Brad Hutcheon as sales director and management of the service staff and myself as technical support and new products. The fact that Brad lived in California and is in the market place, Paul in Florida and my residing in Europe was in many ways an asset to the Co. and in no way detrimental.

During the period prior to our bid Capitol had withdrawn technical support for the SAS on line system. I made enquiries as to the legal standing of Coinmaster USA regarding reverse engineering the SAS system and controlling our own destiny. I determined that CMUSA had the right to do so provided it was not sold to a third party.
Capitol at that time refused to repair any of the main Pcb boards and only sell new boards at considerable cost. I organised the repair of all Pcb's saving CMUSA tens of thousands of dollars.
Capitol also demanded $1000 per machine on site per month for support.
My abilities to organise a SAS software specialist who could reverse engineer the SAS system and instigate any repairs and changes for CMUSA to continue trading allowed Paul Cox options in his negotiations that extensively reduced any charges from Capitol and support was reintroduced.
    I have set up a small highly experienced team of development engineers who under my direction have designed a new Pcb system that is specifically for the Californian market and the SAS system. This board will be ready in the coming few months with a metal cabinet again specifically designed by me for the Californian and USA market, along with a proven high quality roulette wheel.
    This system and new game will render the Coinmaster-Capitol game obsolete and will become the CA market leader for the next several years. As the CA market is the only market that interests me and on a profit sharing arrangement with the Tribes, makes me highly focused and determined to succeed. My personal knowledge of the market requirement and my recognised design skills guarantee my new games success.

I had hoped to do this as part of the management ownership of Coinmaster USA Inc. giving CMUSA exclusive distribution for all of the USA for any product I designed. However the BOS insistence that I should not be involved has changed this position and now I will become CMUSA's main competitor.

Is this the best way forward for the BOS to recover it's two million plus dollars tied up in Coinmaster USA Inc.?

I think not!

I propose the following "WITHOUT PREJUDICE" arrangement.

I retain my position as a director of Coinmaster USA Inc and have the right to one third of the shares in Coinmaster USA Inc, on the same terms as Paul Cox and Brad Heochoen. My monthly fee is reinstated from October 2004, the October 2003 payment is made to me and the balance of the outstanding fees are repaid to me after the BOS has been repaid.
I enter into an exclusive agreement with my new Co for CMUSA to distribute the new games.

2.

σ summarise the up side and possible down side for the BOS: –

Should I succeed in my breach of contract action and be awarded full damages I could be awarded hundreds of thousands of dollars.
This may severely effect the monthly repayment schedule proposed by Paul Cox, and may cause the repayments to be delayed to the BOS until I am repaid any award the courts my grant.
I would in the meanwhile be placing on site in the best Indian casinos my new game, and any award granted by the courts could help to fund my new equipment!

Believe me my new game will push out any competition that it is put up against, as it will be intrinsically more reliable and the revenue I estimate will be 40/60% greater per station. So it is possible that by the time CMUSA is in a position to start repaying the Receiver, the revenue stream from sited machines of CMUSA will most probably be in terminal decline with the obvious consequences to BOS and the proposed new owners of CMUSA.

My proposal strengthens the BOS chances of being fully repaid, as it would be in my interest to see that this happens at the earliest opportunity and control the introduction of my new game to limit any damage to CMUSA's revenue stream.
Also the retained shareholding by the BOS will be of higher value with my new equipment entering service.

I need a reply by Monday 16th August should you consider this is in everyone's best interest, if I have not had a reply by then I will proceed with litigation.


Yours sincerely,


D.A. Tony Lynch

36

**Paulcoxflorida@mindspring.com**

From:     <kover@UK.EY.COM>
To:       <Paulcoxflorida@mindspring.com>
Cc:       <ibest@UK.EY.COM>; <lblackwell@UK.EY.COM>
Sent:     Tuesday, August 10, 2004 4:48 AM
Subject:  Re: Coinmaster Gaming Plc and Coinmaster Gaming Products Limited (Both in Administrative
          Receivership) [Virus checked]

Thanks Paul. I look forward to speaking you later this week. In the
meantime, it should be fine for you to copy this letter to Brad.

Karen Over of Ernst & Young LLP can be contacted as follows:
Mrs Karen L Over, Assistant Director
Tel:  0117 981 2218
Fax:  0117 981 2051
Mobile:  07899 060764
E-Mail:  kover@uk.ey.com
Address:  Ernst & Young, One Bridewell Street, Bristol  BS1 2AA

> "Paulcoxflorida@mind
> spring.com"              To:     <kover@UK.EY.COM>
> <paulcoxflorida          cc:
>                          Subject:  Re: Coinmaster Gaming Plc and Coinmaster Gaming
> 09/08/2004 19:24            Products Limited (Both in Administrative Receivership)
> Please respond to          [Virus checked]
> Paulcoxflorida

Hi Karen.

