IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL ANTHONY LYNCH,                )
                                     )
               Plaintiff,            )
                                     )
        v.                           )    Civil Action No. 06-365
                                     )
COINMASTER USA, INC., a Delaware     )
corporation, and PAUL A. COX,        )
                                     )
               Defendants.           )

## DEFENDANTS' REPLY BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

Thomas P. Preston, Esquire
I.D. No. 2548
BLANK ROME LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6478
Facsimile:   (302) 425-6464

Attorneys for Defendants
Coinmaster USA, Inc. and
Paul A. Cox

Dated:  February 8, 2008

# TABLE OF CONTENTS

I.    SUMMARY OF REPLY ARGUMENT ........................................................................1

II.   THE BREACH OF CONTRACT CLAIM FAILS BASED ON LYNCH'S
      TESTIMONY AND THE UNDISPUTED DOCUMENTS. ................................................4

III.  THE FRAUD CLAIM WAS MADE UP ENTIRELY OUT OF WHOLE CLOTH. ..........7

IV.   THE FORGERY CLAIM. ..................................................................................9

# TABLE OF AUTHORITIES

*Solomon v. Armstrong*,
    747 A.2d 1098 (Del. Ch. 1999)..................................................................................4, 5

*Tarsi v. Pittsburgh National Bank*,
    555 F.2d 1152 (3rd Cir. 1977) ...........................................................................9

## OTHER AUTHORITIES

6 *Del. C.* § 2531 ..................................................................................................9

125762.00601/40173363v.1

I.    **SUMMARY OF REPLY ARGUMENT**

The Motion For Summary Judgment filed by Defendants Coinmaster USA, Inc. ("CMUSA") and Paul A. Cox ("Cox") was based largely on the sworn testimony of the Plaintiff, Daniel Anthony Lynch, and the documents produced by both parties in the course of discovery. The Answering Brief of the Plaintiff makes no attempt to rebut, explain or in any way justify that sworn testimony.

Rather, Plaintiff engages in a confusing, convoluted, and ultimately unconvincing analysis of certain select documents from the discovery, applying Plaintiff's own interpretation of those documents where, as they almost always do, the language fails to state the conclusion Plaintiff desperately seeks.

This Reply Brief will not repeat the deposition testimony of Mr. Lynch. The Court has that for its own consideration at Exhibit A to the Defendants' Opening Brief. This Reply will be limited to demonstrating why Plaintiff has failed to rebut the inevitable legal conclusion required from his own testimony, that is, that his case must fail as a matter of law and undisputed fact.

As to the breach of contract claim, Plaintiff offers four arguments, none of which have merit. First, Defendants are not attempting to "enforce" the Service Agreement ("PLC Service Agreement") entered into between Lynch and Coinmaster Gaming, PLC, but simply offer that as unrebutted evidence of the impropriety of the letter agreement Lynch contends exists or existed between CMUSA and Lynch (the "CMUSA Agreement"). The PLC Service Agreement forbids the later agreement with CMUSA, and by Lynch's own testimony, he was aware of that limitation.

Second, Plaintiff's reading of the PLC Service Agreement as inapplicable to the CMUSA Agreement is unpersuasive and wrong on its face.

Third, the contention that CMUSA, through Paul Cox, could somehow acquiesce in or ratify an agreement with Mr. Lynch which was void *ab initio* is wrong as a matter of law and inconsistent with the undisputed facts. Cox did not know of the PLC Service Agreement at the time he argued that the CMUSA Agreement was valid. Once he learned of the existence of the former agreement, he took no position on the validity of the CMUSA Agreement until forced to do so by this lawsuit.

Fourth, the contention that the PLC Service Agreement was breached does nothing to salvage Lynch's claim. That Agreement, even if ultimately breached (and there is no evidence of that), was fully in effect and valid on the date Lynch attempted to enter into the Agreement with CMUSA. The first Agreement prohibited the latter; therefore, the CMUSA was void *ab initio*.

