IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DANIEL ANTHONY LYNCH, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COINMASTER USA, INC., | : | |
| | : | |
| Defendant/Counterclaim | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 06-365-JJF |
| | : | |
| PAUL A. COX, | : | |
| | : | |
| Defendant/Counterclaim | : | |
| Plaintiff and Third-Party | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AUTOGAMING, INC., | : | |
| | : | |
| Third Party Defendant. | : | |

James S. Green, Esquire and Kevin A. Guerke, Esquire of SEITZ, VAN OGTROP & GREEN, PA, Wilmington, Delaware.

Attorneys for Plaintiff Third-Party Defendant.

Thomas P. Preston, Esquire of BLANK ROME LLP, Wilmington, Delware.

Attorneys for Defendants.

## MEMORANDUM OPINION

March 30, 2009
Wilmington, Delaware

Farnan, District Judge

Pending before the Court is Defendants' Motion For Summary Judgement (D.I. 60) and Plaintiff Daniel Anthony Lynch And Third-Party Defendant Autogaming, Inc.'s Motion For Summary Judgment (D.I. 67). The latter Motion is, in effect, two separate motions, one by Plaintiff for summary judgment on his breach of contract claim, and another by both Plaintiff and Third Party Defendant for summary judgment on Defendants' Counterclaims.

For the reasons discussed, Defendants' Motion will be granted in part and denied in part. Specifically, Defendants' Motion will be granted to the extent it seeks summary judgment on Plaintiff's claims that are based on alleged acts of forgery. Defendants' Motion will be denied in all other respects. Plaintiff's Motion for Summary Judgment on his breach of contract claim will be granted to the extent it seeks termination pay, stock options, and bonus pay. Plaintiff's Motion will be denied to the extent it seeks outstanding monthly pay. In addition, Plaintiff's and Third Party Defendants' Motion on Defendants' Counterclaims will be denied in full.

As set forth in greater detail below, as a result of this Memorandum Opinion, Plaintiff will have outstanding claims for breach of contract (but only to the extent he seeks outstanding monthly pay), common law unfair competition, intentional interference with prospective business relations, and fraud. However, Plaintiff may not continue to assert claims for unfair

competition and intentional interference to the extent they are based on alleged acts of forgery. With respect to Plaintiff's breach of contract claim, the Court will resolve the amount of damages to which Lynch is entitled at a hearing to be set by separate Order. With respect to Defendants, the net result of this Memorandum Opinion is that their Counterclaims remain fully intact.

## I.   Background

Plaintiff Daniel Anthony Lynch ("Lynch") brought the current lawsuit against Defendants Coinmaster USA, Inc. ("Coinmaster USA") and Paul A. Cox ("Cox") on May 31, 2006, alleging breach of his employment contract with Coinmaster USA, deceptive trade practices, intentional interference with prospective business relations, and fraud. (D.I. 1, Exh. A.) Specifically, Lynch alleges that Coinmaster USA breached its contractual obligations to him by failing to pay the salary, termination payout, profit bonus, and stock options required by his employment agreement. (Id. ¶¶ 25, 28-31.) Coinmaster USA filed an Amended Counterclaim against Lynch, alleging conversion of Coinmaster USA assets. (D.I. 28 ¶¶ 63-66.) Similarly, Cox filed an Amended Counterclaim against Lynch, alleging intentional interference with prospective business relations, conversion, fraud, and breach of fiduciary duty. (D.I. 29.) Cox also filed an Amended Third-Party Complaint against AutoGaming, Inc. ("AutoGaming"), which Lynch

2

controls, alleging interference with prospective business relations and conversion. (Id.)

Coinmaster USA was formed in 2001 by Cox and Lynch, longtime friends who were in the business of casino game design and manufacture. (D.I. 69 at B70.) Cox was the initial director and 10% shareholder of Coinmaster USA, and Lynch was the controlling shareholder of Coinmaster USA through the British company Coinmaster Gaming Products LTD ("Coinmaster LTD"), which owned 90% of the Coinmaster USA stock. (D.I. 70 at B313-16.) Coinmaster LTD was a subsidiary of Coinmaster Gaming PLC ("Coinmaster PLC"), which was a holding company for 100% of the stock of Coinmaster LTD. (D.I. 69 at B69, B335.)