Thanks for sending me Tony's letter. Whilst a lot of the content is true,
it
kind of telescope's the timescale of events in a way that is somewhat
helpful to Tony's case.

I'm sure that developing another machine to compete with Coinmaster USA
whilst he theoretically believes that he still is a Director of USA is of
tenuous legality!
(In fact, it probably would be a serious offence here!)

6/1/2006

CM-BR 001234

B  244

Competitively, I'm not concerned, for all sorts of reasons. Brad and I have discussed this and don't believe that Tony has the "lock" on the market that
he thinks he has. Also any new machine has to go through GLI, which as we know is costly and time-consuming.

I've asked Rob to look in his crystal ball and tell me what he thinks the outcome of the current law suit is likely to be. (Rob's advice has consistently been that Tony's contract is solid.) Of course we haven't previously had the benefit of the content of your e mail of July 28 or thought through whether it's of any significance that USA was a signatory to
the original UK deal with the Bank of Scotland, (including Tony's UK contract?) I haven't given Rob a copy of Tony's letter or referred to it in any way.

In that Tony is trying to negotiate a deal, it's good that he wrote the letter. The content however is a mess!

I'll ponder what is to be done from our point of view, and raise it with you
later in the week. Please let me know if you would object to me copying the letter to Brad.

Regards,

Paul
Paul A. Cox
Coinmaster USA Inc.

Ernst & Young is proud to sponsor Art of the Garden at Tate Britain (3rd June - 30th August 2004). This is the first major exhibition to examine the relationship of the garden and British art. Advance booking is recommended.

Information and tickets:  www.tate.org.uk/artofthegarden

This e-mail and any attachment are confidential and contain proprietary information, some or all of which may be legally privileged. It is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient, please notify the author immediately by telephone or by replying to this e-mail, and then delete all copies of the e-mail on your system. If you are not the intended recipient, you must not use, disclose, distribute, copy, print or rely on

6/1/2006

CM-BR 001235

B 245

this e-mail.

Whilst we have taken reasonable precautions to ensure that this e-mail and any attachment has been checked for viruses, we cannot guarantee that they are virus free and we cannot accept liability for any damage sustained as a result of software viruses. We would advise that you carry out your own virus checks, especially before opening an attachment.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member practice of Ernst & Young Global. A list of members' names is available for inspection at 1 More London Place, London, SE1 2AF, the firm's principal place of business and its registered office.

6/1/2006

CM-BR 001236

B 246

3 7

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| **From:** | "tony highview" <tonyhighview@hvillas.e.telefonica.net> |
| **To:** | "Paul A. Cox" <PaulCoxFlorida@MindSpring.com> |
| **Sent:** | Tuesday, August 10, 2004 6:30 AM |
| **Attach:** | BOS CMUSA proposal 04.doc |
| **Subject:** | Fw: Coinmaster USA Inc. |

I would like an explanation from you befor I take a decision on what action
I take.

----- Original Message -----
From: <kover@UK.EY.COM>
To: <tonyhighview@hvillas.e.telefonica.net>
Cc: <ibest@UK.EY.COM>; <lblackwell@UK.EY.COM>;
<PaulCoxFlorida@MindSpring.com>
Sent: Tuesday, August 10, 2004 11:16 AM
Subject: Re: Coinmaster USA Inc.


>
>
>
>
> Dear Mr Lynch
>
> Coinmaster Gaming Products Limited and Coinmaster Gaming Plc (Both in
> Administrative Receivership)
>
> I refer to your earlier e-mail and would advise you that I am dealing with
> this matter in Mr Best's absence and will progress any necessary
> discussions with Coinmaster USA Inc and the Bank of Scotland. A copy of
> your correspondence has been passed to the Bank of Scotland at your
> request. Paula Wolff is Ian Best's secretary and can therefore be copied
> in on any relevant correspondence.
>
> Please note, that this matter is being driven by Coinmaster USA Inc and
not
> by the Bank of Scotland and a copy of your letter has also been forwarded
> to them for consideration. You should therefore correspond with
Coinmaster
> USA Inc in relation to your position. I have coped this e-mail to Paul
Cox
> for his information.
>
> Yours Sincerely
> KL Over
> for I Best
> Administrative Receiver
>
> THE ADMINISTRATIVE RECEIVER CONTRACTS AS AGENT OF THE COMPANIES AND
WITHOUT