As to the fraud claim, reading the Answering Brief leaves one with the overwhelming impression that Mr. Lynch has no facts whatsoever to support his argument. As was demonstrated in the Opening Brief, Mr. Lynch was fully informed at every step of the way of the negotiations between Paul Cox and the Receiver for control of CMUSA. It was only at the eleventh hour, as the transaction was about to close, on a basis which would have permitted Lynch to participate in the ownership of CMUSA in due course, did Mr. Lynch refuse to sign the deal documents. His repeated admissions in his testimony that he was aware of the terms being presented and did nothing to protect his own rights, or to object to those terms, remain unrebutted on this record. There is no basis for fraud in the face of those facts.

Finally, Plaintiff's effort to salvage his claims based on the alleged forgery of an application to a particular Indian gaming authority is unsuccessful. The fair reading of the Complaint establishes that Mr. Lynch's entire claim of misrepresentation is based upon the allegedly forged application. The facts from his deposition establish that there is no evidence

2

that Mr. Cox was a party to any forgery, that the most that can be said was that there was a mistake made by a notary in the filing of the application, that Mr. Lynch has suffered no harm as a result of that mistake, and that, most tellingly, Mr. Lynch facilitated and participated in all of the activity which led up to the unfortunate filing of an application which was not properly executed.  In short, there is no evidence to support Mr. Lynch's claim in this regard.

3

**II.    THE BREACH OF CONTRACT CLAIM FAILS BASED ON LYNCH'S TESTIMONY AND THE UNDISPUTED DOCUMENTS.**

Lynch attempts to salvage his breach of contract claim by a creative reading of several key documents. Lynch admits, as he must, that he had entered into a Service Agreement, dated November 6, 2001, with Coinmaster Gaming, PLC, a public-held company formed under the laws of the United Kingdom. Op. Br. at 5; Ans. Br. at 3. It is also undisputed that Coinmaster Gaming, PLC held 100% of the stock of Coinmaster Gaming Products, Ltd., a privately-held company which owned a majority position in the stock of CMUSA. *Id.*

Mr. Lynch's first argument, that neither CMUSA nor Cox were parties to the PLC Service Agreement and, therefore, cannot attempt to enforce that Agreement, is irrelevant. Cox and CMUSA are not attempting to enforce the PLC Service Agreement, but to demonstrate that based upon the plain and undisputed provisions of that Agreement, Lynch was forbidden from entering into any other agreement with another business. The PLC Service Agreement, by its terms, made Lynch's CMUSA Agreement void *ab initio*. *See Solomon v. Armstrong*, 747 A.2d 1098, 1114 (Del. Ch. 1999) (holding that *ultra vires* acts are void, which would include acts forbidden by the PLC Agreement).

As his second argument, Lynch would have this Court conclude is that because CMUSA was indisputably owned by Coinmaster Gaming, Ltd., which was indisputably owned by Coinmaster Gaming, PLC, CMUSA is somehow outside the definitions contained in the PLC Service Agreement. Not only is there no language in the Agreement to support such an interpretation, but it flies in the face of both common sense and the common parlance of corporate affairs.

4

The PLC Service Agreement is clear that Mr. Lynch was expected to devote his full time and energies to working for Coinmaster Gaming, PLC. *See* Op. Br. Ex. D. at §4.1. The suggestion that the Service Agreement only limited Mr. Lynch's ability to enter into new agreements with first level subsidiaries, but not indirect subsidiaries, also owned by PLC, is unsupported and illogical, and directly contrary to §§ 14 and 17.2 of the Agreement. Most importantly, it is contrary to Lynch's own understanding of the PLC Service Agreement. Lynch Deposition at 36 (Ex. A to Op. Br.).

Third, Plaintiff argues that his Agreement with CMUSA was somehow ratified or acquiesced in by the Receiver, who took over control of the failed UK companies, and/or by CMUSA. This argument likewise misses the point, since if the CMUSA Agreement was void *ab initio* as a result of the explicit language of the PLC Service Agreement, then no party could acquiesce in or ratify that void Agreement. *Solomon, supra.* Further, the Receiver's attempt to settle with Mr. Lynch any lingering dispute over these Agreements is hardly evidence that the Agreement was valid. Rather, it is evidence simply of an effort to bring peace.