In February 2002, Coinmaster PLC borrowed approximately 3 million pounds sterling from the Bank of Scotland, committing all of its subsidiaries to the repayment of this loan. Unfortunately, after the failure of one of Coinmaster PLC's main products, Coinmaster PLC became unable to meet its loan obligations, and, on March 3, 2003, both Coinmaster PLC and Coinmaster LTD fell into receivership. (Id. at B5, B63, B71.) In an effort to repay the loan to the Bank of Scotland, the Receiver began the process of liquidating the assets of Coinmaster PLC and Coinmaster LTD, including their interest in Coinmaster USA. (See D.I. 66 at 9.) Lynch and Cox, believing that Coinmaster USA nevertheless represented a viable company,

3

attempted to acquire the assets of Coinmaster USA from the
Receiver. To this end, Lynch, Cox, and Brad Hutcheon, another
Coinmaster USA employee, put together a business plan to conduct
a management buyout of the Coinmaster USA stock from the
Receiver. (See D.I. 69 at B133-B136.) However, at some point,
Lynch and Cox had a falling out, and Lynch was ultimately not
included in the plan to acquire the assets of Coinmaster USA from
the Receiver. (See D.I. 66 at 19-20.) In general, this falling
out precipitated the instant litigation.

## II. Discussion

### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil
Procedure, a party is entitled to summary judgment if a court
determines from its examination of "the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any," that there are no genuine issues of
material fact and that the moving party is entitled to judgment
as a matter of law. Fed. R. Civ. P. 56(c). In determining
whether there are triable issues of material fact, a court must
review all of the evidence and construe all inferences in the
light most favorable to the non-moving party. However, a court
should not make credibility determinations or weigh the evidence.

To defeat a motion for summary judgment, the non-moving
party must "do more than simply show that there is some

4

metaphysical doubt as to the material facts . . . . 'In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)(citations omitted). However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

## B. Whether Either Party Is Entitled To Summary Judgment On Lynch's Breach of Contract Claim Against Coinmaster USA

### 1. The Pertinent Employment Agreements

Two employment agreements, one with Coinmaster PLC and one with Coinmaster USA, are relevant to Lynch's breach of contract claim. First, beginning in November of 2001, Lynch was employed as chief executive officer ("CEO") of Coinmaster PLC. (D.I. 69 at B3, B68-69.) In connection with this employment relationship, Lynch and Coinmaster PLC entered into an employment contract providing, among other things, that Lynch "shall not be entitled to any remuneration or expenses as a director or employee of the Company in addition to those specified in this Agreement." (D.I. 59, Exh. D at ¶ 6.5.) The Coinmaster PLC contract defines "Company" as including "all Associated Companies," and defines "Associated Company" as including all subsidiaries, holding

5

companies, and subsidiaries of holding companies. (<u>Id.</u> at ¶¶
1.1, 17.1)   The Coinmaster PLC contract further states that Lynch
shall not during the term of the agreement "engage in, carry on
or be interested in any other business."   (<u>Id.</u> at ¶14.)

At the November 8, 2002 annual meeting of Coinmaster USA's
stockholders and board of directors, Lynch was elected Chairman
of the Board of Directors of Coinmaster USA, effective December
1, 2002, "to serve for the ensuing three years, and until [his]
successor [is] elected and qualif[ies]."   (D.I. 70 at 321.)   In
connection with this employment relationship – and in spite of
the provision of the Coinmaster PLC agreement prohibiting Lynch
from receiving remuneration from "Associated Companies" – on
November 17, 2002, Lynch entered into an employment contract with
Coinmaster USA ("Service Agreement").   (D.I. 69 at B182-83.)   The
Service Agreement states, in pertinent part:

> We propose that the terms of the Agreement between
> yourself and Coinmaster USA Inc., for the provision of
> your services, as Chairman of Coinmaster USA Inc., on
> an expense only basis, be amended to the following with
> effect from December 1, 2002.   This will now take
> account of the extensive travelling [sic] required for
> you to perform your duties.   Please retain all receipts
> for travel, in case we are ever audited.
>
> 1.   This agreement will be perpetual in nature, in
> recognition of the value of your services to the
> business.
>
> 2.   Your services will be provided on an as required
> (time) basis, and the expenses paid to yourself, will
> be on the following scale:

6

```
      2003 Financial Year       $8,000 per month
      2004 Financial Year      $12,000 per month
      2005 Financial Year      $14,000 per month
```

3.  You will be entitled to an annual bonus of 5% of
the Company's net profit each year, as recorded by the
Company's accountants.

5.  A stock option scheme will be put in place by
January 2003, giving you a further incentive to achieve
a high performance.

6.  In the event that Coinmaster USA Inc. decides to
terminate this relationship for any reason, or to
change your position in the organization, at any time,
compensation for this loss, to be paid to yourself,
will be

```
      In the 2003 year          $500,000
      In the 2004 year          $600,000
      In the 2005 year          $700,000
      Thereafter                $800,000
```

This obligation must be met in full, on the date of
termination.

All rights to stock options accrued will be retained in
these circumstances, and entitlements to annual bonus
will be on a pro rata monthly basis.

(D.I. 69 at B182-83.)

In accordance with the Service Agreement, Coinmaster USA

paid Lynch $8,000 per month between March and September 2003.