6/1/2006

CM-BR 001240

B 247

> PERSONAL LIABILITY
>
>
> The Institute of Chartered Accountants in England and Wales authorises Ian
> Best to act as an Insolvency Practitioner under section 390(2)(a) of the
> Insolvency Act 1986.
>
>
> _____
> Karen Over of Ernst & Young LLP can be contacted as follows:
> Mrs Karen L Over, Assistant Director
> Tel:  0117 981 2218
> Fax:  0117 981 2051
> Mobile:  07899 060764
> E-Mail:  kover@uk.ey.com
> Address:  Ernst & Young, One Bridewell Street, Bristol  BS1 2AA
>
>
>

>             "tony highview"
>             <tonyhighview@hvillas.e.tele     To:
<kover@UK.EY.COM>
>             fonica.net>             cc:
>                             Subject:
Coinmaster USA Inc.
>             10/08/2004 06:49
>
>
>
>
>
>
> Dear Ms.Over,
>          Mr. Best has emailed me to say he is out of the office
> until 25/08/04 and has advised me to contact Paula Wolff. Can you advise
me
> who Paula Wolff is and her status in EY?
>
> As it is the Bank Of Scotland who need to make a decision, I do not see
the
> necessity for Mr. Best to be present in order for the BOS to decide a
> policy decision regarding me.
> The options are simple:-
>
> 1. The BOS do not want me as part of the management buyout or as a
director
> of Coinmaster USA Inc., in witch case I need to proceed with my court
> action.
>
> 2.The BOS are agreeable to me being part of the buyout team on no worse

6/1/2006

CM-BR 001241

B  248

> terms that Paul Cox or Brad Hutcheon.
>
> If the BOS opt for option 1 there is nothing else to discuss,
> however if the BOS are agreeable to option 2 then there will a number of
> negotiations with Mr. Best, Cox and myself required.
>
> I request that a member of EY contact the BOS with my letter and copies of
> my emails, in order that I can decide my direction in this matter on my
> trip to Delaware.
>
> Regards  D.A.Tony Lynch.
>
>
>
> Ernst & Young is proud to sponsor Art of the Garden at Tate Britain (3rd
> June - 30th August 2004). This is the first major exhibition to examine the
> relationship of the garden and British art.  Advance booking is
> recommended.
>
> Information and tickets:  www.tate.org.uk/artofthegarden
>
>
> This e-mail and any attachment are confidential and contain proprietary
> information, some or all of which may be legally privileged.  It is
> intended solely for the use of the individual or entity to which it is
> addressed.  If you are not the intended recipient, please notify the author
> immediately by telephone or by replying to this e-mail, and then delete all
> copies of the e-mail on your system.  If you are not the intended
> recipient, you must not use, disclose, distribute, copy, print or rely on
> this e-mail.
>
> Whilst we have taken reasonable precautions to ensure that this e-mail and
> any attachment has been checked for viruses, we cannot guarantee that they
> are virus free and we cannot accept liability for any damage sustained as a
> result of software viruses.  We would advise that you carry out your own
> virus checks, especially before opening an attachment.
>
> The UK firm Ernst & Young LLP is a limited liability partnership registered
> in England and Wales with registered number OC300001 and is a member
> practice of Ernst & Young Global.  A list of members' names is available
> for inspection at 1 More London Place, London, SE1 2AF, the firm's
> principal place of business and its registered office.
>
>

6/1/2006

CM-BR 001242

B 249

**Paulcoxflorida@mindspring.com**

| | |
|---|---|
| From: | <kover@UK.EY.COM> |
| To: | <Paulcoxflorida@mindspring.com> |
| Cc: | <ibest@UK.EY.COM>; <lblackwell@UK.EY.COM> |
| Sent: | Tuesday, August 10, 2004 10:19 AM |
| Subject: | Re: Fw: Court action |

Thanks Paul. This is the misunderstanding by Tony that I referred to earlier. I will forward this and the other correspondence to our UK advisors. I would suggest that you also copy Cooper Levenson in. As we discussed, I think the next step is to get the legal advice from both sets of advisors and then to agree jointly on the way to proceed.

Karen Over of Ernst & Young LLP can be contacted as follows:
Mrs Karen L Over, Assistant Director
Tel: 0117 981 2218
Fax: 0117 981 2051
Mobile: 07899 060764
E-Mail: kover@uk.ey.com
Address: Ernst & Young, One Bridewell Street, Bristol BS1 2AA

"Paulcoxflorida@mind      To:   <kover@UK.EY.COM>
spring.com"
<paulcoxflorida            cc:
                Subject:  Fw: Court action
10/08/2004 15:13
Please respond to
Paulcoxflorida

Hi Karen.

This is getting really silly. It would appear that Tony has the ability to misunderstand anything that you write to him, as well as anything I write to him! See below!

Please let me know what actions your UK attorney advises, in due course.

Regards,

6/1/2006

CM-BR 001247

B 250