Mr. Lynch also conveniently ignores the fact that he either failed or refused on multiple occasions to provide Paul Cox with a copy of the PLC Service Agreement. *See, e.g.* Lynch Deposition at 131, Ex. 37. Thus, at the time Mr. Cox was vigorously defending Mr. Lynch and his right to receive his expenses from CMUSA, Cox was arguing from a point of ignorance. *Id.* Once he secured a copy of the PLC Service Agreement, he never again attempted to defend the validity of the Agreement but, instead, dutifully reported the differing contentions with respect to the validity of this CMUSA-Lynch Agreement. *See, e.g.,* Cox Deposition at 87-88 (attached as Ex. 1).

5

Finally, Lynch contends that the PLC Service Agreement was breached, and that somehow this salvaged his void agreement with CMUSA. Again, this argument works only if one ignores the facts. Even if the Receiver did breach the PLC Service Agreement by discharging Lynch from his position at Coinmaster Gaming, PLC, that did not occur until February of 2003, some three months after the Agreement with CMUSA was allegedly formed. Lynch Deposition at 37. Thus, it is undisputed that at the time the CMUSA Agreement was allegedly formed, the PLC Service Agreement was fully in effect and binding on Lynch.

In summary, there is no dispute that Lynch had a supervening Agreement with PLC which forbade his entering into agreements with subsidiaries, including CMUSA. There is no question that Lynch was fully aware of the restrictions, and reported these to Cox, opining that this conflict might "void" his CMUSA Agreement. Lynch Deposition at 81. There is no question that the terms of the PLC Service Agreement, based on a fair reading, forbid precisely the conduct in which Lynch attempted to engage, and which Lynch knew at the time was, at best, problematic. Finally, there can be no legitimate contention either that the void CMUSA Agreement was ever ratified or acquiesced in, nor was the superseding PLC Service Agreement in any way breached at the time Lynch attempted to enter into the CMUSA Agreement.

For all of these reasons, Lynch's breach of contract against CMUSA fails.

6

### III.     THE FRAUD CLAIM WAS MADE UP ENTIRELY OUT OF WHOLE CLOTH.

Plaintiff's response to summary judgment on the fraud claim is almost free of reference to any facts. Rather, it is mostly argument which attempts to avoid the damning admissions by Mr. Lynch in his deposition.

Mr. Lynch begins by claiming that Paul Cox misrepresented whether he was under a confidentiality agreement with respect to the Receiver. Regardless of whether or not that is true, Mr. Lynch has not and cannot point to *any* material information withheld from him based upon this alleged confidentiality agreement. Indeed, what the Opening Brief established and Mr. Lynch has failed to confront, is that Lynch was fully consulted by Paul Cox at every step in the negotiations between Cox and the Receiver for the takeover of CMUSA. *See* Op. Br. at 7-10. Paul Cox shared drafts of each proposal, which indisputably began with Lynch as a full participant in the takeover, and ended up with Mr. Lynch out of the transaction entirely. The fact that Lynch was fully informed of this, had ample opportunity to object, counter, or otherwise become involved in the negotiations, and never did anything to protect his interests, speaks volumes about Lynch's allegations of fraud. Indeed, because Lynch knew of each proposal to the Receiver, and was fully aware that he was not part of those proposals as they were ultimately negotiated, Lynch's claims of fraud fail.

Lynch's contention that the Receiver would not have objected to Lynch being involved in the transaction but for Cox's interference flies directly in the face of unrebutted evidence. The August 26, 2004 e-mail from the Receiver, Ian Best, to Mr. Lynch (B256 of Plaintiff's Appendix) states that: the Bank of Scotland "would not be supportive of you being involved in either the UK or the US [referring to the UK or US companies] going forward."