(D.I. 69 at B114-B119.)  However, Lynch was not compensated by

Coinmaster USA after September 2003, and was not re-elected to

the Board at the 2003 shareholder general meeting, which was held

on October 4, 2004.  (D.I. 70 at B449.)  Having thus been

terminated as a member and Chairman of the Board of Directors,

Lynch brought the instant breach of contract claim, alleging that

he is owed (1) \$132,000 in outstanding monthly pay, (2) the \$600,000 termination fee, (3) \$25,666,66 of Coinmaster USA's accrued profits, and (4) stock options accrued under the Service Agreement.  (See D.I. 68 at 6.)

## 2.    The Parties' Contentions

Defendants contend, first, that Lynch's breach of contract claim fails because the Service Agreement provides not for the payment of a salary but only the payment of expenses.  In this regard, Defendants note that the Service Agreement explicitly refers to compensation on an "expense only" basis.  (D.I. 61 at 6.)  Second, Defendants contend that the Service Agreement is void ab initio in light of Lynch's Coinmaster PLC contract.  In support of this position, Defendants note that the Court of Chancery of Delaware stated in Solomon v. Armstrong, 747 A.2d 1098, 1114 (Del. Ch. 1999), that ultra vires acts are void ab initio,[1] and defined ultra vires acts as "acts specifically prohibited by the corporation's charter, for which no implicit authority may be rationally surmised, or those acts contrary to basic principles of fiduciary law."  Solomon, 747 A.2d at 1114, n.45.  Though Defendants are not particularly clear on this point, their position appears to be that Lynch, by contracting with a second level subsidiary of Coinmaster PLC for additional

---

[1] Acts void ab initio cannot be validated by shareholder ratification, and are subject to the Court's equitable powers (e.g., rescission).  See Solomon, 747 A.2d at 1114.

compensation,[2] breached the Coinmaster PLC agreement and hence breached a fiduciary duty to Coinmaster PLC. (See D.I. 78 at 50:19-51:5.) Under Solomon, Defendants contend, such a contract is ultra vires and hence void ab initio.

Lynch responds, first, that neither Coinmaster USA nor Cox were parties to the Coinmaster PLC Contract. As such, they have no right to enforce any provision of the Coinmaster PLC Contract, including the provision that allegedly prohibited Lynch from accepting remuneration from an "Associated Company" of Coinmaster PLC. (See D.I. 66 at 14.) And, even if Defendants could enforce the Coinmaster PLC Contract, Lynch contends that Coinmaster USA is not an "Associated Company" under the Coinmaster PLC Contract. As Lynch explains, Coinmaster USA is a subsidiary of Coinmaster LTD, which is a subsidiary of Coinmaster PLC. A subsidiary of a subsidiary, Lynch contends, does not fall within the Coinmaster PLC Contract's definition of "Associated Company" (set forth above). (Id. at 15.) Lynch further maintains that Coinmaster PLC stopped paying him and thus breached the Coinmaster PLC contract, relieving him of any obligations he may have otherwise had under the Coinmaster PLC agreement, including the obligation not to accept remuneration from an "Associated Company." Finally, Lynch contends that Coinmaster USA cannot argue that the

_____

[2] Coinmaster PLC held 100% of the stock of Coinmaster Coinmaster LTD, which owned 90% of Coinmaster USA's stock.

9

Service Agreement is invalid or void because Coinmaster USA waived this position long ago and instead ratified the Service Agreement. Specifically, Lynch contends that, pursuant to the Service Agreement, Coinmaster USA made at least seven \$8,000 payments to Lynch. (See D.I. 69 at B114-B121.) Subsequently, Coinmaster USA obtained legal advice regarding the validity of the Service Agreement and then openly defended the validity the Service Agreement before the Receiver. (See, e.g., id. at B201.) In these circumstances, Lynch brings his own Motion for Summary Judgment (D.I. 67), contending that because the Service Agreement is not void, he is entitled to all benefits of the bargain, including outstanding monthly pay, the termination fee, stock options, and a portion of Coinmaster USA profits. (See D.I. 67; D.I. 68 at 4-6.)

### 3. Decision

With respect to the issue of whether the Service Agreement provides only for the reimbursement of Lynch's expenses – and not additional employment compensation – the Court finds that issues of material fact exist and that summary judgment is not warranted. The Service Agreement between Coinmaster USA and Lynch on its face states that compensation was "on an expenses only basis," yet Coinmaster USA indisputably paid Lynch \$8,000 per month for at least six months in 2003, regardless of whether expenses were incurred, and Cox himself later defended the

10

contract as a salary to the Receiver. For instance, in an e-mail responding to the Receiver's arguments that Lynch's contract provided only for compensation on "expenses only basis," Cox wrote that "[m]y attorneys are adamant and unanimous that [Lynch's] US Contract is intact and that your arguments have no merit in a US (Delaware) setting" and that "[f]rom a practical point of view, Tony remains a member of the US Board, and will be paid as per his Contract". (D.I. 69 at B223; see also id. at B225 (Lynch tells the Receiver in an e-mail "[i]f I had thought at the time that [Lynch's] US Contract was invalid, I would have put in place another one, replacing expenses with salary.").) Accordingly, in the Court's view, the meaning of the Service Agreement language is subject to reasonable dispute and the Court will not grant summary judgment in favor of Defendants on this basis. Similarly, the Court will deny Lynch's Motion for Summary Judgment (D.I. 67) on his breach of contract claim to the extent it seeks outstanding monthly pay.