Desperate to salvage his claim, Plaintiff begins making up facts. He contends that Cox was "the driving wedge between the Receiver and Lynch." The references to Plaintiff's Appendix provide no support for such a conclusion, and the contention that the Receiver itself revealed such a state of affairs is ridiculous. The e-mail at B-247 through B-249, from the assistant to the Receiver to Mr. Lynch dated August 10, 2004, states an indisputable fact: "Please note that this matter is being driven by Coinmaster USA, Inc. and not by the Bank of Scotland and a copy of your letter has been forwarded to them for consideration. You should therefore correspond with Coinmaster USA, Inc. in relation to your position." As of August 10, 2004, nearly two months had passed since the transaction between the Receiver, on behalf of the Bank of Scotland, Cox and Brad Hutcheon had closed. Therefore, the email quoted above was absolutely accurate: The Receiver no longer had the ability to negotiate with Lynch over the acquisition of CMUSA because that deal was resolved. Mr. Lynch's suggestion that this e-mail shows something nefarious about the conduct of Paul Cox is inaccurate and requires the Court to completely ignore the realities of what had occurred in June, 2004.

Mr. Lynch was fully informed of the negotiations over the acquisition of CMUSA by Paul Cox. He admitted in his deposition to receiving the e-mails which so informed him, and of the opportunity to comment at each step of the way. *See* Op. Br. at 7-10.

Lynch also admitted in his deposition that it was his decision, and his alone, to refuse to execute the operative agreements at the last possible moment. Lynch Deposition at 201-2. By virtue of doing so, as Lynch conceded, he took himself out of the transaction for the acquisition of CMUSA. Now, having apparently come to the realization that his conduct was unreasonable and self-destructive, he seeks to blame Paul Cox. His own testimony riddles his fraud claim of any validity.

8

## IV.    **THE FORGERY CLAIM.**

The fair reading of Counts II and III of Plaintiff's Complaint establishes that Lynch bases those counts on the allegedly forged application submitted to the Santa Ynez Tribal Gaming Agency. While there are oblique references to other alleged "misrepresentations," Mr. Lynch has failed to produce one piece of evidence during discovery that would support any other basis for his claim.

The deposition testimony and related exhibits demonstrate that Lynch was fully aware of the efforts being made by Cox and his staff to prepare the necessary applications to the various Indian gaming authorities. While it may be true that Mr. Lynch's signature on the Santa Ynez application was improperly notarized, there is absolutely no evidence that Paul Cox executed that application or authorized that improper notarization. Cox Deposition at 149-156 (attached as Ex. 2). Further, the evidence is unrebutted that Lynch was fully aware of all of the acts being taken and fully facilitated the conduct which led to this unfortunate incident. *See* Op. Br. at 10-11.

*Tarsi v. Pittsburgh Nat'l. Bank*, 555 F.2d 1152 (3rd Cir. 1977), establishes that where Lynch was a knowing participant in the improper conduct, he was of "equal fault." The Opening Brief (at 15-17) shows that Lynch knew every material detail about the filing of this Santa Ynez application, was fully cooperative in the undertaking, and only complained when he initiated litigation.

Finally, Mr. Lynch readily conceded that he has suffered no damage as a result of the filing of this application, and he has pointed to no other alleged act which has caused him any damage. Lynch Dep. at 225-6. These facts do not establish any claim under either the Uniform Deceptive Trade Practices Act, 6 *Del. C.* § 2531, or under any other theory.

9

125762.00601/40173363v.1

Plaintiff's Answering Brief refers to his Complaint, but provides no evidence to support any claim under Counts II or III. Lynch's deposition establishes that, at worst, there was a clerical mistake made with respect to a single application, and that that mistake has caused Lynch no harm. Under these circumstances, summary judgment is entirely appropriate for these counts as well.

Respectfully submitted,

BLANK ROME LLP

By: _____
Thomas P. Preston, Esquire
I.D. No. 2548
1201 Market Street, Suite 1500
Wilmington, DE 19801
(302) 425-6400

Counsel for Defendant
Coinmaster USA, Inc.

Dated: February 8, 2008

10

## CERTIFICATE OF SERVICE

I, Thomas P. Preston, hereby certify that on the 8th day of February, 2008, a copy of

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was served on the following counsel of record:

### BY ELECTRONIC SERVICE

James S. Green, Esquire
Kevin A. Guerke, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899

Erin K. Brignola, Esquire
Cooper Levenson April Niedelman &
  Niedelman & Wagenheim, P.A.
30 Fox Hunt Drive
Bear, DE 19701