Thus, the Court can grant summary judgment in Defendants' favor only if the Service Agreement is void ab initio. However, the Court concludes that, as a matter of law, the Service Agreement is not void ab initio. In support of their position that the Service Agreement is void, Defendants rely exclusively on Solomon v. Armstrong,, 1114 (Del. Ch. 1999). In Solomon, the court stated that ultra vires acts are void ab initio, and

11

defined <u>ultra</u> <u>vires</u> acts as "acts specifically prohibited by the
corporation's charter, for which no implicit authority may be
rationally surmised, or those acts contrary to basic principles
of fiduciary law." <u>Solomon</u>, 747 A.2d at 1114, n. 45. However,
beyond declaring peremptorily that acts forbidden by the
Coinmaster PLC Agreement are <u>ultra</u> <u>vires</u>, Defendants present no
additional authority or analysis suggesting that the <u>ultra</u> <u>vires</u>
doctrine is so broad as to apply to the facts of the instant
dispute. In fact, "Delaware law severely constricts the
categories of claimants who can raise the <u>ultra</u> <u>vires</u> defense . .

. ." <u>Anderson v. Redman</u>, 474 F. Supp. 511, 518 (D. Del. 1979);
<u>see also</u> 1 R. Franklin Balotti & Jesse A. Finkelstein, <u>The</u>
<u>Delaware Law of Corporations and Business Organizations</u> § 2.3 (3d
ed. 2006) ("Section 124 of the General Corporation Law was added
in 1967 to abolish the ultra vires doctrine except in three
limited circumstances."). Specifically, Section 124 of the
Delaware General Corporation Law limits the application of the
<u>ultra</u> <u>vires</u> doctrine in Delaware and provides:

> No act of a corporation and no conveyance or transfer
> of real or personal property to or by a corporation
> shall be invalid by reason of the fact that the
> corporation was without capacity or power to do such
> act or to make or receive such conveyance or transfer,
> but such lack of capacity or power may be asserted:
>
> (1) In a proceeding by a stockholder against the
> corporation . . . .;
>
> (2) In a proceeding by the corporation, whether acting
> directly or through a receiver, trustee or other legal
> representative, or through stockholders in a

representative suit, against an incumbent or former
officer or director of the corporation, for loss or
damage due to such incumbent or former officer's or
director's unauthorized act;

(3) In a proceeding by the Attorney General to dissolve
the corporation, or to enjoin the corporation from the
transaction of unauthorized business.

8 Del. C. § 124. By their plain language, all three categories

of Section 124 are inapplicable to the case at bar. Indeed, this

case is not a proceeding by a stockholder or the attorney general

against Coinmaster USA, nor is it a case where Coinmaster PLC or

Coinmaster USA assert a claim for losses arising from the Service

Agreement. Similarly, authority discussing ultra vires acts has

generally involved acts that are contrary to a corporation's

charter. See, e.g., Oberly v. Kirby, 592 A.2d 445, 469 n.17

(Del. 1991)(stating that the approval of a "transaction that

posed a clear threat to the charitable purpose or the assets of

the corporation" would be an ultra vires act); Kohls v. Duthie,

791 A.2d 772, 786 (Del. Ch. 2000)(stating that a stock repurchase

in violation of a Certificate of Designation would constitute an

ultra vires act). Defendants cite no cases, and the Court has

not identified any, suggesting that a contract, such as Lynch's

Service Agreement, is ultra vires, and hence void ab initio,

merely because it conflicts with a contract involving a third

party. Solomon certainly does not stand for this proposition.

Accordingly, the Court will deny – in full – Defendants' Motion

For Summary Judgment with respect to Lynch's breach of contract claim.