Thomas P. Preston
I.D. No. 2548

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANIEL ANTHONY LYNCH,        )
                             )
        Plaintiff,           )
                             )   Civil Action
     vs.                     )   No. 06-365 JJF
                             )
COINMASTER USA, INC.,        )
a Delaware corporation,      )
                             )
        Defendant/Counterclaim )
        Plaintiff            )
                             )
PAUL A. COX,                 )
                             )
        Defendant/Counterclaim )
        Plaintiff and Third- )
        Party Plaintiff      )
                             )
     vs.                     )

AUTO GAMING, INC.,

        Third-Party Defendant


        Deposition of PAUL A. COX taken pursuant to
notice at the law offices of Seitz, Van Ogtrop & Green,
P.A., 222 Delaware Avenue, Suite 1500, Wilmington, Delaware,
beginning at 9:07 a.m., on Tuesday, November 27, 2007,
before Allen S. Blank, Registered Merit Reporter and Notary
Public.


            WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801

            (302) 655-0477

            www.wilfet.com



PAUL A. COX

87

1    A    No.

2    Q    Okay.  I was asking because I didn't know if that

3  was the issue that you were discussing in this e-mail.

4    A    No, it is not.

5         MR. GUERKE:  Would you mark this one,

6  please?

7         (Cox Deposition Exhibit No. 22 was marked for

8  identification.)

9  BY MR. GUERKE:

10   Q    When you have had a chance, please identify this

11  document.

12   A    It's an e-mail from the then and now UK receiver,

13  Ian Best, to me with copies to various people about Tony

14  Lynch.

15   Q    If you would turn to the next page, it is in

16  response to an e-mail that you sent.  Okay.  Now this makes

17  sense.  June 15th, 2004, you sent Mr. Best an e-mail?

18   A    Okay.

19   Q    Do you see that?  The second page.  Hi, Ian.

20   A    Yeah.  Is it dated the 15th?

21        MR. SCHERZER:  The very last line, Kevin?

22        MR. GUERKE:  This is the date I'm referring to.

23        THE WITNESS:  Oh, okay.  Yes, okay.

24  BY MR. GUERKE:



PAUL A. COX

88

1    Q    And in that e-mail to Mr. Best, you state, you guys

2    believe that Tony has no contract with us that is valid

3    anyway.  We didn't hold that view but you may be right.

4              What was the purpose of this e-mail to

5    Mr. Best?

6    A    To give Ian Best some update, I guess, on the

7    situation, I presume, that Tony had told me about his

8    attitude to the terms agreement.

9    Q    At this point on or about June 15th, 2004, you are

10   changing your position on the validity of Mr. Lynch's

11   Coinmaster USA contract, is that right?

12   A    No.

13   Q    You were not?

14   A    I'm absolutely in the don't know/abstain category.

15   I do not know whether he was a director or not at that time.

16   I do not know.

17   Q    Before this time, you had taken the position

18   publicly and everyone involved that he was, in fact, a

19   director, right?

20   A    When you say publicly, what do you mean?

21   Q    You told the receiver that you sent out an

22   information packet with Mr. Lynch as a director in

23   September 2003?

24   A    Okay.  So in September 2003, I sent out an

**EXHIBIT 2**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANIEL ANTHONY LYNCH,                    )
                                         )
                Plaintiff,               )
                                         )   Civil Action
        vs.                              )   No. 06-365 JJF
                                         )
COINMASTER USA, INC.,                    )
a Delaware corporation,                  )
                                         )
                Defendant/Counterclaim   )
                Plaintiff                )
                                         )
PAUL A. COX,                             )
                                         )
                Defendant/Counterclaim   )
                Plaintiff and Third-     )
                Party Plaintiff          )
                                         )
        vs.                              )

AUTO GAMING, INC.,

                Third-Party Defendant


            Deposition of PAUL A. COX taken pursuant to
notice at the law offices of Seitz, Van Ogtrop & Green,
P.A., 222 Delaware Avenue, Suite 1500, Wilmington, Delaware,
beginning at 9:07 a.m., on Tuesday, November 27, 2007,
before Allen S. Blank, Registered Merit Reporter and Notary
Public.


                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801

                    (302) 655-0477

                    www.wilfet.com



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

PAUL A. COX

149

1    Q    Did you ever discuss the content of this letter with

2    either one of them?