However, the Court reaches a different overall result with respect to Lynch's Motion For Summary Judgment on his breach of contract claim. (D.I. 67.) Specifically, although, as explained above, the Court denies Lynch's Motion to the extent it seeks outstanding monthly pay, the Court will otherwise grant Lynch's Motion on his breach of contract claim. In opposing Lynch's Motion for Summary Judgment, Defendants only appear to raise one argument other than the argument that the Service Agreement is void ab initio. Specifically, though it is not entirely clear, Defendants seem to contend that Lynch never properly served as Chairman of Coinmaster USA in the year 2003 because, when he was elected Chairman in 2002, he was elected for a three-year term in violation of the Coinmaster USA bylaws, which allow only for a one year term of service. (See D.I. 72 at 4.) Thus, according to Defendants, because Lynch was never properly elected as Chairman of the Board, he is not entitled to compensation under the Service Agreement.

This argument is unpersuasive. All Coinmaster USA directors, including Cox, were purportedly elected for the same three-year term at the November 8, 2002 shareholders meeting. (See D.I. 70 at B321.) As Lynch notes, if Defendants' argument were correct, Coinmaster USA would have had no directors

14

whatsoever during the year 2003. Furthermore, the bylaws simply require that "each director shall hold office until the next annual meeting of stockholders and until his successor is elected and qualified . . . ." (Id. at B312.) At the 2003 shareholders meeting, it was recognized that the practice of electing directors for a three-year term could conflict with bylaws, and, in accordance with the bylaws, a new set of directors was elected for a new one-year term. (See D.I. 70 at B449.) Thus, no director, including Lynch, ever served longer than the allowed period without having been properly elected. Furthermore, Defendants make no allegations whatsoever that Lynch failed to fulfill his duties as a director of Coinmaster USA or that he breached the Service Agreement. On the contrary, from March to September 2003, Lynch was paid $8,000 per month under the Service Agreement, and, after Coinmaster PLC and Coinmaster LTD went into receivership, Cox and Coinmaster USA defended Lynch's right to compensation under the Service Agreement. (See D.I. 69 at B114-B119, B221-B225). Cox even explained to the Receiver that he still "regarded Tony [Lynch] as an essential part of the Board and management team" and that "[h]e has been performing his duties properly to date." (Id. at B225.) Likewise, Cox explained to the Receiver that his "attorneys are adamant and unanimous that [Lynch's] US Contract is intact . . . ." (Id. at B223.) On these facts, the notion that Lynch's claim fails

15

because he did not properly serve as a director of Coinmaster USA does not defeat summary judgment.

Having concluded that as, a matter of law, the Service Agreement is not void <u>ab initio</u>, and having further concluded that Defendants have not identified any questions of fact that preclude Summary Judgment, the Court will grant in part Lynch's Motion For Summary Judgment on his breach of contract claim. As explained above, to the extent Lynch's Motion seeks outstanding monthly pay, the Court finds that questions of fact remain and will thus deny Lynch's Motion. However, in all other respects, the Court will grant Lynch's Motion For Summary Judgment on his breach of contract claim. The only outstanding issue remaining on the aspects of Lynch's breach of contract claim on which the Court has granted summary judgment is the total amount of damages to which Lynch is entitled. The Court will resolve this question at a hearing to be set by a separate order.

## C. Whether Defendants Are Entitled To Summary Judgment On Lynch's Fraud Claim

### 1. The Parties' Contentions

Lynch contends that Cox misrepresented the nature of his communications with the Receiver regarding the possible management buyout of Coinmaster USA from the Receiver. As a result, Lynch contends he was misled into negotiating a premature exit from Coinmaster USA on subpar terms. Lynch alleges that Cox made the following misrepresentations:

- That a non-disclosure agreement prevented Cox from disclosing the content of Cox's communications with the Receiver. (See D.I. 69 at B204.)

- That the Receiver and Bank of Scotland objected to the involvement of Lynch in the management buyout, causing Lynch to ultimately agree not to be part of the buyout bid. (See D.I. 66 at 19.)

- That after Lynch agreed to not be involved in the management buyout, the Receiver demanded that Lynch be bought out of the deal at a lower cost than what was previously agreed upon. (See id. at 20.)

Defendants contend that Lynch's fraud claim fails on summary judgment because Lynch was, in fact, kept fully and accurately informed of the details of all efforts to acquire Coinmaster USA assets, including that the Bank of Scotland and Receiver refused to accept any deal involving Lynch. As exemplary evidence of this, Defendants point to an e-mail from Cox to Lynch describing the "Bank and Receiver's apparent fixation with making sure that you do not have continuing presence with Coinmaster USA, Inc." (D.I. 61, Exh. E.) Similarly, Defendants point to an August 26, 2004 e-mail from the Receiver to Lynch explaining that the Bank of Scotland "would not be supportive of you being involved in either the UK or th US going forward." (D.I. 70 at B256-B257.) Citing to Lynch's deposition testimony, Defendants further contend that Lynch admits to having been made aware of the Receiver's position as early as mid-2003. (See D.I. 61, Exh. A at 139-140.)