3    A    I don't believe so.

4    Q    After this litigation started, the beginning of

5    2006, did anyone at Ernst & Young confirm to you or anyone

6    at Coinmaster USA that Mr. Lynch was still a director of the

7    UK companies?

8    A    No.

9    Q    So this was news to you when you got it?

10   A    Yes.  It doesn't necessarily mean what you think it

11   means, of course.  You have to ask them.

12            MR. GUERKE:  Would you mark this, please?

13            (Cox Deposition Exhibit No. 45 was marked for

14   identification.)

15   BY MR. GUERKE:

16   Q    I have handed you what's been marked as Exhibit 45.

17   It is the application that was discussed yesterday during

18   Mr. Lynch's deposition.  It is an application for the Santa

19   Ynez Tribal Gaming Agency, is that right?

20   A    Santa Ynez.

21   Q    The information contained in this application is

22   that of Mr. Lynch, is that right?

23   A    Yes.  I believe so.

24   Q    Do you know who filled out this application?



PAUL A. COX

150

1    A    I think there are probably three different people

2  that filled this out.

3    Q    Who were those three people?

4    A    Myself, Kelly Baker and the third one may be either

5  Mary or it may be somebody else.

6    Q    Mary Cox, your wife?

7    A    Um-hmm.

8    Q    Who would that someone else possibly be?

9    A    One of the other girls in the office building who

10 used to fill in applications for me.

11   Q    Who signed the last two pages of this application?

12   A    Nobody signed it apart from Kelly Baker.  I wrote in

13 Tony Lynch's name.

14   Q    Above where it says applicant's signature?

15   A    Above where it says applicant's signature.

16   Q    So you signed this document --

17   A    I didn't sign it.  I wrote in Tony's name.  There is

18 a distinct difference.

19   Q    Explain to me the difference.

20   A    Sure.  The process for completing documents of this

21 sort, you have to remember it's a kind of boring process and

22 a routine process carried out for each tribe.  However many

23 tribes there are.  And it was conducted by a number of

24 people over time.  Okay.



PAUL A. COX

151

1        And some of them weren't fully trained at this

2    point in time.  I used to do a shadow copy, if you like, in

3    other words, a shadow copy, which would complete.  And I

4    would leave it on the table and say, okay, when the other

5    one comes in, compare it with that one; and, if it's the

6    same, put it in the envelope and send it off.

7        Q    So in the last two pages, you filled in D. A.

8    Lynch's name?

9        A    Absolute.

10       Q    And you had Miss Baker notarize that?

11       A    No.

12       Q    How was it notarized?

13       A    Well, Kellie Baker obviously notarized it.

14       Q    Explain to me the process where this document was

15   notarized by Ms. Baker?

16       A    I can't speculate but I can tell you what I think

17   happened.  I'm not speculating.  I'll stop when I start

18   speculating.  I'll tell you the facts.

19       Q    Tell me the facts.

20       A    Okay.  I was not at the office between June 2nd, and

21   June 10th, 2003.  My house got zapped by lightning.  It

22   couldn't have happened any other way.

23            This document had to be in the hands of the

24   tribe by something like June 4th.  I don't remember the



PAUL A. COX

152

1    exact date.  Or June 5th.  Okay.

2              This was on my desk, alongside with the other

3    stuff that had to go, which had already been notarized by

4    myself or Brad.  I suspect we didn't know where Tony was at

5    that point in time.  He may have been in the UK, he may have

6    been in Spain.

7              The process was very simple.  You fax him the

8    last page blank.  Okay.  He fills it in.  Kellie notarizes

9    it and off it goes.

10             So the person -- so I call somebody at the

11   office, either Kellie or one of the other girls, and I say

12   to them, okay, I can't get in, I've got a real problem at

13   home, I've got to stay at home.  Put the things in the

14   envelope.  Send it off to the tribe.  We'll worry about Tony

15   later.  I'll sort it out later.  I often did that.  His

16   package often didn't go out the same time as the others.

17   Q    So this signature on the last two pages was not

18   witnessed by Ms. Baker?