17

## 2. Decision

In the Court's view, genuine issues of material fact remain that preclude summary judgment on Lynch's fraud claim. For instance, although it is clear that Cox told Lynch at an early stage that the Bank of Scotland and Receiver did not want Lynch involved in the management buyout, there remains a genuine issue of fact as to whether this was, in fact, the actual position of the Bank and Receiver. As counsel for Lynch noted during oral argument, there is only one document in which the Receiver himself takes the position that the Bank would not allow Lynch to be involved in the Coinmaster USA management team. (See D.I. 78 at 42:9-18; D.I. 70 at B256-B257.) However, this e-mail was not prepared until August 6, 2004, long after Cox had already acquired the Coinmaster USA stock from the Receiver without Lynch. Furthermore, the Receiver appears to have sent this e-mail in response to an e-mail from Cox specifically requesting that he contact Lynch to explain that "there is no way that the Bank of Scotland will accept him as a Director of the business, or for him to have a presence in the business in any other way . . . ." (D.I. 70 at B254-B254.)

Likewise, Lynch has pointed to a November 10, 2003 e-mail from Cox to Lynch in which Cox tells Lynch that "[The Receiver] doesn't like our deal for you to go! He thinks its way too expensive. That is, you should go at much lower cost!

18

(Preferably no cost, and recovery of what we've already paid you!)." (D.I. 69 at B232.) However, in the Court's view, a legitimate dispute remains as to whether this was, in fact, the Receiver's position. Indeed, Cox's November 10, 2003 e-mail to Lynch appears to be an effort to summarize the contents of an earlier November 10, 2003 e-mail from the Receiver to Cox. (See id. at B230-B231.) However, on reviewing this e-mail, the Court sees no clear indication that the Receiver was in fact aggressively seeking to reduce the cost of Lynch's buyout in the manner Lynch described. Furthermore, Defendant does not appear to dispute that there was never a confidentiality agreement prohibiting Cox from disclosing the substance of his communications with the Receiver, (see D.I. 71 at 7), yet it is clear that Cox nevertheless told Lynch that this was the case. (See D.I. 69 at B204.) In these circumstances, the Court finds that there remains a genuine issue of material fact as to whether Cox was misleading Lynch as to the nature and substance of the buyout negotiations with the Receiver. Accordingly, the Court will deny Defendants' Motion with respect to Lynch's fraud claim.

### D. Whether Defendant Is Entitled To Summary Judgment On Lynch's Deceptive Trade Practices Claim Pursuant to 6 Del. C. § 2531 And The Common Law

Lynch alleges that he was damaged by (1) Cox's false representations that the Receiver required Lynch to resign from Coinmaster USA, (2) Cox's forgery of Lynch's signature on a

19

business application, and (3) Cox's false representations to the Receiver that Lynch had resigned from Coinmaster. (See D.I. 1, Exh. A at ¶¶ 32-36.) Based on this alleged conduct, Lynch raises a claim both for statutory deceptive trade practices pursuant to 6 Del. C. § 2531 and also for unfair competition pursuant to the common law. The Court will consider each claim in turn.

**1. Lynch's Statutory Deceptive Trade Practices Claim**

"To sustain an action under the [Deceptive Trade Practices Act], the plaintiff must assert a basis for injunctive relief and without it, there is no standing for a cause of action under the UDTPA." Irgau v. Christiana Care Health Servs., No. 07C-11-180-JOH, 2008 Del. Super. LEXIS 129, at *11 (Del. Super. Ct. Apr. 9, 2008); see also Lony v. E.I. Du Pont de Nemours & Co., 821 F. Supp. 956, 962 (D. Del. 1993) ("Lony could not seek injunctive relief nor have they attempted to seek such relief. Thus . . . Lony lacks standing to seek relief under the Delaware statute."); HSMY, Inc. v. Getty Petroleum Mktg., 417 F. Supp. 2d 617, 623 (D. Del. 2006) ("[A]ll harm from any alleged deception by Defendant occurred in the past. Furthermore, Lynch is not seeking an injunction; it only seeks the treble damages of § 2533(c). Accordingly, the Court will grant Defendant's Motion To Dismiss The Complaint as it relates to Lynch's claim under the DTPA."); Grand Ventures v. Whaley, 632 A.2d 63, 70 n.2 (Del. 1993) ("Standing under the Act flows from the nature of the wrong and

20

that it is, or was, amenable to injunctive relief because of unreasonable interference with another's business interests or relationships protected by the DTPA. Without this basic predicate to standing, a claim for damages cannot be sustained on an independent basis . . . .").