19   A    This isn't his signature.  If I wanted to put Tony's

20   signature on there, I know his signature well enough.  It's

21   that scroll that looks like a big O.  If I wanted to do

22   that, I would have done it.

23             This was simply -- quite often I did these

24   things in red when I filled in the places where we were

PAUL A. COX

153

1   looking for something from Tony.

2      Q    Mr. Lynch didn't fill this out, though?

3      A    He didn't fill out the document, no.

4      Q    He didn't sign it?

5      A    He didn't sign it, no.

6      Q    And that is not his signature that is notarized?

7      A    Absolutely.

8      Q    How many applications were filled out in this way on

9   behalf of Mr. Lynch?

10     A    What do you mean this way?

11     Q    Where he didn't sign it.

12     A    This is very probably the only one.

13     Q    Was this, in fact, submitted?

14     A    It looks like it was.  I didn't know that until you

15  sent it to me.

16     Q    Was this --

17     A    It is not in my file.  Because this is essentially

18  my file copy.

19     Q    Did you receive a license in response to this

20  application?

21     A    Yes.

22     Q    Is it legal in the state of Florida to notarize in

23  this way?

24     A    You have to ask the notary.



PAUL A. COX

154

| | | |
|---|---|---|
| 1 | Q | Are you a notary? |
| 2 | A | No. |
| 3 | Q | Were you ever? |
| 4 | A | Yes. |
| 5 | Q | In the State of Florida? |
| 6 | A | Yes. |
| 7 | Q | When? |
| 8 | A | 1994 maybe. |
| 9 | Q | Until when? |
| 10 | A | 1996 maybe. |

11   Q    So at this time, you were a notary public?  Oh,
12 1996?

13   A    No, I wasn't.

14   Q    I'm sorry.

15        At the time you were a notary, did the notary
16 public have to witness the signature?

17   A    I don't know.

18   Q    At some point, did you know and you can't recall
19 now?  Did you go through a class?

20   A    No, no class required at that time.  There probably
21 is now.

22   Q    Did you discuss this application with Ms. Baker?

23   A    Never.

24   Q    Just so I'm clear.  Some of the e-mails between you

PAUL A. COX

155

1    and Mr. Lynch, when you were both working at Coinmaster USA,

2    reference applications that you sent to Mr. Lynch and he

3    sent back?

4    A    Or parts of applications.

5    Q    Or parts.

6              Why, again, was this not done in that manner?

7    A    It was going to be done.  It was sitting on my desk

8    waiting to be done.  And I didn't go back.  It's usually the

9    last thing we do because he is the most difficult person to

10   get hold of.  He is just not there.  I didn't know where he

11   was.

12   Q    Did you have Mr. Lynch's permission to fill this out

13   on his behalf?

14   A    Well, the document itself?

15   Q    The document itself.

16   A    The whole document or the whole types of documents?

17   Yes.

18   Q    How about this document and these two authorizations

19   and affidavits at the end?

20   A    No.  Absolutely not.  And we didn't fill them out on

21   his behalf.

22   Q    You didn't have his permission to fill this out?

23   A    We had his permission to fill in the document with

24   the information.  Absolutely.  If I would have been in the

PAUL A. COX

156

1  office, I would have faxed the last two pages.  He would

2  have signed them.  Kellie would have notarized them.  They

3  would have been put together, gone to Chumash and we would

4  have got a license, just like we did.

5    Q    Did Mr. Lynch ever tell you to go ahead and sign on

6  my behalf or anything to that effect?

7    A    Absolutely not.  But I did suggest we get a rubber

8  stamp.  You don't think the chairman of ITT signs all these

9  things, do you?

10   Q    Did you get a rubber stamp?

11   A    No.  Never.  But I wanted to.

12   Q    Do you recall the last application to any gaming

13  institution that Mr. Lynch was a part of on behalf of

14  Coinmaster USA?

15   A    No.

16   Q    Do you recall if any were submitted in 2004?

17   A    No.

18   Q    You don't recall?

19   A    I don't recall.

20        MR. GUERKE:  Would you mark that, please?

21        (Cox Deposition Exhibit No. 46 was marked for

22  identification.)

23  BY MR. GUERKE:

24   Q    This is a cover letter dated March 11, 2005, from