Though the parties have not raised the issue of standing, the Court is obligated to address it sua sponte. See, e.g., Boeing Co. v. Van Gemert, 444 U.S. 472, 488 n.4 (U.S. 1980). All of the alleged misrepresentations by Cox and the alleged forgery took place between five and six years ago, and there is no indication that they are ongoing or could resurface in the future. As such, there is also no indication that Lynch could reasonably seek injunctive relief through his statutory deceptive trade secret practices claim, and, indeed, Lynch's Complaint does not purport to seek injunctive relief. Accordingly, the Court will dismiss Lynch's statutory deceptive trade practices claim for lack of standing. Defendants' Motion For Summary Judgment on this claim will thus be denied as moot.

## 2. Lynch's Common Law Unfair Competition Claim

Lynch's common law unfair trade practices claim is, like his statutory claim, based on both alleged misrepresentations by Cox and also Cox's alleged forgery of Lynch's name on a business application. "The elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a

21

valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1057 (Del. Super. Ct. 2001). With respect to Lynch's unfair competition claim based on Cox's misrepresentations to Lynch and the Receiver, Defendants explained at oral argument that their Motion For Summary Judgment relies on the arguments they put forth for Lynch's fraud claim (i.e., that Cox kept Lynch fully and accurately informed of all details of the negotiations between Cox and the Receiver.) (See D.I. 78 at 19:20-21:4.) As explained above, however, the Court concludes that issues of fact remain as to whether Cox misled Lynch in a manner that ultimately harmed him. See supra Part II.C.2 of this Memorandum Opinion. Accordingly, the Court will deny Defendants' Motion with respect to Lynch's common law unfair trade practices claim to the extent it seeks relief for any alleged misrepresentations by Cox.

With respect to Lynch's common law unfair competition claim based on forgery, however, the Court reaches a different result. As set forth above, to succeed on a claim for common law unfair competition, the plaintiff must show harm. See Total Care Physicians, 798 A.2d at 1057. However, Lynch admitted at deposition that he was not damaged by the alleged forgery. (See D.I. 61, Exh. A at 226:1-2 (Lynch responds to a question about

22

how he was damaged with the statement "[f]inancially, I don't think I was").) Furthermore, at oral argument, counsel for Defendants specifically argued that Lynch could not prove damages. (See id. 21:13-22:13.) In response, Counsel for Lynch failed to identify any harm suffered by Lynch, financial or otherwise. (Id. at 43:3-5 ("Mr. Cox may be correct that there aren't a lot of damages in this situation).) Thus, based on a failure to identify any evidence of harm flowing from the alleged forgery, the Court will grant Defendants' motion to dismiss Lynch's unfair competition claim to the extent it is based on forgery. In addition, at oral argument, counsel for Lynch explained that his forgery claim was brought pursuant to the Deceptive Trade Practices statute, ostensibly because this does not require a showing of damages. (See D.I. 78 at 42:24-43:9 ("Your Honor, that claim is brought under the Deceptive Trade Practices Act. We're not required to prove damages.").) However, for the reasons stated above, the Court has concluded that Lynch does not have standing to bring a claim pursuant to the Deceptive Trade Practices statute, providing an additional basis for dismissing any of Lynch's complaints based on forgery. Accordingly, the Court will grant Defendants' Motion For Summary Judgment on both Lynch's common law and statutory deceptive trade practices claim to the extent they are based on forgery.

**D.   Whether Defendants Are Entitled To Summary Judgment On Lynch's Intentional Interference With Prospective Business Relations Claim**

Lynch's intentional interference claim is, like his deceptive trade practices claim, based on alleged misrepresentations by Cox and the alleged forgery of Lynch's name on a business application. "To sustain a claim for intentional interference with prospective contractual relations, a plaintiff must establish: (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with the opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of defendant's privilege to compete or protect his business interests in a fair and lawful manner." Lipson v. Anesthesia Servs., P.A., 790 A.2d 1261, 1285 (Del. Super. Ct. 2001) (citations omitted).

Because Lynch has admitted that he was not damaged by any alleged forgery and because he has produced no evidence to otherwise suggest that he was damaged, the Court will grant Defendants' Motion For Summary Judgment on Lynch's intentional interference claim to the extent it is based on forgery. However, as explained above, the Court finds that genuine issues of fact remain as to whether Cox misled Lynch, to his detriment, regarding the buyout negotiations with the Receiver. Accordingly, the Court will deny Defendants' Motion For Summary

Judgment on Lynch's intentional interference claim in all other respects.

### E. Whether Lynch And AutoGaming Are Entitled To Summary Judgment On Defendants' Counterclaims

#### 1. Background

After the Receiver took control of Coinmaster LTD and Coinmaster PLC and began the liquidation process, Cox and Lynch formed High View, Inc. ("High View"), with each being 50% shareholders and Directors. Lynch and Cox ostensibly formed High View as a means of continuing the work they had begun at Coinmaster USA. (See D.I. 59, Exh. E; D.I. 79 at 11:20-24.) In October 2003, High View contracted with ML Solutions, Ltd. ("ML Solutions"), which appears to be an independent development company in the casino gaming industry, for ML Solutions to provide High View with technical support, system testing, and new product development. (See D.I. 70 at B286-B288.) At roughly the same time, High View and ML Solutions entered into a Retention Of Title Agreement that gave ML Solutions the "right to dispose of any hardware-software to recover any or all outstanding monies due" from High View. (Id. at B288.)

In July, 2004, after Cox and Lynch had their falling out, Cox and Coinmaster USA declined to continue cooperating with High View. (See D.I. 69 at B211; D.I. 70 at B259-B261.) Lynch thus left High View to form a new company, AutoGaming. At this time, High View had three unpaid invoices to ML Solutions totaling

25

$14,687.03 for work that ML Solutions did creating certain hardware and software for High View. (See D.I. 70 at B462-B465.) Pursuant to the Retention Of Title Agreement, ML Solutions sold this hardware and software to AutoGaming.

## 2. The Parties' Contentions

All of Defendants' Counterclaims are based on the allegation that Lynch absconded with High View assets, specifically, the hardware and software that ML Solutions developed for High View. Lynch contends that these claims fail on summary judgment because there is no evidence that he or AutoGaming converted High View assets and that, rather, AutoGaming legitimately purchased the property from ML Solutions pursuant to the Retention of Title Agreement. (D.I. 79 at 7-8.)

Defendants respond that Lynch manipulated High View's relationship with ML Solutions by, among other things, misrepresenting to ML Solutions that the agreement between High View and ML Solutions had been terminated and that ML Solutions should thus sell all the assets developed for High View to AutoGaming. (D.I. 72 at 6.) With respect to Lynch's position that the Retention of Title Agreement allowed ML Solutions to sell assets to Auto Gaming, Defendants note that the contract for ML Solutions to provide services to High View contained an integration clause stating that the contract constituted "the entire Agreement between the parties." (D.I. 72 at 6.) Thus,

according to Defendants, the Retention of Title Agreement is an invalid amendment to an earlier contract that otherwise fully governed the relationship between High View and ML Solutions.

### 3. Decision

In the Court's view, Defendants have raised enough evidence of possible wrongdoing by Lynch such that summary judgment is unwarranted. In particular, Mike Lerwill, the principal of ML Solutions, testified at deposition that Lynch negotiated for his services, drafted the relevant agreements, handled his payment, informed him that the High View agreement had been terminated, and further informed him that he should sell the assets developed for High View to AutoGaming. (See D.I. 70 at B464, B472-B474, B476-B478, B493-B494.) Lerwill further stated that he knew CMUSA had paid for some of the work he had done for High View. (Id. at B482-B483, B492.) In addition, Cox testified at deposition that he did not know invoices were unpaid and that he believed ML Solutions had, in fact, been paid in full. (D.I. 72, Exh. 2 at In light of this evidence, the Court finds that the factual question of whether Lynch manipulated the arrangement between High View and AutoGaming so that Cox and CMUSA would pay for product development that Lynch could later acquire on his own remains open. In addition, neither in briefing nor at oral argument did Lynch or Auto Gaming respond to Defendants' argument regarding the integration clause in the agreement between High

View and AutoGaming. (<u>See</u> D.I. 68 at 7-8; D.I. 74 at 6-7; D.I. 78 at 47:2-48:18.) Accordingly, the Court will deny Lynch's and AutoGaming's Motion For Summary Judgment on Defendants' Counterclaims.

## III. Conclusion

For the reasons discussed, the Court will grant in part and deny in part Defendants' Motion For Summary Judgment (D.I. 60), and the Court will also grant in part and deny in part Lynch's and AutoGaming's Motion For Summary Judgment (D.I. 67). Specifically, with respect to Lynch's claims for intentional interference with prospective business relations and deceptive trade practices, the Court will grant Defendants' Motion to the extent Lynch's claims are based on forgery. In addition, the Court will dismiss Lynch's statutory deceptive trade practices claim for lack of standing. The Court will deny Defendants' Motion in all other respects. With respect to Lynch's claim for breach of contract, the Court will grant Lynch's Motion For Summary Judgment, except to the extent it seeks outstanding monthly pay. The Court will deny Lynch's and AutoGaming's Motion For Summary Judgment in all other respects.

The outstanding claims in this case are as follows. Lynch has outstanding claims for breach of contract (but only to the extent he seeks outstanding monthly pay), common law unfair competition, intentional interference with prospective business

relations, and fraud. However, Lynch may not continue to assert claims for unfair competition and intentional interference to the extent these claims are based on alleged acts of forgery by Cox. With respect to Plaintiff's breach of contract claim, the Court will resolve the amount of damages to which Lynch is entitled at a hearing to be set by separate Order. With respect to Defendants, the net result of this Memorandum Opinion is that their Counterclaims remain fully intact.